JUDGE STEIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARTHUR E. LANGE and ARTHUR C. LANGE, Individually and on Behalf of All Others Similarly Situated,

        Plaintiffs,

v.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY; OPPENHEIMER ACQUISITION CORPORATION; TREMONT GROUP HOLDINGS, INC.; RYE INVESTMENT MANAGEMENT GROUP; HARRY HODGES; RYE SELECT BROAD MARKET PRIME FUND, L.P.; RYE SELECT BROAD MARKET FUND, L.P.; and TREMONT PARTNERS, INC.

        Defendants.

08 CIV 11117

JURY TRIAL DEMANDED

"ECF Case"



RECEIVED DEC 22 2008 U.S.D.C. S.D.N.Y. CASHIERS

---

## CLASS ACTION COMPLAINT

Andrew J. Entwistle, Esq. (AE-6513)
Stephen D. Oestreich, Esq. (SO-8933)
Robert N. Cappucci, Esq. (RC-2193)
Richard W. Gonnello, Esq. (RG-7098)
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue
26th Floor West
New York, New York 10017
Telephone: (212) 894-7200

*Attorneys for Arthur E. Lange and Arthur C. Lange*

Plaintiffs, Arthur E. Lange and Arthur C. Lange, individually and on behalf of all others similarly situated, allege the following upon information and belief (except as to allegations specifically pertaining to Plaintiffs that are based on personal knowledge) based upon the investigation conducted by and under the supervision of Plaintiffs' counsel, which included reviewing and analyzing information and financial data obtained from numerous public and proprietary sources (such as LEXIS NEXIS, Dow Jones, and Bloomberg), filings with the Securities and Exchange Commission (the "SEC"), press releases, published interviews, news articles, and other media reports.

## I. INTRODUCTION

1. As splashed across the front pages of newspapers around the world, Bernard L. Madoff ("Madoff"), through the eponymous Bernard L. Madoff Investment Securities LLC ("BMIS"), pulled off the largest Ponzi scheme in history.  Over the course of many years, Madoff conducted a classic Ponzi scheme whereby he paid returns to early investors with money raised from new investors through what was effectively the largest hedge fund in the world.  The F.B.I. arrested Madoff on December 11, 2008; and he was charged with violating federal securities laws in connection with his crimes.[1]

2. Madoff organized his scheme so that funds of funds ("FOFs") -- namely, hedge funds that invest in other hedge funds -- set up private label funds that Madoff secretly ran for them.  Although Madoff's now infamous "split-strike conversion strategy" purportedly yielded unparalleled results, he only charged trading commissions in return, which in turn allowed the

---

[1] Attached hereto as Exhibits A and B, respectively, are:  (i) a copy of the criminal complaint captioned *United States of America v. Bernard L. Madoff*; and (ii) a copy of the civil complaint captioned *Securities and Exchange Commission v. Bernard L. Madoff, Bernard L. Madoff Investment Securities LLC*.  The allegations contained in the complaints are incorporated by reference herein.

FOFs to charge investors exorbitant fees. Blinded by the lure of easy money, the FOFs and related third parties, like the Defendants in this action, completely and utterly failed to investigate and monitor Madoff's and BMIS's activities. As a result of this misconduct, and as explained more fully below, investors such as the Plaintiffs suffered billions of dollars in losses.

## II.  JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A).

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial part of Defendants' conduct giving rise to the causes of action occurred in this District.

## III.  PARTIES

**A.  Plaintiffs**

5. Arthur E. Lange ("AEL") is a resident of the state of Connecticut. AEL invested in the Rye Select Broad Market Prime Fund, L.P. (the "Prime Fund") after being advised to do so by Harry Hodges ("Hodges"), his investment advisor at Rye Investment Management Group ("Rye"). AEL invested a substantial sum in the Prime Fund, and his investment is now worthless.

