UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED

09 APR 20  PM 11: 52

U.S. DISTRICT COURT
S.D.N.Y.

———————————————————— x
In re TREMONT SECURITIES LAW, STATE :
LAW AND INSURANCE LITIGATION
———————————————————— :
                                    :
This Document Relates To:           :
                                    :
INSURANCE ACTION, 09-Civ-557.       :
                                    :
                                    :
                                    :
                                    :
                                    :
                                    :
                                    :
                                    :
                                    :
                                    :
———————————————————— x

Master Docket No. 08-Civ-11117(TPG)

CLASS ACTION

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT FOR COMMON
LAW FRAUD, BREACH OF FIDUCIARY
DUTY, NEGLIGENT
MISREPRESENTATION,  GROSS
NEGLIGENCE , UNJUST ENRICHMENT,
AIDING AND ABETTING, INJUNCTIVE
RELIEF, PROMISSORY ESTOPPEL AND
VIOLATIONS OF NEW YORK GENERAL
BUSINESS LAW §349

Plaintiffs Chateau Fiduciaire S.A., as Trustee of The Map Trust, The Geoffrey Rabie Credit Shelter Trust, The Joanne Brenda Rabie Credit Shelter Trust, The Harriet Rutter Klein Revocable Trust and the Matthew L. Klein Irrevocable Family Trust (collectively, "Plaintiffs") bring this action on behalf of themselves and all persons or entities that purchased and/or held variable universal life ("VUL") insurance policies or deferred variable annuities ("Policies") issued by Tremont International Insurance Limited ("TIIL") or Argus International Life Bermuda Ltd. ("Argus Intl") and managed by Tremont Capital Management or Rye Investment Management from May 10, 1994 through December 11, 2008 (the "Class" and the "Class Period"). This action is filed against Defendants for fraud, breach of fiduciary duty, negligent misrepresentation, gross negligence, unjust enrichment, aiding and abetting, injunctive relief, promissory estoppel and violations of New York General Business Law §349 for damages caused to Plaintiffs and the Class.

## NATURE OF ACTION

1.      This case arises from massive breach of fiduciary duties by: (i) Argus, an offshore insurer that solicited and provided U.S. tax-advantaged variable life insurance or annuity policies to U.S. citizens; (ii) Tremont, which entrusted the assets of the "variable" portion of the policies with the Rye Funds (defined below) to Bernard L. Madoff ("Madoff") and/or Bernard L. Madoff Investment Securities LLC ("BMIS") without conducting reasonable due diligence; (iii) Tremont's parents, Oppenheimer and MassMutual (defined below), which, after Oppenheimer acquired Tremont in 2001, knew or recklessly disregarded that Tremont was investing the Policies with Madoff and/or BMIS for their own profit; and (iv) two auditing firms – Ernst & Young LLP ("Ernst & Young") and KPMG LLP ("KPMG") – for certifying the Rye Funds' financial statements despite the fact that there were no assets in the Policyholders' investment accounts. As detailed below, Plaintiffs and the Class lost most, if not all, of the value of their investment accounts and now seek

recovery from the wrongdoers who profited from Madoff's fraud. Plaintiffs also seek injunctive relief to prevent any lapse in their variable life insurance policies.

2.  The Madoff fraud, which has been described as the largest Ponzi scheme in history, has been headline news for the past four months, with losses estimated at $65 billion. As Madoff has admitted, he "paid investors with money that wasn't there."

3.  While the modest, but steady double-digit "returns" that Madoff offered to investors in both up and down markets were attractive to investors, there were numerous red flags that Defendants knowingly, recklessly and/or negligently ignored that could have alerted them to the fact that Madoff was running an illegitimate and illegal Ponzi scheme through BMIS.

4.  For example, Madoff's consistent double-digit returns and his investment strategy were unable to be replicated by rival fund managers, despite numerous attempts. Madoff's strategy as described in BMIS's quarterly reports and "Offering Memorandum," incorporated trades in both equity stocks and options using a "split-strike conversion" strategy. In basic terms, the strategy involved: (i) the purchase of equity shares in select companies that were included in the blue-chip Standard & Poor's 100 Index ("S&P Index"); (ii) the simultaneous sale of "call" options, which give the investor the right to buy a stock at fixed prices; and (iii) the purchase of "put" options, which allows the investor to sell a stock at fixed prices. The call options would, to some degree, limit any gains that would be earned on the underlying equity shares. Madoff claimed that, under the right market conditions, he could achieve steady returns regardless of whether the market as a whole had advanced or declined. Over time, Madoff claimed that he was using a larger "basket" of equity shares selected from the S&P Index, combined with put and call options on the S&P Index itself, rather than options on individual equity shares. These positions were held for a short period of time lasting from a week to two months, and then liquidated. Madoff claimed to execute this "split strike

conversion" strategy six to eight times per year. At some point, he purportedly began to exit the market at the end of every quarter and to put the funds in Treasury Bills, and, accordingly, the quarterly and annual statements to Madoff's clients showed only investments in Treasury Bills.

5.       In reality, however, this strategy was never implemented and Madoff merely paid certain senior investors with the investments received from other junior investors. Irving Picard, who has been appointed as the trustee by the bankruptcy court to oversee the liquidation of BMIS, has stated that he found no evidence that Madoff actually traded *any* stocks or options from 1996 to the present. In other words, Madoff did not make any trades for at least the past twelve years. On March 12, 2009, Madoff pleaded guilty to charges of securities fraud and admitted that he had not made trades for his investment management clients since at least the early 1990s. Instead, the investors' funds were placed in a Chase Manhattan Bank account, which Madoff used to cover the redemption transfers to other investors. The trade confirmations and account statements that investors received reflected fictitious gains to give the appearance that Madoff was executing the split strike conversion strategy, when, in fact, he was not.

6.       Additional "red flags" included:

(a)       the fact that Madoff offered consistent investment returns, beyond reasonable investment benchmarks, in both up and down markets;

(b)       the fact that there was a discrepancy between the trading activity in which Madoff claimed to be buying and selling puts and calls and the open interest of index option contracts;

(c)       the fact that BMIS was audited by a small accounting firm, Friehling & Horowitz, ("F&H") a storefront accounting firm in New City, N.Y. since 1991, as opposed to the 90% of single strategy hedge funds that are audited by one of the top 10 auditors;

(d)     the fact that Madoff did not employ any third party administrators and custodians; Madoff ran his own back office operations – *i.e.*, the calculation of net asset values, the preparation of account statements, etc.;

(e)     the fact that Madoff lacked transparency and limited access to his books and records, thereby maintaining a false appearance of exclusivity; and

(f)     the fact that Madoff admitted to illegally manipulating his accounting records by personally subsidizing returns in slow quarters in order to minimize risk and to maximize reported performance.

7.      Importantly, these and a multitude of other "red flags" were detected by many other investment advisors in the industry.  Indeed, many investment advisors, investment banks and pension funds – *i.e.*, JPMorgan Chase & Co., the Fort Worth pension fund and Acorn Partners – took the time and effort to conduct comprehensive and proper due diligence reviews,  and, as a result of these warning signs, chose to ***not*** invest with Madoff or any of his affiliated funds. In stark contrast, however, Defendants failed to even conduct a rudimentary due diligence review that would have alerted them to Madoff's fraudulent scheme.

8.      The Madoff fraud was perpetrated by a network of "feeder funds" that enabled Madoff to evolve from an ordinary asset manager for select individual clients to a wholesale manager of billions of dollars for thousands of fund investors.  Seven of Madoff's top feeder funds had $25 billion in assets invested with him.  The Tremont Defendants, as well as other known and unknown feeder funds, were unjustly enriched by receiving more than $790 million in management fees over the years for placing the Policies and other client investments with Madoff and/or BMIS.

9.      Ignoring the "red flags" identified above, the Tremont Defendants permitted the Rye Funds to act as "feeder funds" to Madoff by investing and/or permitting Plaintiffs' and the Class'

- 4 -

monies and/or the "variable" account portion of the Policies to be invested with Madoff and his affiliates. Defendants knowingly or recklessly provided investors with the option of investing in certain "Investment Accounts" without undertaking a comprehensive and proper due diligence review to assess the risks involved. For example, the Rye Select Broad Market Fund LP charged a 1% management fee and a 0.5% administration fee throughout the Class Period. The fund had a net asset value ("NAV") of $2.3 billion as of September 2008, and, at that NAV, the Tremont Defendants collected $34 million in fees in 2008 alone. The Rye Select Broad Market Portfolio Ltd. charged total fees of 1.95% of assets and held $1.2 billion as of September 2008. That level of assets would have brought in annual fees of $23.5 million. Upon information and belief, the Tremont Defendants unjustly collected over $300 million in management and administration fees throughout the Class Period for merely entrusting and/or re-depositing their clients' funds with a sub-manager – *i.e.*, Madoff and/or BMIS. This wanton conduct directly caused Plaintiffs and the Class to suffer losses.

10.     Upon information and belief, Madoff's role as the manager of the Rye Funds is concealed in all of Defendants Argus's and Tremont's documents. Plaintiffs and the Class were unaware that their funds were ultimately being invested with Madoff and/or his affiliates. Throughout the Class Period, Tremont's statements in the Rye Funds' offering documents and other documents, were false and misleading, and the lack of diversification of the Rye Funds' investment portfolios proved devastating.

11.     Each of the Rye Funds' offering memoranda included an extensive section on "Risk Factors" which covered a wide variety of investment strategies. There is no warning, however, about the largest risk that the Tremont Defendants took in the management of the Rye Funds, and the one that ultimately caused the Rye Funds to shut down: namely, entrusting a single sub-manager

with sole discretion over the custody and trading of the entire funds' net assets without having conducted even the most basic due diligence. None of the written materials distributed by the Tremont Defendants to investors properly disclosed the Madoff relationship and/or the fact that the Tremont Defendants were a mere feeder fund to Madoff.

12.     Plaintiffs and the Class hereby seek to recover damages as well as all fees and other amounts wrongfully paid to the Defendants. The management fees paid in error, and based on false information, should be returned to Plaintiffs and the Class. These avoidable losses were suffered as a direct result of Defendants' fraud, breach of fiduciary duty, aiding and abetting, violations of New York General Business Law §349, gross negligence, negligent misrepresentation, injunctive relief, unjust enrichment and promissory estoppel.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(d)(2)(A) and/or 28 U.S.C. §1332(d)(2)(B) and has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

14.     This Court has personal jurisdiction over Defendant AGH, Argus Intl and TIIL for the following reasons:

(a)     Defendants AGH, Argus Intl and TIIL have purposefully directed the marketing of their financial services at residents of this District;

(b)     Defendants AGH, Argus Intl and TIILs' representatives purposely and personally marketed the investments to investors located in this District;

(c)     Defendants TIIL sent insurance examiners to Plaintiffs and the Class residing in this District in order to conduct medical examinations and to assess the insurability of its potential policyholders residing in this District;

(d)     Defendants AGH, Argus Intl and TIIL received investment management services for their existing portfolios from Defendant Tremont, which maintains its principal place of business in this District, throughout the Class Period;

(e)     Defendant TIIL sent Plaintiffs and the Class marketing materials directly from Defendant Tremont's principal place of business located in this District; and

(f)     Defendant AGH also maintains a website accessible from this District, which markets and advertises the Policies to Plaintiffs and the Class and other potential policyholders located in this District.

15.     Venue is proper in this District because Defendants maintain their headquarters and principal place of business in this District and/or conduct substantial business in this District. Additionally, the Madoff fraud took place in this District and Defendants Tremont, Ernst & Young and KPMG LLP at all relevant times were headquartered in this District.

## PARTIES

**Plaintiffs**

16.     Plaintiff Chateau Fiduciaire S.A., a Swiss entity, was appointed trustee of The Map Trust in or about 2006. The Map Trust is a foreign discretionary trust set up on or before February 1997 for the benefit of the children of the late David Fine, including Mark Fine. In 2000, The Map Trust purchased a variable universal life insurance policy on the life of Mark Fine with an initial premium of $345,262 and a minimum death benefit of $6,360,000. The Map Trust was initially invested in the Tremont Broad Market Fund for the investment account portion of the policy. Later policy statements show that The Map Trust held Rye Select Broad Market Insurance Portfolio, LDC in its investment account. Substantial further sums were paid periodically so that the Policy had a reported cash value exceeding $2.6 million as of August 2008. The minimum annual premium for this policy was $100,000.

- 7 -

17.     Plaintiffs The Geoffrey Rabie Credit Shelter Trust and The Joanne Brenda Rabie Credit Shelter Trust purchased variable universal life insurance policies that were originally underwritten by Defendant TIIL in April of 1999, and were maintained by Defendant Argus Intl until January 2007, the year that Defendant Tremont Capital sold Defendant TIIL to Defendant AGH. The Geoffrey Rabie Credit Shelter Trust purchased a variable universal life insurance policy that offered a $3,363,338 death benefit and was financed with $650,000 of total initial premiums and was required to maintain a minimum annual premium of $100,000. The Joanne Brenda Rabie Credit Shelter Trust purchased a variable universal life insurance policy that offered a $3,578,198 death benefit and was financed with $650,000 of total initial premiums and was required to maintain a minimum annual premium of $100,000. The beneficiaries of the trusts were Geoffrey and Joanne Rabie and their children. The Geoffrey Rabie Credit Shelter Trust and The Joanne Brenda Rabie Credit Shelter Trust were originally invested in the Tremont Broad Market Fund, LDC, and were transferred in 2004 to the Rye Funds (defined below). The Geoffrey Rabie Credit Shelter Trust and The Joanne Brenda Rabie Credit Shelter Trust accounts were invested in Defendant Rye Select Broad Market Insurance Portfolio, LDC.

18.     Plaintiff The Harriet Rutter Klein Revocable Trust ("Harriet Klein Trust") is the owner of a deferred variable annuity purchased on or about June 16, 1998 from Defendant TIIL with an initial $500,000 annuity contribution. According to the initial policy documents, the Harriet Klein Trust was initially invested in the Tremont Broad Market Fund for the investment account portion of its defined variable annuity ("DVA"), but later policy statements show that it held Rye Select Broad Market Insurance Portfolio, LDC in its investment account. As of October 31, 2008, the deferred variable annuity had over $1.3 million in the investment account.

19.    Plaintiff The Matthew L. Klein Irrevocable Family Trust dated October 27, 1997 ("Matthew Klein Trust") is a discretionary trust set up on or about October 1997 for the benefit of Matthew L. Klein. On August 1, 1998, the Matthew Klein Trust purchased the VUL policy on the life of Matthew Klein with an initial premium of $40,000 and a minimum death benefit of $1,309,557. According to the initial policy documents, the Matthew Klein Trust was initially invested in the Tremont Broad Market Fund for the investment account portion of his VUL policy, but later policy statements show that the Matthew Klein Trust held Rye Select Broad Market Insurance Portfolio, LDC. Subsequently further sums were paid periodically so that the total premium paid on the policy was $200,000.

**The Argus Defendants**

20.    Defendant AGH is an insurance and financial services organization traded on the Bermuda Stock Exchange under the symbol "AGH" with its principal place of business located at The Argus Building, 12 Wesley Street, Hamilton HM 12, Bermuda. According to its website, "Argus provides a broad range of insurance, retirement and financial services to meet the needs of both businesses and individuals." Defendant AGH is the parent organization of Defendant Argus Intl and its predecessor Defendant TIIL, the company that originally issued and maintained the Policies held by Plaintiffs and the Class.

21.    Defendant Argus Intl is a Bermuda-based insurance company that specializes in the issuance of investment linked insurance contracts, which are designed to meet the multi-jurisdictional investment, tax, asset protection and estate planning requirements of the sophisticated high net worth individual. Defendant Argus Intl is a wholly owned subsidiary of Defendant AGH and is licensed and regulated by the Bermuda Monetary Authority. According to a press release dated November 16, 2006:

- 9 -

The Argus Group announced today that its subsidiary, Bermuda Life Insurance Company Limited (Bermuda Life), has achieved an agreement in principle to acquire Tremont International Insurance Limited (TIIL), the Bermuda-based insurer offering variable annuities and life insurance products with a focus on hedge fund investment strategies. Having actively pursued the international wealth management market for over a decade, this acquisition will position Argus as a leading offshore insurance provider in this area.   The Board of Directors of Bermuda Life approved the agreement to acquire TIIL and the parties are expected to conclude an agreement for the sale of TIIL's outstanding shares on or about November 30, 2006, pending regulatory approvals.

*          *          *

*While the prospective transaction will transfer to Bermuda Life all of the policy issuance and administration functions that comprise TIIL's business, Tremont will continue to provide investment management services to the existing TIIL policy portfolio. In addition, Tremont Capital Management will maintain its commitment as a leader in the investment management of insurance-dedicated hedge fund of funds portfolios.*

[Emphasis added.]

22.     Defendant TIIL is a Bermuda-based and Cayman Islands insurer and Defendant AGH purchased TIIL from Tremont Capital in January of 2008.

23.     Defendants AGH, Argus Intl and TIIL are collectively referred to herein as the "Argus Defendants."

**The Tremont Defendants**

24.     Defendant Tremont Group Holdings ("TGH") is the parent company of Defendant Tremont Capital Management (formerly Tremont Advisers), a fund of funds, and Defendant Tremont Partners, Inc. Defendant TGH has its principal place of business at 555 Theodore Fremd Avenue, Rye, New York, 10580. Defendant TGH manages roughly $6 billion in assets through its fund of hedge fund products and multi-manager portfolios, as well as its single-manager Defendant Rye Investment Management unit. Defendant TGH has offices in New York, Toronto, London, and Hong Kong and is owned by Defendant Oppenheimer Acquisition Corporation ("Oppenheimer"),

which is majority controlled by Defendant Massachusetts Mutual Life Insurance Co. ("MassMutual").

25.     Defendant Tremont Capital Management Inc. ("Tremont Capital") is a fund of hedge funds wholly owned by Defendant TGH. Defendant Tremont Capital has its principal place of business at 555 Theodore Fremd Avenue, Rye, New York, 10580. Defendant Tremont Capital provides investment services to Defendant AGH's clients.

26.     Defendant Tremont (Bermuda) Ltd. is wholly-owned by Defendant Tremont Capital and located at Tremont House, 4 Park Road, Hamilton, Bermuda. Defendant Tremont (Bermuda) Ltd. provides investment advisory services to multiple multi-manager offshore funds and also acts as the fund sponsor and administrator for a select group of offshore funds managed by Defendant TGH. Defendant Tremont (Bermuda) Ltd. was the investment manager of the Rye Select Broad Market Insurance Portfolio, LDC.

