UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------x
                                                       :
IN RE TREMONT SECURITIES LAW,                          :        Master File No.:
STATE LAW, AND INSURANCE                                :        08 Civ. 11117 (TPG)
LITIGATION                                             :
                                                       :
-------------------------------------------------------x
This Document Relates to:  Securities Actions :               DEMAND FOR JURY TRIAL
08 Civ. 11212 (TPG)                                    :
_____ x
```

## CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT

Lead plaintiffs Arthur M. Brainson (on behalf of the Arthur M. Brainson IRA R/O),

Yvette Finkelstein, and Group Defined Pension Plan & Trust ("Lead Plaintiffs" or "Plaintiffs")

bring this action on behalf of themselves and all similarly situated persons who purchased

limited partnership interests in the Rye and Tremont family of funds (separately, the "Rye

Funds" and "Tremont Funds," and collectively, the "Funds," defined below), the assets of which

were wholly or partially invested directly or indirectly with Bernard L. Madoff ("Madoff")

and/or Bernard L. Madoff Investment Securities ("BMIS"), and who sustained losses thereby

(the "Class"). The allegations contained herein are based on personal knowledge as to the Lead

Plaintiffs and their own acts, and on information and belief as to all other matters based on the

investigation conducted by and through counsel, which included the review of complaints filed

by the United States Government, the New York Attorney General, and the Securities and

Exchange Commission (the "SEC"), papers and pleadings filed in actions commenced by state

municipalities and administrative agencies, private placement memoranda ("PPMs") and

quarterly and periodic reports issued to potential investors and limited partners, news reports

published in the financial press, auditor reports, and other available information.

## NATURE OF THE ACTION

1.     On December 11, 2008, Madoff was arrested by federal authorities for operating a $50 billion Ponzi scheme, in which Madoff used the principal investments of new clients to pay the fictitious "returns" of other clients. Madoff and BMIS were charged with securities fraud and other federal offenses by the SEC. Madoff and BMIS were also criminally charged with securities fraud by the United States Attorney's Office for the Southern District of New York. On March 12, 2009, Madoff pleaded guilty to all eleven criminal charges, admitting in court that he operated a Ponzi scheme.

2.     Although Madoff has been charged both civilly and criminally, Madoff was unable to perpetrate this fraud by himself. Numerous funds of funds ("FOF"), investment advisors, auditors, and others – including the Defendants – facilitated Madoff's fraud and committed their own violations of law by investing and allowing to be invested billions of dollars of their clients' money with Madoff and his related entities. They did so by, among other things, (a) making false and misleading statements to existing and potential investors regarding the (i) investment strategies and objectives of the Funds, and (ii) their oversight, thorough manager research, careful due diligence, risk allocation, and portfolio management of the Funds, and (b) breaching their fiduciary duties with regard to (i) performing, or failing to perform, adequate due diligence and (ii) monitoring of Madoff and BMIS (*e.g.*, the performance of Madoff's trading strategy) despite the existence of myriad red flags.

3.     As a result of Defendants' wrongful conduct, including making false and misleading statements in the PPMs, audit reports, and other documents about, *inter alia*, the degree of due diligence performed and failing to conduct due diligence into Madoff and/or BMIS, the Funds' investments in Madoff and/or BMIS have been wiped out in whole, or in part, thereby damaging the Class.

2

4.      Plaintiffs seek to recover damages caused to the Class by Defendants' violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as for common law fraud, negligent misrepresentation, breach of fiduciary duty, gross mismanagement, unjust enrichment, and aiding and abetting breaches of fiduciary duty under Delaware and New York State law.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC, as well as under the laws of the states of New York and Delaware. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and pursuant to the supplemental jurisdiction of this Court, 28 U.S.C. § 1367.

6.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud and other wrongdoing and/or their effects have occurred within this District, and many of the Defendants reside in and/or maintain principal executive offices in this District.

7.      In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the mail and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

**Plaintiffs**

8.      Lead Plaintiff Arthur M. Brainson (on behalf of the Arthur M. Brainson IRA R/O) is a limited partner in the Rye Select Broad Market Fund (the "Broad Market Fund").  During the Class Period (defined below), Brainson invested in the Broad Market Fund, and continues to own that investment, which is now worthless as a result of Defendants' wrongful conduct.

9.      Lead Plaintiff Yvette Finkelstein is a limited partner in the Rye Select Broad Market Prime Fund (f/k/a American Masters Broad Market Prime Fund, L.P. and referred to herein as the "Broad Market Prime Fund").

10.     Lead Plaintiff Group Defined Pension Plan & Trust ("Group Defined") is a limited partner in Tremont Market Neutral Fund, L.P. ("Tremont Market Neutral").  Group Defined is a pension plan for Tops Personnel, Inc., located in Jersey City, New Jersey.

11.     The Broad Market Fund, Broad Market Prime Fund, and Tremont Market Neutral Fund, are referred to as the "Lead Plaintiffs' Funds."  For purposes of this Complaint, Plaintiffs will refer to and cite from the documents issued to the investors and limited partners in the Lead Plaintiffs' Funds.

**Rye Defendants**

12.     Defendant Rye Select Broad Market Fund is a limited partnership organized in May 1994 under the Delaware Revised Uniform Limited Partnership Act.  As of November 2008, Rye Select Broad Market Fund had approximately $2.37 billion of assets under management.

13.     Defendant Rye Select Broad Market Prime Fund is a Delaware limited partnership organized on or about May 23, 1997.

14.     Defendant Rye Select Broad Market XL Fund (the "Broad Market XL Fund') is a Delaware limited partnership organized on or about July 13, 2006. The Broad Market XL Fund is linked to a three times levered exposure to the economic performance of the Broad Market Fund.

15.     Defendants Broad Market Fund, Broad Market Prime Fund, and Broad Market XL Fund are collectively referred to herein as the "Rye Funds" and sometimes referred to as the "Rye Defendants."

16.     The Rye Funds were feeder funds into Madoff and/or BMIS, in that 100% of the Rye Funds' investment assets were entrusted to Madoff and/or BMIS as the Rye Funds' outside investment manager. As of December 2008, the Rye Funds had entrusted approximately $3.1 billion to Madoff.

17.     Defendant Rye Investment Management is a division of Tremont Group Holdings, Inc. (defined below). Rye Investment Management manages Tremont Group Holding's line of single manager investment products, specifically the Rye Funds. "Single manager investment products" means that the investment assets of the Rye Funds were managed by one outside investment manager, specifically Madoff and BMIS. Rye Investment Management is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

**Tremont Defendants**

18.     Defendant Tremont Group Holdings, Inc. ("Tremont Group Holdings") is a holding company for Tremont Partners, Inc., Tremont Capital Management and Rye Investment Management. Tremont Group Holdings is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

19.     Defendant Tremont Partners, Inc. ("Tremont Partners") is the general partner of the Funds. Tremont Partners is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

As general partner, Tremont Partners is responsible for the management of the Funds'
investment activities, and has primary responsibility for monitoring the ongoing activities of the
Funds' investment advisors and managers, including Madoff and/or BMIS. Tremont Partners is
a wholly-owned subsidiary of Tremont Group Holdings. Tremont Partners is a registered
investment adviser with the SEC, and as such Tremont Partners has a duty to act as a fiduciary
and in its clients' best interests.

20.    Defendant Tremont Capital Management manages Tremont Group Holdings'
family of multi-manager investment products, also known as a "FOF." A FOF, such as the
Tremont family of funds (defined *infra* as the "Tremont Funds"), invests its assets with multiple
outside investment managers. The Tremont Funds include:  Tremont Arbitrage Fund, L.P.;
Tremont Core Strategies Portfolio Ltd.; Tremont Emerging Markets Fund, L.P.; Tremont
Enhanced Arbitrage Fund, L.P.; Tremont Enhanced Market Neutral Fund L.P.; Tremont Global
Macro Fund, LLC; Tremont Long/Short Equity Fund, L.P.; Tremont Long/Short Equity Portfolio
Limited Class B3; Tremont Long/Short Equity Portfolio Ltd.; Tremont Market Neutral Fund II,
L.P.; Tremont Market Neutral Fund, L.P.; Tremont Oppenheimer Absolute Return Fund;
Tremont Opportunity Fund II, L.P.; Tremont Opportunity Fund III, L.P.; Tremont Opportunity
Fund, L.P.; Tremont Partners Inc./ADV; Tremont Partners Ltd.; Tremont Select Equities Fund;
Tremont Select Equities Offshore ERISA Segregated Portfolio; Tremont Select Equities
Offshore Segregated Portfolio; Tremont Select Funds; Tremont Select Special Situations ERISA
Segregated Portfolio; Tremont Select Special Situations Fund; Tremont Select Special Situations
Segregated Portfolio; Tremont Trading Fund, LLC; Tremont Value Recognition Fund, LLC;
Various Rye Funds (via Spectrum Equities); Tremont Master Strategies Trust, which includes
the following sub-Funds:  Tremont Arbitrage Fund, Tremont Emerging Markets Fund, Tremont

6

Equity Fund, Tremont Global Macro Fund, Tremont Japan Fund, Tremont Market Neutral

Investment Fund, Tremont Opportunity Investment Fund and Tremont Trading Fund, inclusive

of the following Registered Investment companies: Oppenheimer Funds Tremont Core

Strategies Hedge Fund, Oppenheimer Funds Tremont Market Neutral Hedge Fund, Oppenheimer

Tremont Market Neutral Fund, LLC, and Oppenheimer Tremont Opportunity Fund, LLC.

