UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

IN RE TREMONT SECURITIES LAW,       :
STATE LAW AND INSURANCE              :       Master File No.:
LITIGATION                           :       08 Civ. 11117 (TPG)
                                     :
-------------------------------------------------------- x       **JURY TRIAL DEMANDED**

This Document Relates to:  State Law Actions  :
08 Civ. 11183 (TPG)                  :       "ECF Case"

-------------------------------------------------------- x

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO THE OPPENHEIMER DEFENDANTS' MOTION TO DISMISS

---

**ENTWISTLE & CAPPUCCI LLP**

280 Park Avenue
26th Floor West
New York, New York 10017
(212) 894-7200

*Counsel for Plaintiffs Arthur E. Lange
Revocable Trust and Arthur C. Lange*


**HAGENS BERMAN SOBOL SHAPIRO LLP**

715 Hearst Avenue, Suite 202
Berkeley, California 94710
(510) 725-3000

*Counsel for Plaintiffs Eastham Capital
Appreciation Fund LP, NPV Positive Corp.,
John Dennis, Daniel Jackson, Laborers
Local Pension Plan 17 and Richard Peshkin*


Co-Lead Counsel for Plaintiffs

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ..................................................................................................................... 4

POINT I.

THE COMPLAINT SETS FORTH PLAUSIBLE CLAIMS
FOR RELIEF AGAINST THE OPPENHEIMER DEFENDANTS................................... 4

POINT II.

THE MARTIN ACT DOES NOT
PREEMPT PLAINTIFFS' CLAIMS ................................................................................. 5

    A.    New York Law Does Not Control
        And the Martin Act Has No Application ...................................................... 5

    B.    The Martin Act Does Not Preempt
        Existing Common-Law Claims............................................................... 7

    C.    Plaintiffs Do Not Allege Deception and Thus Their
        Claims Fall Outside the Scope of the Martin Act ....................................... 9

POINT III.

SLUSA DOES NOT BAR PLAINTIFFS' CLAIMS ...................................................... 13

    A.    Plaintiffs' Claims Are
        Not Grounded in Fraud ............................................................................ 14

    B.    Defendants' Misconduct Was Not Carried
        Out "in Connection with" a "Covered Security" ....................................... 16

POINT IV.

PLAINTIFFS HAVE ASSERTED A
VIABLE AIDING AND ABETTING CLAIM ............................................................... 16

    A.    The Oppenheimer Defendants Knew of the
        Underlying Breaches of Fiduciary Duties................................................. 18

    B.    The Oppenheimer Defendants
        Assisted the Tremont Defendants ............................................................ 19

i

POINT V.

   PLAINTIFFS STATE A VIABLE
   UNJUST ENRICHMENT CLAIM.................................................................................... 22

CONCLUSION........................................................................................................................... 23

EC.22251.5

# TABLE OF AUTHORITIES

## Cases

Ashcroft v. Iqbal,
  129 S. Ct. 1937 (2009) ........................................................................................................ 4,5

In re Bayou Hedge Fund Litigation,
  534 F. Supp. 2d 405 (S.D.N.Y. 2007) ..................................................................................... 12

Bell Atlantic Corp. v. Twombly,
  550 U.S. 544 (2007) ............................................................................................................ 4, 5

Berman v. Sugo LLC,
  580 F. Supp. 2d 191 (S.D.N.Y. 2008) .................................................................................... 21

Buckley v. Deloitte & Touche USA LLP,
  2007 WL 1491403 (S.D.N.Y. May 22, 2007) ............................................................................ 6

Caboara v. Babylon Cove Development, LLC,
  54 A.D.3d 79, 862 N.Y.S.2d 535 (2d Dep't 2008) ................................................................... 8

Castellano v. Young & Rubicam, Inc.,
  257 F.3d 171 (2d Cir. 2001) .................................................................................................... 7

CPC International, Inc. v. McKesson Corp.,
  70 N.Y.2d 268, 514 N.E.2d 116, N.Y.S.2d 804 (1987) ............................................................. 8

Cromer Finance Ltd. v. Berger,
  2001 WL 1112548 (S.D.N.Y. Sept. 19, 2001) ........................................................................... 8

First Union National Bank v. Paribas,
  135 F. Supp. 2d 443 (S.D.N.Y. 2001),
  aff'd, 2002 WL 31267985 (2d Cir. Oct. 9, 2002) ..................................................................... 7

In re Grand Theft Auto Video Game Consumer Litigation,
  251 F.R.D. 139 (S.D.N.Y. 2008) ........................................................................................... 6, 7

Higgins v. New York Stock Exchange, Inc.,
  10 Misc. 3d 257, 806 N.Y.S.2d 339 (Sup. Ct. N.Y. Co. 2005) ................................................ 21

Jackson National Life Insurance Co. v. Kennedy,
  741 A.2d 377 (Del. Ch. 1999) ............................................................................................... 17

Kerusa Co. v. W10Z/515 Real Estate Limited Partnership,
  12 N.Y.3d 236, 906 N.E.2d 1049, 879 N.Y.S.2d 17 (2009) ..................................................... 7

Knudsen v. Quebecor Printing (U.S.A) Inc.,
  792 F. Supp. 234 (S.D.N.Y. 1992) ......................................................................................... 22

EC.22251.5

Kovens v. Paul,
    2009 WL 562280 (S.D.N.Y. Mar. 4, 2009) ............................................... 6

Lou v. Belzberg,
    728 F. Supp. 1010 (S.D.N.Y. 1990) ...................................................... 6

Louros v. Kreicas,
    367 F. Supp. 2d 572 (S.D.N.Y. 2005) .............................................. 11, 12

MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.,
    216 F. Supp. 2d 251 (S.D.N.Y 2002) ................................................. 22

Meserole v. Sony Corp. of America, Inc.,
    2009 WL 1403933 (S.D.N.Y. May 19, 2009) ......................................... 7

Musalli Factory for Gold & Jewellry v. JP Morgan Chase Bank, N.A.,
    2009 WL 860635 (S.D.N.Y. Mar. 31, 2009) ........................................ 21

Nanopierce Technologies, Inc. v. Southridge Capital Management LLC,
    2003 WL 22052894 (S.D.N.Y. Sept. 2, 2003) ....................................... 5

National City Commercial Capital Co. v. Global Golf, Inc.,
    2009 WL 1437620 (E.D.N.Y. May 20, 2009) ...................................... 22

