UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE TREMONT SECURITIES LAW,   :     Master File No.:
STATE LAW, and INSURANCE          :     08 Civ. 11117 (TPG)
LITIGATION                        :
                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

This Document Relates to:  State Law Actions  :      ECF CASE
08 Civ. 11183 (TPG)                    :      Electronically Filed
                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE TREMONT DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS

Seth M. Schwartz
Susan L. Saltzstein
Michael H. Gruenglas
Jason C. Vigna
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Tremont Partners, Inc.,
Tremont Group Holdings, Inc.,
Robert Schulman, Harry Hodges
and Jim Mitchell

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

ARGUMENT ...................................................................................................... 1

I.    ALL OF PLAINTIFFS' CLAIMS ARE BARRED BY THE EXCULPATION
PROVISIONS OF THE PARTNERSHIP AGREEMENTS ............................... 1

II.    ALL OF PLAINTIFFS' CLAIMS EXCEPT BREACH OF CONTRACT ARE
PREEMPTED BY THE MARTIN ACT ....................................................... 2

III.    PLAINTIFFS' CLAIMS ARE DERIVATIVE ................................................. 4

IV.    PLAINTIFFS' PUTATIVE CLASS CLAIMS ARE PREEMPTED BY SLUSA ............. 5

    A.    The Complaint Alleges Misrepresentations, Omissions And Deceptive
Practices ................................................................................................. 5

    B.    The Alleged Misconduct Occurred In Connection With The Purchase Or
Sale Of Covered Securities .................................................................. 6

V.    DERIVATIVE PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS ........ 8

    A.    Plaintiffs Cannot Assert Double Derivative Claims .............................. 8

    B.    Plaintiffs Have Not Carried Their "Heavy Burden" Of Showing That
Demand Would Be Futile ...................................................................... 9

VI.    ALL OF PLAINTIFFS' CLAIMS ARE OTHERWISE DEFICIENT ............................ 11

    A.    Plaintiffs Fail To State A Claim For Breach Of Fiduciary Duty .......... 11

        1.    Plaintiffs Have Not Shown That Any Defendant Other Than TPI
Owed Them A Fiduciary Duty .............................................. 11

        2.    Plaintiffs Have Not Rebutted The Presumptions Of The Business
Judgment Rule ...................................................................... 13

    B.    Plaintiffs Have Not Adequately Alleged Any Breach Of Contract ..................... 14

    C.    The LPAs And Advisory Agreements Preclude Plaintiffs' Unjust
Enrichment Claim ................................................................................. 16

    D.    Plaintiffs Have Abandoned Their Malpractice And Professional
Negligence Claim Against The Tremont Defendants .......................... 17

    E.    Madoff's Theft Was A Supervening Cause ......................................... 17

CONCLUSION.................................................................................................................19

## TABLE OF AUTHORITIES

### CASES

Anglo American Security Fund, L.P. v. S.R. Global International Fund, L.P.,
    829 A.2d 143 (Del. Ch. 2003) ......................................................................5

Araujo v. John Hancock Life Insurance Co.,
    206 F. Supp. 2d 380 (E.D.N.Y. 2002) ........................................................6

Arma v. Buyseasons, Inc.,
    591 F. Supp. 2d 637 (S.D.N.Y. 2008) ......................................................17

Bakerman v. Sidney Frank Importing Co.,
    No. Civ. A. 1844, 2006 WL 3927242 (Del. Ch. Oct. 16, 2006) ................9

In re Bayou Hedge Fund Litigation,
    534 F. Supp. 2d 405 (S.D.N.Y. 2007) ........................................................3

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007) ..................................................................................18

Bell v. Board of Education of the City of New York,
    90 N.Y.2d 944 (1997) ...............................................................................18

Boley v. Pineloch Associates, Ltd.,
    700 F. Supp. 673 (S.D.N.Y. 1988) ...........................................................12

Caraballo v. United States,
    830 F.2d 19 (2d Cir. 1987)........................................................................17

In re Cencom Cable Income Partners, L.P. Litigation,
    No. 14634, 2001 WL 130629 (Del. Ch. Jan. 27, 2000) ..............................5

Cirri v. Daily News, L.P.,
    9 Misc.3d 1130(A), 2005 WL 3076346 (Sup. Ct. Kings County Feb. 7, 2005) .........16

Clark-Fitzpatrick, Inc. v. Long Island Railroad Co.,
    70 N.Y.2d 382 (1987) ...............................................................................16

CVC Claims Litigation, LLC v. Citicorp Venture Capital Ltd.,
    No. 03 Civ. 7936, 2007 WL 2915181 (S.D.N.Y. Oct. 3, 2007)................13

Dann v. Chrysler Corp.,
    174 A.2d 696 (Del. Ch. 1961) ....................................................................9

Dean v. Dick,
    No. Civ. A. 16566, 1999 WL 413400 (Del. Ch. June 10, 1999).............................11

Derdiarian v. Felix Contracting Corp.,
    51 N.Y.2d 308 (1980) ..............................................................................................18

Dommert v. Raymond James Financial Services, Inc.,
    No. Civ. A. 1:06-102, 2007 WL 1018234 (E.D. Tex. Mar. 29, 2007) .........................7

Duphily v. Delaware Electric Cooperative, Inc.,
    662 A.2d 821 (Del. 1995) .........................................................................................18

In re eBay, Inc. Shareholders Litigation,
    No. C.A. 19988, 2004 WL 253521 (Del. Ch. Feb. 11, 2004).......................................9

Faggionato v. Lerner,
    500 F. Supp. 2d 237 (S.D.N.Y. 2007) .......................................................................14

Forsythe v. ESC Fund Management Co. (U.S.),
    No. 1091, 2007 WL 2982247 (Del. Ch. Oct. 9, 2007) ...................................11, 12, 14

Gaines-Tabb v. ICI Explosives, USA, Inc.,
    160 F.3d 613 (10th Cir. 1998)...................................................................................18

Gavin v. AT&T Corp.,
    464 F.3d 634 (7th Cir. 2006)......................................................................................7

Goldstein v. Groesbeck,
    142 F.2d 422 (2d Cir. 1944).......................................................................................8

Grigsby & Associates v. Rice Derivative Holdings, Inc.,
    No. 00 Civ. 5056, 2001 WL 1135620 (Del. Ch. Sept. 26, 2001)................................5

Grobow v. Perot,
    539 A.2d 180 (Del. 1988) .........................................................................................10

Haber v. Bell,
    465 A.2d 353 (Del. Ch. 1983) ..................................................................................10

Halpert Enterprises v. Harrison,
    No. 06 Civ. 2331, 2007 WL 486561 (S.D.N.Y. Feb. 14, 2007)................................13

Hart v. Internet Wire, Inc.,
    50 F. App'x. 464 (2d Cir. 2002) ...............................................................................13

Heller v. Goldin Restructuring Fund, L.P.,
    590 F. Supp. 2d 603 (S.D.N.Y. 2008) ...............................................................2, 3, 4

Horattas v. Citigroup Financial Markets, Inc.,
    532 F. Supp. 2d 891 (W.D. Mich. 2007) ......................................................................7

IT Group, Inc. v. D'Aniello,
    No. 02-10118, 2005 WL 3050611 (D. Del. 2005) .....................................................13

Industrial Risk Insurers v. Port Authority of New York & New Jersey,
    387 F. Supp. 2d 299 (S.D.N.Y. 2005) .........................................................................1

Jacobs v. Yang,
    No. Civ.A. 206, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004) ....................................10

Kassover v. UBS AG,
    619 F. Supp. 2d 28 (S.D.N.Y. 2008) ...........................................................................2

Knudsen v. Quebecor Printing (U.S.A.), Inc.,
    792 F. Supp. 234 (S.D.N.Y. 1992) .............................................................................16

Kottler v. Deustche Bank AG,
    No. 05 Civ. 7773, 2009 WL 55885 (S.D.N.Y. Jan. 9, 2009) .....................................12

Kush v. City of Buffalo,
    59 N.Y.2d 26 (1983) ............................................................................................ 17, 18

LaSala v. UBS AG,
    510 F. Supp. 2d 213 (S.D.N.Y. 2007) .........................................................................8

