UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x
:
IN RE TREMONT SECURITIES LAW,   :   **OPINION**
STATE LAW AND INSURANCE         :
LITIGATION                      :   09 md 2052
:
:   Master File No.:
:   08 Civ. 11117 (TPG)
:
------------------------------------------------x
This Document Relates to:  Securities Law
Action 08 Civ. 11212 (TPG)
------------------------------------------------x

This putative class action arises out of the massive Ponzi scheme orchestrated by Bernard L. Madoff.  Plaintiffs are investors in hedge funds managed by Tremont Partners, Inc. ("Tremont Partners"), which served as feeder funds by investing the funds' assets with Madoff and his investment firm, Bernard L. Madoff Securities LLC ("BMIS").

As indicated, all of the funds in question were managed by Tremont Partners.  Three of the funds were the Rye Select Broad Market Fund, L.P. (the "Market Fund"), the Rye Select Broad Market Prime Fund L.P. (the "Prime Fund"), and the Rye Select Broad Market XL Fund, L.P. (the "XL Fund"), sometimes referred to as the "Rye Funds."  These were Delaware partnerships in which Tremont Partners was the general partner and the investors were limited partners.  The partnership agreements authorized Tremont Partners to delegate management of the funds' assets to a single manager chosen in its sole discretion.  Based on

1

this grant of authority, Tremont Partners selected Madoff or his company as the exclusive asset manager of the Rye Funds. The other fund was the Tremont Market Neutral Fund, L.P. ("Market Neutral Fund"), a Delaware partnership in which Tremont Partners served as the general partner and the investors as limited partners. In contrast to the Rye Funds, the Market Neutral Fund allocated fund assets to multiple outside investment managers. Tremont Partners chose Madoff or his company as one of the asset managers, investing 27% of fund assets with him.

Plaintiffs

Plaintiffs are Arthur M. Brainson (on behalf of the Arthur M. Brainson IRA R/O), Yvette Finkelstein, and Group Defined Pension Plan & Trust ("Group Defined"). Plaintiff Brainson is a limited partner in the Market Fund, plaintiff Finkelstein is a limited partner in the Prime Fund, and Group Defined is a limited partner in the Market Neutral Fund. There is no plaintiff who was an investor in the Rye Fund known as the XL Fund. A class claim is asserted on behalf of the investors in all of the funds, even the XL Fund, although no plaintiff claims to have been an investor in that fund. The court emphasizes that the class claim is asserted on behalf of a single class.

Defendants

Defendants are Tremont Partners, Tremont Group Holdings, Inc. ("Tremont Group"), Tremont Capital Management, Rye Investment

2

Management, Robert Schulman, Jim Mitchell, and Rupert Allan (collectively, the "Tremont Defendants"); Sandra L. Manzke; the Rye Funds; the Market Neutral Fund; Tremont Group's direct corporate parent, Oppenheimer Acquisition Corporation ("Oppenheimer"); MassMutual Holding LLC, Massachusetts Mutual Life Insurance Co. (collectively, "MassMutual Defendants"), the parent companies of Oppenheimer; and auditors KPMG LLP ("KPMG"), and Ernst & Young LLP ("E&Y") (collectively, the "Auditors").

The Motions

This opinion addresses the motions to dismiss which defendants E&Y and KPMG have filed. The Auditors[1] assert that plaintiffs' claims should be dismissed on multiple grounds pursuant to Rules 9(b), 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Specifically, the Auditors argue that: (1) plaintiffs fail to plead with particularity a violation of Section 10(b) of the Exchange Act; (2) plaintiffs fail to plead their common law fraud claim with particularity; (3) plaintiffs' non-fraud common law claims for breach of fiduciary duty, negligent misrepresentation, and aiding and abetting breach of fiduciary duty are preempted by the Martin Act, N.Y. Gen. Bus. Law § 352 *et seq.*; (4) all of plaintiffs' common law claims are preempted by the Securities

---

[1] Since plaintiffs' substantive allegations do not distinguish between E&Y and KPMG and the Auditors advance largely similar arguments in favor of dismissal, the court will discuss the claims against the Auditors together.

3

Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. §§ 78bb(f), 77p(b); and (5) plaintiffs' common law claims fail to state a claim for relief. In addition, KPMG asserts that to the extent plaintiffs state a valid claim, it is subject to mandatory arbitration.

