UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE  TREMONT SECURITIES LAW, STATE LAW AND INSURANCE LITIGATION | MDL Docket No:  09-md-02052 (TPG) Master Docket No:  08 Civ. 11117 (TPG) |
| This Document Relates to: All Actions:  08 Civ. 11117 (TPG) 09-md-02052 (TPG) | |

**DECLARATION OF VINCENT T. GRESHAM IN SUPPORT OF
THE HAINES PLAINTIFFS' MOTION FOR RELIEF
FROM MEDIATION AND SETTLEMENT CONFIDENTIALITY PROVISIONS**

I, Vincent T. Gresham, declare under penalty of perjury, as follows:

1.  I am counsel for Plaintiffs Madelyn Haines and Paul Zamrowski in the action styled *Haines v. Massachusetts Mutual Life Ins. Co.*, No. 09-10182-RWZ (D. Mass.) (the "*Haines* Action").  The *Haines* Action was transferred to this Court by the Judicial Panel for Multidistrict Litigation on June 11, 2009 and pursuant to the Court's September 25, 2009 Order, was consolidated with this action.  I was admitted pro hac vice in this case at the consolidation hearing on September 24, 2009.  I make this declaration voluntarily based on my own personal knowledge and, if called upon to do so, would testify competently thereto.

2.  I attended the March, 2010 mediation.  I would like to testify and utilize mediation related documents to address Lead Counsels' ("LC") characterizations of the Haines Objections and Objectors, support the Haines Objections and refute LC's arguments.  As set forth below, many statements in LC's various declarations and pleadings can be (and should be) refuted with documentary evidence and testimony but the Court is deprived of such because of mediation and settlement confidentiality

1

agreements.  Below are examples of where currently confidential information would be of assistance to this Court.

## THAT LEAD COUNSELS MISREPRESENTED THE ACTIONS OF OBJECTORS' COUNSEL AT MEDIATION CAN ONLY BE PROVEN WITH INFORMATION CURRENTLY PROTECTED BY MEDIATION AND SETTLEMENT NEGOTIATION CONFIDENTIALITY

### I Did Not Agree With Or Support Quick Pay Provisions That And LC's Selective Release Of Mediation Information To Suggest Otherwise Is Misleading

3. In speaking of the "quick-pay" provision LC repeatedly suggest that I was aware that it was being negotiated and did not oppose it until months later as part of some professional objector extortion attempt.  LC-Reply-Fee-Decl.-¶34.  This is incorrect.  To refute LC's claims I would like to testify as to the circumstances surrounding the mediation quick pay negotiation, but cannot do so because of mediation confidentiality.

4. Shortly after mediation, in the very first round of comments on the Stipulation I was given the opportunity to state my views on the quick-pay provision and did so.  As Securities LC know in my <u>first</u> set of comments on the Stipulation on 4/19/2010 (over one year <u>prior to</u> filing any objections) I took issue with the notion of quick pay:

> I am not sure that these provisions place us in accord with our clients' bests interests.  The Stipulation is full of language and concepts which will be "objection magnets" many of which are likely to result in appeals.  **I can't help but wonder if some of this risky drafting might have been avoided if our interests were more closely aligned with our clients by our getting paid the same time as our clients.  This is an issue that we should discuss and consider at length.**

(emphasis added)  (I will bring a copy of this and other cited but not attached documents to Court on June 1, 2011 so that if LC choose to contest this representation the Court can examine the document.)

5. No such "discussion" took place.  Instead of a good-faith discussion I received

a response labeled as "Comment [j68]" that I would like to share with the Court and Class, for the both to have a full understanding of both my position and LC's on this issue, but I cannot do so as LC claim such is confidential.

6.  On 4/27/2010, I argued (unsuccessfully) against how the quick pay provision combined the plan of allocation provisions would be harmful to our clients for basically the same reasons stated in Fee Objection over a year later:

> *Third*, this provision will result in a vesting of attorneys' fees even if the POA takes years and multiple appeals to resolve. This presents several problems. Initially, it reduces our incentives as plaintiffs' counsel to use our best efforts to come up with a POA that is sufficiently fair and above reproach so that the class accepts it and the POA is not appealed. If we fail in that endeavor, then this provision reduces the financial incentive for plaintiffs' counsel in the appeals process to fight hard to defend the POA. Finally, if the POA is overruled and remanded, this provision reduces plaintiffs' counsels' financial incentives to speedily and effectively develop a fair, adequate and reasonable new POA.

7.  As can be seen from the above, my comments on the subject of quick-pay from April, 2010 are very similar to the objections raised about quick pay in the Haines Objections raised in May, 2011. LC's misleading use of mediation information to suggest that I changed my mind as some type of "professional objector" con can be refuted if I am allowed to testify as to what occurred in mediation. That can only happen if the Court grants relief from mediation confidentiality.

