UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TREMONT SECURITIES LAW, STATE LAW AND INSURANCE LITIGATION | MDL Docket No: 09-md-02052 (TPG)<br>Master Docket No: 08 Civ. 11117 (TPG) |
| This Document Relates to:<br>All Actions: 08 Civ. 11117 (TPG)<br>09-md-02052 (TPG) | |

**THE HAINES PLAINTIFFS' SUPPLEMENTAL OBJECTIONS
PERTAINING TO THE 7/25/2011 SETTLEMENT OF THE MADOFF-
TRUSTEE'S CLAIMS AGAINST THE TREMONT DEFENDANTS**

1

# TABLE OF CONTENTS

| | |
|---|---:|
| I. INTRODUCTION | 1 |
| II. FACTS | 2 |
| III. ARGUMENT | 3 |
| A. The Trustee-Settlement Again Demonstrates That The Class Notices Were Inaccurate And Misleading | 3 |
| B. The Unknowns About The Negotiation Of The Trustee-Settlement Raise Even More Concern About The Ambiguous Release | 5 |
| C. LC's Continued Insistence On Secrecy And Refusal To Provide Class Members With Material Information Continues To Harm Class Members And Prevents Objectors From Effectively Exercising Their Due Process Rights | 8 |
| D. LC's Fee Desires Should Not Be Allowed To Delay The Investors' Receipt Of Substantial Monies From The Trustee-Settlement | 14 |
| CONCLUSION | 15 |

## I.  INTRODUCTION

Shortly after Lead Counsel ("LC") sent a supplemental notice to the Class, the Tremont Defendants entered into a multi-billion dollar settlement with the Madoff-Trustee (the "Trustee-Settlement").  Under the terms of the Trustee-Settlement, some but not all Settling Funds (and the investors in them) have the potential to receive money from the Madoff-Trustee.

Despite the significant impact of the Trustee-Settlement on the Settling Funds, their investors, Class Members, and the issues raised in the approval process for this Settlement, LC provided no information to the Court or Class about the impact of the Trustee-Settlement.  Class Members are left to puzzle through the settlement agreement[1] and figure out for themselves how the Trustee-Settlement impacts them.

This Supplemental Objection addresses some of the material questions that the Trustee-Settlement raises regarding: (1) whether the notices[2] of settlement sent to investors and Class Members were materially inaccurate and misleading, (2) whether the release in this Settlement drafted by LC contains ambiguities regarding its application to the Tremont Defendants' conduct in negotiating and funding the Trustee Settlement, (3) whether LC's continued insistence on secrecy is preventing Class Members from understanding the impact of the Tremont-Settlement specifically and is generally violating their due process rights, and (4) whether LC should be allowed to put prompt payment of the Madoff-Trustee monies at risk of delay by tying such payments to the fate of this problem-riddled Settlement.

---

[1] The settlement agreement is attached as <u>Exhibit A</u> to the Second Supplemental Declaration of Vincent T. Gresham ("VTG Decl.") filed herewith.

[2] A class notice was originally sent out to Class Members and investors in April, it was republished in July.  Collectively these notices are referred to as the "Notices."

## II.  FACTS

The Trustee-Settlement was not announced until July 28, 2011.  This was one week after the July 21, 2011 deadline for objections.  Consequently, Class Members and investors were forced to made a decision about whether to opt-out, object or acquiesce without material information – namely, that some Settling Funds (and their investors) would recover monies through the efforts of the Madoff-Trustee while other Settling Funds (and their investors) would get nothing.

