**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re TREMONT SECURITIES LAW, STATE LAW AND INSURANCE LITIGATION | ) ) ) | Master Docket No. 1:08-11117 (TPG) |
| | ) | |
| CUMMINS INC., as the authorized representative of the Cummins Inc. Grantor Trust dated September 10, 2007, as amended, | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:10-9252 (TPG) |
| NEW YORK LIFE INSURANCE COMPANY, NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION, TREMONT CAPITAL MANAGEMENT, INC., RYE INVESTMENT MANAGEMENT, MASSMUTUAL HOLDING LLC, MASSACHUSETTS MUTUAL LIFE INSURANCE CO., OPPENHEIMER ACQUISITION CORP., RYE SELECT BROAD MARKET PRIME FUND L.P., RYE SELECT BROAD MARKET XL FUND L.P., RYE SELECT BROAD MARKET INSURANCE PORTFOLIO, LDC,  TREMONT OPPORTUNITY FUND III, L.P., TREMONT (BERMUDA) LTD.,TREMONT GROUP HOLDINGS, INC.,and TREMONT PARTNERS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ECF CASE

JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## AMENDED COMPLAINT

Plaintiff Cummins Inc., as the authorized representative of the Cummins Inc. Grantor

Trust dated September 10, 2007 ("Plaintiff"), by and through its undersigned counsel, brings this

action based upon personal knowledge as to itself and its own acts, and on information and belief

1

as to all other matters based on the investigation conducted by and through its undersigned counsel, which included the review of complaints filed by the United States Government and the Securities and Exchange Commission (the "SEC"), news reports published in the financial press, other state and Federal court lawsuits filed against these same defendants and other available information.

## SUMMARY OF ACTION

1.       Plaintiff files this action based upon its purchase of a series of variable universal life insurance ("VUL") policies from New York Life Insurance and Annuity Corporation ("New York Life").  By and through these VUL policies, Plaintiff invested in the Tremont Opportunity Fund III, and hereby sues to recover damages caused by Defendants' violations of the common law of New York.

2.       This case arises from the massive fraudulent scheme perpetrated by Bernard L. Madoff ("Madoff") through his investment firm, Bernard L. Madoff Investment Securities LLC ("BMIS"), and others, and which was facilitated by Defendants named herein.  These Defendants knowingly, recklessly or with gross negligence and/or in breach of contractual, common law and/or statutory duties, caused and permitted Plaintiff's VUL investment entrusted to them by Plaintiff to be funneled to a Ponzi scheme.

3.       On December 10, 2008, Madoff informed certain senior employees at BMIS that his investment advisory business was a fraud.  Madoff stated that he was "finished," that he had "absolutely nothing," that "It's all just one big lie," and that it was "basically, a giant Ponzi scheme." Madoff communicated to the senior employees that he had for years been paying returns to certain investors out of the principal received from other, different investors.  Madoff

stated that the business was insolvent, and that it had been for years.  Madoff also stated that he estimated the losses from this fraud to be approximately $50 billion.

4.     On December 11, 2008, the SEC charged Madoff and BMIS with securities fraud for a multi-billion dollar Ponzi scheme that Madoff and others perpetrated on investor clients of BMIS.  Also on December 11, 2008, Madoff and BMIS were criminally charged by the United States Attorney's Office for the Southern District of New York with securities fraud.  According to the SEC's complaint and the U.S. Attorney's criminal complaint, since at least 2005, Madoff and BMIS had been conducting a Ponzi scheme through the investment advisor services of BMIS.

5.     Madoff was unable to perpetrate this fraud on his own.  Numerous funds of funds ("FOFs"), investment advisors, and affiliates, including the Defendants, facilitated Madoff's fraud.  Although Madoff's now infamous "split-strike conversion strategy" purportedly yielded unparalleled investment returns, Madoff only charged trading commissions in return, which in turn allowed Defendants and other FOFs to charge investors exorbitant fees.  Blinded by the lure of easy money, Defendants and other FOFs, and related third parties, completely and utterly failed to investigate and monitor Madoff's activities.  Moreover, although Defendants' business dealings with Madoff and BMIS made them aware of numerous warning signals that would have given any reasonable investor serious concerns over Madoff's operations, Defendants concealed these "red flags" from Plaintiff.

6.     The warning signals that Madoff and BMIS were not legitimate operations included, among others things:

    A.  The lack of transparency into BMIS, including Madoff's refusal to disclose his investment strategy;

    B.  BMIS's returns were abnormally smooth with very little volatility, including only five months of negative returns in the past twelve years;

C.  The inability of other funds using a "split-strike conversion" strategy (which Madoff purportedly used) to generate returns even remotely comparable to those generated by Madoff;

D.  Madoff acted as his own prime broker, while most hedge funds use large banks such as Goldman Sachs and Morgan Stanley as their prime brokers;

E.  Unlike most hedge funds, which charge investment management fees based on the performance of the fund, BMIS only generated revenue through transaction-based commission fees;

F.  Monthly account statements sent to Madoff's investors did not support the returns they reported;

G.  In 1999, one of Madoff's competitors, Harry Markopolos, sent a detailed letter to the SEC claiming that "Madoff Securities is the world's largest Ponzi Scheme;"

H.  BMIS's auditor, Friegling & Horowitz, consisted of one office in Rockland County, New York, with three employees, one of whom was 78 years old and lived in Florida, and one of whom was a secretary;

I.  BMIS's comptroller was based in Bermuda, while most mainstream hedge funds have in-house comptrollers;

J.  BMIS did not use an independent custodian to hold its securities.

7.     Defendants' extensive and prolonged direct and/or indirect relationships with Madoff put them in a unique position to be aware of many—if not all—of these red flags.  Thus, by omitting or concealing these red flags, Defendants' representations concerning their investment products were materially false and misleading.

8.     Likewise, Defendants' representations regarding their oversight, thorough manager research, careful due diligence, risk allocation, and portfolio management were false and misleading because Defendants either conducted no oversight or due diligence whatsoever or their due diligence was so egregiously reckless that they failed to uncover the blatant warning signals.  For example, during multiple personal presentations made to Plaintiff by Tremont personnel in the spring and summer of 2007 ("2007 Meetings"), Tremont personnel stated that Tremont was regularly "audited by Oppenheimer," that Oppenheimer and Mass Mutual's control

over Tremont provided valuable "checks and balances," and that an "Oppenheimer Risk Group" oversees Tremont's selection of investment managers. Moreover, with respect to Madoff specifically, Tremont personnel informed Plaintiff that Tremont has access to all of Madoff's trades, allowing for "full transparency" into Madoff's activities so that Tremont could accurately "evaluate the risk" involved with entrusting any funds under its control to Madoff. New York Life was aware of Tremont's 2007 Meetings with Plaintiff and that Plaintiff was relying upon the information provided in the 2007 Meetings in choosing Tremont as the investment vehicle for its VUL policies issued by New York Life.

9.      Had any of the Defendants conducted a due diligence investigation of Madoff and BMIS, or had New York Life conducted a due diligence investigation of Tremont, and presented the results of those investigations to Plaintiff, Plaintiff would not have purchased Defendants' investment products.

10.     In addition, Defendants also misrepresented to Plaintiff the extent to which its assets would be allocated to any one Manager. For example, during the 2007 Meetings, Tremont personnel also informed Plaintiff that the Tremont Fund had a low "size to loss potential" and that less than 6% of the Fund's assets were assigned to any one Manager. The Private Placement Memorandum that New York Life provided to Plaintiff ("New York Life PPM") never disclosed the possibility that a large percentage of assets could be allocated to any one Manager.

11.     In contrast, when Cummins requested from New York Life a copy of the Tremont PPM in its file *subsequent* to the discovery of Madoff's Ponzi scheme in December 2008, New York Life sent to Cummins an "amended and restated" Tremont PPM, dated July 15, 2007, which alerted Cummins, for the first time, that it was "likely" that "up to thirty percent (30%) of its total Portfolio [would be] invested with a single Manager." Plaintiff is informed and believes

that New York Life received the "amended and restated" Tremont PPM shortly after it was issued by Tremont but failed to provide this important piece of new information to Plaintiff.

12.     The representations made to Plaintiff that no more than 6% of the Tremont Fund's assets would be assigned to any one Manager, and that Mass Mutual and Oppenheimer at all times maintained extensive oversight over Tremont, were material bases upon which Plaintiff invested in the Tremont Fund through New York Life.

13.     These representations, as set forth above, were false.  After the Madoff fraud was disclosed, New York Life revealed to Plaintiff by letter that, contrary to previous representations that no more than 6% of the Tremont Fund would be invested with any one manager, in fact, roughly 22% of the Tremont Fund assets had been assigned to Madoff.  Moreover, as described more fully below, New York Life, Oppenheimer and Mass Mutual either declined to conduct any of the due diligence and "checks and balances" promised to Plaintiff during the 2007 Meetings, or allowed Tremont to assign 22% of Tremont Fund assets to Madoff with reckless disregard for the truth that Madoff was a fraud.

14.     Shortly thereafter, on or about December 12, 2008, Tremont reported to its "clients" that it had a 14-year relationship with Madoff, and that Plaintiff, through its investments in Tremont, had exposure to BMIS through the Rye Select Broad Market Series.

15.     Defendants have acted fraudulently, recklessly, negligently, in breach of statutory, common law, and/or contractual duties owed to Plaintiff, and have caused and/or permitted Plaintiff to purchase improper and inappropriate investments that have significantly eroded the variable account component of its VUL Policy.

16.     Plaintiff seeks to recover damages caused by Defendants' common law fraud, negligent misrepresentation, unjust enrichment, breach of fiduciary duty, aiding and abetting the

breach of fiduciary duty, breach of contract, and breach of the implied covenant of good faith and fair dealing.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because the Plaintiff is a citizen of a different state from every Defendant and because the amount in controversy exceeds $75,000.  Plaintiff is informed and believes that the citizenship of any and all individual partners of those Defendants which are partnerships and the individual members of those defendants which are limited liability companies are diverse from that of the Plaintiff.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391. Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District. Venue is also proper pursuant to the Order of Consolidation entered March 26, 2009 in *In re Tremont Securities Law, State Law and Insurance Litigation*, Master File No.: 08 Civ. 11117 [Docket #44].

