UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re TREMONT SECURITIES LAW, STATE LAW AND INSURANCE LITIGATION | Master Docket No. 08-Civ-11117 (TPG) |
| YALE M. FISHMAN 1998 INSURANCE TRUST, Individually and On Behalf of All Others Similarly Situated and Derivatively on Behalf of the Nominal Defendant,<br>Plaintiff,<br>vs.<br>PHILADELPHIA FINANCIAL LIFE ASSURANCE COMPANY F/K/A AGL LIFE ASSURANCE COMPANY, TREMONT CAPITAL MANAGEMENT, INC., TREMONT GROUP HOLDINGS, INC., TREMONT PARTNERS, INC., RYE INVESTMENT MANAGEMENT, TREMONT OPPORTUNITY FUND III, L.P., RYE SELECT BROAD MARKET INSURANCE FUND LP, RYE SELECT BROAD MARKET PRIME FUND LP, RYE SELECT BROAD MARKET XL FUND LP, MASSMUTUAL HOLDING LLC, MASSACHUSETTS MUTUAL LIFE INSURANCE CO., OPPENHEIMER ACQUISITION CORP., ROBERT SCHULMAN, SANDRA L. MANZKE, RUPERT A. ALLAN, SUZANNE HAMMOND, STEPHEN CLAYTON, MARK SANTERO, and TIMOTHY BIRNEY,<br>Defendants,<br>-and-<br>TREMONT OPPORTUNITY FUND III, L.P., RYE SELECT BROAD MARKET INSURANCE FUND LP, RYE SELECT BROAD MARKET PRIME FUND LP, and RYE SELECT BROAD MARKET XL FUND LP,<br>Nominal Defendants. | Civil Action No. 11-cv-1283 (TPG)<br><br><u>CLASS ACTION</u><br><br>CONSOLIDATED AMENDED DIRECT AND VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, COMMON LAW FRAUD, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AIDING AND ABETTING BREACH OF FIDUCIARY DUTY, VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW §349, GROSS NEGLIGENCE, NEGLIGENT MISREPRESENTATION, UNJUST ENRICHMENT AND PROMISSORY ESTOPPEL<br><br><u>DEMAND FOR JURY TRIAL</u> |

RECEIVED
2012 JAN -3 P 11:06
US DISTRICT COURT SDNY

## NATURE OF ACTION

1. Plaintiff Yale M. Fishman 1998 Insurance Trust ("Plaintiff") brings this action on behalf of itself and all persons or entities that held variable universal life ("VUL") insurance policies or deferred variable annuities ("DVA") (collectively, the "Policies") issued by Philadelphia Financial Life Assurance Company ("Philadelphia Financial"), formerly known as AGL Life Assurance Company ("AGL") (collectively, "PFLAC"),[1] and managed by Tremont Partners, Inc. ("Tremont Partners") through December 11, 2008 (the "Class" and the "Class Period"). Plaintiff also brings this action derivatively on behalf of the Nominal Defendants Tremont Opportunity Fund III, L.P. ("Tremont Opportunity Fund"), Rye Select Broad Market Insurance Fund L.P. ("Insurance LP Fund"), Rye Select Broad Market Prime Fund L.P. ("Prime Fund"), and Rye Select Broad Market XL Fund LP ("XL Fund") (collectively, the "Nominal Defendants").

2. This action asserts claims against Defendant PFLAC for breach of fiduciary duty, common law fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, violations of New York General Business Law ("GBL") §349, gross negligence, negligent misrepresentation, unjust enrichment and promissory estoppel. Plaintiff also asserts derivative claims on behalf of the Nominal Defendants against Defendant Tremont (defined below), the Control Defendants (defined below) and the Individual Defendants (defined below) for breach of fiduciary duty, common law fraud, gross negligence, negligent misrepresentation, unjust enrichment and aiding and abetting breach of fiduciary duty.

3. This action is brought based on Plaintiff's personal knowledge and its actions, and upon information and belief as to all other matters based on the investigation by its counsel,

---

[1] In or around December 2010, Philadelphia Financial purchased AGL, a then privately owned company established in 1971 and incorporated in Philadelphia.

including a review of the offering materials and other documents provided by Defendants to Plaintiff, the review of complaints filed by other investors with Bernard L. Madoff and/or Bernard L. Madoff Investment Securities LLC ("BLMIS") (collectively, "Madoff") and the United States Government and regulatory authorities, complaints filed by the Trustee for Madoff ("Trustee"), other court filings, published news articles and reports and all other available information.

4. This action arises out of Defendants causing and knowingly permitting monies from Plaintiff's and the Class' Policies, premiums, cash values and their associated death benefits, to be invested in various investment funds that acted as feeder funds for Madoff. Specifically, these monies were invested in the Tremont Opportunity Fund, which was, in turn, invested in the Insurance LP Fund, Prime Fund, and XL Fund, that were ultimately managed or sub-managed by Madoff and/or BLMIS. As a direct result of Defendants' actions, Plaintiff and the Class have suffered damages and/or have lost a substantial portion of their investments.

5. Ignoring information in their own possession or publicly available information that suggested that Madoff's success could only be the result of a massive fraud, Defendants assisted with perpetrating the fraud and, through the receipt of steep management and other fees, benefitted from the Madoff Ponzi scheme. Defendants remained willfully ignorant in order to promote their own self interests, as Defendant Tremont earned more than $180 million in fees in the six years prior to December 2008 and acquired a strong reputation as a leading hedge fund in the industry. All of these fees, however, were a product of fraudulent conveyances, which resulted in many BLMIS customers profiting handsomely from money stolen from others.

6. As part of his Ponzi scheme, Madoff offered his investors a modest but steady double-digit "return" in both up and down markets. Madoff admitted that he "paid investors with money that wasn't there" after he was arrested by the Federal Bureau of Investigation ("FBI") on

December 11, 2008, on criminal charges of securities fraud. Madoff estimated the losses from his massive fraud to be $65 billion.

7. Madoff's consistent double-digit returns and his investment strategy were unable to be replicated by rival fund managers, despite numerous attempts. Madoff's strategy, as described in BLMIS's quarterly reports and "Offering Memorandum," incorporated trades in both equity stocks and options using a "split-strike conversion" strategy. In basic terms, the strategy involved: (i) the purchase of equity shares in a given company; (ii) the sale of "call" options, which give the investor the right to buy a stock at fixed prices; and (iii) the purchase of "put" options, which allow the investor to sell at fixed prices. In reality, however, this strategy was never implemented and Madoff merely paid certain senior investors with the investments already received from other junior investors.

8. Defendants knowingly, recklessly and/or negligently ignored numerous "red flags" that could have alerted them to the fact that Madoff was running an illegitimate and illegal Ponzi scheme through BLMIS. These "red flags" included:

(a) the fact that Madoff offered consistent investment returns, beyond reasonable investment benchmarks, in both up and down markets;

(b) the fact that there was a discrepancy between the trading activity in which Madoff claimed to be buying and selling puts and calls and the open interest of index option contracts;

(c) the fact that BLMIS was audited by a small operation owned by Madoff's brother-in-law as opposed to the 90% of single strategy hedge funds that are audited by one of the top 10 auditors;

(d) the fact that Madoff did not employ any third party administrators and custodians;

(e) the fact that Madoff ran his own back office operations – *i.e.*, the calculation of net asset values, the preparation of account statements, *etc*.;

(f) the fact that Madoff lacked transparency and limited access to his books and records, thereby maintaining a false appearance of exclusivity; and

(g) the fact that Madoff admitted to illegally manipulating his accounting records by personally subsidizing returns in slow quarters in order to minimize risk and to maximize reported performance.

9. Importantly, these "red flags" were recognized by numerous other investment advisors in the industry. Indeed, many investment advisors, investment banks and pension funds – *i.e.*, JPMorgan Chase & Co., the Fort Worth Employees' Retirement Fund ("Fort Worth") and Acorn Partners – took the time and effort to conduct comprehensive and proper due diligence reviews, and, as a result of these warning signs, chose not to invest with Madoff or any of his affiliated funds. In stark contrast, Defendants failed to even conduct a basic due diligence review that would have alerted them to Madoff's fraudulent scheme.

10. Madoff's fraudulent scheme was perpetrated by a network of "feeder funds" that, knowingly or unknowingly, enabled Madoff to evolve from an ordinary asset manager for individual clients to a wholesale manager of billions of dollars. Seven of Madoff's top feeder funds had close to $25 billion in assets invested in him.

11. Ignoring the "red flags" identified above, Defendant Tremont, as defined herein, acted as a "feeder fund" to Madoff by investing and/or permitting Plaintiff's and the Class' monies and/or Policies to be invested with Madoff and his affiliates. Defendants knowingly or recklessly

provided investors with the option of investing in the Tremont Opportunity Fund without undertaking a comprehensive and proper due diligence review to assess the risks involved.

12. Moreover, Defendants profited generously from this arrangement by unjustly receiving millions of dollars in management fees for merely entrusting and/or re-depositing their clients' funds with a sub-manager – *i.e.*, Madoff and/or BLMIS. This wanton conduct directly caused Plaintiff and the Class to suffer losses.

13. Plaintiff and the Class hereby seek to recover damages as well as all fees and other amounts wrongfully paid to Defendants. The management fees paid in error, and based on mistaken information, should be returned to Plaintiff and the Class. These avoidable losses were suffered as a direct result of Defendants' breach of fiduciary duty, fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, aiding and abetting breach of fiduciary duty, violations of GBL §349, gross negligence, negligent misrepresentation, unjust enrichment and promissory estoppel.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(d)(2)(A) as well as principles of pendent and ancillary jurisdiction.

15. Venue is proper in this district pursuant to 28 U.S.C. §1391(a) because a substantial part of Defendants' conduct giving rise to the cause of action occurred in this District. Venue is also proper in this district because Defendant Tremont, Defendant Tremont Opportunity Fund, Defendant Rye Select Funds and Defendant Oppenheimer each had their principal places of business located in New York.

16. On January 13, 2011, this action was removed to the Eastern District of New York and on March 24, 2011, this action was consolidated with *In re Tremont Securities Law*, *State Law*

*and Insurance Litigation*, No. 08-Civ-11117 (TPG) (S.D.N.Y. 2009), and designated to the Insurance Action tranche.

**PARTIES**

**Plaintiff**

17. Plaintiff Yale M. Fishman 1998 Insurance Trust is a contract holder of Policies issued by PFLAC ("Fishman Policies"). Pursuant to the Fishman Policies, Plaintiff entrusted certain monies to PFLAC, which were invested in the Tremont Opportunity Fund that was managed by Defendant TGH (defined below) and Tremont Partners. Plaintiff purchased two Policies issued by PFLAC in February 2000 and February 2001, respectively, and suffered losses as a result of Defendants' misconduct. The first of Plaintiff's Policies, Contract Number VL300117, had total cash deposits from its inception through the date of the Madoff Ponzi scheme of $2,230,000. As a result of Defendants' actions, Plaintiff sustained losses of $408,837.86 on this policy. The second of Plaintiff's Policies, Contract Number VL300195, had total cash deposits from its inception through the date of the Madoff Ponzi scheme of $1,942,000. As a result of Defendants' actions, Plaintiff sustained losses of $397,463.86 on this policy. The total loss suffered by Plaintiff as a result of Defendants' misconduct is $806,301.72.

**Defendants**

**Defendant PFLAC**

18. Defendant Philadelphia Financial is an insurance company organized pursuant to the laws of Pennsylvania, with its principal place of business located at One Liberty Plaza, 1650 Market Street, 54th Floor, Philadelphia, Pennsylvania 19103. Philadelphia Financial delivers strategic insurance products to its clientele. The products delivered by Philadelphia Financial include variable annuities, variable life insurance policies and survivor life insurance products. As mentioned above, in or around December 2010, Defendant Philadelphia Financial purchased Defendant AGL, the

original issuer of Plaintiff's two Policies. Defendant AGL was an insurance and financial services organization having a principal office at 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania 19462. Defendant AGL issued policies and entered into insurance contracts with residents and businesses in the New York, New Jersey, Connecticut and Pennsylvania areas.

19. Defendants Philadelphia Financial and AGL are collectively referred to herein as "PFLAC."

**Tremont Defendants**

20. Defendant Tremont Group Holdings, Inc. ("TGH") is incorporated pursuant to the laws of Delaware and had its principal place of business during the relevant time period at 555 Theodore Fremd Avenue, Rye, New York 10580. Defendant TGH is the parent company for Defendant Tremont Partners, a fund of hedge funds. Defendant TGH was an investment management firm formed in 1987 that managed roughly $7.7 billion in assets as of September 2008 through its fund of hedge fund products and multi-manager portfolios, as well as its single-manager Defendant Rye (defined below). Defendant TGH changed its name several times, in 1991 (to Tremont Advisors, Inc.), in 2003 (to Tremont Capital Management) and, finally, in 2006 to TGH. Defendant TGH has offices in New York, Toronto, London, and Hong Kong and is owned by Defendant Oppenheimer Acquisition Corporation (defined below), which is majority controlled by Defendant Massachusetts Mutual Life Insurance Co. (defined below). TGH's former website stated that TGH "was at the forefront in setting the standard in the industry for fund of hedge funds investment management." During most of the relevant time period, TGH had five directors, two from Tremont management, two from Oppenheimer and one from MassMutual.

21. Defendant Tremont Partners is a Connecticut corporation with its principal place of business located at 555 Theodore Fremd Avenue, Rye, New York 10580, and is a wholly-owned subsidiary of TGH. Tremont Partners is the general partner and investment manager of the Nominal

Defendants. Tremont Partners is an investment adviser registered with the Securities and Exchange Commission (the "SEC") under the Investment Advisers Act of 1940 ("Advisers Act"). Defendant Schulman (listed below), a member of Tremont management, served on the board of Tremont Partners throughout the relevant time period.

22. Defendant Rye Investment Management ("Rye") is a division of Defendant TGH that controlled assets of $3.1 billion, virtually all invested with Madoff. Defendant Rye has its principal place of business located at 555 Theodore Fremd Avenue, Rye, New York 10580. Defendant Rye managed the Rye Select Funds.

23. Defendant TGH, Defendant Tremont Partners and Defendant Rye are at times referred to collectively herein as "Tremont."

