**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re TREMONT SECURITIES LAW, STATE LAW AND INSURANCE LITIGATION | Master Docket No. 1:08-11117 (TPG) |
| CUMMINS INC., as the authorized representative of the Cummins Inc. Grantor Trust dated September 10, 2007, as amended,<br><br>Plaintiff,<br><br>v.<br><br>NEW YORK LIFE INSURANCE COMPANY, NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION, TREMONT CAPITAL MANAGEMENT, INC., RYE INVESTMENT MANAGEMENT, MASSMUTUAL HOLDING LLC, MASSACHUSETTS MUTUAL LIFE INSURANCE CO., OPPENHEIMER ACQUISITION CORP., RYE SELECT BROAD MARKET PRIME FUND L.P., RYE SELECT BROAD MARKET XL FUND L.P., RYE SELECT BROAD MARKET INSURANCE PORTFOLIO, LDC, TREMONT OPPORTUNITY FUND III, L.P., TREMONT (BERMUDA) LTD.,TREMONT GROUP HOLDINGS, INC.,and TREMONT PARTNERS, INC.,<br><br>Defendants. | Civil Action No. 1:10-9252 (TPG)<br><br>ECF CASE<br><br>JURY TRIAL DEMANDED |

**<u>THIRD AMENDED COMPLAINT</u>**

Plaintiff Cummins Inc., as the authorized representative of the Cummins Inc. Grantor Trust dated September 10, 2007 ("Plaintiff"), by and through its undersigned counsel, brings this action based upon personal knowledge as to itself and its own acts, and on information and belief

as to all other matters based on the investigation conducted by and through its undersigned counsel, which included the review of complaints filed by the United States Government and the Securities and Exchange Commission (the "SEC"), news reports published in the financial press, other state and Federal court lawsuits filed against these same defendants and other available information.

## SUMMARY OF ACTION

1. Plaintiff files this action based upon its purchase of a series of variable universal life insurance policies ("VUL Policies") from New York Life Insurance and Annuity Corporation ("New York Life").

2. New York Life, acting in concert with the other Defendants, induced Plaintiff to invest its excess insurance premiums from its VUL Policies in the Tremont Opportunity Fund, III ("Tremont Fund") based upon numerous false and misleading representations.

3. Defendants' misrepresentations, taken together, created the impression that the Tremont Fund was a carefully managed fund of funds ("FOF") that selected sub-funds and sub-managers with whom to entrust its assets based upon rigorous and ongoing due diligence and oversight. Defendants also worked in concert to create the false impression that New York Life and the Tremont Fund's parent, grandparent and great-grandparent companies, Oppenheimer Acquisition Corporation ("Oppenheimer"), MassMutual Holding, LLC ("MassMutual Holding"), and Massachusetts Mutual Life Insurance Company ("MassMutual LIC" and collectively with MassMutual Holding, "MassMutual"), also were conducting ongoing and regular due diligence to confirm that the Tremont Fund's assets were properly and appropriately invested.

4. Additionally, Plaintiff was expressly informed that the Tremont Fund, consistent with its stated objective of "provid[ing] investors with a diversified investment portfolio," would not invest more than six percent of its assets with any one sub-manager.

5. In truth, however, the Tremont Fund assigned twenty-two percent of its assets to the Rye Funds (defined below) who, in turn, entrusted substantially all of their assets to Bernard Madoff and Bernard L. Madoff Investment Securities, LLC (collectively "Madoff"), despite that fact that Madoff refused to provide the Rye Funds or the Tremont Fund with *any* concrete information about the securities he was supposedly trading or *any* specific explanation for how he achieved his reported investment results.

6. In short, the Tremont Fund allocated twenty-two percent of its assets to a sub-manager ("Madoff") with no pre-investment due diligence or post-investment oversight to determine whether those assets would be invested consistent with the investment goals and strategies set forth in the offering materials presented to Plaintiff. Or, if the Tremont Fund performed any such due diligence or oversight, it entrusted twenty-two percent of its assets to Madoff knowing that it was impossible to confirm whether Madoff was investing these assets in the marketplace at all, let alone making investment decisions consistent with any specific investment strategy. MassMutual, Oppenheimer, and New York Life, too, were either aware of the Tremont Fund's complete ignorance as to even the most basic details of Madoff's investment activities, or deliberately turned a blind eye to this fact.

7. In reliance on Defendants' false and misleading representations concerning the Tremont Fund's allocation of its assets and oversight of its sub-managers, Plaintiff invested approximately $122,000,000 in the Tremont Fund through its New York Life VUL Policies. The

Tremont Fund in turn invested twenty-two percent of these funds in the Rye Funds, substantially all of which was entrusted to Madoff and has since been lost.

8. Plaintiff seeks to recover damages caused by Defendants' common law fraud, negligent misrepresentation, unlawful conspiracy, unjust enrichment, breach of fiduciary duty, aiding and abetting the breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because the Plaintiff is a citizen of a different state from every Defendant and because the amount in controversy exceeds $75,000. Plaintiff is informed and believes that the citizenship of any and all individual partners of those Defendants which are partnerships and the individual members of those defendants which are limited liability companies are diverse from that of the Plaintiff.

10. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391. Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District. Venue is also proper pursuant to the Order of Consolidation entered March 26, 2009 in *In re Tremont Securities Law, State Law and Insurance Litigation*, Master File No.: 08 Civ. 11117 [Docket #44].

## PARTIES

### Cummins Inc.

11. Plaintiff Cummins Inc. is an Indiana corporation comprised of complementary business units that design, manufacture, distribute and service engines and related technologies, such as fuel systems, controls, air handling, filtration, emission solutions and electrical power

generation systems. Cummins is headquartered in Columbus, Indiana, and serves customers in approximately 190 countries and territories through an expansive network of company-owned and independent distributors and dealers. The Cummins Inc. Grantor Trust dated September 10, 2007 ("the Trust"), and amended thereafter, was created and funded by Cummins Inc. to hold assets that could be used as a source for funding benefits payable under multiple non-qualified retirement and deferred compensation plans created for the benefit of Cummins' employees and their beneficiaries worldwide. Wells Fargo Bank, N.A. ("Wells Fargo") is the successor in interest to Wachovia Bank, N.A., as Trustee of the Trust. Well Fargo has authorized Cummins Inc. to prosecute these claims on behalf of the Trust.

**New York Life**

12. Defendants New York Life Insurance Company and New York Life Insurance and Annuity Corporation (collectively, "New York Life") are corporations organized and existing under the laws of the State of Delaware with their principal place of business in New York. New York Life Insurance and Annuity Corporation is a wholly-owned subsidiary of New York Life Insurance Company. New York Life is located at 51 Madison Avenue, New York, New York 10010.

**Tremont**

13. Defendant Tremont Capital Management Inc. ("Tremont Capital"), formerly known as Tremont Advisers Inc., is a manager of a fund of hedge funds. It is a unit of Tremont Group Holdings, Inc. Tremont Capital is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

14. Defendant Tremont (Bermuda) Ltd. ("Tremont Bermuda") is wholly-owned by Defendant Tremont Capital and is located at Tremont House, 4 Park Road, Hamilton, Bermuda.

15. Defendant Tremont Group Holdings, Inc. ("Tremont Group") is an investment manager of fund-of-funds products and multi-manager portfolios. According to its website, Tremont Group "has been at the forefront in setting the standard in the industry for fund of hedge funds investment management. Effective investment strategies and oversight, thorough manager research, careful due diligence, advanced risk allocation and time-tested portfolio management form the cornerstones of a comprehensive platform that has been refined over a 23 year span of dedicated strides to maximize our clients' objectives." Tremont Group is the parent of Tremont Capital and Tremont Partners Inc. and is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

16. Defendant Tremont Partners, Inc. ("Tremont Partners") is a subsidiary of Tremont Group that manages and/or serves as General Partner of several of the Tremont Group affiliated funds. Tremont Partners is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

17. Defendant Rye Investment Management ("Rye") is the division within Tremont Group that manages, sells, and administers the firm's select manager funds — the Rye Select Funds. Rye is located at 555 Theodore Fremd Avenue, Rye, New York, 10580.

18. Tremont Opportunity Fund III, f/k/a American Masters Opportunity Insurance Fund, L.P. ("Tremont Fund") is a Delaware limited partnership. The Registered Office of the Tremont Fund is located at 1013 Centre Road, Wilmington, Delaware 19805-1297. Tremont Partners is the General Partner of the Tremont Fund. Through its VUL Polices, Plaintiff had an investment in the Tremont Fund.

19. Tremont Capital, Tremont Bermuda, Tremont Group, Tremont Partners, the Tremont Fund, and Rye are sometimes collectively referenced as "Tremont."

