UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re Tremont Securities Law, State Law, and Insurance Litigation | Master File No. 08 Civ. 11117 |
| ELENDOW FUND, LLC, Plaintiff, v. RYE SELECT BROAD MARKET XL FUND, TREMONT PARTNERS, INC., *et al.*, Defendants. | 10 Civ. 9061 **OPINION** |

    This is an action to recover assets lost in the now-infamous Ponzi scheme perpetrated by Bernard Madoff.  Plaintiff Elendow Fund, a small investment fund located in Bozeman, Montana, alleges that it was induced to invest approximately $12 million in one of Tremont's Madoff-managed funds, the Rye Select Broad Market XL Fund, by certain representations made by Tremont about the XL Fund that proved to be false.  Elendow Funds also alleges that Tremont misrepresented the due diligence that it performed on its fund managers.  Moreover, it alleges that Tremont was aware of so many abnormalities and red flags in Madoff's operations that the most natural inference is that Tremont made these misrepresentations, not merely out of its own ignorance of Madoff's scheme, but with fraudulent intent.

1

Elendow Fund has had the benefit of limited discovery through which it received documents referenced and quoted in other lawsuits, in particular the litigation between Tremont and Irving Picard, the bankruptcy trustee appointed to oversee the liquidation of Bernard L. Madoff Investment Securities.  Elendow Fund's latest amendment to its complaint incorporates the fruits of this discovery.  The complaint includes counts—against various defendants—of securities fraud, control-person liability, common-law fraud, negligent misrepresentation, breach of contract, breach of fiduciary duty, and aiding and abetting a breach of fiduciary duty.

Defendants moves to dismiss the complaint.  The motion is granted.

## The Complaint

### The Parties

Elendow Fund brings this action against numerous defendants falling into three groups: Tremont entities, individual Tremont officers, and control defendants.

The defendant Tremont entities are

- The XL Fund;

- Rye Investment Management, the manager of the XL fund;

- Tremont Partners, the general partner of the XL Fund;

- Tremont Group Holdings, the parent holding company of both the XL Fund and Tremont Partners; and

- Tremont Capital Management, which manages "Tremont Group Holdings' family of multi-manager products."

The individual defendants are presidents and CEOs of Tremont Group Holdings and Rye Investment Management during the time that Elendow Fund made its investments with the XL Fund.

The control defendants are:

- Oppenheimer Acquisition Corporation, parent company of Tremont Holdings;

- MassMutual Holdings, parent company of Oppenheimer; and

- Massachusetts Mutual Life Insurance Company, or simply "MassMutual," parent company of MassMutual Holdings.

## Madoff and The XL Fund

The majority of the XL Fund's exposure to Madoff was, in a certain sense, indirect. The XL Fund operated in such a way that it generated investment returns based upon the performance of another Tremont fund, the Rye Select Broad Market Fund, the assets of which were managed by Madoff.  While some assets were invested directly with the Broad Market Fund, and thus with Madoff, the XL Fund's primary investment strategy was to achieve a three-times leveraged return based upon the performance of the Broad Market Fund.  This means that the XL Fund entered into derivative contracts with various counterparties such that when the contract terminated the counterparty agreed, in exchange for a fixed interest payment, to pay the XL Fund the net increase or decrease in the value

of a hypothetical direct investment in the Broad Market Fund since the contract's inception.  Under the contracts, this hypothetical direct investment was set at three times the value of the XL Fund's actual investment in the Broad Market Fund, such that the XL Fund would enjoy three times the gain, or suffer three times the loss, as it would through its actual direct investment in the Broad Market Fund.

Tremont's Representations

Elendow Fund alleges that Tremont made two types of representations, both of which proved to be false.  It alleges that Tremont falsely represented the investment strategy of the XL Fund and falsely represented that Tremont conducted extensive due diligence on its fund managers.

*Investment-Strategy Representations*

Broadly speaking, Elendow Fund contends that Tremont induced it to invest in the XL Fund by disguising Madoff's fraud.  More specifically, Elendow Fund alleges that Tremont represented that the XL Fund sought to provide "long-term capital growth" and consistent "positive returns irrespective of stock market volatility or direction, while focusing on preservation of capital."  The XL Fund would achieve this, Tremont claimed, by investing its assets with Madoff who supposedly employed a "split-strike conversion" strategy, a hedging strategy using equities, options trading, and short selling.  The fund's offering memorandum indicated that the fund's performance was dependant on Madoff's investment expertise and the inherent risk of the market.  The XL Fund also issued

4

periodic statements that purported to reflect Elendow Fund's gains, losses, and closing capital at the end of the statement periods.