6. Arthur C. Lange ("ACL") is a resident of the state of New York. ACL invested in the Prime Fund after being advised to do so by Hodges, his investment advisor at Rye. ACL invested a substantial sum in the Prime Fund, and his investment is now worthless.

**B.  Defendants**

7. Massachusetts Mutual Life Insurance Company ("MassMutual") is incorporated under the laws of the Commonwealth of Massachusetts, and its principal place of business is 1295 State Street, Springfield, Massachusetts.

8. Oppenheimer Acquisition Corporation ("Oppenheimer") is incorporated under the

laws of the state of Delaware, and its principal place of business is 2 World Financial Center, 225 Liberty Street, 11th Floor, New York, New York.  Oppenheimer is a subsidiary of MassMutual.

9. Tremont Group Holdings, Inc. ("Tremont") is incorporated under the laws of the State of Delaware, and its principal place of business is 555 Theodore Fremd Avenue, Rye, New York.  Tremont is a New York-based investment services provider that specializes in hedge funds, and manages a total of $5.8 billion.  Tremont has made hundreds of millions of dollars peddling funds run by Madoff through BMIS.

10. Since 2001, Oppenheimer continuously knew of Tremont's direct relationship with Madoff and his questionable operations.

11. In 2001, Oppenheimer acquired Tremont as a subsidiary.  In connection with its acquisition of Tremont, Oppenheimer conducted at least three days of due diligence at BMIS's office in New York, examining, *inter alia*, BMIS's books and records, documents reflecting Madoff's split-strike strategy, and the scale of BMIS's operations.

12. As a consequence of this due diligence and otherwise, Oppenheimer was aware at least as early as 2001, and continued to be aware, of numerous indicators of fraud that would have alarmed any investor of ordinary prudence that BMIS was very likely running a Ponzi scheme.

13. Rye Investment Management Group is a division of Tremont, and its principal place of business is 555 Theodore Fremd Avenue, Suite C-300, Rye, New York.  Rye is the division within Tremont that develops, manages, and promotes the firm's platform of select manager funds.

14. Harry Hodges was Vice President of Investor Services at Rye, and is a resident of

New York. Hodges served as an investment advisor to the Plaintiffs. Hodges advised and invested Plaintiffs' assets in the Prime Fund and never advised them to redeem their holdings.

15. Rye Select Broad Market Prime Fund, L.P. (the "Prime Fund") is a Delaware limited partnership, and its principal place of business is 555 Theodore Fremd Avenue, Suite C-300, Rye, New York. The Prime Fund launched on May 23, 1997, and its investment objective was to seek long-term capital growth. Unbeknownst to investors, the Prime Fund was run by Madoff through BMIS.

16. Tremont Partners, Inc. ("Tremont Partners") is incorporated under the laws of the State of Connecticut and its principal place of business is 555 Theodore Fremd Avenue, Rye, New York. Tremont Partners is the Prime Fund's General Partner and Investment Manager. Tremont Partners purportedly allocated the Prime Fund's investment portfolio to advisors with conservative investment styles, demonstrated over a prolonged period of time and under all economic and market conditions, who have the ability to achieve consistent returns. The Prime Fund's portfolio was purportedly invested in a "split-strike synthetic conversion" options trading strategy in connection with approximately 50 large-cap stocks that were hedged with equity index options. Tremont Partners received compensation for serving as General Partner of the Prime Fund, including a Management Fee of 1.5% and a percentage of gains made by investors in the Prime Fund.

17. Rye Select Broad Market Fund, L.P. is a Delaware limited partnership (the "Market Fund") (collectively with the Prime Fund, the "Rye Funds") and its principal place of business is 555 Theodore Fremd Avenue, Suite C-300, Rye, New York. The Market Fund launched on May 1, 1994, and its investment objective was to seek long-term capital growth. Tremont Partners is the Market Fund's General Partner and Investment Manager. Tremont

4

Partners received compensation for serving as General Partner of the Market Fund, including a Management Fee of 1% and a percentage of gains made by investors in the Market Fund. Tremont Partners purportedly allocated the Market Fund's investment portfolio to advisors with conservative investment styles, demonstrated over a prolonged period of time and under all economic and market conditions, who have the ability to achieve consistent returns.  The Market Fund's portfolio was invested in a "split-strike synthetic conversion" options trading strategy in connection with approximately 50 large-cap stocks that were hedged with equity index options. Unbeknownst to investors, the Market Fund was run by Madoff through BMIS.