27.     Defendant Tremont Partners, Inc. ("Tremont Partners") is a wholly-owned subsidiary of Defendant TGH and its principal place of business is located in this Judicial District at 555 Theodore Fremd Avenue, Rye, New York, 10580.

28.     Defendant Rye Investment Management ("Rye") is a division of Defendant TGH that controlled assets of $3.1 billion, virtually all invested with Madoff. Defendant Rye has its principal place of business located at 555 Theodore Fremd Avenue, Rye, New York, 10580. Defendant Rye managed the Rye Select Funds, the family of funds that included the Rye Select Broad Market Fund L.P.

29.     Defendants Rye, TIIL, TGH, Tremont Capital, Tremont (Bermuda) Ltd., and Tremont Partners are collectively referred to herein as "Tremont" or the "Tremont Defendants"

30.     Defendant Rye Select Broad Market Fund L.P. ("Rye SBM Fund"), formerly known as the Tremont Broad Market Fund, LDC, is managed by Defendant Rye and was organized as a limited partnership in Delaware in 1994.  Defendant Tremont Partners is the general partner of the Rye SBM Fund.

31.     Defendant Rye Select Broad Market Insurance Portfolio, LDC is managed by Defendant Tremont (Bermuda) Ltd., and has its principal place of business located at 555 Theodore Fremd Avenue, Rye, New York, 10580.  Plaintiffs were invested in the Rye Select Broad Market Insurance Portfolio Fund LDC.

32.     Defendants Rye Select Broad Market Fund L.P. and Rye Select Broad Market Insurance Portfolio, L.D.C., are collectively referred to herein as the "Rye Funds."[1]

**The Individual Defendants**

33.     Defendant Sandra L. Manzke ("Manzke") was the founder of Tremont Partners and was its Chairman and Chief Executive Officer until April 2005, the co-Chief Executive Officer of the Tremont Group Holdings from 1994 until April 2005, and the Chairman of the Board and Co-Chief Executive Officer of Tremont Advisers, Inc. until 2001.  Manzke was also the Chairman of Tremont (Bermuda) Limited.  Prior to founding Tremont in 1984, Manzke was a principal of Rogers, Case & Barksdale, a pension consulting firm, where she spent six years.  She was also an investment manager at Scudder, Stevens & Clark for five years and an independent consultant for Bernstein MacCauley.  Defendant Manzke resides in New York.

---

[1]     According to account statements, the "Rye Funds" may, at different times, have included the Tremont Broad Market Fund, LDC, Rye Select Broad Market IDF, American Masters Market Neutral Insurance Fund, L.D.C.

34.     Defendant Robert Schulman ("Schulman") was the Chief Executive Officer of Tremont Partners from April 2005 to 2008, President and Co-Chief Executive Officer of Tremont Group Holding from 1994 through April 2005, and its Chief Executive Officer and Chairman of the Board from April 2005 to July 2008. Schulman was the Co-Chief Executive of Tremont Advisers, Inc. from 1994 to 2001. Schulman was the Chief Executive Officer of Rye Investment Management, the division of Tremont Partners that managed the company's hedge funds, until July 2008. Prior to joining Tremont in 1994, Schulman was responsible for Smith Barney's $60 billion Consulting Services Division and Retail New Product Development. In 1982, Schulman founded the Leveraged Product Division at E.F. Hutton and eventually assumed responsibility for all retail products offered at E.F. Hutton. Defendant Schulman resides in New York City.

35.     Defendants Manzke and Schulman are collectively referred to herein as the "Individual Defendants."

**The Controlling Defendants**

36.     Defendant Oppenheimer is a Delaware corporation and is the parent company of TGH. Oppenheimer acquired TGH in 2001. Oppenheimer's headquarters are located at 2 World Financial Center, New York, New York 10281.   Oppenheimer is also the parent of OppenheimerFunds, Inc., which is the manager of the well-known family of Oppenheimer mutual funds. Defendant Oppenheimer markets several funds with Tremont, including the Oppenheimer Tremont Opportunity Fund, LLC and Oppenheimer Tremont Market Neutral Fund, LLC. After its acquisition by Oppenheimer, Tremont Group marketed itself as "An OppenheimerFunds Company."

37.     Defendant MassMutual Holding LLC ("MassMutual Holding") is the parent company of Defendant Oppenheimer and its principal place of business is located at 1295 State Street, Springfield, Massachusetts 01111.

38.    Defendant MassMutual is the parent company of MassMutual Holding.    Its headquarters are located at 1295 State Street Springfield, Massachusetts 01111.  MassMutual is a mutually owned financial protection, accumulation and income management company and is a member of FINRA and SIPC.  MassMutual and its subsidiaries had more than $500 billion in assets under management at year-end 2007.  MassMutual refers to itself, including its subsidiaries such as Tremont Group, as "MassMutual Financial Group."

39.    Defendant MassMutual, as the parent company of Oppenheimer, and Oppenheimer, as the parent company of Tremont Group, had the power to exercise complete control over Tremont including its use of fund managers, its exercise of its professional responsibilities, and the marketing of its funds through the use of offering materials.

40.    Defendants Mass Mutual Holding, Mass Mutual and Oppenheimer are collectively referred to as the "Controlling Defendants".

**Auditor Defendants**

41.    Defendant Ernst & Young is one of the largest professional services firms in the world.   Ernst & Young provides assurance and advisory business services, tax services and consulting for clients worldwide.  Ernst & Young was the auditor for the Rye Funds until 2004, and as such it had a duty to perform its annual audits of the financial statements and financial condition of the Rye Funds in accordance with professional standards applicable to those audits.  Ernst & Young failed to perform its annual audits of the financial statements and financial condition of the Rye Funds in accordance with the professional standards applicable to those audits, as described herein.  Defendant Ernst & Young maintains it headquarters at 5 Times Square, New York, New York, 10036.

42.    Defendant KPMG is one of the largest professional services firms in the world.  KPMG International, a firm based in Switzerland, is the parent of Defendant KPMG.  Defendant

KPMG maintains it headquarters at 757 Third Avenue, New York, NY, New York, 10017. KPMG replaced Defendant Ernst & Young as the auditor for the Rye Funds in 2004, and first audited the Rye Funds' financial statements for the fiscal year ended December 31, 2005, and issued unqualified opinions thereon on March 6, 2006. KPMG performed additional audits of the Rye Funds' financial statements for the fiscal years ended December 31, 2006 and December 31, 2007, and issued unqualified opinions thereon on March 26, 2007, and March 24, 2008, respectively. KPMG failed to perform its annual audits of the financial statements and financial condition of the Rye Funds in accordance with the professional standards applicable to those audits.

43.    Defendants Ernst & Young and KPMG are collectively referred to herein as the "Auditor Defendants."

## SUBSTANTIVE ALLEGATIONS

### Madoff and BMIS Perpetrate
### a $50 Billion Ponzi Scheme

44.    On December 10, 2008, Madoff allegedly told his two sons that the asset management arm of his firm was a giant Ponzi scheme that bilked investors of approximately $50 billion. Madoff's sons alerted the FBI and, the following day, Madoff was arrested and charged with violations of the antifraud provisions of the federal securities laws. The Securities and Exchange Commission ("SEC") immediately filed an emergency action in this Judicial District seeking to cease all ongoing offerings of securities and investment advisory fraud by Madoff and BMIS. The SEC alleged in their moving papers that:

> Madoff is a resident of New York City and is the sole owner of BMIS. BMIS' website indicates that Madoff founded BMIS in the early 1960s and that he is an attorney. Madoff is a former Chairman of the board of directors of the NASDAQ stock market. BMIS is both a broker-dealer and investment adviser registered with the Commission. Madoff oversees and controls the investment adviser services at BMIS as wells at the overall finances of BMIS.

The most recent Form ADV for BMIS filed in January 2008 with the Commission listed BMIS has having over $17 billion in assets under management. BMIS is a broker-dealer and investment advisor registered in both capacities with the Commission. BMIS engages in three different operations, which include investment adviser services, market making services and proprietary trading. BMIS website states that is has been providing quality executions for broker-dealers, banks and financial institutions since its inception in 1960;" and that BMIS, "[w]ith more than $700 million in firm capital, Madoff currently ranks among the top 1% of US Securities firms." Since at least 2005, Madoff and BMIS have been conducting a Ponzi-scheme through the investment adviser services of BMIS. Madoff conducts certain investment advisory business for clients that are separate from the BMIS' proprietary trading and market making activities.

Madoff ran his investment adviser business from a separate floor in the New York offices of BMIS. Madoff kept the financial statements for the firm under lock and key, and was "cryptic" about the firm's investment advisory business when discussing the business with other employees of BMIS. In or about the first week of December, Madoff told Senior Employee No. 2 that there had been requests from clients for approximately $7 billion in redemptions, that he was struggling to obtain the liquidity necessary to meet those obligations, but that he thought that he would be able to do so. According to the Senior Employees, they had previously understood that the investment advisory business had assets under management on the order of between approximately $8-15 billion.

According to a Form ADV filed by Madoff, on behalf of BMIS, with the Commission on or about January 7, 2008, Madoff s investment advisory business served between 11 and 25 clients and had a total of approximately $17.1 billion in assets under management.

*     *     *

At Madoff's Manhattan apartment, Madoff informed the Senior Employees, in substance, that his investment advisory business was a fraud. Madoff stated that he was "finished," that he had "absolutely nothing," that "it's all just one big lie," and that it was "basically, a giant Ponzi scheme." In substance, Madoff communicated to his Senior Employees that he had for years been paying returns to certain investors out of the principal received from other, different, investors. Madoff stated that the business was insolvent, and that it had been for years. Madoff also stated that he estimated the losses from this fraud to be at least approximately $50 billion. One of the Senior Employees has a personal account at BMIS in which several million had been invested under the management of Madoff. At Madoff's Manhattan apartment, Madoff further informed the Senior Employees that, in approximately one week, he planned to surrender to authorities, but before he did that, he had approximately $200-300 million left, and he planned to use that money to make payments to certain selected employees, family, and friends.

45.     On March 12, 2009, Madoff was sent to jail after pleading guilty to 11 felony counts.

An article published in *The Wall Street Journal* on March 13, 2009 entitled "Madoff Jailed After

Admitting Epic Scam" stated, in relevant part, that:

> Mr. Madoff pleaded guilty to 11 felony counts and for the first time publicly
> described how he managed the global, multibillion-dollar Ponzi scheme and
> concealed it from federal authorities and investors for more than a decade. He
> pleaded guilty after waiving a grand-jury indictment and criminal trial in hopes of
> receiving a more lenient sentence from the judge. He faces a maximum sentence of
> 150 years, but is more likely to get about 20 years in prison, if sentences run
> concurrently. U.S. District Judge Denny Chin revoked Mr. Madoff's bail, no longer
> allowing him to remain in his $7 million Manhattan penthouse where he has been
> living under 24-hour security guard since mid-December. He was sent directly to jail,
> pending his sentencing June 16. The decision drew a burst of applause from a crowd
> of Madoff investors and other spectators in the courtroom.

*          *          *

> Mr. Madoff did shed some light on why he started the fraud and whether he knew he
> would get caught. He said when the fraud started in the early 1990s, he felt
> "compelled" to give institutional investors strong returns despite the weak stock
> market and national recession. "When I began the Ponzi scheme I believed it would
> end shortly and I would be able to extricate myself and my clients from the scheme,"
> he told the court. "However, this proved difficult and ultimately impossible."

46.     Madoff explained how he perpetrated the fraud in his criminal allocution, which

Madoff read in open court on March 12, 2009:

> To the best of my recollection, my fraud began in the early 1990s. At that time, the
> country was in a recession and this posed a problem for investments in the securities
> markets. Nevertheless, I had received investment commitments from certain
> institutional clients and understood that those clients, like all professional investors,
> expected to see their investments out-perform the market. While I never promised a
> specific rate of return to any client, I felt compelled to satisfy my clients'
> expectations, at any cost. I therefore claimed that I employed an investment strategy I
> had developed, called a "split strike conversion strategy," to falsely give the
> appearance to clients that I had achieved the results I believed they expected.

> Through the split-strike conversion strategy, I promised to clients and prospective
> clients that client funds would be invested in a basket of common stocks within the
> Standard & Poor's 100 Index, a collection of the 100 largest publicly traded
> companies in terms of their market capitalization. I promised that I would select a
> basket of stocks that would closely mimic the price movements of the Standard &
> Poor's 100 Index. I promised that I would opportunistically time these purchases and

would be out of the market intermittently, investing client funds during these periods in United States Government-issued securities such as United States Treasury bills. In addition, I promised that as part of the split strike conversion strategy, I would hedge the investments I made in the basket of common stocks by using client funds to buy and sell option contracts related to those stocks, thereby limiting potential client losses caused by unpredictable changes in stock prices. In fact, I never made the investments I promised clients, who believed they were invested with me in the split strike conversion strategy.

To conceal my fraud, I misrepresented to clients, employees and others, that I purchased securities for clients in overseas markets. Indeed, when the United States Securities and Exchange Commission asked me to testify as part of an investigation they were conducting about my investment advisory business, I knowingly gave false testimony under oath to the staff of the SEC on May 19, 2006 that I executed trades of common stock on behalf of my investment advisory clients and that I purchased and sold the equities that were part of my investment strategy in European markets. In that session with the SEC, which took place here in Manhattan, New York, I also knowingly gave false testimony under oath that I had executed options contracts on behalf of my investment advisory clients and that my firm had custody of the assets managed on behalf of my investment advisory clients.

To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations. I knew those false confirmations and account statements would be and were sent to clients through the U.S. mails from my office here in Manhattan.

Another way that I concealed my fraud was through the filing of false and misleading certified audit reports and financial statements with the SEC. I knew that these audit reports and financial statements were false and that they would also be sent to clients. These reports, which were prepared here in the Southern District of New York, among things, falsely reflected my firm's liabilities as a result of my intentional failure to purchase securities on behalf of my advisory clients.

Similarly, when I recently caused my firm in 2006 to register as an investment advisor with the SEC, I subsequently filed with the SEC a document called a Form ADV Uniform Application for Investment Adviser Registration. On this form, I intentionally and falsely certified under penalty of perjury that Bernard L. Madoff Investment and Securities had custody of my advisory clients' securities. That was not true and I knew it when I completed and filed the form with the SEC, which I did from my office on the 17th floor of 855 Third Avenue, here in Manhattan.

In more recent years, I used yet another method to conceal my fraud. I wired money between the United States and the United Kingdom to make it appear as though there were actual securities transactions executed on behalf of my investment advisory clients. Specifically, I had money transferred from the U.S. bank account of my investment advisory business to the London bank account of Madoff Securities International Ltd., a United Kingdom corporation that was an affiliate of my business in New York. Madoff Securities International Ltd. was principally engaged in proprietary trading and was a legitimate, honestly run and operated business.

Nevertheless, to support my false claim that I purchased and sold securities for my investment advisory clients in European markets, I caused money from the bank account of my fraudulent advisory business, located here in Manhattan, to be wire transferred to the London bank account of Madoff Securities International Limited.

There were also times in recent years when I had money, which had originated in the New York Chase Manhattan bank account of my investment advisory business, transferred from the London bank account of Madoff Securities International Ltd. to the Bank of New York operating bank account of my firm's legitimate proprietary and market making business. That Bank of New York account was located in New York. I did this as a way of ensuring that the expenses associated with the operation of the fraudulent investment advisory business would not be paid from the operations of the legitimate proprietary trading and market making businesses.

In connection with the purported trades, I caused the fraudulent investment advisory side of my business to charge the investment advisory clients $0.04 per share as a commission. At times in the last few years, these commissions were transferred from Chase Manhattan bank account of the fraudulent investment advisory side of my firm to the account at the Bank of New York, which was the operating account for the legitimate side of Bernard L. Madoff Investment Securities — the proprietary trading and market making side of my firm. I did this to ensure that the expenses associated with the operation of my fraudulent investment advisory business would not be paid from the operations of the legitimate proprietary trading and market making businesses. It is my belief that the salaries and bonuses of the personnel involved in the operation of the legitimate side of Bernard L. Madoff Investment Securities were funded by the operations of the firm's successful proprietary trading and market making businesses.

47.     Madoff perpetrated his fraudulent scheme through his New York and London offices, where directors and shareholders included family members and associates of Madoff. Madoff used the London office to launder over $250 million of client monies generated by Madoff's New York investment advisory business. The money was first transferred to London and then transferred back to the New York office to benefit Madoff personally and BMIS. These transfers gave the

appearance that Madoff was trading his clients' monies in Europe – a false claim that Madoff proffered when probed by investors about his trading strategy.

48.     Shortly after Madoff's guilty plea, Madoff's auditor, David Friehling, was charged by federal prosecutors with falsely certifying that he audited financial statements for BMIS. According to an article in *The Wall Street Journal* published on March 19, 2009 entitled "Accountant Arrested for Sham Audits," Friehling knowingly and improperly rubberstamped Madoff's financial statements without conducting a comprehensive audit:

> In the criminal complaint against Mr. Friehling, a Federal Bureau of Investigation agent said the auditor didn't verify the existence of assets that Mr. Madoff said he held or securities trades Mr. Madoff said he made. The agent also said Mr. Friehling didn't examine a bank account through which billions of dollars of client funds flowed, among other things.

> Mr. Friehling, 49 years old, was the sole auditor at Friehling & Horowitz, a storefront accounting firm in New City, N.Y., a New York City suburb. The government said he audited Mr. Madoff's financial statements since 1991. Since Mr. Madoff's arrest, auditing experts not involved in the case have said they were skeptical that one individual could have audited such a big company. Mr. Madoff's firm, which had several businesses, including a division that facilitated securities trades between investors, had $1.1 billion in assets, according to 2007 financial statements prepared by Mr. Friehling that were reviewed by The Wall Street Journal.

> In a separate civil complaint that mirrored the criminal charges, the SEC also alleged that Mr. Friehling and his family had investment accounts at the Madoff firm worth more than $14 million, a "blatant" conflict of interest that violated auditing rules, according to the complaint. He and his family withdrew at least $5.5 million since 2000, the SEC said.

49.     A reasonable due-diligence inquiry into Madoff's auditors accounting practices would have alerted a reasonable investor to the Madoff Ponzi scheme. According to an opinion piece by the *Business Mirror*, published on March 25, 2009 and entitled "Missing An Easy Clue," it is "Due Diligence 101" to inquire into the auditors accounting practices:

> Investors may have avoided about $74 billion in losses if they had examined—or just tried to shake hands with—accountants supposedly verifying the books.

"Due Diligence 101 should demand that you check out the auditing firm and find out if it exists," said Richard Dietrich, an accounting professor at Ohio State University in Columbus. "Then, you have to find out if they are qualified."