21.    Defendant Tremont Market Neutral Fund is one of the Tremont Funds, a fund of

funds that invested approximately 27% of its assets with Madoff and/or BMIS.

22.    As of December 2008, the Tremont Funds had collectively entrusted

approximately $200 million of their assets to Madoff and/or BMIS either directly or through

investments in the Rye Funds. On information and belief, some or all of the Tremont Funds

entrusted assets to Madoff and BMIS either directly or indirectly through the Rye Funds.

Tremont Funds are named as John Doe Defendants to the extent they invested with Madoff and

incurred losses thereby.

23.    Defendants Tremont Group Holdings, Inc., Rye Investment Management,

Tremont Partners, Inc., Tremont Capital Management Inc., and Tremont Funds are collectively

referred to herein as the "Corporate Tremont Defendants."

**Individual Defendants**

24.    Defendant Robert Schulman ("Schulman") was president, Chief Executive

Officer, and Chairman of the Board of Tremont Group Holdings from 1994 to 2006. In 2006,

Schulman was replaced as President of Tremont Group Holdings while continuing to serve as

Chief Executive Officer. In June 2007, Schulman stepped aside as CEO of Tremont Group

Holdings and became President of Rye Investment Management while remaining Chairman of

Tremont Group Holdings. Schulman retired in July 2008. Prior to joining Tremont Group

holdings in 1994, Schulman was responsible for Smith Barney's $60 billion Consulting Services

Division and Retail New Product Development.  In 1982, Schulman founded the Leveraged

Product Division at E.F. Hutton and eventually assumed responsibility for all retail products

offered at E.F. Hutton.  Schulman resides at 1 Fifth Avenue, Apartment 16-J, New York, New

York 10003.

25.      Defendant Rupert Allan has been President of Tremont Group Holdings since

2006, and CEO since June 2007.  Allan has primary responsibility for the Tremont Capital

Management fund of funds operations.

26.      Defendant Jim Mitchell is and has been president and Chief Executive Officer of

Rye Investment Management since Schulman's retirement in July 2008.

27.      Defendant Sandra L. Manzke founded Tremont Capital Management in 1984.

From 1994 until she left in 2005, Manzke, along with Schulman, was co-Chief Executive Officer

of Tremont Group Holdings.  Prior to founding Tremont in 1984, Manzke was a principal of

Rogers, Case & Barksdale, a pension consulting firm, where she spent six years.  She was an

investment manager at Scudder, Stevens & Clark for five years and an independent consultant

for Bernstein MacCauley.

28.      Defendants Schulman, Allan, Mitchell and Manzke are collectively referred to

herein as the "Individual Defendants," and together with the Corporate Tremont Defendants, the

"Tremont Defendants."

29.      The Tremont Defendants, the Rye Funds, and the Tremont Funds are collectively

referred to herein as the "Tremont-Fund Defendants."

30.      The Tremont-Fund Defendants caused over $3 billion of the investment assets of

Plaintiffs and the Class to be given to Madoff and/or BMIS as of December 2008.

**Controlling Defendants**

31.     Defendant Oppenheimer Acquisition Corporation ("Oppenheimer") is a Delaware corporation and is the parent company of Tremont Group Holdings. Oppenheimer acquired Tremont Group Holdings in 2001 (at the time, Tremont Group Holdings was known as Tremont Advisers, Inc.). Oppenheimer's headquarters are located at 2 World Financial Center, New York, New York 10281. Oppenheimer is also the parent of OppenheimerFunds, Inc. ("Oppenheimer Funds"), which is the manager of the well-known family of Oppenheimer mutual funds.

32.     Defendant Oppenheimer markets several funds with the Tremont Defendants, including the Oppenheimer Tremont Opportunity Fund, LLC and Oppenheimer Tremont Market Neutral Fund, LLC. After its acquisition by Oppenheimer, Tremont Group Holdings marketed itself as "An OppenheimerFunds Company."

33.     Defendant MassMutual Holding LLC ("MassMutual Holding") is the parent company of Defendant Oppenheimer and its principal place of business is located at 1295 State Street, Springfield, Massachusetts 01111.

34.     Defendant Massachusetts Mutual Life Insurance Co. ("MassMutual") is the parent company of MassMutual Holding. Its headquarters are located at 1295 State Street, Springfield, Massachusetts 01111. MassMutual is a mutually owned financial protection, accumulation and income management company and is a member of the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC"). MassMutual and its subsidiaries had more than $500 billion in assets under management at year-end 2007. MassMutual refers to itself, including its subsidiaries, such as the Oppenheimer Funds and the Corporate Tremont Defendants, as the "MassMutual Financial Group."

35.    Defendant MassMutual, as the parent company of Defendant Oppenheimer, and Oppenheimer, as the parent company of the Corporate Tremont Defendants, had the power to exercise complete control over the Tremont Defendants, including their selection and use of fund managers, their exercise of their professional responsibilities, and their marketing of funds through the use of offering materials.

36.    Defendants Oppenheimer, MassMutual Holdings, and MassMutual are collectively referred to herein as the "Controlling Defendants."

**Auditor Defendants**

37.    Defendant KPMG LLP ("KPMG") is part of an international network of member firms offering audit, tax and advisory services and is one of the Big Four auditing firms. KPMG is the U.S. member firm of KPMG International, a Swiss cooperative. KPMG maintains its U.S. headquarters at 757 Third Avenue, New York, New York 10017. KPMG first audited the Rye Funds' financial statements for the fiscal year ended December 31, 2005, and issued unqualified opinions thereon on March 6, 2006. KPMG performed additional audits of the Rye Funds' financial statements for the fiscal years ended December 31, 2006 and December 31, 2007, and issued unqualified opinions thereon on March 26, 2007, and March 24, 2008, respectively. As auditor of the Rye Funds, KPMG had a duty to perform its annual audits of the financial statements and financial condition of the Funds in accordance with professional standards applicable to those audits, described herein. KPMG audited annual financial statements for the Rye Funds during the Class Period and provided its unqualified reports thereon to Tremont Partners, which it knew would be provided to its investors, and potential investors.

38.    Defendant Ernst & Young LLP ("E&Y") is one of the largest professional services firms in the world and one of the "Big Four" auditors. E&Y provides assurance and advisory business services, tax services, and consulting for clients worldwide. E&Y was the

auditor for the Rye Funds until at least 2004, and as such it had a duty to perform its annual audits of the financial statements and financial condition of the Funds in accordance with professional standards applicable to those audits, described herein. E&Y audited annual financial statements for Tremont Partners during the Class Period and provided its unqualified reports thereon to Tremont Partners, which it knew would be provided to its investors, and potential investors. E&Y maintains its U.S. headquarters at 5 Times Square, New York, New York 10036.

39.     Defendants KPMG and E&Y are collectively referred to herein as the "Auditor Defendants" or the "Auditors."

40.     The Rye Funds, Tremont Funds, Tremont Defendants, Individual Defendants, Controlling Defendants, and Auditor Defendants are collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

41.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all persons and entities who invested in limited partnership interests of the Funds between December 11, 2003 through and including December 11, 2008 for claims arising under the Exchange Act (the "Exchange Act Class Period"), and between May 10, 1994 through and including December 11, 2008 for claims arising under common law and state law (the "State Law Claims Class Period," and collectively, the "Class Period") and who sustained losses thereby (the "Class"). Excluded from the Class are the Tremont-Fund Defendants, members of the immediate families of the Individual Defendants, executive officers and/or any affiliate of any of the Funds, and the Corporate Tremont Defendants, and any entity in which any excluded person has a controlling interest, and the legal

representatives, heirs, successors and assigns of any excluded person. Also excluded from the

Class are the Auditor Defendants, the executive officers and partners of the Auditor Defendants,

members of the immediate families of the executive officers and partners of the Auditor

Defendants, and/or any affiliate of each of the Auditor Defendants, and any entity in which any

excluded person has a controlling interest, and the legal representative, heirs, successors and

assigns of each excluded person.