Palkovic v. Johnson,
    281 Fed. Appx. 63 (2d Cir. 2008) ...................................................... 4

Pension Committee of the University of Montreal Pension Plan v.
    Banc of America Securities LLC,
    568 F.3d 374 (2d Cir. 2009) .............................................................. 4

Pension Committee of the University of Montreal Pension Plan v.
    Banc of America Securities, LLC,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006) ................................................ 21

In re Santa Fe Pacific Shareholder Litigation,
    669 A.2d 59 (Del. 1995) .................................................................. 21

Scalp & Blade, Inc. v. Advest, Inc.,
    281 A.D.2d 882, 722 N.Y.S.2d 639 (4th Dep't 2001) ............................. 9

Sprint PCS L.P. v. Connecticut Siting Council,
    222 F.3d 113 (2d Cir. 2000) .............................................................. 9

Suez Equity Investors, L.P. v. The Toronto-Dominion Bank,
    250 F.3d 87 (2d Cir. 2001) ............................................................... 7

EC.22251.5

<u>In re WorldCom, Inc. Securities Litigation</u>,
   382 F. Supp. 2d 549 (S.D.N.Y. 2005)......................................................................... 8

<u>Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.</u>,
   341 F. Supp. 2d 258 (S.D.N.Y. 2004)..................................................................... 8, 9

## **<u>Statutes</u>**

Martin Act, N.Y. Gen. Bus. L. § 352-c..................................................................... 9

Securities Litigation Uniform Standards Act, 15 U.S.C. §§ 77p, 78bb........................... 13, 14, 16

## **<u>Rules</u>**

Fed. R. Civ. P. 8.....................................................................................................22

Fed. R. Civ. 12(b)(6)...............................................................................................4

EC.22251.5

## PRELIMINARY STATEMENT

Plaintiffs the Arthur E. Lange Revocable Trust, Arthur C. Lange, Eastham Capital Appreciation Fund LP and NPV Positive Corp. (collectively, "Class Plaintiffs") respectfully submit this memorandum of law in opposition to the motion of defendants Oppenheimer Acquisition Corp. and OppenheimerFunds, Inc. ("Oppenheimer Defendants") to dismiss the First Consolidated and Amended Class Action and Verified Derivative Complaint ("Complaint").[1]

This action arises out of the devastating financial losses flowing from the $50 billion Ponzi scheme orchestrated by convicted swindler Bernard L. Madoff. The majority of investors who fell prey to Madoff's scheme did not invest directly with him; instead, they invested indirectly through an extensive network of "feeder funds" that marshaled investor assets and then channeled them into the black hole that was Madoff's scam. One of the largest family of Madoff feeder funds was the so-called Rye family of funds ("Rye Funds") through which more than $5 billion was channeled to -- and then plundered by -- Madoff.

The Rye Funds were managed and operated by the Tremont Defendants. The Tremont Defendants, in turn, were owned and/or controlled by the Oppenheimer Defendants and other members of the MassMutual Financial Group. In fact, one of the Oppenheimer Defendants acquired the Rye Funds in 2001 as part of the MassMutual Financial Group's overall strategy to break into the then-booming hedge fund business and capitalize on the lucrative fees flowing from the Tremont Defendants' relationship with Madoff.

As alleged in the Complaint, the Tremont Defendants, along with the Oppenheimer Defendants and others in the MassMutual corporate food chain, knew of gross irregularities in Madoff's operations but turned a blind eye to those suspect operations so as to

---

[1] Capitalized terms used herein shall have the same meanings attributed to them in the Complaint.

continue reaping hundreds of millions of dollars in fees from investors drawn to the Rye Funds. Motivated by unchecked greed, these entities funneled billions of dollars into a highly suspect operation they were loathe to investigate for fear of jeopardizing their extraordinarily lucrative relationship with Madoff. Disinclined to forfeit their place front-and-center at the trough, these entities did absolutely nothing to protect the limited partner investors in the Rye Funds despite their knowledge of both "red flag" warnings regarding Madoff's operations and growing suspicions among other sophisticated corporate entities that those operations were not legitimate.

Class Plaintiffs bring this action on behalf of themselves and the class of Rye Funds' investors who had not redeemed their interests in those limited partnerships as of December 11, 2008 -- i.e., the day Madoff's scheme was exposed to the general public. The Complaint sets forth two straightforward state law claims against the Oppenheimer Defendants. Each of those claims is supported by detailed factual allegations.

First, in Count II the Oppenheimer Defendants are alleged to have aided and abetted the Tremont Defendants in breaching their fiduciary duties to the limited partner investors in the Rye Funds in that they were aware of gross irregularities in Madoff's operations; knew the Tremont Defendants were doing nothing to protect their investors from those suspect operations; and nonetheless assisted the Tremont Defendants in breaching those duties in order to preserve the upstream financial benefits realized from the Madoff relationship. Second, in Count III Class Plaintiffs allege that the Oppenheimer Defendants were unjustly enriched by the upstream benefit they received from the fees that the Rye Funds' investors paid to the Tremont Defendants for due diligence and monitoring of Madoff's operations that was conducted -- if, indeed, it was ever conducted at all -- in a shamefully reckless manner.

In challenging these claims, the Oppenheimer Defendants strain to recast the Complaint as something it is not. In essence, they challenge the pleading they wish had been filed against them rather than the Complaint that is actually before the Court. They do not have that luxury. Notwithstanding the Oppenheimer Defendants' heavy-handed attempts at obfuscation and misdirection, a review of the Complaint makes plain what this case is and is not. This is not a securities fraud case. Indeed, it is not a fraud case of any kind. It is not a case pegged to allegations of deceit, deception, misrepresentations or material omissions. This case does not mirror the related securities law action before this Court that, by definition, is a case founded upon allegations of fraud, deceit and deception.

What this case is, instead, is an action involving two plain-vanilla state law claims. The legal viability of those claims is not dependent on allegations of fraud, deceit, deception, misrepresentations, material omissions or anything of the kind. Those causes of action are supported by voluminous factual allegations that make them both colorable under controlling law and plausible as a matter of common sense. As detailed below, the Oppenheimer Defendants' arguments to the contrary have everything to do with a desperate scramble to avoid discovery into their role in the Tremont Defendants' complete failure to protect their investors from the Madoff debacle and nothing whatsoever to do with any genuine pleading deficiencies to be found in the Complaint. Although the Oppenheimer Defendants are rightfully fearful of what will be revealed by an inquiry into their role in the Tremont Defendants' failure to take adequate steps to protect their investors from Madoff's operations, the allegations of the Complaint open the door to such discovery and Class Plaintiffs are entitled to pursue it in order to develop further evidence supporting their well-pled claims.