Law Debenture v. Maverick Tube Corp.,
    No. 06 Civ. 14320, 2008 WL 4615896 (S.D.N.Y. Oct. 15, 2008) ............................16

In re Lear Corp. Shareholder Litigation,
    967 A.2d 640 (Del. Ch. 2008) ......................................................................................1

Litman v. Prudential-Bache Properties, Inc.,
    No. 12137, 1993 WL 5922 (Del. Ch. Jan. 4, 1993) .....................................................9

Litt v. Wycoff,
    No. Civ.A. 19083-NC, 2003 WL 1794724 (Del. Ch. Mar. 28, 2003) ........................10

Louros v. Kreicas,
    367 F. Supp. 2d 572 (S.D.N.Y. 2005) .........................................................................3

MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.,
    216 F. Supp. 2d 251 (S.D.N.Y. 2002) ...................................................................6, 16

In re Marsh & McLennan Companies Securities Litigation,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) .......................................................................13

Martinez v. Sanders,
    No. 02 Civ. 5624, 2004 WL 1234041 (S.D.N.Y. June 3, 2004) ................................17

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,
    547 U.S. 71 (2006)........................................................................................................7

Moore Business Forms, Inc. v. Cordant Holdings Corp.,
    No. 13911, 1995 WL 662685 (Del. Ch. Nov. 2, 1995) .............................................15

National City Commercial Capital Co., LLC v. Global Golf, Inc.,
    No. 09-CV-0307, 2009 WL 1437620 (E.D.N.Y. May 20, 2009)...............................16

New Paradigm Software Corp. v. New Era of Networks, Inc.,
    107 F. Supp. 2d 325 (S.D.N.Y. 2000) ......................................................................16

Norman v. Salomon Smith Barney Inc.,
    350 F. Supp. 2d 383 (S.D.N.Y. 2004) ........................................................................6

Oei v. Citibank, N.A.,
    957 F. Supp. 492 (S.D.N.Y. 1997) ...........................................................................18

Official Committee of the Unsecured Creditors of Color Tile, Inc. v. Investcorp
S.A.,
    No. 97 Civ. 9261, 1999 WL 754015 (S.D.N.Y. Sept. 24, 1999) ..............................13

Paru v. Mutual of America Life Insurance Co.,
    No. 04 Civ. 6907, 2006 WL 1292828 (S.D.N.Y. May 11, 2006) ................................6

Potter v. Janus Investment Fund,
    483 F. Supp. 2d 692 (S.D. Ill. 2007)...........................................................................6

Redtail Leasing, Inc. v. Bellezza,
    No. 95 Civ. 5191, 1997 WL 603496 (S.D.N.Y. Sept. 29, 1997) ..............................16

Rowinski v. Salomon Smith Barney Inc.,
    398 F.3d 294 (3d Cir. 2005).........................................................................................7

Schnorr v. Schubert,
    No. CIV-05-303, 2005 WL 2019878 (W.D. Okla. Aug. 18, 2005).............................8

Seminaris v. Landa,
    662 A.2d 1350 (Del. Ch. 1995) ..............................................................................10

South Cherry Street, LLC v. Hennessee Group LLC,
    --- F.3d ---, 2009 WL 2032133 (2d Cir. July 14, 2009)..........................................3, 14

Sternberg v. O'Neil,
    550 A.2d 1105 (Del. 1988) ......................................................................................8

In re Tower Air, Inc.,
    416 F.3d 229 (3d Cir. 2005)....................................................................................13

U.S. Mortgage, Inc. v. Saxton,
    494 F.3d 833 (9th Cir. 2007)....................................................................................7

Webster v. New York Life Insurance & Annuity Corp.,
    386 F. Supp. 2d 438 (S.D.N.Y. 2005) ......................................................................6

Weiss v. Swanson,
    948 A.2d 433 (Del. Ch. 2008) ..................................................................................9

White v. Panic,
    793 A.2d 356 (Del. Ch. 2000) ................................................................................11

Winne v. Equitable Life Assurance Society of the United States,
    315 F. Supp. 2d 404 (S.D.N.Y. 2003) ......................................................................6

World Wrestling Entertainment v. Jakks Pacific, Inc.,
    530 F. Supp. 2d 486 (S.D.N.Y. 2007) ....................................................................12

XPedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.,
    341 F. Supp. 2d 258 (S.D.N.Y. 2004) ......................................................................6

## STATUTES

15 U.S.C. § 78bb(f)(1) ...................................................................................................5

N.Y. Gen. Bus. Law §§ 352, *et seq.* (McKinney 2009) .....................................................2

N.Y. Gen. Oblig. Law § 5-701(a)(1) (McKinney 2005) ..................................................19

## MISCELLANEOUS

Dennis J. Block, Nancy E. Barton & Stephen A. Radin, The Business Judgment
    Rule (5th ed. 1998) ..............................................................................................10

The Tremont Defendants respectfully submit this reply memorandum of law in further support of their motion to dismiss the Complaint in this action.[1]

## ARGUMENT

## I.   ALL OF PLAINTIFFS' CLAIMS ARE BARRED BY THE EXCULPATION PROVISIONS OF THE PARTNERSHIP AGREEMENTS

In their Moving Brief, the Tremont Defendants demonstrated that the Funds' exculpation clauses preclude liability absent proof of bad faith or gross negligence.  (See Mov. Br. at 8-9 (citing In re Lear Corp. S'holder Litig., 967 A.2d 640, 652 n.45 (Del. Ch. 2008)).)  In their opposition, plaintiffs contend that their claims survive because they purportedly have pled bad faith and reckless conduct on the part of the Tremont Defendants.  (See Pls.' Mem. of Law in Opp'n to the Tremont Defs.' Mot. To Dismiss ("Opposition" or "Opp." (Docket No. 220) at 6.)  In that connection, plaintiffs cite to the Complaint's use of the word "reckless" and its conclusory allegation that the Tremont Defendants "ignored" or "turned a blind eye" to Madoff's fraud.  (Id.)  Those allegations, however, are insufficient as a matter of law to avoid the application of an exculpation provision.  (See Mov. Br. at 9 n.16 (citing Indus. Risk Insurers v. Port Auth. of N.Y. & N.J., 387 F. Supp. 2d 299, 307 (S.D.N.Y. 2005), aff'd in part, remanded in part on other grounds, 493 F.3d 283 (2d Cir. 2007)).)  And, as more fully set forth below, the Complaint otherwise falls far short of pleading gross negligence or bad faith.  Accordingly, all of plaintiffs' claims are barred by the exculpation provisions, and should be dismissed.

---

[1]      Unless otherwise defined herein, capitalized terms have the same meaning as in the Tremont Defendants' Memorandum of Law in Support of Their Motion To Dismiss, filed May 20, 2009 ("Moving Brief" or "Mov. Br." (Docket No. 147)).

II.    **ALL OF PLAINTIFFS' CLAIMS EXCEPT BREACH
       OF CONTRACT ARE PREEMPTED BY THE MARTIN ACT**

Plaintiffs contend that the Martin Act does not preempt common law claims.  (Opp. at 7.)

As discussed in Section V of the Tremont Defendants' "Securities Action" reply brief also filed

today, plaintiffs are wrong as a matter of law.  Plaintiffs further contend that their breach of

fiduciary duty and unjust enrichment claims are not preempted by the Martin Act because they

purportedly "are not pegged to allegations of deceit or deception" or any "misrepresentation or

material omission."  (Opp. at 8.)  In fact, all of plaintiffs' claims are tied directly to allegations of

defendants' purported misrepresentations regarding their due diligence investigation of Madoff.

(See, e.g., Compl. ¶¶ 6, 7, 78-79, 242, 314-19.)  Consequently, except for the breach of contract

claim, they all are preempted by the Martin Act.  See Heller v. Goldin Restructuring Fund, L.P., 590

F. Supp. 2d 603, 611-13 (S.D.N.Y. 2008); Kassover v. UBS AG, 619 F. Supp. 2d 28, 38 (S.D.N.Y.

2008) (plaintiffs are "not allowed through mere avoidance of the words 'misrepresentation,'

'omission,' and 'deception' to assert claims based on factual circumstances that support Martin Act

claims").