As explained below, the motions to dismiss are granted.

## THE COMPLAINT

The following allegations are taken from the consolidated and amended class action complaint (the "Complaint") and the documents on which it relies. For the purpose of these motions, the allegations in the Complaint are assumed to be true.

Madoff's Ponzi Scheme

The basic facts surrounding Madoff's fraudulent Ponzi scheme are well-known. Madoff told his customers that he was investing their assets through a strategy called "split-strike conversion," which involved the supposed purchase and sale of stocks in the S&P 100 Index as well as options on that index.[2] Madoff sent account statements and trade tickets to his customers purporting to reflect this trading.

On December 11, 2008, news broke that Madoff, through BMIS, had been operating an enormous $50 billion Ponzi scheme for nearly 20 years. Rather than using his customers' money to purchase publicly traded securities, Madoff used investments from new customers to pay

---

[2] The "split-strike conversion" strategy purportedly entailed the purchase of 30 to 40 large capitalization S&P 500 stocks and the simultaneous sale of out-of-the-money calls on the S&P 100 Index and the purchase of out-of-the-money puts on the S&P 100 Index.

4

returns to other customers. In fact, he never purchased a single security. And the account statements and trade tickets that Madoff had been sending to customers were complete fabrications. These bogus trade confirmations were designed to give the appearance that Madoff had executed his strategy with perfect market timing – buying stocks when they were towards the bottom of the price range for a given day and selling close to the peak. Madoff admitted that the audited financial statements he filed with the SEC were false and misleading.

Upon the revelation of this fraud, the United States Attorney for the Southern District of New York charged Madoff with violations of the federal securities laws. On March 13, 2009, Madoff pleaded guilty to these charges. Bernard Madoff has since been sentenced to 150 years in prison for his crimes. While the conviction is not pled in this complaint, which was filed about two months before the sentencing, the court takes judicial notice of this fact as a matter of public record extensively and globally covered in news.

On April 6, 2009, the New York Attorney General brought civil fraud charges under New York's Martin Act against hedge fund operator J. Ezra Merkin based on his feeder funds' role in supplying money to Madoff. The Attorney General alleges that Merkin steered his clients' money to Madoff without permission in exchange for management and incentive fees and ignored glaring "red flags" related to Madoff's investments.

Tremont Defendants, Oppenheimer, and MassMutual Defendants

Plaintiffs allege that the Tremont Defendants, through the funds, invested enormous amounts of money with Madoff and received fees for doing so. Plaintiffs allege that this was done with the knowledge, approval, and assistance of the other corporate defendants – Oppenheimer and the MassMutual Defendants. Plaintiffs contend that there were various "red flags" which should have alerted these defendants as to the grave problems with Madoff, but these warnings were not heeded: that Madoff's returns could not be duplicated by others who attempted to do so using his reported investment strategy; that the volume of Madoff's purported options traded exceeded actual trading volumes reported by the markets; that BMIS's records did not report customer activity; that BMIS essentially was an inside, family business; that Madoff ran his own back-office operations; and that Madoff lacked transparency, limiting access to his books and records. As a result, so it is alleged, plaintiffs' investments, to the extent that they were invested with Madoff, were completely lost.

The Auditors

KPMG audited the financial statements of the funds and, in that capacity, issued single-page opinions in March 2006, 2007, and 2008 stating that its audits complied with Generally Accepted Auditing Standards ("GAAS"). Prior to KPMG, E&Y served as auditor for the funds until at least 2004.

Plaintiffs allege that for many years, the Auditors not only failed to detect the massive fraud perpetrated by Madoff during the course of their audits, but neglected to notify investors of the risks associated with investing in the funds. Plaintiffs assert that BMIS's role as investment advisor, broker, and custodian of the funds' assets required the Auditors to gather audit evidence to corroborate the existence of the funds' assets and the trading activity from sources independent of Madoff and BMIS. Consequently, by failing to obtain this evidence, the Auditors could not have complied with professional auditing standards because if they had, then they surely would have uncovered Madoff's Ponzi scheme. Plaintiffs, however, do not suggest that either E&Y or KPMG audited the financial statements of Madoff's businesses at any time.