**LC's Claims That The SAC Was Not The "Operative" Mediation Complaint And Thus All Of The Current Settling Funds Are Properly Included In The Settlement Is Undercut By Securities LC's Own Statements But Can Be Conclusively Refuted Only With Documents Currently Protected By Mediation Confidentiality**

8.  The Haines Plaintiffs argued that the Settlement negotiated on 3/18/2010 was on behalf of a smaller group of investors than are now included in the newly expanded class definitions that are currently being used. Important to the Haines Objection

argument was the fact that the "operative complaint" was the second amended securities complaint that I worked on with Securities LC (the "SAC").

9.   In reply, LC state that the April, 2009 complaints were the "operative complaints" and not "any proposed complaint [i.e., the SAC]… as one objector group has assumed."  LC-POA-Decl.-¶17.  That the SAC was the "operative complaint" was not an "assumption", but rather it was a promise made by Securities LC.

10.   On 2/18/2010 I received an e-mail in which Securities LC's reconfirmed his oral promises that the Securities Amended Complaint would be the operative complaint: "**As discussed during our last conference call, we will attached the proposed amended complaint to our mediation submission and refer to the proposed complaint in the mediation statement (as well as in discussions with the mediator) as the 'relevant' and operative pleading."** (emphasis added).

11.   On 2/24/2010 I received an e-mail in which Securities LC's reconfirmed that the Securities Amended Complaint was the "operative complaint for purposes of the mediation.": "Attached is a draft mediation statement for your review and comment.  **As I mentioned previously, the statement follows the amended complaint and make clear that the amended complaint is the operative complaint for the purposes of mediation."** (emphasis added).

12.   Proof of what complaint was the "operative" one in Mediation would be in the mediation statements themselves.  However, due to mediation confidentiality this key document cannot be submitted to the Court.

**The Settling Funds In The Current Stipulation Were Not The Settling Funds That The Parties Obtained Information About In Preparation For Mediation Or That Were The Subject Of The March, 2010 Mediations**

13.  LC repeatedly state that I said my clients supported the settlement.  This is true, but the way they phrase and position this correct statement it misleadingly implies that I and my clients at one time agreed to many of the things that we disagree with in the Haines Objection.  This is misleading as explained below.

14.  For example, in response to the Haines Objectors' concerns that the Class is being diluted by the addition of investor in numerous new funds that were not present during the March, 2010 negotiation, LC aggressively proclaim--"THE SETTLING FUNDS ARE PROPER PARTIES TO THE SETTLEMENT".  See, LC-Reply-POA-Decl. at §IV.  This is misleading.  As noted above, at the time the Settlement was negotiated the operative complaints used in the Settlement was limited to a specific number of funds.  Moreover, LC's preparation for mediation and the information they obtained in order to negotiate the Settlement was similarly limited to the few specific funds in the operative complaint.

15.  What is misleading is that when I and my clients said we supported the Settlement, we supported the Settlement that was reached in March, 2010.  As repeatedly noted in the Objections, we believe that LC agreed to harmful changes <u>after</u> the March, 2010 Settlement was agreed to.  These changes we do not and never did agree to.  For example, the Settlement we agreed to was one  in which the $100 million would be primarily shared by investors in a half dozen or so funds who had typical claims of about $1.3 billion.  We did not agree, nor would we, to have the same $100 million negotiated in March, 2010 suddenly spread among investors in all of the 17 funds that are currently

5

listed in the Feburary, 2011 Stipulation of Settlement.  I certainly never did and never would support a settlement that could evenly split the $100 million among the $3.646 billion in claims currently before the court.  We do not support the dilution of investors who were "at the table" in March, 2010 for a bunch of Johnny come latelies who were added months after the March, 2010 settlement was reached.

16.  LC repeatedly imply that I and/or my clients have somehow changed our minds about the Settlement.  That is not correct; it was the Settlement that changed.  My clients and my ideas of what was fair have remained generally consistent.  The vital point about which funds were included in the March, 2010 negotiations can only be proven through introduction of materials currently claimed confidential.

17.  Whether LC obtained information on most of the Settling Funds that I claim are "new" or "additional" can be proven with record evidence consisting of the e-mails and preparation materials that LC were provided by Defendants.  This information is currently subject to a confidentiality agreement which this Court should void for the limited purpose of, among other things, ascertaining (a) if LC are truthfully describing the state of their knowledge, (b) which of the Settling Funds now included as part of the March, 2010 settlement negotiations did LC have knowledge about, and (c) which of the Settling Funds are properly included in this Settlement.

18.  Again, the best evidence of what funds were the subject of the March, 2010 mediation are the mediation statements and the best evidence of what information LC had are the documents and communications between LC and defendants through which information was sought and delivered.  Both are protected by confidentiality, which prevents me from both defending against attacks of "objector extortion" against myself

and my clients, refuting LC's statements about the Settlement and supporting the Haines

Objectors' objections.