Essentially, the Trustee-Settlement requires the immediate payment of $1 billion to the Madoff-Trustee and in turn allows four (4) of the Settling Funds to make "allowed claims" amounting to approximately $3 billion. (VTG-Decl. Ex.-A, ¶2 & ¶5.)  However, much is unknown.  For example, although the Trustee-Settlement calls for the payment of $1 billion from the Tremont Defendants.  LC have not informed the Court or Class where this money is coming from.  The Haines Plaintiffs have already expressed the concern that some of it might be taken from the Settling Funds.[3]

The Trustee-Settlement raises issues about whether this Settlement currently under consideration by this Court still fair, adequate and reasonable?  Notably LC have not shown that they obtain in confirmatory discovery of their *$100 million* settlement <u>all</u> of the information that the Tremont Defendants provided to the Madoff-Trustee successfully used in negotiating his *$1 billion* payment from the same Tremont Defendants.  Moreover, is any of this $1 billion payment coming from the Corporate Tremont Defendants who, according to LC, are paying "tens of millions" into this Settlement?  LC have told the Class and Court nothing.

---

[3] See §I of the Haines Plaintiffs' Objection to Certain Aspects Of The Settlement (VTG-Decl. Ex.-B) submitted to the Court previously.  For the Court's convenience the previous objections that are referenced herein are attached to the VTG-Decl. filed herewith.

### III.  ARGUMENT

**A.  The Trustee-Settlement Again Demonstrates That The Class Notices Were Inaccurate And Misleading**

As previously argued by the Haines Plaintiffs, the Notices LC drafted and sent to the Class and investors incorrectly treat all investors as a homogeneous group.  See, Objection to Notice, VTG-Decl. Ex.-C.  The Trustee-Settlement conclusively proves that there are *highly material* differences between investors in the four (4) Rye Settling Funds that will receive Madoff-Trustee monies[4] and the four (4) Rye Settling Funds that will not receive any payment from the Trustee, a fact that should have been in the Notices.

Instead, both of LC's Notices blandish the false hope of large Madoff-Trustee payments to <u>all investors in all Settling Funds.</u>  The Trustee-Settlement makes clear that because some of the Rye Funds were net-winners (see, e.g., Rye Prime) or had no direct relationship with Madoff (see, e.g., Rye XL); half of the Rye Settling Funds (and those investors in them) will receive <u>nothing</u> from the Trustee Settlement.  As for the investors in the eight (8) Tremont Settling Funds, like the Haines Plaintiffs, the amount they will receive (if any) will be based on their Tremont Fund's investments in the Rye Funds.[5]  The Notices fail to provide sufficient information to enable any Tremont Fund investor to determine whether they will receive any of the Trustee-Settlement monies or how much.

In short, the Notices sent out by LC actively mislead many of their recipient investors into believing that they too will share in Madoff Trustee recoveries when for

---

[4] Rye Broad Market, Rye Portfolio Limited, Rye Insurance and Rye Insurance Portfolio are the only Settling Funds permitted "Allowed Claims" as part of the Trustee-Settlement.  See, VTG-Decl. Ex.-A ¶5.

[5] Thus, for example, if a particular Tremont Fund was invested in Rye Broad, then they would be expected to recover some unknown amount; however, if that Tremont Fund invested in Rye Prime it would get nothing.  Those Tremont Funds, like the Tremont Market Neutral Funds that the Haines Plaintiffs are invested in, which are invested in both Rye Broad and Rye Prime will recover on one investment but not another.

many, there is no possibility of that occurring.  *Class notice cannot be adequate where it makes broad positive statements that are flatly incorrect with respect to a known subgroup of recipients.*  LC should never have sent the first false-hope notice; however, LC sent it out twice.  The second time was in July, 2011 -- a time that LC knew of the falsity of the statements in the first notice (the Haines Plaintiffs had already advised them of defects, see VTG-Decl. Ex.-C), yet LC knowingly sent out false and misleading information to investors and Class Members.[6]

In addition, LC's Notices also misleadingly imply that money from the Trustee-Settlement is somehow tied to the approval of this Settlement.  The fact that the Trustee-Settlement exists prior to the approval of this Settlement demonstrate that the Madoff-Trustee monies are *unrelated* to this Settlement.  The Notice continues to mislead investors by incorrectly tying the two unrelated settlements together, and by suggesting that LC was due credit (and fees) for any recovery from the Madoff Trustee.  When talking of the successful efforts of the Madoff-Trustee, the Notice states:

> Published reports have suggested that the Madoff Trustee has collected nearly half of the principal that investors lost in the fraud….  While the actual amount available in the Fund Distribution Account will depend on a number of unresolved factors and may vary significantly from the Madoff Trustee Proceedings, **we note that the Settlement Fund will enhance the amount recovered under the Settlement in the Fund Distribution account,** making it possible that the combined **recovery for class members covered under this Settlement** could be substantial.  For example, in certain circumstances, a class member could receive a combined recovery in excess of 55% of his or her loss.