## PARTIES

**Cummins Inc.**

19.     Plaintiff Cummins Inc. is an Indiana corporation comprised of complementary business units that design, manufacture, distribute and service engines and related technologies, such as fuel systems, controls, air handling, filtration, emission solutions and electrical power generation systems.  Cummins is headquartered in Columbus, Indiana, and serves customers in approximately 190 countries and territories through an expansive network of company-owned and independent distributors and dealers.  The Cummins Inc. Grantor Trust dated September 10, 2007 ("the Trust"), and amended thereafter, was created and funded by Cummins Inc. to hold

assets that could be used as a source for funding benefits payable under multiple non-qualified retirement and deferred compensation plans created for the benefit of Cummins' employees and their beneficiaries worldwide.  Wells Fargo Bank, N.A. ("Wells Fargo") is the successor in interest to Wachovia Bank, N.A., as Trustee of the Trust.  Well Fargo has authorized Cummins Inc. to prosecute these claims on behalf of the Trust.

**New York Life**

20.     Defendants New York Life Insurance Company and New York Life Insurance and Annuity Corporation (collectively, "New York Life") are corporations organized and existing under the laws of the State of Delaware with their principal place of business in New York.  New York Life Insurance and Annuity Corporation is a wholly-owned subsidiary of New York Life Insurance Company.  New York Life is located at 51 Madison Avenue, New York, New York 10010.

**Tremont**

21.     Defendant Tremont Capital Management Inc. ("Tremont Capital"), formerly known as Tremont Advisers Inc., is a manager of a fund of hedge funds.  It is a unit of Tremont Group Holdings, Inc.  Tremont Capital is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

22.     Defendant Tremont (Bermuda) Ltd. ("Tremont Bermuda") is wholly-owned by Defendant Tremont Capital and is located at Tremont House, 4 Park Road, Hamilton, Bermuda.

23.     Defendant Tremont Group Holdings, Inc. ("Tremont Group") is an investment manager of fund-of-funds products and multi-manager portfolios.  According to its website, Tremont Group "has been at the forefront in setting the standard in the industry for fund of hedge funds investment management.  Effective investment strategies and oversight, thorough manager

8

research, careful due diligence, advanced risk allocation and time-tested portfolio management form the cornerstones of a comprehensive platform that has been refined over a 23 year span of dedicated strides to maximize our clients' objectives." Tremont Group is the parent of Tremont Capital and Tremont Partners Inc. and is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

24.     Defendant Tremont Partners, Inc. ("Tremont Partners") is a subsidiary of Tremont Group that manages and/or serves as General Partner of several of the Tremont Group affiliated funds.  Tremont Partners is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

25.     Defendant Rye Investment Management ("Rye") is the division within Tremont Group that manages, sells, and administers the firm's select manager funds — the Rye Select Funds.  Rye is located at 555 Theodore Fremd Avenue, Rye, New York, 10580.

26.     Tremont Capital, Tremont Bermuda, Tremont Group, Tremont Partners, and Rye are sometimes collectively referenced as "Tremont."

27.     Tremont Opportunity Fund III, f/k/a American Masters Opportunity Insurance Fund, L.P. (the "Tremont Fund") is a Delaware limited partnership managed by Tremont.  The Registered Office of the Tremont Fund is located at 1013 Centre Road, Wilmington, Delaware 19805-1297.  Tremont Partners is the General Partner of the Tremont Fund.  Through its VUL Policy, Plaintiff had an investment in the Tremont Fund.

**Rye Funds**

28.     Defendant Rye Select Broad Market Prime Fund L.P., f/k/a American Masters Broad Market Fund, L.P. ("Prime Fund") is a Delaware limited partnership organized in 1997 and managed by Rye.  Tremont Partners is the General Partner of the Prime Fund.  The Prime Fund was one of the investment funds in which the Tremont Fund was invested.  Through its

VUL policies, Plaintiff had an investment in the Tremont Fund, which in turn had an investment in the Prime Fund.  The Prime Fund is located at 555 Theodore Fremd Avenue, Rye, New York, 10580.

29.     Defendant Rye Select Broad Market XL Fund L.P., f/k/a American Masters Broad Market Prime Fund, L.P. (the "XL Fund") is a Delaware limited partnership organized on July 13, 2006 and managed by Rye.  Tremont Partners is the General Partner of the XL Fund.  The XL Fund was one of the investment funds in which the Tremont Fund was invested.  Through its VUL policies, Plaintiff had an investment in the Tremont Fund, which in turn had an investment in the XL Fund.  The XL Fund L.P. is located at 555 Theodore Fremd Avenue, Rye, New York, 10580.

30.     Rye Select Broad Market Insurance Portfolio, LDC (the "Rye Insurance Portfolio") is a Bermuda-incorporated limited duration company managed by Tremont (Bermuda) Ltd.  The Rye Insurance Portfolio was one of the investment funds in which the Tremont Fund was invested.  Through its VUL policies, Plaintiff had an investment in the Tremont Fund, which in turn had an investment in the Rye Insurance Portfolio.  Rye Insurance Portfolio is located at 555 Theodore Fremd Avenue, Rye, New York, 10580.

31.     The Prime Fund, the XL Fund, and the Rye Insurance Portfolio are collectively referred to herein as the "Rye Funds."

**Oppenheimer, MassMutual Holding, and Mass Mutual**

32.     Defendant Oppenheimer Acquisition Corporation ("Oppenheimer") is the parent company of Tremont.  Oppenheimer is incorporated under the laws of the state of Delaware, and its principal place of business is located at 2 World Financial Center, New York, New York 10281.  Defendant Oppenheimer owns more than 75 percent of, and is listed as a "control

person" of, Tremont Partners on Tremont Partners' Form ADV, which was filed with the SEC.

Defendant Oppenheimer jointly markets several funds with Tremont Partners, allowing Tremont

Partners to use Oppenheimer's name on several of Tremont Partners' funds.  Tremont Partners

identified itself as a "wholly owned subsidiary of Tremont Group Holdings, Inc., which in turn,

is owned by Oppenheimer Acquisition Corp., the parent corporation of Oppenheimer Funds,

Inc., one of the nation's largest asset management companies."  Tremont Partners' Privacy

Policy, which was also attached to the Fund's offering materials provided to the Plaintiff, states

that:

> Tremont is made up of certain entities, including its investment advisory and
> broker-dealer subsidiaries, and in turn, is part of a larger corporate affiliation
> owned by the Oppenheimer Funds group and Massachusetts Mutual Life
> Insurance Company. The Tremont entities and, in some cases, its ownership
> affiliates often work together to provide the financial products and services
> offered to Tremont Clients.

33.     Defendant MassMutual Holding LLC ("MassMutual Holding") is the parent

company of Oppenheimer Acquisition Corp.  MassMutual Holding is listed as a "control person"

of Tremont Partners on Tremont Partner's Form ADV, which was filed with the SEC.

MassMutual Holding's principal business address is 1295 State Street, Springfield,

Massachusetts 01111.

34.     Massachusetts Mutual Life Insurance Co. ("MassMutual") is the parent company

of MassMutual Holding, through which it owns Oppenheimer.  MassMutual is located at 1295

State Street Springfield, Massachusetts 01111, and is the parent company of Oppenheimer.

MassMutual owns more than 75 percent of Tremont's stock, and is listed as a "control person" of

Tremont Partners on Tremont Partners' Form ADV, which was filed with the SEC.  Tremont

Partners' Privacy Policy, which was also attached to the Fund's offering materials provided to

Plaintiff, states that:

11

Tremont is made up of certain entities, including its investment advisory and broker-dealer subsidiaries, and in turn, is part of a larger corporate affiliation owned by the Oppenheimer Funds group and Massachusetts Mutual Life Insurance Company. The Tremont entities and, in some cases, its ownership affiliates often work together to provide the financial product and services offered to Tremont Clients.

35.     Defendants New York Life, Tremont, Rye, Rye Funds, Oppenheimer, MassMutual Holding, and MassMutual, are sometimes referred to herein collectively as the "Defendants."

## PLAINTIFF'S SUBSTANTIVE ALLEGATIONS

### Plaintiff's Variable Universal Life Insurance Policies

36.     Beginning on or about September 15, 2007, Plaintiff made an initial policy purchase under a VUL policy (the "VUL Policy") from New York Life with a premium contribution of $52,638,664.00.  On or about October 15, 2007, Plaintiff made an additional policy purchase from New York Life with a premium contribution of $2,608,437.00.  On or about November 15, 2007, Plaintiff made an additional policy purchase from New York Life with a premium contribution of $5,000,000.00.  On or about June 15, 2008, Plaintiff made an additional policy purchase from New York Life with a premium contribution of $1,127,525.00. On or about July 15, 2008, Plaintiff made an additional policy purchase from New York Life with a premium contribution of $231,575.00.  On or about September 15, 2008, Plaintiff made additional premium contributions of $52,270,676.00 to existing New York Life policies.  On or about October 15, 2008, Plaintiff made additional premium contributions of $2,608,437.00 to existing New York Life policies. On or about November 15, 2008, Plaintiff made additional premium contributions of $6,105,324.00 to existing New York Life policies. Plaintiff's premium contributions made to New York Life through November 2008 totaled $ 122,590,638.

37.     Variable universal life insurance is a type of life insurance, first offered in the late 1980s, that enjoys special tax advantages under the United States Internal Revenue Code and allows a policy holder to build a cash value that can be invested in a choice of separate accounts, similar to mutual funds.  The number and type of investment choices available is dependent on the insurer.  The cash value in these policies is able to earn investment returns without incurring current income tax as long as it meets the definition of life insurance and the policy remains in force.  The tax free investment returns can be used to pay for the costs of insurance inside the policy.

38.     The "variable" component in the name refers to the VUL Policy's "Investment Account" component, which varies in value because it is invested in the financial markets.  The "universal" component in the name refers to the flexibility the owner has in making premium payments.  The premiums may vary in a given month up to maximums defined by the Internal Revenue Code for life insurance.