**Control Defendants**

24. Defendant Oppenheimer Acquisition Corp. ("Oppenheimer") is a company incorporated pursuant to the laws of Delaware and is headquartered at Two World Financial Center, New York, New York 10281. Defendant Oppenheimer is the parent of Tremont. Defendant Oppenheimer was incorporated in 1990 and is a subsidiary of MassMutual (defined below) and the parent company of the OppenheimerFunds, which, according to its website, "is one of the nation's largest and most respected asset management companies." Defendant Oppenheimer jointly marketed several funds with Defendant Tremont Partners and allowed them to use the Oppenheimer name on several funds operated by Defendant Tremont Partners.

25. Defendant MassMutual Holding LLC is the parent company of Defendant Oppenheimer and its principal place of business is located at 1295 State Street, Springfield, Massachusetts 01111.

26. Defendant Massachusetts Mutual Life Insurance Co. is the parent company of Defendant MassMutual Holding LLC, which owns Defendant Oppenheimer. Defendant

Massachusetts Mutual Life Insurance Co. is headquartered at 1295 State Street, Springfield, Massachusetts 01111. According to MassMutual's 2009 Annual Report "MassMutual provides products and services to help meet the financial needs of individual and business clients, including life insurance, disability income insurance, long term care insurance, annuities, executive benefits, benefit funding vehicles and trust services." MassMutual refers to itself, including its subsidiaries, such as OppenheimerFunds and Tremont, as the "MassMutual Financial Group." In its 2007 10-K, Defendant Massachusetts Mutual Life Insurance Co. categorized Tremont as one of its "General Agency and Other Offices."

27. Defendant MassMutual Holding LLC and Defendant Massachusetts Mutual Life Insurance Co. are collectively referred to herein as "MassMutual."

28. Defendants Oppenheimer and MassMutual are collectively referred to herein as the "Control Defendants."

**Individual Defendants**

29. Defendant Sandra L. Manzke ("Manzke") is an individual who founded Tremont in 1984 and was its Chairman and Chief Executive Officer ("CEO") until April 2005. Defendant Manzke was also the co-CEO of TGH from 1994 until April 2005, and the Chairman of the Board and co-CEO of Tremont Advisers until 2001. Prior to founding Tremont in 1984, Manzke was a principal of Rogers, Casey & Barksdale, Inc. ("Rogers Casey"), a pension consulting firm, where she spent six years. She was also an investment manager at Scudder, Stevens & Clark for five years and an independent consultant for Bernstein MacCauley. Defendant Manzke was responsible for Tremont's long-standing relationship with Madoff and she improperly benefitted from management and other fees charged to Plaintiff and the Class as a result of Defendants' misconduct. Upon information and belief, Defendant Manzke resides in Palm Beach, Florida.

30. Defendant Robert Schulman ("Schulman") is an individual who joined Tremont in 1994 and served as the CEO of Tremont from April 2005 to 2008, President and co-CEO of TGH from 1994 through April 2005, and its CEO and Chairman of the Board from April 2005 to July 2008. Defendant Schulman was the CEO of Rye, the division of Tremont Partners that managed the company's hedge funds, until July 2008. Prior to joining Tremont in 1994, Schulman was responsible for Smith Barney's $60 billion Consulting Services Division and Retail New Product Development. In 1982, Schulman founded the Leveraged Product Division at E.F. Hutton and eventually assumed responsibility for all retail products offered at E.F. Hutton. Defendant Schulman was responsible for Tremont's long-standing relationship with Madoff and he improperly benefitted from management and other fees charged to Plaintiff and the Class as a result of Defendants' misconduct. Upon information and belief, Defendant Schulman resides in Armonk, New York.

31. Defendant Rupert A. Allan ("Allan") is an individual who joined Tremont in July 2002 as Managing Director of Defendant Tremont Partners. Defendant Allan was the former President of Defendant Tremont Partners and Defendant TGH, as well as a member of the Executive Committee and Investment Advisory Board. Prior to joining Tremont, Defendant Allan was Executive Director of the Structured Alternative Investment team at Société Générale, where he was responsible for marketing alternative investment products globally, and served as a member of the investment committee in the selection of hedge fund managers. Defendant Allan was considered a principal decision-maker of Tremont Partners during the relevant time period.

32. Defendant Suzanne Hammond ("Hammond") was the Senior Vice President of Tremont Partners. She was also a Director of Defendant Tremont Partners affiliate, Tremont (Bermuda) Limited. Defendant Hammond was responsible for program analysis and fund administration/supervision for all of Defendant Tremont Partner's proprietary products and was also

responsible for certain investment supervision clients. Prior to joining Tremont Partners in 1989, Ms. Hammond spent six years with Rogers Casey as a Senior Analyst responsible for major consulting clients. For five years before joining Rogers Casey, Ms. Hammond served as the liaison representative managing listed Midwestern companies on the New York Stock Exchange, Inc. Prior to that, she worked for three years in the Corporate Banking Division at Morgan Guaranty Trust Company.

33. Defendant Stephen Clayton ("Clayton") was the Chief Financial Officer ("CFO") of Tremont Partners and served as CFO for Tremont Advisors where he was responsible for financial reporting, both internal and to the SEC. Defendant Clayton also served as CFO and as a Director of Tremont Securities, Inc. Defendant Clayton holds a B.S. in Accounting from the University of Connecticut, is a C.P.A., and is a member of the American Institute of Certified Public Accountants and the Connecticut Society of Certified Public Accountants. Prior to joining Tremont Advisors, Mr. Clayton spent ten years with Ernst & Young LLP, lastly as a senior manager, where his clients included numerous financial services companies.

34. Defendant Mark Santero ("Santero") is an individual who served as Chief Operating Officer for Tremont Partners, where he was responsible for the operational oversight and management of Tremont's information technology systems and infrastructure, product management and product development activities, fund administration and operations and human resources. Prior to joining Tremont, Santero served as Managing Director within the Investment Department at IVY Asset Management Corp., where he was responsible for oversight of the firm's structured credit group and managing investment policies in the research, portfolio management, risk management and operational due diligence groups. Defendant Santero was considered a principal decision-maker of Tremont Partners during the relevant time period.

35. Defendant Timothy Birney ("Birney") was a Vice President and Portfolio Manager at Tremont Partners during the relevant time period, where he was responsible for constructing portfolios within the framework of the client's unique objectives and constraints through manager selection and appropriate strategy weightings. Prior to joining Tremont, Mr. Birney was Vice President at Asset Alliance Corp. and a former Vice President at Nikko Securities Co. International, Inc. Defendant Birney was considered a principal decision-maker of Tremont Partners during the relevant time period.

36. Defendants Manzke, Schulman, Allan, Hammond, Clayton, Santero and Birney are collectively referred to herein as the "Individual Defendants."

37. Defendant PFLAC, Defendant Tremont, the Control Defendants and the Individual Defendants are collectively referred to herein as "Defendants."

**The Nominal Defendants**

38. Nominal Defendant Tremont Opportunity Fund was a fund of hedge funds managed, advised and/or overseen by Tremont Partners and had its principal place of business located at 555 Theodore Fremd Avenue, Rye, New York 10580. Tremont Opportunity Fund was invested with Madoff through its investments in the Rye Select Funds and accepted subsequent monies through the Rye Select Funds. As described in a letter dated January 21, 2009 by Nominal Defendant Tremont Opportunity Fund, c/o Defendant Tremont Partners, to Plaintiff, the Tremont Opportunity Fund's 23% investment allocation to BLMIS was written down to zero effective November 30, 2008.

39. Nominal Defendant Insurance LP Fund is a limited liability partnership incorporated in Delaware with its principal place of business located at 555 Theodore Fremd Avenue, Rye, New York 10580.

40. Nominal Defendant Prime Fund is a limited liability partnership incorporated in Delaware with its principal place of business located at 555 Theodore Fremd Avenue, Rye, New

York 10580. It was originally organized under the name American Masters Broad Market Prime Fund, LP. The Prime Fund's principal objective was to provide investors with long-term capital growth by levered investments (accomplished with the assistance of various credit facilities) managed by selected managers.

41. Nominal Defendant Tremont Opportunity Fund was invested with Madoff through the Prime Fund, which had substantially all of its assets invested with Madoff.

42. Nominal Defendant XL Fund is a limited liability partnership incorporated in Delaware with its principal place of business located at 555 Theodore Fremd Avenue, Rye, New York 10580. Tremont Partners served as the XL Fund's general partner and investment manager throughout the relevant time period.

43. Nominal Defendants Insurance LP Fund, Prime Fund and XL Fund are at times referred to collectively herein as the "Rye Select Funds."

**SUBSTANTIVE ALLEGATIONS**

44. As stated above, Defendant PFLAC is a company that delivered strategic insurance products to its clients. The products delivered by PFLAC included variable annuities, variable life insurance policies and survivor life insurance products.

45. One of the products offered to Plaintiff and the Class by Defendant PFLAC were variable universal life insurance policies, which are a form of life insurance also known as a cash value insurance policy. As is the case in virtually all life insurance policies, the variable universal life policy had a payout in case of death known as the "death benefit."

46. Variable universal life insurance policies are designed to allow policyholders to choose how the premiums are invested. Policyholders invest a portion of their premiums in optional investment accounts, which are offered under the policy. Because the investments are held within a policy, gains inside the policy are shielded from income taxes, as is the payout upon death. An

additional benefit is that policyholders can access their money during their lifetime by withdrawing or borrowing funds, tax free, from the policy.

47. The term "universal" refers to the fact that the premium is not an amount "set in stone," as would be true with traditional whole life insurance, but rather can be varied within a range. As for the first part of the name, the "variable" portion refers to the fact that the policyholder can direct the investments that he or she chooses from a pool of options provided by the policy and, thus, the cash value will vary. The policyholder bears the risk of performance in the policy, and is required to keep the policy at a level that allows the "returns" to fund the policy's expenses each year.

48. The risks associated with these policies are that: (i) poor performance could require increasing premiums to keep the policies in force; (ii) they may lapse if they do not have sufficient funding; and (iii) the policyholder cannot withdraw from the cash value during the policyholder's lifetime.

49. Certain members of the Class purchased DVAs offered by PFLAC and managed by Defendant Tremont. A DVA is a type of annuity designed as a retirement savings vehicle, which provide payments to annuitants in varying amounts depending on the success of the investment account of the insurance companies. The monies in the investment account compound, tax-deferred, until they are ultimately withdrawn by the annuity holder, at which point it is taxed as regular gross income. The investment accounts are typically managed by hedge funds or insurance company investment managers. Variable annuities are legally considered insurance contracts with special tax advantages under the Internal Revenue Code.

50. DVAs offer the following advantages:

(a) tax deferral of investment gains: similar to an individual retirement account ("IRA"), an investor's contributions and earnings can grow tax-deferred until the investor starts to withdraw funds;

(b) no caps: unlike an IRA, there is no limit to the amount invested each year;

(c) ease of changing investments: because variable annuities have investment accounts with various mutual funds to select from, it is easy to change investment direction at little or no cost to the investor;

(d) income for life: annuity payout options in the distribution phase of the account can provide guaranteed income for life; and

(e) asset protection: in certain jurisdictions, annuities are a shelter from creditors.

51. Plaintiff allocated the annual net premium payment of the Fishman Policies to an investment account option entitled "American Masters Opportunity Insurance Fund, L.P. Account," which subsequently changed its name to the Tremont Opportunity Fund. As stated in the Fishman Policies, the objective of choosing the investment account option was to achieve long-term capital appreciation and consistently generate positive returns irrespective of stock market volatility or direction while focusing on the preservation of capital.

52. To achieve that objective, PFLAC offered a policy, touting an "investment strategy to invest with various portfolio managers believed to be able to meet the Partnership's objective." The investment was targeted to insurance companies' high net worth clients.

53. Under the terms of the Policies issued by PFLAC, Plaintiff and the Class were allowed to choose where the premiums that they paid would be invested. Certain Class members allocated the cash value of their Policies to at least four funds managed by Tremont Partners: (1) Nominal Defendant Prime Fund; (2) Nominal Defendant Tremont Opportunity Fund;

(3) Tremont Strategic Insurance Fund, L.P.; and (4) Tremont International Insurance Fund, L.P., which were offered by PFLAC as fund options.

54. Defendant PFLAC was able to offer Tremont Opportunity Fund to Plaintiff and the Class as a fund option upon becoming a limited partner in the Tremont Opportunity Fund, with Tremont Partners serving as the General Partner. The relationship between PFLAC and Tremont was governed by, among other offering materials, a limited partnership agreement ("LP Agreement"), a participation agreement and an investment management agreement. Tremont Partners also provided to PFLAC and other limited partners in the Tremont Opportunity Fund a confidential private placement memorandum ("PPM").

55. Under the terms of the PPM and LP Agreement, the Tremont Opportunity Fund accounted separately for the value of PFLAC's assets at all times. Specifically, a separate account was established for PFLAC when it became a limited partner of the Tremont Opportunity Fund with its total value equaling PFLAC's initial contribution. The value of the account later varied based upon subsequent account activities that occurred over the life of the investments, *i.e.*, additional funds were added, redemptions, distributions, *etc*. Additionally, PFLAC received monthly account statements updating the limited partners about the status of their accounts.

56. Defendant PFLAC paid to Defendant Tremont Partners an annual management fee ranging from .75% of net asset value ("NAV") to 1.25%, which was based on the class of shares purchased by the limited partner. Defendant PFLAC also paid to Tremont Partners an annual asset-based administration fee of 10%.

57. The Tremont Opportunity Fund touted a "multi-manager format," which was designed to offer its investors a diversified portfolio of different managers utilizing different investment strategies and techniques. Defendants misled Plaintiff and the Class by virtue of these

misrepresentations since, in reality, all of the funds' NAV was invested with a ***single*** manager, namely, Madoff and BLMIS.

58. In the Tremont Opportunity Fund PPM, Tremont acknowledged that "[t]he overall success of [the Tremont Opportunity Fund] will depend on: (i) the ability of [Tremont Partners] to select Managers and to allocate the assets among them, and (ii) the Manager's ability to be successful in their respective strategies." The Tremont Opportunity Fund PPM provided that Tremont Partners was "responsible for selecting the Partnership's Managers, allocating assets among Managers and monitoring the Partnership's investments."

59. Under applicable state law, in order to offer these investments to Plaintiff and the Class, Defendant PFLAC was required to establish a separate account for each Class member for the purpose of making and holding the investments. In addition, all of the assets held in these accounts for investment had to be owned exclusively by PFLAC. Therefore, although the Policies were issued to and held by Plaintiff and the Class, PFLAC owned and controlled all investments authorized by the Policies and further decided the different investment options it would make available to the insureds. By structuring the Policies this way, PFLAC satisfied applicable state law and was able to offer to Plaintiff and the Class different policies with favorable tax treatment and the deferral of federal income tax.