**Rye Funds**

20. Defendant Rye Select Broad Market Prime Fund L.P., f/k/a American Masters Broad Market Fund, L.P. ("Prime Fund") is a Delaware limited partnership organized in 1997 and managed by Rye. Tremont Partners is the General Partner of the Prime Fund. The Prime Fund was one of the investment funds in which the Tremont Fund was invested. Through its VUL Policies, Plaintiff had an investment in the Tremont Fund, which in turn had an investment in the Prime Fund. The Prime Fund is located at 555 Theodore Fremd Avenue, Rye, New York, 10580.

21. Defendant Rye Select Broad Market XL Fund L.P., f/k/a American Masters Broad Market Prime Fund, L.P. (the "XL Fund") is a Delaware limited partnership organized on July 13, 2006 and managed by Rye. Tremont Partners is the General Partner of the XL Fund. The XL Fund was one of the investment funds in which the Tremont Fund was invested. Through its VUL Policies, Plaintiff had an investment in the Tremont Fund, which in turn had an investment in the XL Fund. The XL Fund L.P. is located at 555 Theodore Fremd Avenue, Rye, New York, 10580.

22. Rye Select Broad Market Insurance Portfolio, LDC (the "Rye Insurance Portfolio") is a Bermuda-incorporated limited duration company managed by Tremont (Bermuda) Ltd. The Rye Insurance Portfolio was one of the investment funds in which the Tremont Fund was invested. Through its VUL Policies, Plaintiff had an investment in the Tremont Fund, which in turn had an investment in the Rye Insurance Portfolio. Rye Insurance Portfolio is located at 555 Theodore Fremd Avenue, Rye, New York, 10580.

23. The Prime Fund, the XL Fund, and the Rye Insurance Portfolio are collectively referred to herein as the "Rye Funds."

**Oppenheimer, MassMutual Holding, and Mass Mutual**

24. Defendant Oppenheimer Acquisition Corporation ("Oppenheimer") is the parent company of Tremont. Oppenheimer is incorporated under the laws of the state of Delaware, and its principal place of business is located at 2 World Financial Center, New York, New York 10281. Defendant Oppenheimer owns more than 75 percent of, and is listed as a "control person" of, Tremont Partners on Tremont Partners' Form ADV, which was filed with the SEC. Defendant Oppenheimer jointly markets several funds with Tremont Partners, allowing Tremont Partners to use Oppenheimer's name on several of Tremont Partners' funds. Tremont Partners identified itself as a "wholly owned subsidiary of Tremont Group Holdings, Inc., which in turn, is owned by Oppenheimer Acquisition Corp., the parent corporation of Oppenheimer Funds, Inc., one of the nation's largest asset management companies."

25. Defendant MassMutual Holding LLC ("MassMutual Holding") is the parent company of Oppenheimer. MassMutual Holding is listed as a "control person" of Tremont Partners on Tremont Partner's Form ADV, which was filed with the SEC. MassMutual Holding's principal business address is 1295 State Street, Springfield, Massachusetts 01111.

26. Massachusetts Mutual Life Insurance Co. ("MassMutual LIC") is the parent company of MassMutual Holding, through which it owns Oppenheimer. MassMutual LIC is located at 1295 State Street Springfield, Massachusetts 01111. MassMutual LIC is listed as a "control person" of Tremont Partners on Tremont Partners' Form ADV, which was filed with the SEC.

27. Tremont Partners' Privacy Policy, which was also attached to the Fund's offering materials provided to Plaintiff, states that:

> Tremont is made up of certain entities, including its investment advisory and broker-dealer subsidiaries, and in turn, is part of a larger corporate affiliation owned by the Oppenheimer Funds group and Massachusetts Mutual Life Insurance Company. The Tremont entities and, in some cases, its ownership affiliates often work together to provide the financial product and services offered to Tremont Clients.

28. Defendants New York Life, Tremont, Rye, Rye Funds, Oppenheimer, MassMutual Holding, and MassMutual, are sometimes referred to herein collectively as the "Defendants."

**PLAINTIFF'S SUBSTANTIVE ALLEGATIONS**

**The Nature of Variable Universal Life Insurance**

29. Variable universal life insurance ("VUL Insurance") is a type of life insurance, first offered in the late 1980s, that enjoys special tax advantages under the United States Internal Revenue Code and allows a policy holder to build a cash value that can be invested in a choice of separate accounts, similar to mutual funds. The number and type of investment choices available is dependent on the insurer. The cash value in these policies is able to earn investment returns without incurring current income tax as long as it meets the definition of life insurance and the policy remains in force. The tax free investment returns can be used to pay for the costs of insurance inside the policy.

30. The "variable" component in the name refers to a VUL Policy's "Investment Account" component, which varies in value because it is invested in the financial markets. The "universal" component in the name refers to the flexibility the owner has in making premium payments. The premiums may vary in a given month up to maximums defined by the Internal Revenue Code for life insurance.

31. Under a VUL Policy, the death benefit is the face amount of the policy plus the buildup of any cash value that occurs (beyond any amount being used to fund the current cost of

insurance). As long as there is sufficient cash value to pay the costs of insurance in the policy, the death benefit will be paid. Additionally, tax-free policy loans to the policyholder (which would be paid off on death by the death benefit) are available from any excess cash value. VUL Policies allow the policyholder a great deal of flexibility in choosing how much premium to pay for a given death benefit. To maintain a death benefit guarantee, a specified premium level must be paid every month. To keep the policy in force, typically no premium needs to be paid as long as there is enough cash value in the policy to pay that month's cost of insurance.

**Defendants Induce Plaintiff to Invest in the Tremont Fund Through a Series of New York Life VUL Policies**

32. In or about the spring of 2007, Plaintiff became interested in purchasing VUL Insurance, and sought information from New York Life about its VUL Policies and the corresponding funds in which New York Life policyholders were permitted to invest. In response to Plaintiff's inquiries, New York Life in approximately July 2007 provided to Plaintiff a Private Placement Memorandum ("NYL PPM," **Exhibit A** hereto) detailing the terms of New York Life's VUL Policies. Incorporated by reference into the NYL PPM and attached thereto as Appendix E was an additional Private Placement Memorandum for the Tremont Fund ("Tremont Fund PPM"), which New York Life recommended to Plaintiff as a FOF through which Plaintiff could choose to invest its excess VUL Insurance premiums.

33. Unbeknownst to Plaintiff, at the time New York Life provided the NYL PPM to Plaintiff, New York Life and Tremont had entered into a formal "Participation Agreement" requiring New York Life to market and sell the Tremont Fund to potential insureds on Tremont's behalf. Participation Agreement, **Exhibit B** hereto. The Participation Agreement contains the following terms material to this lawsuit:

a. New York Life and Tremont expressly agreed that their Participation Agreement "should not be shown to prospective investors."

b. The Tremont Fund was "established as a private investment fund . . . for the purpose of investing in the [Tremont Fund] premiums or contributions made" under the VUL Policies issued by New York Life;

c. New York Life would "withdraw amounts invested in [the Tremont Fund] to compensate [New York Life] for the administrative, risk and other expenses associated with" its insureds' investment of VUL Insurance premiums in the Tremont Fund;

d. Tremont warranted that it would furnish New York Life with copies of the Tremont PPM and any supplements or amendments thereto within ten days of issuance. New York Life, in turn, promised to provide copies of such documents to its insureds;

e. Tremont warranted that it would allow New York Life to inspect the accounts and the books of the Tremont Fund;

f. Tremont and New York Life promised to (i) provide each other with copies of their respective PPMs and other marketing materials; (ii) refrain from distributing any marketing materials to which either party objected; and (iii) refrain from making any representations concerning the Tremont Fund and the New York Life VUL Policies inconsistent with the parties' PPMs and corresponding sales and marketing literature; and

g. Absent a few narrow exceptions, New York Life would only be permitted to cease promoting Tremont as an available investment to its policyholders upon six months prior written notice to Tremont.

34. Accordingly, at all relevant times, New York Life and Tremont were acting in concert to market and sell the Tremont Fund to Plaintiff and were fully aware of the representations that each made to induce Plaintiff to purchase New York Life VUL Policies for the purpose of investing in the Tremont Fund.

35. The NYL PPM provided to Plaintiff in approximately July 2007, which expressly incorporated the Tremont PPM as Appendix E, made a number of representations concerning (i) Tremont's investment strategies and objectives; (ii) the extent to which Tremont conducted on-

going due diligence into the sub-managers to whom it entrusted Tremont Fund assets; and (iii) the extent to which New York Life monitored the activities and decisions of Tremont.