Given the truth of Madoff's operations, it is easy to see that these representations were false. Madoff employed no investment strategy at all, the value of Elendow's investments was not subject to the whims of the market or Madoff investment expertise, and the account statements reflected investments that did not actually exist.

Elendow Fund alleges that Tremont knew these representations to be false when it made them. Internal Tremont communications allegedly indicate that Tremont was aware of many of the red flags that caused others to conclude that Madoff's operation was not legitimate. The documents allegedly reveal that Tremont recognized the risks posed by a number of the warning signs. Tremont allegedly understood

- that it did not know how much money Madoff had under management;

- that Madoff rarely met directly with investors;

- that Madoff did not earn a management fee on top of his commission on trades;

- that Madoff's annual report disclosed only investment in U.S. Treasury bills;

- that Madoff was "self clearing," meaning that there was no third-party to confirm what trades Madoff was making, though the complaint alleges that, in Tremont's view, these concerns were mitigated by its belief that the National Association of Securities Dealers was verifying Madoff's trades;

- that Madoff's returns were exceptionally stable;

- that Madoff used an outdated system of paper trade confirmations which meant that Tremont was only able to spot-check a few transactions per month, instead of engaging in the in-depth monitoring that electronic confirmations would have allowed; and

- that Madoff's accounting firm was possibly not sophisticated enough to effectively audit Madoff's business.

Numerous internal emails and memoranda acknowledged that these aspects of Madoff's business rendered it highly opaque to Tremont's due-diligence efforts and were not in accordance with industry best practices.  In fact, Tremont allegedly did not even know who actually made the investment decisions within Madoff's organization.

Tremont knew that these facts would make it very difficult to attract more sophisticated institutional investors.  While Tremont supposed that the "trust me, let me show you the numbers", or "blind faith" approach would satisfy what one employee referred to as the "Palm Beach crowd," institutional investors would likely require more transparency.  Tremont was also aware that at least one other hedge fund manager would not recommend Tremont to investors because its relationship with Madoff was "prone to blow up" (although a follow-up email characterized this concern as a "misconception").

Tremont also was also aware that The Royal Bank of Scotland, one of Tremont's counterparties, was not comfortable dealing with Madoff.  Tremont executives also met with representatives of another bank, MeesPierson, and discussed many of the warning signs noted above.

Tremont executives also were aware of and discussed two of the major articles that appeared in the financial press in 2001 raising questions about Madoff's business.

The complaint alleges that several individuals, banks, funds, and investment advisors, presented with the same red flags as those brought to Tremont's attention, concluded that Madoff's results were too good to be true and made the wise decision to avoid any exposure to him.

### *Due-Diligence Representations*

Elendow Fund also alleges that Tremont represented that it would subject Madoff, as one of its investment managers, to a strict, ongoing program of due diligence.  The Tremont Group website claimed that Tremont clients would benefit from its "thorough manager research, careful due diligence, advanced risk allocation and time tested portfolio management."  Tremont's Form ADV, filed in 2006 with the Securities and Exchange Commission, contained more specific representations.  Tremont claimed that it "engaged on a daily basis with custodians and/or trustees to monitor cash flow and fund compliance," that "accounts are monitored in terms of securities holdings, asset mix and adherence to investment guidelines," and that it "uses its own proprietary software programs to monitor the performance of fund managers."

Elendow alleges that it reviewed the XL Fund's private placement memoranda.  But Elendow Fund does not specifically allege that it reviewed either of the documents containing the due-diligence representations alleged in the complaint.  Elendow Fund,

however, alleges more generally that it "relied, to its detriment" on "such misleading statements" as "described above" in the complaint.