18. The primary difference between the Rye Funds is that the Prime Fund used leverage (*i.e.*, borrowed funds) to enhance its rate of return whereas the Market Fund did not. The additional rate of return allowed the Prime Fund to charge higher fees than the Market Fund.

## IV.     SUMMARY OF THE ACTION

19. In investing the assets of the Plaintiffs and other member of the Class (as defined below) in the Rye Funds, Defendants Tremont, Rye, and Hodges breached their fiduciary duties by failing to conduct adequate due diligence and/or ignoring numerous red flags that would have alerted an investor of ordinary prudence that Madoff was running a Ponzi scheme through BMIS. The numerous warnings signs (the "Red Flags"), included but are not limited to the following:

- *Suspect Strategy:*  The description of Madoff's split-strike strategy (*e.g.*, purchase of large cap stocks versus sale of out of the money calls) appeared to be inconsistent with the pattern of returns in the track record, which showed only seven small monthly losses in a 14 year period. Moreover, the strategy's returns could never be replicated by quantitative analysts that attempted to do so.  Michael Markov, a hedge fund consultant, said that he was hired by a fund two years ago to look into one of the FOFs' returns and found that it was "statistically impossible to replicate them."

- *Suspect Market-Timing:*  Account statements revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve with the consistency reflected in

5

the documents.

- *Impossible Options Volumes:* Trading volumes reflected in accounts were vastly in excess of actually reported trading volumes. In particular, the S&P100 options that Madoff purported to trade could not handle the size of the combined FOFs' assets. A report from Bloomberg estimated that the strategy would have required at least 10 times the S&P100 option contracts that traded on U.S. exchanges.

- *No Standalone Hedge Fund:* Madoff operated through managed accounts, rather than by setting up a hedge fund of his own, where his fees would have been much higher than the brokerage commissions that Madoff was charging. This is particularly suspicious because a hedge fund requires annual audits. FOF auditors, on the other hand, only review the account statements and transaction reports generated by the brokerage firm, and would not investigate the brokerage firm (*i.e.*, BMIS).

- *Cash Positions:* BMIS liquidated its securities positions at the end of each quarter, presumably to avoid reporting large securities positions.

- *Lack of a Third Party Custodian and Administrator:* The FOFs had recognized administrators and auditors, but substantially all of the assets were in the custody of BMIS. Moreover, BMIS initiated trades in the accounts, executed the trades, and served as custodian and administrator for the accounts.

- *Obscure and Ill-Equipped Auditor:* BMIS was audited by Frielingh & Horowitz, which had three employees, of which one was 78 years old and living in Florida, one was a secretary, and the other was an active 47-year old accountant, whose office in Rockland County, New York was 13 feet by 18 feet.

- *Audit Reports:* Audit reports of BMIS showed no evidence of customer activity whatsoever, with neither accounts payable nor accounts receivable from customers. BMIS appeared to be nothing more than a market maker -- not a firm with $17 billion in customer accounts.

- *Former Employees Noted Secrecy:* Former employees stated that a high degree of secrecy surrounded the accounts of the FOFs.

- *Family Run Operation:* Key positions at BMIS were controlled by Madoff family members (Madoff's brother, two sons, and niece).

- *Lack of Electronic Access:* BMIS was supposedly technologically advanced but FOFs did not have electronic access to their accounts at BMIS. Paper documentations provided Madoff with the ability to manufacture trade tickets that confirm investment results, and to falsify

6

supporting documentation.