*       *       *

"Too many Larry, Moe & Curly accounting firms" are now auditing money managers, said James Cox, a law professor at Duke University in Durham, North Carolina. "While we made progress with accounting for reporting companies, we have not with investment advisers."

*       *       *

Money managers should be required to disclose to regulators who audits their books, handles their trades and has custody of their assets, Cox said. Fund managers typically disclose those details privately to investors, who may try to independently verify them. Many don't.

Friehling, Madoff's accountant, operated from an office in the Georgetown Office Plaza, sandwiched between a medical practice and a pediatrician's office. Prosecutors and the SEC said Friehling, 49, vouched for Madoff's books without taking meaningful steps to verify them. Friehling is free on $2.5-million bail and hasn't entered a plea.

50.     On April 2, 2009, the Secretary of the Commonwealth of Massachusetts, William Galvin, brought charges against a Madoff feeder fund. Fairfield Greenwich Group, the largest Madoff feeder fund, was charged with civil fraud claims for ignoring the multitude of red flags and for the unjust retention of hundreds of millions of dollars in management and administration fees. According to an article published by *The Wall Street Journal* entitled "Madoff Feeder is Charged in Fraud," the complaint alleges that the feeder fund failed to perform anything near the due diligence it had promised its investors:

The complaint marks a new stage in the investigation of the Madoff fraud and could spark broader attempts by investors to reclaim lost money from firms and people who earned hefty fees for bringing investors to Mr. Madoff.

*       *       *

While there is no evidence in the complaint that New York based Fairfield Greenwich knew that Mr. Madoff was running a Ponzi scheme, as he has admitted, authorities say that Fairfield Greenwich failed to perform anything near the due diligence it promised its customers.

- 21 -

The complaint also says Mr. Madoff coached officials at Fairfield Greenwich Group on how to deflect questions from Securities and Exchange Commission investigators.

*    *    *

The SEC is also investigating feeder funds. The SEC investigation is broad and looks at whether the funds told investors that their money was invested only with Madoff. It also looks into whether feeders disclosed to investors that they were receiving fees from Madoff for steering him business, people familiar with the matter say.

The Massachusetts complaint, filed on Wednesday by Secretary of the Commonwealth William F. Galvin, marks the first government charges against a Madoff "feeder" fund -- firms that earned hefty fees for bundling money to invest with Mr. Madoff. Mr. Madoff pleaded guilty last month to perpetrating a massive Ponzi scheme.

51.    Notably, the Secretary of the Commonwealth of Massachusetts, William Galvin, has recently opened an investigation to determine the extent of Defendant Tremont's illegal conduct and its failure to conduct a proper due diligence review into Madoff's investment practices.

**The Connecticut Superior Court Issues a TRO Freezing
the Assets of TPI, TGH, Oppenheimer, Manzke and Schulman**

52.    On March 30, 2009, the Retirement Program for Employees of the Town of Fairfield, Retirement Program for Police Officers and Firemen of the Town of Fairfield, and the Town of Fairfield (collectively, "Fairfield") commenced an action against, *inter alia*, TPI, TGH, Oppenheimer, Manzke, Schulman and others in the Superior Court of the State of Connecticut, Judicial District of Fairfield at Bridgeport. *Retirement Program for Employees of the Town of Fairfield, et al. v. Bernard L. Madoff, et al.*, FBT CV 095023735 (Conn. Sup. Ct.) ("Fairfield Action"). In addition to asserting claims to recover money damages from defendants, the Fairfield plaintiffs made an application for a temporary restraining order ("TRO"), freezing the assets of defendants, which included Madoff and members of his family, the managers of "Maxam" funds, the

- 22 -

managers of the Fairfield Greenwich funds, and the Tremont Defendants.[2]  On the basis of the

complaint and affidavits presented in support of the motion, the court issued the TRO freezing the

assets of all defendants, including the Tremont Defendants.

53.     The complaint in the Fairfield Action alleges:

In or about 1995, defendants Manzke and Schulman caused defendant Tremont
Partners to form The Broad Market Fund, LP, ("The Broad Market Fund," the
"Tremont Partners' Fund," or the "Fund"), a hedge fund in the form of a limited
partnership that solicited a pool of investments from individuals and entities.
Defendant Tremont Partners served as the general partner of the Fund and, pursuant
to defendants Manke's, Schulman's and Tremont Partners' arrangement with
Madoff, placed all of the limited partners' investments with Madoff for his
management.  Pursuant to their arrangement with Madoff, defendant Tremont
Partners paid Madoff commissions on his reported investment transaction and
charged each limited partner of the Fund an annual percentage fee of 1% of the
partner's investments for its "investment management" services on behalf of
AMBMF, as well as a .5% administrative fee for purported record-keeping and
auditing.

54.     The Fairfield Complaint further alleges:

At some time prior to 1997, defendant Manzke, acting in her own interests and on
behalf of defendant Tremont Partners, entered into a business arrangement with
Bernard L. Madoff, then a New York-based investment manager.  Pursuant to their
business arrangement with Madoff, defendants Manzke and Tremont Partners agreed
to form a hedge fund, in the form of a limited partnership, that would solicit
investment from individuals and entities that, pooled together, would comprise a
substantial multi-million investment fund.  Defendant Tremont Partners was to serve
as the general partner of the hedge fund limited partnership and, as general partner,
would retain Madoff to manage all of the limited partners' investments.

Pursuant to their arrangement with Madoff, defendant Tremont Partners would reap
substantial annual payments as a result of its role as general partner and manager of
the hedge fund.  Although investment managers normally charge their clients on the
basis of a percentage of the clients' annual investment, Madoff agreed that defendant
Tremont Partners, rather than he, would be allowed to charge the hedge fund's
investors such percentage fee and agreed that his compensation would be in the form
of commissions on the trades he undertook, which would be processed through a

---

[2]     The Fairfield Action defines the "Tremont Defendants" as Tremont Partners, Inc., Sandra L.
Manzke, and Robert Schulman.

broker-dealer company, Bernard L. Madoff Securities, Inc. ("BLMIS"), owned and controlled by Madoff. Defendant Tremont Partners would, further, be able to charge the limited partners an annual fee for administrative services. Pursuant to this business arrangement with Madoff, defendants Tremont Partners and Manzke were, thus, in a position to earn millions of dollars annually in return for raising money that would be placed with Madoff for his management.

In or about 1995, defendants Manzke and Schulman caused defendant Tremont Partners to form The Broad Market Fund, LP ("The Broad Market Fund" or the "Fund"), a hedge fund in the form of a limited partnership that solicited a pool of investments from individuals and entities. Defendant Tremont Partners served as the general partner of the fund and, pursuant to defendants Manzke's, Schulman's and Tremont Partners' arrangement with Madoff, placed all of the limited partners' investments with Madoff for his management. Pursuant to their arrangement with Madoff, defendant Tremont Partners paid Madoff commissions on his reported investment transaction and charged each limited partner of The Broad Market Fund an annual percentage fee of 1% of the partner's investments for its "investment management" services on behalf of the Fund, as well as a .5% administrative fee for purported record-keeping and auditing.

Beginning in 1995 and continuing to date, defendant Tremont Partners has served as the Fund's general partner and, through January 2008, received tens of millions of dollars in management fees from the Fund's limited partners for managing the partnership and administrative fees for record-keeping and administration of the partnership, including maintaining the books and records of the partnership, preparing periodic financial statements, reconciling the partnership's cash and portfolio positions, and arranging the annual audit of the partnership.

55.   In support of their motion for a TRO against the Tremont Defendants, plaintiffs in the

Fairfield Action submitted the affidavit of Edward H. Siedle (the "Siedle Affidavit" or "Siedle

Aff."). Since 1983, Mr. Siedle has worked as a securities industry investigator, investigating non-

traditional and alternative asset managers, including hedge funds. He has spent the last ten years

investigating securities and money management abuses.

56.   Siedle, after conducting a thorough investigation of the relevant facts, opined as

follows:

It is my opinion, for the reasons discussed below, that Tremont Partners, and its principals, Manzke and Schulman ... were all aware that Bernard L. Madoff was engaging in illegal conduct in connection with his purported money management operations and intentionally chose to participate in and support Madoff's illegal conduct in order to reap enormous illicit financial benefits. (Siedle Aff. ¶4)

*        *        *

It is my understanding that Tremont Partners solicited investor contributions to the two Rye Select hedge funds through representations that the hedge funds' investment manager (Madoff) had achieved consistent investment gains in the range of 8-12% throughout the 1990's and 2000's through use of a purported "split-strike conversion" investment strategy, and that Tremont Partners represented that it performed appropriate due diligence with respect to Madoff's investment activities. (Siedle Aff. ¶7)

*        *        *

It is my opinion that, as experienced industry professionals monitoring Madoff's reported investment results and claimed investment activity (and performing due diligence on Madoff's purported investment activity), the principals of Tremont Partners ... knew (or deliberately closed their eyes so that they could claim they did not know) that Madoff was engaged in illegal conduct. My opinion is based on a number of factors, including the following:

*        *        *

Tremont principal Manzke, and Tremont investment professionals Suzanne Hammond and Catherine Sweeney (senior managers at the firm), all had substantial experience serving as fiduciaries to pension plans performing due diligence reviews of money managers as a result of their years of former employment at Rogers, Casey & Barksdale, Inc., a well-known, highly regarded pension fund consulting firm. Tremont principal Schulman, prior to his joining Tremont in 1994 as President and co-CEO, was Executive Vice President for Smith Barney where he headed up its $60 billion Consulting Services Division. Thus, Manzke and Schulman and their associates at Tremont were highly experienced in performing due diligence reviews of investment managers.

*        *        *

Tremont . . . [was] phenomenally successful in convincing investors to entrust their assets to them because they did, in fact, possess all the requisite experience for conducting due diligence reviews of money managers.

Further, as firms with substantial institutional assets to place with investment managers they had unique access to public and non-public information regarding money managers and securities brokerages, such as BLMIS. It is customary in the investment management industry that money managers and securities brokerages seeking to be hired provide financial advisers to pensions and other large institutional investors with information regarding their businesses that is not generally available, such as the results of their most recent regulatory compliance examinations, pending litigation and customer complaints. (Siedle Aff. ¶12)

- 25 -

57.    The Seidle Affidavit further noted that "numerous financial analysts and hedge fund managers, without the enhanced access to information from Madoff enjoyed by Tremont . . . had long been suspicious of Madoff's long-term investment performance." The "red flags" that led these analysts and fund managers to conclude that Madoff was operating illegitimately included, *inter alia*:

the fee arrangement between Madoff and the "feeder firms" was the opposite of convention and counter-intuitive: Madoff, the investment fund manager who generated the exceptional returns, was paid a low commission-based fee, while the marketing firms received rich performance-like fees. Thus, Tremont, which charged over 1% for placing funds with Madoff, was scheduled to receive over $30 million in fees in 2008 on the $3.3 billion it had placed with Madoff ... All of theses enormous fees were paid to the "feeder firms" for what was essentially marketing Madoff. Madoff's willingness to part with such rich fees, which ordinarily would be retained by the investment manager, not the marketer was a blatant "red flag." (Siedle Aff. ¶12)

\*        \*        \*

It has, further now been revealed that such major financial institutions as Goldman Sachs, Merrill Lynch, Credit Suisse and Societe Generale were so uncomfortable with Madoff's refusal to provide a satisfactory explanation for his claimed success and the numerous red flags raised suspicions about the legality of his operations that they prohibited investments with Madoff. Likewise, published reports document that a number of established financial advisors, including Aksia LLC, an independent hedge fund research and advisory firm, Acorn Advisory Capital, LP, an investment advisory firm, and others, refused to do business with Madoff for similar reasons. (Siedle Aff. ¶14)

\*        \*        \*

[M]ajor financial institutions [such] as Goldman Sachs, Merrill Lynch, Credit Suisse and Societe Generale were so uncomfortable with Madoff's refusal to provide satisfactory explanation for his claimed success and the numerous red flags raising suspicions about the legality of his operations that they prohibited investments with Madoff. Likewise, published reports document that a number of established financial advisors, including Aksia LLC, an independent hedge fund research and advisory firm, Acorn Advisory Capital, LP, an investment advisory firm, and others, refused to do business with Madoff for similar reasons.

\*        \*        \*

In addition to those privately questioning Madoff's operations, there were financial industry publications on at least two occasions that publicly raised concerns with the legality of Madoff's operations. In the May 7, 2001 edition of Barron's, a respected financial publication, an article entitled, "Don't Ask, Don't Tell" raised concerns about Madoff and BLMIS. The author noted that some of Madoff's billion-dollar funds had never had a down year and reported on speculation on Wall Street that Madoff was using his market-making business to subsidize and smooth out the returns of the funds he was managing. The author suggested that investors seek greater transparency related to Madoff's investment strategy than Madoff was providing. In addition, in May 2001, Michael Ocrant raised many of the same concerns in an article that appeared in Institutional Investor and the MAR/Hedge report. In this article, Ocrant referred to over a dozen hedge fund professionals who questioned why others using the same "split-strike conversion" strategy were unable to achieve similar impressive results.

*       *       *

These published reports are significant because, in my experience, while the financial press may comment on investment manager strategy or performance, there is an understandable reluctance to question the integrity of a manager. Consequently, when articles of such a nature do appear, it is exceptional and requires immediate attention on the part of fiduciaries responsible for safeguarding client assets. (Siedle Aff. ¶16)

*       *       *

Given the enormously rich fees – totaling in the hundreds of millions – that th[is] firm[] derived from the funds they placed with Madoff, there is simply no question that Tremont ... had the financial resources, in addition to the intellectual capital and experience, to undertake the rigorous due diligence examination of Madoff that the red flags discussed above and noted by market professionals and the market media demanded. And, Tremont ... ha[s] all acknowledged that they undertook such rigorous due diligence. [Tremont] touted their exhaustive due diligence procedures to their prospective investors. In my over 25 years of experience, I have never seen such impressively elaborate due diligence review schemes, both with respect to the scope and depth of the procedures. Certain of the procedures are, in my opinion, far beyond what is necessary or practical, especially in the fiduciary context. (Siedle Aff. ¶18)

*       *       *

There are three other important factors I rely upon in forming my opinions that Tremont ... knew of Madoff's illegal activity.  First, Madoff's investment management operation was a Ponzi scheme and was a total fraud.  Thus, there were no legitimate transactions or records that could have confused a party engaged in a due diligence of the firm.  Second, the duration of the fraud spanned approximately two decades and involved tens of billions in dollars in thousands of client accounts

- 27 -

and millions of trades, providing a vast and continuing opportunity for detection in the face of the due diligence that these professionals represent they were performing. And third, and perhaps most important of all, these "feeder firms" that earned rich fees for supposedly searching for talented investment mangers globally placed all or virtually all of their assets with Madoff and even indicated in their offering documents that it was "likely" that they would continue to use this single broker or manager executing this same investment strategy. Thus, despite the existence of thousands of money management firms globally, many with impressive investment performance and assets under management, these "feeder firms" made no effort to retain managers with investment performance competitive with Madoff. As fiduciaries, they did not provide their investors with diversification against single manager risk. Why? Because they knew or believed that no other manger could legitimately compete with Madoff's illegal or fraudulent performance. This, in my opinion, is a very telling fact. (Siedle Aff. ¶21)

58.     On April 6, 2009, the investment adviser for Ascot Partners, LP, Gabriel Capital

Corp. and Ariel Fund Ltd., J. Ezra Merkin, was charged by the New York Attorney General, Andrew

Cuomo, for acting as a feeder fund to Madoff.  According to an article published by *The Wall Street*

*Journal* on April 7, 2009 entitled "Financier Charged in Madoff Fraud," the feeder funds received

hundreds of millions of dollars in management and advisory fees over more than a decade while

concealing to investors, in the same manner that Defendant Tremont concealed to its investors, that

Madoff was sub-managing the funds accounts:

> Mr. Merkin, a New York philanthropic leader and the former chairman of finance company GMAC, raised billions of dollars for his three hedge funds, telling clients he was managing the money himself. But instead, according to a civil fraud complaint filed by New York state's attorney general, Andrew Cuomo, Mr. Merkin collected hundreds of millions of dollars in fees over more than a decade while weaving a "panoply of lies" to conceal that he was channeling much of his clients' funds to Mr. Madoff.
>
> *     *     *
>
> Mr. Cuomo said the Ascot fund was formed by Mr. Merkin in 1992 as a "feeder" fund for Mr. Madoff. It grew to hold $1.8 billion from 300 investors by the end of December 2008. Mr. Madoff pleaded guilty last month to using the money in a Ponzi scheme, where funds from new investors were used to pay existing ones.
>
> About 85% of investors in the Ascot fund didn't know their money was flowing largely to Mr. Madoff, Mr. Cuomo's complaint said. In two meetings with Ascot investors in his offices at 450 Park Ave. in Manhattan, it says, Mr. Merkin pointed

through a glass partition to a trading area and said his staff "right here" was doing the work of managing their money.

*    *    *

Mr. Merkin collected an annual fee from Ascot's investors amounting to 1% to 1.5% of the fund's total assets, which included the fictitious Madoff returns, Mr. Cuomo's complaint said. By 2008, Mr. Merkin was collecting about $25.5 million a year from managing Ascot -- generating management fees of about $169 million from Ascot from 1995 to 2007, the complaint says.

59.    As described herein, Madoff feeder funds have already been punished by numerous authorities for bilking investors of their entire investments and for the wholly unearned and unjust management fees that they levied on investors for merely handing over the investment accounts to Madoff. Defendant Tremont's actions have mirrored the behavior of these other feeder funds, and Defendant Tremont is currently under investigation for failing to perform adequate due diligence and for concealing the fact that the investments were sub-managed by Madoff. Many members of the Class lost their entire life savings due to Defendants' breaches of fiduciary duties and unjust enrichment in the form of undeserving management and administrative fees.

<h3 style="text-align:center">Variable Universal<br>Life Insurance Policies and Deferred Variable Annuities</h3>

60.    Variable universal life is a type of cash-value insurance policy. The other types of cash value life insurance are whole, universal, and variable life. As is the case in all life insurance policies, there is a payout in case of death called the "death benefit."

61.    Similar to whole-life insurance, the VUL insurance policy has a cash value that enjoys tax-deferred growth over time and allows the policyholder to borrow against the cash value of the policy throughout the life of the policy.