42.     This action is properly maintainable as a class action because:

a.      The members of the proposed Class are dispersed geographically and are

so numerous that joinder of all Class members is impracticable. While the exact number

of Class members is unknown to Plaintiffs at this time and can be ascertained only

through appropriate discovery, Plaintiffs believe that Class members number in the

hundreds, if not thousands;

b.      Plaintiffs' claims are typical of those of all members of the Class because

all have been similarly affected by Defendants' actionable conduct in violation of the

federal securities laws and Delaware and New York state and common law as alleged

herein;

c.      Plaintiffs will fairly and adequately protect the interests of the Class and

have retained counsel competent and experienced in class action litigation. Plaintiffs

have no interests antagonistic to, or in conflict with, the Class that Plaintiffs seek to

represent;

d.      The questions of law and fact common to the members of the Class

predominate over any questions affecting individual members of the Class. Among the

questions of law and fact common to the Class are:

       i.      whether Defendants' acts and/or omissions as alleged herein violated the federal securities laws;

      ii.     whether the Defendants' representations to Plaintiffs and the other Class members misrepresented and/or omitted material facts;

     iii.     whether Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

     iv.     whether Defendants' conduct alleged herein was intentional, reckless, or grossly negligent or in violation of fiduciary duties owed Plaintiffs and other Class members and, therefore, violated the statutory and common law of Delaware and New York; and

      v.     to what extent the members of the Class have sustained damages and the proper measure of damages.

    e.    A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable.  Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to redress the wrongs done to them.  The likelihood of individual Class members prosecuting separate claims is remote;

    f.    Plaintiffs anticipate no unusual difficulties in the management of this action as a class action; and

## SUBSTANTIVE ALLEGATIONS

### Summary of Allegations

43.     On March 12, 2009, Madoff pled guilty to all eleven counts in the criminal information filed by the United States Attorney's Office, admitting that he perpetrated a fraud since the early 1990s (prosecutors charged that the fraud began in the early 1980s). In his plea allocution, Madoff admitted that he never invested his investment advisory clients' funds in securities, that he never employed the split-strike conversion strategy he (and the Tremont Defendants) touted, and that he never had custody of the securities he purportedly held for his investment advisory clients. (BMIS purportedly acted as prime broker and custodian for the assets Madoff claimed to manage for his investment advisory clients.) Instead, Madoff and BMIS merely deposited client funds into an account at Chase Manhattan Bank, and distributed money from this account to clients who requested redemptions, while also stealing some of those funds for his own use or other purposes.

44.     Madoff also admitted that he caused to be created and sent to his clients, false trading confirmation and client account statements that reflected bogus transactions and positions. These trade confirmations and account statements were designed to give the appearance that he had executed his strategy with perfect market timing – buying stocks when they were towards the bottom of the price range for a given day, and selling close to the top. Prosecutors charged that Madoff hired numerous employees with little or no prior pertinent training or experience in the securities industry to perform these and other "back office" functions. Madoff admitted that he knew that the audited financial statements he filed with the SEC were false and misleading; BMIS's accountant was thereafter charged with fraud on March 18, 2009.

14

45.     Madoff also described in his plea allocution how he wired money between BMIS's bank accounts and the London bank account of BMIS United Kingdom affiliate Madoff Securities International Ltd.  Prosecutors charged that these transfers were designed to give the appearance that he was conducting securities transactions in Europe.

46.     In order to keep the Ponzi scheme running, Madoff needed money from new investors.  Notwithstanding, Madoff limited the number of investors he would deal with directly. Consequently, Madoff accepted investments from funds sold by, among others, the Tremont Defendants.

47.     The Tremont-Fund Defendants marketed their funds such as the Lead Plaintiffs Funds, (which were in the form of limited partnerships) to investors (including Lead Plaintiffs and the members of the Class) as a gateway to Madoff's investment advisory services, though, for the most part, they did so without disclosing that Madoff was the investment manager of their funds.  The Tremont-Fund Defendants solicited investments into their funds pursuant to private placement memoranda and other materials from individuals, charities, pension funds and retirement accounts, institutions and other entities, including other hedge funds.  Tremont Partners served as the general partner of these limited partnerships and, as general partner, retained Madoff to manage the limited partners' investments, even though they knew, or recklessly disregarded, that Madoff's investment operations involved improper conduct.

48.     As the general partner of the Funds, the Tremont Partners (and the I.D.s) had fiduciary obligations to oversee the Funds and ensure that the Funds' assets were invested in legitimate investment products.  In breach of their fiduciary duties, the Tremont Defendants raised billions of dollars for Madoff's improper operations and received hundreds of millions of dollars in improper fees, knowing, or recklessly disregarding, that Madoff was engaged in

wrongful conduct with respect to the monies they placed under his management. In particular, the Tremont Defendants placed over $3 billion of investor funds with Madoff and received annual management fees of 1% of each investor's investment and 0.5% for administration and auditing of Madoff's investment activity. In 2008, the Tremont Defendants were in a position to generate over $50 million in illicit payments pursuant to their wrongful conduct.

49.     In marketing the Funds to investors, the Tremont Defendants represented that one of their outside investment managers, i.e., Madoff, had for years achieved, and was continuing to achieve, consistent annual returns in the range of 8-12% (with positive monthly returns in virtually every month) on the monies he was managing through among other, use of a hedging strategy using equities, options trading, and short selling or so-called "split-strike conversion" strategy that entailed the purchase of 30 to 40 large capitalization S&P 500 stocks and the simultaneous sale of out-of-the-money calls on the S&P 100 Index and the purchase of out-of-the-money puts on the S&P 100 Index. As explained by the New York Attorney General in its action against Ezra Merkin and others (*Cuomo v. Ezra Merkin & Gabriel Capital Corp.*, NY Supreme Ct., No. 0450879/2009, the "NY AG Action"), Madoff would purportedly (a) buy stocks of selected corporations that were included in the blue-chip S&P100 Index and simultaneously, (b) buy put options below the current stock price to protect against large declines, and (c) sell call options above the current price to fund the purchase of put options. The call options would also, to some degree, limit any gains that would be earned on the underlying stocks. Madoff claimed that under the right market conditions, he could achieve steady returns of over ten percent per year regardless of whether the market as a whole had advanced or declined. The Tremont-Fund Defendants represented that, through use of, among others, this strategy, the investment manager (i.e., Madoff) could limit losses when stock prices

decline while still affording an upside potential capped to the stock price of the short call when stock prices rise.

50.    As noted in the NY AG Action, Madoff's purported investment strategy evolved slightly over time. Madoff soon began to claim that he was using a larger "basket" of stocks selected from the S&P Index, combined with put and call options on the S&P 100 Index itself rather than options on individual stocks. The positions were supposedly held for a short period of time lasting from a few days to no longer than about two months, and then liquidated. Madoff claimed to execute the "split strike conversion" strategy six to eight times per year. At some point, Madoff purportedly adopted the practice of exiting the market entirely at the very end of each quarter and putting all funds in U.S. Treasury bills ("Treasuries"). For this reason, Madoff's quarterly statements to investors, and the end-of-year audits of investor holdings, would list only Treasuries.

51.    In fact, as noted, Madoff never executed this strategy. The court-appointed Trustee liquidating Madoff's assets has stated that he has found no evidence that, from at least 1996 to the present, any stocks or options were traded by Madoff for investors.

**Failure to Conduct Adequate Due Diligence**

52.    Hedge funds, of funds, like the Funds, are complex investment vehicles that, unlike mutual funds, are not subject to strict regulatory requirements for disclosure. Their lack of transparency means that investors rely on fund managers to protect their investments by conducting thorough research and due diligence when selecting outside managers and continuing to conduct due diligence intermittently to ensure that the outside managers continue to meet the selection criteria. The hedge fund managers also have a duty to closely monitor the performance of the underlying investments and to verify the information reported by the outside managers. Despite representing to prospective and existing investors that they were fulfilling their fiduciary

duties by performing these functions, the Tremont Defendants conducted no or little due

diligence, did not verify Madoff's and/or BMIS' reported results, and recklessly disregarded

glaring warning signs that caused other industry professionals to steer clear of Madoff.