# ARGUMENT

## POINT I.

## THE COMPLAINT SETS FORTH PLAUSIBLE CLAIMS
## FOR RELIEF AGAINST THE OPPENHEIMER DEFENDANTS

A complaint challenged under Rule 12(b)(6) "does not need detailed factual allegations" to survive. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). The challenged complaint need only make a "`showing´" of the plaintiff's "entitlement to relief." <u>Id.</u> at 555 n.3. The Complaint here plainly does so.

As the Supreme Court has instructed, on a motion to dismiss, "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." <u>Id.</u> at 570. Plausibility in this context, the Court has cautioned, "is not akin to a `probability requirement[.]´" <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009). Determining whether a complaint makes out a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> at 1950. In making that determination, a court "construe[s] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in Plaintiffs' favor." <u>Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC</u>, 568 F.3d 374, 381 (2d Cir. 2009). Ultimately, the inquiry is not whether a plaintiff is likely to prevail on its claims, but whether it is entitled under the circumstances to develop and offer evidence to support those claims. <u>See</u> <u>Palkovic v. Johnson</u>, 281 Fed. Appx. 63, 66 (2d Cir. 2008).

The Complaint more than adequately details the factual basis for the claims asserted against the Oppenheimer Defendants. Class Plaintiffs plainly have done much more than file "an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Iqbal</u>, 129 S. Ct. at 1949. The Complaint certainly offers more than mere "`labels and conclusions´ or a `formulaic

recitation of the elements'" of Plaintiffs' claims.  Id.  It clearly reaches well beyond the "'naked

assertion[s]' devoid of `further factual enhancement.'"  Id.

Class Plaintiffs submit that the facts and circumstances detailed in the Complaint

have "nudged their claims across the line from conceivable to plausible[.]"  Twombly, 550 U.S.

at 570.  The 115-page, 547-paragraph Complaint possesses "enough heft `to sho[w] that the

pleader is entitled to relief'" and sets forth "enough fact[s] to raise a reasonable expectation that

discovery will reveal evidence" further supporting these claims.  Id. at 556-57.  For the reasons

set forth below, Class Plaintiffs respectfully request that the Court deny the Oppenheimer

Defendants' motion in its entirety and direct discovery to proceed forthwith.

## POINT II.

### THE MARTIN ACT DOES NOT
### PREEMPT PLAINTIFFS' CLAIMS

The Oppenheimer Defendants lead with the baseless argument that New York's

Martin Act preempts the claims asserted against them.  See Oppenheimer Defendants' Brief at 6-

10.  As discussed below, this contention rests on three assumptions that do not withstand even

mild scrutiny.

### A.    New York Law Does Not Control
### And the Martin Act Has No Application

The Oppenheimer Defendants advance their Martin Act argument without any

choice-of-law analysis demonstrating that New York law controls here.[2]  A federal court sitting

---

[2]    The Oppenheimer Defendants boldly -- and erroneously -- assert that the Martin Act governs
state law claims arising under the laws of all fifty states.  See Oppenheimer Defendants' Brief at
7 n.6.  This sweeping statement relies on a gross misreading of Nanopierce Technologies, Inc. v.
Southridge Capital Management LLC, 2003 WL 22052894, at *5-6 (S.D.N.Y. Sept. 2, 2003).
The Nanopierce court merely held that New York law applied there because "the parties in this
case signed a contract choosing New York law, and they are now bound by that choice."  Id. at
*6.  Notwithstanding the Oppenheimer Defendants' assertion to the contrary, a choice-of-law
analysis is necessary before the application of the Martin Act can be justified here.

in diversity applies the choice-of-law principles of the forum state.  Kovens v. Paul, 2009 WL

562280, at *3 (S.D.N.Y. Mar. 4, 2009).  Under New York law, the underlying breach of

fiduciary duty claim is governed by the laws of the jurisdiction in which the relevant corporate

entities were organized.  Here, the Rye Funds are incorporated under the laws of Delaware and

the Cayman Islands and therefore the laws of those jurisdictions apply.  See Complaint, ¶¶ 48-

52.  The Tremont Defendants concede this point.  See Tremont Defendants' Brief at 19 n.30.

      The claim against the Oppenheimer Defendants for aiding and abetting the

Tremont Defendants in breaching their fiduciary duties is also governed by the laws of Delaware

-- i.e., the jurisdiction in which the domestic Rye Funds are incorporated.  See Buckley v.

Deloitte & Touche USA LLP, 2007 WL 1491403, at *13 (S.D.N.Y. May 22, 2007); Lou v.

Belzberg, 728 F. Supp. 1010, 1023 (S.D.N.Y. 1990).

      As for the unjust enrichment claim asserted against the Oppenheimer Defendants,

the applicable choice-of-law analysis is highly complex.  Courts in this District have applied at

least three different tests to unjust enrichment claims.  See In re Grand Theft Auto Video Game

Consumer Litig., 251 F.R.D. 139, 148-49 n.11 (S.D.N.Y. 2008).  Regardless of which test the

Court ultimately applies, the analysis necessarily will be highly fact-sensitive.  Among other

things, the Court will need to examine where the unjust enrichment was conferred and received.

The defendants include entities that are incorporated in Massachusetts, Delaware and Colorado.

Their principal places of business include Massachusetts and New York.  See Complaint, ¶¶ 26-

31.  Without knowing the nature of Tremont Partners' dividend and other payments to their co-

defendants, including where and how these payments were made, it is premature to make a

choice-of-law determination at this stage of the proceedings.  Courts regularly defer choice-of-

law determinations at the pleadings stage where, as here, the relevant factual and legal issues are

complex and require further development.  See, e.g., Meserole v. Sony Corp. of Am., Inc., 2009

WL 1403933, at *5 n.6 (S.D.N.Y. May 19, 2009); In re Grand Theft Auto Video Game

Consumer Litig., 2006 WL 3039993, at *3 n.3 (S.D.N.Y. Oct. 25, 2006); First Union Nat'l Bank

v. Paribas, 135 F. Supp. 2d 443, 453 (S.D.N.Y. 2001), aff'd, 2002 WL 31267985 (2d Cir. Oct. 9,

2002).