In Heller, plaintiff asserted a federal securities law claim against the general partner of a

fund, alleging that the general partner lied about the fund's capitalization and investment objectives.

See 590 F. Supp. 2d at 608, 612-13.  Plaintiff also brought a breach of fiduciary duty claim, alleging

that the general partner mismanaged the fund by departing from those objectives.  See id. at 611-12.

Like plaintiffs here, the plaintiff in Heller argued that its breach of fiduciary duty claim was not

based on the general partner's statements prior to plaintiff's investment, but "Defendants' subsequent

fiduciary duty to manage the [fund]."  Id. at 612.  The court found plaintiff's distinction

"unpersuasive," holding that the breach of fiduciary duty claim was preempted by the Martin Act.

Id.  The court noted that the misrepresentations cited by plaintiff allegedly were "[a] 'significant

2

component' of the conduct that . . . induced [plaintiff] to invest" in the fund.  Id.  Consequently, the court held that the "'breach of fiduciary duty [claim] arises from the alleged securities fraud'" and is barred by the Martin Act.  Id. (citation omitted).

Here, as in Heller, the Complaint alleges that the Funds' general partner (TPI) promised to perform due diligence in selecting an investment adviser for the Funds.  (See Compl. ¶¶ 314-319.) Plaintiffs also allege that they relied on those statements in deciding to invest.  (See, e.g., id. ¶ 7 (alleging that plaintiffs "were relying on the managers of the Rye funds to vet and monitor the entity to which their investments were being entrusted").)  And, in Count I of the Complaint, after reincorporating the allegations of all prior paragraphs, plaintiffs assert that the Tremont Defendants breached fiduciary duties owed to plaintiffs by "failing to conduct or cause to be conducted adequate due diligence on Madoff's operations."  (Id. ¶ 441.)  As recently held by one court in finding a substantially identical claim preempted by the Martin Act:

> [This] breach of fiduciary claim does allege deception.  [Plaintiffs'] claim [defendant] was dishonest when it represented that it would never recommend a hedge fund investment without first conducting due diligence, and then did precisely that.  This allegation is part and parcel of plaintiff[s'] claim.

In re Bayou Hedge Fund Litigation, 534 F. Supp. 2d 405, 422 (S.D.N.Y. 2007), aff'd sub nom., South Cherry St., LLC v. Hennessee Group LLC, --- F.3d ---, 2009 WL 2032133 (2d Cir. July 14, 2009) (distinguishing Louros v. Kreicas, 367 F. Supp. 2d 572 (S.D.N.Y. 2005), a case cited by plaintiffs).

Plaintiffs also argue that the Martin Act does not preempt their breach of fiduciary claims because they are governed by Delaware or Cayman, and not New York, law.  (Oppenheimer Opp.[2] at 5-7.)  Plaintiffs, however, cite no authority for the proposition that Martin Act preemption turns

---

[2]      Pls.' Mem. of Law in Opp'n to the Oppenheimer Defs.' Mot. To Dismiss (Docket No. 221).

on the law governing the common law claims alleged in the complaint.  The argument in all events

is undermined by Heller, where the court dismissed on preemption grounds breach of fiduciary

claims against the general partner of a Delaware limited partnership that were governed by

Delaware law.  See 590 F. Supp. 2d at 606 n.3, 611-12.  As Heller illustrates, the only territorial

nexus required for Martin Act preemption is a securities transaction "within or from" New York, a

condition indisputably satisfied here.  See id. at 611 n.9.  (See also Compl. ¶14.)  Accordingly, all of

plaintiffs' claims other than breach of contract are preempted by the Martin Act and should be

dismissed.

## III.   PLAINTIFFS' CLAIMS ARE DERIVATIVE

Plaintiffs erroneously contend that they may simultaneously assert the same claims *both*

derivatively on behalf of the Funds *and* directly on their own behalf.  This argument is foreclosed

by the nature of the injury alleged in the Complaint, *i.e.*, the loss of all or substantially all of the

assets of the Funds, which had been held and misappropriated by Madoff.  (Compl. ¶¶ 236-37.)

This alleged injury is solely derivative in nature in that it has been suffered directly by the Funds

and only incidentally by plaintiffs and other investors pro rata to their interests in the Funds.

In their opposition brief, plaintiffs state that they no longer wish to proceed with derivative

claims on behalf of the Off-shore Funds.  (See Rye Opp.[3] at 2 n.4.)  They provide no authority

under applicable Cayman law, however, explaining why they have any right to maintain direct

claims pertaining to their off-shore investments.  As established in the Moving Brief and the

accompanying declaration of Cayman law expert James Tyre Bagnall, they have no such right.

(Mov. Br. at 12-13; Bagnall Decl. ¶¶ 15.1-16.9.)  All claims relating to the Off-shore Funds

therefore should be dismissed.

---

[3]      Pls.' Mem. of Law in Opp'n to the Rye Fund Nominal Defs.' Mot. To Dismiss (Docket No. 223).

With respect to the On-shore Funds, plaintiffs urge this Court to allow them to maintain their claims directly under the narrowly circumscribed exceptions articulated in In re Cencom Cable Income Partners, L.P. Litigation, No. 14634, 2000 WL 130629 (Del. Ch. Jan. 27, 2000), and Anglo American Security Fund, L.P. v. S.R. Global International Fund, L.P., 829 A.2d 143 (Del. Ch. 2003).  For the reasons stated in Section VI of the Tremont Defendants' Securities Reply, the allegations of the Complaint fail to trigger either exception.[4]  Plaintiffs' direct claims are in fact derivative, and should be dismissed.

## IV.   PLAINTIFFS' PUTATIVE CLASS CLAIMS ARE PREEMPTED BY SLUSA

Even if plaintiffs' claims are direct, which they are not, they still should be dismissed on the ground that they are barred by SLUSA.  In their Opposition, plaintiffs argue that SLUSA does not apply here because (i) their putative class claims purportedly do not allege misrepresentations, omissions or deceptive practices and (ii) even if they did, they are not alleged to have occurred "in connection with" the sale or purchase of covered securities.  (Opp. at 13-14 (incorporating MassMutual Opp.[5] at 12-22).)  Neither argument has any merit.

### A.   The Complaint Alleges Misrepresentations, Omissions And Deceptive Practices

Plaintiffs' Complaint alleges that TPI made numerous purported misrepresentations regarding the extent of Tremont's due diligence efforts (Compl. ¶¶ 314-19) and Madoff's investment strategy.  (Id. ¶¶ 78-79.)  Plaintiffs further allege that they were deceived by those alleged misstatements.  (Id. ¶¶ 6, 7, 242.)

---

[4]   Grigsby & Associates v. Rice Derivative Holdings, Inc., No. 00 Civ. 5056, 2001 WL 1135620 (S.D.N.Y. Sept. 26, 2001), also is distinguishable.  The claim at issue in that case was direct because it sought to enforce a partner's individual contractual right to receive his share of partnership profits and to obtain access to the partnership's books and records.  No such claim has been alleged here.

[5]   Pls.' Mem. of Law in Opp'n to the MassMutual Defs.' Mot. To Dismiss (Docket No. 222).

Plaintiffs tactical decision to refrain from asserting a "fraud" claim based on those allegations does not shield them from SLUSA preemption.  It is well established that "'labels . . . of claims for relief . . . do not matter' in federal court.  In the particular context of SLUSA, this means that a court must look to the substance rather than the form of a claim to determine whether it is within the scope of the statute."  Potter v. Janus Inv. Fund, 483 F. Supp. 2d 692, 697 (S.D. Ill. 2007) (citation omitted); see also Araujo v. John Hancock Life Ins. Co., 206 F. Supp. 2d 380, 384 (E.D.N.Y. 2002).  The Complaint's allegations of misrepresentations and deception are integral to, and incorporated into, each Count brought directly on behalf of a putative class.  (Compl. ¶¶ 433, 460, 471.)  The claims, therefore, are preempted by SLUSA.[6]  See Winne v. Equitable Life Assurance Soc'y of the U.S., 315 F. Supp. 2d 404, 413-14 (S.D.N.Y. 2003) ("The argument that SLUSA preempts only state-law claims alleging scienter must fail because no language in the statute supports it.").