Despite these allegations of fraudulent conduct, plaintiffs never assert that any of the defendants acted in concert with Madoff to maintain the Ponzi scheme or otherwise had any knowledge of the Ponzi scheme. And plaintiffs concede that the SEC also failed to uncover Madoff's fraud through its inquiries even after Harry Markopolos submitted a letter in May 1999 and repeatedly voiced his concerns to the SEC about the legitimacy of Madoff's trading operations.

The Claims in This Action

The Complaint contains 11 counts, however only Counts I, III, VIII, X, XI pertain to the Auditors. Count I alleges violations of the federal securities laws, Section 10(b) of the Exchange Act and Rule 10b-5 of the

7

Securities and Exchange Commission. Counts III, VIII, X, and XI are based on various common law theories -- fraud, aiding and abetting a breach of fiduciary duty, negligent misrepresentation, and breach of fiduciary duty, respectively. The claims against the Tremont Defendants, Oppenheimer, and MassMutual Defendants – for securities fraud under Section 10(b) of the Exchange Act, control person liability under Section 20(a) of the Exchange Act, fraud, negligent misrepresentation, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, gross negligence and mismanagement, and unjust enrichment – are not addressed here.

## DISCUSSION

### Standard on a Motion to Dismiss

In reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. See Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While a complaint need not supply "detailed factual allegations," it must consist of more than "labels

8

and conclusions" or a "formulaic recitation of the elements of a cause of action." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible," the complaint must be dismissed. Id. at 570.

Section 10(b) of the Exchange Act (Count I)

Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b), prohibits conduct "involving manipulation or deception, manipulation being practices ... that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive." Field v. Trump, 850 F.2d 938, 946-47 (2d Cir. 1988). To state a claim under Section 10(b) of the Exchange Act, a plaintiff must allege facts sufficient to show that, in connection with the purchase or sale of securities, the defendant made a false material representation or omitted to disclose material information, with scienter, upon which plaintiff relied, and that plaintiff's reliance was the proximate cause of the injury. See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2008). A claim for relief under Section 10(b) is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA. See ATSI Commc'ns v. Shaar Fund Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Indeed, under both Rule 9(b) and Section 101(b) of the PSLRA, allegations must be made "with particularity" and give "rise to a strong inference that the defendant

9

acted with the required state of mind," namely, "to deceive, manipulate or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313-14 (2007).

The Auditors challenge the validity of the Complaint on scienter, loss causation, and reliance grounds. As discussed in detail below, because the court finds that plaintiffs have failed to plead scienter adequately, the court need not consider the issues of loss causation and reliance.

Scienter

For purposes of stating a Section 10(b) claim, scienter means an actual intent "to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). A plaintiff may satisfy the requirement to plead scienter by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness. See Ganino v. Citizens Utils. Co., 228 F.3d 154, 168-69 (2d Cir. 2000). Moreover, for an inference of scienter to be strong, it must be more than merely plausible or reasonable -- it must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 310. In short, to determine whether a plaintiff's purported inferences of scienter are sufficiently "strong," the court must consider both the inferences urged by the plaintiff and any

competing inferences rationally drawn from all the facts alleged, taken collectively. See ECA, 553 F.3d at 198.

The standard for pleading auditor scienter is demanding. See In re IMAX Secs. Litig., 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008). Allegations of GAAS violations without corresponding fraudulent intent are insufficient to state a securities fraud claim against an independent accountant. See Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000); Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996).

> For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.

Rothman, 220 F.3d at 98. Put another way, a plaintiff must allege that the accounting practices were so deficient that the "audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." In re Scottish Re Group Secs. Litig., 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007).

A complaint might reach the "no audit at all" threshold by alleging that the auditor disregarded specific "red flags" that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors. See In re AOL Time Warner Secs. & "ERISA" Litig., 381 F. Supp. 2d 192, 240 n.51 (S.D.N.Y. 2004);

11

see also In re Marsh & McLennan Cos., Inc. Secs. Litig., 501 F. Supp. 2d 452, 487 (S.D.N.Y. 2006) ("Merely labeling allegations as red flags . . . is insufficient to make those allegations relevant to a defendant's scienter."). Under this framework, however, merely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient. See Rothman, 220 F.3d at 98; see also In re aaiPharma Inc. Secs. Litig., 521 F. Supp. 2d 507, 513 (E.D.N.C. 2007) (rejecting theory that auditor's access to information could support an inference of scienter, noting that "merely because a person has broad access to every book in a library does not mean that the person has read and chosen to ignore facts contained in a particular book in the library").