## II.  MANY OF LEAD COUNSELS' REPRESENTATIONS OF FACT IN THEIR PLEADINGS AND DECLARATION ARE DEMONSTRABLY FALSE OR CAN BE SHOWN TO BE SO THROUGH INFORMATION THAT IS CURRENTLY PROTECTED BY CONFIDENTIALITY

19.  On page one of LC's Fee Reply Memorandum, LC make a false statement in

an attempt to obtain an award of expenses.  LC state: "No Class Member has objected to

[LC's] request for reimbursement of expenses… further illustrating the fairness of these

requests."  LC-Reply-Fee-Memo.-p.1.  (Dkt.#518)

20.  The Haines Plaintiffs Objection to Fees And Expenses includes objections to

the improper allocation of expenses, and insufficient and inadequate information

regarding expenses that :

> The "Class will be saddled with fees and expenses that should be allocated to other cases or shouldn't be charged at…"  Fee-Obj.-29:
>
> "LC's Fee Motion is virtually devoid of relevant information that would enable Objectors, the Class or this court to verify that LC's fees and expenses were properly incurred or properly allocated."  Fee-Obj.-29:
>
> "LC's expenses are similarly unsupported.  The attachments to their various declarations simply list expenses without any detail that would enable objectors to evaluate them or this Court to perform its required <u>independent</u> review.  The expense information is inadequate."  Fee-Obj.-32.
>
> This uninformative presentation of expense information, without any narrative account to explain why the expenses were being incurred-makes it impossible for the Court to determine which, if any, of these claimed expenses were necessary….  The same sins were committed here.  Fee-Obj.-32-33.

While LC may disagree with the Haines' expense objections, LC cannot honestly state

that no expense objections were made.

**There Is Evidence that LC'S Denials Of Double Billing Are Refuted By the Record**

21.  According to their testimony, none of the LC double bill their time.[1]  LC-Reply-Fee-Decl.-¶53-59.  They provide no other detail or proof and again invite this Court to simply trust them.  However, despite their studious efforts to deny Objectors or this Court any information that could be used to verify their statements, there is nevertheless record evidence suggesting that double billing does occur.

22.  For example, in connection with the Argus Settlement of 2009, Wolf's fee declaration sought (and received) payment in that settlement for the following:

> 3. The services rendered and work performed by attorneys, paralegals, and other professionals and paraprofessionals of my firm during the course of this Litigation to date include the following: (i) investigating, researching and analyzing claims and potential claims, including reviewing publicly available information concerning the Argus Defendants prior to filing the complaint; (ii) drafting the initial and consolidated complaints;

See Dkt.330 page 2 of 5.  The court approved an award of fees to Wolf at the final approval hearing for the Argus settlement.  12-23-09 Transcript page 9:13-15.

23.  In Wolf's Insurance Fee Decl. Filed 5/5/2011 as Dkt. 450-1 in connection with their seeking over $2 million in fees Wolf made the following representation:

> 3. The services rendered and work performed by attorneys, paralegals, and other professionals and paraprofessionals of my firm during the course of this Litigation to date include the following: (i) investigating, researching and analyzing claims and potential claims, including reviewing publicly available information concerning Defendants' actions prior to filing the complaint; (ii) drafting an initial complaint and amended consolidated complaint….

---

[1]Although they all claim to have separate billing numbers for separate cases, none of them addressed the issue raised in the Haines Objection about how they decide which case to bill time to when common issues among cases result in identical documents being read (e.g., the Madoff Bankruptcy file), common issues being researched (e.g., hedge fund law), etc.

As can be seen, this is the exact same work for which Wolf sought, and received payment, in December, 2009. There were (obviously) no other initial complaints and there is only one "amended consolidated complaint" for the Insurance Actions.

24. Here the same work that was used to justify one fee in December 2009 was used again in an (attempt to) obtain a second fee on June 1, 2011. This seems like just the type of double billing that all LC claim to avoid in their *trust-me* declarations.

25. In LC-Reply-Fee-Decl.-¶58, LC claim the work on the Auditor Defendants "benefited the Settlement Class." This is incorrect, the Auditor Defendants have not paid one penny. Thus, while work may have been done, the class has yet to enjoy benefits. If and when these defendants do pay, <u>then</u> and only then will LC's work have benefited the class. Paying them now simply opens the door for them to do the same thing with the Auditor time that Wolf apparently did with their time, i.e., use this auditor time once now to inflate their fees in this Settlement, and then use it a second time when they settle against the Auditors.