(emphasis added, notice at Dkt. #554 page 7 of 20.)  However, monies paid by the Madoff Trustee are not "recovered under the Settlement" at issue here and any payments of such Madoff-Trustee monies are not payable to just "class members covered under this

---

[6] This raises serious issues as to the adequacy of LC.  Why didn't they disclose this information to the Court when seeking the Court's permission to republish the Notice?

4

Settlement." In fact, the payment of Trustee-Settlement monies bear absolutely <u>no relationship</u> to class membership or the approval or rejection of this Settlement. Class Members need to be told unequivocally that they can reject the Settlement and still enjoy all of the benefits of the Madoff-Trustee's efforts, <u>without</u> LC's 3% fee from the monies generated by the Madoff-Trustee.

*The Notices LC created and used in this Settlement are all inadequate because none of them ever tell investors the simple truth that monies due to the efforts of the Madoff-Trustee will be paid whether or not this Settlement is approved.*

**B. The Unknowns About The Negotiation Of The Trustee-Settlement Raise Even More Concern About The Ambiguous Release**

The Haines Plaintiffs previously pointed out ambiguities in the Settlement's release: "At best, the release in this Settlement is ambiguous; at worse, it could inadvertently release hundreds of millions of additional claims unrelated to those in the Actions for no consideration, causing further harm to both the Funds and Class." (VTG-Decl. Ex.-B at §I)

The Trustee-Settlement highlights this concern, because despite its billion-dollar impact, nothing known about the negotiation process for the Trustee-Settlement. Where did $1 billion paid to the Madoff-Trustee come from? Did the Tremont Defendants use any of the Settling Funds' money to "buy" a release for themselves? Are the four Rye Funds that got <u>nothing</u> in the Trustee-Settlement paying part of the $1 billion?

5

Did the Tremont Defendants shift Trustee-Settlement monies to favored funds or subgroups?[7] Because little known about the negotiation and funding of the Trustee-Settlement, it is important that nothing is released by this Settlement's vague and overbroad release.

Finally, the Trustee-Settlement might well expose the Tremont Defendants to other claims relating, not to their investments in Madoff or conduct prior to 12/11/2008, but in their conduct <u>after</u> discovery of Madoff's Ponzi on 12/11/2008. For example, under the Trustee-Settlement, investors in Rye Prime Fund will get <u>nothing</u> from the Madoff-Trustee, not because of anything relating to them but rather because their fund is a "net winner." How does a fund become a net winner? It becomes a net winner because prior to Madoff's unmasking other investors left the fund taking with them not only their investments but also millions of dollars in fictitious Ponzi profits as well. Thus, because of the overcompensation of departed investors, current investors are left holding the (empty) bag. This seems unfair.[8]

---

[7] For example, the fund that got the largest share of the allocation under the Trustee-Settlement is the one fund in which the Swap-Counterparties made all of their $2 billion investment. (See, Dkt #482 ex 10-11). Notably, in between the Tremont Defendants' very favorable allocations and LC's release of them from the Rye XL Fund's $450 million in claims, the four (4) large Swap-Counterparties are doing atypically well in this secretive settlement process. The Haines Plaintiffs have questions about the process whereby the Tremont Defendants negotiated a Trustee-Settlement pursuant to which the Tremont Defendants' business partners-- the Swap-Counterparties-- will receive a disproportionately large share of the Madoff-Trustee money. Have the Swap-Counterparties threatened litigation against any of the Tremont Defendants, other than the previously disclosed collateral claims? Are their ongoing business relationships between the two groups or any of their members? (Finally, no mention of the Swap-Counterparties would be complete without correcting an error made in the Haines Plaintiffs Supplemental Objections (Dkt#559) where the economic value of the Swap-Counterparties' objections was repeatedly, but incorrectly, referred to as $80 million when the actual number was $70 million. Counsel for the Haines Plaintiffs apologize to all for his error.)