39.     Under a VUL policy, the death benefit is the face amount of the policy plus the build up of any cash value that occurs (beyond any amount being used to fund the current cost of insurance).  As long as there is sufficient cash value to pay the costs of insurance in the policy, the death benefit will be paid.  Additionally, tax-free policy loans to the policyholder (which would be paid off on death by the death benefit) are available from any excess cash value.  VUL policies allow the policyholder a great deal of flexibility in choosing how much premium to pay for a given death benefit.  To maintain a death benefit guarantee, a specified premium level must be paid every month.  To keep the policy in force, typically no premium needs to be paid as long as there is enough cash value in the policy to pay that month's cost of insurance.

**The Tremont Fund**

40.     Plaintiff's premium contributions were invested by New York Life in the Tremont Fund.  By November 2008, New York Life had invested $122,590,638 of Plaintiff's premium contributions in the Tremont Fund.

41.     The Tremont Fund, through its fund-of-funds structure, allocated roughly 22 percent of its assets to the Rye Funds, substantially all of which went to Madoff, and substantially all of which has been lost.

**New York Life Misrepresented the VUL Policy and Breached Its Statutory, Common Law, and/or Contractual Duties to Plaintiff**

42.     New York Life, as Plaintiff's insurer under Plaintiff's VUL Policy, owed Plaintiff statutory, common law, and/or contractual duties, including duties under the implied covenant of good faith and fair dealing and the duty not to misrepresent the appropriateness of the investments it offered through its VUL Policy.

43.     Despite having the discretion to deem investments inappropriate for its policyholders and the presence of numerous red flags concerning Madoff's fraudulent scheme, New York Life endorsed the investments in the Tremont Fund and the Rye Funds as appropriate investments for policyholders.  In doing so, New York Life breached its contractual obligations to invest Plaintiff's funds in an "Investment Account" that was real and not a sham and breached its statutory, common law, and/or contractual duties to Plaintiff by failing to perform even the most rudimentary analysis of the suitability of the investment funds it offered to policyholders.

**Defendants' Misrepresentations and Omissions**

44.     Defendants made several misrepresentations and omissions regarding the Tremont Fund's investment strategy and the alleged safeguards and services Tremont performed on behalf of its clients and/or limited partners in the Tremont Fund.  Plaintiff reasonably relied on those

misrepresentations and omissions in choosing to invest in the Tremont Fund, which directly led to its losses when Defendants allowed the Tremont Fund's assets to be invested with Madoff and/or BMIS.

45.    Defendants solicited  investments in the Tremont Fund through a Variable Life Insurance Policy Private Offering Memorandum issued by New York Life (the "New York Life PPM," **Exhibit A** hereto), which adopted and incorporated, as appendices, a private placement memorandum for the Tremont Fund (the "Tremont PPM"), and a Variable Universal Life Policy (the "VUL Policy"), among other offering materials.  The Tremont PPM that New York Life provided to Plaintiff was dated November 1, 2006.  At the time New York Life provided Plaintiff with the November 2006 Tremont PPM, there existed a later-dated Tremont PPM, dated July 15, 2007, which New York Life did not provide to Plaintiff and which contained a materially different representation on a material characteristic of Plaintiff's investments with New York Life; namely, the percentage of the Fund's assets that could be allocated to any single portfolio manager, in this case Madoff.

46.    The New York Life PPM that New York Life provided to Plaintiff describes New York Life's extensive control and authority over the investments of its VUL policyholders.  For example, New York Life PPM states that the funds invested in each VUL policy are held in one or more "Separate Accounts" and may be allocated among certain "Subaccounts" that invest in shares or units of an underlying portfolio of securities managed by one or more portfolio managers pursuant to certain investment objectives and policies that determine the risk of the portfolio.  Each New York Life PPM states:

> We have established and currently maintain the Separate Account under the laws of the State of Delaware. Any realized or unrealized income, net gains or losses from the assets of the Separate Account are credited or charged to without regard to Our other income, gains or losses, including income, gains or losses from Our

other separate accounts. We put assets into the Separate Account that You have allocated to the Investment Divisions for the Policy, and We may also do the same for any other variable life insurance policies We may issue.

47.     Each New York Life PPM similarly describes the Separate Account Investments:

Maintain a master account with the Fund which account shall bear the name of NYLIAC as the record owner of Fund shares on behalf of each Separate Account investing in the Fund

***

Perform miscellaneous accounting services as may be reasonably requested from time to time by the investment mangaer, which services shall relate to the business contemplated by the participation or subscription agreement between NYLIAC and the respective Fund, as amended from time to time

***

Distribute the Fund's prospectus or confidential memorandum and any supplements thereto to policy owners

***

Provide telephonic support for policy owners, including, without limitation, information with respect to inquires about the Fund.

48.     New York Life also made certain additional material representations in the offering materials about their role in selecting the Investment Divisions in which their policyholders could choose to allocate their investments, and in managing the Separate Accounts and Subaccounts on behalf of their policyholders. The New York Life PPM states that New York Life "retains the exclusive right to select the investments of the Investment Divisions" in which policyholders' Separate Accounts and Subaccounts may be placed.  The PPM states that "[t]he various Investment Divisions [New York Life] established reflect different investment philosophies varying in degree of risk, type of risk and type of assets."

16

49.     Consistent with its sole discretion to select the investments to which their policyholders could choose to allocate funds, New York Life also retained the right to make extensive changes to its policyholders' Subaccounts. Specifically:

When permitted by law, and subject to any required notice to You and approval by regulatory authorities or you, we have the right to make the following changes with regard to the Separate Accounts:

- Make available additional separate accounts;
- Restrict or eliminate any of Your voting rights or other persons who have voting rights as to the Separate Account
- Restrict transfers among Separate Accounts;
- Combine the Separate Account with one or more other Separate Accounts;
- Make additions to, deletions from, or substitutions for the Registered Funds or Exempt Funds held by any Investment Divisions to new investments;
- Merge existing Investment Divisions;
- Close existing Investment Divisions to new investments;
- Change the investment policy of an Investment Division;
- Register or de-register the Separate Account under the 1940 Act;
- Change the name of the Separate Account; or
- Change the amount of any minimum or maximum investments or additional investments.

50.     In their Policies, New York Life promised to notify Plaintiff of any change in the Subaccounts. Specifically:

We will notify You if any change results in a material change in the Fund Portfolios of Investment Divisions to which You have allocated funds. You may then make a new election.

51.     Contrary to New York Life's material representations, a considerable portion of Plaintiff's funds were never invested in a portfolio of securities, never managed with any meaningful investment objective or policy, and never subject to the kind of oversight that would allow New York Life to provide Plaintiff "notice" of "material changes" in the underlying portfolio.

52.     Moreover, New York Life issued periodic statements that misrepresented the value of Plaintiff's investment in the Tremont Fund, which was consistently overstated by the 22% that Madoff had stolen immediately upon his receipt of same.  Additionally, contrary to its express contractual obligation to provide Plaintiff in a timely manner with any revised PPMs issued by Tremont, New York Life failed to provide Plaintiff with the "amended and restated" Tremont PPM, dated July 15, 2007, until more than a year later, and only after Madoff's fraud had been disclosed.

**New York Life's Misrepresentations Concerning Tremont's Prudent Selection of the Fund's Investment Advisor or Manager**

53.     Defendants New York Life, Tremont and Rye made additional material misstatements to Plaintiff throughout the Tremont PPM.  Pursuant to the Tremont PPM, the General Partner (Tremont Partners) was (i) "accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the Partnership's affairs;" (ii) "responsible for the day-to-day administration and operation of the Partnership;" and "ha[d] primary responsibility for monitoring the ongoing activities of [Madoff]." Tremont's duties included "review[ing] the confirmations of the Partnership's trading activity for purposes of tracking the current status of the Partnership's accounts."

54.     However, in breach of its expressly acknowledged fiduciary duties to the Partnership, Tremont could not have had "primary responsibility" or done the monitoring it represented because if it had done so, it would have discovered that 22 percent of the Tremont Fund, and virtually all of the Rye Funds, were not "trading" at all, but instead were simply being misappropriated.

55.     The Tremont Fund's stated purpose was to achieve long-term capital growth while focusing on capital appreciation and to "provide investors with a diversified investment

portfolio [] designed to result in above average returns over a long period of time.".  To achieve these objectives, the Tremont PPM informed investors that the Fund invested primarily in securities through selected investment advisors. The Tremont PPM further described that Tremont had the right to delegate discretionary and other authority to manage the Tremont Fund's accounts to one or more Investment Advisors or other qualified Persons, in the General Partner's sole and absolute discretion. In particular, the Limited Partnership Agreement between Tremont Partners and its investors (here, New York Life) stated that the General Partner:

> may enter into, execute, amend, supplement, acknowledge and deliver any and all contracts, agreements or other instruments, including, but not limited to, contracts with one or more Investment Advisors, banks, trust companies or administrators for the performance of services to the [Tremont Fund], including the investment and reinvestment of all or part of the [Tremont Fund]'s assets, the execution of portfolio transactions and the performance of any or all administrative functions. The General Partner may also appoint agents to perform such duties on behalf of the [Tremont Fund] as the General Partner may deem desirable.

56.    As stated above, New York Life expressly incorporated into the New York Life PPM provided to Plaintiff a copy of Tremont's own Private Placement Memorandum (the "Tremont PPM"), thus making Tremont's misrepresentations regarding Tremont's knowledge of and control over Madoff its own.   The Tremont PPM contains a number of additional misrepresentations concerning Tremont's extensive prudence and due diligence in selecting investment managers that will best facilitate Tremont's investment objectives:

> The objectives of the Tremont Opportunity Insurance Fund, L.P. (the "Portfolio") are to (i) achieve long term capital appreciation and (ii) consistently generate positive returns irrespective of stock market volatility or direction, while focusing on preservation of capital. The General Partner will attempt to accomplish these investment objectives by investing with various portfolio managers, which the Fund's general partner believes are able to meet the Portfolio's objective. The terms "opportunity" and "opportunistic" refer to a broad range of investment strategies including but not limited to: long-short equity strategies, hedging and arbitrage techniques in the equity, fixed income, and currency markets; index arbitrage; interest rate arbitrage; convertible bond and warrant hedging; merger arbitrage; statistical long/short equity strategies; pairs trading; and investment in

non-U.S. securities. These sophisticated investment strategies often require the use of derivative trading vehicles such as stock options and index options.