60. Beginning in 2003, Defendant Tremont requested that PFLAC identify the annuity or policyholders and policy numbers associated with each investment instruction (*i.e.*, contribution or redemption) issued by PFLAC. PFLAC at that time stopped making subscriptions to the Tremont Opportunity Fund in PFLAC's name and instead made subscriptions to the Tremont Opportunity Fund in the name of the distinct separate PFLAC accounts.

61. In connection with the selection of investment alternatives under the Policy, PFLAC provided to Plaintiff for its consideration and review, amongst other offering materials and documents, the First AGL Private Placement Memorandum dated March 21, 2000 ("2000 PPM") and the Supplement to the 2000 PPM ("2000 PPM Supplement"). In or around 2008, PFLAC provided to Plaintiff for its consideration and review the Second Amended and Restated Confidential Private Placement Memorandum for the Tremont Opportunity Fund dated August, 2008 ("2008 PPM").

62. The 2000 PPM was issued to Plaintiff was in connection with the purchase of the Fishman Policies. The 2000 PPM stated that "[p]remiums paid by the Policyholder will be placed into the AGL Variable Account, which is a separate account of the Company established for the purpose of funding the variable benefits under the Policy. . . . The value of amounts invested in the Investment Accounts will vary up or down in accordance with the performance of the investments selected for these Investment Accounts."

63. According to the 2000 PPM, the Company only issued policies to those investors with at least the initial minimum premium of $250,000. The 2000 PPM discussed certain monthly charges that were deducted under the terms of the policies, including a charge for mortality and expense risks deducted as a percentage of the account value:

> Before crediting any Premium to the Investment Accounts, a Premium Load, which consists of a Distribution Charge and a Premium Tax Charge, and a DAC Tax Charge is deducted as a percentage of that Premium.
>
> <u>Premium Tax Charge</u>. The Company [AGL] also deducts a Premium Tax Charge that is based on Premiums received during the Policy and that is imposed on the Company by the applicable state taxing jurisdiction.
>
> <u>DAC Tax Charge</u>. The Company also deducts a 1% DAC Tax Charge based on Premiums received under the Policy.
>
> <u>Mortality and Expense Risk Charge</u>. Each Investment Account is assessed a mortality and risk charge of .20% per annum.

* * *

> Cost of Insurance Charge. A deduction for the Company's cost of insurance protection is made on each Monthly Calculation Date and will vary only by Ages of Insureds. The cost of insurance rates generally increases as an Insured's Age increases.
>
> * * *
>
> Additional Insurance Benefits. Deductions will be made on each Monthly Calculation Date for applicable charges for any additional benefits provided by Policy rider.
>
> Underwriting and Administration Charge. One Insured: . . . $.10 per $1000 of Face Amount, with a minimum charge of $200 and a maximum charge of $700. Two Insureds: . . . $.20 per $1000 of Face Amount, with a minimum charge of $400 and a maximum charge of $1400.
>
> Annual Charges. Charges assessed in connection with any Policy Loan will be added to the loan principal on an annual basis, if such charges are not otherwise paid.
>
> Charges Against the Variable Account. The value of the net assets of each Investment Account will reflect the investments advisory fee and other expenses incurred by that Investment Account. The fee is calculated based on net assets at the beginning of the calendar quarter for each Investment Account. Currently, the investment advisory fee paid by each of the Investment Accounts is as follows:
>
> Money Market Account. The investment advisory fees paid with respect to the Money Market Account will be any fees which are directly charged as a result of the underlying investments of the Account, plus a management fee not to exceed 20 basis points.

*See* 2000 PPM at 23-25.

64. In the 2000 PPM, there is a section entitled "The Variable Account," which stated, in pertinent part, as follows:

> The Money Market Account is part of the Variable Account which was established under the laws of the Commonwealth of Pennsylvania on January 1, 1996. This Investment Account and other Investment Accounts that may be added in the future serve as the investment options for premiums received from purchasers of a flexible premium deferred variable life insurance policy (the "Policy") issued by the Company. . .
>
> * * *
>
> The Variable Account's assets are owned by the Company and are held separately from all other assets of the Company. The portion of the Variable Account's assets equal to the

> reserves and other Policy liabilities of the Variable Account will not be chargeable with any liabilities arising out of any other business of the Company. The income, gains, and losses, realized or unrealized, from assets allocated to the Variable Account are credited to or charged against the Variable Account, without regard to other income, gains, or losses of the Company.
>
> The overall management of the Variable Account's business affairs is subject to the authority of the Company's Board of Directors.
>
> * * *
>
> **<u>INVESTMENT ACCOUNT OBJECTIVES AND POLICIES</u>**
>
> The investment objectives and policies of each Investment Account are summarized below. THERE CAN BE NO ASSURANCE THAT THE INVESTMENT OBJECTIVE OF ANY INVESTMENT ACCOUNT WILL BE ACHIEVED:
>
> 1. <u>Money Market Account</u>. The objective of this Investment Account is to achieve the highest level of current income consistent with preservation of capital and maintenance of liquidity. This Account will be invested in a broad range of investment grade securities with an average maturity of 91 days or less. The instruments employed will include money market funds, commercial paper, U.S. sponsored Agency Discount Notes, repurchase agreements, U.S. Treasury bills, and other short term securities considered by FASB to be money market instruments. All premiums received will be placed in this Account until as soon as practicable after the end of the Free Look Period, at which time premiums will be allocated among the Investment Accounts in accordance with the most recent instructions of the Policyholder.

*See* 2000 PPM at 35. [Emphasis in original.]

65. The 2000 PPM Supplement was a document that had the same legal force and effect as the 2000 PPM and further governed the rights of Plaintiff and the Class. The document memorialized this fact as follows: "However, it must be emphasized that the rights of the Policy Owner are governed by the terms of this AGL Life Assurance Company Private Placement Memorandum and any supplements thereto. . ."

66. The 2000 PPM Supplement added a number of investment choices for Plaintiff. Specifically, the three variable accounts made available to Plaintiff now included the: (i) Money Market Account (as described in the 2000 PPM); (ii) the Stillman Market Neutral Fund, L.P. Account; and (iii) Tremont Opportunity Fund.

67. The document further described the Tremont Opportunity Fund in great detail, and instructed Plaintiff to read the limited partnership agreement and private placement memorandum for the Tremont Opportunity Fund. The 2000 PPM Supplement also provided a summary description of the Tremont Opportunity Fund's objectives, as stated in the private placement memorandum:

> American Masters Opportunity Insurance Fund, L.P. Account (the "AMOIF Account"). This Account invests in the American Masters Opportunity Insurance Fund, L.P. (the 'Partnership").
>
> * * *
>
> A. INVESTMENT OBJECTIVES
>
> The American Masters Opportunity Insurance Fund, L.P. Account.
>
> The American Masters Opportunity Insurance Fund, L.P. Account's use of a multimanager format, whereby investments are made through a variety of managers utilizing different and, if possible, non-correlated investment strategies and trading techniques, is designed to provide investors with a diversified investment portfolio, as well as enable them to obtain above-average returns over a market cycle. The overall success of the Partnership will depend on (i) the ability of the General Partner to select Managers and to allocate the assets among them, and (ii) the Managers' ability to be successful in their respective strategies.
>
> * * *
>
> B. INVESTMENT STRATEGIES
>
> The American Masters Opportunity Insurance Fund L.P. Account.
>
> The following is a brief summary of some aspects of the Partnership. The Partnership seeks to (i) achieve long-term capital appreciation and (ii) consistently generate positive returns irrespective of stock market volatility or direction, while focusing on the preservation of capital. The Account is managed by Tremont Partners, Inc. ("General Partner") which will attempt to accomplish these investment objectives by investing with various portfolio managers (the "Managers") which the General Partner believes are able to meet the Partnerships objectives.
>
> * * *
>
> Policy Owners should consider the following risk factors when evaluating the merits and suitability of an investment in the Partnership:
>
> *1. Multi-Manager Concept* – The use of a multi-manager concept increases the costs of managing funds and the risk of delegating control of a majority of the

> Partnership's assets to persons other than the General Partner. There is no ability to predict the investments the Manager may select or whether they will act in accordance with disclosure documents or descriptive materials furnished by them to the Partnership. This strategy may also significantly increase the fees and expenses payable by the Partnership since the Managers charge their own *fees* and expenses.
>
> * * *
>
> C. THE INVESTMENT ACCOUNT'S MANAGERS
>
> **The General Partner**
>
> The American Masters Opportunity Insurance Fund, L.P. Account is managed by the general partner, Tremont Partners, Inc., a Connecticut corporation. The general partner is registered as an investment adviser. The general partner is principally engaged in the business of providing consulting and specialized investment services to financial institutions, mutual funds, other investment companies, investment managers and individuals. The general partner also develops, manages and provides consulting services to other of its own proprietary multi-advisor funds. The general partner is a wholly-owned subsidiary of Tremont Advisers, Inc. ("Tremont Advisers"), a publicly-traded Delaware corporation.

*See* 2000 PPM Supplement at 1-3, 6-7.

68. Defendant PFLAC, by issuing the 2000 PPM Supplement and the above statements concerning the Tremont Opportunity Fund to Plaintiff and other Class members and publishing to Plaintiff and other Class members the statements made therein, misled Plaintiff and the Class because the investments made by it of Plaintiff's and the Class' funds were not ultimately invested pursuant to the investment strategy outlined as set forth above. Rather, the Tremont Opportunity Fund deposited its funds in the Rye Select Funds, and ultimately in Madoff, as managers of the funds and these funds were subject to Madoff's Ponzi scheme by which the funds were not invested, but rather held by Madoff and ultimately lost. The risk factors listed by Defendant PFLAC in the 2000 PPM Supplement did not include the possibility that Plaintiff's and the Class' monies would be invested, and ultimately lost, in a Ponzi scheme.

69. In 2008, Plaintiff was provided with the 2008 PPM by Defendants. The 2008 PPM stated that the objective of the Tremont Opportunity Fund was to: (i) achieve long-term capital appreciation; and (ii) consistently generate positive returns irrespective of stock market volatility or direction, while focusing on preservation of capital.

70. As explained in both the Policy and the 2008 PPM, the owners of variable life insurance contracts issued by the insurance companies could opt to have the insurance company invest their premiums in the Tremont Opportunity Fund. The Policy owners, however, were expressly restricted from any contact or communication, either direct or indirect, with the general partner, Tremont Partners, and with the Tremont Opportunity Fund. Thus, Plaintiff was barred from having any communication with the general partner or the Tremont Opportunity Fund; only PFLAC could have any communication or contact with the general partner or the Tremont Opportunity Fund.

71. As a result of its exclusive relationship with Tremont, and the reliance its insureds were placing on it, Defendant PFLAC knew, or should have known, how important it was to analyze and evaluate any prospective manager of the investments of the Tremont Opportunity Fund as each manager chosen by the general partner was to be granted full discretion over all matters relating to the manner, method and timing of investment and trading transactions with respect to the Tremont Opportunity Fund assets allocated to the manager, subject to the investment objectives, policies and restrictions of the Tremont Opportunity Fund or as "otherwise communicated to the [m]anager by the [g]eneral [p]artner."

72. PFLAC represented, through the 2008 PPM, that "[t]he [g]eneral [p]artner believes, however, that, given its alternative investment market experience, it should be able to obtain sufficient information about potential [m]anagers or [i]nvestment [v]ehicles to select them effectively." As expressly provided in the 2008 PPM, the general partner is accountable to the

Tremont Opportunity Fund as a fiduciary and consequently must exercise good faith and integrity in the handling of the Tremont Opportunity Fund's affairs.

73. Defendant PFLAC, by issuing the 2008 PPM and the partnership agreement of the Tremont Opportunity Fund to Plaintiff and other Class members and publishing to Plaintiff and other Class members the statements made therein, misled Plaintiff and the Class because the investments made by it of Plaintiff's and the Class' funds were not ultimately invested pursuant to the investment strategy outlined as set forth above. Rather, the Tremont Opportunity Fund deposited its funds in the Rye Select Funds, and ultimately in Madoff, as managers of the funds and these funds were subject to Madoff's Ponzi scheme by which the funds were not invested, but rather held by Madoff and ultimately lost.

74. PFLAC conveyed the false impression that it conducted a thorough investigation and due diligence review of the managers of the funds in which Plaintiff's and other Class members' premiums were to be invested. In reality, PFLAC did not conduct a comprehensive due diligence review and ignored the warnings that would have alerted it to Madoff's Ponzi scheme.

75. Plaintiff and the Class maintained in excess of $125 million in their investment accounts in the Tremont Opportunity Fund, Select Rye Funds and other Tremont and Rye funds offered by PFLAC. Although the exact total amount of damages suffered by Plaintiff and the Class is unknown at this time, Defendants' records show that the investment accounts sustained substantial losses as a result of Defendants' dealings with Madoff.

76. Despite purporting to have a sophisticated plan to perform due diligence on the investment companies it offered to policyholders, PFLAC did not perform independent, reasonable, meaningful qualitative or quantitative due diligence on Tremont or Madoff and BLMIS. It did not perform its fiduciary duties to Plaintiff and the Class by failing to perform the due diligence that it

promised to perform. It failed to investigate whether Defendant Tremont was actually investing Plaintiff's and the Class' monies utilizing the "multi-manager" investment strategy promised to investors. PFLAC also did not conduct any reasonable analysis as to whether Madoff's stated returns were even possible based upon the strategy he purported to use and wrongly relied on Tremont's and Madoff's reputation and consciously disregarded many indications of fraud.

**The Madoff Ponzi Scheme**

77. Founded in 1959, BLMIS began operations as a sole proprietorship of Madoff and later, effective January 2001, formed as a limited liability company wholly owned by Madoff. Since approximately 1986, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, and CEO, ran BLMIS together with several family members and a number of additional employees. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78o(b). BLMIS had three business units: the investment advisor business, market making and proprietary trading.

78. Madoff attributed the investment advisory business's consistent investment success to his "split-strike conversion" strategy. He also asserted that he would carefully time purchases and sales to maximize value, and correspondingly, Plaintiff's and the Class' funds would, at certain times, be out of the equity markets. While out of the market, those funds were purportedly invested in U.S. Treasuries or in mutual funds holding U.S. Treasuries.