36. Specifically, the NYL PPM made the following material representations concerning New York Life's extensive control, authority over and monitoring of the investments of its VUL policyholders:

a. The funds that New York Life made available to VUL policyholders, including the Tremont Fund, "reflect[ed] different investment philosophies varying in degree of risk, type of risk and type of assets;"

b. New York Life would have the "exclusive right" to select funds, such as the Tremont Fund, in which insureds would be permitted to invest their premiums;

c. The funds invested in each New York Life VUL Policy would be held in one or more "Separate Accounts" which may be allocated among certain "Subaccounts" that invest[ed] in shares or units of an underlying portfolio of securities managed by one or more portfolio managers pursuant to certain investment objectives and policies that determine the risk of the portfolio;

d. With respect to its insureds' Separate Accounts, New York Life would maintain "sole discretion" to, among other things, (i) restrict transfers among Separate Accounts; (ii) combine the Separate Account with one or more other Separate Accounts; (iii) close existing Investment Divisions to new investments; (iv) change the investment policy of an Investment Division; (v) change the amount of any minimum or maximum investments or additional investments, etc.;

e. New York Life "would notify [Plaintiff] if any change result[ed] in a material change in the [Tremont]" so that Plaintiff could "then make a new election;"

f. New York Life would "perform miscellaneous accounting services as may be reasonably requested from time to time by" Tremont, "relate[d] to the business contemplated by the participation or subscription agreement between NYLIAC and [Tremont];"

g. New York Life would "[d]istribute [Tremont's] prospectus or confidential memorandum and any supplements thereto to policy owners;" and

h. "[I]f, in the judgment of [New York Life's] management, further investment in shares of [Tremont] should become inappropriate in view of the purposes of the Policies, [New York Life] may substitute shares of another Portfolio or of a different Fund for shares already purchased, or to be purchased in the future under the Policies."

37. In addition, the NYL PPM explained that, under the United States Internal Revenue Code (the "Code"), Plaintiff would not reap the intended tax benefits of the VUL Policies unless (i) the invested assets were adequately diversified under Code Section 817(h); and (ii) Plaintiff avoided possessing "incidents of ownership such as the ability to exercise control over the assets." In that regard, New York Life represented that:

a. New York Life would "reserve the right to modify the [Plaintiff's VUL Policies], as necessary, to attempt to prevent [Plaintiff] from being considered the owner of [its VUL Policies'] pro rata share of the assets in the Separate Account;"

b. New York Life would "reserve the right to make changes to [Plaintiff's VUL Policies] . . . to attempt to assure qualification of [each of Plaintiff's VUL Policies] as a life insurance contract;" and

c. New York Life would exercise as it "deemed appropriate" any voting rights afforded to the Tremont Fund's limited partners on Plaintiff's behalf, and would not accept any instructions from Plaintiff as to how those voting rights should be exercised.

38. Additionally, the Tremont PPM, expressly incorporated in and attached to the NYL PPM, made the following additional material representations concerning Tremont's careful selection and monitoring of the managers to whom Tremont Fund assets were entrusted:

a. Tremont "ha[d] primary responsibility for monitoring the ongoing activities of [Madoff];"

b. Tremont would "review the confirmations of the Partnership's trading activity for purposes of tracking the current status of the Partnership's accounts;"

c. Tremont's purpose was to achieve long-term capital growth while focusing on capital appreciation and to "provide investors with a diversified investment portfolio [] designed to result in above average returns over a long period of time" by delegating discretionary and other authority to manage the Tremont Fund's accounts to one or more Investment Advisors in Tremont's absolute discretion;

d. In selecting these investment advisors, Tremont would "seek[] to select Managers that satisfy one or more criteria including, but not limited to: extensive investment management experience; successful historical performance, including a history of consistent returns with respect to the Manager's investment style; the degree to which a specific Manager complements and balances the [Tremont Fund's] Portfolio with respect to the strategies employed by other Managers; the quality

and stability of the Manager's organization; the ability of the [Tremont Fund] to make withdrawals or liquidate its investment; and the ability of each Manager to consistently and effectively apply its investment approach;"

e. In seeking to ensure that the selected Managers would satisfy these criteria, Tremont would "collect[], analyze[] and evaluate[] information regarding the personnel, history and background, and the investment styles, strategies and performance of professional investment management firms;"

f. Tremont would "request detailed information on a continuing basis from each Manager regarding the Manager's historical performance and investment strategies;" and

g. Tremont would provide New York Life, as a limited partner of the Tremont Fund on Plaintiff's behalf, with annual reports audited by an independent certified public accountant.

39. Finally, because of the substantial size of Plaintiff's intended investment through the VUL Policies, and with New York Life's knowledge and consent, Plaintiff prepared a Request for Proposal ("RFP") which sought from Tremont substantial additional detailed information concerning the Tremont Fund. Tremont's response to the RFP ("RFP Response") touted Tremont's affiliation with Defendants Oppenheimer and MassMutual as follows:

> Since 2001, Tremont has been one hundred percent owned by Oppenheimer Acquisition Corp., the parent company of Oppenheimer Funds, Inc., a widely known mutual fund company. Massachusetts Mutual Life Insurance Company, in turn, owns Oppenheimer Acquisition Corp.

40. The RFP Response also made the following representation, among others, concerning Tremont's due diligence process in selecting its underlying managers, including Madoff:

> Tremont believes it is important to "know our managers" through personal meetings, high quality reference checks, background checks, etc. ***We do not hire a manager based on numbers alone*** (emphasis supplied).

41. Tremont's Form ADV, which was filed with the SEC and incorporated into the Fund's offering materials, made the following additional representations on which Plaintiff relied in choosing to invest its excess VUL Insurance premiums in the Tremont Fund:

a. Tremont's senior officers were responsible for employing Tremont's "own proprietary software programs to monitor the performance of investment managers" such as Madoff;

b. Tremont "relie[d] on underlying investment advisor reports and its examination of advisor operations as primary sources of information;"

c. Tremont "utilized databases, wire services, performance measurement publications and other surveys of investment results, such as newspapers, and other business journals as information sources. . . . [and had] a license to utilize the information included in the Lipper TASS database, an extensive database of hedge fund investment manager performance;"

d. "Tremont maintain[ed] a database of over 6,000 management firms to evaluate investment process, approach and investment results;" and

e. Tremont "sources data on new investment organizations through referrals to [Tremont] by other investment managers, its clients and contacts in the financial industry;"

42. Tremont's website, www.tremont.com, contained still more representations concerning its approach to investment management:

a. Tremont provided its investors with "effective investment strategies and oversight, thorough manager research, careful due diligence, advanced risk allocation and time-tested portfolio management;"

b. Tremont 's research staff "analyzed, in detail, the philosophy, styles, strategies, investment professionals, decision-making processes and performance of the organization and the investment products offered;" and

c. Tremont's "research staff conduct[ed] on-site interviews at and examination of such organizations to evaluate back office operations and internal staff, among other things."

43. Likewise, during multiple personal presentations made to Plaintiff by Tremont personnel in the spring and summer of 2007 ("2007 Meetings"), Tremont personnel stated that Tremont was regularly "audited by Oppenheimer," that Oppenheimer and Mass Mutual's control over Tremont provided valuable "checks and balances," and that an "Oppenheimer Risk Group" oversees Tremont's selection of investment managers. Moreover, with respect to Madoff specifically, Tremont personnel informed Plaintiff that Tremont has access to all of Madoff's

trades, allowing for "full transparency" into Madoff's activities so that Tremont could accurately "evaluate the risk" involved with entrusting any funds under its control to Madoff. Tremont personnel also informed Plaintiff during the 2007 Meetings that the Tremont Fund had a low "size to loss potential" and that less than 6% of the Fund's assets were assigned to any one Manager. New York Life was aware of Tremont's 2007 Meetings with Plaintiff and that Plaintiff was relying upon the information provided in the 2007 Meetings in choosing Tremont as the investment vehicle for its VUL policies issued by New York Life.

44. Defendants' representations, as described in paragraphs 32 through 43 above, coupled with Defendants' omission of the Participation Agreement between New York Life and Tremont, cumulatively created the impressions that (i) any manger to whom Tremont would entrust assets under its control had been and would continuously be vetted through a rigorous and ongoing due diligence process; and (ii) New York Life would continuously monitor Tremont to confirm the suitability of Tremont as an appropriate investment vehicle for New York Life's VUL insureds.

**Plaintiff Purchases VUL Polices from New York Life and Elects to Invests Its Excess Insurance Premiums in the Tremont Fund Based Upon Defendants' Representations**

45. Beginning on or about September 15, 2007, in reliance upon Defendants' representations as described in paragraphs 32 through 43 above, Plaintiff made several policy purchases under VUL Policies from New York Life, each time authorizing New York Life to invest Plaintiffs' excess premiums in the Tremont Fund.