These representations, Elendow Fund alleges, are belied by many of the allegations described above.  Most basically, Elendow Fund contends, because Tremont knew of all the red flags alleged above and yet still made the decision to invest with Madoff, one must conclude that, when it came to Madoff, Tremont's due-diligence practices were all but suspended in favor of blind reliance on Madoff's reputation.  Specifically, Tremont's awareness that Madoff's operation had "no transparency" in numerous respects means that Tremont must have known that it was not, in fact, able to do the specific things it said it was doing in the way of due diligence.  Similarly, Elendow alleges that Tremont could not have used the sophisticated, computerized monitoring techniques it said it would because Madoff actually submitted his trade confirmations by U.S. Mail on paper, days after the fact.

Control Allegations

Elendow Fund alleges that Oppenheimer acquired Tremont Group Holdings in 2001 (it was then called "Tremont Advisers").  In so doing, Oppenheimer allegedly had complete access to Tremont's files and conducted interviews with Tremont executives. Oppenheimer allegedly had access to information regarding Tremont's "strategic relationships," including its lucrative relationship with Madoff.  Oppenheimer therefore conditioned its acquisition of Tremont on the continued employment of two Tremont executives who had personal relationships with Madoff.

8

A number of Tremont's directors, the complaint alleges, are also MassMutual and Oppenheimer executives.  MassMutual, in turn, allegedly controls Oppenheimer, as well as two intermediary holding companies, through its majority stock ownership and its installation of its own officers as Oppenheimer executives. MassMutual allegedly holds itself out as a part of the same integrated financial services firm as Oppenheimer and Tremont.  Thus, Elendow Fund alleges, Oppenheimer controlled Tremont, and MassMutual, in turn, controlled Oppenheimer.

## Discussion

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must plead sufficient facts to state a claim for relief that is plausible on its face.  Ashcroft v. Iqbal, 556 U.S. 662, 677–78 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In deciding a motion under Rule 12(b)(6), a court must accept as true the facts alleged in the complaint, drawing all reasonable inferences in the plaintiff's favor, and may consider legally required public disclosures as well as documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit.  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

Allegations of securities fraud, however, are subject to the heightened pleading standards of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, and Federal Rule of Civil Procedure 9(b).  A plaintiff alleging securities fraud must identify in its complaint "each statement alleged to have been misleading, the reason or reasons why the

9

statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Id. at § 78u-4(b)(1).

Plaintiffs are also subject to a heightened pleading standard for scienter—that is, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. at § 78u-4(b)(2). Plaintiffs must plead facts giving rise to an inference of fraudulent intent that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007). This requirement has, in turn, been interpreted by the Second Circuit to require a particularized pleading of "facts: (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99. Recklessness is defined "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009). In other words, plaintiffs must allege that defendants were aware of such major risks that their state of mind "approximated actual intent." S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009).

<u>Securities Fraud</u>

As discussed above, Elendow Fund alleges that Tremont made two types of fraudulent representations in enticing it to invest.  It represented that the XL Fund's assets would actually be invested according to a particular strategy and with certain goals, and it represented that it would investigate and monitor the funds in which it invested so as to achieve some standard of due diligence.

*Investment-Strategy Representations*

It is clear enough, in light of all that has been alleged and all that is now widely known about Madoff's scheme, that Tremont's representations indicating that the XL Fund's assets would be invested at all were false.  The issue is not whether these were misrepresentations but whether they were made with fraudulent intent.

Despite the complaint's extensive and detailed allegations regarding all the red flags that Tremont allegedly saw, the strongest inference to be drawn from them is that Tremont—like so many others—overlooked the red flags or rationalized them.  Nowhere does the complaint specifically and plausibly allege that Tremont actually knew that Madoff's operation was a fraud.

In fact, the complaint contains a number of allegations that strongly support the opposite inference.  For example, the complaint quotes a Tremont memorandum that states that parts of Madoff's operations do "not represent be industry practices," but the memorandum later states that "[t]here are numerous controls put around Madoff (including numerous audits by administrators, accountants, exchanges and governmental

entities) to give investors comfort that Madoff is following the operating guidelines and securities laws." The complaint also alleges that although Termont was alerted that lack of transparency might create problems in its relationship with Madoff, Tremont insiders regarded these concerns as based upon "misconceptions." The complaint further alleges that Tremont believed that Madoff's trades were actually being verified with NASD. And, indeed, all the allegations of Tremont's fruitless efforts to seek transparency and answers from Madoff, suggest a company that, at the time, believed that there existed legitimate answers to its questions. Put another way, if Tremont had known, or even strongly suspected, that Madoff was perpetrating a fraud, it would have been peculiar for Tremont to continue discussing ways of gaining greater transparency into Madoff's operations and to continue sending Madoff due-diligence questionnaires.