20.     In light of these Red Flags surrounding BMIS's operations, one firm that conducts due diligence for potential investors explained, "Taken together, these were not merely warning lights, but a smoking gun.  The only plausible explanation we could conceive was that [BMIS] account statements and trade confirmation were not bona fide but were generated as part of some fraudulent or improper activity."

21.     Indeed, as summed up by Harry Markopolos, who actually reported Madoff and BMIS to the SEC, "If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all of the industry rankings.  Name one mutual fund company, Venture Capital firm, or LBO firm which doesn't brag about the size of their largest funds' assets under management.  Then ask yourself, why would the world's largest hedge fund manager be so secretive that he didn't even want his investors to know that he was investing their money?  Or is it that [Madoff] doesn't want the SEC and [the Financial Services Authority] to know that he exists?"

22.     Tremont, Rye, and Hodges also breached their fiduciary duties to Plaintiffs and other Class Members by investing approximately $3.1 billion of Class Member assets in the Rye Funds, which used a *single undisclosed* investment advisor.  By putting all of the Class's eggs in one basket, so to speak, Tremont, Rye, and Hodges did not act as a reasonably prudent investor would have.

## V.     CLASS ACTION ALLEGATIONS

23.     Plaintiffs bring this class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the Class consisting of all investors in the Rye Funds who had not redeemed their interests in the Fund as of December 11, 2008 (the "Class").  Excluded from the Class are the Defendants herein and any person, firm, trust,

7

corporation, or other entity related to or affiliated with any of the Defendants, BMIS, Madoff, and any other members of the Madoff family.

24. Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Class members remains unknown at this time, Plaintiffs believe that there are hundreds of members of the proposed Class.

25. Plaintiffs' claims are typical of the other members of the proposed Class in that Plaintiffs and the other Class members invested in the Rye Funds and maintained their investments in the Rye Funds as a result of the advice of Tremont, Rye, and Hodges, all of whom owed fiduciary duties to Plaintiffs and the members of the proposed Class. Plaintiffs and other Class members sustained damages due to the same breaches of fiduciary duties owed to the Class by Tremont, Rye, and Hodges.

26. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel that is competent and experienced in class action and shareholder litigation.

27. A class action is superior to other methods for the fair and efficient adjudication of the Class claims herein asserted. Moreover, the questions of law and fact common to the Class predominate over questions, if any, relating to individual Class Members. Common questions of law and fact include, but are not limited to, whether Tremont, Rye, and Hodges breached fiduciary duties to Plaintiffs and the Class by, among other things:

- Failing to conduct adequate due diligence and/or ignoring numerous Red Flags when investing Class member assets in the Rye Funds; and

- Investing Class member assets in the Rye Funds, which used a *single undisclosed* investment advisor.

28. In addition, there are common questions of law and fact regarding whether the Rye Funds and Tremont Partners aided and abetted the breach of fiduciary duties by Tremont, Rye, and Hodges.

8

## VI.     CAUSES OF ACTION

### COUNT I
### (AGAINST TREMONT, RYE, AND HODGES FOR FIDUCIARY DUTY BREACHES)

29. Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

30. Plaintiffs bring this Count against Defendants Tremont, Rye, and Hodges for breaching their fiduciary duties to Plaintiffs and other members of the Class.

31. Tremont, Rye, and Hodges breached their fiduciary duties by investing the assets of Plaintiffs and other Class members in the Rye Funds while failing to perform adequate due diligence and/or in spite of all of the Red Flags.

32. Tremont, Rye, and Hodges breached their fiduciary duties by investing the assets of Plaintiffs and other Class Members in the Rye Funds, which used a single undisclosed investment advisor.

33. Plaintiffs and other Class Members have suffered damages proximately caused by the fiduciary duty breaches of Tremont, Rye, and Hodges in an amount to be proven at trial.

34. Moreover, Defendants Tremont, Rye, and Hodges are liable for, and Plaintiffs and other Class Members are entitled to, punitive damages in an amount also to be determined at trial attributable to conduct by Tremont, Rye, and Hodges that was reckless, willful, wanton, and without regard to the rights of Plaintiffs and other Class Members.