62.    Unlike traditional whole-life insurance, however, VUL policies allow the policyholder to choose how the premiums are invested, usually from a universe of funds. The policy's cash value as well as the death benefit can fluctuate with the performance of the investments

- 29 -

that the policyholder chooses. Many of the VULs purchased by Plaintiffs and the Class throughout the Class Period were purchased overseas and placed into Trusts to offer further tax benefits. Importantly, the universe of funds made available to Plaintiffs and the Class who purchased these VUL policies was extremely limited.

63.     "Universal" refers to the fact that the premium is not an amount "set in stone," as would be true with traditional whole life insurance, but rather can be varied within a range. As for the first part of the name, the "variable" portion refers to the fact that the policyholder can direct the investments that he or she chooses from a pool of options provided by the policy and, thus, the cash value will vary. The policyholder bears the risk of performance in the policy, and is required to keep the policy at a level that allows the "returns" to fund the expenses each year.

64.     The risks associated with these policies are that: (i) bad performance could require increasing premiums to keep the policy in force; (ii) should a policy not have sufficient funding, it may lapse; and (iii) the policyholder cannot withdraw from the cash value during the policyholder's lifetime.

65.     Certain of the Plaintiffs and the Class purchased deferred variable annuities offered by Defendant Argus Intl and managed by Defendant Tremont. A DVA is a type of annuity designed as a retirement savings vehicle with investments much like mutual funds call sub-accounts or investment accounts. The monies in the investment account compound, tax- deferred, until they are ultimately withdrawn by the annuity holder at which point it is taxed as regular gross income. The investment accounts are typically managed by hedge funds or insurance company investment managers. Variable annuities are legally considered insurance contracts with special tax advantages under the Internal Revenue Code.

**Defendants Deemed the Rye Select Funds**
**as an "Appropriate" Investment for the Policies**

66.     At all relevant times, Defendant Tremont Capital underwrote VUL insurance policies in Bermuda. Only sophisticated investors earning over $200,000 per year and having a total net worth of over $1,000,000 were offered the opportunity to invest in these universal life insurance policies. Defendant Tremont Capital created Defendant TIIL as a wholly-owned subsidiary in Bermuda to underwrite and maintain these universal life insurance policies. This offshore subsidiary offered Defendant Tremont Capital a number of attractive options: (i) a reduction in premiums; (ii) improved risk management; (iii) offshore tax benefits and tax exemptions; (iv) the ability to secure insurance coverage where it would otherwise be uneconomically feasible; and (v) the generation of tax-free offshore investment income and direct access to the re-insurance offshore market.

67.     DVAs offer the following advantages:

(a)     tax deferral of investment gains: similar to an individual retirement account ("IRA"), an investor's contributions and earnings can grow tax-deferred until the investor starts to withdraw funds;

(b)     no caps: unlike an IRA, there is no limit to the amount invested each year;

(c)     ease of changing investments: because variable annuities have investment accounts with various mutual funds to select from, it is easy to change investment direction at little or no cost to the investor;

(d)     income for life: annuity payout options in the distribution phase of the account can provide guaranteed income for life; and

(e)     asset protection: in certain jurisdictions, annuities are a shelter from creditors.

68.     Offshore annuities also afford annuity holders an extra level of privacy and access to fund managers they may not otherwise have.

69.     The combination of advantageous tax treatment of investment earnings and privacy make these policies attractive to annuity holders, especially those in a high tax-bracket.

70.     Defendants Argus Intl and TIIL provided its policyholders with the policy contracts that bound the policyholders to the terms of the policy.   The policy contracts provided the policyholder with the option to choose the "Investment Accounts" that the policyholder desired, yet, Defendants Argus Intl and TIIL reserved their rights to limit the options of the policyholder at any time.

### False and Misleading Statements in
### The Funds' Offering Materials

71.     None of the offering materials used to solicit Policyholders' investments disclosed that the vast majority of the Investment Account portion of their Policies was blindly entrusted to Madoff, BMIS, or any other Madoff-controlled entities that were part of his Ponzi scheme.

72.     One of the Investment Accounts offered to policyholders by Defendants Argus Intl and Defendant TIIL was the Tremont Broad Market Fund, LDC, which was managed by Defendant Tremont (Bermuda) Ltd.  According to the Summary of Terms document given to policyholders, the investment strategy of the Tremont Broad Market Fund, LDC was as follows:[3]

**DESCRIPTION OF INVESTMENT STYLE**

The Fund's Investment objective is long term capital growth.  To achieve its objective, the Fund entrusts the management of its assets to an investment advisor that has a conservative investment style and has demonstrated, over a prolonged period of time and under all economic and market conditions their ability to achieve consistent returns. ***The investment advisor presently employed by the Fund invests exclusively in the United States equities and utilizes a non-traditional investment***

---

[3]     Tremont Broad Market Fund, LDC was, in turn, almost exclusively invested in Broad Market Fund, L.P.  Not surprisingly, the investment style of The Broad Market Fund L.P., managed by Tremont Partners Inc., was described as having the identical investment strategy as Tremont Broad Market Fund, LDC.

*strategy which is often described as a "split-strike conversion."* This strategy consists of (i) purchasing equity shares, (ii) selling related out-of-the-money call options which represent a number of underlying Shares equal to the number of shares purchased, and, (iii) buying related out-of-the-money or at-the-money put options representing the same number of underlying shares. A properly executed strategy along these lines will limit losses if the price of the stock declines, while still affording upside potential (albeit capped at the strike price of the short call) should the stock rise.

The investment advisor presently employed by the Fund utilizes a strategy which entails:

(i)    purchasing a basket of 30 to 35 large-capitalization S&P 100 Index ("OEX") stocks. . ., which at the time the purchases are made, presents a high degree of correlation with the general market;

(ii)    selling out-of-the-money OEX Index call options representing a dollar amount of the underlying Index equivalent to the dollar amount of the basket of shares purchased;

(iii)    purchasing out-of-the-money or at-the-money OEX Index puts in the same dollar amount.

\*        \*        \*

A proprietary computer system continuously optimizes the basket of stocks to replicate and enhance the performance of the overall market (S&P 100 Index) at low cost. The put and call options positions are actively managed as strike prices and maturities are adjusted as a function of relative valuations and general market movements. The collection of dividends on the basket of stocks constitutes an integral part of the strategy.

[Emphasis added.]

73.    These statements made by Tremont were false and misleading because the investments made by Plaintiffs and the Class were ultimately *not* invested pursuant to the investment strategy outlined above. As the sub-manager of the Fund, Madoff did not invest the client funds using a "split-strike conversion" strategy; rather, Madoff merely paid certain senior investors with the investments that he had already received from other junior investors.

74.    In addition, the Amended and Restated Information Memorandum for the Tremont Broad Market Fund, LDC, dated July 1, 1999 (the "Information Memorandum"), stated that Tremont

- 33 -

(Bermuda) Limited was Tremont Broad Market Fund LDC's Investment Advisor. The Information Memorandum falsely stated that Tremont (Bermuda) Limited would conduct due diligence with respect to the Fund's investments. Specifically, the Information Memorandum falsely stated that Tremont (Bermuda) Limited would "evaluate, select and monitor Managers and, in general, provide all necessary management services to the Fund."   Among other things, the Information Memorandum stated that Tremont (Bermuda) Limited allegedly used the following criteria to select a Manager for the Fund: "past performance and reputation," "size and efficiency of assets managed" and the "continued favorable outlook for the strategy employed."

75.     Further, according to the Information Memorandum, as the Investment Advisor for Tremont Broad Market Fund LDC, Tremont (Bermuda) Limited reviewed "the Fund's holdings with the Manager or Managers not less frequently than monthly to assess....their investment performance and to determine whether they continue to meet the general investment criteria."

76.     The Information Memorandum conveyed the false impression that Defendant Tremont had conducted a thorough investigation of the Fund's Manager and his "split-strike conversion strategy." The Information Memorandum contained a material omission in that it failed to disclose that, with no or inadequate due diligence or oversight, Defendant Tremont (Bermuda) Limited abdicated its responsibilities and blindly entrusted the assets of the Fund to investment vehicles that were connected with Madoff.

77.     The Information Memorandum also falsely stated that the Fund's assets would be fully diversified:

> The Investment Advisor, will at all times invest the assets of the Fund, in a manner that complies with the diversification requirements provided in Section 817(h) of the U.S. Code and the Treasury Regulations promulgated thereunder, as they may be amended or officially interpreted from time to time.  Under current law and regulations, pursuant to those requirements no more than fifty-five percent (55%) of the Net Asset Value of the Fund or of any classes of interests or series of classes of

- 34 -

interests, shall be represented by one (1) investment, no more than seventy percent (70%) of such Net Asset Value shall be represented by any two (2) investments, no more than eighty percent (80%) of such Net Asset Value shall be represented by any three (3) investments and no more than ninety percent (90%) of such Net Asset Value shall be represented by any four (4) investments (where all securities of the same issuer are treated as a single investment). In the event that the Fund is not so diversified, it will be so within thirty (30) days after the end of the relevant calendar quarter.

78.    In stark contrast to the statements in the Information Memorandum, there was no diversification of the Fund's assets whatsoever. Instead, nearly all of the Fund's assets were blindly handed over to Madoff as part of his Ponzi scheme.

79.    Upon information and belief, in 2006, Defendant Argus Intl conducted an extensive due diligence review prior to its purchase of Defendant TIIL. This due diligence review revealed, or should have revealed, that Defendant Tremont was nothing more than a mere feeder fund to the Madoff Ponzi scheme. Nonetheless, Defendant Argus Intl egregiously recommended the Rye Funds as an appropriate investment alternative and encouraged and/or permitted Plaintiffs and the Class to invest or to reinvest in the Rye Funds.

80.    In a press release dated November 16, 2007, Defendant Argus Intl announced that "Tremont will continue to provide investment management services to the existing TIIL policy portfolio. In addition, Tremont Capital Management will maintain its commitment as a leader in the investment management of insurance-dedicated hedge fund of funds portfolios." Defendant Argus Intl also announced in a February 28, 2007 letter to annuity holders that it is "continuing with our relationship with Tremont Capital Management for investment management services."

81.    The above-referenced statements were materially false and misleading because Tremont Capital Management did not manage portfolios but instead was a mere conduit to the Madoff Ponzi scheme. Had Plaintiffs and the Class known that Defendants Argus Intl and Tremont

were knowingly or recklessly ignoring the numerous "red flags" that existed about Madoff, they

would have never permitted their Policies to be invested in the Rye Funds.

**False and Misleading Statements in the Policies**

82.    The VUL Policy documents provided to policyholders stipulated that:

SECTION VI – VARIABLE ACCOUNT PROVISIONS

B.    Investments of the Variable Account

The Variable Account is segmented into Investment Accounts. Premiums applied to the Variable Account are allocated to an Investment Account of the Variable Account. The assets of the Investment Accounts are invested in an underlying Investment Fund or Funds.

\*          \*          \*

*If shares of, or beneficial interest in, any of the Investment Funds become unavailable for investment by the Investment Account, or the Insurer deems further investment in these shares or interests, inappropriate, the Insurer may limit further investment in the shares or interests, or may substitute shares or interests of another Investment Fund for shares or interests already purchased under this Policy.*

[Emphasis added.]

83.    Similarly, the DVA agreement provides:

**SECTION VI – VARIABLE ACCOUNT PROVISIONS**
**B. Investments of the Variable Account**

The Variable Account is segmented into Investment Accounts. Annuity contributions applied to the Variable Account are allocated to one or more Investment Accounts. The assets of the Investment Accounts are invested in Investment Funds. The Investment Accounts available on the Issue Date are shown on the Data Pages. The Insurer may, from time to time, add additional Investment Accounts or delete Investment Accounts. Any change in investment selection shall be pursuant to a duly executed change form filed with the Insurer at the Service Office. The Owner may be permitted to transfer Contract Values to the additional Investment Accounts. However, the right to make any transfer will be limited by the terms and conditions imposed by the Insurer.

If shares of, or beneficial interest in, any of the Investment Funds become unavailable for investment by the Investment Account, or *the*

> *Insurer deems further investment in these shares or interests,*
> *inappropriate, the Insurer may limit further investment in the*
> *shares or interests, or may substitute shares or interests of another*
> *Investment Fund for shares or interests already purchased under*
> *this Contract.* (Emphasis added.)

84.    Despite having the discretion to deem investments "inappropriate" for its VUL and

DVA Policyholders and the presence of numerous red flags concerning Madoff's fraudulent scheme,

during the Class Period, the Insurer never deemed the investments in the Rye Funds to be

inappropriate investments for Policyholders even though it knew the funds' assets ultimately were

invested in one investment advisor, Madoff, which was not disclosed to Policyholders. In fact, the

Insurer, originally an entity owned by Tremont, breached its fiduciary duties to Plaintiff and the

Class and failed to perform even the most rudimentary analysis of the suitability of the investment

funds it offered to Policyholders.

85.    Under the DVA Policies, the annuity holder was charged by the Insurer a fee based

on the annuity's Contract Value (the "Insurer's Charge"). According to the DVA Policy, the

Insurer's Charge was calculated as "1/12 of 1.00% times the Contract Value as of the last Business

Day of a month corresponding to a Valuation Date, prorated for any partial month."

86.    There was an additional $50 per month "Contract Maintenance" fee.

87.    Defendants Argus Intl and TIIL chose which Investment Accounts would be available

for the Class to choose for investment purposes. Defendants Argus Intl and TIIL also had the right

to "deem further investments in these shares or interests, inappropriate . . ." Defendants Argus Intl

and TIIL, however, breached their fiduciary duties and did not conduct a comprehensive due

diligence review, thereby ignoring the warning signs that would have alerted Defendants to Madoff's

Ponzi scheme. As a result, Defendants Argus Intl and TIIL failed to deem investing with Madoff as

"inappropriate."

88.     Defendants Argus Intl and Tremont were content to collect their respective fees and, rather than jeopardize this income stream, failed to perform the necessary due diligence required to meet their fiduciary obligations due Plaintiffs and the Class.

### False and Misleading Account Statements

89.     At all relevant times, Argus Intl and TIIL sent policyholders performance reviews, valuation statements and similar documents ("Statements") showing the performance of the Investment Account portions of their Policies.

90.     These Statements showed consistent net returns for the Rye Funds through November 2008. These reported net returns, however, did not exist because, in reality, nearly all of the Investment Account portions of the Policies were handed over to Madoff as part of his Ponzi scheme. As a result, the Statements, which were sent to Plaintiffs and the Class, contained false and misleading statements regarding the value of the Policies, and this information was relied upon by Plaintiffs and the Class to their detriment.

### Despite Numerous "Red Flags," Defendants Failed to Perform an Adequate Due Diligence Review

91.     According to Tremont's official website:

Tremont has been at the forefront in setting the standard in the industry for fund of hedge funds investment management. Effective investment strategies and oversight, thorough manager research, *careful due diligence*, advanced risk allocation and time-tested portfolio management form the cornerstones of a comprehensive platform that has been refined over a 23-year span of dedicated strides to maximize our clients' objectives. Our established performance history and our focus on client service distinguishes the firm at a time when the influx of new entrants creates choice but not the certainty of experience.

[Emphasis added.]

92.     This due diligence was simply not performed or was performed in an improper manner. Hedge funds are complex investment funds that often lack transparency and the mere disclosure of a fund's investment holdings would not adequately reveal the types and magnitudes of

- 38 -

risks that a hedge fund manager undertakes. Accordingly, the unique and complex nature of hedge funds requires a level of robust, proactive due diligence above and beyond what is required for more transparent investments that are strictly regulated.

93.     Particular care must be exercised in due diligence of hedge managers and their funds, because of: (i) their more complex investment strategies; (ii) the possibilities of concentrated exposure to market and counterparty risks; (iii) their use of leverage and the associated risks; and (iv) the minimal regulation of these firms. Fund of funds, such as Tremont Capital, have a fiduciary duty to understand how a hedge fund or hedge fund manager may perform in a variety of future scenarios and to review its organizational culture, internal economic incentives and conflicts-of-interests.

94.     On the flipside of the "due diligence coin," monitoring a hedge fund or a hedge fund manager is a continuation of the initial, fiduciary-grounded due diligence process. While the initial due diligence serves to qualify a hedge fund as a desirable investment, the ongoing monitoring process continually and periodically reconfirms that the conclusions and assumptions used in the initial evaluation and selection remain valid. Fiduciaries, as well as institutional investment staff and consultants, should take reasonable steps to identify any events or circumstances that may result in the hedge fund or hedge fund manager failing to meet the standards and expectations that were originally required in the selection process.

95.     Had Tremont Defendants performed the adequate and comprehensive due diligence review of Madoff and BMIS that they purportedly undertook, they would have noticed significant "red flags," which would have alerted them of the perils of investing with Madoff.

96.     In stark contrast to the promises made on its website, the Tremont Defendants neglected to conduct any meaningful due diligence review into whether Madoff was actually

transacting trades or whether he was holding assets in order to pay redemption requests by more senior investors.  The Tremont Defendants did not question the fact that Madoff was both the custodian of the assets and the executing broker. In other words, even if the Tremont Defendants did check the custodian's records against the broker's records, they would have been in essence checking information received from Madoff against other information received by Madoff.  This lack of third party corroboration should have dissuaded the Tremont Defendants from investing the Rye Funds' assets with Madoff.

97.     Moreover, upon information and belief, the Tremont Defendants never collected any hard corroborated evidence that Madoff was, in fact, performing the split strike conversion strategy that Madoff promised he was performing.