**A.**     **Tremont Defendants Had a Long-Standing Relationship With Madoff**

53.     The Tremont Defendants, rather than conduct due diligence or, if conducted, a

proper one into Madoff's operations, trusted his name and reputation based on a long-term

relationship and years of generating fees.

54.     In or about May 1994, Defendants Manzke and Schulman caused defendant

Tremont Partners to form the Broad Market Fund, a hedge fund in the form of a limited

partnership that solicited a pool of investments from individuals and entities. Defendant

Tremont Partners served as the general partner of the Broad Market Fund and, pursuant to

Defendants Manzke's, Schulman's, and Tremont Partners' arrangement with Madoff, placed all

of the limited partners' investments with Madoff for his management. Pursuant to their

arrangement with Madoff, Tremont Partners paid Madoff commissions on his reported

investment transactions and charged each limited partner of the fund an annual percentage fee of

1% of the partner's investments for its "investment management" services on behalf of the fund,

as well as a 0.5% administrative fee for purported record-keeping and auditing.

55.     According to the NY AG Action, at the time Defendants Manzke and Tremont

Partners first recommended starting investing with Madoff, they knew or recklessly disregarded

that Madoff purported to obtain his investment management success through the so-called "split-

strike conversion" strategy described above.

56.     As noted, the Tremont Defendants knew, or recklessly disregarded, that Madoff's

purported split-strike strategy could not, in and of itself, produce the investment results claimed

by Madoff. In fact, as alleged, Madoff was engaging in no actual stock or option transactions,

and his purported investment management strategy was a sham to conceal his implementation of a massive Ponzi scheme supported by massive infusions of investments from large investors and "feeder funds" like the Rye Funds, for example.

57.     Although the Tremont Defendants knew, or recklessly disregarded, that Madoff's investment returns were not actually produced by his purported split-strike conversion strategy, they falsely represented to the Plaintiffs and the Class in written materials prepared, approved or distributed by defendants Manzke, Schulman, and (after Schulman's retirement in 2008) Mitchell, that the performance history of the outside manager (*i.e.*, Madoff) was produced by a hedging or split-strike conversion strategy.

58.     Although the Tremont Defendants knew, or recklessly disregarded, that Madoff's investment returns could not have been generated through the purported split-strike conversion strategy, they concealed that knowledge from Plaintiffs and the Class and falsely represented to Plaintiffs and the Class that the returns of the outside manager were honestly produced.

**B.      Defendants Ignored Dozens of Warning Signs That Madoff's Operations Were Not Legitimate**

59.     Defendants ignored myriad warning signs that Madoff was operating a fraud.  By failing to conduct due diligence on Madoff's operations, or if conducted, a proper one, Defendants breached their fiduciary duties to Plaintiffs and the Class and caused their statements regarding their ongoing due diligence and oversight of outside investment managers to be materially false and misleading.

60.     The numerous warnings signs, included, but are not limited to, the following:

a.      Suspect Strategy:  The description of Madoff's split-strike conversion strategy appeared to be inconsistent with the pattern of returns in the track record, which showed only seven small monthly losses over a 14 year period.  Moreover, the returns

purportedly generated by this strategy could never be replicated by quantitative analysts who attempted to do so. Michael Markov, a hedge fund consultant, stated that he was hired by a fund in 2006 to look into one of the feeder fund's returns and found that it was "statistically impossible to replicate them." In May 1999, Harry Markopolos ("Markopolos"), a derivatives expert with experience managing the split-strike conversion strategy used by Madoff, sent a letter to the SEC describing how Madoff could not have generated the returns he reported using the split-strike conversion strategy. As reported in May 2001, in an article titled, "Madoff Tops Charts; Skeptics Ask How," appearing in MAR/Hedge, a semi-monthly newsletter reporting on the hedge fund industry: "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

       b.     <u>Suspect Market-Timing</u>: Account statements revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve with the consistency reflected in Madoff's reported results.

       c.     <u>Impossible Options Volumes</u>: Trading volumes reflected in accounts were vastly in excess of actually reported trading volumes. In particular, the S&P 100 Index options that Madoff purported to trade could not handle the size of the combined FOF assets. A report from *Bloomberg* estimated that Madoff's strategy would have required at least 10 times the S&P 100 Index option contracts that traded on U.S. exchanges.

       d.     <u>No Standalone Hedge Fund</u>: Madoff operated through managed accounts, rather than by setting up a hedge fund of his own, where his fees would have been much

higher than the brokerage commissions he was charging.  This is particularly suspicious because a hedge fund requires annual audits.

      e.     Cash Positions:  BMIS liquidated its securities positions at the end of each quarter, presumably to avoid reporting large securities positions.  In 2007, hedge fund investment adviser Aksia LLC ("Aksia") urged its clients not to invest in Madoff feeder funds concluding, among other things, that, after reviewing Madoff's holdings, they were too small to support the size of the assets Madoff claimed to be managing.  Indeed, as noted, Irving Picard, the court-appointed trustee charged with sorting out what Madoff assets remain, reported that Madoff never (at least during the Class Period) engaged in any trades.

      f.     Lack of a Third Party Custodian and Administrator:  The FOF had recognized administrators and auditors, but substantially all of the assets were in the custody of BMIS.  Moreover, BMIS initiated trades in the accounts, executed the trades, and served as custodian and administrator for the accounts.  Thus, instead of using an outside prime broker as nearly all hedge funds do, Madoff was his own prime broker and custodian of all the assets he managed.  A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which vets hedge funds for clients, as follows:  "There was no independent custodian involved who could prove the existence of assets . . .  There's a clear and blatant conflict of interest with a manager using a related-party broker-dealer.  Madoff is enormously unusual in that this is not a structure I've seen."

      g.     Obscure and Ill-Equipped Auditor:  BMIS was audited by Friehling & Horowitz ("F&H"), which had three employees, of which one was 78 years old and living

in Florida, one was a secretary, and the other was an active 47-year old accountant, whose office in Rockland County, New York was 13 feet by 18 feet. On March 18, 2009, David G. Friehling ("Friehling") was arrested and criminally charged with securities fraud and with aiding and abetting Madoff's Ponzi scheme. The SEC also filed a civil complaint against Friehling and F&H, alleging that F&H never conducted even minimal audit procedures on Madoff and/or BMIS and failed to confirm that the securities BMIS purportedly held on behalf of its investors actually existed.

       h.    <u>Audit Reports</u>:  Audit reports of BMIS showed no evidence of customer activity whatsoever, with neither accounts payable nor accounts receivable from customers.  BMIS appeared to be nothing more than a market maker – not a firm with $17 billion in customer accounts.

       i.    <u>Madoff Publicly Spoke of Secrecy</u>:  Madoff perpetuated the secrecy in his public statements. As reported in the May 2001 article in MAR/Hedge, "[Madoff] won't reveal how much capital is required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% invested.'" Additionally, "[a]s for the specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'" On May 7, 2001, *Barron's* published an article titled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum." In that article, author Erin E. Arvedlund wrote: "When Barron's asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy. I can't go into it in great detail.'" "What Madoff told us was, 'If you invest with me, you must never tell anyone

that you're invested with me.  It's no one's business what goes on here,' says an investment manger who took over a pool of assets that included an investment in a Madoff fund.  'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'"

      j.     <u>Family Run Operation</u>:  Key positions at BMIS were controlled by Madoff family members (Madoff's brother, two sons, and niece).

      k.     <u>Lack of Electronic Access</u>:  BMIS was supposedly technologically advanced but FOF did not have electronic access to their accounts at BMIS.  Paper documentation provided Madoff with the ability to manufacture trade tickets purporting to confirm investment results that had not and were not occurring, and to falsify supporting documentation.

**C.     Investment Professionals Who Did Conduct Due Diligence <u>Discovered the Red Flags Warning That Madoff Was Operating a Fraud</u>**

61.    The Tremont Defendants' selection of Madoff as an outside investment manager for its funds – and as the only manager of the Rye Funds – despite the abundance of red flags regarding Madoff and BMIS leads to only one of three possibilities:  (1) The Tremont Defendants conducted no due diligence whatsoever; (2) Defendants due diligence was so recklessly deficient that they didn't discover the red flags, or (3) their due diligence uncovered these red flag warnings but these defendants ignored them.  In their quest for lager fees whatever the case, the Tremont Defendants breached their fiduciary duties to Plaintiffs and the Class.  (*See also* allegations against the Auditor Defendants, *infra.*)

62.    Defendants, including Defendants Manzke, Schulman and Allan who were experienced investment professionals, could not have performed due diligence and missed the red flags or claim to have been duped by Madoff:

a.      The PPM for the Tremont Neutral Fund, for example, represents that the

principal decision-makers of the Corporate Tremont Defendants, such as Defendants

Manzke, Schulman, and Allan, have significant experience and expertise regarding

manager selection and monitoring.  Schulman is described as having prior experience in

manager selection while at Smith Barney, where he was "involved in all aspects of

investment management and manager selection processes."  The PPM concludes that

"Mr. Schulman is experienced in all aspects of investment management, product

development, database management, and the manager selection process."