        Absent any demonstrated basis for applying New York law to the claims asserted

against the Oppenheimer Defendants, Class Plaintiffs respectfully submit that giving the Martin

Act preclusive effect with respect to those claims at the pleadings stage of this case is

unwarranted.

      **B.**    **The Martin Act Does Not Preempt
              Existing Common-Law Claims**

        The Oppenheimer Defendants maintain that "well-settled and reasoned" precedent

compels the conclusion that the Martin Act preempts certain common-law claims for relief.  See

Oppenheimer Defendants' Brief at 6.  In fact, the New York Court of Appeals has not so held.[3]

---

[3]  Indeed, in its most recent Martin Act decision in Kerusa Co. v. W10Z/515 Real Estate
Limited Partnership, 12 N.Y.3d 236, 239, 906 N.E.2d 1049, 1050, 879 N.Y.S.2d 17, 18 (2009),
the New York Court of Appeals went only so far as to hold that the Martin Act preempted a
common-law fraud claim "predicated solely" on the failure to make specific disclosures
expressly required under the Martin Act itself.  This narrow holding, Plaintiffs submit, signals
that the New York Court of Appeals would find no Martin Act preemption of common-law
claims based on wrongful conduct other than violations of express provisions of the Act itself.
The preemption issue remains unsettled in the Second Circuit, as well.  In Suez Equity Investors,
L.P. v. The Toronto-Dominion Bank, 250 F.3d 87 (2d Cir. 2001), the Second Circuit observed
that the lower New York courts that have found the Martin Act to preempt certain common-law
claims had not "explore[d] the issue with the level of depth that would justify a ruling by us in
the first instance[.]"  Id. at 104.  The Suez Equity court stated that it was "not immediately
persuaded that the [New York] Court of Appeals would follow [the] lead" of those lower court
decisions.  Id.  In Castellano v. Young & Rubicam, Inc., 257 F.3d 171 (2d Cir. 2001), the Second
Circuit found the Martin Act to preempt a common-law claim for breach of fiduciary duty, but
did so only on "principles of federalism and respect for" the intermediate appellate courts of
New York and their interpretation of New York law rather than as a prediction of how New
York's highest court would rule.  Id. at 190.  Subsequent to Castellano, the intermediate New
York appellate courts have continued to be divided on the (***footnote continued on next page***)

The lower New York courts and the courts of this District are divided on the preemption issue. None of the decisions finding that the Martin Act preempts certain common-law claims is binding on this Court. For the reasons set forth below, Class Plaintiffs respectfully submit that the better view is that the New York Legislature, while intending to preclude a private right of action under the Martin Act, did <u>not</u> intend that statutory scheme to abolish then-existing common-law claims such as those asserted here.

That there is no private right of action under the Martin Act has been settled law for more than two decades. <u>See</u> <u>CPC Int'l, Inc. v. McKesson Corp.</u>, 70 N.Y.2d 268, 276, 514 N.E.2d 116, 118, 519 N.Y.S.2d 804, 807 (1987). Subsequent to the <u>McKesson</u> decision, a number of lower courts have held that the Martin Act also preempts certain traditional common-law claims arising out of facts that would provide the Attorney General with grounds to commence an action under that statutory scheme.

The Second Department just last year underscored the fact that the New York Court of Appeals has not squarely held common-law claims to be preempted under the Martin Act. <u>See</u> <u>Caboara v. Babylon Cove Dev., LLC.</u>, 54 A.D.3d 79, 82, 862 N.Y.S.2d 535, 538 (2d Dep't 2008). Other courts have expressed similar misgivings about the presumption reflected in those decisions holding that the Martin Act was intended to preclude certain common-law claims. Judge Cote observed in <u>Cromer Finance Ltd. v. Berger</u>, 2001 WL 1112548 (S.D.N.Y. Sept. 19, 2001), for example, that "there is nothing in either of the New York Court of Appeals cases [addressing the Martin Act] or in the text of the Martin Act itself to indicate an intention to abrogate common law causes of action." <u>Id.</u> at *4; <u>see also</u> <u>In re WorldCom, Inc. Sec. Litig.</u>, 382 F. Supp. 2d 549, 560 n.18 (S.D.N.Y. 2005); <u>Xpedior Creditor Trust v. Credit Suisse First Boston</u>

Martin Act preemption issue and a number of courts in this District have declined to follow <u>Castellano</u> because of the unsettled status of New York law on that issue.

(USA) Inc., 341 F. Supp. 2d 258, 272 (S.D.N.Y. 2004); <u>Scalp & Blade, Inc. v. Advest, Inc.</u>, 281 A.D.2d 882, 883, 722 N.Y.S.2d 639, 640 (4th Dep't 2001).

When interpreting a state statute such as the Martin Act, it is a federal court's "'job to predict how the forum state's highest court would decide the issues'" presented. <u>Sprint PCS L.P. v. Connecticut Siting Council</u>, 222 F.3d 113, 115 (2d Cir. 2000). Class Plaintiffs respectfully submit that, for the reasons set forth above, there is no basis to conclude that the New York Court of Appeals would hold that the Martin Act was intended to impose a blanket preemption of common-law claims arising out of conduct arguably prohibited under the act.

**C.** **Plaintiffs Do Not Allege Deception and Thus Their Claims Fall Outside the Scope of the Martin Act**

Assuming that the Martin Act applies and was intended to preempt certain common-law claims, it still would not preempt the claims asserted here. The Martin Act prohibits fraudulent and deceitful conduct in the advertisement, distribution, exchange, transfer, sale and purchase of securities. <u>See</u> N.Y. Gen. Bus. L. § 352-c. Class Plaintiffs' claims do not fall within the scope of the Martin Act because those claims simply are not pegged to allegations of fraudulent or deceitful conduct.

This case no doubt is pegged to the defendants' wrongful conduct, for absent wrongful conduct there would be no case. But not all wrongful conduct is deceitful, and not all claims arising out of wrongful conduct fall within the scope of the Martin Act. Class Plaintiffs allege that the breaching parties acted wrongfully, out of self-interest and not in Class Plaintiffs' interests. These allegations, however, are not tantamount to claims of deception. To the contrary, such allegations are the stuff of plain-vanilla breach of fiduciary duty and unjust enrichment claims that fall outside the scope of the Martin Act.