## B.   The Alleged Misconduct Occurred In Connection With The Purchase Or Sale Of Covered Securities

Plaintiffs also erroneously contend that the "nexus" between their claims and the covered "securities Madoff may or may not have purchased or sold (common stocks) is too attenuated to justify SLUSA preemption."  (MassMutual Opp. at 20.)  In reality, the nexus is direct.  For example,

---

[6]      The SLUSA cases cited by plaintiffs are not to the contrary.  They are either breach of contract cases not involving deception, or cases where, in contrast to this action, the complaints alleged no misrepresentations or omissions of material fact.  See Paru v. Mut. of Am. Life Ins. Co., No. 04 Civ. 6907, 2006 WL 1292828, at *5 (S.D.N.Y. May 11, 2006) (complaint did "not contain a single allegation of a misrepresentation or omission of material fact made by defendant"); Webster v. N.Y. Life Ins. & Annuity Corp., 386 F. Supp. 2d 438, 440-42 (S.D.N.Y. 2005) (acknowledging that "[a] party need not bring a claim for fraud in order to give rise to SLUSA preemption," but declining to preempt simple contract interpretation claims); Norman v. Salomon Smith Barney Inc., 350 F. Supp. 2d 382, 387 (S.D.N.Y. 2004) ("the gravamen of the Complaint is plainly a straightforward breach [of contract] claim"); XPedior Creditor Trust v. Credit Suisse First Boston (USA) Inc., 341 F. Supp. 2d 258, 269 (S.D.N.Y. 2004) (no SLUSA preemption where claims did not involve any misrepresentation, omission or deception); MDCM Holdings, Inc. v. Credit Suisse First Boston Corp., 216 F. Supp. 2d 251, 259 (S.D.N.Y. 2002) (SLUSA did not preempt claims grounded in contract where, unlike here, there was no allegation of misrepresentations or material omissions).

plaintiffs allege that in connection with their investment in the Funds, they were told by Tremont

that Madoff was "'purchasing equity shares, buying related out-of-the money or at-the-money put

options representing the same number of underlying shares, and selling related out-of-the-money

call options which represented a number of underlying shares equal [to] the number of shares

purchased.'" (Compl. ¶ 79.)  Moreover, plaintiffs seek to recover damages based on the loss of

Fund assets that should have been, but allegedly were not, invested by Madoff in covered securities.

(Compl. ¶¶ 233, 234, 236, 237.)  Such allegations establish a nexus between their claims and the

purchase or sale of covered securities.  See Rowinski v. Salomon Smith Barney Inc., 398 F.3d 294,

301 (3d Cir. 2005).

At bottom, plaintiffs' argument appears to be that there is no SLUSA preemption here

because they themselves did not purchase covered securities.  The argument is wrong as a matter of

settled law.[7]  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 85 (2006) ("[I]t

is enough that the fraud alleged 'coincide' with a securities transaction – whether by the plaintiff or

by someone else." (emphasis added)); U.S. Mortgage, Inc. v. Saxton, 494 F.3d 833, 844-45 (9th Cir.

2007) ("While plaintiffs themselves did not purchase or sell any of the publicly traded shares . . .

Dabit does not require that they do so."); Horattas v. Citigroup Fin. Mkts., Inc., 532 F. Supp. 2d 891,

897-99, 902-03 (W.D. Mich. 2007) (finding cemetery plot owners' claims that defendants

mismanaged cemetery endowment funds precluded by SLUSA); Dommert v. Raymond James Fin.

---

[7]     Plaintiffs' reliance on Gavin v. AT&T Corp., 464 F.3d 634 (7th Cir. 2006), is misplaced. (Mass
Mutual Opp. at 21.)  In Gavin, former shareholders of MediaOne, which merged with AT&T, brought suit
alleging that defendants fraudulently failed to inform them of an option available to former MediaOne
shareholders following completion of the merger.  Id. at 637-38.  Because the alleged misrepresentations
occurred after plaintiffs received their AT&T shares in the merger, the alleged fraud did not occur "in
connection with" the purchase or sale of securities.  Id. at 638.  LaSala v. UBS AG, 510 F. Supp. 2d 213, 243
(S.D.N.Y. 2007), also is distinguishable because plaintiffs sought to hold defendant UBS bank responsible
for its role in handling funds funneled through various banks after two corporate insiders sold their shares in
a massive "pump and dump" scheme.  Id. at 243.  In contrast, in this case, the alleged deception occurred at
all times in connection with Madoff's falsely reported purchase and sale of covered securities.

<u>Servs., Inc.</u>, No. Civ. A. 1:06-102, 2007 WL 1018234, at *11 (E.D. Tex. Mar. 29, 2007) (holding "in connection with" prong satisfied because the purpose of an investment advisory agreement between the parties was to invest plaintiff's assets in covered securities through third-party money manager).   Accordingly, plaintiffs' putative class claims are barred by SLUSA and should be dismissed.   <u>See, e.g.</u>, <u>Schnorr v. Schubert</u>, No. CIV-05-303, 2005 WL 2019878, at **5-7 (W.D. Okla. Aug. 18, 2005) (finding claims that defendants failed to prevent Ponzi scheme barred by SLUSA).

## V.      DERIVATIVE PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS

### A.       Plaintiffs Cannot Assert Double Derivative Claims

Plaintiffs' attempt to assert double derivative claims on behalf of the Market Fund and XL Fund is wholly novel.   (<u>See</u> Rye Opp. at 1.)  Plaintiffs cite to no case in which a court has imported the "double derivative" corporate concept into the partnership context and, as noted in the Moving Brief, the Tremont Defendants are aware of none.   (<u>See</u> Mov. Br. at 15.)  As the Delaware Supreme Court has stated without exception, "[a] 'double derivative' action is a derivative action maintained by the shareholders of a parent corporation or holding company on behalf of a subsidiary company."[8] <u>Sternberg v. O'Neil</u>, 550 A.2d 1105, 1107 n.1 (Del. 1988).  This limitation is rooted in the parent-subsidiary relationship:  directors of wholly-owned subsidiaries owe duties directly to shareholders of the parent corporation, and the double-derivative mechanism enables shareholders to enforce those duties.  <u>See id.</u> at 1124.  No such justification exists here.  Plaintiffs seek to sue on behalf of the Market Fund and XL Fund, neither of which is owned by *any* entity – much less by the

---

[8]      The lone case cited by plaintiffs in this regard, <u>Goldstein v. Groesbeck</u>, 142 F.2d 422 (2d Cir. 1944), is not to the contrary.  In <u>Goldstein</u>, shareholders of a parent corporation brought suit on behalf of the parent's wholly-owned subsidiary.  The ruling regarding double-derivative claims has no application beyond that specific context.  <u>See id.</u> at 424-25.

four limited partnerships in which plaintiffs directly invested.  Plaintiffs did not directly invest in the XL Fund or Market Fund.  Rather, they invested in the Feeder Funds which, in turn, invested in the Market Fund and the XL Fund.  (See Mov. Br. at 5-6, 15.)  TPI owed no duty to Feeder Fund investors, given that they were *not* TPI clients, and plaintiffs cite no authority to the contrary.  This Court therefore should reject plaintiffs' unprecedented attempt to expand the use of the double-derivative mechanism to hedge funds of funds.