Plaintiffs allege that the Auditors were complicit in Madoff's fraud because they ignored various "red flags" and failed to uncover the Ponzi scheme despite having unfettered access to the funds' records. Consequently, plaintiffs surmise that the Auditors did not perform audits that complied with GAAS because if they had, they undoubtedly would have discovered Madoff's fraudulent conduct.

The Auditors contend that it is simply not plausible that they, along with every auditor at every accounting firm who audited the financial statements of the funds that invested with Madoff, participated in Madoff's fraud by virtue of failing to detect it.

As discussed above, alleging a shoddy audit in violation of GAAS does not establish the intent to defraud required to maintain a claim for

securities fraud. And while plaintiffs identify several purported "red flags" in the Complaint, they do not allege that the Auditors were aware of any facts indicative of Madoff's fraud that they consciously disregarded -- plaintiffs do not allege that Markopolos ever discussed his assessment that Madoff was operating a Ponzi scheme with the Auditors or published it in the press, plaintiffs do not assert that the Auditors knew that Madoff's returns could not be replicated by others, and plaintiffs do not claim that investors who elected not to deal with Madoff informed the Auditors of their decisions. Rather than plaintiffs' proposed inference that the Auditors did not comply with GAAS because they ignored "red flag" warnings and failed to uncover the Ponzi scheme, the more compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and eluding the SEC and other financial professionals.

But most critically, the Auditors were never engaged to audit Madoff's businesses or to issue an opinion on the financial statements of BMIS. The Auditors' only role is that they audited the financial statements of the Rye Funds and the Market Neutral Fund. The notion that a firm hired to audit the financial statements of one client (the Rye Funds and the Market Neutral Fund) must conduct audit procedures on a third party that is not an audit client (BMIS) on whose financial statements the audit firm expresses no opinion has no basis. To impose liability on the Auditors would expand their limited, circumscribed duty

impermissibly. Accordingly, plaintiffs' Section 10(b) claim against the Auditors is dismissed.

Common Law Claims (Counts III, VIII, X, XI)

A: Fraud

To state a claim for common law fraud in New York, a plaintiff must show a material representation or omission of fact, made with knowledge of its falsity, with scienter or an intent to defraud, upon which the plaintiff reasonably relied, and that such reliance caused damage to the plaintiff. See May Dep't Stores Co. v. Int'l Leasing Corp., 1 F.3d 138, 141 (2d Cir. 1993). Courts in the Second Circuit have found that the elements of common law fraud are "essentially the same" as those that must be pleaded to establish a claim under Section 10(b) and Rule 10b-5. See Fezzani v. Bear, Stearns & Co., 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008).

As noted above, the elements of Section 10(b) claims are essentially the same as those for common law fraud in New York. Since plaintiffs' Section 10(b) claim does not survive, plaintiffs' common law fraud claim, based on the same allegations of fact, must be dismissed as well.

B: Martin Act Preemption

The Martin Act prohibits,

> (a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;
>
> (b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

14

> (c) Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made.

N.Y. Gen. Bus. Law. § 352-c(1). New York courts construe the Martin Act liberally and have held that the statute vests the New York Attorney General with the sole authority to prosecute state law claims involving securities sounding in fraud that do not require proof of intent to defraud or scienter. See Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 190 (2d Cir. 2001); First Energy Leasing Corp. v. Attorney-General, 68 N.Y.2d 59, 64 (1986). There is no implied private right of action for any claim covered by the Martin Act. See CPC Int'l, Inc. v. McKesson Corp., 70 N.Y.2d 268, 275 (1987).

Courts routinely dismiss common-law securities claims under the Martin Act based on conduct that is "within or from" New York sounding in fraud or deception that do not require pleading or proof of intent. See Owens v. Gaffken & Barriger Fund, LLC, No. 08 Civ. 8414 (PKC), 2009 WL 3073338, at *13 (S.D.N.Y. Sept. 21, 2009). Limited partnership interests are considered securities for purposes of the Martin Act. See N.Y. Gen. Bus. Law § 352(1); Mayer v. Oil Field Sys. Corp., 721 F.2d 59, 65 (2d Cir. 1993). And a transaction qualifies as "within or from" New York for purposes of the Martin Act if a plaintiff alleges that a substantial portion of the events giving rise to a claim occurred in New York. See,

e.g., Sedona Corp. v. Ladenburg Thalmann & Co., Inc., No. 03 Civ. 3120 (LTS)(THK), 2005 WL 1902780, at *22 (S.D.N.Y. Aug. 9, 2005) (applying Martin Act where Complaint alleged proper venue in New York based on substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York).