**LC's Denials Of Simultaneously Negotiating Their Clear Sailing Agreement For Fees And The Expanded Definition Of The Settlement Class Can Be Refuted**

26. The Haines Objectors argued that there was simultaneous negotiation of LC's clear-sailing agreement for their fees and just as one hand washes the other a greatly expanded definition of the Settlement Class.

27. In reply, LC claim that the clear-sailing provision was not "agreed upon until… well after the substantive terms of the Settlement had been reached." LC-Settle-Decl.-¶44. This is false. Just as the Haines Objectors argued, the clear-sailing provision was inserted by LC into the first draft of the Stipulation and at that time the "Settling Funds" were limited to just 5 funds each for the State and Securities Classes. This can be

proven only through introduction of now confidential early drafts of the Stipulation. <u>After</u> LC's included the clear-sailing agreement in their first draft, <u>then</u> Defendants proposed to change the definition of the Settling Funds by adding numerous new funds in a later draft. As noted in the objections those new funds and their investors thus expanding the settlement class and diluting current investors. This can be shown by introduction of now confidential subsequent drafts of the Stipulation. Contrary to LC's incorrect reply representations, the two issues were simultaneous, which can be proven if relief from confidentiality is granted.

## LC's Claims To Have Earned Fees On The FDA Amounts Through Their Longstanding Efforts To Maximize Such Amounts Are Refuted By Record Evidence

28. The Haines Objections took issue with LC's extravagant claims in their initial 5/5/2011 filing that "the Settlement assures the involvement of Plaintiffs' Settlement Class Counsel in continuing to press for the best possible result in the Madoff Trustee Proceeding and prosecution of the SIPC and BLMIS claims in connection with the subject partnerships." Citing the Stipulation at ¶2.2, Objectors pointed out that LC were contractually prohibited from being involved except for requesting "status reports." ("As per the Stipulation the only "pressing" LC are contractually entitled to do is for a "status report" from those who are actually doing the work, Defendants' counsel.")

29. LC respond in Section III of the LC-Reply-Fee-Memorandum at 8-10 and in LC-Reply-Fee Decl.-¶47-52, by making a blizzard of representations about their alleged "pressing" efforts to "maximize" the value of the Settling Funds. However, they do not cite to anything specific provision in the Stipulation. Instead of Stipulation citations which would enable the Court to verify their claims, both the Memorandum and

Declaration simply say, in trust-me fashion, that LC are doing tons of great stuff for the

class, for example:

> "Through our negotiations, [LC] obtained a waiver of all management fees owed
> or that may be owed by the Settling Funds." LC-Reply-Fee-Decl.-¶51.

I cannot find any such agreement in the Stipulation and LC's declarations cite to nothing.

> "Through our negotiations, [LC] have prevented the Individual Settling
> Defendants and their spouses from recovering [from] the Fund Distribution
> Account." LC-Reply-Fee-Decl.-¶51.

The Haines Objectors informed LC that the Stipulations says nothing about spouses.

Despite the fact that they now know their statement is incorrect they still repeat it.

30.   Additionally, LC claim "Since inception, [LC] has been actively involved in

the BLMIS Bankrupcty, SIPC and SIPC-related actions and has pressed Settling

Defendants to… maximize the value of any potential recovery by the Settling Funds in

the Trustee Bankruptcy proceedings." LC-Reply-Fee-Memo.-p.8,   "[T]he Settlement

confirms [LC's] ongoing role pressing for the maximum possible recovery in connection

with the Madoff Trustee Proceedings…" Id-p.8.

31.   On 2/11/2010 I circulated an e-mail in which I compared the fund by fund

cash balances as of 2/1/2010 and 12/31/2008 and discovered that they had declined by

almost $50 million.  Based on my discovery of this missing money I asked all 7 counsel

involved in the Securities Action (including Bernstein Liebhard and Wolf) the following:

> Do we know why aggregate cash balances dropped by almost $50 million?  If not,
> shouldn't we find out?

> My understanding is that Tremont is currently negotiating with Madoff's
> bankruptcy trustee concerning the disposition of these funds.  Is anyone else
> troubled that Tremont is negotiating the disposition of these funds without our
> being involved?  In fact, to my knowledge we are not even being informed about
> the status of these negotiations.  Doesn't Tremont have conflicts of interests in
> such negotiations that could easily result in the cash in our clients' funds being

used as a bargaining chip for Tremont's own benefit?

Our clients' funds currently have almost $100 million.  What are we currently doing to protect this common fund?  At this point in time, shouldn't our focus be determining if there is anything we can do to preserve this common fund for the benefit of our clients?

I followed up on this written request in our next conference call, all to no effect.  None of the counsel (now seeking fees <u>from</u> these monies) wanted to do anything to "protect this common fund."  None of them wanted to "determin[e] if there is anything we can do to preserve this common fund for the benefit of our clients."  Nothing was done to protect the common fund.  I don't recall even receiving a responsive e-mail.