[8] See VTG-Decl. Ex-A p.4 ¶H for Trustee's calculations. Who were these withdrawing partners that caused the Rye Prime Fund (and perhaps others) to become net winners? Were any of these withdrawing partners affiliated with Tremont? Neither the Court not Class knows.

The Tremont Defendants have been aware of this problem for months, if not years, but they never took any action to recover the fictitious Ponzi profits from departed investors. In light of the recent Trustee-Settlement in which many investors in several funds receive <u>nothing</u>, was the Tremont Defendants' failure a breach of fiduciary duty? The Haines Plaintiffs don't have sufficient information to answer the question, but to raise it to further illustrate why the release language in this Settlement must by crystal clear, and not left ambiguous and overbroad as Defendants (understandably) and LC (inexplicably) desire.

The release is one long, ambiguous run-on sentence that includes among other things in its definition of "Released Claims" the following: **"any and all direct, indirect and/or derivative claims…. [that] have been asserted in the Actions….. or that relate to the management or administration of the Settling Funds…."** The latter phrase might well be read to release claims relating to the Settling-Defendants' post 12/11/2008 conduct in connection with, among other things, the Trustee Settlement.

Although in pleadings LC claim that the Release is limited (Dkt.520, fn.26), the Tremont Defendants have remained loudly silent on the scope of the release. Moreover, LC's own declaration states:

> The release (in the proof of claim) provides in more detail, what the Notice stated namely, that any and all claims or causes of action that 'arise out of, or are based upon, or relate to, the allegations… set forth… in the Complaints filed in the Actions, or that relate to the management or administration of the Settling Funds[…]' are released by the Settlement." (Dkt.#521, ¶57)

Based on LC's own explanation the Tremont Defendants could easily argue that their conduct in negotiating and entering the Trustee-Settlement on behalf of the Settling

7

Funds related to the "management or administration of the Settling Funds" thus releasing them from any conduct in connection with the Trustee-Settlement.

Given the ambiguity of the release language, the lack of information about the Trustee Settlement and the high stakes involved, at minimum LC must obtain a binding statement from the Tremont Defendants confirming that the release <u>only</u> extends to those Madoff related claims in the complaints and does <u>not</u> cover post 12/11/2008 "claims relating to the management and administration of the Settling Funds" such as claims arising if the Tremont Defendants engaged in any wrongdoing with respect to the Trustee-Settlement. Until this is done, the Settlement should not be approved.

**C. LC's Continued Insistence On Secrecy And Refusal To Provide Class Members With Material Information Continues To Harm Class Members And Prevents Objectors From Effectively Exercising Their Due Process Rights**

The notice problems addressed in §III.A. above are exacerbated by LC's excessive secrecy and refusal to provide Class Members, investors and objectors (and the Court for that matter) with information necessary for any of them to understand the Settlement and its various impacts. For example, even investors in the "lucky four"[9] Rye Settling Funds that do receive monies from the Trustee-Settlement still have no way to even estimate the percentage or amount of their recoveries. Moreover, because the Notices incorrectly describe the allocation method (see, VTG-Decl. Ex.-B §I.B), investors may not realize that *the manner in which LC decided to allocate the monies from the Trustee-Settlement allows <u>some</u> investors to recover large amounts of fictitious Ponzi profits, before <u>all</u> investors have fully recovered their actual out-of-pocket losses.*

---

[9]Make no mistake about it, it is just luck. As discussed in §III.B, investors in Prime Fund will get nothing from the Madoff-Trustee, not because of anything relating to them but rather because of the actions of other investors withdrawing from the fund prior to Madoff's unmasking.