\*\*\*

The General Partner seeks to select Managers that satisfy one or more criteria including, but not limited to: extensive investment management experience; successful historical performance, including a history of consistent returns with respect to the Manager's investment style; the degree to which a specific Manager complements and balances the Partnership's Portfolio with respect to the strategies employed by other Managers; the quality and stability of the Manager's organization; the ability of the Partnership to make withdrawals or liquidate its investment; and the ability of each Manager to consistently and effectively apply its investment approach. Certain of the criteria may be emphasized above others in the selection of a specific Manager. Consistent with the foregoing criteria, the General Partner may invest in other partnerships or entities in which it acts as general partner or managers. Such investments have better liquidity.

\*\*\*

In selecting Managers, the General Partner collects, analyzes and evaluates information regarding the personnel, history and background, and the investment styles, strategies and performance of professional investment management firms.

\*\*\*

Investments with Managers with which the Partnership invests will generally be valued at the net asset value supplied by such Managers. The value of assets will be recorded at their fair value as determined in good faith by the General Partner in the absence of current quotations or if the General Partner concludes that such quotations are not indicative of fair value by reason of illiquidity of a particular security or other factors.

\*\*\*

The General Partner will request detailed information on a continuing basis from each Manager regarding the Manager's historical performance and investment strategies

57.    Here too, in breach of its fiduciary duties, Tremont could not have conducted any of the due diligence and data analysis described in the Tremont PPM with respect to Madoff because, if Tremont had done so, it would have easily determined that Madoff was not utilizing any of the "opportunistic" strategies described in the Tremont PPM, was not operating a high-

20

quality and stable organization, did not have the ability to withdraw or liquidate its investment, and was not "consistently and effectively apply[ing]" any particular "investment approach."

58.     Similarly, Tremont clearly did not "request detailed information on a continuing basis from [BMIS] regarding the [BMIS's] historical performance and investment strategies," and made no good faith attempt to determine the fair value of assets that BMIS was managing. If Tremont had done so, it would have discovered that BMIS was merely misappropriating all funds entrusted to it.

59.     Likewise, contrary to Tremont's and New York Life's misrepresentations, a considerable portion of Plaintiff's investment in the VUL Policy was never invested in any securities, much less a "diversified portfolio" of securities.

60.     At all relevant times, New York Life either knew that the above statements contained in the Tremont PPM were false or acted with reckless disregard as to the truth of these statements.   Specifically, New York Life took no actions to establish the truth of any of the representations made by Tremont in the Tremont PPM and, instead, chose to blindly rely upon the unsubstantiated statements made by Tremont in the Tremont PPM and incorporate those false representations into its own PPM.   Had New York Life disclosed to Plaintiff that it had not conducted any independent investigation to determine the accuracy of the representations in the Tremont PPM, Plaintiff would not have chosen Tremont as its investment option for its VUL policies.

**Defendants' Additional Misrepresentations in Response to Plaintiff's Request for Proposal**

61.     Because of the substantial size of Plaintiff's intended investment through the New York Life VUL policies, with New York Life's knowledge and consent, Plaintiff prepared a Request for Proposal ("RFP") which sought substantial additional detailed information

concerning the investment options offered by New York Life under its VUL policies. Tremont's response to the RFP ("RFP Response") touted Tremont's affiliation with Defendants Oppenheimer and MassMutal as follows:

> Since 2001, Tremont has been 100% owned by Oppenheimer Acquisition Corp., the parent company of Oppenheimer Funds, Inc., a widely known mutual fund company. Massachusetts Mutual Life Insurance Company, in turn, owns Oppenheimer Acquisition Corp.

62. The RFP Response also made the following misrepresentation, among others, concerning Tremont's due diligence process in selecting its underlying managers, including BMIS:

> Tremont believes it is important to "know our managers" through personal meetings, high quality reference checks, background checks, etc. ***We do not hire a manager based on numbers alone*** (emphasis supplied).

Unfortunately for Plaintiff and other investors in Tremont and contrary to the forgoing representation, Defendants, including New York Life, did select and continued using BMIS in managing investor funds based on Madoff's bogus performance claims alone.

63. In the case of each of the five separate policy purchases of New York Life VUL Insurance, and additional premium contributions to existing policies, made by Plaintiff as described in further detail above in Paragraph 36, New York Life made the specific representation in its "Premium Allocation Form" that the Tremont Fund:

> Seeks to (i) achieve long-term capital appreciation and (ii) consistently generate positive returns irrespective of stock market volatility or direction, while focusing on preservation of capital.

64. In the case of the funds being "managed" by Madoff within the Tremont Fund, there was no "return" or "preservation of capital;" only loss from Madoff's Ponzi scheme.

65. Neither New York Life, Tremont, nor any of the other Defendants exercised the requisite due care they owed to Plaintiff. Defendants concealed from Plaintiff that Tremont had

abdicated its contractual and fiduciary obligations and blindly entrusted the assets in the Tremont Fund and the Rye Funds to Madoff, BMIS, and other Madoff-related entities with no oversight while receiving substantial fees purportedly to oversee these investments.

**New York Life Was Aware of Plaintiff's Reliance on These Misrepresentations**

66.     In retaining exclusive authority to select the investment vehicles in which policyholders could place their funds, policyholders like Plaintiff were entitled to rely upon New York Life to perform sufficient due diligence to ensure that the investment vehicles selected, such as Tremont, were legitimate and managed in accordance with the guidelines set forth in the New York Life PPM and quoted, in part, above.

67.     At all relevant times, New York Life was aware that Plaintiff was relying upon New York Life's representations concerning Tremont as described above and as set forth in the New York Life PPM and Tremont PPM.  Similarly, at all relevant times, New York Life held itself out to Plaintiff as having taken all reasonable measures to verify the accuracy of the information it provided to Plaintiff concerning Tremont.

68.     Through at least October 2008, just before Madoff's fraud was discovered, New York Life represented to its policyholders, including Plaintiff, that it conducted its "own fundamental, bottom-up research, rather than relying on credit ratings," and "ensure[d] that the potential returns offered by the securities [New York Life] invest[ed] in [would] significantly exceed the risk of these investments."  Moreover, through at least October 2008, New York Life represented to policyholders, including Plaintiff, that its "independence from the demands of Wall Street analysts mean[t] [New York Life had] the freedom to walk away from [its] investments or sales practices that promise[d] potential near-term results but may not [have been] in [its] policyholders' best interest."  Had New York Life honestly disclosed to Plaintiff that it

did not conduct any independent analysis of Tremont or Tremont's underlying investment managers, including Madoff, Plaintiff would not have invested in Tremont.

69.     Further evidencing New York Life's awareness of Plaintiff's reliance, prior to issuing the Policies to Plaintiff, New York Life required Plaintiff to sign a "Purchaser Questionnaire" verifying that Plaintiff had had "the opportunity to ask questions and receive answers concerning the terms and conditions of the offering and to obtain any additional information that NYLIAC [New York Life] possesses or can acquire without unreasonable effort or expense that is necessary to verify the accuracy of the information furnished," and that Plaintiff had "relied" upon the information New York Life provided in making the decision to invest in Tremont.

**Both New York Life and Tremont Earned Substantial Fees In Connection With Their Management and Administration of Plaintiff's Investment**

70.     Pursuant to the Tremont PPM, Tremont also collected substantial fees in connection with  its management of Plaintiff's investment.

71.     The New York Life PPM discloses that it also earned substantial fees in connection with providing certain administrative services to the investment advisors of the Funds in which it allows its policyholders to invest, including Tremont.  These services include, among others, (i) "[p]erform[ing] miscellaneous accounting services as may be reasonably requested from time to time by the investment manager; (ii) ***"[d]istribut[ing] the Fund's prospectus or confidential memorandum and any supplements thereto to policy owners;"*** and (iii) "[p]rov[ing] telephonic support for policyowners, including, without limitation, information with respect to inquiries about the Fund [emphasis added]." Had New York Life performed the services it represented that it would perform and provided Plaintiff with Tremont's "amended

and restated" PPM, dated July 15, 2007, in a timely manner, Plaintiff would not have invested in Tremont.  (Plaintiff's first investment in Tremont was made in September 2007.)

**Defendants Ignored the Warning Signs Concerning Madoff and BMIS**

72.     Defendants, including New York Life, were content to collect their respective fees and, rather than jeopardize this income stream, failed to perform the necessary due diligence required to meet their contractual and common law obligations due to Plaintiff.  Likewise, to the extent that New York Life and Tremont did perform due diligence, they violated their statutory, common law, and/or contractual duties by purposefully failing to communicate material information to their investors and to correct the misrepresentations contained in the New York Life PPM and Tremont PPM, on which Plaintiff relied in purchasing the VUL policies and investing in the Tremont Fund.

73.     According to *Bloomberg News,* Tremont "sold Madoff-managed investments since 1997 under the Rye Select Broad Market name, charging 2 percent of assets."

74.     Yet, neither New York Life nor Tremont, in breach of their statutory, common law, and/or contractual duties, conducted even the most rudimentary due diligence on Madoff and instead relied on the "reputation" of Madoff without conducting any investigation of the *bona fides* of Madoff and his operation, and/or any analysis of the trading strategies and investment returns reported by Madoff, which remained suspiciously and consistently high even during adverse market conditions.

75.     Tremont, as the manager and general partner of the Tremont Fund and the Rye Funds, utterly failed to supervise, monitor, and manage the investments of those funds. By way of its failures and omissions, Tremont violated its duties under the laws of New York.  Likewise, New York Life, as the issuer of the VUL policies purchased by Plaintiff and the offeror of

Tremont Funds as an investment option under its VUL policies, utterly failed to conduct any due diligence to determine whether or not Tremont was performing the management and oversight of Madoff Tremont claimed to perform, in violation of New York Life's duties to Plaintiff under the laws of New York.