79. Madoff's customers received falsified account statements showing that securities were held in, or had been traded through, their accounts. For all periods relevant hereto, BLMIS was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options. Rather BLMIS used customer deposits to pay redemptions and to make other avoidable

transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

80. On December 10, 2008, Madoff allegedly told his two sons that the asset management arm of his firm was a giant Ponzi scheme that had bilked investors out of approximately $65 billion. Madoff's sons alerted the FBI and, the following day, Madoff, a former Chairman of the National Association of Securities Dealers' NASDAQ ("NASDAQ") and a former member of its Board of Governors, was arrested and charged with violations of the antifraud provisions of the federal securities laws. The SEC immediately filed an emergency action in the Southern District of New York seeking to cease all ongoing offerings of securities and investment advisory fraud by Madoff and BLMIS. The SEC alleged in its moving papers that:

> Madoff is a resident of New York City and is the sole owner of BMIS. BMIS' website indicates that Madoff founded BMIS in the early 1960s and that he is an attorney. Madoff is a former Chairman of the board of directors of the NASDAQ stock market. BMIS is both a broker-dealer and investment adviser registered with the Commission. Madoff oversees and controls the investment adviser services at BMIS as wells at the overall finances of BMIS. The most recent Form ADV for BMIS filed in January 2008 with the Commission listed BMIS has having over $17 billion in assets under management. BMIS is a broker-dealer and investment advisor registered in both capacities with the Commission. BMIS engages in three different operations, which include investment adviser services, market making services and proprietary trading. BMIS website states that is has been providing quality executions for broker-dealers, banks and financial institutions since its inception in 1960;" and that BMIS, "[w]ith more than $700 million in firm capital, Madoff currently ranks among the top 1% of US Securities firms." Since at least 2005, Madoff and BMIS have been conducting a Ponzi-scheme through the investment adviser services of BMIS. Madoff conducts certain investment advisory business for clients that are separate from the BMIS' proprietary trading and market making activities.
>
> Madoff ran his investment adviser business from a separate floor in the New York offices of BMIS. Madoff kept the financial statements for the firm under lock and key, and was "cryptic" about the firm's investment advisory business when discussing the business with other employees of BMIS. In or about the first week of December, Madoff told Senior Employee No. 2 that there had been requests from clients for approximately $7 billion in redemptions, that he was struggling to obtain the liquidity necessary to meet those obligations, but that he thought that he would be able to do so. According to the Senior Employees, they had previously understood

> that the investment advisory business had assets under management on the order of between approximately $8 – 15 billion.
>
> According to a Form ADV filed by Madoff, on behalf of BMIS, with the Commission on or about January 7, 2008, Madoff's investment advisory business served between 11 and 25 clients and had a total of approximately $17.1 billion in assets under management.
>
> At Madoff's Manhattan apartment, Madoff informed the Senior Employees, in substance, that his investment advisory business was a fraud. Madoff stated that he was "finished," that he had "absolutely nothing," that "it's all just one big lie," and that it was "basically, a giant Ponzi scheme." In substance, Madoff communicated to his Senior Employees that he had for years been paying returns to certain investors out of the principal received from other, different, investors. Madoff stated that the business was insolvent, and that it had been for years. Madoff also stated that he estimated the losses from this fraud to be at least approximately $50 billion. One of the Senior Employees has a personal account at BMIS in which several million had been invested under the management of Madoff. At Madoff's Manhattan apartment, Madoff further informed the Senior Employees that, in approximately one week, he planned to surrender to authorities, but before he did that, he had approximately $200 – 300 million left, and he planned to use that money to make payments to certain selected employees, family, and friends.

81. Madoff perpetrated his fraudulent scheme through his New York and London offices, where directors and shareholders included family members and associates of Madoff. Madoff used his London office to launder over $250 million of client monies generated by his New York investment advisory business. The money was first transferred to London and then transferred back to the New York office to benefit Madoff personally and BLMIS. These transfers gave the appearance that Madoff was trading his clients' monies in Europe – a false claim that Madoff proffered when probed by investors about his trading strategy.

82. Shortly after Madoff's guilty plea, Madoff's auditor, David Friehling ("Friehling"), was charged by federal prosecutors with falsely certifying that he audited financial statements for BLMIS. According to an article in *The Wall Street Journal* published on March 19, 2009, entitled "Accountant Arrested for Sham Audits," Friehling knowingly and improperly rubberstamped Madoff's financial statements without conducting a comprehensive audit:

> In the criminal complaint against Mr. Friehling, a Federal Bureau of Investigation agent said the auditor didn't verify the existence of assets that Mr. Madoff said he held or securities trades Mr. Madoff said he made. The agent also said Mr. Friehling didn't examine a bank account through which billions of dollars of client funds flowed, among other things.
>
> Mr. Friehling, 49 years old, was the sole auditor at Friehling & Horowitz, a storefront accounting firm in New City, N.Y., a New York City suburb. The government said he audited Mr. Madoff's financial statements since 1991. Since Mr. Madoff's arrest, auditing experts not involved in the case have said they were skeptical that one individual could have audited such a big company. Mr. Madoff's firm, which had several businesses, including a division that facilitated securities trades between investors, had $1.1 billion in assets, according to 2007 financial statements prepared by Mr. Friehling that were reviewed by The Wall Street Journal.
>
> In a separate civil complaint that mirrored the criminal charges, the SEC also alleged that Mr. Friehling and his family had investment accounts at the Madoff firm worth more than $14 million, a "blatant" conflict of interest that violated auditing rules, according to the complaint. He and his family withdrew at least $5.5 million since 2000, the SEC said.

83. On November 3, 2009, Friehling pleaded guilty to securities fraud, aiding and abetting investment advisor fraud, three counts of obstructing or impeding the administration of Internal Revenue laws and four counts of making false filings with the SEC. He admitted that he failed to conduct independent audits of BLMIS's financial statements, saying he took the information given to him by Madoff or Madoff's employees at "face value."

84. A reasonable due diligence inquiry into Madoff's auditor's accounting practices would have alerted a reasonable investor to the Madoff Ponzi scheme. According to an opinion piece by the *Business Mirror* published on March 25, 2009, entitled "Missing An Easy Clue," it is "Due Diligence 101" to inquire into the auditor's accounting practices:

> Investors may have avoided about $74 billion in losses if they had examined -or just tried to shake hands with - accountants supposedly verifying the books.
>
> "Due Diligence 101 should demand that you check out the auditing firm and find out if it exists," said Richard Dietrich, an accounting professor at Ohio State University in Columbus. "Then, you have to find out if they are qualified."

* * *

> "Too many Larry, Moe & Curly accounting firms" are now auditing money managers, said James Cox, a law professor at Duke University in Durham, North Carolina. "While we made progress with accounting for reporting companies, we have not with investment advisers."
>
> * * *
>
> Money managers should be required to disclose to regulators who audits their books, handles their trades and has custody of their assets, Cox said. Fund managers typically disclose those details privately to investors, who may try to independently verify them. Many don't.
>
> Friehling, Madoff's accountant, operated from an office in the Georgetown Office Plaza, sandwiched between a medical practice and a pediatrician's office. Prosecutors and the SEC said Friehling, 49, vouched for Madoff's books without taking meaningful steps to verify them.

85. On or about December 12, 2008, Plaintiff received notification from Defendant Tremont that the portion of Plaintiff's account attributable to investments in accounts controlled by Madoff was zero. Tremont's explanation for its claim that a portion of Plaintiff's account now had a zero value was that the monies had been lost through the fraudulent schemes of Madoff. As Plaintiff later learned, and despite what had been represented by Defendants Tremont and PFLAC, its monies had in fact never been invested in any securities and the strategies described by the Policy had never been followed.

86. By the express terms of the Policy, only "income, gains and losses from each Investment Account" were to be charged against that account, "without regard to the income, gains or losses of any other Investment Account and without regard to any of our other income gains or losses." Thus, by the express terms of the Policy, as well as a matter of law, absent legitimate investment losses, Plaintiff's account value should have been the amount determined by the provisions set forth above, *i.e.*, the amounts deposited, minus certain charges.

**Defendant Tremont's Close Ties with Madoff**

87. Defendant Manzke is one of the founders and a former CEO of Tremont. Tremont's initial focus was on consulting for pension funds and traditional asset management, and Manzke grew the company steadily over time. Upon information and belief, Tremont, known at the time as Tremont Advisers, Inc., went public in 1992 and was traded on the NASDAQ exchange until approximately October 2001, when it was acquired by Oppenheimer. At the time of the acquisition, upon information and belief, Tremont Group had approximately 65 employees, advised on more than $8 billion in alternative investments, and managed more than $1.5 billion of client assets in its proprietary Rye and Tremont Funds.

88. Defendant Manzke learned about Madoff in 1991 through the former Chairman of Tremont and its first investment with BLMIS was via a proprietary product called "Tremont Advisers L.P." In 1994 Tremont founded the first Madoff dedicated feeder fund, the American Masters Broad Market Fund, L.P., improperly relying on Madoff's reputation and its own greedy appetite for consistent returns.

89. Defendant Schulman joined Tremont that same year. Schulman developed a close business relationship with Madoff, having regular meetings and discussions with both Madoff and his top lieutenant, Frank DiPascali. Upon information and belief, Schulman met with Madoff approximately four or five times per year on average between 1995 and 2000. Upon information and belief, Schulman, as well as other Tremont officers and personnel, also had numerous meetings with Madoff.

90. Defendant Manzke left Tremont in 2005 before the conclusion of her five year employment agreement with OppenheimerFunds and founded another investment adviser, Maxam Capital Management LLC, a competing Madoff feeder fund. Upon information and belief, Manzke received $3.5 million in severance payments from Tremont in the two years following her

termination. Tremont, however, through Defendant Schulman and others, continued its relationship with Madoff and continued to exploit Madoff's consistent returns even after Manzke's departure.

**Despite Numerous "Red Flags," Defendant Tremont Failed to Perform an Adequate Due Diligence Review**

91. As alleged more fully below, Defendant Tremont provided Madoff with investors and much-needed capital, as it ramped up operations and eventually invested more than $4 billion into the scheme over time, earning tens of millions in fees annually for providing Madoff with fresh money.

92. According to Tremont's official website:

> Tremont has been at the forefront in setting the standard in the industry for fund of hedge funds investment management. Effective investment strategies and oversight, thorough manager research, ***careful due diligence***, advanced risk allocation and time-tested portfolio management form the cornerstones of a comprehensive platform that has been refined over a 23-year span of dedicated strides to maximize our clients' objectives. Our established performance history and our focus on client service distinguishes the firm at a time when the influx of new entrants creates choice but not the certainty of experience.

[Emphasis added.]

93. This due diligence was simply not performed or was performed in an improper manner. Hedge funds are complex investment funds that often lack transparency and the mere disclosure of a fund's investment holdings would not adequately reveal the types and magnitudes of risks a hedge fund manager undertakes. Accordingly, the unique and complex nature of hedge funds requires a level of robust, proactive due diligence above and beyond what is required for more transparent investments that are strictly regulated.

94. Particular care must be exercised in due diligence of hedge managers and their funds, because of: (i) their more complex investment strategies; (ii) the possibilities of concentrated exposure to market and counterparty risks; (iii) their use of leverage and the associated risks; and (iv) the light regulation of these firms. Fund of funds, such as Tremont, have a fiduciary duty to

understand how a hedge manager/fund may perform in a variety of future scenarios and to review its organizational culture, internal economic incentives and conflicts-of-interests.

95. On the flipside of the "due diligence coin," monitoring a hedge manager/fund is a continuation of the initial, fiduciary-grounded due diligence process. While the initial due diligence serves to qualify a hedge fund as a desirable investment, the ongoing monitoring process continually and periodically reconfirms that the conclusions and assumptions used in the initial evaluation and selection remain valid. Fiduciaries and institutional investment staff and consultants should take reasonable steps to identify any events or circumstances that may result in the hedge manager/fund failing to meet the standards and expectations that were originally required in the selection process.

96. Had Defendants Tremont and PFLAC performed an adequate and comprehensive due diligence review of Madoff and BLMIS, they would have noticed big "red flags," which would have alerted them to the Madoff Ponzi scheme.

97. In fact, Harry Markopolos, a former money manager based in Boston, started complaining to the SEC in 2000 that Madoff was either front-running his clients' money or operating a Ponzi scheme. In a 19-page document sent to the SEC in November 2005, entitled "The World's Largest Hedge Fund is a Fraud," he argued that it was impossible for Madoff's firm to collect as much money as it did from feeder funds and still execute his stated split-strike strategy, and identified 29 "red flags" that should have raised doubts about Madoff's alleged investment strategy. Among these "red flags" were:

(a) Madoff's fund structure – unlike most private pooled investments by which the investor is charged a fee by a fund manager, most investors with Madoff were invested in a secondary fund of funds, such as Tremont, and were charged management fees by the respective fund of funds, not by Madoff. Notwithstanding the fact that Madoff could easily have collected

management or performance fees, Madoff chose to forego millions of dollars in fees and only collected "market rate" commissions charged on each trade;

(b) Madoff's secrecy – the investors that invested with these fund of funds were usually unaware that their funds were invested with Madoff. This secrecy plus the deregulation of the entire hedge fund industry allowed Madoff to promise lucrative returns that went unverified. Moreover, Madoff's trade tickets went unverified;

(c) The investment strategy produced mathematically improbable returns – the total amount of call options outstanding was not nearly enough to generate $65 billion of assets under management. Moreover, the price percentages at which Madoff claimed to purchase the put options were unreasonably under-priced as "there were not enough option put contracts in existence to hedge the way Madoff was hedging";

(d) Compelling media releases that questioned Madoff's strategy – on May 7, 2001, *Barron's* published an article, entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum," which listed numerous "red flags," including the specious double-digit returns using the "split-strike conversion" strategy. A May 2001 article in *Mar/Hedge*, entitled "Madoff Tops Charts; Skeptics Ask How," identified many financial professionals who questioned the source and consistency of Madoff's returns;

(e) Madoff's consistency in creating double-digit returns for his investors – as of 2001, Fairfield Sentry, a fund of funds invested primarily in Madoff, had only four months of losses since its inception in 1989;

(f) Madoff's illegal manipulations – Madoff boasted to other feeder funds that he subsidized returns in down quarters to maximize reported performance and minimize risk, which in and of itself is an illegal manipulation of his accounting books and records;

(g) Madoff's auditor was obscure and ill-equipped – Madoff was audited by a small auditor in Rockland County, New York, Friehling & Horowitz ("F&H"), a three-employee accounting firm, as opposed to the 90% of single strategy hedge funds that are audited by one of the top ten auditing firms. F&H's staff consisted of Jerome Horowitz (a partner who lived in Miami), a secretary and one active accountant, Friehling. Additionally, while F&H purportedly audited BLMIS, F&H had filed annual forms with The American Institute of Certified Public Accountants ("AICPA") attesting that it had not performed audits for the past 15 years. The AICPA conducted an ethics investigation into F&H and announced that, as a result, it had expelled Friehling. Federal investigators have issued a subpoena to F&H and have requested documents going back to 2000. Friehling was arrested by authorities for his improper audits and faces up to 100 years in prison if convicted of the felony charges levied against him;

(h) Madoff's lack of segregation among service providers – Madoff did not use an independent custodian and by both directing trades as money manager and keeping track of the funds as custodian, Madoff was in a unique position to be able to falsify his accounting records. Additionally, the comptroller of BLMIS was based in Bermuda, while most mainstream hedge fund investment advisers have their comptroller on location;

(i) Madoff's close familial relationships – only Madoff family members were privy to his investment strategy and the Madoff family held high positions with the NASD, NASDAQ, SIA, DTC and other prominent industry bodies. Therefore these organizations would not be inclined to doubt or investigate Madoff or BLMIS;

(j) Madoff's incoherent 13F filings – 13F filings are required for investment managers who manage over $100 million or more of assets and disclose the class of securities, the CUSIP number, the number of shares owned and the total market value of each security. Madoff's

13F disclosures usually contained only smatterings of small positions in small equities and his explanation for this was that his strategy was mostly in cash at the end of each quarter to avoid disclosing the securities he was trading. However, had Madoff been doing as he said, there would have been massive movements on money markets and there were no such movements in these markets; and

(k) BLMIS's office in the Lipstick Building in New York – Madoff's secret operation took up about three-quarters of the 17th floor of the oval-shaped Lipstick Building in Manhattan. Most Madoff employees on other floors did not have access to the space. Thus, anyone performing a proper due diligence would have questioned why all of the hedge fund's files were being quarantined in an inaccessible floor of the building. In its regulatory filings, BLMIS indicated that it only had between one and five employees managing a disclosed $17 billion of assets under management.