46. The approximate dates and amounts of Plaintiffs' VUL Policy purchases and corresponding premium contributions are as follows:

| Appx. date of Policy Purchase | Premium Amount |
|---|---|
| November 15, 2007 | $52,638,664.00 |
| October 15, 2007 | $2,608,437.00 |
| November 15, 2007 | $5,000,000.00 |
| June 15, 2008 | $1,127,525.00 |
| July 15, 2008 | $231,575.00 |
| September 15, 2008 | $52,270,676.00 |
| October 15, 2008 | $2,608,437.00 |
| November 15, 2008 | $6,105,324.00 |
| **Total Premium Contributions:** | **$122,590,638.00** |

**Both Prior and Subsequent to Defendants Inducing Plaintiff to Invest in the Tremont Fund, New York Life and Tremont Fail to Monitor the Tremont Fund's Investments Consistent with the Representations Set Forth in the Tremont PPM, NYL PPM, and Other Offering Materials**

47. Unbeknownst to Plaintiff, New York Life's and the Tremont's representations as described above were false, at least with respect to the twenty-two percent of Tremont Fund assets that Tremont Partners allocated to Madoff.

48. First, Tremont's investment of twenty-two percent of its assets with Madoff far exceeded the maximum six percent that Plaintiff was promised would be invested with any one manager.

49. Second, at all relevant times, before and after Defendants induced Plaintiff to invest more than $122,000,000, the following was true of Madoff:

a. Madoff refused to provide third-parties who marketed him, such as Tremont and New York Life, with any specific details concerning his investment strategy or the securities in which he purportedly chose to invest;

b. Madoff did not allow outside performance audits;

c. Madoff's auditor was a small, obscure accounting firm, Friehling & Horowitz, which has its offices in Rockland County, New York and had no experience auditing entities of Madoff's apparent size and complexity;

d. Madoff did not use an outside prime broker, as nearly all hedge funds do to avoid the existence or appearance of conflicts of interest;

e. Madoff's publicly available financial information concerning its assets was inconsistent with the purported amounts that Madoff managed for clients such as Tremont;

f. Madoff reported abnormally high and stable positive investment results that could not be reconciled with the marketplace in which he was supposedly trading;

g. Other hedge funds using the same "split-strike conversion strategy" that Madoff claimed to employ were unable to achieve results anywhere close to those that Madoff touted;

h. Madoff inexplicably claimed to convert all assets under his management to one hundred percent cash at year's end; and

i. Throughout the period of 2007-2010, numerous financial institutions, such as JPMorgan Chase, were withdrawing their funds from Madoff's control due to concerns arising from their own internal due diligence processes.

50. In light of these facts, New York Life and Tremont at all relevant times either knew that the representations contained in the NYL PPM, Tremont PPM, RFP Response, Tremont Form ADV, and Tremont website were false, or New York Life and Tremont acted with reckless disregard as to the truth of these representations.

51. Tremont could not have been monitoring Madoff's ongoing activities, reviewing Madoff's trade confirmations, or evaluating Madoff's back office operations and internal staff because, in fact, Madoff refused to make such information available. Tremont likewise could not have evaluated Madoff's suitability as a manager according to any of the criteria set forth in the Tremont PPM (investment style, the strategies employed, liquidity, etc.), because Tremont had no way to confirm whether Madoff was investing assets in securities at all, let alone investing in securities in accordance with any particular investment strategy.

52. Similarly, New York Life could not have confirmed that Tremont's allocation of more than one fifth of its assets to Madoff was reflective of any particular investment philosophy, policy or objective or was an appropriate choice for New York Life's insureds. Nor could New York Life have determined whether Madoff made any material changes to his

investment approach such that Plaintiff and other insureds should be notified. New York Life either took no steps to confirm that Madoff's investment approach was consistent with the representations in the NYL PPM, Tremont PPM, RFP Response, Tremont Form ADV, or Tremont website, or New York Life deliberately turned a blind eye to the fact that such confirmation would be impossible.

53. In addition to making representations in the NYL PPM with knowledge of their falsity or with reckless disregard for their accuracy, New York Life failed even to provide Plaintiff with the most updated version of the Tremont PPM. The Tremont PPM that New York Life provided Plaintiff in or about July 2007 to induce Plaintiff's purchase of VUL Policies was dated November 2006 and was silent as to the percentage of Tremont assets that could be allocated to any one manager. However, prior to Plaintiff's first New York Life VUL Policy purchase in November 2007, there existed an "amended and restated" Tremont PPM, dated July 15, 2007, which New York Life did not provide to Plaintiff and which stated:

> While the Partnership intends to invest with various Managers, the Partnership will likely have . . . up to thirty percent (30%) of its total Portfolio invested with a single Manager.

New York Life did not provide this amended and restated Tremont PPM to Plaintiff until after Madoff's fraud was disclosed, in December 2010.

54. Finally, New York Life failed to disclose the terms of the Participation Agreement to Plaintiff, most notably New York Life's contractual requirement to market and sell Tremont to its insureds.

**New York Life Was Aware of Plaintiff's Reliance on Its Misrepresentations**

55. In retaining exclusive authority to select the investment vehicles in which policyholders could place their funds, policyholders like Plaintiff were entitled to rely upon New

York Life to perform sufficient due diligence to ensure that the investment vehicles selected, such as Tremont, were legitimate and managed in accordance with the guidelines set forth in the New York Life PPM and quoted, in part, above.

56. At all relevant times, New York Life was aware that Plaintiff was relying upon New York Life's representations concerning Tremont as described above and as set forth in the New York Life PPM and Tremont PPM. Similarly, at all relevant times, New York Life held itself out to Plaintiff as having taken all reasonable measures to verify the accuracy of the information it provided to Plaintiff concerning Tremont.

57. Evidencing New York Life's awareness of Plaintiff's reliance, prior to issuing the VUL Policies to Plaintiff, New York Life required Plaintiff to sign a "Purchaser Questionnaire" verifying that Plaintiff had had "the opportunity to ask questions and receive answers concerning the terms and conditions of the offering and to obtain any additional information that NYLIAC [New York Life] possesses or can acquire without unreasonable effort or expense that is necessary to verify the accuracy of the information furnished," and that Plaintiff had "relied" upon the information New York Life provided in making the decision to invest in Tremont. Consistent with this Purchaser Questionnaire, the NYL PPM stated that NYL would be available to "[p]rovide telephonic support for policy owners, including, without limitation, information with respect to inquires about the [Tremont Fund]." Underscoring the importance of this Purchaser Questionnaire to New York Life, it is expressly incorporated by reference into Plaintiff's New York Life VUL Policies.

58. Moreover, New York Life's advertising materials, provided to Plaintiff during its relationship with New York Life and prior to December 2010, reinforced New York Life's representations as to the superior level of due diligence and oversight that New York Life was

conducting with respect to its investment offerings, including the Tremont Fund. For example, in October 2008, New York Life provided to Plaintiff the brochure attached hereto as **Exhibit C**, stating that New York Life conducted its "own fundamental, bottom-up research, rather than relying on credit ratings," and "ensure[d] that the potential returns offered by the securities [New York Life] invest[ed] in [would] significantly exceed the risk of these investments." New York Life further stated that its "independence from the demands of Wall Street analysts mean[t] [that New York Life had] the freedom to walk away from [its] investments or sales practices that promise[d] potential near-term results but may not [have been] in [its] policyholders' best interest."

59. Had New York Life disclosed to Plaintiff that it had not conducted any independent investigation, let alone "bottom up research," to determine the accuracy of the representations in the Tremont PPM (or that any research New York Life did conduct revealed that Tremont new little or nothing about the practices of a manager to whom it entrusted twenty-two percent of the Tremont Fund's assets), Plaintiff would not have chosen to invest its excuse VUL Insurance premiums in the Tremont Fund.

**Both New York Life and Tremont Earned Substantial Fees In Connection With Their Management and Administration of Plaintiff's Investment**

60. Despite the fact that New York Life and Tremont either conducted no ongoing due diligence or oversight into Madoff's operation, or recklessly disregarded the alarming results of any such due diligence, New York Life and Tremont were content to collect substantial fees in connection with their inducement of Plaintiff's and numerous other insured's substantial investments in Madoff.

61. Pursuant to the Tremont PPM, Tremont collected substantial fees in connection with its "management" of Plaintiff's investment.