Plaintiff contends that even if the complaint fails to adequately allege that Tremont actually knew of Madoff's fraud, the complaint sufficiently alleges that Tremont was reckless in disregarding the red flags. But recklessness for purposes of scienter in securities-fraud actions is "not merely a heightened form of negligence." Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000). Rather, recklessness in this context must approximate actual intent by strongly showing that the red flags were so egregious or "so obvious that the defendant must have been aware of it." ECA, 553 F.3d at 198; see also S. Cherry St., 573 F.3d at 109 (repeatedly emphasizing the words "egregious" and "obvious"). And, in complaints like this one where plaintiffs do not plead motive and opportunity, the strength of the circumstantial evidence of evidence must be even greater. Id. at 198–99.

Here, Elendow Fund's complaint does not sufficiently allege facts showing that the dangers posed by Madoff were so unmistakable that Tremont must have known that its representations were false.  Rather, the more compelling inference is that Tremont recognized that an investment with Madoff presented a combination of risks and benefits and genuinely chose to continue its relationship with Madoff.  The allegations in the complaint are not sufficient to show that Termont "egregiously refus[ed] to see the obvious, or to investigate the doubtful."  Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996).  Rather, as stated above, the complaint shows that Tremont did investigate the risks through endeavors like its "Madoff Operations Review."  At bottom, the red flags alleged here, like those this court has held insufficient in similar cases, do not show that Tremont "must have been aware" of the fraud.  See, e.g., Prickett v. New York Life Ins. Co., 896 F. Supp. 2d 236, 245–48 (S.D.N.Y. 2012).  "[T]he more compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and deceiving the SEC and other financial professionals."  Id. at 247 (quoting Meridian Horizon Fund, LP v. Tremont Group Holdings, Inc., 747 F. Supp. 2d 406, 413 (S.D.N.Y. 2010)).

*Due-Diligence Representations*

Elendow Fund's allegations regarding Tremont's due-diligence representations are also inadequate to plead securities fraud.  To begin, the complaint adequately alleges that Elendow Fund reviewed and relied upon Tremont's private placement memorandum, but the memorandum does not contain any representations about Tremont's due-diligence

program.  Thus, reliance on the private placement memorandum cannot support Elendow Fund's due-diligence allegations.

Instead, the complaint alleges that the false statements forming the basis of the securities-fraud claim were contained on Tremont's website and Tremont's SEC Form ADV.  But Elendow Fund's claims based on these allegedly false statements also fail.

First, Elendow Fund alleges that Tremont breached its promise to perform "careful" due diligence, which appeared on Tremont's website.  But the complaint does not adequately allege that the statements quoted from the Tremont website were actually false. It is clear from the complaint itself that Tremont did conduct some due diligence upon Madoff.  The complaint alleges that Tremont spot checked Madoff's paper trade confirmations several times per month.  It alleges that a "Madoff Operations Review" was conducted to "get a clearer understanding of the policies and procedures in place at Madoff Securities."  It alleges that Tremont sent a due-diligence questionnaire to Madoff in an effort to answer the questions raised in that review.  Indeed, a striking feature of Elendow Fund's complaint is that it presents a picture—quite dramatic, in retrospect—of a firm continually striving to better understand Madoff's business, despite Madoff's obstructions, starting at the beginning of the Tremont-Madoff relationship and continuing right up until the Ponzi scheme was unmasked.  In short, the allegations in the complaint tend to show that Tremont did what due diligence it could on Madoff.  It may be that a serious program of due diligence simply should not have tolerated Madoff's obstructions and lack of transparency.  But this is a criticism of Tremont's due-diligence practices, not an allegation that they did not exist.