### COUNT II
### (AGAINST THE RYE FUNDS, TREMONT PARTNERS, AND HODGES FOR AIDING AND ABETTING FIDUCIARY DUTY BREACHES)

35. Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

36. Plaintiffs bring this Count against the Rye Funds and Tremont Partners for aiding

9

and abetting the fiduciary duty breaches by Tremont, Rye, and Hodges detailed above.

37. Plaintiffs also bring this Count against Hodges for aiding and abetting the fiduciary breaches by Tremont and Rye.

38. The Rye Funds and Tremont Partners had actual knowledge of the fiduciary duty breaches by Tremont, Rye, and Hodges, and substantially assisted them in those breaches.

39. Hodges had actual knowledge of the fiduciary duty breaches by Tremont and Rye.

40. Plaintiffs and other Class Members suffered damages proximately caused by the Rye Funds' and Tremont Partners' aiding and abetting of the fiduciary duty breaches of Tremont, Rye, and Hodges in an amount to be proven at trial.

41. Plaintiffs and other Class Members suffered damages proximately caused by Hodges' aiding and abetting of the fiduciary duty breaches of Tremont and Rye in an amount to be proven at trial.

## COUNT III
## (AGAINST MASSMUTUAL, OPPENHEIMER, AND TREMONT PARTNERS FOR UNJUST ENRICHMENT)

42. Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

43. As a result of the misconduct detailed herein, the Rye Funds have been rendered worthless, yet MassMutual, Oppenheimer, and Tremont Partners reaped substantial dividends, fees, and other pecuniary benefits at the expense of Plaintiffs and other Class members.

44. MassMutual, Oppenheimer, and Tremont Partners have therefore been unjustly enriched and equity and good conscience require that these defendants disgorge to the Plaintiffs and the Class all such unjust enrichment in an amount to be determined at trial.

## COUNT IV
## (AGAINST OPPENHEIMER FOR AIDING AND ABETTING FIDUCIARY DUTY BREACHES)

45.     Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

46.     Plaintiff brings this Count against Oppenheimer for aiding and abetting the fiduciary duty breaches of Tremont and Rye.

47.     In connection with its due diligence in 2001 and continuing thereafter through 2008, Oppenheimer had actual knowledge of the Red Flags and the relationship between Tremont and BMIS.  With that knowledge, Oppenheimer knew of the fiduciary duty breaches by Tremont, Rye, and Hodges or was willfully blind to substantial evidence of such breaches.

48.     Oppenheimer substantially assisted the fiduciary duty breaches of Tremont and Rye, and Hodges.

49.     Plaintiffs and other Class Members suffered damages proximately caused by Oppenheimer's aiding and abetting of the fiduciary duty breaches of Tremont and Rye's in an amount to be proven at trial.

### VII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment:

A.     Determining that this action is a proper class action, and certifying Plaintiffs as representatives under Fed. R. Civ. P. 23.

B.     Awarding compensatory damages against Defendants in favor of Plaintiffs and the Class for damages sustained as a result of Defendants' wrongdoing together with interest thereon;

C.     Awarding prejudgment interest;

D.     Awarding punitive damages as appropriate;

E.  Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including but not limited to disgorgement);

F.  Awarding Plaintiffs and the Class their costs and disbursements of this suit, including reasonable attorneys' fees, accountants' fees, and experts' fees; and

G.  Awarding such other and further relief as may be just and proper.

### VIII.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: December 22, 2008

ENTWISTLE & CAPPUCCI LLP

Andrew J. Entwistle, Esq. (AE-6513)
Stephen D. Oestreich, Esq. (SO-8933)
Robert N. Cappucci, Esq. (RC-2193)
Richard W. Gonnello, Esq. (RG-7098)
280 Park Avenue
26th Floor West
New York, New York 10017
Telephone: (212) 894-7200

*Attorneys for Arthur E. Lange and Arthur C. Lange,*

12