98.     In fact, Harry Markopolos, a former money manager based in Boston, started complaining to the SEC in 2000 that Madoff was either front-running his clients' money or operating a Ponzi scheme.  In a 19-page document sent to the SEC in November 2005 entitled "The World's Largest Hedge Fund is a Fraud," he argued that it was impossible for Madoff's firm to collect as much money as it did from feeder funds and still execute his stated split-strike strategy, and identified 29 "red flags" that should have raised doubts about Madoff's alleged investment strategy. These "red flags" included:

(a)     Madoff's fund structure – unlike most private pooled investments where the investor is charged a fee by a fund manager, most investors with Madoff were invested in secondary fund of funds, such as Tremont, and were charged management fees by the respective fund of fund, not by Madoff; notwithstanding the fact that Madoff could easily have collected management or performance fees, Madoff chose to forgo millions of dollars in fees and only collected "market rate" commissions charged on each trade;

(b)     Madoff's Secrecy – the investors that invest with funds of funds are usually unaware that their funds are invested with Madoff. This secrecy plus the deregulation of the entire hedge fund industry allowed Madoff to promise lucrative returns that went unverified. Madoff's trade tickets went unverified;

(c)     the investment strategy produced mathematically improbable returns – the total amount of call options outstanding was not nearly enough to generate $50 billion of assets under management. Moreover, the price percentages at which Madoff claimed to purchase the put options were unreasonably under-priced and "there were not enough option put contracts in existence to hedge the way Madoff was hedging";

(d)     compelling media releases that questioned Madoff's strategy – on May 7, 2001, *Barron's* published an article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum," which listed numerous "red flags" including the specious double-digit returns using the "split-strike conversion" strategy; a May 2001 article in *Mar/Hedge* entitled "Madoff Tops Charts; Skeptics Ask How," which identified many financial professionals who questioned the source and consistency of Madoff's returns;

(e)     Madoff's consistency in creating double-digit returns for his investors – as of 2001, Fairfield Sentry, a fund of funds invested primarily in Madoff, had only four months of losses since its inception in 1989;

(f)     Madoff's illegal manipulations – Madoff boasted to several feeder funds that he subsidized returns in down quarters to maximize reported performance and minimize risk, which in and of itself is an illegal manipulation of his accounting books and records;

(g)     Madoff's auditor – Madoff was audited by a small auditor in Rockland County, New York, F&H, a three employee accounting firm, as opposed to the 90% of single

- 41 -

strategy hedge funds that are audited by one of the top 10 auditors. F&H's staff consisted of Jerome
Horowitz (a partner who lived in Miami), a secretary and one active accountant, David Friehling.
Additionally, while F&H purportedly audited BMIS, F&H had filed annual forms with The
American Institute of Certified Public Accountants ("AICPA") attesting that it had not performed
audits for the past fifteen years. The AICPA has begun an ethics investigation into F&H. Federal
investigators have issued a subpoena to F&H and have requested documents going back to 2000;
David Friehling was arrested by authorities for his improper audits and faces up to 100 years in
prison if convicted of the felony charges levied against him.

    (h) Madoff's lack of segregation among service providers – Madoff did not use an
independent custodian. By both directing trades as money manager and keeping track of the funds
as custodian, Madoff was in a unique position to be able to falsify his accounting records.
Additionally, the comptroller of BMIS was based in Bermuda while most mainstream hedge fund
investment advisers have their comptroller in-house;

    (i) Madoff's close familial relationships – only Madoff family members were
privy to his investment strategy and the Madoff family held high positions with the NASD,
NASDAQ, SIA, DTC and other prominent industry bodies. Accordingly, these organizations would
not be inclined to doubt or investigate Madoff or BMIS;

    (j) Madoff's incoherent 13F filings – investment managers who manage over
$100 million or more of assets are required to disclose in 13F filings with the SEC the class of
securities, the CUSIP number, the number of shares owned and the total market value of each
security. Madoff's 13F disclosures usually contained only smatterings of small positions in small
equities and his explanation for this was that his strategy was mostly in cash at the end of each
quarter to avoid disclosing the securities he was trading. However, had Madoff been doing as he

claimed, there would have been massive movements in money markets at the end of each quarter, but no such movements existed; and

        (k)    BMIS's office in the Lipstick Building in New York – Madoff's secret operation took up about three-quarters of the 17th floor of the oval-shaped Lipstick Building in Manhattan. Most Madoff employees on other floors did not have access to the space. Anyone performing a proper due diligence would have questioned why all of the hedge fund's files were being quarantined in an inaccessible floor of the building. Additionally, in its regulatory filings, BMIS indicated that it had only between one and five employees managing a disclosed $17 billion of assets under management.

        99.    Had Plaintiffs and the Class known that Defendants would knowingly or recklessly disregard these numerous "red flags," they would never have permitted their Policies to be invested in the Rye Funds.

## Other Prudent Advisors Stopped Investing with
## Madoff Following Their Due Diligence Review of BMIS

        100.    Prudent investment advisors, investment banks and pension funds – *i.e.*, JPMorgan Chase & Co., the Fort Worth pension fund and Acorn Partners – took the time and effort to conduct comprehensive and proper due diligence reviews of Madoff and, as a result of these warning signs, chose not to invest or to maintain their earlier investments with Madoff or any of his affiliated funds. In stark contrast, Defendants failed to even conduct a rudimentary due diligence review that would have alerted them of Madoff's fraudulent scheme.

        101.    An article published in *The New York Times* on January 29, 2009 entitled "JPMorgan Exited Madoff-Linked Funds Last Fall," stated, in relevant part, that:

> As early as 2006, the bank had started offering investors a way to leverage their bets on the future performance of two hedge funds that invested with Mr. Madoff. To protect itself from the resulting risk, the bank put $250 million of its own money into those funds.

But the bank suddenly began pulling its millions out of those funds in early autumn, months before Mr. Madoff was arrested, according to accounts from Europe and New York that were subsequently confirmed by the bank. The bank did not notify investors of its move, and several of them are furious that it protected itself but left them holding notes that the bank itself now says are probably worthless.

A spokeswoman, Kristin Lemkau, said the bank withdrew from the Madoff-linked funds last fall after "a wide-ranging review of our hedge fund exposure." Ms. Lemkau acknowledged, however, *that the bank also "became concerned about the lack of transparency to some questions we posed as part of our review."*

[Emphasis added.]

102.    An article published in *BusinessWeek* on December 31, 2008 entitled "The Madoff

Case Could Reel in Former Investors," states, in relevant part, that:

The managers of the Fort Worth Employees' Retirement Fund thought they had dodged a bullet when Bernard L. Madoff was arrested on Dec. 11 for alleged fraud. Just a few months earlier the $1.7 billion public pension plan had pulled $10 million out of a hedge fund that invested exclusively with Madoff. But now the managers face the possibility of having to give back the money – a sum that includes all of the pension's purported gains over the years plus its initial investment.

\*       \*       \*

Some investors may not have known what they were buying. The Fort Worth pension fund, for example, owned the Rye Select Broad Market, a hedge fund managed by the Tremont Group. *The Rye marketing literature rarely, if ever, mentioned Madoff by name, even though his fund was the only investment.* Says Steven Caruso, a lawyer for a number of Tremont investors: "Some investors may be facing the prospect of a financial death sentence if they're forced to return funds." In a letter to investors, Tremont's managers say they "exercised appropriate due diligence."

\*       \*       \*

Managers of the Fort Worth pension fund, who first invested with Rye five years ago, *started to rethink their investment in early 2008 after hiring Albourne Partners, a London due diligence firm, to assess their hedge fund portfolio. The Rye fund raised red flags almost immediately. Albourne's managing director, Simon Ruddick, says the firm, which had long-standing concerns about Madoff's trading strategy and consistent returns, had urged clients for nearly a decade to avoid affiliated funds such as Rye.*

[Emphasis added.]

103.    An article published in *The New York Times* on December 12, 2008 entitled "Look

Back at Wall St. Wizard Finds Magic Had Its Skeptics," quoted Robert Rosenkranz, a principal at

Acorn Partners, an investment advisory firm, who stated:

> "Our due diligence, which got into both account statements of his customers, and the
> audited statements of Madoff Securities, which he filed with the S.E.C., made it seem
> highly likely that the account statements themselves were just pieces of paper that
> were generated in connection with some sort of fraudulent activity." . . .

104.    An article published in *The New York Times* on December 17, 2008 entitled

"European Banks Tally Losses Linked to Fraud" stated, in relevant part, that:

> Société Générale, itself the victim of an apparent scam early this year when
> unauthorized bets by a trader, Jérôme Kerviel, caused a $7 billion loss, was not the
> only financial firm to think Mr. Madoff's unfailing record was too good to be true,
> said Drago Indjic, a project manager at the Hedge Fund Center of the London
> Business School.
>
> ***"Madoff did not pass due diligence for many European hedge fund companies,"***
> ***Mr. Indjic said. "Experienced people know there are many ways to provide the***
> ***kind of return stream offered by Madoff, almost like a bank account, and one of***
> ***them is a Ponzi scheme."***
>
> ***Smaller American investment advisory firms like Acorn Partners and Aksia also***
> ***spotted problems with Mr. Madoff's strategy early on, but Société Générale is the***
> ***first major investment player known to have steered clients away him.***
>
> Mr. Indjic said the scheme revealed not only faulty due diligence, but also a basic
> failure to diversify.  "If you had half a percentage point of total assets under
> management with one firm, that is more typical," he said.  "But some had much,
> much more than that with Madoff, so their due diligence failure was compounded by
> poor portfolio management."

[Emphasis added.]

105.    The financial press also reported that, prior to the disclosure of the massive fraud

caused by Madoff, Simon Fludgate, head of operational due diligence at Aksia concluded that the

stock holdings reported in the quarterly statements of BMIS filed with the SEC appeared too small to

support the size of the assets Madoff claimed to be managing.  The likely reason for this was

revealed on December 15, 2008, when investigators working at Madoff's offices determined that

Madoff was operating a secret, unregistered investment vehicle from his office.

106.    A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder

of Castle Hall Alternatives, which invests in hedge funds for clients, as follows:

> There was no independent custodian involved who could prove the existence of
> assets... There's clear and blatant conflict of interest with a manager using a related-
> party broker-dealer. Madoff is enormously unusual in that this is not a structure I've
> seen.

### Defendants Unjustly Reaped
### Millions of Dollars in Management Fees

107.    At all relevant times, Defendants charged management fees to Plaintiffs and the Class

for managing the affairs of the Rye Funds. As with other investment funds, the management fee was

calculated as a percentage of the Rye Funds' net asset value. According to the policy, the fee was

"1/12 of 0.85% times the Policy's Cash Value before all other charges as of the last Business Day of

a month corresponding to a Valuation Date, prorated for any partial month."

108.    At all relevant times, the Rye Select Broad Market Fund LP charged a 1%

management fee and a 0.5% administration fee. For instance, the fund had a net asset value

("NAV") of $2.3 billion as of Sept. 2008, and, at that NAV, the Tremont Defendants collected $34

million in fees in 2008 alone. The Rye Select Broad Market Portfolio Ltd. charged total fees of

1.95% of assets and held $1.2 billion as of September 2008. That level of assets would have brought

in annual fees of $23.5 million. Upon information and belief, the Tremont Defendants unjustly

collected over $300 million in management and administration fees throughout the Class Period for

merely entrusting and/or re-depositing their clients' funds with a sub-manager – *i.e.*, Madoff and/or

BMIS.

109.    The Argus, Tremont and Controlling Defendants improperly collected these fees, as

they mismanaged the investments made by Plaintiffs and the Class. By failing to perform an

adequate and comprehensive due diligence into Madoff's practices, the Argus, Tremont and

Controlling Defendants breached their fiduciary duties, collected these fees improperly and were

unjustly enriched.

### Defendants Immediately Disclaim
### Responsibility for Any Losses

110.    On December 12, 2008, Defendant Rye sent out a letter to investors, which stated, in

relevant part, that:

> December 12, 2008
>
> Dear Investor,
>
> On Thursday December 11th, Bernard L. Madoff, founder of Bernard L. Madoff
> Investment Securities LLC was arrested by U.S. federal law enforcement and
> charged with a single count of securities fraud.  The Securities and Exchange
> Commission (SEC) also charged Mr. Madoff with securities fraud.
>
> We have obtained and reviewed a copy f the federal complaint and the SEC charges
> in order to understand the allegations against Mr. Madoff.  Needless to say, our level
> of anger and dismay over the apparent betrayal by Mr. Madoff and his organization
> of his 14-year relationship with Tremont is immeasurable.  By all accounts he headed
> a credible and respected organization, with investors making tens of billions of
> dollars of commitments to the Firm.  Mr. Madoff also personally served as Vice
> Chairman of the NASD and was a member of NASDAQ's stock market's board of
> governors and its Executive Committee.
>
> Be assured that we are aggressively taking all the necessary steps to identify and
> recover your and our investments.  We have retained legal counsel, Skadden, Arps,
> Slate, Meagher & Flom LLP, and through our lawyers are communicating with law
> enforcement and the SEC in order to understand this situation and gather the relevant
> facts.   Our repeated attempts to contact the Madoff organization were not
> acknowledged.
>
> We will continue to update you as events unfold.
>
> Rye Investment Management

111.    On December 14, 2008, Defendant Rye sent out a second letter to investors, which

stated, in relevant part, that:

> December 14, 2008

Re: Madoff Fraud

As you are aware, news reports following the arrest of Bernard L. Madoff about the scope and scale of his alleged scheme characterize it, in the words of the SEC, as "a stunning fraud that appears to be of epic proportions." If we can come to any conclusion at this early stage in this matter, it is that it seems we were all victimized by not just a person but a scheme and a complex process designed to deceive individuals and organizations, managers and analysts – including some of the largest, mot sophisticated financial institutions in the world.

We believe Tremont exercised appropriate due diligence in connection with the Madoff investments. We are working with our legal counsel and communicating with law enforcement and other government authorities to gather information about the nature of the fraud and the assets affected by it. We restate our commitment to do everything in our power to identify and recover your and our investments. We are considering all options, including legal action.

We will keep you informed of developments as they occur.

Rye Investment Management

112.    Defendant Rye wasted no time in immediately claiming that it was caught unaware of the massive Ponzi scheme perpetrated by Madoff and BMIS. As discussed more fully herein, had Defendants properly performed any operational due diligence review and/or quantitative analysis, the numerous "red flag" warning signs would have alerted them to this Ponzi scheme.

113.    On December 19, 2008, Plaintiffs and other policyholders received a letter from Defendant Rye Select Broad Insurance Portfolio, LDC, which stated:

December 19, 2008

Re: Rye Select Broad Insurance Portfolio, LDC(the "Fund") Dear Shareholder:

We are writing to inform you of the measures that the Board of Directors is taking as a result of the apparent fraud perpetrated on the Fund by Bernard L. Madoff and his finn, Bernard L. Madoff Investment Securities, LLC ("BLMIS"). On Tuesday, December 16, 2008, the SEC issued Release 2008-297, by Commissioner Cox, that restated the emergency actions being taken by the SEC and indicated that it had learned in reviewing records of Madoff that "those records are increasingly exposing the complicated steps that Mr. Madoff took to deceive investors, the public and regulators," and that he maintained "several sets of books and records and false documents, and provided false information involving his advisory activities to

investors and regulators." The full text of the release appears at www.sec.gov. The apparent fraud is massive.

As you know, all or substantially all of the Fund's portfolio had exposure to BLMIS and/or one or more of its affiliates or agents. All capitalized terms used herein and not otherwise defined herein shall have their respective meanings set forth in the Fund's Amended and Restated Information Memorandum, dated as of July 15, 2008.

The Board has determined, in consultation with Tremont (Bermuda) Limited (the "Investment Manager") and pursuant to the Fund's Articles of Association, that it is in the best interests of the Fund as a whole to declare a temporary suspension of (i) the determination of the Net Asset Value of the Fund, (ii) redemptions from the Fund those requests submitted for December 31, 2008 and thereafter and (iii) payment of redemption proceeds, due to the uncertainty associated with prior Net Asset Value calculations, which remain unpaid as of this date.

Each of the above suspensions will be effective as of December 19, 2008 and will remain in effect until such time as the Board, in consultation with the Investment Manager, determines it is in the best interests of the Fund to lift such suspension.

We will update you of any new developments in connection with the above matters. We appreciate your patience during this time and wish to assure you that we are consulting with the Fund's counsel and reviewing all options available to the Fund.

Sincerely,

Board of Directors

Rye Select Broad Insurance Portfolio LDC

114.    On December 23, 2008, Defendant Argus Intl sent an email to Plaintiffs and policyholders, which stated:

Dear Policyowner,

We are writing to update you on the situation regarding Rye Select Broad Market Insurance Portfolio Fund and Rye Select Broad Market XL ('the Funds'), which were in turn invested in Bernard L. Madoff Investment Securities.

The situation is evolving, with the latest news that dealing in the Funds has been suspended. A copy of the correspondence received from the Funds is attached for your information.

We continue to work with our legal counsel on our options concerning the above. At this stage, we can confirm that our legal counsel has initiated communications with the Funds, requesting further information, and we will revert to you once that information has been received and considered.

Regarding your life policy, in accordance with policy provisions, the Death Benefit will remain in place until January 31st, 2009 for affected policies.

Early in January, we will write to affected policyowners individually providing an in-force illustration and available options for keeping the policy and associated Death Benefit in place.

Kind regards.

Phil Trussell

115.    On January 8, 2009, Defendant Argus Intl sent another email to Plaintiffs and policyholders, which stated:

Dear Policyowner,

Please find your policy valuation statement attached.

As previously notified, dealing has been suspended in the Rye funds invested with Bernard L. Madoff Investment Securities ("BMIS"). In light of this, the fact that liquidation proceedings have now been commenced against BMIS and the uncertainties surrounding the possibility of any recovery, we have taken the step of writing down the value of these investments to zero with effect from November 30, 2008.

We continue to work diligently with our counsel, Morrison & Foerster LLP and Appleby, to gather all the facts and determine the best way to proceed. We are, among other things, in the process of reviewing related lawsuits that have already been filed in the United States. Obviously, as with all entities which have been impacted by the Madoff situation, the process is at an early stage, and we continue to investigate the facts surrounding this alleged fraud and the potential claims that may be available.

For policyowners with life policies affected by the above situation, we can confirm that your death benefit will be kept in place until February 28 2009.

Towards the end of next week, we will contact affected policyowners individually, and will present the options available to keep the death benefit in place beyond this date

In the meantime, please do not hesitate to contact me if you have any questions.

Kind regards.

Phil Trussell

116. On January 16, 2009, Defendant Argus Intl sent a third email to Plaintiffs and policyholders, which stated:

Dear Policyowner,

As previously advised in our email correspondence to you of January 8, 2009, dealing has been suspended in the Rye funds invested with Bernard L. Madoff Investment Securities LLC. As a result of this, we wrote the value of those investments down to zero with effect from November 30, 2008, as seen in your last Valuation Statement.

*Unfortunately, this may have caused your Policy to have a Negative Cash Surrender Value or will cause to do so in the near future. The Policy Terms and Conditions for this event are as follows:*

*D. Grace Period*

*The Insurer may terminate this Policy if on any Processing Date, the Net Cash Surrender Value is negative. The negative Net Cash Surrender Value will be considered as an overdue charge as of such Processing Date. However, the Insurer will not terminate this Policy due to a negative Net Cash Surrender Value until the end of the grace period.*

*The grace period will end 31 days after the Insurer delivers a notice informing the Policyowner that the Insurer will terminate this Policy because of insufficient Net Cash Surrender Value.*

*To avoid termination, the Policyowner must submit a subsequent premium at least equal to the Minimum Subsequent Premium set forth on the Data Pages plus any overdue charges. This amount will be specified in the notice.*

Details of your policy's Cash Surrender Value as at December 31, 2008 can be found on the attached Policy Lapse Notice. Our calculations of your future Policy Deductions (Cost of Insurance and Administrative Fee charges), indicate that your policy will have a Negative Cash Surrender Value on *December 31, 2008*.