b.      The PPM for the Tremont Neutral Fund, in effect during Manzke's tenure

touts her expertise in manager selection and monitoring:  "At Scudder Stevens & Clark,

Ms. Manzke established one of their internal measurement systems during her tenure as

an Investment Manager from 1969 to 1974.  Ms. Manzke's extensive experience in

designing and implementing multi-manager, multi-asset class investment programs

includes the Sentinel Investment Management Company, the Rodney Square Funds, and

Minority Equity Trust . . . .  She has broad experience in all aspects of ... manager

research, performance measurement, and program administration."

c.      The PPM for the Tremont Neutral Fund, for example, highlights Allan's

experience in hedge fund manager selection, noting that Allan was responsible for

manager selection in alternative investments at a subsidiary of Credit Lyonnais, and

served as a member of the investment committee in the selection of hedge fund managers

during his tenure at Societe Generale.

Investment professionals who actually investigated the legitimacy of Madoff's operations

uncovered the red flag warnings and, based on the numerous red flags and the absence of any

24

legitimate explanation from Madoff as to how he could generate such consistent results, concluded that his operation must be a fraud.

63.    In the article "Madoff Tops Charts; Skeptics Ask How" appearing in the May 2001 MAR/Hedge (mentioned above), author Michael Ocrant wrote:

a.    "Madoff has reported positive returns for the last 11-plus years in assets managed on behalf of the feeder fund known as Fairfield Sentry. . . . [The] other [feeder] funds have demonstrated equally positive track records using the same strategy for much of that period."

b.    "Those who question the consistency of the returns . . . include current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executives, many of whom are familiar with the so-called split-strike conversion strategy used to manage the assets."

c.    These individuals "noted that others who use or have used the strategy . . . are known to have had nowhere near the same degree of success."

d.    "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

e.    "The strategy and trading, [Madoff] says, are done by signals from a proprietary 'black box' system that allows for human intervention to take into account the 'gut feel' of the firm's professionals."

f.    "As for specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by

saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

        g.     "[Madoff] won't reveal how much capital is required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% invested.'"

        h.     "Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.'  He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

64.     In the May 7, 2001, *Barron's* article, "Don't Ask, Don't Tell:  Bernie Madoff is so secretive, he even asks his investors to keep mum," (mentioned above), Erin E. Arvedlund wrote:

        a.     The private accounts managed by Madoff "have produced compound average annual returns of 15% for more than a decade.  Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year.  When Barron's asked Madoff . . . how he accomplishes this, he said, 'It's a proprietary strategy.  I can't go into it in great detail.'  Nor were the firms that market Madoff's funds forthcoming . . . ."

        b.     "Still, some on Wall Street remain skeptical about how Madoff achieves such stunning double-digit returns using options alone . . . .  [T]hree option strategists at major investment banks told Barron's they couldn't understand how Madoff churns out such numbers [using this strategy]."

        c.     Adding further mystery to Madoff's motives is the fact that "he charges no fees for his money management services."

     d.     "The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy.  But Madoff's investors rave about his performance – even though they don't understand how he does it.  'Even knowledgeable people can't really tell you what he's doing,' one very satisfied investor told Barron's.  'People who have all the trade confirmations and statements still can't define it very well.' . . . This investor declined to be quoted by name.  Why?  Because Madoff politely requests that his investors not reveal that he runs their money."

     e.     "'What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me.  It's no one's business what goes on here,' says an investment manger who took over a pool of assets that included an investment in a Madoff fund.  'When he couldn't explain how they were up or down in a particular month,' he added, 'I pulled the money out.'"

65.     In addition to the foregoing, on November 7, 2005, Harry Markopolos submitted a letter to the SEC, titled "The World's Largest Hedge Fund is a Fraud," in which he set forth in over 17 single-spaced pages and a two-page attachment, how Madoff's returns could not be real. Markopolos identified 29 red flags that were signs of highly suspicious activity in BMIS, including, among others:

     a.     "why would B[ernie ]M[adoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits?"

     b.     "The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff

as the actual manager in their performance summaries or marketing literature. . . . Why

the need for such secrecy?  If I was the world's largest hedge fund and had great returns,

I'd want all the publicity I could garner and would want to appear as the world's largest

hedge fund in all the industry rankings."

      c.    "It is mathematically impossible for a strategy using index call options and

index put options to have such a low correlation to the market where its returns are

supposedly being generated from.  This makes no sense! . . .  However, BM's

performance numbers show only 7 extremely small [monthly] losses during 14½ years

and these numbers are too good to be true.  The largest one month loss was only -55 basis

points  (-0.55%) or just over one-half of one percent!  And BM never had more than a

one month losing streak!"

      d.    "Madoff does not allow outside performance audits."

      e.    "Madoff's returns are not consistent with the one publicly traded option

income fund with a history as long as Madoff's."

      f.    "Why is Bernie Madoff borrowing money at an average rate of 16.00%

per anum and allowing these third party hedge fund, fund of funds to pocket their 1% and

20% fees bases [sic] upon Bernie Madoff's hard work and brains?  Does this make any

sense at all?  Typically FOF's [funds of funds] charge only 1% and 10%, yet BM allows

them the extra 10%.  Why?  And why do these third parties fail to mention Bernie

Madoff in their marketing literature?  After all he's the manager, don't investors have a

right to know who's managing their money?"

      g.    "BM goes to 100% cash for every December 31st year-end according to

one FOF invested with BM.  This allows for 'cleaner financial statements' according to

this source. Any unusual transfers or activity near a quarter-end or year-end is a red flag for fraud."

66.     As summed up by Markopolos: "If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all of the industry rankings. Name one mutual fund company, Venture Capital firm, or LBO firm which doesn't brag about the size of their largest funds' assets under management. Then ask yourself, why would the world's largest hedge fund manager be so secretive that he didn't even want his investors to know that he was investing their money? Or is it that [Madoff] doesn't want the SEC and [the Financial Services Authority] to know that he exists?"

67.     In 2007, Aksia urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff and discovered several red flags, including:

        a.     Madoff's comptroller was based in Bermuda, whereas most mainstream hedge funds have their own in-house comptrollers;

        b.     Madoff's auditor, F&H, operated out of a 13 x 18 foot location in New City, New York, and included one partner in his late 70s who lives in Florida, a secretary, and one active accountant, whereas most hedge funds are audited by a Big Three accounting firm. F&H is now under investigation by the district attorney of Rockland County; and

        c.     Aksia discovered the 2005 letter from Markopolos to the SEC described above.

68.     Aksia prepared its client advisory after, among other things, reviewing the stock holdings of BMIS that were reported in quarterly statements filed with the SEC. Aksia

concluded that the holdings appeared to be too small to support the size of the assets Madoff

claimed to be managing.  The reason for this was revealed on December 15, 2008, when

investigators working at Madoff's New York offices concluded that Madoff had been operating a

secret, unregistered investment vehicle from his office.

69.     In addition to the foregoing, investment advisors and professionals, who

thoroughly looked into Madoff's trading, were unable to reconcile investors' account statements

with the reported returns.  In a December 13, 2008 article in *The New York Times*, Robert

Rosenkranz, principal of hedge fund adviser Acorn Parters, was quoted as saying, "Our due

diligence, which got into both account statements of [Madoff's] customers, and the audited

statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that

the account statements themselves were just pieces of paper that were generated in connection

with some sort of fraudulent activity."

70.     As noted earlier, Madoff was his own prime broker and custodian of all the assets

he managed.  As  Chris Addy told *The Wall Street Journal* on December 13, 2008, such conduct

was unusual because without an independent custodian, there was no one "involved who could

prove the existence of assets." According to Addy, "There's a clear and blatant conflict of

interest with a manager using a related-party broker-dealer."

71.     Had Defendants conducted due diligence or, if conducted, a proper one, into

Madoff, BMIS, and/or Madoff-controlled entities, they would have discovered at least some of

the dozens of red flags identified herein.  At the very least, like Aksia, Defendants should have

been able to discover the existence of Markopolos' letter, which would put them on notice of at

least some of the 29 red flags identified therein.