Straining to shoehorn these claims into the scope of the Martin Act, the Oppenheimer Defendants contend that the claims against them "clearly contain allegations of `deception´ or `dishonesty´[.]" See Oppenheimer Defendants' Brief at 9. Tellingly, they cite to no paragraph in the Complaint where the quoted language (or anything even remotely approaching it) is used. In fact, the Court will search the Complaint in vain for any allegation of deceitful conduct attributed to the Oppenheimer Defendants.[4]

In support of the contention that the claims asserted against them are pegged to deceitful conduct, the Oppenheimer Defendants direct the Court's attention to paragraphs 437, 438 and 466 of the Complaint. Paragraphs 437 and 438 are part of the breach of fiduciary duty claim asserted in Count I. Neither paragraph contains even a hint of an allegation of deceitful conduct; instead, they both relate to the allegation in paragraph 435 that Class Plaintiffs "reposed in [the Tremont Defendants] a high degree of confidence and trust and relied on their superior expertise in investment matters." This element of trust and confidence, of course, is key to any breach of fiduciary duty claim. The irony here is that had Class Plaintiffs merely asserted this allegation without further elaboration, they no doubt would have been met with the argument that such a conclusory allegation is insufficient to support the breach of fiduciary duty or related aiding and abetting claims. Anticipating that argument, Class Plaintiffs elaborated in paragraphs 437 and 438 on the bases for the "high degree of confidence and trust" they placed in the Tremont Defendants.

In paragraph 437, for example, Class Plaintiffs identify one such basis as the Tremont Defendants' statements that they "possessed the expertise and sophistication necessary" to conduct adequate due diligence of the manager with whom the assets were entrusted. In

_____

[4]  This inability to identify any allegations of deceptive conduct in the Complaint is also fatal to the Oppenheimer Defendants' SLUSA preemption argument, as discussed below at pages 13-16.

paragraph 438, Class Plaintiffs identify a second basis as the Tremont Defendants' statements that they "possessed the expertise and sophistication necessary" to adequately monitor the manager with whom their assets would be entrusted. Neither of these allegations expressly or implicitly attributes any deceitful conduct to any of the defendants.

The same is true of the only other allegation the Oppenheimer Defendants cite, paragraph 466 of the Complaint. That paragraph is part of the unjust enrichment claim asserted in Count III. The allegations in that paragraph merely support the core allegations of the unjust enrichment claim -- i.e., that Class Plaintiffs paid astronomical fees to the defendants and received no services in exchange. All paragraph 466 alleges is the obvious fact that "Madoff . . . was not adequately vetted nor were his operations adequately monitored." Again, this allegation merely states that Class Plaintiffs did not receive the services they paid dearly for. It does not attribute any deceptive conduct to any of the defendants.

In short, this is <u>not</u> a fraud case. It is <u>not</u> a case pegged to deceitful conduct. Instead, the claims asserted against the Oppenheimer Defendants are analogous to the breach of fiduciary duty claim sustained against a Martin Act preemption challenge in <u>Louros v. Kreicas</u>, 367 F. Supp. 2d 572 (S.D.N.Y. 2005). There, Judge Kaplan noted the line of cases in which breach of fiduciary duty claims have been precluded by the Martin Act "where the alleged misdeeds fall within the purview" of that statutory scheme. <u>Id.</u> at 595. Judge Kaplan cautioned, however, against a reflexively over-expansive application of the Martin Act to preclude <u>all</u> claims for breach of fiduciary duty:

> The reach of the Act . . . cannot be unlimited. A
> claim of breach of duty that involves securities but
> does not allege any kind of dishonesty or deception
> implicates neither the plain language of the statute
> nor its policies. Such a claim therefore is not

> foreclosed by the absence of a private right of
> action under the Martin Act.

Id. at 595-96.

On a summary judgment motion, Judge Kaplan declined to dismiss the fiduciary duty claim. He held that plaintiff "simply alleges that [defendant] breached a fiduciary duty owed to [plaintiff] to manage his accounts in a way that comported with his needs and to keep him informed about the market and the trades in his account. This count does not allege deception, deliberate or otherwise." Id. at 596.

As in Louros, the aiding and abetting and unjust enrichment claims asserted against the Oppenheimer Defendants are free of allegations of deceit. For this same reason, the claims asserted here are easily distinguished from the common-law claims found to have been preempted in In re Bayou Hedge Fund Litigation, 534 F. Supp. 2d 405 (S.D.N.Y. 2007), a decision on which the Oppenheimer Defendants rely heavily. See Oppenheimer Defendants' Brief at 7-10. Although not apparent from the reported decision, the complaint in In re Bayou Hedge Fund makes clear how central allegations of deceptive conduct were to the preempted claims. See Declaration of Richard W. Gonnello, Esq., Ex. B. There, unlike here, the defendant was alleged to have made representations "specifically intended to induce prospective customers to trust in [defendant's] promised extensive due diligence process" and plaintiff relied on those representations. Id., ¶ 21. In addition, the defendant in that case was alleged to have orchestrated a "cover-up" of its failure to conduct meaningful due diligence. Id., ¶¶ 38-43. This cover-up was "intended to make it more difficult for [plaintiff] later to assert claims against" the defendant for breaches of fiduciary duty and breach of contract. Id., ¶ 42.

The claims asserted in the Complaint are free of any such allegations of deceit and therefore are not preempted by the Martin Act. As much as the Oppenheimer Defendants would

prefer to have the Court equate the claims asserted here with those asserted in the related

securities law action, they are two fundamentally different cases. The related securities action

before this Court by definition is one based on deceitful conduct[5]; this case is not, and for that

reason the Oppenheimer Defendants' Martin Act argument must fail.

        Moreover, to apply the Martin Act as expansively as the Court is urged to do here

would strip Class Plaintiffs of any remedy against the Oppenheimer Defendants -- and for no

good reason. The New York Attorney General has made no move since the Madoff Ponzi

scheme imploded very publicly in December 2008 to intervene in any way with respect to the

staggering losses suffered by investors in the Rye Funds. With federal authorities fully engaged

in that investigation, it is highly unlikely that the Attorney General will ever become involved.

Under the circumstances, nothing -- not the plain language of the Martin Act, not the public

policy the Act was intended to advance, not the caselaw construing the reach of the Martin Act,

not common sense and certainly not fundamental principles of equity -- warrants preemption of

the claims asserted here.