### B.      Plaintiffs Have Not Carried Their "Heavy Burden" Of Showing That Demand Would Be Futile

According to plaintiffs, a demand upon TPI, the general partner of the On-shore Funds, would be futile because TPI received fees in exchange for managing the Funds.  (Opp. at 5.)  However, "[i]t is well established in Delaware law that mere payments [to a general partner] alone are not enough to create a conflict of interest" sufficient to excuse demand.  Litman v. Prudential-Bache Props., Inc., No. 12137, 1993 WL 5922, at **3-4 (Del. Ch. Jan. 4, 1993), remanded on other grounds, 1993 WL 603303 (Del. Nov. 18, 1993).  The cases cited by plaintiffs all involve allegations of self-dealing, and are wholly inapposite because the Complaint does not allege any self-interested transactions involving the Tremont Defendants.[9]  (See Rye Opp. at 5-6.)  As

---

[9]      In Weiss v. Swanson, 948 A.2d 433, 448 (Del. Ch. 2008), the court found demand futile where shareholders challenged directors' decision to grant themselves options with allegedly low strike prices.  In re eBay, Inc. Shareholders Litigation, No. C.A. 19988, 2004 WL 253521 (Del. Ch. Feb. 11, 2004), involved allegations that eBay's underwriter offered shares of stock in dozens of IPOs to eBay's directors in exchange for the company's future business, which the court found was a corporate opportunity usurped by the directors.  See id. at *4.  See also Bakerman v. Sidney Frank Importing Co., No. Civ. 1844-N, 2006 WL 3927242, at **4, 7 (Del. Ch. Oct. 16, 2006) (member of LLC challenged managers' decision to allocate proceeds from sale of a subsidiary in such a way that two members were excluded from the distribution, thereby increasing the amount of proceeds the managers collected).  Dann v. Chrysler Corp., 174 A.2d 696 (Del. Ch. 1961), is not to the contrary because it does not clearly explain the nature of the alleged wrongdoing at issue.  Dann also was decided before Delaware courts began strictly enforcing the demand requirements in derivative actions.  See II Dennis J. Block, Nancy E. Barton & Stephen A. Radin, The Business Judgment Rule 1472 (5th ed. 1998) (noting that "Delaware's approach to claims that demand is excused has changed since the mid-1980s" and has become much more exacting).  In any event, "[a] close reading of that decision [in Dann] shows that the Court's ruling was predicated on its finding that the

*(cont'd)*

plaintiffs concede, TPI received a flat management fee representing a percentage of assets under management.  (See Compl. ¶¶ 81, 85, 95.)  TPI received this fee regardless of whether it entrusted Fund assets to Madoff or any other investment manager.  See, e.g., Grobow v. Perot, 539 A.2d 180, 188 (Del. 1988) (allegations that defendants received fees, "without more, do not establish any financial interest" sufficient to constitute self-dealing).  The Complaint also contains no allegation that TPI received a kickback from Madoff for deciding to invest with him over other money managers.  Thus, stripped of the excess verbiage, the Complaint alleges nothing more than that demand would be futile because TPI would have to consider suing itself for the decision to invest with Madoff, and might be held liable for damages.  As plaintiffs concede, however, "the mere threat of personal liability [is] insufficient to excuse demand."  (Rye Opp. at 3.)  See also Jacobs v. Yang, No. Civ.A. 206, 2004 WL 1728521, at *6 n.31 (Del. Ch. Aug. 2, 2004), aff'd, 867 A.2d 902 (Del. 2005).

To be sure, plaintiffs also argue that demand would be futile because TPI purportedly faces a "substantial likelihood of . . . liability."  (Rye Opp. at 6-7.)  For the reasons stated below and in the Moving Brief, however, plaintiffs have failed to satisfy the pleading standards of Rule 8, much less have met their "heavy burden" of pleading "particularized facts" establishing "egregious" misconduct creating a "substantial likelihood of liability."  Seminaris v. Landa, 662 A.2d 1350, 1354 (Del. Ch. 1995); see also Litt v. Wycoff, No. Civ.A. 19083-NC, 2003 WL 1794724, at *6 (Del.

_____

*(cont'd from previous page)*

complaint contained the 'requisite particulars' to permit an inference that Board approval was more than mere acquiescence or passive approval.  The Board's approval in that case was possibly fraudulent or grossly negligent."  Haber v. Bell, 465 A.2d 353, 359 (Del. Ch. 1983).  In other words, it was not the directors' receipt of money from the challenged transactions that excused demand, it was particularized allegations showing a substantial likelihood of liability, allegations lacking here for reasons discussed in Section VI.

10

Ch. Mar. 28, 2003); White v. Panic, 793 A.2d 356, 367 (Del. Ch. 2000), aff'd, 783 A.2d 543 (Del.

2001).[10]   Accordingly, plaintiffs' derivative claims should be dismissed for failure to make demand.

## VI.   ALL OF PLAINTIFFS' CLAIMS ARE OTHERWISE DEFICIENT

### A.   Plaintiffs Fail To State A Claim For Breach Of Fiduciary Duty

#### 1.   Plaintiffs Have Not Shown That Any Defendant Other Than TPI Owed Them A Fiduciary Duty

Plaintiffs have pled no facts demonstrating that they had any relationship, much less a

fiduciary relationship, with TGH or the individual Tremont Defendants.  Nonetheless, plaintiffs

argue that those defendants somehow became fiduciaries because the exculpation clauses in the

Prime Fund and XL Fund LPAs cover not only TPI, but also its "Affiliates" (including TGH and the

individual Tremont Defendants).  (Opp. at 19.)  The lone case plaintiffs cite for this novel argument,

Forsythe v. ESC Fund Management. Co. (U.S.), No. 1091, 2007 WL 2982247 (Del. Ch. Oct. 9,

2007), compels no such result.  The Forsythe court did *not* hold that an investment adviser became a

fiduciary merely because it could claim the protections of an exculpation clause.  Rather, it found as

a matter of common law that the adviser owed fiduciary duties to a partnership where, in contrast to

TGH and the individual Tremont Defendants here, the adviser "ratified investment decisions [for

the partnership], and had authority to purchase and sell investments for the Fund."[11]  Id. at *10.

---

[10]      Plaintiffs also assert that demand upon a corporate general partner is always excused when the general partner is asked to sue its 100% owner.  (See Rye Opp. at 3-4 (citing Dean v. Dick, No. Civ. A. 16566, 1999 WL 413400 (Del. Ch. June 10, 1999)).)  That is not the holding of Dean.  Rather, Dean stands for the proposition that demand is excused when a general partner is run by one individual, that individual is also the 100% owner of the general partner and the general partner is asked to sue that individual.  See 1999 WL 413400, at *3.  The court in Dean found it dispositive that the general partner was run by an individual, rather than, as here, a board of directors.  See id. (explaining that an individual is more susceptible to a disabling interest than a board of directors because "the board of directors has some pressure to at least consider the suit, as some directors may feel they are not as liable as others").  Because TPI is governed by a board of directors, Dean is inapposite.

[11]      Apparently seeking to make this case resemble Forsythe, plaintiffs conclusorily assert in their Opposition that TGH and the individual Tremont Defendants acted as "investment advisers" to

*(cont'd)*

11

In this case, in contrast to Forsythe, the Complaint nowhere alleges that TGH or the individual Tremont Defendants "ratified investment decisions [for the partnership], [or] had authority to purchase and sell investments for the Fund[s]." Id. at *10.  In reality, the LPAs vested responsibility for those functions with TPI, and expressly authorized TPI to delegate them to Madoff, which it did.[12]  Plaintiffs' vague and conclusory allegations that they "reposed confidence" in TGH and the individual Tremont Defendants, who had "superior expertise" (Compl. ¶¶ 436-38), are also insufficient to establish a fiduciary duty.  See Boley v. Pineloch Assocs., Ltd., 700 F. Supp. 673, 681 (S.D.N.Y. 1988) ("Allegations of reliance on another party with superior expertise, standing by themselves, will not suffice.").[13]  Accordingly, plaintiffs have not adequately alleged the existence of a fiduciary relationship with TGH or the individual Tremont Defendants, and the breach of fiduciary duty claims against them should be dismissed.

---

*(cont'd from previous page)*

plaintiffs.  (Opp. at 20.)  But aside from defendant Hodges' alleged "recommendation" that plaintiff Lange invest in the Funds (Compl. ¶¶ 86-87, 96), plaintiffs identify no advice rendered by those defendants. Moreover, labeling a defendant an "adviser" is not, by itself, sufficient to show a close relationship of trust and confidence, as required to establish the existence of a fiduciary relationship.  See Kotler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 465-66 (S.D.N.Y. 2009) (granting alleged "advisor's" motion to dismiss breach of fiduciary duty claims).  Here, the absence of any such relationship is reflected in the PPMs, which specifically disclaimed any intention on the part of Tremont or its employees to act as investment advisers to plaintiffs, stating that "[e]ach prospective investor is urged to seek independent investment, legal and tax advice concerning the consequences of investment in this partnership."  (Broad Market PPM (Trans Decl. Ex. F) at preface; Prime Fund PPM (Trans. Decl. Ex. G) at i; XL Fund PPM (Trans. Decl. Ex. H) at iii; Market Portfolio Fund PPM (Trans. Decl. Ex. D) at i; XL Portfolio Fund PPM (Trans. Decl. Ex. E) at i.)