    The Auditors contend that plaintiffs' non-fraud claims fall squarely within the Martin Act's preemptive scope because plaintiffs allege that they were deceived into purchasing interests in limited partnerships that were supposed to invest in securities, only to find themselves victims of Madoff's elaborate Ponzi scheme. Moreover, none of plaintiffs' non-fraud claims -- for breach of fiduciary duty, negligent misrepresentation, and aiding and abetting breach of fiduciary duty -- requires proof of scienter. In support of their position, defendants reference more than twenty decisions rendered by judges in this district preempting non-fraud common law claims.

    Plaintiffs do not contest that their common law claims contain allegations of dishonesty and deception and involve securities that were sold within or from New York. Instead, in an attempt to escape Martin Act-preemption, plaintiffs cite Cromer Fin. Ltd. v. Berger, No. 00 Civ. 2498, 2001 WL 1112548, at *4 (S.D.N.Y. Sept. 19, 2001), Caboara v. Babylon Cove Dev., LLC, 862 N.Y.S.2d 535, 538-39 (2d Dep't 2008), and Scalp & Blade, Inc. v. Advest, Inc., 722 N.Y.S.2d 639, 640 (4th Dep't

2001), to bolster their argument that the numerous opinions issued by New York state and federal courts were wrongly decided.

Plaintiffs' non-fraud claims plainly fall within the ambit of the Martin Act. First, plaintiffs' claims involve a "security" under the Martin Act based on their ownership of limited partnership interests in the Funds. Second, as plaintiffs themselves acknowledge, substantial acts in furtherance of the alleged wrongdoing occurred within the district, thus satisfying the Martin Act's geographic prong. Third, the Complaint is centered on plaintiffs' allegations of various misrepresentations and omissions with respect to the diligence performed on the funds, including ignoring countless "red flags" warning that Madoff was operating a Ponzi scheme. Finally, the fact that the Complaint specifically references the New York Attorney General's action under the Martin Act against Ezra Merkin and feeder fund Gabriel Capital Corp. for funneling fund assets to Madoff only underscores the appropriateness of Martin Act-preemption here.

And the line of cases that plaintiffs advance has been rejected repeatedly by courts in this district. See, e.g., Kassover v. UBS AG, 619 F. Supp. 2d 28, 39 (S.D.N.Y. 2008) ("Plaintiff's reliance on Caboara is unavailing . . . Caboara appears to overlook a long-standing distinction between courts' treatment of common law fraud claims and that of other state law claims based on deceptive practices."); Nanopierce Techs., Inc. v. Southridge Capital Mgmt., LLC, No. 02 Civ. 0767 (LBS), 2003 WL

22052894, at *4 (S.D.N.Y. Sept. 2, 2003) ("Both Scalp & Blade and Cromer Finance stand as solitary islands in a stream of contrary opinion"). Indeed, although "there is some disagreement among New York's appellate courts as to whether the Martin Act preempts common law claims, the Second Circuit has adopted the First Department's rule that the Martin Act preempts common law tort claims in the securities context." Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc., No. 08 Civ. 7509 (SAS), 2009 WL 2828018, at *14 (S.D.N.Y. Sept. 2, 2009). Plaintiffs' argument -- drawn from case law outside the First Department -- is thus insufficiently persuasive in the face of substantial contrary authority.

Given the amount of legal authority in this district favoring Martin Act-preemption for non-fraud common law claims based on deceptive acts committed in connection with the sale of securities within or from New York, dismissal of these claims (Counts VIII, X, and XI) is warranted.

Because it is unnecessary to do so, the court declines to address defendants' remaining arguments in support of dismissal of the common law claims.

## CONCLUSION

For the reasons set forth herein, E&Y's and KPMG's motions to dismiss are granted (Docket Nos. 35 and 45 on 08 Civ. 11212; Docket No. 103 on 08 Civ. 11117).

Dated: New York, New York
March 30, 2010

Thomas P. Griesa
U.S.D.J.