32.  This failure to respond when I pointed out risks to <u>our</u> <u>clients</u> with respect to these monies and unwillingness to do anything to protect these funds is a primary animating factor to my belief that none of these counsel deserve a 3% fee based on the FDA Amounts and that the claims made in the reply statement (none of which cite to any provision in the Stipulation) may be grossly exaggerated if not outright false.

33.  With respect to their claims of involvement in "pressing" to maximize the recovery in the Madoff-Trustee proceedings, this too can be undercut by review of comments to the drafts of the Stipulation of Settlement.  Comments in my first set of comments on the Stipulation on 4/19/2010 regarding the then Section 2.7 and the comment I received back as "Comment [j32]" will help the Court further understand why LC are not creating any real value in connection with the Madoff-Trustee proceedings worthy of the 3% fee they demand.  However, I cannot use this information because it is deemed confidential.

**In Addition To Fee Related Misrepresentations**
**LC's Reply Also Misrepresent The All-Important Class Notice**

34.   Among the objections to the Class Notice was the following statement:

[T]he Notice purports to include a "Statement of potential outcome which states:

**Statement of Potential Outcome of the Case**
The Settling Plaintiffs estimate, based on the opinions and analyses of their expert, that **the average percentage recovery if the Settling Plaintiffs prevailed on each claim asserted is approximately 5.7%** before deduction of Court-awarded attorneys' fees and expenses.  Notice p4.

However, this is inconsistent with Securities LC's own declaration which states something else entirely:  "Settling Class Plaintiffs' damages expert has estimated that the maximum total damages in this case (assuming that Settling Class Plaintiffs prevailed on Settling Defendants' various challenges to the Complaints) amount to $1.646 billion."  LC-Settle-Decl.-¶ 58.

(Haines Notice-Obj.-p. 8).

35.   In reply, LC state "The Notice does not state or imply 'that just 5.7% was all they could ever recover even if plaintiffs 'prevailed on each claim asserted.'" and cite page 8 of the Haines Notice Objection.  LC-Settle-Decl.-¶38.  LC were informed of the statement in the Notice, but in their reply LC deny the existence of the statement in the Notice.

36.   On page 4 of the Notice under the bold underlined heading:  "**Statement of Potential Outcome of the Case**" in the first paragraph, second sentence the following language appears:   "The Settling Plaintiffs estimate, based on the opinions and analyses of their expert, that the average percentage recovery if the Settling Plaintiffs prevailed on each claim asserted is approximately 5.7% before deduction of Court-awarded attorneys' fees and expenses."  The "average percentage recovery" language in the Notice is

inconsistent with the information provided to LC by their expert, see, LC-Settle-Decl.-¶58, just as the Haines Objection alleges.

**LC's Denial Of Stripping Away Rights Of Limited Partners
Is Refuted By The Plain Language Of The Class Notice**

37.   The Haines Plaintiffs pointed out that in the creation of the FDA Account, LC stripped important rights away from limited partners.  In reply, LC state "The objection is frivolous"  LC-Reply-POA-Memo-p.4

38.   In a declaration, LC state: "The Settlement does not require the Fund Distribution Claimants to surrender any rights, including the rights to: use their own counsel; file claims in a convenient forum; trial by jury; discovery; or to make any legally cognizable argument."  LC-POA-Decl.-¶16.  This is wrong.

39.   As the Haines Plaintiffs pointed out prior to the time LC made their statement, the Notice at page 11 under the heading "**13.   What if My Claim is Denied?**" states what occurs to "any Claimant whose claim has been rejected."  Claimant is defined in the Stipulation ¶1.6 as a "Person who seeks a disbursement from … the Fund Distribution Account…"  The plain language of the Notice at page 11 states that "If the claim remains in dispute and cannot be resolved, **Plaintiffs' Settlement Class Counsel shall thereafter present the disputed** claim for review to the Court.  **There shall be no discovery** of any type permitted…  **the scope of claim review shall be limited** to a determination as to whether the Proof of Claim… was in compliance with the requirements of the Stipulation.  **Each Claimant expressly waives trial by jury**… **and any right of appeal** or review…"  (emphasis added).

**Securities LC Made A 2.3 Billion Dollar Error In Judgment That Can Only Be Remedied By Eliminating Both The Swap-Counterparties And The Investors In The Additional Funds Added To The Definition Of "Settling Funds" After The 3/18 Settlement Was Reached**

40.  LC concede they relied on information voluntarily supplied by Defendants to inform themselves and develop their negotiating positions and strategies for mediation.

41.  Below are comments I made to Securities LC in an e-mail of 2/27/2010 in which I questioned Securities LC's reliance on defendant-supplied class damage numbers.  Included in my comments are the following:

- "I don't believe the numbers on the spreadsheet correlate to investor damages for three reasons:"

- "In short, just eyeballing these numbers invites skepticism, not reliance."