8

Under LC's allocation plan the "lucky four" Funds are *collecting* monies from the Trustee-Settlement on the net equity basis (i.e., investment amount less withdrawals), but are *distributing* money based on the account statement basis (i.e., investment amount plus fictitious Ponzi profits). The difference between the two amounts is stark. For example, Securities Lead Plaintiff Brainson only invested **$1,725,000;** however, his 2008 client account statement reflected the sum of **$2,828,401**. (VTG-Decl. Ex.-D) Apparently then, fictitious Ponzi profits inflated Lead Plaintiff Brainson's account statement by $1.1 million, or 64% over his actual losses.

In response to the first class Notice, on May 9, 2011, the Haines Plaintiffs requested that LC provide the relevant aggregate account statement information for all funds so that they could calculate the impact of this allocation method on themselves and their respective Settling Funds. However LC refused to provide any information and even went so far as to refuse to answer the Haines Plaintiffs' questions regarding the Settlement citing this Court's 5/5/2011 Order.[10] (VTG-Decl. Ex.-E) LC's refusal to provide the requested information prevented the Haines Plaintiffs from being able to determine the impact of LC's allocation method or the Trustee-Settlement on them.

Due to lack of information, neither the Haines Plaintiffs nor any other of the Class Members or investors can estimate their percentage recoveries nor determine the impact of LC's allocation method. Looking at their own account statement balances is insufficient because whether a particular investor is benefited or harmed by an allocation method that allows recovery of fictitious Ponzi profits depends on the relationship

---

[10]The Court never issued a written order reflecting the 5/5/2011 hearing, thus leaving LC free to make up their own interpretation which is that Class Members are not entitled to information by order of this Court. (VTG-Decl. Ex.-E) If this was *not* this Court's intent, then this Court needs to act to cause LC to provide Class Members with information and answer Class Member questions relating to the Settlement.

9

between their relative share of Ponzi profits versus that of all other investors in their fund. To determine this, investors need to know not only their own December, 2008 statement, but also the aggregate amount of <u>all</u> December, 2008 account statements for their Fund.[11]

In the Rye Funds, long term investors (who like Brainson can, under this allocation method, lay claim to large amounts of fictitious Ponzi profits) will benefit at the expense of more recent investors (whose Ponzi profits are de minimis); however, LC's refusal to provide the basic information needed to calculate these allocation recoveries prevents investors from being able to make knowledgeable decisions about whether this allocation method benefits them or not. As can be seen the Brainson example, the allocation method LC selected (a) reflects a bias for older common law claims at the expense of the more recent securities claims,[12] and (b) allows recoveries of large amounts of fictitious Ponzi profits for <u>some</u> investors (like Lead Plaintiff Brainson) before <u>all</u> investors recover their out-of-pocket losses.

As with so many of LC's decisions, their decision to use this allocation method will benefit some Class Members while harming other Class Members. The problems raised here relate not only the conflicts and inadequacies of representation of which this Court has long been aware[13] but also to the fact that LC—citing this Court's 5/5/2011

---

[11] Tremont Fund investors like the Haines Plaintiffs are doubly disadvantaged because they cannot determine whether the allocation methodology benefits them or not without the December, 2008 information for not only their own Tremont Fund but also any Rye Fund in which their Tremont Fund is invested. (Although LC's allocation method is tied to the December 2008 account statements the relevant account statements might be the ones for November.)

[12] The impact of the bias of the Securities Lead Plaintiffs for old common law claims and why they are not adequate representatives for securities claims held by more recent investors (like the Haines Plaintiffs) is extensively addressed in the Haines Plaintiffs' Objections to Certification. (VTG-Decl. Ex.-F)

[13] The fallacy of LC's continued insistence that they and their representatives as a cohesive group can represent all diverse and divergent subgroups of Class Members without taking steps to subclass the sprawling 14-year, 12 different fund Settlement Class or otherwise provide for adequate independent representation was first exposed by the Haines Plaintiffs over a

order--have refused to provide information necessary for Objectors and Class Members to determine whether they are benefited or harmed by LC's choice of allocation methods. LC's secretive withholding of information prevents all investors and Class Members from being able to protect themselves by making knowledgeable opt-out, object, or acquiesce decisions[14] and from being able to exercise their due process rights to effectively and knowledgeably participate in the final approval process.