76.     Tremont acted with knowledge that it abdicated responsibility for the management of the Tremont Fund's and the Rye Funds' assets to Madoff, and with gross negligence in failing to perform or causing to be performed appropriate due diligence that would have revealed material irregularities in the investments, operations, and financial reporting of Madoff.  Likewise, New York Life acted with knowledge that it was offering Madoff as an investment option to its VUL policyholders, including Plaintiff, without having conducted any independent investigation of Madoff or Tremont's purported due diligence on Madoff.

77.     Defendants either knew or recklessly disregarded: (a) the concentration of the Tremont Fund's capital in the Rye Funds; (b) the concentration of the Rye Funds' investments in a single third-party investment manager, Madoff; (c) the materially heightened risk to the Tremont Fund's and the Rye Funds' assets from such reliance on Madoff, particularly given the lack of transparency of Madoff's operations; (d) the abnormally high and stable positive investment results reportedly obtained by Madoff; (e) the inconsistency between BMIS's publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients such as Tremont; and (f) the fact that BMIS itself was audited by a small, obscure accounting firm, Friehling & Horowitz, which has its offices in Rockland County, New York and had no experience auditing entities of the apparent size and complexity of BMIS.

78.     Unlike Defendants, other investment managers and advisors who conducted due diligence on Madoff and ran even the most simplistic models testing the validity of Madoff's

results recognized the fraudulent irregularities with Madoff's investments.  For example, the financial press reported that Robert Rosenkranz of Acorn Partners, an investment advisor for high net worth individuals, conducted due diligence on Madoff and found it very likely that the BMIS account statements were generated as part of a fraudulent scheme.  Mr. Rosenkranz reached this conclusion based on, *inter alia*, the abnormally stable and high investment returns claimed by Madoff, as well as the inconsistencies between customer account statements and the audited BMIS financial statements filed with the SEC.

79.     The financial press also reported that, prior to the disclosure of the massive fraud caused by Madoff, Simon Fludgate, head of operational due diligence at Aksia, another advisory firm, concluded that the stock holdings reported in the quarterly statements of BMIS filed with the SEC appeared too small to support the size of the assets Madoff claimed to be managing. The likely reason for this was revealed on December 15, 2008, when investigators working at Madoff's offices determined that Madoff was operating a secret, unregistered investment vehicle from his office.

80.     Further, *BusinessWeek* reported that "managers of the Fort Worth pension fund, who first invested with Rye five years ago, started to rethink their investment in early 2008 after hiring Albourne Partners, a London due diligence firm, to assess their hedge fund 15 portfolio. The Rye Fund raised red flags almost immediately.  Albourne's managing director, Simon Ruddick, says the firm, which had long-standing concerns about Madoff's trading strategy and consistent returns, had urged clients for nearly a decade to avoid affiliated funds such as Rye.  In July, the pension's board voted unanimously to dump its Rye stake."

81.     Indeed, there were warning signs going back as early as 1992 that should have alerted investment professionals, such as New York Life and Tremont, that Madoff and/or BMIS were perpetrating a massive fraud on investors.

82.     For example, in 1992, the SEC filed a lawsuit against accountants Frank Avellino and Michael Bienes, who sold $441 million in unregistered securities to 3,200 people, promising returns of 13.5 to 20 percent, and invested the money entirely with Madoff.  As a result of the SEC investigation, Avellino and Bienes agreed to shut down their business and reimbursed their clients.  No action was taken against Madoff.

83.     In May 1999, Harry Markopolos, a derivatives expert with experience managing the "split-strike conversion" strategy used by Madoff, sent a letter to the SEC describing how Madoff could not have generated the returns he reported using that strategy.

84.     A May 2001 article entitled "Madoff Tops Charts; Skeptics Ask How" in *MAR/Hedge,* a semi-monthly newsletter reporting on the hedge fund industry, reported that Madoff had reported positive returns for the last eleven-plus years for Fairfield Sentry and other feeder funds, but that current and former traders, other money managers, consultants, quantitative analysts, and fund-of-funds executives, many of whom were familiar with the so-called split-strike conversion strategy used by Madoff, questioned the consistency of the returns. These professionals noted that others using the strategy had nowhere near the same degree of success, and that Gateway, a publicly traded mutual fund, which also used the strategy purportedly employed by Madoff, had experienced far greater volatility and lower returns than Madoff.

85.     Further, the article reported that Madoff's strategy and trading were done by signals from a proprietary "black box," and that Madoff would not disclose the specifics of his

firm's risk management and how it could move so much capital in and out of positions without having a major effect on the market.  The article quoted Madoff as saying "I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk."

86.     On May 27, 2001, *Barron's* published an article entitled "Don't Ask, Don't tell; Bernie Madoff is so secretive, he even asks his investors to keep mum."  As reported in Barron's, Madoff's accounts

> have produced compound average annual returns of 15% for more than a decade. Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year.  When *Barron's* asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy. I can't go into it in great detail.' Nor were the firms that market Madoff's fund forthcoming.

The article reported that some on Wall Street, including three options strategists for major investment banks, were skeptical about how Madoff achieved his double-digit returns using options alone, and told *Barron's* they couldn't understand how "Madoff churns out such numbers using this strategy."

87.     The article further reported that:

> The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy.  But Madoff's investors rave about his performance - even though they don't understand how he does it. "Even knowledgeable people can't really tell you what he's doing," one very satisfied investor told *Barron's*. People who have all the trade confirms and statements still can't define it very well; . . . This investor declined to be quoted by name. Why? Because Madoff politely requests that his investors not reveal that he runs their money.
>
> * * *
>
> What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me. It's no one's business what goes on here,' says an investment manager who took over a pool of assets that included an investment in a Madoff fund 'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'

88.     Moreover, Madoff, instead of using an outside prime broker as nearly all hedge funds do, was his own prime broker and custodian of all the assets he manages.  A December 13,

2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which invests in hedge funds for clients, as follows: "There was no independent custodian involved who could prove the existence of assets. . . . There's clear and blatant conflict of interest with a manager using a related-party broker-dealer. Madoff is enormously unusual in that this is not a structure I've seen."

89.    On November 7, 2005, Markopolos submitted another letter to the SEC, titled "The World's Largest Hedge Fund is a Fraud," in which he set forth in detail, over 17 singlespaced pages and a two-page attachment, how Madoff's returns could not be real. Markopolos identified 29 red flags that were signs of highly suspicious activity at Madoff Securities, including:

A.    "*Madoff does not allow outside performance audits*." (Emphasis in original.)

B.    "*why would B[ernard] M[adoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits?*" (Emphasis in original.)

C.    "The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature. . . . ***Why the need for such secrecy?*** *If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all the industry rankings*." (Emphasis in original.)

D.    "*It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from. This makes no sense! . . . However, BM's performance numbers show only 7 extremely small [monthly] losses during 14 ½ years and these numbers are too good to be true. The largest one month loss was only -55 basis points (-0.55%) or just over onehalf of one percent! And BM never had more than a one month losing streak!*" (Emphasis in original.)

E.    "*Madoff's returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's*." (Emphasis in original.)

F.    "*Why is Bernie Madoff borrowing money at an average rate of 16.00% per anum and allowing these third party hedge fund, fund of funds to pocket their 1% and*

*20% fees bases* [sic] *upon Bernie Madoff's hard work and brains? Does this make any sense at all? Typically FOF's* [fund of funds] *charge only 1% and 10%, yet BM allows them the extra 10%. Why? And why do these third parties fail to mention Bernie Madoff in their marketing literature? After all he's the manager, don't investors have a right to know who's managing their money?"* (Emphasis in original.)

G. *"BM goes to 100% cash for every December 31st year-end according to one FOF invested with BM. This allows for 'cleaner financial statements' according to this source. Any unusual transfers or activity near a quarter-end or year-end is a red flag for fraud."* (Emphasis in original.)

90.    According to a January 28, 2009 article in the New York Times, JPMorgan Chase became concerned about its investments in BMIS in the fall of 2008 when its "due diligence people had too many doubts."   Consequently, in October 2008, JPMorgan Chase "suddenly cashed out" of the Madoff-invested Fairfield funds.

**Adequate Due Diligence**

91.    Tremont's Form ADV, which was filed with the SEC and incorporated into the Fund's offering materials, stated that Tremont "relies on underlying investment advisor reports and its examination of advisor operations as primary sources of information."   Tremont's Form ADV further stated that Tremont "utilized databases, wire services, performance measurement publications and other surveys of investment results, such as newspapers, and other business journals as information sources. . . . [and had] a license to utilize the information included in the Lipper TASS database, an extensive database of hedge fund investment manager performance."

92.    Tremont's ADV further stated that "Tremont maintain[ed] a database of over 6,000 management firms to evaluate investment process, approach and investment results."   In addition, Tremont's Form ADV stated that Tremont "sources data on new investment organizations through referrals to [Tremont] by other investment managers, its clients and contacts in the financial industry."

93.     According to its website (www.tremont.com), Tremont purportedly provided its investors with "effective investment strategies and oversight, thorough manager research, careful due diligence, advanced risk allocation and time-tested portfolio management." Tremont's website further boasted that Tremont's "research staff evaluates investment management organizations.   The staff analyzes, in detail, the philosophy, styles, strategies, investment professionals, decision-making processes and performance of the organization and the investment products offered."   Finally, the website claimed that Tremont's "research staff conducts on-site interviews at and examination of such organizations to evaluate back office operations and internal staff, among other things." These statements were misrepresentations because if Tremont has performed anything even resembling this level of investigation with regard to Madoff's operations, Tremont would have immediately seen that BMIS was "one big lie," as Madoff ultimately confessed.

**Ongoing Investment Monitoring Activities**

94.     According to Tremont's Form ADV and the RFP Response, its clients' accounts were subject both to monthly review and daily monitoring for cash flow and fund compliance. Tremont further reported that it used "its own proprietary software programs to monitor the performance of investment managers" and that its senior officers were responsible for performing those monitoring functions. Tremont's Form ADV and the RFP Response further asserted that it provided detailed quarterly reports in order to keep its investors apprised of the status of their investments.