98. Had Plaintiffs and the Class known that Defendants would knowingly or recklessly ignore these numerous "red flags," they would have never permitted their Policies to be invested in the Tremont Opportunity Fund and/or the Rye Select Funds.

**Other Prudent Advisors Stopped Investing with Madoff Following Their Due Diligence Review of BLMIS**

99. Prudent investment advisors, investment banks and pension funds – *i.e.*, JPMorgan Chase & Co., Fort Worth and Acorn Partners – took the time and effort to conduct comprehensive and proper due diligence reviews on Madoff and, as a result of these warning signs, chose not to invest or to maintain their earlier investments with Madoff or any of his affiliated funds. In stark contrast, Defendants failed to even conduct a rudimentary due diligence review that would have alerted them to Madoff's fraudulent scheme.

100. An article published in *The New York Times* on January 29, 2009, entitled "JPMorgan Exited Madoff-Linked Funds Last Fall," stated, in relevant part, that:

> As early as 2006, the bank had started offering investors a way to leverage their bets on the future performance of two hedge funds that invested with Mr. Madoff. To protect itself from the resulting risk, the bank put $250 million of its own money into those funds.
>
> But the bank suddenly began pulling its millions out of those funds in early autumn, months before Mr. Madoff was arrested, according to accounts from Europe and New York that were subsequently confirmed by the bank. The bank did not notify investors of its move, and several of them are furious that it protected itself but left them holding notes that the bank itself now says are probably worthless.
>
> A spokeswoman, Kristin Lemkau, said the bank withdrew from the Madoff-linked funds last fall after "a wide-ranging review of our hedge fund exposure." Ms. Lemkau acknowledged, however, ***that the bank also "became concerned about the lack of transparency to some questions we posed as part of our review."***

[Emphasis added.]

101. An article published in *BusinessWeek* on December 31, 2008, entitled "The Madoff Case Could Reel in Former Investors," stated, in relevant part, that:

> The managers of the Fort Worth Employees' Retirement Fund thought they had dodged a bullet when Bernard L. Madoff was arrested on Dec. 11 for alleged fraud. Just a few months earlier the $1.7 billion public pension plan had pulled $10 million out of a hedge fund that invested exclusively with Madoff. But now the managers face the possibility of having to give back the money – a sum that includes all of the pension's purported gains over the years plus its initial investment.
>
> * * *
>
> Some investors may not have known what they were buying. The Fort Worth pension fund, for example, owned the Rye Select Broad Market, a hedge fund managed by the Tremont Group. ***The Rye marketing literature rarely, if ever, mentioned Madoff by name, even though his fund was the only investment.*** Says Steven Caruso, a lawyer for a number of Tremont investors: "Some investors may be facing the prospect of a financial death sentence if they're forced to return funds." In a letter to investors, Tremont's managers say they "exercised appropriate due diligence."
>
> * * *

> Managers of the Fort Worth pension fund, who first invested with Rye five years ago, ***started to rethink their investment in early 2008 after hiring Albourne Partners, a London due diligence firm, to assess their hedge fund portfolio. The Rye fund raised red flags almost immediately. Albourne's managing director, Simon Ruddick, says the firm, which had long-standing concerns about Madoff's trading strategy and consistent returns, had urged clients for nearly a decade to avoid affiliated funds such as Rye.***

[Emphasis added.]

102. An article published in *The New York Times* on December 17, 2008, entitled "Look Back at Wall St. Wizard Finds Magic Had Its Skeptics," quoted Robert Rosenkranz, a principal at Acorn Partners, an investment advisory firm, who stated:

> Our due diligence, which got into both account statements of his customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity.

103. An article published in *The New York Times* on December 17, 2008, entitled "European Banks Tally Losses Linked to Fraud," stated, in relevant part, that:

> Société Générale, itself the victim of an apparent scam early this year when unauthorized bets by a trader, Jérôme Kerviel, caused a $7 billion loss, was not the only financial firm to think Mr. Madoff's unfailing record was too good to be true, said Drago Indjic, a project manager at the Hedge Fund Center of the London Business School.
>
> ***"Madoff did not pass due diligence for many European hedge fund companies," Mr. Indjic said. "Experienced people know there are many ways to provide the kind of return stream offered by Madoff, almost like a bank account, and one of them is a Ponzi scheme."***
>
> ***Smaller American investment advisory firms like Acorn Partners and Aksia also spotted problems with Mr. Madoff's strategy early on, but Société Générale is the first major investment player known to have steered clients away [sic] him.***
>
> Mr. Indjic said the scheme revealed not only faulty due diligence, but also a basic failure to diversify. "If you had half a percentage point of total assets under management with one firm, that is more typical," he said. "But some had much, much more than that with Madoff, so their due diligence failure was compounded by poor portfolio management."

[Emphasis added.]

**Defendants Unjustly Reaped Millions of Dollars in Management Fees**

104. Defendants have charged management fees to Plaintiff and the Class for managing the affairs of the funds. As with other investment funds, the management fee was calculated as a percentage of the funds' net asset value.

105. Defendant PFLAC collected these fees improperly, as it mismanaged the investments made by Plaintiff and the Class. By failing to perform an adequate and comprehensive due diligence review into Madoff's practices, Defendant PFLAC breached its fiduciary obligations and collected these fees improperly.

106. Defendant Tremont also unjustly received tens of millions of dollars in fees annually based on little more than its ability to take investor money and hand it over to Madoff. These fees made continuing business with Madoff very lucrative, providing millions of reasons to look the other way from Madoff's fraud. Upon information and belief, in total, Defendant Tremont received more than $180 million in management and administration fees between 2003 and the collapse of the Madoff Ponzi scheme in 2008. Upon information and belief, throughout the life of the Madoff relationship, Tremont collected a total close to $240 million in management and administrative fees beyond that six year period.

107. Tremont's Madoff investments were the most profitable part of its business, and those investments dwarfed all of its non-Madoff investments, totaling, for example, nearly 60% of Defendant Tremont's total capital raised in 2007.

**Oppenheimer Acquires Tremont**

108. In 2001, Oppenheimer acquired Tremont Advisers, Inc. ("TA," the predecessor of TGH) for $145.3 million. In the acquisition, shareholders of TA received $19 per share, which represented a significant premium over the price of TA's shares prior to the acquisition.

109. As described in TA's Schedule 14A Proxy Statement filed on August 20, 2001, soliciting votes in favor of the acquisition (the "Proxy Statement"), Oppenheimer "had been actively evaluating the alternative asset management industry and had discussed Tremont with representatives of Putnam Lovell," in the fourth quarter of 2000. Subsequently, in 2001, TA hired Putnam Lovell as its financial advisor on the deal.

110. By this time, TA was an extremely profitable company. Its total revenues increased from $10,656,100 in 1998 to $16,524,600 in 1999 and then $23,177,500 in 2000.

111. In 2000, TA had more than $1 billion in its domestic and offshore funds. These funds included the American Masters Broad Market Prime Fund, L.P., American Masters Broad Market Fund, L.P. and Tremont Broad Market Fund, LDC, all of which were invested with Madoff.

112. According to TA's Form 10-KSB for 2000 ("2000 10-K"), more than half of TA's revenues came from the fees it collected on its proprietary funds. In 2000, TA's revenues from its funds totaled $11,874,400, representing 51.2% of TA's total revenues. Moreover, its fund revenues had increased dramatically between 1998 and 2000. According to TA's 2000 10-K, "[f]ees from the Company's proprietary investment funds increased 45.9% from $8,139,500 in the year ended December 31, 1999 to $11,874,400 for the year ended December 31, 2000 and 67.6% from $4,855,600 in the year ended December 31, 1998 to $8,139,500 for the year ended December 31, 1999, in both cases due to the growth of the funds' net assets caused by additional investor capital contributions and positive investment performance."

113. TA attributed the success of its funds to the managers it selected to invest fund assets. Indeed, according to TA's Form 2000 10-K, TA's "proprietary investment funds were originally created to provide clients with vehicles for investment with 'hard-to-access' managers." TA's 2000 10-K also stated that: "Tremont's single-manager funds offer access to managers who have

undergone review by the Company's research department and investment committee. The Company sponsors only the funds of those managers it believes to be the 'best in class,' who generally have at least a 12 month track record and $50 million under management." TA's "hard-to-access" and "best in class" manager was Madoff.

114. According to the Proxy Statement, in early March 2001, Oppenheimer approached Putnam Lovell and expressed interest in exploring a potential strategic transaction with TA. After discussions between high level executives of both companies, Oppenheimer and TA determined to continue their discussions, and, on March 14, 2001, entered into a confidentiality agreement. Putnam Lovell then provided Oppenheimer with a package of information it had assembled on TA, which included "a description of Tremont's various business lines, an overview of its investments and distribution platform, its strategic relationships, its distribution needs and its financial projections."

115. Oppenheimer was also given access to TA's "data room" which, according to the Proxy Statement, "housed an extensive list of Tremont due diligence material including legal contracts, corporate documents, regulatory filings, audited and unaudited financial statements and tax returns." Oppenheimer then conducted extensive due diligence on TA, including its funds, its fund managers, and its due diligence procedures.

116. According to the Proxy Statement, as part of Oppenheimer's due diligence, TA provided to Oppenheimer "true, correct and complete copies of the offering documents, subscription agreements, administrative services agreements, distribution or placement agency agreements, solicitation agreements and custody agreements, as applicable, or any similar agreements, in any case pertaining to the Funds and used since January 1, 1998."

117. TA also "agreed to afford to Oppenheimer and its representatives reasonable and prompt access to our information, assets and personnel and to make available to Oppenheimer on a timely basis a copy of each material document filed, furnished or received by us pursuant to the requirements of domestic or foreign laws and all other information reasonably requested by Oppenheimer concerning our business, properties and personnel."

118. Indeed, in the Proxy Statement, TA represented and warranted that it had provided Oppenheimer with "each Company Contract between the Company, any of its Subsidiaries or any of the Funds and any other Person . . . in which the Company, any of its Subsidiaries or any of the Funds owns an equity interest," and "each other Company Contract material to the business, governance, operations or financial condition of the Company, any of its Subsidiaries or any of the Funds." Any contract between TA and Madoff or BLMIS therefore would have been analyzed by Oppenheimer during due diligence.

119. As part of its due diligence, Oppenheimer also had various meetings with TA personnel, including Defendants Manzke and Schulman, which, according to the Proxy Statement, "focused on various business function areas, such as sales and marketing, accounting and administration and manager research." Thus, Oppenheimer had full access to all information pertaining to TA's all-important "strategic relationships," TA's due diligence on the investment managers of its funds, and the due diligence procedures employed by TA.

120. Oppenheimer's due diligence on TA continued for three months until mid-June 2001. As a result of its extensive due diligence, Oppenheimer would have discovered that the "hard-to-access" and "best in class" manager of TA's proprietary funds was Madoff. Oppenheimer also knew that the robust revenue stream TA derived from these funds was largely the result of TA's relationship with the "hard to access" and "best in class" manager, namely Madoff.

121. Indeed, Putnam Lovell, in its analysis of the financial fairness of the merger, considered "the significant contribution to Tremont's revenues from a single relationship it has with an investment manager to its proprietary investment products." Throughout the due diligence process, Putnam Lovell, which had a pre-existing relationship with Oppenheimer, had numerous meetings and discussions with Oppenheimer. Oppenheimer knew that if it acquired TA, it was acquiring TA's extremely lucrative "single relationship" with Madoff.

122. On July 10, 2001, Oppenheimer and TA entered into a merger agreement pursuant to which Oppenheimer acquired TA for $145.3 million. This $145.3 million purchase price was over thirty-six times TA's net income in 2000 and ten times its net worth on TA's pro forma balance sheet. The purchase price was to be financed by Oppenheimer's cash on hand, and, if necessary, capital contributions by Oppenheimer's ultimate parent MassMutual.

123. As part of the merger, Oppenheimer's subsidiary, OppenheimerFunds, Inc., entered into employment agreements with Defendants Manzke and Schulman, the co-CEOs of TA, whereby Manzke and Schulman would retain their positions for five years following the merger.

124. Under their respective employment agreements, Manzke and Schulman were to receive annual salaries of $500,000 each and would be eligible for annual discretionary bonuses of up to 150% of their base salaries, but no less than the lower of $500,000 and 20% of a bonus pool. The bonus pool was to consist of up to 22.5% of the annual EBITDA of TA for 2002 and beyond. Oppenheimer was willing to pay Manzke and Schulman these amounts because they had the relationship with Madoff, and Oppenheimer wanted to make sure that relationship would continue after it acquired TA. In fact, one of the conditions under which Oppenheimer could terminate the merger was if these employment agreements with Manzke and Schulman were not in effect at the time of the merger's closing.