62. The New York Life PPM also discloses that New York Life earned substantial fees in connection with providing certain "administrative services" to Tremont. Had New York Life performed the services it represented that it would perform and timely provided Plaintiff with Tremont's "amended and restated" PPM, dated July 15, 2007, Plaintiff would not have invested in Tremont.

63. New York Life and Tremont were content to collect their respective fees and, rather than jeopardize this income stream, New York Life and Tremont failed to perform the necessary due diligence required to meet their contractual and common law obligations due to Plaintiff. Likewise, to the extent that New York Life and Tremont did perform due diligence, they violated their statutory, common law, and/or contractual duties by purposefully failing to communicate material information to their investors and to correct the misrepresentations contained in the New York Life PPM and Tremont PPM, on which Plaintiff relied in purchasing the VUL Policies and investing in the Tremont Fund.

**Defendants Reveal their Fraud to Investors**

64. On December 11, 2008, the SEC charged Madoff with securities fraud for a multi-billion dollar Ponzi scheme that Madoff and others perpetrated on their investor clients. Also on December 11, 2008, Madoff was criminally charged by the United States Attorney's Office for the Southern District of New York with securities fraud. According to the SEC's complaint and the U.S. Attorney's criminal complaint, Madoff had been conducting a Ponzi scheme since at least 2005.

65. Shortly after Madoff confessed to his Ponzi scheme, New York Life informed Plaintiff and other investors by letter that their investments through New York Life's VUL Policies in the Tremont Fund had "investment exposure to Madoff Investment Securities LLC."

66. In a subsequent letter to Plaintiff and other investors, New York Life informed Plaintiff that from its preliminary discussions with Tremont Capital, it had determined that there was exposure to Madoff. According to New York Life, as of October 31, 2008, Madoff appeared to have been assigned to manage roughly twenty-two percent of the Tremont Fund assets.

67. Plaintiff now finds itself without the funds it believed it had accumulated over time.

**Loss Causation**

68. Plaintiff has lost the portion of its principal investment in the Tremont Fund that was invested in the Rye Funds.

69. Further, Plaintiff has lost its share of the millions of dollars in management and advisory fees and administrative service fees that were paid to Defendants New York Life and Tremont. Despite collecting those enormous fees, Tremont and New York Life completely failed to provide the services promised to Plaintiff, or provided those services so inadequately as to render them completely ineffective.

70. Plaintiff has also lost the opportunity to make a different investment and to earn real returns on its investments.

71. Defendants' conduct, as alleged herein, proximately caused losses to Plaintiff.

**Defendants Oppenheimer, MassMutual Holding, and MassMutual LIC Exercised Control Over Tremont**

72. Defendants Oppenheimer, MassMutual Holding, and MassMutual LIC– which are members of the MassMutual Financial Group – maintained significant influence and/or control over and provided substantial assistance to the Tremont entities that managed and operated the Rye funds.

73. MassMutual LIC determined in or about 2000 to accelerate its involvement in what was then the extraordinarily lucrative hedge fund arena.

74. In search of strategic acquisitions to help it achieve this objective, MassMutual LIC set its sights on Tremont Advisers, Tremont Group's predecessor entity. Defendant Oppenheimer was the MassMutual Financial Group entity designated to pursue a deal with Tremont Advisers.

75. In March 2001, Oppenheimer approached Tremont Advisers' financial advisor, Putnam Lovell Securities, Inc. ("Putnam Lovell"), and expressed "an interest in exploring a strategic transaction with Tremont," according to Tremont Advisers' Form DEFM14A filed with the SEC on August 20, 2001 (the "Tremont Proxy").

76. Tremont Advisers' access to Madoff was one of its greatest selling points. In its Form 10-K SB filled with the SEC, just as Oppenheimer was making its initial approach in March 2001, Tremont Advisers stated that the Market Fund, Prime Fund and its other proprietary investment funds were designed "to provide clients with vehicles for investments with 'hard-to-access' managers." Plainly, Madoff was the most prominent of these "hard-to-access" managers.

77. After Oppenheimer and Tremont Advisers entered into a confidentiality agreement on or about March 14, 2001, Oppenheimer was provided with an "information package" that Putnam Lovell had prepared. The package included, among other things, "a description of Tremont's various business lines, an overview of its investments and distribution platform, its strategic relationships, its distribution need and its financial projections," according to the Tremont Proxy.

78. Significantly, included in this package was Putnam Lovell's "analysis of the significant contribution to Tremont's revenues from a single relationship it has with an

investment manager to its proprietary investment products[,]" according to the Tremont Proxy. This "single relationship" was Tremont Advisers' critical relationship with Madoff.

79. Thus, at the very outset of the transaction, the issue of Tremont Advisers' close and highly lucrative relationship with Madoff was placed squarely before Oppenheimer and its affiliated entities in the MassMutual Financial Group.

80. On or about April 27, 2001, Oppenheimer submitted to Tremont Advisers a written "preliminary indication of interest" signaling that it valued Tremont Advisers at between $100 million and $140 million.

81. Over the second half of May 2001, Oppenheimer held extensive meetings with Tremont Advisers to discuss "various business function areas, such as sales and marketing, accounting and administration and manager research," according to the Tremont Proxy.

82. Also during the second half of May 2001, Oppenheimer representatives conducted extensive due diligence in Tremont Advisers' data room, according to the Tremont Proxy.

83. On or about May 21, 2011, Putnam Lovell and Tremont Advisers' counsel at Skadden, Arps forwarded a draft merger agreement to Oppenheimer along with a "protocol letter" inviting Oppenheimer to submit a final proposal to acquire Tremont Advisers.

84. From late May into early June 2001, the senior management of Tremont Advisers along with representatives of Putnam Lovell continued to work closely with senior Oppenheimer executive who were continuing their due diligence – a painstaking, deliberate process then entering its third month.

85. The due diligence conducted by Oppenheimer focused in substantial part on Tremont Advisers' business dealings with Madoff and BMIS, as well as Madoff's investment strategy and the overall nature of Madoff's operations.

86. By mid-June 2001, Oppenheimer had completed it due diligence, according to the Tremont Proxy.

87. As a consequence of their due diligence and through other available sources, MassMutual LIC, MassMutual Holdings, Oppenheimer, and other members of the MassMutual Financial Group were aware as early as the spring of 2001 of numerous indicators of gross irregularities in Madoff's operations.

88. In addition to this due diligence, at the time Oppenheimer was pursing the purchase of Tremont Advisers, sophisticated players within the investment community who were not involved in the Tremont Advisers transaction already had begun to publicly express skepticism regarding the legitimacy of Madoff's operations.

89. For example, in May 2001 – at the height of Oppenheimer's due diligence inquiry – an article entitled "Madoff Tops Charts; Skeptics Ask How" was published in a semi-monthly newsletter reporting on the hedge fund industry. This article reported that Madoff had reported positive returns for the last eleven-plus years for Fairfield Sentry and other feeder funds, but that current and former traders, other money managers, consultants, quantitative analysts, and fund-of-funds executives, many of whom were familiar with the so-called split-strike conversion strategy used by Madoff, questioned the consistency of the returns. These professionals noted that others using the strategy had nowhere near the same degree of success, and that Gateway, a publicly traded mutual fund, which also used the strategy purportedly employed by Madoff, had experienced far greater volatility and lower returns than Madoff. In other words, the article

highlighted the fact that Madoff's track record could not be replicated by others employing the same investment strategy he claimed to be utilizing.

90. In addition, on or about May 27, 2001 – again, at the height of Oppenheimer's due diligence inquiry – another article entitled "Don't Ask, Don't Tell: Bernie Madoff Is So Secretive, He Even Asks His Investors to Keep Mum" was published in *Barron's*. This article reported that three derivative strategists at major investment banks were highly skeptical about the usually steady double-digit returns Madoff claimed were flowing from his split-strike conversion strategy.

91. The *Barron's* article quoted a former Madoff investor as stating: "Anybody who's a seasoned hedge-fund investor knows the split-strike conversion is not the whole story. To take it at face value is a bit naïve."

92. Notwithstanding their knowledge of Tremont Advisers' close relationship with Madoff, the nature of Madoff's operations and the skepticism other sophisiticated entities were expressing publicly with respect to Madoff's alleged investment strategy, executives at the highest level of MassMutual, Oppenheimer and other MassMutual Financial Group entities pressed forward with the Tremont Advisers acquisition.

93. On or about June 8, 2011, Oppenheimer submitted a formal proposal to acquire all of Tremont Advisers' outstanding common stock for $18.25 per share, according to the Tremont Proxy.

94. Neither its own due diligence into Madoff's operations nor the increasing skepticism being voices about his purported investment strategy dampened Oppenheimer's drive to acquire Tremont Advisers.