Second, Elendow Fund alleges that Tremont's SEC Form ADV contained specific, false statements concerning its due-diligence program.  In that form Tremont represented that it engaged with custodians "on a daily basis," monitored their "securities holdings, asset mix and adherence to investment guidelines," and used its own proprietary software to continually evaluate managers' performance.  Unlike the general representations that Tremont's due diligence would be "careful," these representations are sufficiently specific that a reasonable investor may have relied upon them.  But the only allegation that Elendow Fund read and relied upon these materials is this:

> In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by [Tremont], Plaintiff relied, to its detriment, on such misleading statements in purchasing limited partnerships in the XL Fund.

This allegation might have been sufficient if, in context, it clearly referred to any specific representations.  But this allegation appears, not alongside any allegations of actual representations, but in the formulaic recitation of the elements of count I of the complaint.  In that context it is not clear what "statements described above" the allegation refers to.  When an allegation couched in such generic language is completely separated from the substantive, factual allegations of the complaint, it is simply too vague to support an action for securities fraud under the applicable heightened pleading standards.  Elendow Fund's generic allegation that it relied upon such representations as those described in the complaint is simply not adequate to push its reliance allegation over the line from conceivable to plausible.  See Twombly, 550 U.S. at 570.

Accordingly, count I of Elendow Fund's complaint is dismissed.

15

Exchange Act § 20 Control-Person Liability

Because the complaint does not allege a primary violation of the Exchange Act,
count II of the complaint, for control-person liability under § 20(a) is also dismissed.
Though the issue is not, therefore, presently before the court, it is also dubious whether the
complaint adequately alleges that the control defendants' "culpable participation" in the
alleged violations.  See Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998); Meridian
Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc., 09 CIV. 3708, 2012 WL 6168151
(S.D.N.Y. Dec. 11, 2012).

Common-Law Fraud

The elements of common-law fraud are "essentially the same" as those that must be
pleaded to establish a claim under § 10(b) and Rule 10b–5. See Meridian Horizon Fund,
LP v. Tremont Grp. Holdings, Inc., 747 F. Supp. 2d 406, 414 (S.D.N.Y. 2010); Fezzani v.
Bear, Stearns & Co., 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008).  Elendow Fund's
common-law fraud claim is based on the same allegations of fact as its § 10(b) claim, and
the § 10(b) claim is dismissed.  Therefore, plaintiffs' common-law fraud claim must be
dismissed as well.

Negligent Misrepresentation

Elendow Fund also brings a claim for negligent misrepresentation against the
Tremont defendants, but such a claim is barred by the XL Fund's limited partnership
agreement.  Elendow Fund argues that the agreement does not bar negligence suits "clearly

16

and unequivocally." But it does. Section 2.6 of the limited partnership agreement says, "Neither the general partner nor any affiliate shall be liable to any Limited Partner or the Partnership for errors of judgment or for action or inaction, whether or not disclosed, which said party reasonably believed to be in the best interests of the partnership." This clearly exculpates Tremont Partner (the general partner) and the other Tremont defendants (affiliates) for any action, so long as that party believed the action was in the best interest of the partnership and so long as the wrongdoing was not intentional, as limited by state or federal law. The category "any action" clearly covers negligent misrepresentations.

Because New York follows the "internal affairs doctrine," N.Y. P'Ship L. § 121-901, and the XL Fund was organized in Delaware, Delaware law governs the interpretation of this clause. Delaware law permits exculpation clauses to bar suits only for conduct taken in good faith, but "good faith" under Delaware law encompasses both negligence and gross negligence. In re Walt Disney Co. Derivative Litig., 906 A.2d 27, 64–65 (Del. 2006) ("[W]e address the issue of whether gross negligence . . . without more, can also constitute bad faith. The answer is clearly no.").

When, as here, an exculpation clause clearly bars a claim, it is entirely appropriate to enforce the clause at the pleading stage. Accordingly, Elendow Fund's negligent misrepresentation claim is dismissed.


## Breach of Contract

Elendow Fund also alleges that Tremont Partners breached a number of provisions of the XL Fund limited partnership agreement. But under any fair reading of the

17

agreement, Elendow Fund has not alleged any breach of Tremont Partner's obligations under it.