Based on the above, the Grace Period will begin on *December 31, 2008*, and if no further premiums are paid into your policy by *February 28, 2009*, then the policy will lapse.

**[Emphasis in original.]**

117. Defendant Argus also sent a letter to Plaintiffs and the Class, dated March 24, 2009, outlining a special loan program and enclosing an initial Loan Agreement; however, the specific terms of the Loan Agreement have not been finalized as of the date of the filing of this Complaint.

118.    As a direct result of Defendants' illegal conduct, Plaintiffs and the Class have witnessed the values of their investment accounts and their Policies disappear. Had Plaintiffs and the Class known that the Argus and Tremont Defendants would knowingly or recklessly ignore Madoff's numerous "red flags" and invest their funds imprudently, they would have never invested their monies and/or Policies in the Rye Funds.

**Control Person Allegations**

**Oppenheimer Acquires Tremont**

119.    In 2001, Oppenheimer acquired Tremont Advisers, Inc. ("TA," the predecessor of TGH) for $145.3 million. In the acquisition, shareholders of TA received $19 per share which represented a significant premium over the price of TA's shares prior to the acquisition.

120.    As described in TA's Schedule 14A Proxy Statement filed on August 20, 2001 soliciting votes in favor of the acquisition (the "Proxy Statement"), Oppenheimer "had been actively evaluating the alternative asset management industry and had discussed Tremont with representatives of Putnam Lovell," in the fourth quarter of 2000. Subsequently, in 2001, TA hired Putnam Lovell as its financial advisor on the deal.

121.    By this time, TA was an extremely profitable company. Its total revenues increased from $10,656,100 in 1998 to $16,524,600 in 1999 to $23,177,500 in 2000.

122.    In 2000, TA had more than $1 billion in its domestic and offshore funds. These funds included the American Masters Broad Market Prime Fund, L.P., American Masters Broad Market Fund, L.P. and Tremont Broad Market Fund, LDC, all of which were invested with Madoff.

123.    According to TA's Form 10-KSB for 2000 ("2000 10-K"), more than half of TA's revenues came from the fees it collected on its proprietary funds. In 2000, TA's revenues from its funds totaled $11,874,400, representing 51.2% of TA's total revenues. Moreover, its fund revenues had increased dramatically between 1998 and 2000. According to TA's 2000 10-K, "[f]ees from the

Company's proprietary investment funds increased 45.9% from $8,139,500 in the year ended December 31, 1999 to $11,874,400 for the year ended December 31, 2000 and 67.6% from $4,855,600 in the year ended December 31, 1998 to $8,139,500 for the year ended December 31, 1999, in both cases due to the growth of the funds' net assets caused by additional investor capital contributions and positive investment performance."

124.    TA attributed the success of its funds to the managers it selected to invest fund assets. Indeed, according to TA's Form 2000 10-K, TA's "proprietary investment funds were originally created to provide clients with vehicles for investment with 'hard-to-access' managers." TA's 2000 10-K also stated that: "Tremont's single-manager funds offer access to managers who have undergone review by the Company's research department and investment committee. The Company sponsors only the funds of those managers it believes to be the 'best in class,' who generally have at least a 12 month track record and $50 million under management." TA's "hard-to-access" and "best in class" manager was Madoff.

125.    According to the Proxy Statement, in early March 2001, Oppenheimer approached Putnam Lovell and expressed interest in exploring a potential strategic transaction with TA. After discussions between high level executives of both companies, Oppenheimer and TA determined to continue their discussions, and, on March 14, 2001, entered into a confidentiality agreement. Putnam Lovell then provided Oppenheimer with a package of information it had assembled on TA, which included "a description of Tremont's various business lines, an overview of its investments and distribution platform, its strategic relationships, its distribution needs and its financial projections."

126.    Oppenheimer was also given access to TA's "data room" which, according to the Proxy Statement, "housed an extensive list of Tremont due diligence material including legal

contracts, corporate documents, regulatory filings, audited and unaudited financial statements."
Oppenheimer then conducted extensive due diligence on TA, including its funds, its fund managers,
and its due diligence procedures.

127.     According to the Proxy Statement, as part of Oppenheimer's due diligence, TA
provided to Oppenheimer "true, correct and complete copies of the offering documents, subscription
agreements, administrative services agreements, distribution or placement agency agreements,
solicitation agreements and custody agreements, as applicable, or any similar agreements, in any
case pertaining to the Funds and used since January 1, 1998."

128.     TA also "agreed to afford to Oppenheimer and its representatives reasonable and
prompt access to our information, assets and personnel and to make available to Oppenheimer on a
timely basis a copy of each material document filed, furnished or received by us pursuant to the
requirements of domestic or foreign laws and all other information reasonably requested by
Oppenheimer concerning our business, properties and personnel."

129.     Indeed, in the Proxy Statement, TA represented and warranted that it had provided
Oppenheimer with "each Company Contract between the Company, any of its Subsidiaries or any of
the Funds and any other Person ... in which the Company, any of its Subsidiaries or any of the
Funds owns an equity interest," and "each other Company Contract material to the business,
governance, operations or financial condition of the Company, any of its Subsidiaries or any of the
Funds." Any contract between TA and Madoff or BMIS therefore would have been analyzed by
Oppenheimer during due diligence.

130.     As part of its due diligence, Oppenheimer also had various meetings with TA
personnel, including Defendants Manzke and Schulman, which, according to the Proxy Statement,
"focused on various business function areas, such as sales and marketing, accounting and

- 54 -

administration and manager research." Thus, Oppenheimer had full access to all information pertaining to TA's all-important "strategic relationships," TA's due diligence on the investment managers of its funds, and the due diligence procedures employed by TA.

131.    Oppenheimer's due diligence on TA continued for three months until mid-June 2001. As a result of its extensive due diligence, Oppenheimer would have discovered that the "hard-to-access" and "best in class" manager of TA's proprietary funds was Madoff. Oppenheimer also knew that the robust revenue stream TA derived from these funds was largely the result of TA's relationship with the "hard to access" and "best in class" manager, namely Madoff.

132.    Indeed, Putnam Lovell, in its analysis of the financial fairness of the merger, considered "the significant contribution to Tremont's revenues from a single relationship it has with an investment manager to its proprietary investment products." Throughout the due diligence process, Putnam Lovell, which had a pre-existing relationship with Oppenheimer, had numerous meetings and discussions with Oppenheimer. Oppenheimer knew that if it acquired TA, it was acquiring TA's extremely lucrative "single relationship" with Madoff.

133.    On July 10, 2001, Oppenheimer and TA entered into the Merger Agreement pursuant to which Oppenheimer acquired TA for $145.3 million. This $145.3 million purchase price was over thirty-six times TA's net income in 2000 and ten times its net worth on TA's pro forma balance sheet. The purchase price was to be financed by Oppenheimer's cash on hand, and, if necessary, capital contributions by Oppenheimer's ultimate parent MassMutual.

134.    As part of the merger, Oppenheimer's subsidiary, OppenheimerFunds, Inc., entered into employment agreements with Defendants Manzke and Schulman, the Co-Chief Executive Officers of TA, whereby Manzke and Schulman would retain their positions for five years following the merger.

135.    Under their respective employment agreements, Manzke and Schulman were to receive annual salaries of $500,000 each and would be eligible for annual discretionary bonuses of up to 150% of their base salaries, but no less than the lower of $500,000 and 20% of a bonus pool. The bonus pool was to consist of up to 22.5% of the annual EBITDA of TA for 2002 and beyond. Oppenheimer was willing to pay Manzke and Schulman these amounts because they had the relationship with Madoff, and Oppenheimer wanted to make sure that relationship would continue after it acquired TA. In fact, one of the conditions under which Oppenheimer could terminate the merger was if these employment agreements with Manzke and Schulman were not in effect at the time of the merger's closing.

136.    In the July 10, 2001 press release announcing the merger, Oppenheimer emphasized that its distribution network would make TA's funds widely available to the investing public. John V. Murpy, then the Chairman and CEO of OppenheimerFunds, Inc., stated that "Tremont's unique product offerings, in combination with our distribution network, will open up the world of alternative investing to a new segment of investors."

137.    TA also touted the benefit of Oppeneheimer's distribution network to increasing the availability of TA funds. Defendant Schulman declared, "[o]ur alliance with OppenheimerFunds in an excellent strategic fit that brings together Tremont's capabilities in creating alternative investment products with Oppenheimer's strong financial intermediary relationships and unparalleled distribution talents."

138.    Oppenheimer's acquisition of TA and its funds allowed Oppenheimer to fill a gap in its product line that was sure to garner profits, and to maximize those profits by making the funds available to a wider array of investors. As Kurt Wolfgruber, the Director of Domestic Equities at OFI, was quoted as saying in a July 11, 2001 article in *The New York Times*: "Tremont fits perfectly

with our goal of extending both our product line and our client base," adding that "[o]ur clients have been asking for hedge funds more frequently."

139.    Similarly, in a July 16, 2001 article about the merger in *The Financial Times*, John V. Murphy, the Chairman and CEO of OppenheimerFunds, Inc., was quoted as saying: "We believe Tremont's multi-manager, fund-of-funds approach to hedge fund investing will appeal to many of our high net worth individuals."

140.    The merger was consummated in October 2001. Following the merger, TA marketed itself as "An OppenheimerFunds Company."

141.    Further, TA emphasized its connection to Oppenheimer and MassMutual in its marketing materials. In describing its privacy policy in its private placement memoranda for its funds, TA stated:

> Tremont is made up of certain entities, including its investment advisory and broker-dealer subsidiaries, and, in turn, is part of a larger corporate affiliation owned by the OppenheimerFunds group and Massachusetts Mutual Life Insurance Company. The Tremont entities and, in some cases, its ownership affiliates often work together to provide the financial products and services offered to Tremont Clients. By sharing information about Tremont's Clients among these companies and affiliates, Tremont can serve Clients more efficiently. Tremont is permitted to share information concerning Client account history and experiences within and among the companies that comprise Tremont and its subsidiaries and affiliates.

**MassMutual Represented Itself, Oppenheimer and Tremont**
**As Being Part Of One Integrated Financial Services Company**

142.    MassMutual markets itself and its subsidiaries, such as OppenheimerFunds, Inc. and Tremont, as one integrated financial services company under the name "MassMutual Financial Group." MassMutual's annual reports include discussions of its life insurance, mutual fund and asset management businesses, among others, and its consolidated financial statements report results from each of these businesses.

143.    MassMutual's annual reports for 2006 and 2007 state that "Massachusetts Mutual Life Insurance Company and its subsidiaries have offices around the globe," and list and provide contact information for "OppenheimerFunds, Inc., Tremont Group Holdings, Inc. and Tremont Capital Management Ltd."   The three subsidiaries are identified as "general agencies and other offices."

144.    In describing its "Corporate Operations" in its 2005 Annual Report, MassMutual refers to itself as a "diversified financial services organization" and states that: "When leveraged across the enterprise, [our] resources help us increase efficiencies and take advantage of economies of scale, ensuring that people in our lines of business can focus on their primary objective: to develop, distribute and service a wide variety of financial products to help our customers meet their needs."

145.    In its 2005 Annual Report, MassMutual also touted the strength of its asset management business, which includes OppenheimerFunds, Inc. and Tremont, writing: "The MassMutual Financial Group companies have the experience and disciplined financial expertise required by today's sophisticated individual, corporate and institutional investors.  From $325.8 billion in 2004 to $395.9 billion as of year-end 2005, assets under management at our companies, including OppenheimerFunds, Inc. ... increased more than 22 percent. This reflects the confidence investors have in our asset management capabilities."

146.    In the 2005 Annual Report, MassMutual singled out the success of its subsidiaries that are "funds of funds" such as the Tremont Funds: "Similarly, the company's businesses serving affluent investors continued to grow, expanding offerings and gaining traction in key products such as hedge funds of funds, separately managed accounts and college savings plans. As a result, these businesses now collectively manage over $8.5 billion in assets, with sales up 15 percent over last

year." The Annual Report further noted that: "In late 2005, OppenheimerFunds, along with its subsidiaries and controlled affiliates, reached a significant milestone, surpassing $200 billion in assets under management."

147.    Similarly, in its 2006 Annual Report, MassMutual reported that OppenheimerFunds, Inc. and its controlled affiliates:

> have helped investors realize their financial goals by offering diverse investment products, strong long-term investment performance and excellent customer service. The company's consistent focus on long-term investing, building lasting partnerships with financial advisors and maintaining a values-based culture is the foundation of its success and the springboard for its continued growth.

> Each of the company's business lines – serving retail and institutional clients – experienced significant growth in 2006. Sales for the company totaled $59.7 billion, up 29 percent over 2005; assets under management were $244.1 billion at year-end 2006, a 19.5 percent increase over the previous year. This marks the company's fourth consecutive year of record results.

148.    In its 2007 Annual Report, MassMutual stated that OppenheimerFunds, Inc. is "[o]ne of the nation's largest and most respected investment management companies, [and] OppenheimerFunds has been helping investors realize their financial goals for nearly a half century. OppenheimerFunds and its controlled affiliates offer a broad range of products and services."

149.    The Annual Report emphasized that the interconnected relationships among MassMutual and its investment subsidiaries enhanced MassMutual's overall financial strength and stability: "The MassMutual Financial Group of companies includes a number of respected investment management companies. If you have an insurance policy or retirement plan with us, your money is often managed by these industry leaders. Or, they can serve you and other investors independently. Their presence in the MassMutual Financial Group enhances our overall financial strength and stability."

150.    In addition, according to its 2007 Annual Report, MassMutual has agreements with its affiliates, such as OppenheimerFunds, Inc., to provide record keeping and other services. As of December 31, 2007, these affiliates owed MassMutual $17 million.

151.    MassMutual also acknowledged the role its subsidiaries, such as OppenheimerFunds, Inc. and Tremont, played in its overall success as a company. In a 2008 MassMutual publication entitled "The Keys to Investment Management," MassMutual states: "Our investment management expertise, which is integral to the success of our company and products, is drawn from our investment subsidiaries." These investment subsidiaries include OppenheimerFunds, Inc. and Tremont.

152.    In its 2008 Annual Report, MassMutual referred to OppenheimerFunds, Inc. as "[o]ne of the nation's largest and most respected investment management companies," and reiterated that OppenheimerFunds, Inc. and "its controlled affiliates offer a broad range of products and services to individuals, corporations and institutions."

153.    In addition, Defendants Manzke and Schulman, who were hired as executives of OppenheimerFunds, Inc. as part of the merger, enjoyed the same benefits as other OppenheimerFunds, Inc. executives. According to the Proxy Statement, Manzke and Schulman would "receive employee benefits on the same basis as other similarly situated [OppenheimerFunds, Inc.] executives," and participate in a bonus pool established for Tremont that was "consistent with Oppenheimer's overall bonus arrangements." Under their respective employment agreements, Manzke and Schulman had the right to terminate their employment if, among other things, there was "a material diminution of the level of the executive's title and reporting position to the board of directors of Tremont, [OppenheimerFunds, Inc.] or Oppenheimer from those in effect immediately following the completion of the merger."

154.    After the acquisition of Tremont, MassMutual operated and marketed itself as a single, integrated financial services company comprised of its life insurance business and its investment subsidiaries such as OppenheimerFunds, Inc. and Tremont. MassMutual therefore controlled Tremont and is responsible for Tremont's false statements and material omissions in the Rye Funds' private placement memoranda, the ongoing false statements and material omissions in other communications, and Tremont's failure to discharge its professional duties in a manner consistent with its fiduciary obligations.

MassMutual and Oppenheimer Controlled Tremont

155.    MassMutual, through its control of Oppenheimer, controlled Tremont.

156.    Oppenheimer is a majority owned subsidiary of MassMutual Holding Trust 1 ("MassMutual Trust"), a Massachusetts business trust, which is controlled by MassMutual Holding Company, a Delaware corporation ("MassMutual Holding"). MassMutual Holding, in turn, is controlled by MassMutual.

157.    MassMutual appointed its own employees on the boards of Oppenheimer and MassMutual Trust, both of which it controlled. For example, after Oppenheimer acquired Tremont, the following MassMutual employees were members of the board of directors of both Oppenheimer and MassMutual Trust: Howard E. Gunton, Executive Vice President and Chief Financial Officer of MassMutual; Stuart H. Reese, Executive Vice President and Chief Investment Officer of MassMutual; John V. Murphy, Executive Vice President of MassMutual; Lawrence W. Burkett, Jr., Executive Vice President and General Counsel of MassMutual; and Ann F. Lomeli, Senior Vice President, Secretary and Deputy General Counsel for MassMutual.

158.    MassMutual's majority stock ownership of Oppenheimer and its installment of its own officers in high level executive positions at Oppenheimer gave MassMutual control over all

aspects of Oppenheimer and Oppenheimer's subsidiaries, including OppenheimerFunds, Inc. and Tremont.

159.    Further, MassMutual and Oppenheimer executives controlled Tremont as directors of Tremont Capital or TGH.

160.    John V. Murphy, was a director of Tremont Capital from 2001-2009, the President and a director of Oppenheimer from 2001-2009, Chairman, President and Chief Executive Officer of OFI from 2001-2008, the Chairman of OFI in 2009, and Executive Vice President of MassMutual from 2001-2009.

161.    Michael T. Rollins was a director of TGH in 2007, Senior Vice President of MassMutual in 2005, and Executive Vice President  and Chief Financial Officer of MassMutual from 2006-2009.

162.    Kurt Wolfgruber was a director of Tremont Capital from 2003-2009, the Director of Domestic Equities of OppenheimerFunds, Inc. from 2001-2003, Chief Investment Officer of OFI from 2003-2007, and Chief Investment Officer and President of OppenheimerFunds, Inc. from 2007-2009.

163.    In addition, individuals employed by or affiliated with MassMutual and Oppenheimer controlled the board of directors of hedge funds that were advised by OppenheimerFunds, Inc. and sub-advised by TPI. For example, according to the Annual Report of the Tremont Core Strategies Fund, the fund had one insider trustee, John V. Murphy, who was the President and Principal Executive Officer of the Fund, and was also the President of Oppenheimer, Chairman of OppenheimerFunds, Inc. and Executive Vice President of MassMutual.  While the other ten trustees of the fund were characterized as independent trustees, all of them had an affiliation with OppenheimerFunds, Inc. as overseers of other portfolios in the OppenheimerFunds, Inc. complex.