72.     Instead, Defendants relied on the "reputation" of Madoff without conducting any investigation of the bona fides of Madoff and his operations, and/or an analysis of the trading strategies and investment returns reported by Madoff, which remained consistently high even during adverse market conditions.

73.     Defendants acted with gross negligence and violated their duties by failing to perform, or cause to be performed, appropriate due diligence that would have revealed that the assets of the Funds (in whole or in part) were invested with Madoff, BMIS, and/or Madoff-controlled entities and by failing to monitor the Funds' investments in these Madoff entities.

**D.     The Tremont Defendants Ignored the Red Flags Pointing Towards Madoff's Fraud Because Their Relationship With Madoff Benefitted Them Financially**

74.     The only rational explanation for the Tremont Defendants' failure to learn, or ignorance of, the myriad red flags identified above is that they were content to collect the fees they "earned" from their long-term relationship with Madoff and BMIS.  Therefore, they did not conduct due diligence, or if conducted, a meaningful one that would have uncovered the red flags which would have required them to end their lucrative relationship with Madoff and/or the entities he owned and controlled.

75.     Notwithstanding their lack of candor and care, the Tremont Defendants nevertheless gorged on fees.  The fees generated from the Tremont Funds illustrates this fact. The Tremont Funds' investments in Madoff through the Rye Funds were particularly lucrative because Tremont Partners took two sets of fees.  This "double dip" also benefited Tremont Partners' ultimate owner, MassMutual.

76.     The first set of fees was taken from the Rye Funds. This first set of fees was based on the imaginary asset values and investment returns reported by Madoff and accepted by

Tremont Partners. Had their fees been calculated based on actual values, Tremont Partners would have been entitled to no fees from the Rye Funds.

77.     The second set of fees was taken directly from the Tremont Funds. As related to Madoff, this second set of fees was again based on the imaginary asset values and investment returns that the Rye Funds reported by Madoff and passed along by Tremont Partners. Had the fees been calculated based on actual values, Tremont Partners would have been entitled to nothing on account of investments in the Rye Funds.

**E.      The Tremont Defendants' Assets Have Been Frozen Based In Part On An Investigator's Opinion That Tremont Should Have Discovered The Red Flags**

78.     On March 20, 2009, a Connecticut Superior Court judge issued a temporary restraining order, freezing the assets of the Tremont Defendants in a case brought by the pension funds of the Connecticut town of Fairfield (CV 09 5023735) (the "Fairfield Action"). The plaintiffs in the Fairfield Action asserted claims under statutory and common law arising from the same facts and circumstances as alleged herein against Defendants Tremont Partners, Tremont Group Holdings, Oppenheimer Acquisition Corp., Manzke and Schulman, among others.

79.     In support of their motion for a temporary restraining order against the Tremont related, the plaintiffs in the Fairfield Action submitted the affidavit of Edward H. Siedle (the "Siedle Aff."). Siedle is a securities industry investigator with 25 years experience investigating non-traditional and alternative asset managers, including hedge funds.

80.     Siedle conducted an extensive investigation of the Tremont Defendants. Siedle's affidavit is exhaustive and his findings about certain Tremont Defendants here warrant quoting at length:

32

Tremont Partners, and its principals, Manzke and Schulman...
were all aware that Bernard L. Madoff was engaging in illegal
conduct in connection with his purported money management
operations and intentionally chose to participate in and support
Madoff's illegal conduct in order to reap enormous illicit financial
benefits.... (Seidle Aff. ¶ 4).

Tremont principal Manzke, and Tremont investment professionals
Suzanne Hammond and Catherine Sweeney (senior managers at
the firm), all had substantial experience serving as fiduciaries to
pension plans performing due diligence reviews of money
managers as a result of their years of former employment at
Rogers, Casey & Barksdale, Inc., a well-known, highly regarded
pension fund consulting firm.  Tremont principal Schulman, prior
to his joining Tremont in 1994 as President and co-CEO, was
Executive Vice President for Smith Barney where he headed up its
$60 billion Consulting Services Division. Thus, Manzke and
Schulman and their associates at Tremont were highly experienced
in performing due diligence reviews of investment managers....
(Siedle Aff. ¶ 12(a)).

Critical to Madoff's purported investment strategy was the
purchase and sale of put and call options on the billions of dollars
of securities under his management. Given the enormous amount
of the assets under management with Madoff purportedly invested
in the strategy and the level of options trading required to
implement the strategy, there were not enough listed and over the-
counter index options to support Madoff's level of trading. Further,
the large volume of option trades that the strategy would have
generated would have had a profound impact upon the market.
**Market professionals purporting to review Madoff's trading
activity -- as the Tremont...professional[s] ... represented they
were carefully doing -- would have been immediately aware of
these fundamental disparities between what Madoff said he
was doing and what the marketplace data showed (to the
contrary). Likewise, it would be apparent to any market
professional reviewing Madoff's purported trades that there is
no evidence of the substantial block trades of the billions of
dollars of securities in Madoff's purported strategy that would
have been required. Further, press accounts indicate that even
a cursory analysis of the stock trades reported on the account
statements issued by Madoff compared against the actual
trading prices on the relevant dates would have shown that the
prices did not match. Quite clearly, it would be fundamentally
apparent to any market professional performing due diligence
on Madoff's trading activity that he was not trading the
securities or options necessary to implement his purported**

**split-strike conversion strategy….** (Siedle Aff. ¶ 12(f))
(emphasis added).

Any market professional would have been very troubled by the
way in which Madoff purported to verify his purported trading
activity. Madoff s requirement that his investors custody their
assets at BLMIS, as opposed to at a third party custodian, was
unusual and posed real dangers, including lack of independent
verification of assets within accounts and related returns.
Moreover, the form of the BLMIS statements was outdated and
lacking in detail, which was also both surprising and of concern
from a verification standpoint. Annual audits of Madoff s trading
activities and holdings by a qualified, national auditing firm might
have allayed these concerns; however, Madoff s auditor was a
three-person firm which did not have the qualifications or expertise
to audit an advisor with $17 billion in reported assets. **While
start-up companies sometimes use small auditing firms, it is
unheard of for an established firm with billions under
management to use such an auditor….** (Siedle Aff. ¶ 12(f))
(emphasis added).

Other investment managers have noted inconsistencies between
customer account statements and the audited BLMIS financial
statements filed with the SEC. The stock holdings reported in the
quarterly statements of BLMIS filed with the SEC appeared too
small to support the size of the assets Madoff claimed to be
managing…. (Siedle Aff. ¶ 12(f)).

The degree of secrecy insisted upon by Madoff was highly unusual
and suspicious. While successful investment managers generally
seek to tout their level of assets under management and their
investment strategy and to be responsive to increasing demands for
transparency, Madoff s refusal to provide information raised
serious concerns with some cautious managers and advisors.
(Siedle Aff. ¶ 12(f)).

The fee arrangement between Madoff and the "feeder firms" was
the opposite of convention and counter-intuitive: Madoff, the
investment fund manager who generated the exceptional returns,
was paid a low commission-based fee, while the marketing firms
received rich performance-like fees. **Thus, Tremont, which
charged over 1% for placing funds with Madoff, was
scheduled to receive over $30 million in fees in 2008 on the $3.3
billion it had placed with Madoff…. All of these enormous fees
were paid to the "feeder firms" for what was essentially
marketing Madoff. Madoff's willingness to part with such rich
fees, which ordinarily would be retained by the investment**

34

> **manager, not the marketer, was a blatant "red flag." [...]**
> (Siedle Aff. ¶ 12(f)) (emphasis added).

> Such major financial institutions as Goldman Sachs, Merrill
> Lynch, Credit Suisse and Societe Generale were so uncomfortable
> with Madoff s refusal to provide a satisfactory explanation for his
> claimed success and the numerous red flags raising suspicions
> about the legality of his operations that they prohibited investments
> with Madoff.  Likewise, published reports document that a number
> of established financial advisors, including Aksia LLC, an
> independent hedge fund research and advisory firm, Acorn
> Advisory Capital, LP, an investment advisory firm, and others,
> refused to do business with Madoff for similar reason…. (Siedle
> Aff. ¶ 14).

> As a result of the substantial customer order flow at BLMIS, a
> plausible explanation for Madoff s superior investment
> performance in rising and declining markets was that Madoff was
> illegally "front-running" BLMIS's securities customers orders.
> Indeed, this theory was discussed in the 2001 Barron's article
> referenced earlier, and FGG actually touted its "market-timing"
> ability as the basis for the returns it Madoff-invested hedge funds
> were obtained.  (Siedle Aff. ¶ 22).