## POINT III.

### SLUSA DOES NOT BAR PLAINTIFFS' CLAIMS

        The Oppenheimer Defendants' argument that the Securities Litigation Uniform

Standards Act ("SLUSA"), 15 U.S.C. §§ 77p, 78bb(f), preempts the class claims asserted against

them in Counts II and III of the Complaint is without merit. See Oppenheimer Defendants' Brief

at 10-14. To secure dismissal under SLUSA, the Oppenheimer Defendants must demonstrate

that this action is (1) a covered class action, (2) based on state law, (3) in which Plaintiffs allege

---

[5]  See, e.g., Consolidated and Amended Class Action Complaint in Securities Action at ¶¶ 2, 3,
57-58, 83-115, 199-200, 210-211. For the Court's convenience, a copy of this Complaint is
attached as Exhibit A to the accompanying Declaration of Richard W. Gonnello, Esq.

a misrepresentation or omission of material fact, and (4) that misrepresentation or omission is alleged to have been made "in connection with" the purchase or sale of a "covered security." Id., § 77p(b). As discussed in greater detail at pages 12-22 of Plaintiffs' brief in opposition to the MassMutual Defendants' motion, the Oppenheimer Defendants cannot satisfy either the third or fourth prong of this test.

### A. Plaintiffs' Claims Are Not Grounded in Fraud

Straining to drag this action within SLUSA's reach, the Oppenheimer Defendants grossly mischaracterize the nature of the class claims. Those class claims, the Oppenheimer Defendants contend, all flow from the core allegation that the Tremont Defendants made misrepresentations relating to their due diligence process and concealed their due diligence failures. Because they do not and cannot point to a single allegation of the Complaint that would support this distortion, the SLUSA preemption argument fails. See Plaintiffs' Brief in Opposition to the MassMutual Defendants' Motion to Dismiss ("MassMutual Opposition Brief") at 12-19.[6]

None of the paragraphs of the Complaint relied upon by the Oppenheimer Defendants supports the conclusion that the class claims flow from allegations of misrepresentations or omissions. Paragraphs 314-316, for example, are wrenched out of a section of the Complaint in which Class Plaintiffs allege that the Tremont Defendants acted recklessly -- not fraudulently -- by failing to act on red flag warnings of irregularities in Madoff's operations. See Complaint, ¶¶ 310-322. There, Class Plaintiffs allege that the Tremont Defendants "must have detected the red flags . . . had they followed to any degree the due

---

[6]   This inability to point to any allegation of misrepresentations, omissions or deceit is also fatal to the Oppenheimer Defendants' Martin Act preemption argument, as discussed above at pages 9-13.

diligence and monitoring processes they claimed to employ[.]" Id., ¶ 313. In the three snippets

of the Complaint the Oppenheimer Defendants rely upon here, Class Plaintiffs merely point to

some of the "due diligence and monitoring processes" the Tremont Defendants claimed to

employ. Id., ¶¶ 314-316. Nowhere in those paragraphs, or anywhere else in the Complaint, do

Class Plaintiffs allege that the Tremont Defendants misrepresented the nature of those processes

or their intention to employ them. To the contrary, the gist of the allegation here is that,

assuming the Tremont Defendants did employ those processes as described in paragraphs 314-

316, they could not have missed the red flags and thus acted recklessly (not fraudulently) in

failing to take adequate measures to protect their investors.

      The Oppenheimer Defendants' reliance on paragraph 320 is also misplaced.

There, Class Plaintiffs explicitly allege reckless -- not fraudulent -- conduct. Neither does

paragraph 437 advance the Oppenheimer Defendants' position. As discussed above at pages 10-

11 in refuting the Martin Act preemption argument, paragraph 437 relates to the breach of

fiduciary duty claim. It bolsters the core allegation of that cause of action that Class Plaintiffs

"reposed in [the Tremont Defendants] a high degree of confidence and trust and relied on their

superior expertise in investment matters." Id., ¶ 435. In paragraph 437, Class Plaintiffs merely

identify one basis for this confidence and trust as the Tremont Defendants' claim that they

"possessed the expertise and sophistication necessary" to conduct adequate due diligence of the

manager with whom the assets were entrusted. This paragraph certainly does not expressly or

implicitly allege that misrepresentations or omissions were made regarding the Tremont

Defendants' expertise or sophistication.

      Nor does paragraph 456 support the Oppenheimer Defendants' position. This

paragraph merely supports the claim that the Oppenheimer Defendants aided and abetted the

Tremont Defendants in breaching their fiduciary duties.  The reality is that fiduciaries who breach their duties are not in the habit of broadcasting their breaching conduct, and their disinclination in this regard certainly does not of itself transform their breaching conduct into fraudulent or deceitful conduct.  If this were the case, every breach of fiduciary duty claim could be contorted into a fraud claim subject to SLUSA preemption.  As the authorities discussed above demonstrate, that simply is not the case.  The same logic applies to those who aid and abet fiduciaries in breaching their duties.  An allegation that an aider and abettor assisted a fiduciary in advancing its desire to avoid discovery of its breaching conduct is not enough to convert the aiding and abetting claim into a fraud claim.

**B.     Defendants' Misconduct Was Not Carried
        Out "in Connection with" a "Covered Security"**

The Oppenheimer Defendants' SLUSA preemption argument fails for a second reason.  For the reasons discussed in greater detail at pages 20-22 of Plaintiffs' brief in opposition to the MassMutual Defendants' motion, the Oppenheimer Defendants cannot demonstrate that the Complaint alleges deceptive conduct occurring "in connection with the purchase or sale of a covered security[.]"  15 U.S.C. § 78bb(f)(1).

**POINT IV.**

**PLAINTIFFS HAVE ASSERTED A
VIABLE AIDING AND ABETTING CLAIM**

The Oppenheimer Defendants' assertion that the aiding and abetting claim (Count II) rests on nothing more than "conclusions and implausible assumptions" simply ignores the detailed factual allegations of the Complaint and the reasonable inferences to be drawn from those allegations.  <u>See</u> Oppenheimer Defendants' Brief at 14-22.  Those allegations are more than adequate at the pleadings stage to render plausible the claim that the Oppenheimer Defendants knew of the Tremont Defendants' breaches of their fiduciary duties and assisted the

Tremont Defendants in breaching those duties in order not to jeopardize the significant revenue stream the Madoff relationship was generating.