12      (Broad Market LPA (Trans. Decl. Ex. A) § 2.06(ix); Prime Fund LPA (Trans. Decl. Ex. B) § 1.4(a); XL Fund LPA (Trans. Decl. Ex. C) § 1.4(b).)

13      See also Kottler, 607 F. Supp. 2d at 265-66 ("Mere expertise in a subject is not enough to create a fiduciary duty."); World Wrestling Entm't v. Jakks Pac., Inc., 530 F. Supp. 2d 486, 504 (S.D.N.Y. 2007) ("[A]llegations that a plaintiff relied on a defendant's expertise in a particular field are insufficient . . . to survive dismissal"), aff'd, No. 08-0118-cv, 2009 WL 1391807 (2d Cir. Mar. 19, 2009).

2.      **Plaintiffs Have Not Rebutted The**
        <u>**Presumptions Of The Business Judgment Rule**</u>

Plaintiffs concede that TPI, as the Funds' general partner, is entitled to the presumptions of

the business judgment rule.  (Opp. at 20.)  Nonetheless, plaintiffs contend that they have pled

sufficient facts to rebut this presumption.[14]  According to plaintiffs, they have adequately alleged

the existence of a number of "red flags" purportedly revealing that Madoff was a fraud.  (Opp. at 5-

6, 20; Compl. ¶¶ 241-309.)  Plaintiffs further allege that defendants "must have detected" the "red

flags" if they conducted the due diligence they purportedly promised to conduct.  (Compl. ¶ 313.)

Plaintiffs contend that these allegations establish a substantial likelihood that TPI (i) knew Madoff

was running a Ponzi scheme; (ii) consciously disregarded a risk that he was doing so; or (iii) failed

to discover the "red flags" because it utilized a grossly negligent or reckless decision-making

process.  (Opp. at 5-6, 20-21.)

Plaintiffs' argument fails to withstand analysis.  Characterizing events as "red flags" is

"insufficient to make those allegations relevant to a defendant's [alleged recklessness]."  <u>In re Marsh</u>

<u>& McLennan Cos. Sec. Litig.</u>, 501 F. Supp. 2d 452, 487 (S.D.N.Y. 2006).  Rather, to establish

recklessness, the "red flags" must be obvious signs of fraud such that the danger was "'so obvious

that [defendant] must have been aware of it.'"  <u>Hart v. Internet Wire, Inc.</u>, 50 F. App'x. 464, 466 (2d

---

14      Citing <u>In re Tower Air, Inc.</u>, 416 F.3d 229 (3d Cir. 2005), plaintiffs argue that they need not plead
"particularized facts" rebutting the presumptions of the business judgment rule.  <u>Tower Air</u>, however, has
never been followed by any court in this Circuit and, in fact, contradicts well-established precedent.  <u>See</u>
<u>Halpert Enters. v. Harrison</u>, No. 06 Civ. 2331, 2007 WL 486561, at *5 (S.D.N.Y. Feb. 14, 2007) (holding
that plaintiff must "plead *with particularity*" to rebut the presumption of the business judgment rule)
(emphasis added), <u>aff'd</u>, No. 07-1144-cv, 2008 WL 4585466 (2d Cir. Oct. 15, 2008); <u>see also</u> <u>CVC Claims</u>
<u>Litig. LLC v. Citicorp Venture Capital Ltd.</u>, No. 03 Civ. 7936, 2007 WL 2915181, at *4 (S.D.N.Y. Oct. 3,
2007); <u>Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.</u>, No. 97 Civ. 9261,
1999 WL 754015, at *5 (S.D.N.Y. Sept. 24, 1999).  Moreover, <u>Tower Air</u> has been roundly criticized.  <u>See,</u>
<u>e.g.</u>, <u>IT Litig. Trust v. D'Aniello</u>, No. 02-10118, 2005 WL 3050611, at *8 n.10 (D. Del. 2005) ("[T]he
Delaware requirement that there be more than conclusory allegations to support fiduciary duty claims . . .
shape[s] the substance of fiduciary duty claims by enforcing the business judgment rule, which is
fundamental to Delaware corporate law.").

Cir. 2002) (citation omitted).[15]  The Complaint, however, nowhere alleges facts sufficient to show that TPI ever became aware of facts making it obvious that Madoff was conducting a Ponzi scheme.[16]  Accordingly, the allegations of the Complaint do not create, as they must, a plausible inference that TPI knew of or recklessly disregarded Madoff's fraud.

### B.    Plaintiffs Have Not Adequately Alleged Any Breach Of Contract

Plaintiffs concede that they have no written contract with TGH or the individual Tremont Defendants.  They argue, however, that TGH "orally obligated itself to ensure that adequate due diligence and monitoring was conducted."  (Opp. at 22.)  The only "facts" proffered to substantiate this legal conclusion are the Complaint's allegations that plaintiffs purportedly invested in different Funds "upon the advice of defendant Harry Hodges."  (Id.; Compl. ¶¶ 86-89, 96-97.)  Plainly, these allegations are insufficient to show that TGH "orally obligated itself to ensure that adequate due diligence and monitoring was conducted."  In any event, plaintiffs' allegations of an oral contract are barred by the applicable statute of frauds, Section 5-701(a)(1) of the New York General Obligations Law.  See South Cherry St., LLC v. Hennessee Group LLC, ---F.3d---, 2009 WL 2032133, at **16-21 (2d Cir. July 14, 2009).[17]

As for TPI, plaintiffs' breach of contract claim against that defendant fails because the Complaint nowhere identifies any provision in the operative contracts – the LPAs and the

---

[15]     The conclusory nature of plaintiffs' allegations also distinguishes this case from the allegations in Forsythe, 2007 WL 2982247.  In contrast to the Complaint here, the complaint in Forsythe painted a "particular and detailed picture of . . . gross negligence," including allegations of particularized fact that the general partner did not conduct meetings and approved transactions that violated the funds' stated investment policy.  Id. at **8-9.

[16]     Attached hereto as Exhibit 1 is a chart setting forth all the red flags alleged in the Complaint and explaining why none of them was an indicator of fraud, much less an obvious indicator of a Ponzi scheme.

[17]     New York law applies to plaintiffs' allegations of an oral contract because the contract was allegedly made in New York, where Hodges worked, and it relates to services to be performed in New York.  See Faggionato v. Lerner, 500 F. Supp. 2d 237, 243-44 (S.D.N.Y. 2007).

Subscription Agreements – breached by TPI.  (Mov. Br. at 23-24.)  Undaunted, in their Opposition, plaintiffs attempt to rely on statements in the *PPMs*, claiming that the purported breach of those representations constituted a breach of contract.  (See Opp. at 22 n.8 (citing Broad Market PPM (Trans. Decl. Ex. F); Prime Fund PPM (Trans. Decl. Ex. G)).)  Nothing in the PPMs, however, obligated the Tremont Defendants to do anything plaintiffs contend they were required to with respect to Madoff.

As a threshold matter, the phrase "due diligence" does not appear in the PPMs.  (See generally Trans. Decl. Exs. F, G.)  Moreover, the provisions of the PPMs specifically identified by plaintiffs do not purport to create an obligation to conduct due diligence or monitor the Funds' investments in any particular way.[18]  At most, they required TPI to report the performance of those investments based on the information provided to the Funds by Madoff, the manager of the Funds' assets.  (Market Fund PPM (Trans. Decl. Ex. F) at 6; Prime Fund PPM (Trans. Decl. Ex. G) at xiii.)  Plaintiffs do not – and cannot – allege that TPI failed to fulfill this narrowly circumscribed obligation.  Accordingly, plaintiffs' breach of contract claim should be dismissed.  See, e.g., Moore Bus. Forms, Inc. v. Cordant Holdings Corp., No. 13911, 1995 WL 662685, at *7 (Del. Ch. Nov. 2, 1995) (dismissing breach of contract claim because plaintiff did not allege that the defendant "failed to comply with any of those express [valuation] provisions.  Nor [did the complaint] cite any other provision of the Agreement that creates a contractual duty to conduct the valuation inquiry in a particular manner").