- "The spreadsheet numbers are inconsistent with the numbers provided on the SIPC claim forms."

- "The $1.5 Billion discrepancy between the spreadsheet numbers and the SIPC numbers demonstrates further that the spreadsheet should not be relied upon, at least until we know exactly what all terms mean and how all amounts were calculated."

- "In conclusion, I don't believe that the numbers on the spreadsheet referenced yesterday should be interpreted as being the same as investor damages."

42.  Through introduction of the course of communications regarding what was and was not said and provided when the information leading up to the mediation was commenced I believe I can demonstrate that at the commencement of mediation in March, 2010 Securities LC believed that the total class member damages was only $1.3 billion dollars, a far cry from the actual $3.646 billion that they are seeking to settle on June 1, 2011.  The introduction of all mediation statements of all LC would assist the Court in understanding the state of LC's knowledge at the time of mediation.

43.  The reason I believe that the Settlement can <u>still</u> be approved is if the Swap Counterparties and the recently added Settling Funds are both <u>excluded</u>, then the damages of the Settling Class will approximate the $1.3 billion number that LC believed they were negotiating.  In short, no harm no foul.

44.  The calculations supporting my belief are as follows:  the Settlement attempts to settle $3.646 billion in claims.  According to the Notice approximately $2 billion of those claims are Swap-counterparty claims.  If the Swap-counterparties are excluded from the Settlement Class as the Haines Objectors' believe they must be, then the total claims will approximate $1.646 billion. If the investors in additional funds which were added by the Stipulation but were not included in the mediation are excluded from the Settlement Class as the Haines Objectors' believe they must be, then I believe the total claims will approximate the $1.3 billion that Securities LC was representing at the Mediation.  I believe that this would arguably cure most problems with the Settlement caused by the LC's lack of knowledge about their case and class.

**LC'S ACCUSATIONS THAT THE IMPORTANT ETHICAL,
CONSTITUTIONAL AND STATUTORY ISSUES RAISED IN THE HAINES
OBJECTIONS, ARE MERELY AN ATTEMPT BY PROFESSIONAL
OBJECTORS TO ELICIT BRIBES ARE DEMONSTRABLY FALSE**

**Representation Of The Haines Plaintiffs Was Proper**

45.   At LC-Reply-Fee-Decl.-¶38, LC insult the integrity of my clients by stating
that "Gresham decided to have his clients…" implying that they are merely pawns.  To
the contrary, I have kept my clients informed throughout this process and have over 100
e-mail communications with them to prove it along with telephone and billing records
reflecting numerous oral communications.  Prior to filing, both clients were provided
with all of the objections and I had several telephone conversations in which I went over
each and every objection with them and answered each and every question.

46.   Should this court have <u>any doubt whatsoever</u> that my clients are fully
informed, I am happy to print and turn over all e-mails for this court's *in camera* review.

47.   With respect to the Haines Plaintiffs' attorney fee objections, which seem to
cause LC so much angst, my clients determined a range of acceptable percentages months
ago.  The process began on September 22, 2010 with an initial discussion, on October 13,
2010 and October 14, 2010 both clients were sent e-mails on the topic of attorneys' fees.
After answering factual questions and further discussion, both plaintiffs gave me the
range of acceptable fees on October 15, 2010.  LC's fee petition filed 5/5/11 vastly
exceeded the range of acceptable fees provided to me by my clients thus resulting in the
Fee Objection, which before it was filed was discussed, provided to my clients, gone over
with both of them and all questions were answered before the Fee Objection was filed.

48.  Should the court desire to see the written communications *in camera* or desire client affidavits be submitted *in camera*, such will be made available that can prove to this Court's satisfaction the integrity of decision making process.

**The Haines Objectors' Objections Were Principled And Properly Made**

49.  LC repeatedly label many of the Haines Objections, frivolous, baseless, or some other pejorative term; however, rarely do they back up their rhetoric with evidence. For example, at LC-Reply-Fee-Decl.-¶29 they accuse me of making "baseless arguments"; however, they cite to a 37 page transcript without specifying where there is any evidence that anything was baseless.  Moreover, this Court's contemporaneous comments directly refute LC's declaration because this Court clearly stated that the arguments (though not persuasive) made sense and were not unprofessional:

> "So I have great respect for what I've heard from plaintiffs' counsel in Haines and Kretchmar.  You've made a lot of sense."  9/24/2009 Trans.-25:2-4

> "No lawyer here is unprofessional.  I haven't heard anything unprofessional." 9/24/2009 Trans.-26:4-5.

In their ¶29 LC have attempted to misrepresent the record through vague citations to a lengthy transcript in which nothing supports their accusation.