Although vital, the withholding of information required for investors to evaluate the allocation method and calculate what they might receive from the Trustee-Settlement is not the only information LC have kept from Class Members and objectors. In just the short time after the initial filing of the objections of 5/11/2011, objectors' and Class Members' due process rights were thwarted by at least two no-notice hearings at which various LC communicated with the Court. LC scheduled both hearings with the Court without any prior notice to Class Members or objectors.

At the first no-notice hearing of 5/27/2011, it appears that important decisions were made regarding the viability of the claims against the auditors. Knowing about these decisions would have provided important information for Class Members about the viability of both (a) the auditor claims currently asserted by the Class and Settling Funds,

---

year ago in their July 31, 2010 submission to this Court (VTG-Decl. Ex.-G) and has been vigorously asserted in the context of the final approval process by not only the Haines Plaintiffs but other objectors as well.

[14]The withheld information allowing investors to approximate their share of the monies from the Trustee-Settlement might change a Class Member's or investor's opt-out, object or acquiesce decision for a variety of reasons. For example, those who opted out in the face of the Settlement's 5.7% recovery might decide their own lawsuit isn't worth it if they can calculate to their satisfaction "enough" additional recovery from the Trustee-Settlement. Those who remained Class Members just to assure themselves of some recovery might now chose to opt-out electing to roll the dice with their own lawsuit. Others may object to the Settlement reasoning that if there is information that enabled the Madoff-Trustee to obtain $1 billion, LC should press for more than just $100 million. However, LC have prevented all Class Members from making any such decisions knowledgably by keeping information from them.

11

and (b) the to-be assigned auditor claims that is additional Settlement consideration referenced in the Notices, see, Dkt#554 at 7 of 20.

The second no-notice hearing of 5/31/2011 demonstrates why such conduct during the settlement approval process particularly harms objectors by depriving them of relevant information that would enable them to craft persuasive arguments to this Court or to avoid being blindsided at final approval hearings.  At the final approval hearing on June 1, 2011, a significant part of the final approval hearing was devoted to issues that had apparently been discussed the day before in a no-notice "conference" with the Court and one of Insurance LC.  (See 5/31 docket minute entry)[15]  As with the prior no-notice hearing regarding the auditors, there was neither prior notice of this conference provided to the Class, nor even objectors who had entered appearances.

The topic was a matter of significant importance to all objectors—whether or not the Class would be expanded.  This issue was of vital importance to the Haines Plaintiffs who had weeks before submitted an objection *on the very topic* of Settlement dilution, see VTG-Decl.-B, §III.  In their Objection, the Haines Plaintiffs had strenuously argued that after the $100 million settlement fund was fixed, allowing new investors into the Class, without a corresponding expansion of the $100 million settlement fund, would dilute the value of the Settlement to existing Class Members.[16]  However, despite their objection on this exact point, the Haines Plaintiffs were not given any notice of the conference at which the issue they were objecting about was discussed.  Nothing

---

[15] "I had a conference yesterday.  Two people by the name of Fishman were there." 6/1/2011 Trans. 13:12-13.  See, discussion of issues at 6/1/2011 Trans. pp. 14-46.

[16] More specifically, the Haines Plaintiffs argued against LC's simultaneous negotiation of both a clear sailing agreement for their own fees at the same time they allowed the Defendants to dilute the value of the Settlement to the Haines Plaintiffs by allowing investors in 12 new funds to share in the fixed $100 million settlement fund. (VTG-Decl. Ex-B §III).

12

appeared on the docket about this conference until days after the 6/1/2011 hearing, of course, by then it was too late. The first time counsel for the Haines Plaintiffs heard of this conference was at the final approval hearing itself, <u>after</u> the Court had already developed strong ideas about the desirability of allowing more investors to become Class Members. See, 6/1/2011 Trans. 15:10-20.