95.     According to the Tremont PPM, Tremont "ha[d] overall responsibility for implementing the investment strategy of the Partnership and has the authority to select the Managers with which the Partnership will invest."

96.     In addition, the General Partner (Tremont Partners) was responsible for maintaining capital accounts for each limited partner and those accounts were required to include the limited partner's principal investment and profits earned on the principal.

97.     Similarly, the Tremont PPM required the General Partner to provide each limited partner with annual and quarterly reports.  Although the quarterly reports were allowed to be unaudited, the annual reports had to be audited by an independent certified public accountant.

98.     Tremont utterly failed to perform the duties listed above. First, despite assurances that Tremont would carefully select an investment professional to whom the Tremont Fund's investment authority was delegated, it failed to select an appropriate investment manager under the criteria outlined in the offering materials.  Second, despite pledging to conduct thorough due diligence of any investment advisor and/or investment products before making investment decisions, it failed to perform any due diligence prior to investing the Tremont Fund's and virtually all of the Rye Funds' assets with Madoff and/or BMIS.  Third, despite claims that Tremont would consistently monitor the status of the Tremont Fund's investments, it failed to conduct any such monitoring activities with respect to the Tremont Fund's assets that were invested with Madoff and/or BMIS.

99.     The New York Life PPM Plaintiff received from New York Life dated November 1, 2006 was silent regarding concentration of funds in any one manager.  However, during multiple personal presentations made to Plaintiff by Tremont personnel in the spring and summer of 2007 ("2007 Meetings"), Plaintiff was told that the Tremont Fund had a low "size to loss potential" because less than 6% of the Fund's assets were assigned to any one manager. This specific representation made to Plaintiff that no more than 6% of the Tremont Fund's

assets were assigned to any on manager was a material basis upon which Plaintiff invested in the Tremont Fund through New York Life.

100.    At some point following the revelation of Madoff's Ponzi scheme, Plaintiff requested from Tremont a copy of the PPM for the Tremont Fund that it had in its files for Plaintiff.  The document sent by Tremont was an "Amended and Restated" PPM dated July 15, 2007.  This PPM contained the following language addressing the concentration of funds with managers:

> While the Partnership intends to invest with various Managers, the Partnership will likely have, at any time and from time to time, up to thirty percent (30%) of its total Portfolio invested with a single Manager.

Plaintiff had never previously received this version of the Tremont PPM, either from New York Life or Tremont, and the earlier iteration of the PPM did not contain this disclosure about concentrating as much as thirty percent with a single manager.  Had Plaintiff known this information at the time it made its investments, it would not have made the investments.  It was ultimately disclosed that the Tremont Fund had allocated approximately 22% of its assets to Madoff/BMIS which was well above the 6% limit Tremont had represented to Plaintiff it strictly applied to its allocation of funds to any one manager.

**Defendants Reveal their Fraud to Investors**

101.    Shortly after Madoff confessed to his Ponzi scheme, New York Life informed Plaintiff and other investors by letter that their investments through New York Life's VUL policies in the Tremont Fund had "investment exposure to Madoff Investment Securities LLC."

102.    In a subsequent letter to Plaintiff and other investors, New York Life informed Plaintiff that from its preliminary discussions with Tremont Capital, it had determined that there was exposure to Madoff.  According to New York Life, as of October 31, 2008, Madoff appeared to have been assigned to manage roughly 22% of the Tremont Fund assets.

34

103.   As described herein, there were numerous red flags known to Defendants prior to and throughout the time period that Plaintiff held an interest in the Tremont Fund through its New York Life VUL policies.

104.   By failing to investigate and acting in willful blindness towards these clear signals of the illegitimate nature of Madoff and BMIS, New York Life breached its statutory, common law, and/or contractual duties to Plaintiff and all Defendants committed fraud and were grossly negligent.

105.   The Defendants also willfully ignored the aforementioned warning signs concerning Madoff and BMIS.

106.   If Defendants had made an appropriate inquiry concerning these warning signs, that investigation would have raised questions regarding the true value and existence of the Tremont Fund's and the Rye Funds' reported investment assets and the suitability of the Tremont Fund as an investment option to support life insurance policies.

107.   New York Life's and Tremont's breach of contract, fraud, negligence, inadequate oversight, and abdication of their statutory, common law, and/or contractual duties have resulted in the decimation of the Investment Account component of the Plaintiff's VUL policies.

108.   Plaintiff now finds itself without the funds it believed it had accumulated over time.

**Loss Causation**

109.   Plaintiff has lost the portion of its principal investment in the Tremont Fund that was invested in the Rye Funds.

110.   Further, Plaintiff has lost its share of the millions of dollars in management and advisory fees and administrative service fees that were paid to Defendants New York Life and

Tremont.   Despite collecting those enormous fees, Tremont and New York Life completely failed to provide the services promised to Plaintiff, or provided those services so inadequately as to render them completely ineffective.

111.    Plaintiff has also lost the opportunity to make a different investment and to earn real returns on its investments.

112.    Defendants' conduct, as alleged herein, proximately caused losses to Plaintiff.

**Defendants Oppenheimer, MassMutual Holding, and MassMutual Exercised Control Over Tremont**

113.    Defendants Oppenheimer, MassMutual Holding, and MassMutual – which are members of the MassMutual Financial Group – maintained significance influence and/or control over and provided substantial assistance to the Tremont entities that managed and operated the Rye funds.

114.    MassMutual determined in or about 2000 to accelerate its involvement in what was then the extraordinarily lucrative hedge fund arena.

115.    In search of strategic acquisitions to help it achieve this objective, MassMutual set its sights on Tremont Advisers, Tremont Group's predecessor entity. Defendant Oppenheimer was the MassMutual Financial Group entity designated to pursue a deal with Tremont Advisers.

116.    In March 2001, Oppenheimer approached Tremont Advisers' financial advisor, Putnam Lovell Securities, Inc. ("Putnam Lovell"), and expressed "an interest in exploring a strategic transaction with Tremont," according to Tremont Advisers' Form DEFM14A filed with the SEC on August 20, 2001 (the "Tremont Proxy").

117.    Tremont Advisers' access to Madoff was one of its greatest selling points. In its Form 10-K SB filled with the SEC, just as Oppenheimer was making its initial approach in March 2001, Tremont Advisers stated that the Market Fund, Prime Fund and its other proprietary

investment funds were designed "to provide clients with vehicles for investments with 'hard-to-access' managers." Plainly, Madoff was the most prominent of these "hard-to-access" managers.

118.   After Oppenheimer and Tremont Advisers entered into a confidentiality agreement on or about March 14, 2001, Oppenheimer was provided with an "information package" that Putnam Lovell had prepared. The package included, among other things, "a description of Tremont's various business lines, an overview of its investments and distribution platform, its strategic relationships, its distribution need and its financial projections," according to the Tremont Proxy.

119.   Significantly, included in this package was Putnam Lovell's "analysis of the significant contribution to Tremont's revenues from a single relationship it has with an investment manager to its proprietary investment products[,]" according to the Tremont Proxy. This "single relationship" was Tremont Advisers' critical relationship with Madoff.

120.   Thus, at the very outset of the transaction, the issue of Tremont Advisers' close and highly lucrative relationship with Madoff was placed squarely before Oppenheimer and its affiliated entities in the MassMutual Financial Group.

121.   On or about April 27, 2001, Oppenheimer submitted to Tremont Advisers a written "preliminary indication of interest" signaling that it valued Tremont Advisers at between $100 million and $140 million.

122.   Over the second half of May 2001, Oppenheimer held extensive meetings with Tremont Advisers to discuss "various business function areas, such as sales and marketing, accounting and administration and manager research," according to the Tremont Proxy.

123.   Also during the second half of May 2001, Oppenheimer representatives conducted extensive due diligence in Tremont Advisers' data room, according to the Tremont Proxy.

124.   On or about May 21, 2011, Putnam Lovell and Tremont Advisers' counsel at Skadden, Arps forwarded a draft merger agreement to Oppenheimer along with a "protocol letter" inviting Oppenheimer to submit a final proposal to acquire Tremont Advisers.

125.   From late May into early June 2001, the senior management of Tremont Advisers along with representatives of Putnam Lovell continued to work closely with senior Oppenheimer executive who were continuing their due diligence – a painstaking, deliberate process then entering its third month.

126.   The due diligence conducted by Oppenheimer focused in substantial part on Tremont Advisers' business dealings with Madoff and BMIS, as well as Madoff's investment strategy and the overall nature of BMIS's operations.

127.   By mid-June 2001, Oppenheimer had completed it due diligence, according to the Tremont Proxy.

128.   As a consequence of their due diligence and through other available sources, MassMutual, MassMutual Holdings, Oppenheimer, and other members of the MassMutual Financial Group were aware as early as the spring of 2001 of numerous "red flags" or indicators of gross irregularities in Madoff's operations.

129.   In addition to this due diligence, at the time Oppenheimer was pursing the purchase of Tremont Advisers, sophisticated players within the investment community who were not involved in the Tremont Advisers transaction already had begun to publicly express skepticism regarding the legitimacy of Madoff's operations.

38

130.   For example, in May 2001 – at the height of Oppenheimer's due diligence inquiry – the aforementioned MAR/Hedge article entitled "Madoff Tops Charts; Skeptics Ask How" was published.

131.   Noting the consistently positive returns Madoff claimed to have earned for his investors over the years, the MAR/Hedge article reported that numerous traders, money managers and fund managers employing a split-strike conversion strategy experienced far greater volatility and more meager returns than Madoff was reporting with respect to what he claimed was his split-strike conversion strategy. In other words, the article highlighted the fact that Madoff's track record could not be replicated by others employing the same investment strategy he claimed to be utilizing.