125. In the July 10, 2001 press release announcing the merger, Oppenheimer emphasized that its distribution network would make TA's funds widely available to the investing public. John V. Murphy then the Chairman and CEO of OppenheimerFunds, Inc., stated that "Tremont's unique product offerings, in combination with our distribution network, will open up the world of alternative investing to a new segment of investors."

126. TA also touted the benefit of Oppenheimer's distribution network to increasing the availability of TA funds. Defendant Schulman declared, "[o]ur alliance with OppenheimerFunds is an excellent strategic fit that brings together Tremont's capabilities in creating alternative investment products with Oppenheimer's strong financial intermediary relationships and unparalleled distribution talents."

127. Oppenheimer's acquisition of TA and its funds allowed Oppenheimer to fill a gap in its product line that was sure to garner profits, and to maximize those profits by making the funds available to a wider array of investors. As Kurt Wolfgruber, the Director of Domestic Equities at OppenheimerFunds, Inc., was quoted as saying in a July 11, 2001 article in *The New York Times*: "Tremont fits perfectly with our goal of extending both our product line and our client base," adding that "[o]ur clients have been asking for hedge funds more frequently."

128. Similarly, in a July 16, 2001 article about the merger in *The Financial Times,* John V. Murphy, the Chairman and CEO of OppenheimerFunds, Inc., was quoted as saying: "We believe Tremont's multi-manager, fund-of-funds approach to hedge fund investing will appeal to many of our high net worth individuals."

129. The merger was consummated in October 2001. Following the merger, TA marketed itself as "An OppenheimerFunds Company."

130. Further, TA emphasized its connection to Oppenheimer and MassMutual in its marketing materials. In describing its privacy policy in its private placement memoranda for its funds, TA stated:

> Tremont is made up of certain entities, including its investment advisory and broker-dealer subsidiaries, and, in turn, is part of a larger corporate affiliation owned by the OppenheimerFunds group and Massachusetts Mutual Life Insurance Company. The Tremont entities and, in some cases, its ownership affiliates often work together to provide the financial products and services offered to Tremont Clients. By sharing information about Tremont's Clients among these companies and affiliates, Tremont can serve Clients more efficiently. Tremont is permitted to share information concerning Client account history and experiences within and among the companies that comprise Tremont and its subsidiaries and affiliates.

**MassMutual Represented Itself, Oppenheimer and Tremont as Being Part of One Integrated Financial Services Company**

131. MassMutual markets itself and its subsidiaries, such as OppenheimerFunds, Inc. and Tremont, as one integrated financial services company under the name "MassMutual Financial Group." MassMutual's annual reports include discussions of its life insurance, mutual fund and asset management businesses, among others, and its consolidated financial statements report results from each of these businesses.

132. MassMutual's annual reports for 2006 and 2007 state that "Massachusetts Mutual Life Insurance Company and its subsidiaries have offices around the globe," and list and provide contact information for "OppenheimerFunds, Inc., Tremont Group Holdings, Inc. and Tremont Capital Management Ltd." The three subsidiaries are identified as "general agencies and other offices."

133. In describing its "Corporate Operations" in its 2005 Annual Report, MassMutual refers to itself as a "diversified financial services organization" and states that: "When leveraged across the enterprise, [our] resources help us increase efficiencies and take advantage of economies of scale, ensuring that people in our lines of business can focus on their primary objective: to

develop, distribute and service a wide variety of financial products to help our customers meet their needs."

134. In its 2005 Annual Report, MassMutual also touted the strength of its asset management business, which includes OppenheimerFunds, Inc. and Tremont, writing: "The MassMutual Financial Group companies have the experience and disciplined financial expertise required by today's sophisticated individual, corporate and institutional investors. From $325.8 billion in 2004 to $395.9 billion as of year-end 2005, assets under management at our companies, including OppenheimerFunds, Inc. . . . increased more than 22 percent. This reflects the confidence investors have in our asset management capabilities."

135. In the 2005 Annual Report, MassMutual singled out the success of its subsidiaries that are "funds of funds" such as the Tremont Funds: "Similarly, the company's businesses serving affluent investors continued to grow, expanding offerings and gaining traction in key products such as hedge funds of funds, separately managed accounts and college savings plans. As a result, these businesses now collectively manage over $8.5 billion in assets, with sales up 15 percent over last year." The Annual Report further noted that: "In late 2005, OppenheimerFunds, along with its subsidiaries and controlled affiliates, reached a significant milestone, surpassing $200 billion in assets under management."

136. Similarly, in its 2006 Annual Report, MassMutual reported that OppenheimerFunds, Inc. and its controlled affiliates:

> have helped investors realize their financial goals by offering diverse investment products, strong long-term investment performance and excellent customer service. The company's consistent focus on long-term investing, building lasting partnerships with financial advisors and maintaining a values-based culture is the foundation of its success and the springboard for its continued growth.
>
> Each of the company's business lines – serving retail and institutional clients – experienced significant growth in 2006. Sales for the company totaled $59.7 billion, up 29 percent over 2005; assets under management were $244.1 billion at year-end

> 2006, a 19.5 percent increase over the previous year. This marks the company's fourth consecutive year of record results.

137. In its 2007 Annual Report, MassMutual stated that OppenheimerFunds, Inc. is "[o]ne of the nation's largest and most respected investment management companies, [and] OppenheimerFunds has been helping investors realize their financial goals for nearly a half century. OppenheimerFunds and its controlled affiliates offer a broad range of products and services."

138. The Annual Report emphasized that the interconnected relationships among MassMutual and its investment subsidiaries enhanced MassMutual's overall financial strength and stability: "The MassMutual Financial Group of companies includes a number of respected investment management companies. If you have an insurance policy or retirement plan with us, your money is often managed by these industry leaders. Or, they can serve you and other investors independently. Their presence in the MassMutual Financial Group enhances our overall financial strength and stability."

139. In addition, according to its 2007 Annual Report, MassMutual has agreements with its affiliates, such as OppenheimerFunds, Inc., to provide record keeping and other services. As of December 31, 2007, these affiliates owed MassMutual $17 million.

140. MassMutual also acknowledged the role its subsidiaries, such as OppenheimerFunds, Inc. and Tremont, played in its overall success as a company. In a 2008 MassMutual publication entitled "The Keys to Investment Management," MassMutual states: "Our investment management expertise, which is integral to the success of our company and products, is drawn from our investment subsidiaries." These investment subsidiaries include OppenheimerFunds, Inc. and Tremont.

141. In its 2008 Annual Report, MassMutual referred to OppenheimerFunds, Inc. as "[o]ne of the nation's largest and most respected investment management companies," and reiterated that

OppenheimerFunds, Inc. and "its controlled affiliates offer a broad range of products and services to individuals, corporations and institutions."

142. In addition, Defendants Manzke and Schulman, who were hired as executives of OppenheimerFunds, Inc. as part of the merger, enjoyed the same benefits as other OppenheimerFunds, Inc. executives. According to the Proxy Statement, Manzke and Schulman would "receive employee benefits on the same basis as other similarly situated [OppenheimerFunds, Inc.] executives," and participate in a bonus pool established for Tremont that was "consistent with Oppenheimer's overall bonus arrangements." Under their respective employment agreements, Manzke and Schulman had the right to terminate their employment if, among other things, there was "a material diminution of the level of the executive's title and reporting position to the board of directors of Tremont, [OppenheimerFunds, Inc.] or Oppenheimer from those in effect immediately following the completion of the merger."

143. After the acquisition of Tremont, MassMutual operated and marketed itself as a single, integrated financial services company comprised of its life insurance business and its investment subsidiaries such as OppenheimerFunds, Inc. and Tremont. MassMutual therefore controlled Tremont and is responsible for Tremont's false statements and material omissions in the Rye Funds' private placement memoranda, the ongoing false statements and material omissions in other communications, and Tremont's failure to discharge its professional duties in a manner consistent with its fiduciary obligations.

**MassMutual and Oppenheimer Controlled Tremont**

144. MassMutual, through its control of Oppenheimer, controlled Tremont.

145. Oppenheimer is a majority owned subsidiary of MassMutual Holding Trust I ("MassMutual Trust"), a Massachusetts business trust, which is controlled by MassMutual Holding

Company, a Delaware corporation ("MassMutual Holding"). MassMutual Holding, in turn, is controlled by MassMutual.

146. MassMutual appointed its own employees on the boards of Oppenheimer and MassMutual Trust, both of which it controlled. For example, after Oppenheimer acquired Tremont, the following MassMutual employees were members of the board of directors of both Oppenheimer and MassMutual Trust: Howard E. Gunton, Executive Vice President and CFO of MassMutual; Stuart H. Reese, Executive Vice President and Chief Investment Officer of MassMutual; John V. Murphy, Executive Vice President of MassMutual; Lawrence W. Burkett, Jr., Executive Vice President and General Counsel of MassMutual; and Ann F. Lomeli, Senior Vice President, Secretary and Deputy General Counsel for MassMutual.

147. MassMutual's majority stock ownership of Oppenheimer and its installment of its own officers in high level executive positions at Oppenheimer gave MassMutual control over all aspects of Oppenheimer and Oppenheimer's subsidiaries, including OppenheimerFunds, Inc. and Tremont.

148. Further, MassMutual and Oppenheimer executives controlled Tremont as directors of Tremont Capital or TGH.

149. John V. Murphy, was a director of Tremont Capital from 2001-2009, the President and a director of Oppenheimer from 2001-2009, Chairman, President and CEO of OppenheimerFunds, Inc. from 2001-2008, the Chairman of OFI in 2009, and Executive Vice President of MassMutual from 2001-2009.

150. Michael T. Rollins was a director of TGH in 2007, Senior Vice President of MassMutual in 2005, and Executive Vice President and CFO of MassMutual from 2006-2009.

151. Kurt Wolfgruber was a director of Tremont Capital from 2003-2009, the Director of Domestic Equities of OppenheimerFunds, Inc. from 2001-2003, Chief Investment Officer of OppenheimerFunds, Inc. from 2003-2007, and Chief Investment Officer and President of OppenheimerFunds, Inc. from 2007-2009.

152. In addition, individuals employed by or affiliated with MassMutual and Oppenheimer controlled the board of directors of hedge funds that were advised by OppenheimerFunds, Inc. and sub-advised by Tremont Partners. For example, according to the Annual Report of the Tremont Core Strategies Fund, the fund had one insider trustee, John V. Murphy, who was the President and Principal Executive Officer of the Fund, and was also the President of Oppenheimer, Chairman of OppenheimerFunds, Inc. and Executive Vice President of MassMutual. While the other ten trustees of the fund were characterized as independent trustees, all of them had an affiliation with OppenheimerFunds, Inc. as overseers of other portfolios in the OppenheimerFunds, Inc. complex. Each of Brian F. Wruble and David K. Downes oversaw portfolios of 64 OppenheimerFunds, Inc. funds, and the following trustees oversaw 54 OppenheimerFunds, Inc. funds: Matthew P. Fink, Robert G. Galli, Phillip A. Griffiths, Mary F. Miller, Joel W. Motley, Russell S. Reynolds, Jr., Joseph W. Wikler and Peter I. Wold.

**Defendant Tremont Immediately Disclaims Responsibility for Any Losses Suffered**

153. Defendant Tremont wasted no time in immediately claiming that it was caught unaware of the massive Ponzi scheme perpetrated by Madoff and BLMIS. As discussed more fully herein, had Defendants properly performed any operational due diligence review and/or quantitative analysis, "red flag" warning signs would have alerted them to this Ponzi scheme.

154. On December 12, 2008, Defendant Tremont sent out a letter to its clients, which stated, in relevant part, as follows:

Dear Client:

On Thursday December 11th Bernard L. Madoff, founder of Bernard L. Madoff Investment Securities LLC was arrested by U.S. federal law enforcement and charged with a single count of securities fraud. The Securities and Exchange Commission (SEC) also charged Mr. Madoff with securities fraud.

We have obtained and reviewed a copy of the federal complaint and the SEC charges in order to understand the allegations against Mr. Madoff. Needless to say, our level of anger and dismay over the apparent betrayal by Mr. Madoff and his organization of his 14-year relationship with Tremont is immeasurable. By all accounts he headed a credible and respected organization, with investors making tens of billions of dollars of commitments to the firm. Mr. Madoff also personally served as Vice Chairman of the NASD and was a member of NASDAQ's stock market's board of governors and its Executive Committee.

Your multi-strategy portfolio had exposure to Madoff Investment Securities through the Rye Select Broad Market Series.

Be assured that we arc aggressively taking all the necessary steps to identify and recover your and our investments. We have retained legal counsel, Skadden, Arps, Slate, Meagher & Flom LLP, and through our lawyers arc communicating with law enforcement and the SEC in order to understand this situation and gather the relevant facts. Our repeated attempts to contact the Madoff organization were not acknowledged.

We will continue to update you as events unfold.

Tremont Group Holdings

155. On December 14, 2008, Defendant Tremont sent out a second letter to its clients, which stated, in relevant part, as follows:

Re: Madoff Fraud

As you are aware, news reports following the arrest of Bernard L. Madoff about the scope and scale of his alleged scheme characterize it, in the words of the SEC, as "a stunning fraud that appears to be of epic proportions." If we can come to any conclusion at this early stage in this matter, it is that it seems we were all victimized by not just a person but a scheme and a complex process designed to deceive individuals and organizations, managers and analysts – including some of the largest, most sophisticated financial institutions in the world.

We believe Tremont exercised appropriate due diligence in connection with the Madoff investments. We are working with our legal counsel and communicating with law enforcement and other government authorities to gather information about the nature of the fraud and the assets affected by it. We restate our commitment to

do everything in our power to identify and recover your and our investments. We arc considering all our options, including legal action.

We will keep you informed of developments as they occur.

Tremont Group Holdings

156. On January 21, 2009, Plaintiff and other policyholders received a letter from Defendant Tremont Opportunity Fund, which stated, in pertinent part, as follows:

Re: Tremont Opportunity Fund III, L.P. (the "Partnership")

Dear Limited Partners:

As you know, as a result of the Partnership's exposure to the fraud of Bernard L. Madoff and his investment firm Bernard L. Madoff Investment Securities, LLC or one of more of its affiliates (collectively, "BLMIS Products"), as well suspensions of the calculation of net asset value, suspension of or limitations on redemptions or similar actions by a number of investment funds in which the Partnership has invested. In December the Partnership declared a temporary suspension of withdrawals by Limited Partners and the payment of withdrawal proceeds to Limited Partners.