95. Indeed, on or about June 25, 2001, Oppenheimer sweetened its initial proposal and offered to acquire Tremont Advisers at $19.00 per share, according to the Tremont Proxy.

96. On June 27, 2001, Tremont Advisers' board of directors authorized senior management to conclude their negotiations with Oppenheimer.

97. On July 9, 2001, Tremont Advisers' board unanimously approved the proposed transaction and the final terms of the deal were finalized early the next day.

**Defendants Oppenheimer, MassMutual Holdings, and MassMutual LIC Exercised Control Over Tremont's Rye Funds**

98. Oppenheimer's acquisition of Tremont Advisers closed on October 1, 2001. From that point forward, Tremont Advisers' operations – including the marketing and investment activities of the Rye Funds – were directly under the MassMutual Financial Group umbrella.

99. By virtue of the acquisition, Tremont Advisers became a wholly-owned direct subsidiary of Oppenheimer.

100. In addition, Tremont Advisers' management structure was overhauled to reflect MassMutual Holding, Oppenheimer and OppenheimerFunds' deep involvement in and control over its operations.

**Defendants Oppenheimer, MassMutual Holding, and MassMutual LIC Exercised Control of Tremont Advisers**

101. At the time of the acquisition of Tremont Advisers by MassMutual Financial Group, Tremont Advisers' board consisted of five members. All five board members had direct ties to a MassMutal and/or an Oppenheimer entity.

102. Specifically, as part of the acquisition, John Murphy ("Murphy"), the chairman, chief executive officer and president of OppenheimerFunds, was named a director of Tremont

Advisers. Murphy also held the position of executive vice president at MassMutual and was a director of Oppenheimer.

103. Joining Murphy on Tremont Advisers' restructured board of directors was Kurt Wolfgruber ("Wolfgruber"). Wolfgruber served as management director and the assistant treasurer of Oppenheimer. Wolfgruber also served as the president, chief investment officer and director of OppenheimerFunds.

104. In addition to Murphy and Wolfgruber, Howard E. Gunton ("Gunton"), an executive vice president and the chief financial officer of MassMutual, was named to Tremont Advisers' board. Gunton also served as a director of Oppenheimer.

105. Further, as part of the acquisition, Sandra Manzke ("Manzke") and Robert Schulman ("Schulman"), Tremont Advisers' co-chief executive officers and board members, became employees of OppenheimerFunds, according to the Tremont Proxy.

106. Manzke and Schulman each had employment agreements under which they would continue to serve as co-chief executives "or in other positions to which they may be appointed from time to time" by OppenheimerFunds. Further, those agreements provided for OppenheimerFunds to pay Manzke and Schulman annual base salaries of $500,000.00 plus potentially substantial discretionary bonuses.

107. Subsequent to the Tremont Advisers transaction, Michael Rollings ("Rollings"), chief financial officer and an executive vice president at MassMutual LIC, was named to Tremont Advisers' board of directors.

108. By the time Rollings joined as a director in 2006, Tremont Advisers' board consisted of four members: Murphy, Wolfgruber, Schulman and Rolings, according to Tremont Advisers' Annual Franchise Tax Report for 2007 filed with the State of Delaware. As noted

above, each of those four directors held senior positions with MassMutual and/or an Oppenheimer entity.

109. By 2008, Tremont Advisers' board consisted of three members, according to Tremont's Annual Franchise Tax Report for 2008 filed with the State of Delaware. Each of these directors – Murphy, Wolfgruber and Rollings – was a high-level executive and/or director of an entity operating within the MassMutual Financial Group network as noted above.

110. The remaining two members of Oppenheimer's board of directors at the time of the Tremont Advisers' acquisition were O. Leonard Darling ("Darling") and Jeremy Griffiths ("Griffiths"). Darling was chief investment officer and an executive vice president of OppenheimerFunds.

111. Griffiths, who also served as Oppenheimer's chief financial officer and treasurer, was chief financial officer and an executive vice president of OppenheimerFunds, according to Form SC 13D filed by MassMutual LIC on behalf of Tremont Advisors Inc. (now Tremont Group) dated July 20, 2001.

112. In addition, Oppenheimer's top executives at the time of the Tremont Advisers transaction had direct ties to MassMutual LIC and OppenheimerFunds. Andrew J. Donohue, Oppenheimer's general counsel and secretary, was an executive vice president and the general counsel of OppenheimerFunds.

113. Brian W. Wixted, Oppenheimer's assistant treasurer, was a senior vice president and the treasurer of OppenheimerFunds.

114. Further, Stephen L. Kuhn, Oppenheimer's assistant secretary, was senior vice president, deputy general counsel and assistant secretary of MassMutual LIC.

**MassMutual Exercised Control over MassMutual Holding**

115. MassMutual Holding, the corporate parent of the Oppenheimer entity that acquired Tremont Advisers, also was controlled by top-level MassMutual LIC executives at the time of the Tremont Advisers acquisition.

116. MassMutual Holding's then chairman, president and chief executive officer, Robert J. O'Connell, held those same positions with MassMutual LIC simultaneously.

117. Lawrence V. Burkett, Jr., a director and executive vice president of MassMutual Holding, served as an executive vice president and general counsel of MassMutual LIC.

118. Gunton, a director, vice president and the chief financial officer of MassMutual Holding, was an executive vice president and the chief financial officer of MassMutual LIC.

119. MassMutual Holdings director Margaret Sperry was a senior vice president and the chief compliance officer of MassMutual LIC.

120. In addition, Ann F. Lomeli, a director, senior vice president and the secretary of MassMutual Holding, held the titles of senior vice president, secretary and deputy general counsel at MassMutual LIC.

121. Stuart H. Reese, an executive vice president of MassMutual Holding, served as the executive vice president and the chief investment officer of MassMutual LIC.

122. Christine Modie, an executive vice president of MassMutual Holding, was an executive vice president and the chief information officer of MassMutual LIC.

123. Murphy, an executive vice president with MassMutual LIC, served as an executive vice president of MassMutual Holding.

124. Susan A. Alfano, an executive vice president of MassMutual Holding, held that same title with MassMutual LIC.

125. Matthew E. Winter, a MassMutual Holding executive vice president, held the same title at MassMutual LIC.

126. Finally, Edward M. Kline, vice president and treasurer of MassMutual Holding, held those same positions at MassMutual LIC.

**MassMutual LIC Represented Itself, Oppenheimer, and Tremont Group Holdings as Being Part of One Integrated Financial Services Company**

127. MassMutual LIC marketed itself and its subsidiaries, such as Oppenheimer and Tremont, as one integrated financial services company under the name "MassMutual Financial Group." MassMutual's annual reports included discussions of its life insurance, mutual fund, and asset management businesses, among others, and its consolidated financial statements report results from each of these businesses.

128. For example, in its 2006 Annual Report, MassMutual LIC stated that Oppenheimer and MassMutual investment professionals worked together to "successfully leverage the accumulation, protection and income management products and services available across the MassMutual Financial Group companies, from life insurance to mutual funds to college savings plans." MassMutual LIC made Tremont's position in this unified group clear by listing Tremont among its "General Agencies and Other Offices" in its Annual Reports from 2005 to 2008. Likewise, in keeping with MassMutual LIC's mission statement, Oppenheimer directly promoted several funds that bore the name of both Tremont and Oppenheimer, such as the Oppenheimer Tremont Opportunity Fund LLC.

129. MassMutual LIC's annual reports for 2005, 2006, and 2007 further stated that "Massachusetts Mutual Life Insurance Company and its subsidiaries have offices around the globe," and listed and provided contact information for "OppenheimerFunds, Inc., Tremont

Group Holdings, Inc. and Tremont Capital Management Ltd." The three subsidiaries were identified as "general agencies and other offices."

130. In describing its "Corporate Operations" in its 2005 Annual Report, MassMutual LIC referred to itself as a "diversified financial services organization" and stated that: "When leveraged across the enterprise, [our] resources help us increase efficiencies and take advantage of economies of scale, ensuring that people in our lines of business can focus on their primary objective: to develop, distribute and service a wide variety of financial products to help our customers meet their needs."

131. In its 2005 Annual Report, MassMutual LIC also singled out the success of its subsidiaries that were "funds of funds" such as the Tremont Fund: "Similarly, the company's businesses serving affluent investors continued to grow, expanding offerings and gaining traction in key products such as hedge funds of funds, separately managed accounts and college savings plans. As a result, these businesses now collectively manage over $8.5 billion in assets, with sales up 15 percent over last year." The 2005 Annual Report further noted that: "In late 2005, OppenheimerFunds, along with its subsidiaries and controlled affiliates, reached a significant milestone, surpassing $200 billion in assets under management."