Elendow Fund contends that Tremont Partners was obligated to "utilize the strategies discussed" in the XL Fund offering memorandum for the purpose of generating and preserving capital. The strategy discussed in the offering memorandum is the leveraged investment in the Broad Market Fund detailed in the section of the offering memorandum entitled "Investment Objective and Strategies." There is no allegation that Tremont Partners did not employ the strategies discussed in that section. Similarly, there is no plausible allegation that Tremont Partners did not seek to achieve the goals of capital appreciation and preservation. To be sure, there are ample allegations that Tremont Partners did not in fact achieve those goals, but the XL Fund offering memorandum explicitly warns that these goals might not be achieved.

Elendow Fund also contends that Tremont Partners delegated its responsibilities to a party who was not suitable, in violation of § 2.1 of the agreement ("The General Partner has the right to delegate its responsibilities . . . to suitable parties."). But that is not the only provision of the agreement that granted Tremont Partners the ability to delegate its responsibilities. In fact, the very next sentence provides that "the General Partner may also retain other parties" and § 2.2 provides that the general partner had the power to "designate such other agents . . . to carry out, any and all of the objects and purposes of the Partnership." In neither of these provisions is there any reference to the "suitability" of Tremont Partner's chosen agent. Because the sentence quoted by Elendow Fund clearly confers a right upon Tremont—rather than imposes a restriction—it is no breach of contract

18

for Tremont Partners to delegate its responsibilities under one of these other provisions that do not impose an open-ended suitability requirement.

Elendow Fund also contends that Tremont Partners breached its obligation to manage the day-to-day business of the fund and to devote as much time to the fund's investment activities as the general partner deemed reasonable.  There is no allegation in the complaint that Tremont Partners did not manage the day-to-day operation of the fund.  In fact, the complaint is replete with examples of Tremont Partners doing just that.   There is also no allegation that Tremont Partners believed that it ought to have been devoting more time to the XL Fund than it was.

Finally, Elendow Fund contends that Tremont Partners breached its obligation to calculate the net asset value of the XL Fund and the capital accounts of its limited partners.  The agreement also provides, however, that the value of the fund's assets would be based upon the calculations provided by the fund's counterparties and that the fund was entitled to rely on valuations provided by its counterparties' affiliates.  The agreement explicitly provides that these amounts would not be verified or reviewed.  The complaint does not allege that Tremont Partners did anything other than calculate the value of the XL Fund's assets and maintain the limited partners' capital accounts in reliance on this information from the fund's counterparties, as provided in the agreement.

Accordingly, count V of the complaint is dismissed.

Breach of Fiduciary Duty

Elendow Fund contends that the Tremont and Rye defendants breached their fiduciary duties to it by failing to provide accurate and complete information about the XL Fund's investments.  Elendow Fund argues that its injury was separate from its *pro rata* share of the injury to the XL Fund because defendants breached their fiduciary duties to it while inducing it to invest.  In this way, Elendow Fund evidently seeks to avoid dismissal of its complaint for lack of standing, since a mismanagement claim could only be brought derivatively, while also avoiding the scienter requirements of a fraud allegation or the exculpation clause's preclusive effect on a negligence claim.  But Elendow Fund cannot thread this needle because defendants were not its fiduciaries when it was induced to invest. That relationship arose later as an incident of its membership in the XL Fund as a limited partner.

Thus, in the absence of any allegations to suggest that defendants were Elendow Fund's fiduciaries before it actually joined the partnership, Elendow Fund's claim for breach of fiduciary duty claim is dismissed to the extent it alleges breaches of obligations owed to it when it was still merely a prospective investor, while defendants were inducing Elendow Fund to join the partnership.  To the extent the complaint claims that defendants breached their fiduciary duties to Elendow Fund in their management of the XL Fund after Elendow Fund joined as a limited partner, the claim is dismissed for lack of standing.  Such claims must be brought derivatively.  See Feldman v. Cutaia, 951 A.2d 727, 733 (Del. 2008).  Thus, count VI is dismissed.  Count VII's claim for aiding and abetting breach of

fiduciary duty is also dismissed as the complaint does not sufficiently plead a primary breach.

## Conclusion

Elendow Fund's complaint is dismissed in its entirety. This opinion resolves the motions listed as document numbers 821, 826, and 828 in case number 08 Civ. 11117 and document numbers 55, 59, 61, and 63 in case number 10 Civ. 9061.

So ordered.

Dated: New York, New York
September 16, 2013

Thomas P. Griesa
United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/16/2013

*21*