Each of Brian F. Wruble and David K. Downes oversaw portfolios of 64 OppenheimerFunds, Inc. funds, and the following trustees oversaw 54 OppenheimerFunds, Inc. funds: Matthew P. Fink, Robert G. Galli, Phillip A. Griffiths, Mary F. Miller, Joel W. Motley, Russell S. Reynolds, Jr., Joseph W. Wikler and Peter I. Wold.

OppenheimerFunds, Inc., as the Advisor to the Oppenheimer Tremont Funds,
Knew or Should Have Known Tremont Invested Fund Assets With Madoff

164.   Following the merger with Tremont, MassMutual and Oppenheimer established, among others, the Oppenheimer Tremont Market Neutral Fund, LLC ("Oppenheimer Tremont MNF") and the Oppenheimer Tremont Opportunity Fund, LLC ("Oppenheimer Tremont Opportunity"). According to their prospectuses, OppenheimerFunds, Inc. was the investment adviser and Tremont Partners was the investment manager of the funds, subject to supervision by OppenheimerFunds, Inc.

165.   As investment adviser to the funds, OppenheimerFunds, Inc., subject to the ultimate supervision of and subject to any policies established by the fund's board, was "…responsible for developing, implementing and supervising the Fund's investment program and for providing various administrative services to the Fund…." OppenheimerFunds, Inc. therefore had access to Tremont's investments and had knowledge of Tremont's use of Madoff.

166.   Pursuant to the Oppenheimer Tremont MNF and Oppenheimer Tremont Opportunity's prospectuses, Manzke and Schulman were part of the management team of the funds, and were "primarily responsible for selecting Portfolio Managers and allocating the Fund's assets among the Portfolio Managers."

167.   Oppenheimer Tremont MNF and Oppenheimer Tremont Opportunity each had an eight member Board of Managers, the function of which, according to their Statement of Additional Information, was to "manage and control the business affairs of the Fund, including the complete

and exclusive authority to establish policies regarding the management, conduct and operation of the Fund's business." Of the eight members of the Board of Managers of the funds, six had affiliations with either MassMutual or Oppenheimer.

168.    Due to its exposure to Madoff's ponzi scheme, Oppenheimer closed the Oppenheimer Tremont MNF as of March 25, 2009.

169.    On March 31, 2009, in the wake of the collapse of the Funds, Kurt Wolfgruber, who was a director of Tremont Capital, "resigned" from his position as OppenheimerFunds, Inc.'s Chief Investment Officer, presumably as a result of the Oppenheimer Tremont funds' exposure to Madoff on his watch.    Wolfgruber's resignation was announced in a press release issued by OppenheimerFunds, Inc., which announced in the same press release that OppenheimerFunds, Inc. was making additional staffing changes to "enhance its risk management capabilities" to assure its clients and the investment public that its risk monitoring procedure would not expose its clients to unscrupulous investment managers like Madoff in the future.

### Defendants Ernst & Young and KPMG Failed to Perform Their Functions as Auditors to the Rye Funds

170.    During the Class Period, Defendants Ernst & Young and KPMG failed to perform their functions as auditors to the Rye Funds in a manner consistent with the standards of Generally Accepted Auditing Standards ("GAAS") as established by the Accounting Standards Board ("ASB") of the American Institute of Certified Public Accountants ("AICPA"), and instead, issued audit reports that contained false and misleading statements.

171.    GAAS consists of ten standards that establish guidelines for audit procedures and for the overall objectives to be achieved by a financial statement audit. The primary requirement under GAAS is that the auditor exercise due professional care in the performance of procedures and in the rendering of an opinion. Auditors are required to follow GAAS in every audit they conduct. GAAS

includes Statements of Auditing Standards ("SAS") issued by the ASB, which have been codified in AICPA Professional Standards under the prefix "AU."

172.    Specifically, during the Class Period, Ernst & Young and KPMG issued unqualified audit opinions for the annual financial statements of the Rye Funds during their respective tenures as the Rye Funds' auditor. With regard to each of the annual reports at issue, Defendants Ernst & Young and KPMG represented that their audits were conducted and prepared in accordance with GAAS. The audit reports also stated that as part of the audits, Ernst & Young and KPMG examined, "on a test basis, evidence supporting the amounts and disclosures in the financial statements." These audit reports, however, were false and misleading because, as discussed below, the audits failed to conform with numerous GAAS provisions and contained numerous false statements about, inter alia, the Rye Funds' net assets, results of operations and cash flows for each of the audit years in question.

173.    In auditing the financial statements for the Rye Funds, Ernst & Young and KPMG knowingly or recklessly disregarded numerous red flags, including: (i) that the Rye Funds' investments were heavily concentrated in a single sub-manager, Madoff; (ii) that Madoff's purported trading strategy and returns were unable to be replicated by others in the financial industry and were consistently achieved despite the performance of the overall financial market;  (iii) that Madoff did not employ any third party administrators and custodians; Madoff instead ran his own back office operations – i.e., the calculation of net asset values, and the preparation of account statements, etc.; (iv) that the Rye Funds relied solely on Madoff to provide them with reports on the performance of the Funds' investments; (v)  that there was a discrepancy between the trading activity in which Madoff claimed to be buying and selling puts and calls and the open interest of index option contracts; (vi) that Madoff lacked transparency and limited access to his books and records; (vii)

that, as he later admitted, Madoff had been illegally manipulating his accounting records by personally subsidizing returns in slow quarters in order to minimize risk and to maximize reported performance; and (viii) that BMIS was audited by a small operation, whereas 90% of single strategy hedge funds are audited by one of the top 10 auditors.

174.    GAAS required Ernst & Young and KPMG to obtain a sufficient understanding of the Rye Funds, including the internal controls in place, in order to assess the risk of material misstatement of the Rye Funds' financial statements. As set forth herein, Ernst & Young's and KPMG's utter failure to identify any of the significant audit risks present at the Rye Funds, illustrates their failure to obtain a sufficient understanding of the Rye Funds.

175.    Ernst & Young and KPMG's failure to recognize any of the multiple red flags rendered each of their audits of the Rye Funds annual statements in violation of AU § 230, which provides that an "auditor must exercise due professional care in the performance of the audit and the preparation of the report." Due professional care "imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting." AU § 230 also requires that an auditor exercise professional skepticism in evaluating the audit evidence.

176.    Ernst & Young and KPMG also violated AU § 311, which required them to properly plan their audits of the Rye Funds, as well as AU § 314, which required them to understand the entity and its environment and in assessing the risk of material misstatement. In order to conduct a proper audit of the Rye Funds, Ernst & Young and KPMG were required to obtain an understanding of, among other things, the Rye Funds' investments, ownership structure and operations. AU § 314 further required Ernst & Young and KPMG to evaluate the design of the internal controls at the Rye Funds. Since Madoff and BMIS acted as investment advisor, prime broker and custodian of the vast

majority of the Rye Funds' investments, Ernst & Young and KPMG should have been aware that this created a significant audit risk that required further investigation.

177.    In addition, AU § 316 provides that "the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 316 notes that assets resulting from investing activities may be deemed to have high inherent risk because of the subjectivity and management judgment involved in estimating fair values of those investments. By failing to maintain an appropriate degree of skepticism in the performance of their audits, especially in light of the fact that virtually all of the Rye Funds' income was coming from their investments with Madoff, Ernst & Young and KPMG violated AU § 316.

178.    AU § 318 also required that, to the extent Ernst & Young and KPMG relied upon the internal controls in place at the Rye Funds, they were required to determine whether the internal controls were, in fact, operating effectively. Ernst & Young and KPMG were required to test, *inter alia*, the existence and valuation of the Rye Funds' securities, as well as the reasonableness of the Rye Funds' reported investment income.

179.    Ernst & Young and KPMG performed audits that were in further violation of AU §318, as well as AU §§ 324 and 332. For example, according to AU §§ 318 and 332, Ernst & Young and KPMG should have obtained additional audit evidence about the operating effectiveness of those controls relating to initiation, recording, processing, and reporting of BMIS's investment advisory clients' transactions (including those of the Rye Funds), and those relating to the custody of BMIS's investment advisory clients' investments (including those of the Rye Funds).

180.    Furthermore, under AU § 318, they should have required that substantive procedures be performed at BMIS relating to the Rye Funds' reported investments and investment income.

According to AU §§ 324 and 543, Ernst & Young and KPMG could have performed these procedures themselves, or they could have relied on a report from a reputable auditor whose work was adequate to meet these audit objectives.

181. AU §326 provides that the quantity of audit evidence needed is affected by the risk of misstatement (the greater the risk, the more audit evidence is likely to be required) and also by the quality of such audit evidence (the higher the quality, the less the audit evidence that may be required). Here, the fact that the Rye Funds' investment with Madoff accounted for the vast majority of the Rye Funds' assets made the risk of material misstatement very high. This, coupled with the fact that Madoff also acted as the investment advisor, prime broker, and custodian for the Rye Funds' assets, should have led Ernst & Young and KPMG to obtain the highest level of audit evidence before issuing unqualified opinions regarding the Rye Funds' financial statements.

182. Similarly, AU § 332 provides that when valuations of alternative investments, such as hedge funds, are based on an investee's financial results, the auditor should obtain sufficient appropriate audit evidence in support of the investee's financial results.

183. In addition, AICPA publication, *Alternative Investments – Audit Considerations, A Practice Aid for Auditors*, which was intended to assist auditors in their audits of hedge funds and funds of funds, states that when conducting a risk assessment, "the extent of the audit evidence necessary for the auditor to conclude on the sufficiency and the appropriateness of audit evidence increases as: (1) the percentage of alternative investments to both total assets as well as the total investment portfolio increases; and (2) the nature, complexity and volatility of the underlying investments increases."

184. By failing to obtain sufficient evidence to support their opinions about the conformity of the Rye Funds' financial statements to GAAS, especially in light of the fact that the vast majority

of the Rye Funds' assets were invested with Madoff and that Madoff's entire operation was audited by a one man accounting firm that did not perform auditing services, Ernst & Young and KPMG did not comply with these procedures.

185.    Under these circumstances, Ernst & Young and KPMG should have taken additional steps to verify the Rye Funds' investments with BMIS, including *inter alia*: (i) observing the Rye Funds' visits and telephone calls with BMIS; (ii) inspecting other documentation showing the Rye Funds' investments with BMIS; and (iii) reviewing periodic statements from BMIS reflecting the investment activity and comparing that activity with amounts recorded by the Rye Funds.

186.    Had Ernst & Young and KPMG performed their audit functions in a reasonably acceptable manner, they would have been alerted to the "red flags" of the Madoff Ponzi scheme.

187.    Instead, Ernst & Young and KPMG recklessly ignored all of these "red flags" and issued unqualified audit opinions without performing the procedures necessary to verify the existence and the valuation of the Rye Funds' investments with Madoff. Ernst & Young and KPMG could have obtained the necessary verification by having another reputable auditor perform the audit procedures or performing these procedures themselves. Ernst & Young and KPMG also failed to properly test the internal controls at the Rye Funds for confirming the amount of returns Madoff reported to the Rye Funds.

188.    Because Madoff claimed to put all of his clients' assets into United States Treasuries at the end of each reporting period, it would have been simple for an auditor to confirm this by seeking the confirmations from the depository institutions or clearing houses where the book entries for these transactions should have existed and comparing them with the settlement statements issued by Madoff.

189.    An auditor should have also requested the trade confirmations from Madoff's alleged counter-parties and immediately seen that the trades did not take place. Because Ernst & Young and KPMG failed to verify the Rye Funds' investments with Madoff, they could not have properly issued unqualified audit opinions on the Rye Funds' financial statements or claim that their respective audits were performed in accordance with GAAS.

190.    Both Ernst & Young recklessly issued unqualified opinions regarding the Rye Funds' financial statements and falsely stated that the financial statements "present fairly, in all material respects, the financial position of [the Rye Fund at issue] ...and the results of its operations, the changes in its net assets and its cash flows for the year then ended in conformity with the accounting principles generally accepted in the United States of America."

191.    The Rye Funds mailed the annual financial statements of the Rye Funds, together with unqualified audit reports of Ernst & Young and/or KPMG, to Plaintiffs and the members of the Class. These financial statements were intended to be accurate representations of the financial status of each of the Rye Funds and to be relied on by Plaintiffs and the members of the Class. Both Ernst & Young and KPMG knew the purpose of their audits of the Funds and that the information would be disseminated to Plaintiffs and the members of the Class, who the auditors knew or should have known, would rely on the same. Indeed, some, if not all, of the audit reports were addressed directly to the members of the Class.

192.    Plaintiffs and the Class were damaged by Ernst & Young and KPMG's knowing or reckless conduct in that it caused them to retain their interests in the Rye Funds.

193.    Ernst & Young and KPMG both received substantial fees for their audit work for the Rye Funds and have been unjustly enriched.

**Tremont Shuts Down Defendant Rye**

194.     An article published in *FINalternatives* on January 27, 2009 entitled "Tremont Closes

Rye After Madoff Losses," stated that:

> Tremont Group Holdings has shuttered its Bernard Madoff-scarred Rye Investment
> Management division, it said yesterday.
>
> The New York-based firm has suspended the operations of Rye, its single-manager
> hedge fund unit that had all of its assets under management invested with Madoff,
> who was charged last year with running a $50 billion Ponzi scheme. Before the
> scandal broke, the Rye, N.Y.-based unit managed $3.1 billion.
>
> The decision to close Rye is part of a broader restructuring of Tremont "to reflect
> market conditions and the reduced amount of assets under management," the
> MassMutual unit said in a statement. In addition to Rye's losses, Tremont's fund of
> hedge funds unit, Tremont Capital Management lost some $190 million invested with
> Madoff.
>
> Tremont made clear that the closure of Rye did not mean the foreclosure of attempts
> to recoup its losses in court.
>
> "While the Rye Investment Management unit is permanently suspended, it also
> retains the staff necessary to seek to recover any available Madoff assets," the firm
> said.

## CLASS ACTION ALLEGATIONS

195.     Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the

Federal Rules of Civil Procedure, on behalf of all persons or entities that purchased and/or held

Policies issued by TIIL or Argus Intl and managed by the Tremont Defendants from May 10, 1994

through December 11, 2008. Excluded from the Class are the Defendants, and any entity in which

the Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives,

heirs, successors, subsidiaries, and/or assigns of any such individual or entity. The members of the

Class are so numerous that joinder of all members is impracticable. While the exact number of Class

members is unknown to Plaintiffs at this time and can only be ascertained through appropriate

discovery, Plaintiffs believe there are in excess of one hundred members of the Class.

196.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation; they are members of the Class; their claims are typical of the claims of all Class members; and they do not have interests antagonistic to, or in conflict with, those of the Class.

197.    There are numerous questions of law and fact which are common to the Class and which predominate over any questions affecting individual members of the Class, including:

(a)    whether Defendants Tremont, Argus, the Individual Defendants and the Auditor Defendants breached their fiduciary duties to Plaintiffs and the Class by failing to properly manage their investments and to perform necessary due diligence that would have uncovered the massive Ponzi scheme carried out by Madoff and BMIS, and the wrongful dissipation of the assets of Plaintiffs and the Class;

(b)    whether and to what extent Plaintiffs and the Class were damaged by Defendants Tremont, Argus, the Individual Defendants and the Auditor Defendants' breaches of fiduciary duty;

(c)    whether Defendants Tremont, Argus, the Individual Defendants and the Auditor Defendants were grossly negligent in failing to perform necessary due diligence that would have uncovered the massive Ponzi scheme carried out by Madoff and BMIS;

(d)    whether and to what extent Plaintiffs and the Class were damaged by Defendants Tremont, Argus, the Individual Defendants and the Auditor Defendants' gross negligence;

(e)    whether Defendant Argus breached its fiduciary duties to Plaintiffs and the Class by making Tremont-managed funds an acceptable Investment Account without conducting a comprehensive due diligence review;

(f)     whether Defendants Tremont, Argus, the Individual Defendants and the Auditor Defendants' conduct was in violation of fiduciary duties owed Plaintiffs and the Class and therefore in violation of the law governing fiduciaries;

(g)     whether Defendants TGH, the Controlling Defendants and the Auditor Defendants aided and abetted the breaches of fiduciary duties owed Plaintiffs and the Class;

(h)     whether Defendants Tremont, the Controlling Defendants and the Auditor Defendants were unjustly enriched at the expense of Plaintiffs and the Class;

(i)     whether it is appropriate to create a constructive trust to hold fees paid to Defendants;

(j)     whether management and performance fees were paid based on a mutual mistake of the parties; and

(k)     the extent of damages sustained by Plaintiffs and the Class and the proper measure of such damages.

198.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the Court system and could create the possibility of inconsistent judgments. Moreover, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually. There will be no difficulty in the management of this action as a class action.

### COUNT 1

**For Common Law Fraud**
**Against the Tremont Defendants, the Individual Defendants and the Auditor Defendants**

199.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

200.    Plaintiffs and other members of the Class, in reasonable and justifiable reliance upon the statements and representations made by Defendants named in this Count, purchased investment

interests in the Rye Funds.  Plaintiffs and other members of the Class would not have purchased their investment interests in the Rye Funds except for their reliance upon the representations made by the Defendants in this Count in the Offering documents for the Rye Funds, performance reports, audit reports, and other materials, and would never have purchased them had they been aware that the Defendants failed to conduct due diligence, or alternatively, failed to conduct adequate due diligence on Madoff and BMIS.

201.    Similarly, as the Rye Funds' auditors, the Auditor Defendants knew or should have known that the majority of the Rye Funds' assets were not invested as described in the Offering documents and other materials distributed to Plaintiffs and the Class, but, rather, were invested heavily in Madoff-related vehicles.  The Auditor Defendants also falsely certified the Funds' financial statements and reports.

202.    At the time the statements and representations were made by Tremont Defendants and the Auditor Defendants in the Offering documents, account statements, audit reports, and other materials, these Defendants knew them to be false and intended to deceive Plaintiffs and other members of the Class by making such statements and representations.

203.    At the time of the false statements, misrepresentations and omissions set forth above, each of the named Defendants intended that Plaintiffs and other members of the Class would act on the basis of the misrepresentations and omissions contained in the Offering documents, account statements, audit reports, and other materials, in determining whether to purchase investment interests in the Rye Funds.  Plaintiffs and other Class members reasonably relied thereon to their detriment in making such decisions.

204.    Had Plaintiffs and other members of the Class known of the material facts that the named Defendants wrongfully concealed and misrepresented, and the falsity of the named

Defendants' representations, Plaintiffs and other Class members would not have purchased their investment interests in the Rye Funds.