81.    Siedle summarized his conclusions on Tremont in a way that can only be called

damning:

> Tremont Partners, thus, had a fiduciary and professional duty to the
> plaintiffs Plans in two respects - first, as general partner of the Rye
> Select hedge funds in which the Plans invested, and second, as the
> Plans' independent investment advisor. In my opinion, Tremont
> Partners (and its principals) breached its fiduciary and professional
> duties to the plaintiffs Plans in both of these capacities. Even if
> Tremont Partners (and its principals) did not actually know (or
> close their eyes to avoid knowing) that Madoff was involved in
> criminal activity, it was, in my opinion, a breach of Tremont
> Partners' fiduciary responsibility as the Plans' advisor and
> professionally negligent for Tremont Partners to fail to advise the
> Plans of the serious questions that existed concerning the legality
> of Madoffs investment activities and of the unsuitability of an
> investment of public pension funds with Madoff by the plaintiffs
> Plans. Furthermore, if they did not actually know (or close their
> eyes to avoid knowing) that Madoff was involved in criminal
> activity, it was a breach of fiduciary duty and professionally
> negligent for Tremont Partners (and its principals) to fail to
> perform an adequate due diligence investigation of Madoffs

investment activities to uncover such illegality or, at a minimum, to determine that they were unable to verify Madoff's claimed returns. (Siedle Aff. ¶ 23.)

82.     Based on the opinions in the Siedle Affidavit, the complaint in the Fairfield Case, and other affidavits, the judge issued a temporary restraining order freezing the assets of, among others, Tremont Partners, Tremont Group Holdings, Oppenheimer, Manzke, and Schulman.  The entry of a temporary restraining order is significant because it means that the court found that the plaintiffs in the Fairfield Action are likely to succeed on the merits.

## TREMONT DEFENDANTS AND AUDITOR DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS

### A.     Tremont Defendants Failed to Disclose That Madoff Was The Funds' Investment Manager

83.     For purposes of this allegation, Plaintiffs will highlight the false and misleading statements set forth in documents relating to the Lead Plaintiff Funds, such as the PPMs and performance updates, as Plaintiffs believe that such statements are representative of those in the PPMs offered to investors for all Funds during the Class Period.  The PPMs for each of the Lead Plaintiff Funds have been amended or revised from time to time during the Class Period.  Although they have changed over the years, they are, however, the same in all material respects relevant to this action.  Additionally, the PPMs are consistent with respect to the material information they concealed or failed to disclose.

84.     During the Class Period, the Tremont Defendants hid Madoff's control over the assets of the Lead Plaintiff Funds by crafting offering documents, reports, and other written materials that failed to identify Madoff as the manager of the Lead Plaintiff Funds' assets.

85.     For example, the 1996 Broad Market Fund PPM states that the "Partnership's investment portfolio is presently allocated to one Investment Advisor selected by the General Partner."  Because the Broad Market Fund was managed by a single, unidentified manager, the

PPM advised prospective and current investors that "the overall success of the Partnership depends on the ability of the Investment Advisor to be successful in his own strategy."

86.     In discussing the investment objectives of the Broad Market XL Fund, the 2008 PPM, for example, refers to the efforts of the investment advisor retained by Tremont Partners in the Broad Market Fund, since the XL Fund fund seeks "a return linked to a three times levered exposure to the economic performance" of the Broad Market Fund.  In this regard, the PPM states: "The Reference Entity [i.e., the Broad Market Fund] . . . invest[s] the majority of the assets with one investment manager who employs a 'split strike conversion' strategy . . .."

87.     By concealing Madoff's role as the manager of the Lead Plaintiff Funds' assets, as well as the fact that the Lead Plaintiff Funds were feeder funds to Madoff, the Tremont-Fund Defendants falsely led potential investors and limited partners to believe that Tremont Partners and the Individual Defendants would be involved in the management of the Lead Plaintiff Funds on a day-to-day and transaction-by-transaction basis.

88.     For example, the July 1, 2006 PPM for the Broad Market Prime Fund stated that Tremont Partners is "responsible for the day-to-day administration and operation of the Partnership;" that Tremont Partners had "primary responsibility for monitoring the ongoing activities of" the outside investment manager [i.e., Madoff]; and that it reviewed "confirmations of the Partnership's trading activity for purposes of tracking the current status of the Partnership's accounts."  Similar statements were made in the Broad Market Fund PPM ("The General Partner is responsible for the day to day administration and operation of the Partnership"; that Tremont Partners "has primary responsibility for monitoring the ongoing activities of the Investment Advisor [i.e., Madoff]"; and that Tremont Partners "reviews the

confirmations of the Partnership's trading activity for purposes of tracking the current status of the Partnership's accounts.").

89.     These statements were materially false and misleading because it was Madoff, not Tremont Partners, who had day-to-day control of the Lead Plaintiff Funds' assets.  If Tremont Partners (and the Individual Defendants) had actually monitored Madoff's activities and verified the trading activity in the confirmations, it would have discovered that Madoff was operating a fraud.

**B.     Tremont Defendants Misstated the Funds' Investment Objectives and Strategies**

90.     The PPMs also contained false and misleading statements regarding the Lead Plaintiffs' Funds' investment objectives and strategies.

91.     For example, the 1998 Broad Market Fund PPM represented that the investment objective of the fund was long-term capital growth by investing "with a Manager . . . who invests or trades in-a wide range of equity securities, and, to a lesser extent, other securities." The PPM goes on to say that the investment advisor specializes "in hedged transactions using equities, options and index options."  Later PPM for this fund make similar representations.

92.     Although this statement arguably describes the "split-strike conversion" strategy purportedly used by Madoff, the statement was nonetheless materially false and misleading because it conveyed the false impression that Tremont Partners was investing the Lead Plaintiff Fund's assets with an investment manager who was actually using this strategy.  In fact, as it is now well known, Madoff only claimed to use this strategy while operating a massive fraud.  Had Tremont Partners and the Individual Defendants conducted due diligence, or if conducted, an appropriate one, they would have learned of the red flags identified herein relevant to the "split-

strike conversion" strategy, that Madoff did not have such expertise, and that his investment advisory operation was nothing more than a fraud.

93.    The Tremont Market Neutral PPM, dated July 1, 2008, stated that it employed a "market neutral" investment strategy by investing with a diverse group of portfolio managers.

94.    The Tremont Market Neutral PPM also stated that this "multi-manager approach is designed to permit the use of Managers who employ diverse investment styles and strategies . . ."

95.    The Tremont Market Neutral PPM further stated that "[t]he investments will be with a broad class of investment strategies and hence be 'market neutral' and have a low correlation to the performance of equity/debt and other markets."

96.    These statements were undeniably false and misleading because Tremont Market Neutral invested approximately 27% of the fund's assets with Madoff, a highly concentrated position in stark contrast to the representation of diversity.  By abandoning the market neutral investment strategy and placing direct responsibility and discretion in the hands of Madoff, Tremont Partners (and the Individual Defendants) exposed the fund's limited partners to investment risks not consistent with the market neutral strategy described in the PPM.

**C.    Tremont Defendants Made False and Misleading Statements
Regarding The Due Diligence They Claimed to Conduct**

97.    The process and procedures by which Tremont Partners and the Individual Defendants selected outside investment managers was of paramount importance to the success of the Lead Plaintiff Funds.  As the Market Neutral PPM states, limited partners "cannot take part in the management or control of the Partnership's business, which is the sole responsibility of the General Partner."  Similar language is found in the 1996 Broad Market PPM ("Limited Partners have no right or power to take part in the management of the Partnership"), as well as later Broad

Market PPMs ("The General Partner exercises ultimate authority over the Partnership and responsible for the investment management activities of the Partnership.")  Consequently, Plaintiffs and other members of the Class were dependent upon Tremont Partners and the Individual Defendants to carefully and diligently vet all potential investment mangers before retaining them and to carefully and diligently monitor investment managers after they were retained.

98.     The Tremont Neutral PPM acknowledges the "General Partner has overall responsibility for implementing the investment strategy of the Partnership and has the authority to select the Managers that the Partnership invests in." Similar language is found in the 1996 Braod Market PPM. (Noting the criteria used to select an investment advisor), as well as later Broad Market PPMs. (Noting that the General Partner selects the investment manager for the fund)  The PPMs place upon the General Partner the responsibility for the management of the day-to-day operations of the Partnership, including, as noted in the Tremont Market Neutral PPM, "managing the assets of the Partnership, selecting Managers, negotiating fee arrangements with Managers, allocating assets among Managers and monitoring their performance and adherence to their stated investment objectives."