The gist of the underlying fiduciary duty claim is that the Tremont Defendants knew of gross irregularities in Madoff's operations; failed to conduct adequate due diligence or monitoring of Madoff's highly suspect operations; failed to take adequate steps to protect Class Plaintiffs from those operations; and, while abdicating their fiduciary responsibilities, they gorged themselves on the astronomical fees generated by their relationship with Madoff. See Complaint, ¶¶ 440-445.

As detailed below, the Oppenheimer Defendants aided and abetted those breaches in that they knew of gross irregularities in Madoff's operations; knew the Tremont Defendants had failed to take any steps to protect investors from Madoff's suspect operations; and -- while aware that the Tremont Defendants were doing nothing to protect investors -- substantially assisted the Tremont Defendants in breaching their fiduciary obligations so that the Oppenheimer Defendants, too, could continue to reap the enormous upstream financial benefits flowing from the Tremont Defendants' lucrative relationship with Madoff. Those allegations, Class Plaintiffs respectfully submit, are sufficient to state a claim for aiding and abetting. See Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377, 386 (Del. Ch. 1999) (elements of an aiding and abetting claim under Delaware law are the existence of a fiduciary relationship; the fiduciary's breach of its duty; a non-fiduciary's knowing participation in that breach; and resulting damages).[7]

---

[7]   Class Plaintiffs respectfully submit that Delaware law controls with respect to the aiding and abetting claim. See Plaintiffs' Brief in Opposition to MassMutual Defendants' Motion to Dismiss at 6. However, even if New York law controls, as the Oppenheimer Defendants maintain, the allegations of the Complaint are sufficient to make out an aiding and abetting claim under New York law. Id.

**A.    The Oppenheimer Defendants Knew of the
        Underlying Breaches of Fiduciary Duties**

The Oppenheimer Defendants contend that the Complaint fails to adequately allege that they had actual knowledge of the underlying breaches of fiduciary duties. <u>See</u> Oppenheimer Defendants' Brief at 18-20. This assertion is belied by the allegations of the Complaint. Those detailed factual allegations, and the reasonable inferences that flow from them, demonstrate that:

- the Oppenheimer Defendants conducted extensive due diligence in connection with OAC's acquisition of Tremont Advisers, <u>see</u> Complaint, ¶¶ 122-23, 127-28, 130-33;

- as a result of this due diligence, the Oppenheimer Defendants knew of the Tremont Defendants' close and highly lucrative relationship with Madoff, and the importance of that single relationship to the overall success of the Tremont Defendants' operations, <u>id.</u>, ¶¶ 123-25, 131, 139, 213-14;

- as a result of this due diligence, the Oppenheimer Defendants knew of numerous "red flag" indicators of gross irregularities in Madoff's operations, and were aware that the Tremont Defendants had not taken adequate steps to protect their investors from Madoff's scheme for fear of interrupting the lucrative fees flowing from the Madoff relationship, <u>id.</u>, ¶¶ 130-33, 321-22, 449-54;

- as a result of this due diligence, the Oppenheimer Defendants knew of articles in the business press noting growing skepticism in the investment community regarding the legitimacy of Madoff's operations, and were aware that the Tremont Defendants had not taken adequate steps to protect their investors from Madoff's scheme for fear of interrupting the lucrative business arrangement with Madoff, <u>id.</u>, ¶¶ 133-39, 260-61, 449-54;

- as sophisticated financial institutions, the Oppenheimer Defendants were aware that a growing number of their peers in the investment community were refusing to deal with Madoff based on their suspicions regarding the legitimacy of his operations, and at the same time they knew that the Tremont Defendants were not taking

adequate steps to protect their investors from Madoff's operations for fear of interrupting the Madoff relationship, id., ¶¶ 295-309, 322, 449-53; and,

- given the extensive degree of control and influence they had over the Tremont Defendants, id., ¶¶ 31, 155-67, 193-97, the Oppenheimer Defendants were privy to the Tremont Defendants' knowledge of the "red flags" regarding potential criminality and gross irregularities in Madoff's operations, id., ¶¶ 242-294, 310-322, and knew of the Tremont Defendants' failure to take adequate steps to protect their investors for fear of upsetting the historically lucrative business arrangement with Madoff, id., ¶¶ 449-53.

Class Plaintiffs respectfully submit that these detailed allegations are sufficient to satisfy the knowledge element of the aiding and abetting claim.

**B.    The Oppenheimer Defendants**
       **Assisted the Tremont Defendants**

The Oppenheimer Defendants further argue that the aiding and abetting claim fails because the Complaint does not adequately allege that they assisted the Tremont Defendants in breaching their fiduciary duties. See Oppenheimer Defendants' Brief at 21-22. Again, this assertion cannot be squared with the allegations of the Complaint. Those detailed factual allegations, and the reasonable inferences that flow from them, demonstrate that:

- the Oppenheimer Defendants, as part of an overall corporate strategy of the MassMutual Financial Group, targeted Tremont Advisers for acquisition as part of a push into the lucrative hedge fund arena and in an effort to tap into the "robust and growing revenue stream" generated by the Tremont Defendants' relationship with Madoff, see Complaint, ¶¶ 105-20;

- following the acquisition of Tremont Advisers, and with knowledge of the Tremont Defendants' breaches of their fiduciary duties, the Oppenheimer Defendants commenced a marketing campaign touting the Tremont Defendants' capabilities and promoting the Tremont Defendants as being part of the network of subsidiaries and affiliates that comprised the MassMutual Financial Group, id., ¶¶ 145-54, 198-212, 455, 457;

- being folded into the MassMutual Financial Group, of which the Oppenheimer Defendants were a part, provided the Tremont Defendants with the opportunity to attract larger numbers of investors through MassMutual's extensive global distribution network, id., ¶¶ 119, 148, 151-54, 457;

- being brought into the MassMutual fold permitted the Tremont Defendants -- a relative newcomer to the investment community -- to enhance its credibility among potential investors by operating alongside and with the imprimatur of such familiar, well-established and trusted entities as OppenheimerFunds and MassMutual, id., ¶¶ 120, 152-53, 458; and

- the Oppenheimer Defendants provided this assistance while aware of the underlying breaches and with the expectation that the historically rich revenue stream flowing from the Tremont Defendants' relationship with Madoff that prompted their acquisition of the Rye Funds in the first place would continue into the future, id., ¶ 454.