---

[18]    While the PPMs set forth certain criteria for Tremont's selection of asset managers, plaintiffs do not suggest – much less allege – that TPI failed to adhere to those criteria, nor could they.  Madoff, the former chairman of NASDAQ, was well-regarded in the securities industry for over thirty years before plaintiffs invested in the Funds.  Moreover, his directional "split-strike conversion" strategy appeared to produce consistent returns for more than a decade and to have a continued favorable outlook for success (see, e.g, Compl. ¶ 64 ("For decades, Madoff was widely respected and highly respected in the Wall Street community" approaching "near legendary status")) and he never failed to meet any of the Funds' redemption requests.

C.     The LPAs And Advisory Agreements Preclude
       Plaintiffs' Unjust Enrichment Claim

Plaintiffs' unjust enrichment claim fails as a matter of law because the existence of a valid

and enforceable written contract governing the transactions at issue (here, the payment of

management fees, which is addressed in the LPAs) "precludes recovery in quasi contract for events

arising out of the same subject matter." Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d

382, 388 (1987).  Plaintiffs attempt to sidestep this rule by claiming a right to plead inconsistent

claims in the alternative.  (Opp. at 23.)  But plaintiffs may not allege unjust enrichment – even in

the alternative – where, as here, "both parties agree that a valid and enforceable contract exists

between them." New Paradigm Software Corp. v. New Era of Networks, Inc., 107 F. Supp. 2d 325,

329 (S.D.N.Y. 2000).  The same rule applies even if the precise scope of the contract is unclear at

the pleading stage.  See Cirri v. Daily News, L.P., 9 Misc. 3d 1130(A), 2005 WL 3076346, at *7

(Sup. Ct. Kings County Feb. 7, 2005) (dismissing unjust enrichment claim and rejecting plaintiffs'

argument that "it would be premature to dismiss their unjust enrichment cause of action because

they are unsure of how the scope and applicability of the written contracts will be interpreted").[19]

---

[19]     The cases cited by plaintiffs are not to the contrary.  They hold that a plaintiff may only plead in the
alternative "when the existence of a contract is in dispute," Knudsen v. Quebecor Printing (U.S.A.) Inc., 792
F. Supp. 234, 237 (S.D.N.Y. 1992), or "in the absence of an agreement between the parties," National City
Commercial Capital Co. v. Global Golf, Inc., No. 09-CV-0307, 2009 WL 1437620, at *1 (E.D.N.Y. May 20,
2009).  See also MDCM Holdings, 216 F. Supp. 2d at 261.

         A controlling contract bars unjust enrichment claims even against non-parties to that contract, such
as TGH and the individual Tremont Defendants.  See, e.g., Law Debenture v. Maverick Tube Corp., No. 06
Civ. 14320, 2008 WL 4615896, at *13 (S.D.N.Y. Oct. 15, 2008) ("the trend of recent New York state and
federal decisions [conclusively establish that] a claim for unjust enrichment, even against a third party,
cannot proceed when there is an express agreement between two parties governing the subject matter of the
dispute.").  There is no merit to plaintiffs' assertion that they may proceed with a claim sounding in quasi-
contract, such as unjust enrichment, even in the absence of privity between plaintiff and defendant.  Under
New York law, an unjust enrichment claim "requires some type of direct dealing or actual, substantive
relationship with a defendant." Redtail Leasing, Inc. v. Bellezza, No. 95 Civ. 519, 1997 WL 603496, at *8
(S.D.N.Y. Sept. 30, 1997).  Here, plaintiffs allege no substantive relationship with TGH or the individual
Tremont Defendants, foreclosing any claim of unjust enrichment against them.

###### D. Plaintiffs Have Abandoned Their Malpractice And <u>Professional Negligence Claim Against The Tremont Defendants</u>

Plaintiffs have not addressed the Tremont Defendants' authorities demonstrating that they have no claim for malpractice or professional negligence against defendants, such as the Tremont Defendants, who are not engaged in any profession.  (Mov. Br. at 9. n.18.)  Those claims therefore have been abandoned and should be dismissed for the reasons stated in the Moving Brief.  <u>See</u> <u>Arma v. Buyseasons, Inc.</u>, 591 F. Supp. 2d 637, 643 (S.D.N.Y. 2008) (courts "'will . . . deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed'") (citation omitted); <u>Martinez v. Sanders</u>, No. 02 Civ. 5624, 2004 WL 1234041, at *3 (S.D.N.Y. June 3, 2004) (same).

###### E. <u>Madoff's Theft Was A Supervening Cause</u>

Each of plaintiffs' claims should be dismissed for the additional reason that Madoff, and not the Tremont Defendants, proximately caused their losses by stealing the Funds' assets.  As noted in <u>Kush v. City of Buffalo</u>, 59 N.Y.2d 26 (1983), a decision cited by plaintiffs, "an intervening intentional or criminal act will generally sever the liability of the original [alleged] tortfeasor."  <u>Id.</u> at 33.

In their Opposition, plaintiffs contend that the foregoing rule is no bar to recovery here in light of the principle that where a criminal act is a "normal and foreseeable" consequence of a defendant's own conduct, it is not a superseding cause of plaintiff's injury.  <u>Caraballo v. United States</u>, 830 F.2d 19, 22 (2d Cir. 1987).  Plaintiffs further argue that they are entitled to discovery into whether Madoff's theft was normal and foreseeable under the circumstances.  (Opp. at 17-18.)

The fatal flaw with plaintiffs' contention is that they have alleged no facts sufficient to show that Madoff's misconduct was "normal and foreseeable."  A criminal act will be deemed normal and foreseeable only where "(1) the situation [created by defendant's actions] provides a temptation to

which a 'recognizable percentage' of persons would yield, or (2) the temptation is created at a place where 'persons of a peculiarly vicious type are likely to be.'"[20]  Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613, 621 (10th Cir. 1998) (quoting Restatement (2d) of Torts § 448 cmt. b).  Neither scenario is plausibly implicated here, and neither has been alleged in the Complaint.  Having failed to make the requisite showing, plaintiffs are not entitled to discovery.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559-60 (2007).[21]

---

[20]    Kush follows the rule that liability will not be excused where the moving defendant created a temptation to which a recognizable percentage of persons would yield.  There, a representative of the defendant school district freely admitted that the science project chemicals that injured the plaintiff should have been locked up because children were "likely" to steal them and "cause trouble" otherwise.  59 N.Y.2d at 30-31.  Duphily v. Delaware Electric Cooperative, Inc., 662 A.2d 821 (Del. 1995), and Derdiarian v. Felix Contracting Corp., 51 N.Y.2d 308 (1980), are inapposite because they did not involve intervening intentional torts or criminal acts.

[21]    Oei v. Citibank, N.A., 957 F. Supp. 492 (S.D.N.Y. 1997), and Bell v. Board of Education, 90 N.Y.2d 944 (1997), are not to the contrary.  In Oei, the defendant bank was accused of violating an express contractual and statutory obligation to examine specified transaction documents before honoring a letter of credit.  Id. at 502.  Those documents, on their face, showed that the conditions for honoring the letter of credit had not been satisfied, yet the bank honored it anyway.  See id. at 508-09.  In contrast, in this case, TPI had no specific contractual or statutory duty to check the accuracy of specified documents or information before investing with Madoff.  In Bell, plaintiff similarly sued the defendant school district for failing to honor a specific and well-recognized duty – to supervise students in loco parentis during a field trip and to leave no student behind at the conclusion of the trip.  90 N.Y.2d at 946-47.  Here, by contrast, the Complaint does not allege TPI's breach of any concrete duty regarding Madoff.  Consequently, his fraud was the intervening cause of plaintiffs' loss.

## CONCLUSION

For all of the foregoing reasons, and the reasons stated in the Moving Brief, the Tremont

Defendants' motion to dismiss should be granted in all respects.