50.  LC-Reply-Fee-Decl.-¶26.  LC accuse me of making "ad hominem" accusations in connection with pointing out their failure to comply with the PSLRA; however, every "accusation" is supported by record evidence.  LC do not point to any instance where any accusation was not supported by record evidence.  They do not refute the record evidence.  I stand by the accusations that TBG (a) violated the PSLRA, (b) overstated their financial interest, and (b) made misrepresentations to the Court.  LC's produces no proof or refutation of any of the record evidence.

51.  LC go back to the inception of my involvement with the case to criticize the decision to file in Massachusetts as one solely motivated by "an attempt to preserve a leadership position for himself…"  LC state "[I]n an attempt to preserve a leadership position for himself, Gresham purposefully filed the Haines Action in Massachusetts after lead plaintiff applications had been made in this court."  LC-Reply-Settlement-p.5-fn.-10.

52.  If the sole goal was to "preserve a leadership position" there was no need to go all the way to Massachusetts to do so.  There is a federal court in Atlanta, Georgia.  I believe that by insisting that all securities case consolidated in the SDNY, Securities LC destroyed much of the potential value of the case because of the differences in the Section 20(a) culpable participation requirement between the First and Second Circuits.

53.  LC also criticize my exit from the case.  Here LC claim "Gresham, apparently not happy with his limited role, ceased working with Securities Class Counsel and now objects."  LC-Reply-Fee-Memo.-p.3.

54.  Securities LC know this is wrong.  After I notified both this Court and Mediator Phillips of the issues concerning Wolf's simultaneous representation and conflicts of interests, Securities LC refused to provide me or my clients any information about the case.  This is reflected in an email of 8/10/2010 from Securities LC.  Securities LC's representation to the contrary is knowingly false.

55.  This Court was informed of this fact on 9-13-2010, but did nothing about it: "[I]n retribution for coming to you with these issues, my clients have been cut off of all information about the settlement.  We don't know what's occurring now; lead counsel decided to cut us off of all information.  So as we might have been able to protect ourselves somewhat earlier, that act has been lost."  Trans.9-13-10, p.14:15-20.

56. I believe that not only did my clients lose protection when Securities LC cut us out of the case, but all other investors did as well.

57. LC's claim that I voluntarily quit trying to assist and protect this Class is absolutely false. They knew it was false at the time they said it.

58. Finally, in connection with these objections, LC also suggest impropriety by my preserving the long-standing issues concerning the PSLRA violations and Wolf's improper simultaneous negotiation through raising them in the Haines Objections. LC incorrectly state that the Court has previously addressed and ruled adversely on these issues. For example, LC state that "After hearing argument, the Court, rejecting Gresham's arguments, denied the objections to consolidation **as well as the other applications made by the Haines Objectors.**" LC-Reply-Fee-Decl.-¶30. (emphasis added) LC's support for this is a citation to the 9-26-2009 Trans. 26:8-10--" So that's where I leave it. I think the issues that were supposed to be dealt with today, those are my rulings."

59. I do not believe LC correctly characterize this Court's actions because the record is clear that the only "rulings" issued were granting consolidation. As the Court clearly stated at the opening of the hearing the issue was consolidation. "THE COURT: I think that the main issue here is to deal with the question of whether the two new cases transferred to me should be consolidated." Id. 3:3-5. No other issue was addressed. Thus, LC are incorrect in stating that the other applications were "denied." They were not "denied," they were not even mentioned. The Order referenced at LC-Reply-Fee-Decl.-¶31 only addresses consolidation issues, nothing else.

60.   Moreover, although the transcript does not reflect that the Court read the non-consolidation filings, the Court's comments at the hearing regarding protecting of rights could also support the belief that although the Court didn't specifically address the issues, nor issue any specific ruling, it appears to me that the Court took steps to try to fix the problem by "jawboning" so as to make clear to Securities LC that this Court was aware of the importance of representational issues and LC needed to be open and inclusive of the Haines Plaintiffs:

> **"[W]hen I say that there's to be a consolidation, it doesn't mean that the lead counsel can just kiss the other plaintiffs' counsel goodbye and say, we won't pay any attention to you."** Trans. at 25/20-5.

> **"[A]ll the plaintiffs have their rights, and if their rights are not being properly handled, then I would expect to hear about that.  And I would not expect counsel for the Haines plaintiffs… to simply go to sleep because of a consolidation order."**  Trans. at 25/8-12.

> **"If the lead counsel is unwilling to brief fairly and adequately the noncommon issues, I'm going to get an objection to the conduct of the lead counsel…** The counsel for clients here are not going to go to sleep.  There still are lawyers with clients, and the **lead counsel does not literally represent all the plaintiffs** and all the plaintiff clients… **Their job is to assist the litigants and the Court in a kind of coordination…"**  Trans. at 24/11-25.