LC's practice of scheduling hearings and conferences with the Court—without notice and without disclosure—give LC improper advantages in arguing against objectors and create an appearance of unfairness. Moreover, according to the Southern District Court Reporters, there is no transcript available of the 5/31/2011 conference, see VTG Decl at ¶2. Thus, what the conference participants told the Court is not part of the record and thus cannot be reviewed by objectors, Class Members, or the Second Circuit in the event of an appeal. Similarly beyond review are LC's letters to the Court which they refuse to file on the publicly accessible ECF system and which they continue to refuse to divulge in the face of specific requests for them[17] but which continue to be an important part of the Court's decision making process as indicated by references to them in various transcripts of hearings. (See, references to letters not on the ECF system at 3/28/2011 Trans 10:6-11 and 5/27/2011 Trans. at 39:16-20. Contrary to LC's practices and arguments, secrets have no place in representative actions such as this class and derivative action. *LC's insistence on secrecy and concealment have resulted in a settlement approval process that lacks the basic integrity that only transparency can provide.* Furthermore, there should be no secret communications between LC and this Court, oral or written, and all future hearings need to be noticed.

---

[17] See, VTG-Decl. Ex.-E ("Please provide all communications to or from the court that are not in the ECF system, which would include all orders, letters, e-mails or writings reflecting oral communications.") The request was refused based on this Court's alleged 5/5/2011 order.

13

**D.  LC's Fee Desires Should Not Be Allowed To Delay The Investors' Receipt Of Substantial Monies From The Trustee-Settlement**

As the Settlement Agreement for the Trustee-Settlement makes clear, neither the Trustee-Settlement nor the Madoff-Trustee's payment of allowed claims under the Trustee-Settlement is in any way connected to this Settlement or LC's efforts.  The only reason LC have attempted to tie the two together is to support an unjustified and unearned fee consisting of 3% of the monies the Madoff-Trustee pays to the Settling Funds.

LC's 3% fee has been a common theme of many objectors and was a significant part of the Haines Plaintiffs' Objection to Attorney Fees and Expenses, see VTG-Decl. Ex-I §II.B.  However, the recent Trustee-Settlement underscores the importance of another issue which the delay in payment potentially caused by LC's attempt tie the investors' receipt of the Madoff-Trustee monies to this problem-riddled Settlement.  This problem was first exposed in the Haines Plaintiffs' Attorney Fee Objection:

> In fact, LC's attempt to create an undeserved fee for themselves harms the class beyond the 3%, because by including them in the Settlement, LC may delay their payment.  Nothing may be paid under the Settlement until both it and the POA are finalized, this may take years.  Thus, if the Funds and the Madoff Trustee settled tomorrow for $3 Billion, that money would sit gathering dust until this Settlement and POA are finalized.  If not for the Settlement, the $3 billion could be distributed to Fund partners immediately.  LC again harm, not help, their clients.

(VTG Decl. Ex.-I at p.10 fn.11)  Now that the Trustee-Settlement has been entered, this potential harm pointed out months ago has been realized.  It is likely that if the Settlement is approved, one or more of the objectors will appeal the approval.  Thus LC's effort to grab an underserved 3% fee by tying payments of the unrelated Madoff-Trustee monies to this Settlement threatens significant delay and harm.  There is no justification to tie payments of the Trustee-Settlement monies into this Settlement.

14

## CONCLUSION

The Trustee-Settlement exposes more problems with the Notices, the release, and the conduct of LC in tainting the approval process with secrecy and in so doing supports the Haines Plaintiffs' previous objections. Moreover, the existence of money-on-the-table from the Trustee-Settlement demonstrates exactly why LC cannot be allowed to tie the unrelated Madoff-Trustee monies to the Settlement just to support an unpersuasive argument for an underserved fee.

Respectfully submitted August 3, 2011,

/s/

Vincent T. Gresham

(pro hac 9/24/2010)
Law Office Of Vincent T. Gresham
2870 Peachtree Road, #306
Atlanta Georgia 30305
T.  (404) 281-2762
F.  (866) 618-3846
gresham05@comcast.net