132.   In addition, on or about May 27, 2001 – again, at the height of Oppenheimer's due diligence inquiry – the aforementioned article entitled "Don't Ask, Don't Tell: Bernie Madoff Is So Secretive, He Even Asks His Investors to Keep Mum" was published. This article reported that three derivative strategists at major investment banks were highly skeptical about the usually steady double-digit returns Madoff claimed were flowing from his split-strike conversion strategy.

133.   The Barron's article quoted a former Madoff investor as stating:  "Anybody who's a seasoned hedge-fund investor knows the split-strike conversion is not the whole story. To take it at face value is a bit naïve."

134.   Notwithstanding their knowledge of Tremont Advisers' close relationship with Madoff, the nature of Madoff's operations and the skepticism other sophisiticated entities were expressing publicly with respect to Madoff's alleged investment strategy, executives at the

highest level of MassMutual, Oppenheimer and other MassMutual Financial Group entities pressed forward with the Tremont Advisers acquisition.

135.   On or about June 8, 2011, Oppenheimer submitted a formal proposal to acquire all of Tremont Advisers' outstanding common stock for $18.25 per share, according to the Tremont Proxy.

136.   Neither its own due diligence into Madoff's operations nor the increasing skepticism being voices about his purported investment strategy dampened Oppenheimer's drive to acquire Tremont Advisers.

137.   Indeed, on or about June 25, 2001, Oppenheimer sweetened its initial proposal and offered to acquire Tremont Advisers at $19.00 per share, according to the Tremont Proxy.

138.   On June 27, 2001, Tremont Advisers' board of directors authorized senior management to conclude their negotiations with Oppenheimer.

139.   On July 9, 2001, Tremont Advisers' board unanimously approved the proposed transaction and the final terms of the deal were finalized early the next day.

**Defendants Oppenheimer, MassMutual Holdings, and MassMutual Exercised Control Over Tremont's Rye Funds**

140.   Oppenheimer's acquisition of Tremont Advisers closed on October 1, 2001. From that point forward, Tremont Advisers' operations – including the marketing and investment activities of the Rye Funds – were directly under the MassMutual Financial Group umbrella.

141.   By virtue of the acquisition, Tremont Advisers became a wholly-owned direct subsidiary of Oppenheimer.

142.   In addition, Tremont Advisers' management structure was overhauled to reflect MassMutual Holding, Oppenheimer and OppenheimerFunds' deep involvement in and control over its operations.

**Defendants Oppenheimer, MassMutual Holding, and MassMutual Exercised Control of Tremont Advisers**

143.    At the time of the acquisition of Tremont Advisers by MassMutual Financial Group, Tremont Advisers' board consisted of five members. All five board members had direct ties to a MassMutal and/or an Oppenheimer entity.

144.    Specifically, as part of the acquisition, John Murphy ("Murphy"), the chairman, chief executive officer and president of OppenheimerFunds, was named a director of Tremont Advisers. Murphy also held the position of executive vice president at MassMutual and was a director of Oppenheimer.

145.    Joining Murphy on Tremont Advisers' restructured board of directors was Kurt Wolfgruber ("Wolfgruber"). Wolfgruber served as management director and the assistant treasurer of Oppenheimer. Wolfgruber also served as the president, chief investment officer and director of OppenheimerFunds.

146.    In addition to Murphy and Wolfgruber, Howard E. Gunton ("Gunton"), an executive vice president and the chief financial officer of MassMutual, was named to Tremont Advisers' board. Gunton also served as a director of Oppenheimer.

147.    Further, as part of the acquisition, Sandra Manzke ("Manzke") and Robert Schulman ("Schulman"), Tremont Advisers' co-chief executive officers and board members, became employees of OppenheimerFunds, according to the Tremont Proxy.

148.    Manzke and Schulman each had employment agreements under which they would continue to serve as co-chief executives "or in other positions to which they may be appointed from time to time" by OppenheimerFunds. Further, those agreements provided for OppenheimerFunds to pay Manzke and Schulman annual base salaries of $500,000.00 plus potentially substantial discretionary bonuses.

41

149.     Subsequent to the Tremont Advisers transaction, Michael Rollings ("Rollings"), chief financial officer and an executive vice president at MassMutual, was named to Tremont Advisers' board of directors.

150.     By the time Rollings joined as a director in 2006, Tremont Advisers' board consisted of four members: Murphy, Wolfgruber, Schulman and Rolings, according to Tremont Advisers' Annual Franchise Tax Report for 2007 filed with the State of Delaware. As noted above, each of those four directors held senior positions with MassMutual and/or an Oppenheimer entity.

151.     By 2008, Tremont Advisers' board consisted of three members, according to Tremont's Annual Franchise Tax Report for 2008 filed with the State of Delaware. Each of these directors – Murphy, Wolfgruber and Rollings – was a high-level executive and/or director of an entity operating within the MassMutual Financial Group network as noted above.

152.     The remaining two members of Oppenheimer's board of directors at the time of the Tremont Advisers' acquisition were O. Leonard Darling ("Darling") and Jeremy Griffiths ("Griffiths"). Darling was chief investment officer and an executive vice president of OppenheimerFunds.

153.     Griffiths, who also served as Oppenheimer's chief financial officer and treasurer, was chief financial officer and an executive vice president of OppenheimerFunds, according to Form SC 13D filed by MassMutual on behalf of Tremont Advisors Inc. (now Tremont Group) dated July 20, 2001.

154.     In addition, Oppenheimer's top executives at the time of the Tremont Advisers transaction had direct ties to MassMutual and OppenheimerFunds. Andrew J. Donohue,

Oppenheimer's general counsel and secretary, was an executive vice president and the general counsel of OppenheimerFunds.

155.    Brian W. Wixted, Oppenheimer's assistant treasurer, was a senior vice president and the treasurer of OppenheimerFunds.

156.    Further, Stephen L. Kuhn, Oppenheimer's assistant secretary, was senior vice president, deputy general counsel and assistant secretary of MassMutual.

**MassMutual Exercised Control over MassMutual Holding**

157.    MassMutual Holding, the corporate parent of the Oppenheimer entity that acquired Tremont Advisers, also was controlled by top-level MassMutual executives at the time of the Tremont Advisers acquisition.

158.    MassMutual Holding's then chairman, president and chief executive officer, Robert J. O'Connell, held those same positions with MassMutual simultaneously.

159.    Lawrence V. Burkett, Jr., a director and executive vice president of MassMutual Holding, served as an executive vice president and general counsel of MassMutual.

160.    Gunton, a director, vice president and the chief financial officer of MassMutual Holding, was an executive vice president and the chief financial officer of MassMutual.

161.    MassMutual Holdings director Margaret Sperry was a senior vice president and the chief compliance officer of MassMutual.

162.    In addition, Ann F. Lomeli, a director, senior vice president and the secretary of MassMutual Holding, held the titles of senior vice president, secretary and deputy general counsel at MassMutual.

163.    Stuart H. Reese, an executive vice president of MassMutual Holding, served as the executive vice president and the chief investment officer of MassMutual.

164.    Christine Modie, an executive vice president of MassMutual Holding, was an executive vice president and the chief information officer of MassMutual.

165.    Murphy, an executive vice president with MassMutual, served as an executive vice president of MassMutual Holding.

166.    Susan A. Alfano, an executive vice president of MassMutual Holding, held that same title with MassMutual.

167.    Matthew E. Winter, a MassMutual Holding executive vice president, held the same title at MassMutual.

168.    Finally, Edward M. Kline, vice president and treasurer of MassMutual Holding, held those same positions at MassMutual.

## COUNT I
### (Breach of Contract – against New York Life)

169.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

170.    The New York Life Policies and offering materials related thereto (**Exhibit A**, hereto) constitute a contract between New York Life and Plaintiff (the "Contract").

171.    Plaintiff has performed all of it obligations under the Contract.

172.    New York Life has failed and refused to perform its obligations under the Contract including, among others, the obligation to timely distribute Tremont's prospectus or confidential memorandum and any supplements thereto to Plaintiff.

173.    As a result of New York Life's breach of the Contract, New York Life has sustained substantial damages.

174.    Had New York Life timely provided to Plaintiff a copy of Tremont's amended and restated PPM, Plaintiff would have learned that Tremont allocates up to 30% of its

investment funds with a single manager, and would not have chosen to invest its funds with Tremont.

## COUNT II
### (Common Law Fraud – against all Defendants)

175.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

176.    Plaintiff, in reasonable and justifiable reliance upon the statements and representations made by Defendants, as previously set forth herein, purchased, through the Investment Account component of its VUL policies, an investment interest in the Tremont Fund, which in turn, invested in the Rye Funds.  Plaintiff would not have purchased these investment interests except for its reliance upon the representations made by Defendants, and would never have purchased these investment interests had Plaintiff been aware of the material omissions and concealment of the facts pertaining to these funds.

177.    At the time the statements and representations were made by the Defendants, the Defendants knew them to be false, or disregarded their falsity with extreme recklessness, and Defendants intended to deceive Plaintiff by making such statements and representations and by concealing material facts.

178.    Had Plaintiff known of the material facts that the Defendants wrongfully concealed and misrepresented, and the falsity of the Defendants' representations, Plaintiff would not have invested in the Tremont Fund.

179.    Plaintiff, as a result of its purchase of an interest in the Tremont Fund and by reasons of the Defendants' wrongful concealments and misrepresentations, has sustained damages and has lost a substantial part of its respective investment in an amount yet to be determined, and to be proven at trial.

180.     By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff.

181.     Defendants are further liable to Plaintiff for punitive damages, in an amount also to be determined at trial, attributable to their wanton course of conduct that was reckless, willful and without regard to the rights of Plaintiff.

## COUNT III
### (Negligent Misrepresentation – against all Defendants)

182.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

183.     The Defendants owed to Plaintiff a duty: (a) to act with reasonable care in preparing and disseminating the policy statements and other representations relied upon by Plaintiff in deciding to acquire and maintain its VUL Policy and/or make its investment choice in the Tremont Fund; and (b) to use reasonable diligence in determining the accuracy of and preparing the information contained in those statements.  Defendants knew that these statements would be provided to policyholders and would be relied upon by them in making investment decisions concerning the Investment Account component of their VUL policies.