With respect to a small proportion of the Limited Partner interests, the Partnership received withdrawal notices that were effective as of November 30, 2008 ("November 30 Withdrawals"). Because the effective date of the November 30 Withdrawals was prior to the Partnership's suspension of withdrawals in mid-December, Limited Partners who effected November 30 Withdrawals are entitled to receive withdrawal proceeds based upon the net asset value of their withdrawn Partnership interests as of November 30 and will be paid the amounts owed to them as promptly as practicable after the determination of the net asset value of the Partnership as of that date, subject to the establishment of appropriate reserves.

Limited Partners who did not effect November 30 Withdrawals have now submitted withdrawal notices with respect to almost all of the Partnership's Capital Accounts, effective (subject to the suspension noted above) on or before February 28, 2009. As a result, the partnership's General Partner has determined that it is no longer practicable to maintain the Partnership in business to manage the limited assets attributable to the Capital Accounts of those few Limited Partners who have not submitted withdrawal notices. Accordingly, in order to facilitate the orderly honoring of withdrawal notices and the attendant liquidation of the Partnership's assets, the General Partner has-determined that it is the best interests of the Partnership to require the full withdrawal from the Partnership of all Limited Partners who have not previously submitted withdrawal notices, effective at the same time as all other outstanding withdrawal notices. Correlatively, Limited Partners whose withdrawal notices would have been effective, but for the temporary suspension of

> withdrawals in mid-December, at the end of December or January will be deemed to have withdrawn at the same time as all other Limited Partners who did not effect November 30 Withdrawals.
>
> The Partnership will liquidate its assets and begin pro rata distributions of cash as promptly as practicable. Because the Partnership considers withdrawals to be effective with respect to all Limited Partners' Capital Accounts, the General Partner may determine that a date earlier than February 28 should be deemed the withdrawal date for purposes of commencing the distribution of withdrawal payments (subject to the establishment of appropriate reserves). The Partnership notes, however, that, as a result of the suspensions and limitations on withdrawal noted above by a number of the Partnership's portfolio investment funds and the impracticability or impossibility of disposing of interests in such funds in secondary market transactions, the Partnership will not immediately be able to liquidate certain of the Partnership's assets. The Partnership will make pro rata distributions of the cash received upon the liquidation of such portfolio interests as promptly as practicable and reserves the right to make a final in-kind distribution of assets although it does not currently expect to take that step.
>
> The extent of the recovery, if any, that will be achieved from the Partnership's exposure to BLMIS Products remains unclear, because the value of the Partnership's interest in BLMIS Products has been written down to zero as of November 30, 2008, if and to the extent that any such recovery is achieved, the Partnership will allocate the proceeds so received to the Limited Partners pro rata based upon their respective Interests in the Partnership as of November 30.
>
> Sincerely,
>
> Tremont Opportunity Fund III, LP.

157. As a direct result of Defendants' illegal conduct, Plaintiff and the Class have sustained significant losses in their investment accounts and the values of their Policies have dramatically declined. Had Plaintiff and the Class known that Defendants Tremont and PFLAC would knowingly or recklessly ignore numerous "red flags" and invest their funds imprudently, they would have never invested their monies and/or Policies in the Tremont Opportunity Fund and/or the Rye Select Funds.

**Tremont Shuts Down Defendant Rye**

158. An article published in *FINalternatives* on January 27, 2009, entitled "Tremont Closes Rye After Madoff Losses," stated that:

> Tremont Group Holdings has shuttered its Bernard Madoff-scarred Rye Investment Management division, it said yesterday.
>
> The New York-based firm has suspended the operations of Rye, its single-manager hedge fund unit that had all of its assets under management invested with Madoff, who was charged last year with running a $50 billion Ponzi scheme. Before the scandal broke, the Rye, N.Y.-based unit managed $3.1 billion.
>
> The decision to close Rye is part of a broader restructuring of Tremont "to reflect market conditions and the reduced amount of assets under management," the MassMutual unit said in a statement. In addition to Rye's losses, Tremont's fund of hedge funds unit, Tremont Capital Management lost some $190 million invested with Madoff.
>
> Tremont made clear that the closure of Rye did not mean the foreclosure of attempts to recoup its losses in court.
>
> "While the Rye Investment Management unit is permanently suspended, it also retains the staff necessary to seek to recover any available Madoff assets," the firm said.

## DERIVATIVE ALLEGATIONS

159. Plaintiff hereby asserts derivative claims for the benefit of the Nominal Defendants to redress the injuries suffered as a result of Defendant Tremont's misconduct.

160. Plaintiff is an investor in the Nominal Defendants, which invested with Madoff prior to, and at the time Madoff's Ponzi scheme was revealed on or about December 11, 2008.

161. This action is not a collusive one to confer jurisdiction. Plaintiff has not made efforts to have Tremont bring suit against itself because making a demand on Defendant Tremont – to bring an action on behalf of Plaintiff against itself in the face of its own potential liability for the misconduct alleged herein – would be futile. Defendant Tremont, as a named defendant herein, has also been subjected to other numerous lawsuits in connection with the conduct alleged herein and therefore will not adequately prosecute claims against itself. Furthermore, to bring suit against itself would create for Defendant Tremont an irreconcilable conflict of interest since it faces substantial

exposure to liabilities as a result of the misconduct complained of herein. For these reasons, demand would be futile and is excused.

**CLASS ACTION ALLEGATIONS**

162. Plaintiff brings this action as a class action on behalf of all persons or entities that held Policies issued by PFLAC – and managed by Defendant Tremont Partners – through December 11, 2008. Excluded from the Class is PFLAC, and any entity in which PFLAC has a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

163. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are a sufficient number of members of the Class to warrant this action proceeding as a class action.

164. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation under the laws of New York; it is a member of the Class, its claims are typical of the claims of all Class members, and it does not have interests antagonistic to, or in conflict with, those of the Class.

165. There are numerous questions of law and fact which are common to the Class and which predominate over any questions affecting individual members of the Class, including:

(a) whether PFLAC breached its fiduciary duties to Plaintiff and the Class by failing to properly manage their investments and to perform necessary due diligence that would have uncovered the massive Ponzi scheme carried out by Madoff and his company, BLMIS, and the wrongful dissipation of the assets of Plaintiff and the Class;

(b) whether and to what extent Plaintiff and the Class were damaged by PFLAC's breaches of fiduciary duty;

(c) whether PFLAC was grossly negligent in failing to perform necessary due diligence that would have uncovered the massive Ponzi scheme carried out by Madoff and BLMIS;

(d) whether and to what extent Plaintiff and the Class were damaged by PFLAC's gross negligence;

(e) whether PFLAC breached its fiduciary duties to Plaintiff and the Class by making Tremont-managed funds an acceptable investment option without conducting a comprehensive due diligence review;

(f) whether PFLAC's conduct was in violation of fiduciary duties owed to Plaintiff and the Class and, therefore, in violation of the law governing fiduciaries;

(g) whether PFLAC was unjustly enriched at the expense of Plaintiff and the Class;

(h) whether it is appropriate to create a constructive trust to hold fees paid to Defendants;

(i) whether management and performance fees were paid based on a mutual mistake of the parties; and

(j) the extent of damages sustained by Plaintiff and the Class and the proper measure of such damages.

166. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the Court system and could create the possibility of inconsistent judgments. Moreover, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually. There will be no difficulty in the management of this action as a class action.

## DIRECT CAUSES OF ACTION

### COUNT I

### For Breach of Fiduciary Duty Against Defendant PFLAC

167. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

168. Plaintiff and the Class invested their assets with PFLAC and Defendant PFLAC owed fiduciary duties to Plaintiff and the Class.

169. As insurance companies who offered investment options to Plaintiff and the Class, Defendant PFLAC knew or should have known how to perform its fiduciary obligations in monitoring the safety and performance of Plaintiff's and the Class' assets in a prudent and professional manner.

170. Specifically, Defendant PFLAC failed to conduct adequate and comprehensive due diligence reviews on the investment options that they offered to Plaintiff and the Class, despite its representations that such due diligence was being, or had been, conducted. Defendant PFLAC has, as a result, ignored numerous "red flags" that would have warned it of the fraudulent scheme perpetrated by Madoff and BLMIS and the dangers of including the Tremont Opportunity Fund as an investment option for Plaintiff and the Class. Defendant PFLAC has further caused the dissemination of the false and misleading statements and omissions alleged herein.

171. Defendant PFLAC further breached the following fiduciary duties owed to Plaintiff and the Class:

(a) the duty to deal fairly and honestly with Plaintiff and the Class;

(b) the duty to act with reasonable care to verify the truthfulness of the information set forth in the written materials, including the monthly account statements, and other presentations communicated to and relied upon by Plaintiff and the Class;

(c) the duty to oversee that the investment assets were made and maintained in a prudent and professional manner;

(d) the duty to perform due diligence and to maintain oversight and transparency as to the activities of any fund manager that managed the investment assets; and

(e) the duty to exercise the prudent and cautious judgment and best practices that would be expected of investment managers.

172. As a direct and proximate result of Defendant PFLAC's breaches of its fiduciary duties, Plaintiff and the Class have suffered damages and are entitled to such damages from Defendant PFLAC as well as a return of all fees paid to Defendant PFLAC.

173. Defendant PFLAC is further liable for punitive damages as a result of their wanton and grossly negligent course of conduct.

**COUNT II**

**For Common Law Fraud**
**Against Defendant PFLAC**

174. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

175. Plaintiff and the Class, in reasonable and justifiable reliance upon the statements and representations made by Defendant PFLAC, purchased investment interests in the Tremont Opportunity Fund. Plaintiff and the Class would not have purchased their investment interests in the Tremont Opportunity Fund except for their reliance upon the representations made by Defendant PFLAC in the PPMs and other offering materials, and would never have purchased them had they been aware that Defendant PFLAC failed to conduct due diligence, or alternatively, failed to conduct adequate due diligence on Defendant Tremont, Madoff and BLMIS.

176. At the time the statements and representations were made by Defendant PFLAC in the PPMs and other offering materials, Defendant PFLAC knew, or should have known, them to be false and intended to deceive Plaintiff and the Class by making such statements and representations.

177. At the time of the false statements, misrepresentations and omissions set forth above, Defendant PFLAC intended that Plaintiff and the Class would act on the basis of the misrepresentations and omissions contained in the PPMs and other offering materials in determining whether to purchase investment interests in the Tremont Opportunity Fund. Plaintiff and the Class reasonably relied thereon to their detriment in making such decisions.

178. Had Plaintiff and the Class known of the material facts that Defendant PFLAC wrongfully concealed and misrepresented, and the falsity of Defendants PFLAC's representations, Plaintiff and the Class would not have purchased their investment interests in the Tremont Opportunity Fund.

179. Plaintiff and the Class, as a result of their purchase of investment interests in the Tremont Opportunity Fund and by reason of Defendant PFLAC's wrongful concealments and misrepresentations, have sustained damages, losing all or substantially all of their respective investments in the Tremont Opportunity Fund in an amount yet to be determined, and to be proven at trial.

180. By reason of the foregoing, Defendant PFLAC is liable to Plaintiff and the Class.

181. Defendant PFLAC's fraudulent acts were willful and wanton and Plaintiff and the Class are entitled to punitive damages.

## COUNT III

### For Breach of Contract
### Against Defendant PFLAC

182. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

183. The Policies, PPMs and offering materials related thereto constitute a contract between Plaintiff and the Class and Defendant PFLAC.

184. Plaintiff and the Class have performed all of their obligations under the contract.

185. Defendant PFLAC has failed and refused to perform its obligations under the contract, including, but not limited to, the obligation to perform due diligence prior to adding an investment fund as an investment option for Plaintiff and the Class to invest their excess insurance premiums to ensure that the fund represents a trustworthy investment vehicle and not a Ponzi scheme. Defendant PFLAC also failed to monitor the Tremont Opportunity Fund and failed to reasonably exercise its sole discretion to close the Tremont Opportunity Fund as an investment option since that investment option was illegitimate and otherwise misappropriated Plaintiff's and the Class' funds.

186. As a direct and proximate result of Defendant PFLAC's breaches of contract, Plaintiff and the Class have sustained substantial damages.

187. Had Defendant PFLAC performed its contractual obligations to monitor the activities of Defendant Tremont and the activities of the Tremont Opportunity Fund, it would have determined that Tremont blindly invested in the Madoff Ponzi scheme, and Defendant PFLAC would have exercised its sole discretion to remove the Tremont Opportunity Fund from the list of funds in which Plaintiff and the Class could invest.

## COUNT IV

### For Breach of the Implied Covenant of Good Faith and Fair Dealing Against Defendant PFLAC

188. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

189. Plaintiff entered into a contract with Defendant PFLAC. Implicit in the contract was a duty of good faith and fair dealing.

190. Defendant PFLAC breached that duty, thereby destroying or injuring Plaintiff's and the Class' right to receive the benefits under the contract, in the following ways:

(a) Defendant PFLAC failed to disclose to Plaintiff and the Class prior to entering in the contract and investing in the Tremont Opportunity Fund that Defendant PFLAC had not taken any significant steps to verify the representations in the PPMs and other offering materials or to otherwise monitor Defendant Tremont's investment activities;

(b) in choosing the Tremont Opportunity Fund, Defendant PFLAC conducted no due diligence to confirm that the Tremont Opportunity Fund was a legitimate investment option and not a feeder fund to the Madoff Ponzi scheme;

(c) Defendant PFLAC failed to reasonably monitor the Tremont Opportunity Fund and, therefore, could not warn Plaintiff and the Class of any material changes in the fund or of the fact that the fund was an "inappropriate" investment vehicle; and

(d) Defendant PFLAC inaccurately represented to Plaintiff and the Class that it conducted its own due diligence on the Tremont Opportunity Fund.

191. Had Defendant PFLAC performed its contractual obligations to monitor the activities of Defendant Tremont and the activities of the Tremont Opportunity Fund, it would have determined that Tremont blindly invested in the Madoff Ponzi scheme, and Defendant PFLAC would have exercised its sole discretion to remove the Tremont Opportunity Fund from the list of funds in which Plaintiff and the Class could invest.

192. As a direct and proximate result of Defendant PFLAC's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class sustained damages.

## COUNT V

### For Violations of General Business Law §349
### Against Defendant PFLAC

193. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

194. Defendant PFLAC's acts and conduct in furtherance of its scheme or artifice constitute deceptive acts and practices in the conduct of a business or in the furnishing of a service, within the meaning of GBL §349 and, as such, are unlawful.