132. Indeed, as set forth above in paragraph 19, the MassMutual Financial Group presented a unified front to the public by cross marketing products, cross-promoting each purportedly distinct entity, and representing to its clients that each member company of the MassMutual Financial Group had access to the resources of the other members of the group.

133. Thus, after the acquisition of Tremont, MassMutual LIC operated and marketed itself as a single, integrated financial services company comprised of its life insurance business and its investment subsidiaries such as Oppenheimer and Tremont.

**COUNT I**

**(Fraud in the Inducement- Against all Defendants)**

134. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

135. In or about July 2007, Tremont and/or New York Life made numerous representations as described in detail in paragraphs 32 through 43 above concerning, without limitation, (i) the nature of the Tremont Fund as an investment vehicle; (ii) the high level of ongoing due diligence and oversight that Defendants had and would continue to engage in with respect to investment managers to whom Tremont entrusted the Tremont Fund's assets; (iii) the maximum percentage of Tremont Fund Assets (six percent) that would be entrusted to any one manager; (iv) New York Life's commitment on an ongoing basis to providing Plaintiff with the most up to date copy of Tremont's prospectus (the "Misrepresentations").

136. On information and belief, defendants Oppenheimer, MassMutual Holding, and MassMutual LIC individually and collectively were directly involved with the everyday business of Tremont and, specifically, with the preparation of the Tremont PPM, Tremont Form ADV, Tremont website, and/or RFP Response.

137. To the extent any one of the Misrepresentations were made by Tremont, New York Life at all relevant times was aware of and actively reinforced these Misrepresentations to Plaintiff pursuant to the Participation Agreement attached hereto as **Exhibit A** and also by expressly incorporating by reference the Tremont PPM into the NYL PPM.

138. At the time the Misrepresentationswere made, Defendants knew them to be false or acted with extreme reckless disregarded for the truth or falsity of these Misrepresentations.

139. Defendants knew and intended at all relevant times that Plaintiff would rely on the Misrepresentations in purchasing VUL Policies through New York Life and investing its corresponding VUL Insurance premiums in the Tremont Fund.

140. Plaintiff did reasonably rely on the Misrepresentations in purchasing New York Life VUL Policies and investing its VUL Insurance premiums in the Tremont Fund. But for Defendants' knowing Misrepresentations, Plaintiff would not have invested its excess VUL Insurance premiums in the Tremont Fund and would instead have chosen a different investment vehicle for its excess VUL Insurance premiums.

141. Plaintiff, as a result of its investment in the Tremont Fund and by reason of the Defendants' wrongful concealments and misrepresentations, has sustained damages and has lost a substantial part of its respective investment in an amount yet to be determined, and to be proven at trial.

142. By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff.

143. Defendants are further liable to Plaintiff for punitive damages, in an amount also to be determined at trial, attributable to their wanton course of conduct that was reckless, willful and without regard to the rights of Plaintiff.

**COUNT II**

**(Negligent Misrepresentation- against New York Life and Tremont)**

144. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

145. In or about Spring 2007, Defendants New York Life and Tremont, acting in concert pursuant to an undisclosed Participation Agreement between them, presented to Plaintiff a NYL PPM, Tremont PPM, RFP Response (as defined above), and other offering materials as

described in paragraphs 32 through 43 above (collectively, the "Offering Materials"), for the express purpose of inducing Plaintiff to purchase VUL insurance through New York Life and to invest its excess premiums in the Tremont Fund.

146. Both New York Life and Tremont knew that these Offering Materials were being provided to Plaintiff and that Plaintiff would rely on these materials in making investment decisions concerning the Investment Account component of its VUL Policies through New York Life.

147. In the course of presenting the Offering Materials to Plaintiff, New York Life marketed itself as having unique expertise in selecting investment vehicles suitable for VUL insureds.

148. In the course of presenting the Offering Materials to Plaintiff, Tremont marketed itself as having unique expertise in creating and providing investment vehicles suitable for VUL insureds.

149. Accordingly, New York Life and Tremont each owed to Plaintiff a duty to: (i) act with reasonable care in preparing and disseminating Offering Materials relied upon by Plaintiff in deciding to acquire and maintain New York Life VUL Policies and/or choose to invest VUL Insurance premiums in the Tremont Fund; and (ii) use reasonable diligence in determining the accuracy of and preparing the information contained in those Offering Materials.

150. Additionally, subsequent to Plaintiff's purchasing of VUL policies and investment of excess premiums in the Tremont Fund, New York Life and Tremont owed to Plaintiff a duty to act with reasonable care in providing account statements and other materials reflecting the value of Plaintiff's VUL Policies and the value of Plaintiff's interest in the Tremont Fund.

151. As described above in paragraphs 32 through 43, the Offering Materials that New York Life presented to Plaintiff contained numerous false and misleading representations concerning, without limitation, (i) the investment philosophy of the Tremont Fund; (ii) the extent of Tremont's due diligence into and monitoring of the sub-managers with whom Tremont Fund assets were entrusted; and (iii) the extent of New York Life's due diligence into and ongoing monitoring of Tremont and the Tremont Fund to determine and confirm Tremont's suitability as an investment vehicle for New York Life's VUL insureds.

152. As described above in paragraphs 32 through 43, the Offering Materials that Tremont presented to Plaintiff contained numerous false and misleading representations concerning both the topics set forth in paragraph 151 above and, without limitation, (i) the "full transparency" that Madoff provided to Tremont with respect to Madoff's trading activities; (ii) the Tremont Fund's "low size to loss potential;" and (iii) the percentage of Tremont Fund assets (no more than six percent) that would be invested with any one Manager.

153. Further, New York Life, despite representing in the NYL PPM that it would "[d]istribute [Tremont's] prospectus or confidential memorandum and any supplements thereto to policy owners," failed to provide Plaintiff with a copy of the Amended and Restated Tremont PPM, dated July 15, 2007. This Amended and Restated Tremont PPM, contradicting Tremont's prior representations to Plaintiff, disclosed the *likelihood* that as much as thirty percent of Tremont Fund assets may be allocated to a single Manager.

154. The Offering Materials that Tremont and New York Life provided to Plaintiff also did not disclose the risks associated with the Tremont Fund's or the Rye Funds' investment with Madoff, or other Madoff controlled entities. Specifically, and without limitation, the Offering Materials did not disclose that none of the Defendants had or could ever verify with certainty that

Madoff was investing Tremont Fund assets entrusted to him in legitimate securities at all, let alone securities consistent with the Tremont Fund's stated investment objectives.

155. Additionally, after Plaintiff purchased New York Life VUL policies and invested its excess premiums in the Tremont Fund, Tremont and New York Life caused to be issued, or participated in the preparation and issuance of deceptive and materially false and misleading statements to Plaintiff regarding the value of Plaintiff's VUL Policies and the value of Plaintiff's interest in the Tremont Fund.

156. Finally, neither Tremont nor New York Life disclosed the terms of their Participation Agreement to Plaintiff, including, without limitation, New York Life's contractual requirement to market and sell the Tremont Fund to insureds.

157. New York Life and Tremont's actions and inactions as described herein were in breach of their duties to Plaintiff as set forth in paragraph 149 above.

158. As a direct, foreseeable and proximate result of New York Life's and Tremont's negligence, Plaintiff has sustained damages and has lost a substantial part of its investment in an amount yet to be determined, and to be proven at trial.

159. By reason of the foregoing, Defendants New York Life and Tremont are further liable to Plaintiff for punitive damages, in an amount also to be determined at trial, attributable to their wanton course of conduct that was reckless, willful and without regard to the rights of Plaintiff.

## COUNT III

**(Breach of the Implied Covenant of Good Faith and Fair Dealing- against New York Life)**

160. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

161. Plaintiff's New York Life VUL Policies constitute contracts between Plaintiff and New York Life.

162. Inherent in each VUL Policy is New York Life's implied duty of good faith and fair dealing.

163. New York Life's duty of good faith and fair dealing includes the duties to:

a. Act consistent with the terms of the NYL PPM and other offering materials as described above;

b. In its capacity as a limited partner of the Tremont Fund on behalf of Plaintiff, to reasonably monitor Tremont's investment activities and determine in good faith that the Tremont Fund continued to be an "appropriate" investment vehicle for Plaintiff;

c. Timely provide Plaintiff with a copy of any revised Tremont offering materials, including the Amended and Restated Tremont PPM;

d. Take reasonable measures to verify the accuracy of the cash value of Plaintiff's VUL Policies as stated in the annual report provided to Plaintiff in accordance with the VUL Policies' express terms; and

e. In its capacity as custodian and record owner of Plaintiff's Separate Accounts, and having reserved "sole discretion" to oversee and manage those accounts, take reasonable measures to verify that Plaintiffs' assets in those accounts were invested in genuine securities and consistent with the investment objectives and level of risk set forth in the NYL PPM, Tremont PPM and other offering materials.