205.    Plaintiffs and other members of the Class, as a result of their purchase of investment interests in the Rye Funds and by reason of the named Defendants' wrongful concealments and misrepresentations, have sustained damages, losing all or substantially all of their respective investments in the Rye Funds in an amount yet to be determined, and to be proven at trial.

206.    By reason of the foregoing, the named Defendants are jointly and severally liable to Plaintiffs and other Class members.

207.    Defendants' fraudulent acts were willful and wanton and Plaintiffs and other Class members are entitled to punitive damages.

## COUNT II

### For Breach of Fiduciary Duty
### Against the Tremont Defendants, the Argus Defendants and the Individual Defendants

208.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

209.    Plaintiffs and the Class invested their assets with the Tremont Defendants, the Argus Defendants and the Individual Defendants. As a result, the Tremont Defendants, the Argus Defendants and the Individual Defendants owed fiduciary duties to Plaintiffs and the Class.

210.    As investment managers, the Tremont Defendants, the Argus Defendants and the Individual Defendants knew or should have known how to exercise their fiduciary obligations in monitoring the safety and performance of the assets of Plaintiffs and the Class in a prudent and professional manner.

211.    Specifically, the Tremont Defendants, the Argus Defendants and the Individual Defendants failed to conduct adequate and comprehensive due diligence reviews on the Investment Accounts that they offered to Plaintiffs and other members of the Class.  The Tremont Defendants,

the Argus Defendants and the Individual Defendants, as a result, ignored numerous "red flags" that would have warned them of the fraudulent scheme perpetrated by Madoff and BMIS. The Tremont Defendants, the Argus Defendants and the Individual Defendants have further caused the dissemination of the false and misleading statements and omissions alleged herein.

212.    The Tremont Defendants, the Argus Defendants and the Individual Defendants further breached the following fiduciary duties owed to Plaintiffs and the Class:

(a)    the duty to deal fairly and honestly with Plaintiffs and the Class;

(b)    the duty to act with reasonable care to verify the truthfulness of the information set forth in the written materials, including the Information Memorandum, monthly account statements, and other presentations communicated to and relied upon by Plaintiffs and the Class;

(c)    the duty to oversee that the investment assets were made and maintained in a prudent and professional manner;

(d)    the duty to perform due diligence and to maintain oversight and transparency as to the activities of any fund manager that managed the investment assets; and

(e)    the duty to exercise the prudent and cautious judgment and best practices that would be expected of investment managers.

213.    As a direct and proximate result of the Tremont Defendants', the Argus Defendants' and the Individual Defendants' breaches of their fiduciary duties, Plaintiffs and the Class have suffered damages and are entitled to such damages from the Tremont Defendants, the Argus Defendants and the Individual Defendants, jointly and severally, as well as a return of all fees paid to the Tremont Defendants, the Argus Defendants and the Individual Defendants.

214.    The Tremont Defendants, the Argus Defendants and the Individual Defendants are further liable for punitive damages as a result of their wanton and grossly negligent course of conduct.

## COUNT III

### For Negligent Misrepresentation
### Against the Tremont Defendants and the Individual Defendants

215.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

216.    This cause of action is brought against the Tremont Defendants and the Individual Defendants based on negligent misrepresentation.

217.    The Tremont Defendants and the Individual Defendants owed Plaintiffs and the Class a duty to act with reasonable care in connection with the assets entrusted to them by Plaintiffs and the Class and to conduct due diligence to determine the accuracy and preparation of information contained in the policy statements.

218.    The Tremont Defendants and the Individual Defendants breached these duties knowingly, wantonly, recklessly, or at least negligently, by including untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made reflecting the value of the monies and/or Policies, in light of the circumstances under which they were made, not misleading.

219.    At the time of the misrepresentations and omissions of material facts by the Tremont Defendants and the Individual Defendants, Plaintiffs and the Class were ignorant of their falsity and believed them to be true. Plaintiffs and the Class relied upon the representations made by Tremont and the Individual Defendants. Neither the account statements nor any of the other materials disseminated by the Tremont Defendants and the Individual Defendants ever disclosed the risks

associated with investing with Madoff or BMIS. Had Plaintiffs and the Class been aware of the true facts, they would not have invested in the Rye Funds.

220.    Neither Plaintiffs and the Class nor their agents knew of the falsity and/or misleading nature of the Tremont Defendants' and the Individual Defendants' statements and omissions and, therefore, relied upon the representations made by the Tremont Defendants and the Individual Defendants.

221.    The Tremont Defendants' and the Individual Defendants' conduct constitute the making of negligent misrepresentations (including negligent omissions to state facts in connection with statements that were made) under applicable state law. As a direct and proximate result of the negligent misrepresentations (and omissions) by the Tremont Defendants and the Individual Defendants, and in reliance thereon, Plaintiffs and the Class have suffered damages in connection with their investment in the Rye Funds.

## COUNT IV

### For Breach Of Fiduciary Duty Against The Auditor Defendants

222.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

223.    The Auditor Defendants were required to perform their functions as auditors to the Rye Funds in a manner consistent with the standards of GAAS, and instead, issued audit reports that contained false and misleading statements. Plaintiffs were directly affected by these false and misleading audit reports and were recipients of account statements based on the audits.

224.    The Auditor Defendants breached their duty to Plaintiffs and the Class to perform their audits in accordance with GAAS by knowingly or recklessly ignoring information that indicated or should have indicated that the monies invested by Plaintiffs and the Class in the Rye Funds were being invested with Madoff and BMIS and that Madoff and BMIS were involved in a Ponzi scheme.

225.    The Auditor Defendants breached their fiduciary duties by:

(a)    Failing to identify excessive risks associated with the Rye Funds investing their entire assets with Madoff;

(b)    Failing to identify any evidence of the Madoff Ponzi scheme;

(c)    Failing to ensure proper internal controls testing to support the accuracy of the Rye Funds' financial statements; and

(d)    Failing to warn Plaintiffs about the auditing deficiencies described herein.

226.    As a direct result of the Auditor Defendants' breach of fiduciary duties, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

## COUNT V

### For Negligent Misrepresentation Against The Auditor Defendants

227.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

228.    This cause of action is brought against the Auditor Defendants based on negligent misrepresentation.

229.    The Auditor Defendants were required to perform their functions as auditors to the Rye Funds in a manner consistent with the standards of GAAS, and instead, issued audit reports that contained false and misleading statements. Plaintiffs were directly affected by these false and misleading audit reports and were recipients of account statements based on the audits.

230.    The Auditor Defendants knew that these false and misleading audit reports would directly impact Plaintiffs and the Class and that Plaintiffs and the Class would rely on the account statements they received in investing and maintaining their investments in the Rye Funds.

231.    Plaintiffs and the Class materially relied upon the expectation that the Auditor Defendants would perform their audit functions in a manner consistent with GAAS. As a direct

result of the Auditor Defendants' misrepresentations, Plaintiffs and the Class suffered damages in an amount to be proven at trial.

## COUNT VI

### For Gross Negligence
### Against the Tremont Defendants, the Argus Defendants and the Individual Defendants.

232.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

233.    As investment managers with discretionary control over the assets entrusted to them by Plaintiffs and the Class, the Tremont Defendants, the Argus Defendants and the Individual Defendants owed Plaintiffs and the Class a duty to manage and monitor the investments of Plaintiffs and the Class with reasonable care. The Tremont Defendants, the Argus Defendants and the Individual Defendants breached this duty.

234.    The Tremont Defendants, the Argus Defendants and the Individual Defendants further breached their duty of care by failing to:

(a)    take all reasonable steps to ensure that the investment of the assets of Plaintiffs and the Class were made and maintained in a prudent and professional manner;

(b)    take all reasonable steps to preserve the value of Plaintiffs' and the Class' investments;

(c)    perform all necessary and adequate due diligence; and

(d)    exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

235.    As a direct and proximate result of the Tremont Defendants', the Argus Defendants' and the Individual Defendants' gross negligence, Plaintiffs and the Class have suffered damages and are entitled to such damages from the Tremont Defendants, the Argus Defendants and the Individual Defendants.

## COUNT VII

### For Gross Negligence Against the Auditor Defendants

236.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

237.    As auditors to the Rye Funds, the Auditor Defendants were required to perform their functions as auditors in a manner consistent with the standards of GAAS, and instead, issued audit reports that contained false and misleading statements. The Auditor Defendants breached this duty.

238.    As a direct and proximate result of the Auditors Defendants' gross negligence, Plaintiffs and the Class have suffered damages and are entitled to such damages from the Auditor Defendants in an amount to be proven at trial.

## COUNT VIII

### For Unjust Enrichment
### Against the Tremont Defendants, Argus Defendants and the Controlling Defendants

239.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

240.    The Tremont Defendants and the Controlling Defendants financially benefited from their unlawful acts by collecting improper management fees based on the Policies' net asset values. These unlawful acts caused Plaintiffs and the Class to suffer injury and monetary loss.

241.    As a result, it is unjust and inequitable for the Tremont Defendants and the Controlling Defendants to have enriched themselves in this manner.

242.    Each Defendant named in this Count should repay its own unjust enrichment to Plaintiffs and the Class.

243.    Plaintiffs and the Class are entitled to restitution of the revenue derived and are entitled to the establishment of a constructive trust imposed on the benefits to the Tremont Defendants and the Controlling Defendants from their unjust enrichment and inequitable conduct.

## COUNT IX

### For Unjust Enrichment
### Against the Auditor Defendants

244.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

245.    The Auditor Defendants financially benefited from their unlawful acts by collecting auditing fees for the purported audits that they performed on the Rye Funds. Their failure to detect blatant "red flags" caused Plaintiffs and the Class to suffer injury and monetary loss.

246.    As a result, it is unjust and inequitable for the Auditor Defendants to have enriched themselves in this manner.

247.    The Auditor Defendants named in this Count should repay their own unjust enrichment to Plaintiffs and the Class.

248.    Plaintiffs and the Class are entitled to restitution of the auditor fees paid to the Auditor Defendants and are entitled to the establishment of a constructive trust imposed on the Auditor Defendants from their unjust enrichment and inequitable conduct.

## COUNT X

### For Aiding and Abetting
### Against TGH

249.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

250.    By virtue of its control over the Rye Funds, TGH had intimate knowledge of and approved the issuance of the false and misleading statements complained of herein.

251.    Further, TGH had actual knowledge of the breach of fiduciary obligations complained of herein. By virtue of its control, TGH influenced the Rye Fund's decision to invest with Madoff and/or BMIS and also had the power to influence and control the content of the various account statements sent to Plaintiffs and the Class that were false and misleading.

252.   As described above, Plaintiffs and the Class have suffered substantial damages in connection with the misconduct caused by TGH by aiding and abetting the beach of fiduciary obligations described herein.

## COUNT XI

### For Aiding and Abetting Breach of Fiduciary Duty
### Against the Control Defendants

253.   Plaintiffs incorporate each of the foregoing paragraphs as if set forth fully herein.

254.   By virtue of the due diligence performed during their acquisition of Tremont, and their ongoing oversight of Tremont, the Control Defendants had actual knowledge of the relationship between Tremont, Madoff, and BMIS.

255.   As a result of the Control Defendants' due diligence into Tremont, as well as their oversight of Tremont following the acquisition, the Control Defendants had actual knowledge of the "red flags" and warnings against investing with Madoff.  As a result, the Control Defendants were recklessly indifferent and/or willfully blind to the fiduciary breaches committed by Tremont.

256.   The Control Defendants substantially assisted in breaches of fiduciary duty committed by Tremont.

257.   As a direct and proximate cause of the Control Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages.

## COUNT XII

### For Aiding and Abetting
### Against the Auditor Defendants

258.   Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

259.   Defendants Tremont, AGH, and Argus Intl owed Plaintiffs and the Class certain fiduciary duties as alleged herein.

260.    By committing the acts alleged herein, Defendants have breached their fiduciary duties owed to Plaintiffs and the Class.

261.    The Auditor Defendants aided and abetted Defendants in breaching their fiduciary duties owed to Plaintiffs and the Class. The Auditor Defendants colluded with or aided and abetted Tremont's, AGH's and Argus Intl's breaches of fiduciary duties, and were active and knowing participants in the breaches of fiduciary duties owed to Plaintiffs and the Class. Among other things, the Auditor Defendants knowingly or recklessly disregarded information that indicated or should have indicated that the monies invested by Plaintiffs and the Class in the Rye Funds were being invested with Madoff and BMIS and that Madoff and BMIS's were involved in a Ponzi scheme.

262.    Plaintiffs and the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

## COUNT XIII

### Injunctive Relief
### Against the Tremont Defendants and the Argus Defendants

263.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

264.    As described herein, Plaintiffs' and the Class' Policies and their associated death benefits are in severe risk of lapsing in the very near future.

265.    The Tremont Defendants and the Argus Defendants should be enjoined from terminating the death benefits associated with the Policies as their actions are unlawful.

## COUNT XIV

### For Violations of General Business Law §349
### Against the Tremont Defendants and the Argus Defendants

266.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

267.    The Tremont Defendants' and the Argus Defendants' acts and conduct in furtherance of their scheme or artifice constitute deceptive acts and practices in the conduct of a business or in

the furnishing of a service, within the meaning of §349 of the New York General Business Law and, as such, are unlawful.

268.    Upon information and belief, the same acts and conduct used by the Tremont Defendants and the Argus Defendants to defraud Plaintiffs have been used repeatedly and are of a recurring nature.

269.    The acts and conduct of the Tremont Defendants and the Argus Defendants, by which they knowingly fraudulently represented to potential purchasers the nature of the investments that the Tremont Defendants and the Argus Defendants were selling to Plaintiffs, affect the public interest.

270.    As a result of the Tremont Defendants' and the Argus Defendants' unlawful acts and conduct in violation of §349 of the New York General Business Law, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT XV

### For Promissory Estoppel
### Against the Tremont Defendants and the Argus Defendants

271.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

272.    This Count is asserted for promissory estoppel.

273.    The Tremont Defendants and the Argus Defendants made a clear and unambiguous promise on its website and in the documents and material tendered to Plaintiffs and the Class to conduct and perform due diligence and the continued monitoring of the fund managers with which it placed its clients' investments.

274.    Plaintiffs and the Class reasonably relied upon this promise by the Tremont Defendants and the Argus Defendants in choosing to place their assets in the Rye Funds.

275.    As described herein, Plaintiffs and the Class have suffered substantial damages in connection with the Tremont Defendants' and the Argus Defendants' failure to perform their promises that were prominently displayed on their website and in the documents and material tendered to Plaintiffs and the Class.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the entire Class, pray for judgment as follows:

A.    declaring this action to be a proper class action maintainable pursuant to Federal Rules of Civil Procedure 23(b)(3);

B.    awarding Plaintiffs and the other members of the Class damages suffered as a result of the wrongs complained of herein together with appropriate interest;

C.    awarding Plaintiffs and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements;

D.    declaring that Defendants have unjustly enriched themselves and imposing a constructive trust to recoup the Defendants' fees, unjust benefits and other assets for the benefit of Plaintiffs and the Class; and

E.    awarding Plaintiffs and the Class such other and further relief as may be just and proper under the circumstances.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED:  April 20, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
EDWARD Y. KROUB


_____
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

DATED:  April 20, 2009

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ, LLP
DANIEL W. KRASNER
GREGORY M. NESPOLE
DEMET BASAR
STACEY T. KELLY


_____
DEMET BASAR

270 Madison Avenue
New York, NY  10016
Telephone:  212/545-4600
212/545-4653 (fax)

*Interim Co-Lead Counsel for Plaintiffs*

542615

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
09 APR 20 PM 11: 51

U.S. DISTRICT COURT
S.D.N.Y.

| | |
|---|---|
| IN RE TREMONT SECURITIES LAW, STATE LAW AND INSURANCE LITIGATION | Master File No.: 08 Civ. 11117 (TPG) |
| This Document Relates To: Insurance Action, No. 09 Civ. 557 | |

## CERTIFICATION OF SERVICE

I, Stacey T. Kelly, hereby certify that on April 20, 2009, I caused a true and correct copy

of the Consolidated Amended Class Action Complaint in the above captioned action, to be

served by e-mail and first class mail, on all counsel listed below.

STACEY T. KELLY

David S. Brown (dbrown@mofo.com)
Jack C. Auspitz (jauspitz@mofo.com)
Joel C. Haims (jhaims@mofo.com)
Michael Gerard (mgerard@mofo.com)
**MORRISON & FOERSTER**
1290 Avenue of the Americas
New York, New York 10104-0050
Phone: (212) 468-8000
Fax: (212) 468-7900

*Attorneys for Argus Int'l Life Bermuda and Argus Group Holdings Ltd.*

Frances S. Cohen (frances.cohen@bingham.com)
Kenneth I. Schacter (kenneth.schacter@bingham.com)
Carol E. Head (carol.head@bingham.com)
Joseph L. Kociubes (joe.kociubes@bingham.com)
**BINGHAM McCUTCHEN LLP**
One Federal Street
Boston, MA 02110-1726
Phone: (617) 951-8000
Fax: (617) 951-8736

*Attorneys for Massachusetts Mutual Life Insurance Co.*

\542578

E. Macey Russell (mrussell@choate.com)
Mitchell H. Kaplan (mkaplan@choate.com)
**CHOATE HALL & STEWART LLP**
Two International Place
Boston, MA 02110
Phone: (617) 248-5000
Fax: (617) 248-4000

*Attorneys for Massachusetts Mutual Life
Insurance Co.*

Alex Patchen (patchen@thshlaw.com)
David Kanfer (kanfer@thshlaw.com)
George F. du Pont (duPont@thshlaw.com)
Jamie B.W. Stecher (Stecher@thshlaw.com)
**TANNENBAUM HELPERN SYRACUSE &
HIRSCHTRITT LLP**
900 Third Avenue,
New York, New York 10022
Phone: (212) 508-6700
Fax: (212) 371-1084

*Attorneys for Rye Select Broad Market Fund L.P.*

David A. Kotler (david.kotler@dechert.com)
William K. Dodds (william.dodds@dechert.com)
Robert W. Topp (robert.topp@dechert.com)
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036-6797
Phone: (212) 698-3500
Fax: (212) 698-3599

*Attorneys for Oppenheimer Acquisition Corporation*

Seth M. Schwartz (seth.schwartz@skadden.com)
William J. O'Brien (william.obrien@skadden.com)
Timothy Loper (timothy.loper@skadden.com)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM
LLP & AFFILIATES**
Four Times Square
New York, New York 10036
Phone: (212)735-3000
Fax: (212) 735-2000/1

*Attorneys for Tremont (Bermuda) Limited, Tremont
Capital Management, Inc., Tremont Group Holdings,
and Tremont Partners, Inc.*