99.     In light of the vital importance of the manager selection process, the PPMs set forth extensive manager selection criteria which the Tremont Defendants claimed to employ with respect to all prospective managers:

a.      the manager's past performance and reputation; size and efficiency of assets managed; continued favorable outlook for the strategy employed; and ability of the fund to make withdrawals or liquidate its investment. (See the Broad Market PPMs.)

b.      the investment manager's experience; the historical performance of each

manager, including a history of consistent returns with respect to its investment style; the

degree to which a specific manager compliments and balances the fund's portfolio with

respect to the strategies employed by other managers; the quality and stability of the

manager's organization; the ability of the fund to make withdrawals or liquidate its

investment; and the ability of each manager to consistently and effectively apply its

investment approach. (See the Market Neutral PPMs.)

100.    The PPMs also represented that after the fund managers were selected, Tremont

Partners and the Individual Defendants would carefully monitor their actions.  For example, the

Tremont Market Neutral PPM represented that:

> "Investment supervisory accounts are reviewed at least
> monthly, although Tremont Partners, Inc. ("Tremont") is engaged
> on a daily basis with custodians and/or trustees to monitor cash
> flow and fund compliance. **** Fund accounts are monitored in
> terms of securities holdings, asset mix and adherence to investment
> guidelines. *** Tremont uses it own proprietary software programs
> to monitor the performance of investment managers. Senior
> officers are responsible for the reporting and monitoring functions.
> *** Clients receive monthly and/or quarterly reports showing
> investment results. *** Each quarter, Tremont's clients receive a
> detailed review which profiles the investments' results relative to
> performance objectives market indices and other relevant manager
> universes and benchmarks. *** Tremont maintains a database of
> over 6,000 management firms to evaluate investment process,
> approach and investment results."

101.    The Broad Market Fund PPM also stated that Tremont Partners and the Individual

Defendants reviewed the fund's holdings "not less frequently than quarterly to assess, among

other things, their investment performance and to determine whether they continue to meet the

general investment criteria" set forth in the Broad Market PPM.

102.    The January 1, 2003 American Masters Fund PPM stated that Tremont Partners

"has primary responsibility for monitoring the ongoing activities of the Investment Adviser or

Investment Advisers," and "reviews the confirmations of the Partnership's trading activity for purposes of tracking the current status of the Partnership's accounts."

103.   The statements in paragraphs 97 to 102 were materially false and misleading because, among other things, they conveyed the false impression that the Tremont Defendants had conducted, and continued to conduct, a thorough investigation of Madoff and BMIS's trading operations, assets under management, and the strategy employed by Madoff – the split-strike conversion strategy.  This false impression was made more egregious in light of Tremont Group Holdings' representation on its Website that it conducted effective "oversight, thorough manager research, careful due diligence ... risk allocation and ... portfolio management ..."  The Tremont Defendants either did not perform due diligence, or their due diligence was so lacking as to be reckless, into the past performance and success of Madoff's investment strategy, which performance was not based on actual returns but rather a Ponzi scheme.  Moreover, had the Tremont Defendants reviewed the Funds' trading confirmations, they would have discovered that the confirmations did not support the investment strategy purportedly employed by Madoff or the returns that strategy purportedly generated.

104.   The statements in paragraphs 97 to 102 were also materially false and misleading because they conveyed the false impression that the Tremont Defendants maintained a system of internal controls, which included continued oversight, portfolio management and due diligence of the investment manager, and which were intended to reduce the risk of loss to the limited partners.  Indeed, the Tremont Defendants never verified that there were actual assets in existence, that actual investment strategies were being pursued or that actual profits were being made.  Tremont Partners' failure to verify this basic information was even more egregious in light of Madoff's use of an affiliated custodian, an affiliated broker, and a sham accounting firm.

42

Specifically, BMIS, through discretionary brokerage agreements, purportedly initiated trades in the accounts, executed the trades, and custodied and administered the assets. This lack of segregation of duties was a clear conflict of interest and a blatant red flag. Furthermore, Tremont Partners had no electronic access to the Funds' accounts at BMIS.

### D.   False and Misleading Statements in Other Fund Documents

105.   Throughout the Class Period, the Tremont Defendants disseminated performance updates for the Lead Plaintiff Funds. As late as December 2008, for example, the performance report for the Broad Market Fund showed consistent positive net returns for the first 11 months of 2008, even during the months of September, October, and November, when the stock market was in a tailspin. In fact, the performance report showed positive year-to-date net returns for the years 1998 through the first eleven months of 2008. These returns were not real, as they were the result of Madoff's Ponzi scheme and, therefore, were materially false and misleading.

106.   Throughout the Class Period, the fact that due diligence was not being performed on Madoff was concealed through the Tremont Defendants' dissemination of these performance updates and other documents discussing the Funds.

107.   Tremont Defendants knew and intended that their communications to investors through documents, such as the performance updates, would create a false impression in Plaintiffs and other Class Members that the Funds' managers were being professionally vetted, monitored, and overseen by the Tremont Partners.

108.   For example, in addition to showing the net monthly returns, the December 2008 performance report for the Broad Market Fund included a brief discussion of the fund's investment objective. In this regard, the performance report stated that the Broad Market Fund's "investment objective is long-term capital growth," and that to "achieve its objective, the Fund entrusts the management of its assets to investment advisors that have conservative investment

43

styles and have demonstrated, over a prolonged period of time and under all economic and market conditions, their ability to achieve consistent returns. The Fund's portfolio is currently invested in a 'split strike synthetic conversion' options trading strategy."

109.    These statements were materially false and misleading because they falsely implied that Tremont Partners was pursuing the fund's investment objective in a prudent manner by employing investment managers having a conservative style, thereby avoiding risky strategies that could not generate consistent returns "over a prolonged period of time and under all economic and market conditions." Additionally, the statement falsely implied that Tremont Partners selected investment advisors only after they performed a thorough due diligence of the advisors' management style and performance results. Instead of performing such due diligence, Tremont Partners had, with no or inadequate due diligence or oversight, abdicated their responsibilities and entrusted the assets of the Funds to Madoff and BMIS.

110.    Had the Tremont-Fund Defendants conducted due diligence into Madoff and BMIS, they would have discovered at least some of the dozens of red flags identified herein. As discussed above, other investment professionals who did conduct proper due diligence discovered dozens of red flags and avoided investing with Madoff.

111.    Tremont Partners, as the general partner of the Funds (and the Individual Defendants who controlled Tremont Partners' day-to-day operations), failed to supervise and monitor the Fund's investments in violation of its fiduciary duties under the laws of both New York and Delaware, and contrary to the representations made in, among other documents, the PPMs.

112.    According to Tremont Group Holding's website:

> Tremont has been at the forefront in setting the standard in the
> industry for fund of hedge funds investment management.

> Effective investment strategies and ***oversight, thorough manager***
> ***research, careful due diligence***, advanced risk allocation and time-
> tested portfolio management form the cornerstones of a
> comprehensive platform that has been refined over a 23-year span
> of dedicated strides to maximize our clients' objectives. Our
> established performance history and our focus on client service
> distinguishes the firm at a time when the influx of new entrants
> creates choice but not the certainty of experience.

(Emphasis added).

113.    Similarly, in its Form ADV filed with the SEC on January 1, 2006, Tremont

Partners represented that it "is engaged on a daily basis with custodians and/or trustees to

monitor cash flow and fund compliance"; that "accounts are monitored in terms of securities

holdings, asset mix and adherence to investment guidelines"; and that Tremont Partners "uses its

own proprietary software programs to monitor the performance of investment managers."

114.    These statements were materially false and misleading because Tremont Partners

conducted no due diligence or oversight with respect to Madoff and/or BMIS, failed to verify the

existence of actual securities holdings, and failed to monitor Madoff's operations.

115.    Due to both (a) the success of the Tremont-Fund Defendants in affirmatively

misrepresenting facts concerning the Funds' initial and ongoing due diligence and in concealing

material information about the Funds' Madoff related investments, which they knew of and were

obligated to disclose but failed to do so as set forth in the allegations above, and (b) Plaintiffs'

and Class Members' foreseeable and reasonable reliance upon Tremont Partners to honor its

fiduciary duty of candor in communications to limited partners, Plaintiffs and Class Members did

not and could not have reasonably discovered the wrongdoing alleged in any of the Counts set

forth below, nor did they have sufficient true information to put them on reasonable notice of the

wrongdoing alleged in any of the Counts set forth below until the exposure of the Madoff Ponzi

scheme in December 2008.