In short, the Oppenheimer Defendants enabled the Tremont Defendants to cast an extraordinarily wide net in attracting investors to the Rye Funds. The Tremont Defendants' reach was nowhere near as extensive prior to the 2001 acquisition of Tremont Advisers. This expanded reach afforded by the Oppenheimer Defendants -- at a time when they knew the Tremont Defendants were doing nothing to protect investors from Madoff's highly suspect operations -- allowed the Tremont Defendants to continue funneling to Madoff the increasingly larger levels of assets necessary to keep his scheme afloat until it crashed in December 2008. The fees realized from this flood of assets into Madoff's operations benefitted not just the Tremont Defendants, but also those entities further up the corporate food chain, including the Oppenheimer Defendants.

*   *   *   *

Class Plaintiffs respectfully submit that the aiding and abetting claim finds more than adequate support in the Complaint's detailed factual allegations and the inferences

reasonably drawn from those allegations.  Predictably, the Oppenheimer Defendants insist that more particularized allegations are required.  This is not so.  Given the reality that more detailed information regarding the Oppenheimer Defendants' knowledge of and involvement in the Tremont Defendants' breaching conduct necessarily is within the defendants' exclusive control, those issues ultimately are matters to be developed in discovery and resolved at a later phase in the litigation.  See Higgins v. New York Stock Exch., Inc., 10 Misc. 3d 257, 290, 806 N.Y.S.2d 339, 366 (Sup. Ct. N.Y. Co. 2005) (sustaining aiding and abetting claim on a motion to dismiss, court observed that "[t]o the extent that Goldman's knowledge of the breadth of the [New York Stock Exchange] defendants' alleged breach has not been alleged by particularized facts, its knowledge, ultimately, is a matter for discovery, as much of that information is necessarily in Goldman's control").  It is, of course, precisely such an inquiry that the Oppenheimer Defendants are scrambling to escape here.[8]

---

[8]   The decisions cited at pages 17-22 of the Oppenheimer Defendants' brief to demonstrate that the aiding and abetting claim is "conspicuously devoid of . . . well-pleaded allegations" do no such thing.  Indeed, those decisions illustrate the distinction between the detailed factual allegations set forth in the Complaint and the truly conclusory allegations found inadequate in those cases.  For example, in In re Santa Fe Pacific Shareholder Litigation, 669 A.2d 59 (Del. 1995), plaintiffs attempted to base an aiding and abetting claim on a single and patently conclusory allegation that the defendant "had knowledge" of the underlying fiduciary duties and "knowingly and substantially participated and assisted" the fiduciaries in breaching those duties. Id. at 72.  Affirming the dismissal of the claim, the court noted that "[o]ther than this statement, Plaintiffs have alleged no facts from which a claim for aiding and abetting breaches of fiduciary duty could be stated."  Id.; see also Musalli Factory for Gold & Jewellry v. JP Morgan Chase Bank, N.A., 2009 WL 860635, at *11 (S.D.N.Y. Mar. 31, 2009) (same); Berman v. Sugo LLC, 580 F. Supp. 2d 191, 205 (S.D.N.Y. 2008) (same); Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 202-04 (S.D.N.Y. 2006) (same). The aiding and abetting allegations in these cases were conclusory.  In contrast, the claim here is supported by detailed factual allegations sufficient to defeat this motion.

# POINT V.

## PLAINTIFFS STATE A VIABLE
## UNJUST ENRICHMENT CLAIM

Finally, the Oppenheimer Defendants maintain that the unjust enrichment claim (Count III) is "unavailable" because Class Plaintiffs have an adequate remedy in the form of the breach of contract claim (Count IV).  See Oppenheimer Defendants' Brief at 22-25.  As discussed in greater detail at pages 11-12 of Plaintiffs' brief in opposition to the MassMutual Defendants' motion, this argument overlooks the fact that, at the pleadings stage, a plaintiff is free under Rule 8 to assert inconsistent claims for relief.

It is well settled that at the pleadings stage, a breach of contract claim will be deemed fatal to a quantum meruit claim only where -- unlike here -- it is clear on the face of the complaint itself that there exists an express contract that covers in its entirety the subject matter of the parties' dispute.  Knudsen v. Quebecor Printing (U.S.A) Inc., 792 F. Supp. 234, 237 (S.D.N.Y. 1992).  The courts consistently have recognized that the determination of whether an express contract occupies the field so as to rule out an unjust enrichment claim can, as here, involve factual issues not properly resolved at the pleadings stage.  See, e.g., National City Commercial Capital Co. v. Global Golf, Inc., 2009 WL 1437620, at *1 (E.D.N.Y. May 20, 2009); MDCM Holdings, Inc. v. Credit Suisse First Boston Corp., 216 F. Supp. 2d 251, 261 (S.D.N.Y 2002).

Here, the Tremont Defendants acknowledge that the express contracts between Tremont Partners and Class Plaintiffs do not cover the entirety of the dispute between the parties.  See Plaintiffs' Brief in Opposition to Tremont Defendants' Motion to Dismiss at 23-24.  Thus, there is no basis to conclude on the face of the Complaint that the limited partnership and subscription agreements control the entire subject matter of the parties' dispute.  Plainly, they do

not. At a minimum, factual issues exist as to whether the express contracts to which the breach of contract claim is pegged governs the totality of the dispute between the parties. As a result, the contract claim is not fatal to the unjust enrichment claim and Class Plaintiffs may pursue both claims in the alternative.

## **CONCLUSION**

For the reasons set forth above, Class Plaintiffs respectfully request that the Court enter an Order denying in its entirety the Oppenheimer Defendants' motion to dismiss the Complaint.

Dated: New York, New York
     July 14, 2009

               ENTWISTLE & CAPPUCCI LLP


By:    /s/ Andrew J. Entwistle           
       ANDREW J. ENTWISTLE

280 Park Avenue
26th Floor West
New York, New York 10017
Telephone: (212) 894-7200

*Counsel for Plaintiffs Arthur E. Lange*
*Revocable Trust and Arthur C. Lange*

HAGENS BERMAN SOBOL SHAPIRO LLP


By:    /s/ Reed Kathrein           
       REED KATHREIN

715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (501) 725-3001
Admitted <u>Pro</u> <u>Hac</u> <u>Vice</u>

*Counsel for Plaintiffs Eastham Capital Appreciation Fund*
*LP, NPV Positive Corp., John Dennis, Daniel Jackson,*
*Laborers Local Pension Plan 17 and Richard Peshkin*

Co-Lead Counsel for Plaintiffs