Dated: New York, New York
      August 14, 2009

                      Respectfully submitted,

                       /s/ Seth M. Schwartz
                      Seth M. Schwartz (Seth.Schwartz@Skadden.com)
                      Susan L. Saltzstein (Susan.Saltzstein@Skadden.com)
                      Michael H. Gruenglas (Michael.Gruenglas@Skadden.com)
                      Jason C. Vigna (Jason.Vigna@Skadden.com)
                      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                      Four Times Square
                      New York, New York 10036
                      (212) 735-3000

                      Attorneys for Tremont Partners, Inc.,
                      Tremont Group Holdings, Inc., Robert Schulman,
                      Harry Hodges and Jim Mitchell

# Exhibit 1

**"RED FLAGS"**

| **"Red Flag"** | **Response** |
|---|---|
| | |
| 1. "Madoff's purported track record was simply too good." (Compl. ¶ 249.) | Superlative financial results are not, by themselves, clear evidence of wrongdoing.  See Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996) ("The fact that GE did not automatically equate record profits with misconduct cannot be said to be reckless."). |
| 2. Madoff engaged an ill-equipped three-man auditing firm (Compl. ¶ 253) that could not have audited a firm as large as BMIS.  (Id. at ¶ 258.) | That an auditor may have been understaffed is not clear evidence that its *clients* are engaged in fraud.  Further, no facts are alleged to show that Tremont knew that the firm was unqualified to, or incapable of, properly auditing Madoff's business. |
| 3. Madoff's returns could not be replicated by quantitive analysts who attempted to use the split strike strategy. (Compl. ¶ 260.) | Madoff never disclosed the details of his split strike strategy; analysts, therefore, had no way of understanding, much less replicating, the strategy.  Also, plaintiffs do not allege that Tremont knew or should have known that analysts tried but failed to replicate the strategy. |
| 4. Major financial institutions refused to invest with Madoff. (Compl. ¶¶ 261, 300-09.) | The Complaint makes no allegation that Tremont was aware that any major financial institution purportedly refused to invest with Madoff, or that no major financial institution invested with Madoff. |
| 5. BMIS's SEC filings reflected "modest" stock holdings that "could not be reconciled with the magnitude of assets Madoff claimed to be managing." (Compl. ¶ 278.) | There is no discrepancy between the SEC filings and what Madoff claimed to be managing.  Madoff disclosed to the SEC that he had approximately $17 billion in assets under management.  And, as plaintiffs concede, before December 11, 2008, Madoff "claimed to be managing" $17 billion, not the $50 billion or more now being reported in the media.  (Compl. ¶ 216.) |
| 6. BMIS retained custody over client assets.  (Compl. ¶¶ 267-69.) | That an advisor retains custody of assets is not clear evidence that he or it is stealing those assets.  Further, TPI disclosed in the Funds' PPMs that the manager of the Funds' assets, *i.e.*, BMIS, also had custody of the Funds' assets.[22]  Thus, plaintiffs were aware of this fact and nevertheless elected to invest with Madoff through Tremont. |

---

[22]    (Broad Market PPM (Trans. Decl. Ex. F) at 18; Prime Fund PPM (Trans. Decl. Ex. G) at 12; XL Fund PPM (Trans. Decl. Ex. H) at 7; Market Portfolio Fund PPM (Trans. Decl. Ex. D) at 8; XL Portfolio Fund PPM (Trans. Decl. Ex. E) at 8.)

| **"Red Flag"** | **Response** |
|---|---|
| 7. BMIS acted as its own broker-dealer. (Compl. ¶¶ 270-72.) | That the principal of one of the world's largest broker-dealers efficiently used his own firm to clear his advisory clients' trades is not clear evidence of fraud.  Further, TPI disclosed in the Funds' PPMs that the manager of the Funds' assets, *i.e.*, BMIS, also was the broker-dealer for trades executed on behalf of the Funds.[23]  Thus, plaintiffs were aware of this fact and nevertheless elected to invest with Madoff through Tremont. |
| 8. Madoff's trade confirmations were "dated" (Compl. ¶ 273) and came only in paper form, enabling "Madoff to manufacture [false] trade tickets."  (Id. at ¶ 275.) | Plaintiffs wholly fail to explain why "dated" documentation is an indication of fraud.  Hedge fund managers frequently delay the disclosure of their trades (if they reveal them at all) so as to preserve the confidentiality of their proprietary trading strategies.  See, e.g., Chris Kentouris, Hedge Funds Bracing for Likely Disclosure Mandates, Securities Industry News, Dec. 1, 2008 ("[F]or many hedge funds, proprietary trading strategies – as reflected by their specific securities positions – are the secret sauce that allows them to generate above-market returns and attract investors . . . .  Disclosing this confidential information to the public at large would be like disclosing the formula for Coke."). |
| 9. The account statements "reflected a suspiciously consistent pattern of securities purchases at or close to daily lows and securities sales at or close to daily highs" that was "virtually impossible" to achieve.  (Compl. ¶ 277.) | The Complaint alleges no facts to show that this "pattern" is reflected in the trading confirmations or account statements sent by Madoff to Tremont.  The Complaint also fails to plead, as it must, the source and factual basis of this allegation, which plaintiffs have pled solely on information and belief. |

---

[23]    (Broad Market PPM (Trans. Decl. Ex. F) at 18; Prime Fund PPM (Trans. Decl. Ex. G) at 12; XL Fund PPM (Trans. Decl. Ex. H) at 7; Market Portfolio Fund PPM (Trans. Decl. Ex. D) at 8; XL Portfolio Fund PPM (Trans. Decl. Ex. E) at 8.)

| "Red Flag" | Response |
|---|---|
| 10. Key positions at BMIS were controlled by Madoff family members. (Compl. ¶¶ 284-91.) | The Complaint nowhere explains how this is evidence of a Ponzi scheme, much less alleges any facts to show that the family members in question were unqualified for their jobs. Cf. Don Dion, Fidelity: The Family That Works Together . . ., The Street.com, July 10, 2009, http://www.thestreet.com/story/10540861/1/fidelity-the-family-that-works-together.com ("Fidelity Investments was founded in 1949 by Edward Johnson II and has always been controlled by the Johnson family. Under the family's oversight, Fidelity has grown to be the largest mutual fund company in the world"). |
| 11. Madoff only took brokerage commissions, rather than performance-based fees. (Compl. ¶¶ 280-82.) | The Complaint nowhere explains how this is evidence of a Ponzi scheme. |
| 12. "BMIS's comptroller was based not in BMIS's Manhattan offices," but in Bermuda. (Compl. ¶ 292.) | The Complaint nowhere explains how this is evidence of a Ponzi scheme, much less how, if at all, the comptroller's location in Bermuda compromised its ability to competently render services to BMIS. |
| 13. The financial press disclosed the existence of the "red flags" about Madoff's operations. (Compl. ¶¶ 260-62.) | Press reports outlining risks of an investment are not obvious indicators of fraud. See In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 212-14 (S.D.N.Y. 2008). Further, here, the press reports did not conclude that Madoff was running a Ponzi scheme; at most, they noted that Madoff would not divulge the mechanics of his successful trading strategy. |
| 14. "[T]here were not enough index options available on the market" for Madoff to execute his strategy (Compl. ¶ 264), and "Madoff's strategy would have required at least ten times the S&P 100 option contracts that were actually traded on United States Exchanges." (Id.) | The Complaint alleges no facts to show that Tremont could have determined the volume of options Madoff needed, nor does it allege any facts to show that Madoff purchased or sold options on any Exchange; in fact, he claimed to purchase and sell options in private transactions over the counter. |
| 15. "[T]he level of options trades [Madoff's] strategy required would have had a significant impact on the market," but "[n]o such impact materialized." (Compl. ¶ 265.) | The Complaint alleges no facts to show that Tremont knew the total level of options trades required or that the level required for the Funds necessarily would have moved the market. |

| **"Red Flag"** | **Response** |
|---|---|
|  |  |
| 16. "Customer account statements BMIS issued could not be reconciled with reports BMIS filed with the SEC." (Compl. ¶ 278.) | The Complaint nowhere alleges that there was *any* discrepancy – material or otherwise – between the transactions reported by Madoff on account statements issued to TPI and the reports, if any, submitted by Madoff to the SEC regarding his purchase and sale of securities on behalf of the Funds. |