For awhile I think the Court's words did ameliorate the representational problem, at least through the 3/18/2010 Settlement.

**LC's Accusations That I Am A Professional Objector More Interested In Eliciting Bribes Than Resolving Class Member Concerns Is Demonstrably False**

61.   In their Fee Reply, LC label me as a "professional objector" based on a career total of <u>one</u> objection to attorneys' fees.  This occurred in the *Nuanes v. Insignia* case referenced in their fn.11.  In *Nuanes*, a New York class action firm proposed to settle the

case on terms that were unfavorable to the clients and class.  On behalf of numerous

clients, I wrote them a lengthy letter that described many problems with the settlement.

     62.  Those New York class action counsel elected to ignore the issues I raised.

However, the clients agreed with me and told New York class counsel not to settle.  New

York class counsel ignored them also.  In fact, as I recall a decade later, what New York

counsel did was claim to be going out of town on a discovery trip, and instead they

actually went to California to obtain preliminary approval of the settlement I and the

clients said not to enter into, with a completely new and different group clients.

     63.  LC here are correct in that in *Nuanes* I sought to stop those New York class

counsel and prevent the payment of fees to them.  The New York class action firm in

*Nuanes* was disqualified for lying to the court, lying to the class and lying to their clients.

They got no fees.

     64.  Although documentary evidence exists to prove the above, it is in files that

are not accessible on such short notice.  The closest to documentary evidence is from one

of the many ancillary appeals included the following:

> Following an ex parte hearing scheduled by Friedman, the court preliminarily
> approved the settlement. Plaintiffs objected to the settlement, characterized it as
> unauthorized, asked that **the court vacate its preliminary approval order, and
> moved to disqualify** Friedman and Glancy as class counsel. Although plaintiffs
> asserted a plethora of other reasons to discharge Friedman and Glancy, they also
> contended that Stanger had previously done work for AIMCO, creating a potential
> conflict of interest.
>
> **On June 27, 2000, the trial court issued an order discharging Friedman and
> Glancy. Most of the court's order focused on the attorneys' behavior in
> connection with the proposed settlement.**  \*\*\*  The only conclusion that seems
> reasonable to infer is that in fact Stanger and Company was not an 'Independent
> Appraiser' as stated by Mr. Friedman and Mr. Glancy.  Stanger and Company had
> a **conflict of interest as told to Mr. Friedman by [plaintiffs' attorney] Mr.
> Gresham.**"

(emphasis added) *Nuanes v. Insignia Fin. Group, Inc.*, No A115340, 2002 WL 1767615 (Cal.Ct.App. July 31, 2002)(unpublished).

65.  I didn't believe counsel deserve fees when they lie to the court, class or clients 10 years ago in *Nuanes* when I filed the first attorney fee objection on behalf of clients.  I still don't believe it today as I file my second fee objection on behalf of clients.

66.  LC's attempt to label me a "professional objector" is unfounded and unfair. Professional objectors are those "who seek out class actions to simply extract a fee by lodging generic, unhelpful protests."  *Shaw v. Toshiba Corp.*, 91 F.Supp.2d 942, 973 (E.D.Tex. 2000)(the opinion also describes "beneficial objectors"). It has been used by a Supreme Court opinion. *Devlin v. Scardelletti*, 536 U.S. 1, 21-22 n.5 (2002) (Justices Scalia, Kennedy and Thomas, dissenting). It has been used extensively as an derogatory term in the legal and daily press.  In short, a professional objector is a type of extortionist.

67.  In connection with *Nuanes*, after I raised problems with the proposed settlement and made clear I and the clients intended to oppose it, the soon to be disqualified New York class action counsel informed me that <u>if</u> the settlement went through I would make a million dollars.  I did not accept the offer but instead the California court was informed of it.

68. Later, when appealing another issue in the *Nuanes* case, I and my client were offered a very significant sum of money to drop our appeal seeking class-wide relief in exchange for payments made to just us.  As I recall, our quick one word response was merely written on their offer, the one word was "rejected."

69.  The appeal continued, and as LC chortle about in their most recent filings, my client and I ultimately lost our appeal--but not our honor by selling out the class we were fighting for.

70.  To further assuage any concerns that this Court may have that I and the Haines Plaintiffs are extortionist, my clients and I have all agreed that none of us will personally accept any monies to drop the objection, or to drop the appeal of this Court's approval of any of the issues we object to.  Thus, this Court, LC and the Second Circuit can all rest assured that no bribes will be accepted and the only resolution of our appeal will be an appellate decision of affirmance or reversal.  If this Court would like this covenant in the form of a written contract, or pleading to be filed we are happy to do so.

I declare under penalty of perjury, under the laws of the United States, that the foregoing information is true and correct.  Executed in Atlanta, Georgia on May 31, 2011.

/s/

_____

Vincent T. Gresham