184.     Defendants, by their actions and inactions, knowingly and recklessly issued, caused to be issued, or participated in the preparation and issuance of deceptive and materially false and misleading statements to Plaintiff regarding the value of Plaintiff's VUL Policy and the value of Plaintiff's interest in the Tremont Fund.

185.     The Defendants breached their duties to Plaintiff by failing to investigate, confirm, prepare, and review with reasonable care the information contained in these statements and other representations.

186.     Neither the statements nor any other material disseminated to Plaintiff ever disclosed the risks associated with the Tremont Fund's or the Rye Funds' investment with

46

Madoff, BMIS or other Madoff controlled entities.  As a direct, foreseeable and proximate result of this negligence, Plaintiff has sustained damages and has lost a substantial part of its investment in an amount yet to be determined, and to be proven at trial.

187.    By reason of the foregoing, Defendants are further liable to Plaintiff for punitive damages, in an amount also to be determined at trial, attributable to their wanton course of conduct that was reckless, willful and without regard to the rights of Plaintiff.

### COUNT IV
### (Unjust Enrichment – against all Defendants)

188.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

189.    With respect to New York Life, Count IV is alleged in the alternative to Count I.

190.    By their actions and inactions, Defendants have benefited and profited unjustly by receiving excessive revenue derived from the fees they collected based on the VUL policies' cash value.

191.    These payments have been received by New York Life and Tremont at the expense of Plaintiff, under circumstances in which it would be inequitable for Defendants to be permitted to retain the benefit.

192.    Plaintiff is entitled to restitution of the excessive revenue derived from the assessment of fees based on the misrepresented cash value portion of its VUL policies.

### COUNT V
### (Breach of Fiduciary Duty – against New York Life and Tremont)

193.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47

194.     Defendants New York Life and Tremont owed duties to Plaintiff to use due care in the investigation, recommendation, management, and supervision of the invested assets of Plaintiff.

195.     Defendants New York Life and Tremont breached their fiduciary duties to the Plaintiff by investing the assets of Plaintiff in the Rye Funds and BMIS despite numerous red flags.

196.     Defendants New York Life and Tremont breached their fiduciary duties to the Plaintiff by failing to ensure that investments offered in the Investment Account component of its VUL policies were appropriate, and by failing to use due care and reasonable oversight of those investments.

197.     Defendants New York Life and Tremont breached their fiduciary duties by investing the assets of Plaintiff in the Rye Funds, which used a single undisclosed investment advisor.

198.     Defendants New York Life and Tremont breached their fiduciary duties by allowing Plaintiff to direct its investments to funds that invested with Madoff or Madoff related entities without any oversight, supervision, or due diligence, by failing to adequately monitor Madoff's financial reporting, and by failing to detect, prevent, or halt the misstatements and omissions of material fact alleged herein.

199.     As a proximate result of New York Life's and Tremont's breaches of fiduciary duty, Plaintiff has sustained damages and has lost a substantial part of its investment in an amount yet to be determined and to be proven at trial.

200.    New York Life and Tremont are further liable to Plaintiff for punitive damages, in an amount also to be determined at trial, attributable to the wanton course of conduct of New York Life and Tremont that was reckless, willful and without regard to the rights of Plaintiff.

201.    By reason of the foregoing, Defendants New York Life and Tremont are liable to Plaintiff.

## COUNT VI
### (Aiding and Abetting Fraud and Breaches of Fiduciary Duty – Against  Oppenheimer, and MassMutual)

202.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

203.    Defendants Oppenheimer and MassMutual had actual knowledge of the fraud and breaches of fiduciary duty by the Tremont Fund, Rye, and the Rye Funds and substantially assisted in the fraud and  breaches of fiduciary duty.

204.    Defendants Oppenheimer and MassMutual participated in and/or were aware of the Tremont Fund's, Rye's, and the Rye Fund's operations, and/or had intimate knowledge of their products, sales, accounting, plans and implementation thereof, had the power to influence and control and did influence and control, directly or indirectly, the decision-making of these entities, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Defendants Tremont, Oppenheimer, and MassMutual had the ability to prevent the issuance of the statements or cause the statements to be corrected.

205.    Defendants Oppenheimer and MassMutual had direct and supervisory involvement in the day-to-day operations of the Tremont Fund, Rye, and the Rye Funds and, given the size, scope, and blatancy of the wrongdoing and the misrepresentations alleged above,

are presumed to have had the power to control or influence the particular statements giving rise to the claims alleged herein.

206.    Plaintiff suffered damages proximately caused by Oppenheimer and MassMutual aiding and abetting the fraud and breaches of fiduciary duty by the Tremont Fund, Rye, and the Rye Funds in an amount to be proven at trial.

**COUNT VII**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing – against New York Life)**

207.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

208.    Plaintiff entered into a Contract with New York Life.  The Contract expressly (i) stated that NewYork Life has the "exclusive right" to determine the Funds in which Plaintiff, as policyholder, may invest its excess premiums; (ii) gave New York Life the exclusive right to remove its policyholders' investments from any Fund if New York Life determines investing in the Fund has become "inappropriate in view of the purposes of the Policies;" and (iii) required New York Life to notify Plaintiff of any "material change" in a Fund to which Plaintiff had allocated its excess premiums.

209.    Implicit in the Contract was a duty of good faith and fair dealing.

210.     New York Life breached that duty, thereby destroying or injuring Plaintiff's right to receive the fruits of the Contract, in at least the following respects:

a.      New York Life failed to disclose to Plaintiff prior to entering in the Contract and investing in Tremont that New York Life had taken steps whatsoever to verify the representations in the Tremont PPM or otherwise monitor Tremont's investment activities;

b.  In choosing Tremont as a Fund in which its policyholders, including Plaintiff, could invest, New York Life conducted no due diligence to confirm that Tremont was a legitimate investment vehicle and not a sham;

c.  New York Life failed to reasonably monitor Tremont's investment activities during the course of the parties' performance pursuant to the Contract such that New York Life could notify Plaintiff of any material change in the Tremont Fund and/or confirm that the Tremont Fund had not become an "inappropriate" investment vehicle;

d.  New York Life inaccurately represented to Plaintiff that it conducted its "own fundamental, bottom-up research" on the Funds in which it allows policyholders like Plaintiff to invest their excess insurance premiums.

211.  Had New York Life performed its implied obligations to monitor the activities of Tremont and the funds in which Tremont invested, it would have (i) determined that Tremont was blindly allocating 22% of its investors' money to a ponzi scheme that adhered to no investment philosophy whatsoever; and (ii) exercised its "exclusive right" to remove the Tremont Fund from the list of Funds in which policyholders like Plaintiff could choose to invest.

212.  As a direct and proximate result of New York Life's breach of that duty, Plaintiff sustained damages.

## COUNT VIII
### (Negligent Misrepresentation against New York Life)

213.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

214.  In selling the VUL Policy to Plaintiff, New York Life owed Plaintiff a duty to disclose facts within its knowledge material to Plaintiff's decisions as to (i) whether to purchase

51

VUL Policy from New York Life; and (ii) in purchasing the VUL Policy, which Fund among those approved by New York Life to invest its excess insurance premiums.

215.    New York Life breached this duty by failing to disclose to Plaintiff that, though it retained the "exclusive right" to determine the list of funds in which its policyholders could invest, New York Life had conducted no independent due diligence to determine whether each Funds it had selected, such as the Tremont Fund, was legitimate.

216.    Moreover, New York Life breached this duty by inaccurately representing to Plaintiff that New York Life conducted its "own fundamental, bottom-up research" with respect to the securities in which it allowed its policyholders to invest.

217.    As a direct, foreseeable and proximate result of this negligence, Plaintiff has sustained damages and has lost a substantial part of its investment in an amount yet to be determined, and to be proven at trial.

218.    New York Life is further liable to Plaintiff for punitive damages, in an amount also to be determined at trial, attributable to its wanton course of conduct that was reckless, willful and without regard to the rights of Plaintiff.

## COUNT IX
### (Violations of New York General Business Law § 349 – against New York Life and Tremont)

219.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

220.    Defendants New York Life's and Tremont's acts and conduct, as detailed herein, constitute deceptive acts and practices in the conduct of business or in the furnishing of a service, within the meaning of § 349 of the New York General Business Law and, as such, are unlawful.

221.    Upon information and belief, the same acts and conduct used by Defendants New York Life and Tremont to defraud Plaintiff have been used repeatedly and are of a recurring nature.

222.    The acts and conduct of Defendants, by which they knowingly and fraudulently misrepresented to potential purchasers the nature of the investments that Defendants New York Life and Tremont were selling to Plaintiff affect the public interest.

223.    As a result of Defendants New York Life and Tremont's unlawful acts and conduct in violation of § 349 of the New York General Business Law, Plaintiff has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.   Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

b.   Awarding prejudgment interest;

c.   Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including but not limited to disgorgement);

d.   Awarding Plaintiff its reasonable costs and expenses incurred in this suit, including reasonable attorneys' fees, accountants' fees, and experts' fees;

e.   Awarding Plaintiff punitive damages; and

f.   Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff hereby demands a trial by

jury of all issues so triable.

Dated:  December 19, 2011

Respectfully submitted,

Plaintiff Cummins Inc., as the authorized representative of the Cummins Inc. Grantor Trust dated September 10, 2007

By: s/ Sara Siegall
One of its attorneys

**Lead Counsel**
*(Admitted Pro Hac Vice )*

Kevin M. Flynn
Kevin M. Flynn & Associates
77 West Wacker, Suite 4800
Chicago, Illinois 60601
312-456-0240

Robert A. Chapman
Sara Siegall
Chapman Spingola, LLP
77 West Wacker Drive, Suite 4800
Chicago, Illinois 60601
312-630-9202

**Local Counsel**

Jonathan D. Berg, Esq.
Lagemann Law Offices
300 East 42nd Street, 10th FL
New York, NY 10017
212-599-0990

## <u>CERTIFICATE OF SERVICE</u>

I, Sara Siegall, an attorney, hereby certify that on December 19, 2011, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF electronic filing system, which will send a notice of electronic filing to counsel of record.

/s/ Sara Siegall