195. Upon information and belief, the same acts and conduct used by Defendant PFLAC to defraud Plaintiff and the Class have been used repeatedly and are of a recurring nature.

196. The acts and conduct of Defendant PFLAC, by which it knowingly fraudulently represented to potential purchasers the nature of the investments that Defendants were selling to Plaintiff and the Class, affect the public interest.

197. As a result of Defendant PFLAC's unlawful acts and conduct in violation of GBL §349, Plaintiff and the Class have been damaged in an amount to be proven at trial.

## COUNT VI

### For Gross Negligence
### Against Defendant PFLAC

198. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

199. As investment managers with discretionary control over the assets entrusted to them by Plaintiff and the Class, Defendant PFLAC owed Plaintiff and the Class a duty to manage and monitor the investments of Plaintiff and the Class with reasonable care. Defendant PFLAC breached this duty.

200. Defendant PFLAC further breached its duty of care by failing to:

(a) take all reasonable steps to ensure that the investment of the assets of Plaintiff and the Class were made and maintained in a prudent and professional manner;

(b) take all reasonable steps to preserve the value of Plaintiff's and the Class' investments;

(c) perform all necessary and adequate due diligence; and

(d) exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

201. As a direct and proximate result of Defendant PFLAC's gross negligence, Plaintiff and the Class have suffered damages and are entitled to such damages from Defendant PFLAC.

**COUNT VII**

**For Negligent Misrepresentation**
**Against Defendant PFLAC**

202. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

203. This cause of action is brought against Defendant PFLAC based on negligent misrepresentation.

204. Defendant PFLAC owed Plaintiff and the Class a duty to act with reasonable care in connection with the assets entrusted to them by Plaintiff and the Class and to conduct due diligence to determine the accuracy and preparation of information contained in the PPMs and other offering materials. Defendant PFLAC breached these duties knowingly, wantonly, recklessly, or at least negligently, by including untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made reflecting the value of the monies and/or Policies, in light of the circumstances under which they were made, not misleading.

205. At the time of the misrepresentations and omissions of material facts by Defendant PFLAC, Plaintiff and the Class were ignorant of their falsity and believed them to be true. Plaintiff and the Class relied upon the representations made by Defendant PFLAC. Neither the account statements nor any of the other materials disseminated by Defendant PFLAC ever disclosed the risks

associated with investing with Defendants Tremont, Madoff or BLMIS. Had Plaintiff and the Class been aware of the true facts, Plaintiff and the Class would not have invested in the Tremont Opportunity Fund.

206. Neither Plaintiff, Class members nor their agents knew of the falsity and/or misleading nature of Defendant PFLAC's statements and omissions and, therefore, relied upon the representations made by Defendant PFLAC.

207. Defendant PFLAC's conduct constitutes the making of negligent misrepresentations (including negligent omissions to state facts in connection with statements that were made) under applicable state law. As a direct and proximate results of the negligent misrepresentations (and omissions) by Defendant PFLAC, and in reliance thereon, Plaintiff and the Class have suffered damages in connection with their investments.

**COUNT VIII**

**For Unjust Enrichment**
**Against Defendant PFLAC**

208. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

209. Defendant PFLAC financially benefited from its unlawful acts as it collected improper management fees based on the Policies' net asset values. These unlawful acts caused Plaintiff and the Class to suffer injury and monetary loss.

210. As a result, it is unjust and inequitable for Defendant PFLAC to have enriched itself in this manner.

211. Defendant PFLAC should pay its own unjust enrichment to Plaintiff and the Class.

212. Plaintiff and the Class are entitled to restitution of the revenue derived and are entitled to the establishment of a constructive trust imposed on the benefits to Defendant PFLAC from its unjust enrichment and inequitable conduct.

**COUNT IX**

**For Promissory Estoppel**
**Against Defendant PFLAC**

213. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

214. This Count is asserted for promissory estoppel.

215. Defendant PFLAC made a clear and unambiguous promise in the documents and materials tendered to Plaintiff and the Class to conduct and perform due diligence and the continued monitoring of the fund managers with which it placed its clients' investments.

216. Plaintiff and the Class reasonably relied upon these promises by Defendant PFLAC in choosing to place their assets in the Tremont Opportunity Fund.

217. As described herein, Plaintiff and the Class have suffered substantial damages and unconscionable injury in connection with relying on Defendants promises and based upon Defendant PFLAC's failure to perform its promises set forth in the Policies, PPMs and other offering materials tendered to Plaintiff and the Class.

**DERIVATIVE CAUSES OF ACTION**

**COUNT X**

**For Breach of Fiduciary Duty, Brought**
**Derivatively on Behalf of the Nominal Defendants**
**Against Defendant Tremont and the Individual Defendants**

218. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

219. The Nominal Defendants invested their assets with Defendant Tremont and the Individual Defendants, who owed fiduciary duties to the Nominal Defendants.

220. As investment managers and general partners in the Nominal Defendants, Defendant Tremont and the Individual Defendants knew or should have known how to perform their fiduciary

obligations in monitoring the safety and performance of the Nominal Defendants' assets in a prudent and professional manner.

221. Specifically, Defendant Tremont and the Individual Defendants failed to conduct adequate and comprehensive due diligence reviews on Madoff and invested the assets of the Nominal Defendants in an illegal and imprudent manner. Defendant Tremont and the Individual Defendants have ignored numerous "red flags" that would have warned them of the fraudulent scheme perpetrated by Madoff and BLMIS. Defendant Tremont and the Individual Defendants have further caused the dissemination of the false and misleading statements and omissions alleged herein.

222. Defendant Tremont and the Individual Defendants further breached the following fiduciary duties owed to the Nominal Defendants:

(a) the duty to deal fairly and honestly with the Nominal Defendants;

(b) the duty to act with reasonable care to verify the truthfulness of the information set forth in the written materials and other presentations communicated to and relied upon by the Nominal Defendants;

(c) the duty to oversee that the investment assets were made and maintained in a prudent and professional manner;

(d) the duty to perform due diligence and to maintain oversight and transparency as to the activities of any fund manager that managed the investment assets; and

(e) the duty to exercise the prudent and cautious judgment and best practices that would be expected of investment managers.

223. As a direct and proximate result of Defendant Tremont's and the Individual Defendants' breaches of their fiduciary duties, the Nominal Defendants have suffered damages and

are entitled to such damages from Defendant Tremont and the Individual Defendants as well as a return of all fees paid to Defendant Tremont and the Individual Defendants.

224. Defendant Tremont and the Individual Defendants are further liable for punitive damages as a result of their wanton and grossly negligent course of conduct.

**COUNT XI**

**For Common Law Fraud, Brought Derivatively on Behalf of the Nominal Defendants Against Defendant Tremont and the Individual Defendants**

225. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

226. Defendant Tremont and the Individual Defendants made false and misleading statements as previously set forth herein, including misrepresentations and omissions in the offering materials and misrepresentations concerning the due diligence and continued monitoring activities performed. Defendant Tremont and the Individual Defendants knew that no such due diligence or monitoring activities had been performed, and would not be performed. Defendant Tremont and the Individual Defendants further knew and were aware that the investment assets were not invested as described, but rather, were simply handed to, and lost by, the Madoff Ponzi scheme.

227. At the time of those statements and misrepresentations, Defendant Tremont and the Individual Defendants knew them to be false, or disregarded their falsity with wanton disregard and Defendant Tremont and the Individual Defendants intended to deceive Nominal Defendants by making such misrepresentations.

228. Defendant Tremont and the Individual Defendants knew or should have known and intended that the Nominal Defendants would reasonably rely on their false and misleading statements. Upon information and belief, had the Nominal Defendants known of the material facts that Defendant Tremont and the Individual Defendants wrongfully concealed and misrepresented, and the falsity of Defendant Tremont's and the Individual Defendants' representations, the Nominal

Defendants would not have entered into their respective partnership agreements and would not have suffered the damages complained of herein.

229. The Nominal Defendants, by reason of Defendant Tremont's and the Individual Defendants' wrongful concealments and misrepresentations, have sustained damages, losing all or substantially all of their respective assets in an amount yet to be determined, and to be proven at trial.

230. By reason of the foregoing, Defendant Tremont and the Individual Defendants are liable to the Nominal Defendants.

231. Defendant Tremont's and the Individual Defendants' fraudulent acts were willful and wanton and the Nominal Defendants are entitled to punitive damages.

**COUNT XII**

**For Gross Negligence, Brought Derivatively on Behalf of the Nominal Defendants Against Defendant Tremont and the Individual Defendants**

232. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

233. As investment managers with discretionary control over the assets entrusted to them by the Nominal Defendants, Defendant Tremont and the Individual Defendants owed the Nominal Defendants a duty to manage and monitor the investments of the Nominal Defendants with reasonable care. Defendant Tremont and the Individual Defendants breached this duty.

234. Defendant Tremont and the Individual Defendants further breached their duty of care by failing to:

(a) take all reasonable steps to ensure that the investment of the assets of the Nominal Defendants were made and maintained in a prudent and professional manner;

(b) take all reasonable steps to preserve the value of the Nominal Defendants' investments;

(c) perform all necessary and adequate due diligence; and

(d) exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

235. As a direct and proximate result of Defendant Tremont's and the Individual Defendants' gross negligence, the Nominal Defendants have suffered damages and are entitled to such damages from Defendant Tremont and the Individual Defendants.

**COUNT XIII**

**For Negligent Misrepresentation, Brought Derivatively on Behalf of the Nominal Defendants Against Defendant Tremont and the Individual Defendants**

236. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

237. Defendant Tremont and the Individual Defendants owed the Nominal Defendants duties to act with reasonable care in the preparation and dissemination of the offering materials and representations concerning the due diligence performed and continued monitoring activities, and a duty to use reasonable diligence in determining the accuracy of and preparation of such information.

238. Defendant Tremont and the Individual Defendants breached these duties to the Nominal Defendants and acted negligently by failing to investigate, confirm, prepare and review with reasonable care the information represented and disseminated. Defendant Tremont and the Individual Defendants disseminated offering materials containing numerous misrepresentations to the Nominal Defendants.

239. As a direct and proximate result of Defendant Tremont's and the Individual Defendants' conduct, Nominal Defendants have been damaged.

240. As a result of Defendant Tremont's and the Individual Defendants' negligent misrepresentations, the Nominal Defendants are entitled to recover damages, attorneys' fees and accosts.

## COUNT XIV

### For Unjust Enrichment, Brought Derivatively on Behalf of the Nominal Defendants Against Defendant Tremont and the Individual Defendants

241. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

242. Defendant Tremont and the Individual Defendants financially benefited from their unlawful acts as they collected improper management fees. These unlawful acts caused the Nominal Defendants to suffer injury and monetary loss.

243. As a result, it is unjust and inequitable for Defendant Tremont and the Individual Defendants to have enriched themselves in this manner.

244. Defendant Tremont and the Individual Defendants should pay their own unjust enrichment to the Nominal Defendants.

245. The Nominal Defendants are entitled to restitution of the revenue derived and are entitled to the establishment of a constructive trust imposed on the benefits to Defendant Tremont and the Individual Defendants from their unjust enrichment and inequitable conduct.

## COUNT XV

### For Aiding and Abetting Breach of Fiduciary Duty, Brought Derivatively on Behalf of the Nominal Defendants Against Defendant Tremont, the Control Defendants and the Individual Defendants

246. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

247. By virtue of their control over the Nominal Defendants, Defendant Tremont, the Control Defendants and the Individual Defendants had intimate knowledge of and approved the issuance of the false and misleading statements complained of herein.

248. Further, Defendant Tremont, the Control Defendants and the Individual Defendants had actual knowledge of the breach of fiduciary obligations complained of herein. By virtue of their control, Defendant Tremont, the Control Defendants and the Individual Defendants influenced the

Nominal Defendants' decision to invest with Madoff and/or BLMIS and also had the power to influence and control the content of the various account statements sent to Plaintiff and the Class that were false and misleading.

249. As described above, the Nominal Defendants have suffered substantial damages in connection with the misconduct caused by Defendant Tremont, the Control Defendants and the Individual Defendants by aiding and abetting the beach of fiduciary obligations described herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually, and on behalf of the entire Class, prays for judgment as follows:

A. declaring this action to be a proper class action;

B. awarding Plaintiff and the other members of the Class damages suffered as a result of the wrongs complained of herein together with appropriate interest;

C. awarding Plaintiff and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements;

D. declaring that Defendants have unjustly enriched themselves and imposing a constructive trust to recoup Defendants' fees, unjust benefits and other assets for the benefit of Plaintiff and the Class; and

E. awarding Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all issues so triable.

DATED: January 3, 2012

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
EDWARD Y. KROUB

DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
ekroub@rgrdlaw.com

*Attorneys for Plaintiff*

# VERIFICATION

I, DAVID A. ROSENFELD, hereby declare as follows:

1. I am counsel for plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2. I make this Verification because plaintiff is absent from the County of Suffolk where I maintain my office.

Executed this 3rd day of January, 2012 at Melville, NY.

DAVID A. ROSENFELD

**CERTIFICATE OF SERVICE**

I, David A. Rosenfeld, hereby certify that on January 3, 2012, I caused a true and correct copy of the attached:

> Consolidated Amended Direct and Verified Derivative Complaint for Breach of Fiduciary Duty, Common Law Fraud, Breach of Contract, Breach of The Implied Covenant of Good Faith and Fair Dealing, Aiding and Abetting Breach of Fiduciary Duty, Violations of New York General Business Law §349, Gross Negligence, Negligent Misrepresentation, Unjust Enrichment and Promissory Estoppel

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to all counsel on the attached service list.

David A. Rosenfeld

**SERVICE LIST**

David McDowell
Thomas F.A. Hetherington
Edison, McDowell & Hetherington LLP
Phoenix Tower
3200 Southwest Freeway, Suite 2920
Houston, TX 77027
(713) 337-5583
david.mcdowell@emhllp.com
tom.hetherington@emhllp.com

William Kennedy Dodds
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
(212)698-3557
Fax: (212)698-3599
william.dodds@dechert.com

Seth M Schwartz
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
42nd floor
New York, NY 10036
212-735-3000
Fax: 917-777-2710
sschwart@skadden.com

Joseph L. Kociubes
Bingham McCutchen LLP
One Federal Street
Boston, MA 02110
(617) 951-8831
Fax: (617)345-5040
joe.kociubes@bingham.com