164. New York Life did not perform any of these implied obligations.

165. Had New York Life performed these obligations, it would have recognized that the Tremont Fund was not an appropriate investment vehicle for Plaintiff and its other insureds and would have exercised its "sole discretion" to cease offering the Tremont Fund as a VUL Insurance investment vehicle. In the alternative, New York Life would have disclosed to Plaintiff that twenty-two percent of the Tremont Fund's assets were invested in a portfolio of unknown securities, the performance of which could not be reconciled with the general marketplace. Had New York Life disclosed this information, Plaintiff would not have made the

pre-contractual decision to invest its excess VUL Insurance premiums in the Tremont Fund. At an absolute minimum, had New York Life been meeting its implied duty of good faith and fair dealing, it would at some point prior to December 2008 have provided Plaintiff with a copy of the Amended and Restated Tremont PPM, disclosing that up to thirty percent of the Tremont Fund's assets would likely be allocated to a single manager. Had New York Life timely provided the Amended and Restated Tremont PPM to Plaintiff, Plaintiff would have elected to with withdraw its assets from the Tremont Fund prior the revelation of Madoff's fraud in December 2010.

166. As a direct and proximate result of New York Life's breach of its implied duty of good faith and fair dealing, Plaintiff sustained substantial damages.

**COUNT IV**

**(Breach of Fiduciary Duty – against New York Life and Tremont)**

167. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

168. Defendants New York Life and Tremont owed duties to Plaintiff to use due care in the investigation, recommendation, management, and supervision of the invested assets of Plaintiff.

169. Defendants New York Life and Tremont breached their fiduciary duties to the Plaintiff by investing the assets of Plaintiff in the Rye Funds and Madoff without conducting any of the pre-investment due diligence or post-investment oversight promised in the NYL PPM, Tremont PPM, Tremont Form ADV, Tremont website and RFP Response, as described in large part above.

170. Defendant New York Life breached its fiduciary duty to the Plaintiff by failing to ensure that investments offered in the Investment Account component of the New York Life VUL Policies were appropriate, and by failing to use due care and reasonable oversight of those investments.

171. Defendants New York Life and Tremont breached their fiduciary duties by investing the assets of Plaintiff in the Rye Funds, which used a single undisclosed investment advisor.

172. Defendants New York Life and Tremont breached their fiduciary duties by failing to disclose that twenty-two percent of the Tremont Fund's assets were and could continue to be entrusted to a single undisclosed investment advisor.

173. Defendants New York Life and Tremont breached their fiduciary duties by failing to timely provide Plaintiff with a copy of the Amended and Restated Tremont PPM, which would have alerted Plaintiff prior to December 2010 that, contrary to Defendants' initial representations, the Tremont Fund's allocation of assets to any single manager would not be limited to six percent of the Tremont Fund's total assets but instead would "likely" be as high as thirty percent of the Tremont Fund's total assets.

174. Defendants New York Life and Tremont breached their fiduciary duties by allowing Plaintiff to direct its investments to funds that invested with Madoff or Madoff related entities without any oversight, supervision, or due diligence, by failing to adequately monitor Madoff's financial reporting, and by failing to detect, prevent, or halt the misstatements and omissions of material fact alleged herein.

175. By reason of the foregoing, Defendants New York Life and Tremont are liable to Plaintiff.

176. New York Life and Tremont are further liable to Plaintiff for punitive damages, in an amount also to be determined at trial, attributable to the wanton course of conduct of New York Life and Tremont that was reckless, willful and without regard to the rights of Plaintiff.

**COUNT V**

**(Aiding and Abetting Fraud and Breaches of Fiduciary Duty – against Oppenheimer, and MassMutual)**

177. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

178. Defendants Oppenheimer and MassMutual had actual knowledge of the fraud and breaches of fiduciary duty by Tremont and New York Life and substantially assisted in them in that regard.

179. Defendants Oppenheimer and MassMutual participated in and/or were aware of the Tremont's operations, and/or had intimate knowledge of their products, sales, accounting, plans and implementation thereof, had the power to and did influence and control Tremont's decision-making, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Defendants Oppenheimer, and MassMutual had the ability to prevent the issuance of the statements or cause the statements to be corrected.

180. Defendants Oppenheimer and MassMutual had direct and supervisory involvement in the day-to-day operations of the Tremont Fund, Rye, and the Rye Funds and, given the size, scope, and blatancy of the wrongdoing and the misrepresentations alleged above, are presumed to have had the power to control or influence the particular statements giving rise to the claims alleged herein.

181. Plaintiff suffered damages proximately caused by Oppenheimer and MassMutual aiding and abetting the fraud and breaches of fiduciary duty by the Tremont Fund, Rye, and the Rye Funds in an amount to be proven at trial.

**COUNT VI**

**(Civil Conspiracy- against all Defendants)**

182. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

183. At all relevant times, and pursuant to the Participation Agreement between them, Tremont and New York Life joined forces for the express purpose of marketing and selling VUL Policies and the Tremont Fund to Plaintiff.

184. Tremont and New York Life accomplished this purpose by intentionally making numerous false and misleading representations and material omissions to Plaintiff as described above.

185. Defendants MassMutual Holding, MassMutual LIC and Oppenheimer at all relevant times were aware of Tremont's and New York Life's common purpose and, in furtherance thereof, deliberately contributed to the preparation of and lent their names to the Tremont offering materials provided to Plaintiff.

186. As a result of Defendants' wrongful conduct, Plaintiff has suffered substantial damages.

187. Defendants are further liable to Plaintiff for punitive damages, in an amount also to be determined at trial, attributable to the wanton course of conduct of Defendants that was reckless, willful and without regard to the rights of Plaintiff.

**COUNT VII**

**(Unjust Enrichment- against all Defendants)**

188. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

189. With respect to New York Life, Count VII is alleged in the alternative to Count III.

190. By their actions and inactions, Defendants have benefited and profited unjustly by receiving excessive revenue derived from the fees they collected based on the VUL Policies' cash value.

191. These payments have been received by New York Life and Tremont at the expense of Plaintiff, under circumstances in which it would be inequitable for Defendants to be permitted to retain the benefit.

192. Plaintiff is entitled to restitution of the excessive revenue derived from the assessment of fees based on the misrepresented cash value portion of its VUL Policies.

**COUNT VIII**

**(Violations of New York General Business Law § 349 –**
**against New York Life and Tremont)**

193. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

194. Defendants New York Life's and Tremont's acts and conduct, as detailed herein, constitute deceptive acts and practices in the conduct of business or in the furnishing of a service, within the meaning of § 349 of the New York General Business Law and, as such, are unlawful.

195. Upon information and belief, the same acts and conduct used by Defendants New York Life and Tremont to defraud Plaintiff have been used repeatedly and are of a recurring nature.

196. The acts and conduct of Defendants, by which they knowingly and fraudulently misrepresented to potential purchasers the nature of the investments that Defendants New York Life and Tremont were selling to Plaintiff affect the public interest.

197. As a result of Defendants New York Life and Tremont's unlawful acts and conduct in violation of § 349 of the New York General Business Law, Plaintiff has been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a. Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

b. Awarding prejudgment interest;

c. Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including but not limited to disgorgement);

d. Awarding Plaintiff its reasonable costs and expenses incurred in this suit, including reasonable attorneys' fees, accountants' fees, and experts' fees;

e. Awarding Plaintiff punitive damages; and

f. Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: October 29, 2012

Respectfully submitted,

Plaintiff Cummins Inc., as the authorized representative of the Cummins Inc. Grantor Trust dated September 10, 2007

By: s/ Sara Siegall
One of its attorneys

**Lead Counsel**
*(Admitted Pro Hac Vice )*

Kevin M. Flynn
Kevin M. Flynn & Associates
77 West Wacker, Suite 4800
Chicago, Illinois 60601
312-456-0240

Robert A. Chapman
Sara Siegall
Chapman Spingola, LLP
77 West Wacker Drive, Suite 4800
Chicago, Illinois 60601
312-630-9202

**Local Counsel**

Jonathan D. Berg, Esq.
Lagemann Law Offices
300 East 42nd Street, 10th FL
New York, NY 10017
212-599-0990

**CERTIFICATE OF SERVICE**

I, Sara Siegall, an attorney, hereby certify that on October 29, 2012, I caused a copy of the foregoing to be delivered electronically to counsel of record via PDF/E-mail.

/s/ Sara Siegall