UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TREMONT SECURITIES LAW, STATE LAW, AND INSURANCE LITIGATION | Master File No. 08 Civ. 11117 |
| CUMMINS INC., Plaintiff, v. NEW YORK LIFE INSURANCE CO. ET AL., Defendants. | 09 Civ. 557 10 Civ. 9252 **OPINION** |

This action arises out of the massive Ponzi scheme perpetrated by Bernard Madoff.  Plaintiff Cummins Inc. is the administrator of a trust that invested $123 million in variable universal life insurance policies that it purchased from defendant New York Life Insurance Company.  Through the policies, Cummins' investment was exposed to Madoff's fraud.  More than 22% of Cummins' $123-million investment was lost when it was revealed that Bernard Madoff was using the assets to fund his Ponzi scheme.  Cummins now brings state-law claims against New York Life and various other defendants based on its purchase of the insurance policies.

Defendants move to dismiss the complaint.  The motions are granted.

1

## The Complaint

Cummins Inc. brings this action as the authorized representative of the Cummins Inc. Grantor Trust.  This trust was created by Cummins to manage assets that would be used to fund its employees' retirement plans or other forms of deferred compensation.

Between September 2007 and November 2008, Cummins purchased several variable universal life insurance ("VUL") policies from New York Life and paid about $123 million in premiums.  A VUL is a type of life insurance that permits the policyholder to engage in some degree of investment activity while enjoying the tax advantages afforded a life insurance policy.  The policyholder can direct how the funds paid into that account are invested by choosing among the options provided by the insurance carrier.  The proceeds from those investments are paid out through the policy's eventual death benefit and, in the meantime, may be borrowed against and put towards the policy premiums and other policy expenses.  This arrangement is structured so that the assets held in the policy are considered to be those of the insurance carrier, not of the policyholder.  This ensures that the investment transactions within the VUL benefit from the tax advantages afforded life-insurance benefits.

The Defendants

The defendants fall into four groups.  First, Cummins purchased the policies from New York Life Insurance and Annuity Corporation.  New York Life

2

Insurance and Annuity Corporation is a wholly owned subsidiary of New York Life Insurance Company (collectively referred to as "New York Life").

Second, the Tremont defendants allegedly operated the fund of funds into which Cummins invested through the VUL.  The Tremont defendants include:

- Tremont Capital Management, Inc., the manager of a fund of funds;

- Tremont (Bermuda) Ltd., a wholly-owned subsidiary of Tremont Capital;

- Tremont Group Holdings Inc., parent company of Tremont Capital and Tremont Partners;

- Tremont Partners, Inc., the general partner of several Tremont Group affiliated funds;

- Rye Investment Management, the division within Tremont Group that manages, sells, and administers the Rye Select Funds; and

- Tremont Opportunity Fund III, the fund in which Cummins invested through the variable universal life insurance policy.

Third, Cummins groups together the "Rye Funds" defendants.  These defendants are funds in which the Tremont Opportunity Fund III invested; Cummins had investments in these funds through its purchase of the variable universal life insurance policy:

- Rye Select Broad Market Prime Fund L.P., a fund managed by general partner Tremont Partners;

- Rye Select Broad Market XL Fund L.P., a fund managed by general partner Tremont Partners; and

- Rye Select Broad Market Insurance Portfolio, a fund managed by Tremont (Bermuda) Ltd.

Fourth, there are the defendants that allegedly control the Tremont defendants:

3

- Oppenheimer Acquisition Corporation, the parent company of Tremont Capital Management;

- MassMutual Holding, LLC, the parent company of Oppenheimer Acquisition Corporation; and

- Massachusetts Mutual Life Insurance Co., the parent company of MassMutual Holding.

New York Life's Relationship with Tremont

Prior to Cummins' purchases of the VUL policies from New York Life, New York Life and Tremont allegedly entered into a "Participation Agreement" that authorized New York Life to invest in the Tremont Fund.  The agreement permitted New York Life to withdraw money invested into the Tremont Fund to compensate New York Life for administrative expenses associated with the investment of VUL premiums into the fund.  In the agreement, Tremont warranted that it would furnish New York Life with copies of Tremont's offering memorandum and any supplements or amendments to it; New York Life agreed to provide copies of the documents to its policyholders.  New York Life and Tremont agreed to not distribute marketing material to which either party objected and to refrain from making representations concerning the Tremont Fund or the VUL policies that were inconsistent with the parties' offering memoranda and marketing materials.  Finally, the agreement provided that it should not be shown to prospective investors.

This agreement was not disclosed to Cummins before it made its purchases, so Cummins does not allege that it relied on this document.  But based on this agreement, Cummins contends that New York Life and Tremont

were acting in concert and were fully aware of the representations that each made to induce Cummins to purchase the VUL policy.

Cummins Purchases of VUL policies from New York Life

In early 2007, Cummins contacted New York Life about purchasing a VUL policy.  In response, New York Life provided Cummins with its offering memorandum.  Attached to the New York Life offering memorandum was allegedly an offering memorandum for Tremont Fund, which New York Life allegedly recommended as an investment for Cummins' excess VUL premiums.

Also, before purchasing the VUL policies, Cummins sought additional information about the Tremont Fund from Tremont.  Tremont responded to Cummins' request for proposal, making additional representations about the fund.

Relying on these statements, Cummins bought eight VUL policies from New York Life, totaling about $123 million in premiums.  Cummins directed New York Life to invest all of the excess premiums with Tremont.

New York Life's Representations

Cummins alleges that the New York Life's offering memorandum contained a number of representations upon which Cummins relied in deciding to purchase the VUL policies.  The specific representations are numerous, but in summary the complaint alleges that New York Life represented that Cummins' assets would be invested in diversified portfolios of securities, managed by one

or more fund managers.  New York Life allegedly represented that it would monitor the portfolios of the funds it offered for investment to ensure that they remained adequately diversified, as required by the Internal Revenue Service Code.

New York Life's offering memorandum also provided that New York Life maintained the "exclusive right" to determine where a policy's assets would be invested and "reserved the right" to change the investments available for investment through VUL policies or to alter the securities held under a VUL policy when investment conditions warranted it.  It laid out a number of specific types of changes that could be made (such as the substitution of one investment for another, or the liquidation of a position) and the reasons for which it would make such a change ("if marketing, tax, or investment conditions so warrant").  It also represented that it would notify the policyholder if any of these things occurred.

Cummins also alleges that New York Life's offering memorandum represented that New York Life would provide the offering memoranda, along with any supplements or amendments, for any fund in which VUL policyholders could invest.

Tremont's Representations

In addition, Cummins alleges that it relied on representations in Tremont's offering memorandum, responses to Cummins' request for proposal, website, and Form ADV filed with the Securities and Exchange Commission.

6

In Tremont's offering memorandum, Tremont accepted "primary
responsibility for monitoring the ongoing activities of" the fund managers.
Tremont agreed to "review the confirmations of the Partnership's trading
activity for the purposes of tracking the current status of the Partnership's
accounts."  The offering memorandum also stated that Tremont would achieve
its purpose of long-term capital growth by delegating discretionary and other
authority to manage accounts to one or more Investment Advisors in Tremont's
absolute discretion.  Before selecting managers, Tremont would collect,
analyze, and evaluate information regarding the personnel, history and
background, and the investment styles, strategies, and performance of
professional investment management firms.  And Tremont agreed to provide
limited partners (like New York Life) with annual reports audited by an
independent certified public accountant.

In response to Cummins' request for proposal, Tremont also represented
that it "believed it was important to 'know our managers' through personal
meetings, high quality reference checks, background checks, etc.  We do not
hire a manager based on numbers alone."

In Tremont's Form ADV, filed with the SEC, Tremont represented that it
used its "own proprietary software programs to monitor the performance of
investment managers."  And Tremont said it relied on underlying investment
advisor reports and its examination of advisor operations as primary sources of
information.

On Tremont's website, it represented that it provided investors with "effective investment strategies and oversight, through manager research, careful due diligence, advanced risk allocation and time-tested portfolio management." Moreover, Tremont's website touts its research staff's investigation of manager's style, strategies, and performance.

Finally, at an in-person meeting, Cummins alleges that Tremont personnel—who are not specifically identified in the complaint—stated that Tremont was regularly audited by Oppenheimer and that an "Oppenehimer Risk Group" oversaw Termont's selection of managers. Additionally, the staff allegedly told Cummins that they had access to all of Madoff's trades, allowing for full transparency, and that Tremont had a low "size to loss potential" because less than 6% of the Fund's assets were assigned to any one manager.

<u>Alleged Falsehood of Representations</u>

Cummins alleges that the above-mentioned representations were false. In particular, Cummins alleges that Tremont invested 22% of its assets with Madoff, exceeding the promised 6% limitation. Additionally, Cummins contends that Tremont could not possibly have performed the promised due diligence on Madoff because it is now known that Madoff refused to allow anyone to inspect his back office, internal records, or personnel. Finally, Cummins alleges that New York Life failed to provide it with the amended version of Tremont's offering memorandum, which alleged disclosed Tremont's intent to invest as much as 30% of its funds with any single manager.

Based on these allegations, Cummins pleads claims for (1) fraud in the inducement; (2) negligent misrepresentation; (3) breach of the implied covenant of good faith and fair dealing; (4) breach of fiduciary duty; (5) aiding and abetting fraud and breaches of fiduciary duty; (6) civil conspiracy; (7) unjust enrichment; and (8) violations of New York General Business Law § 349.

## Discussion

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead sufficient facts to state a claim for relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 677–78 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In deciding such a motion, a court must accept as true all non-conclusory facts alleged in the complaint, drawing all reasonable inferences in the plaintiff's favor. Id. The court may also consider legally required public disclosures as well as documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

When pleading a claim for fraud, a plaintiff is subject to the heightened standard of Rule 9(b)—the plaintiff must plead the claim with particularity. "Specifically, the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).

Fraud in the Inducement and Negligent Misrepresentation

Cummins alleges that New York Life and Tremont made several misrepresentations about New York Life's VUL policies and Tremont's investments.  Based on these alleged misrepresentations, Cummins brings a claim for fraud in the inducement against all defendants and a claim for negligent misrepresentation against New York Life and Tremont.

Under New York law, fraudulent inducement has four elements: "(i) the defendant made a material false representation, (ii) the defendant intended to defraud the plaintiff thereby, (iii) the plaintiff reasonably relied upon the representation, and (iv) the plaintiff suffered damage as a result of such reliance."  Maxim Group LLC v. Life Partners Holdings, Inc., 690 F. Supp. 2d 293, 306 (S.D.N.Y. 2010).

Similarly, "the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment."  Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000).

10

The elements of the claims are similar, and both claims are subject to the "particularity" pleading standard in Rule 9(b).  See Naughright v. Weiss, 826 F. Supp. 2d 676, 689 (S.D.N.Y. 2011).

**Tremont Defendants**

Tremont's alleged misrepresentations are discussed in detail above, but in sum, there are three types of false statements: (1) that Tremont misrepresented its ongoing due diligence of its managers; (2) that Tremont misrepresented its due diligence before Cummins purchased the VUL investment; and (3) that Tremont misrepresented that it would not assign more than 6% of the fund's assets to any one manager.

First, there are Tremont's alleged statements that it would maintain ongoing due diligence on its investment managers.  But these allegations standing alone do not support a claim for negligent misrepresentation or fraud. The contention that Tremont did not continue to conduct due diligence after Cummins had already invested in the fund (through the VUL policies) is merely an allegation that Tremont broke its promise.  And to state a claim for fraud or misrepresentation, the statement must be more than a broken promise—it must have been a false representation at the time it was made, when Cummins bought the VUL policies.  See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004); see also In re Tremont Sec. Law, State Law, & Ins. Litig., No. 08 CIV. 11117, 2013 WL

11

4516792 (S.D.N.Y. Aug. 23, 2013).  For this reason, these forward-looking statements are not actionable as fraud or misrepresentation.

Second, and in contrast to representations about ongoing due diligence, Cummins alleges that Tremont misrepresented the due diligence it conducted prior to Cummins' selection of Tremont Fund for its excess VUL premiums. Cummins alleges that they were false when they were made.

For example, Tremont stated that it would collect and analyze information about the history, investment strategies, and performance of its investment managers.  And Tremont stated that it got to know its managers before selecting them.  Cummins alleges that these statements are false because Tremont "could not have evaluated Madoff's suitability as a manager according to any of the criteria set forth in the Tremont [offering memorandum] (investment style, the strategies employed, liquidity, etc.), because Tremont had no way to confirm whether Madoff was investing assets in securities at all, let alone investing in securities in accordance with any particular investment strategy."

But Cummins' blanket allegation that there was "no way to confirm" Madoff's strategy—because it was impossible to get any information about Madoff's investment activities—is belied by other allegations in the complaint. For example, the complaint contains quite a few facts about Madoff and his investments.  The complaint alleges that Tremont knew that Madoff used a small accounting firm and served as its own broker; that there was public

information available about Madoff's financial investments; that Madoff reported about his investments to his clients; that Madoff's investment results were available and known; and that Madoff employed a "split-strike strategy," a hedging strategy using equities, options trading, and short selling.  Strikingly, these are the same types of criteria that Tremont purported to use when selecting managers.  Cummins may not have been comfortable with the answers that Tremont received, but it cannot plausibly be said that Tremont could not have done due diligence because no information on Madoff was available.

Moreover, Cummins cherry-picks statements from Tremont's offering memorandum, but overlooks important cautionary statements.  For example, Tremont warned that it

> may not always be provided with detailed information regarding all the investments made by Managers [like Madoff] because certain of this information may be considered proprietary information by the Managers.  This lack of access to information may make it more difficult for the General Partner to select, allocate among and evaluate the Mangers . . . .

The offering memorandum goes on to state that "[t]here is no ability to predict the investments the Managers may select, or whether they will act in accordance with disclosure documents or descriptive materials furnished by them to [Tremont]."  These statements clearly circumscribe the representations Tremont made about its ability to conduct due diligence on its managers.

Perhaps the closest Cummins gets to sufficiently alleging a fraudulent misrepresentation is the allegation that a representative from Tremont

indicated that Tremont had access to all of Madoff's trades, allowing for full transparency.  But nowhere does the complaint allege that Madoff did not report his trades to Tremont.  Nor does the complaint allege that Tremont did not review any reports provided by Madoff.  Without any other allegations or factual support, the most plausible inference from Cummins' complaint is not that Tremont did not conduct due diligence, but rather that Tremont, like many other investors, failed to detect Madoff's fraud.  See e.g., In re Tremont Sec. Law, State Law, & Ins. Litig., No. 08 CIV. 11117, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013); Prickett v. New York Life Ins. Co., 896 F. Supp. 2d 236, 24–48 (S.D.N.Y. 2012).

Thus, the statements about Tremont's due diligence *before* Cummins purchased the VUL are not sufficient to state claims for fraud and misrepresentations.

Third and finally, Cummins alleges that Tremont misrepresented that it would not assign more than 6% of the fund's assets to any one manager.  An unnamed Tremont representative allegedly made this representation to Cummins at a meeting during the "spring and summer of 2007."  But this alleged misrepresentation fails to support the fraud and misrepresentation claim for two reasons.  First, the only allocation restriction in Tremont's offering memorandum stated that Tremont would comply with the tax code, which restricted the fund from allocating more than 55% of its assets to any single investment.  And the offering memorandum cautioned that no person

14

was authorized to make additional representations about the fund.  In light of
this cautionary language, Cummins cannot reasonably rely on oral
representations to support its fraud claims.  See Mercury Air Grp., Inc. v. Jet
USA Airlines, Inc., No. 97 CIV. 3473, 1998 WL 542291 (S.D.N.Y. Aug. 26,
1998), aff'd, 189 F.3d 461 (2d Cir. 1999).  As a sophisticated investor,
Cummins should have known not to rely on materials outside of the offering
memorandum.  Zissu v. Bear, Stearns & Co., 805 F.2d 75, 80 (2d Cir. 1986).
Second, even if Cummins could have reasonably relied on the oral
representation, Cummins has failed to plead the misrepresentation with the
particularity required by Rule 9(b).  Cummins does not allege who made the
statement and exactly when the statement was made.  Without these facts, the
allegation is insufficient to support the fraud and misrepresentation claims.
See Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999).

Thus, none of the three types of representations allegedly made by
Tremont sufficiently support Cummins' fraud and misrepresentation claims.

Because Cummins has failed to state a valid claim against Tremont, the
fraud claim against Oppenheimer, MassMutual Holding, Massachusetts
Mutual, and the Rye Funds defendants should also be dismissed because the
liability of these defendants depended upon the existence of a sufficient claim
against Tremont.

15

**New York Life**

New York Life allegedly made certain representations that it would monitor the level of diversification in the underlying funds, but Cummins has not credibly alleged that the New York Life's representations about diversification were false. The offering materials quoted by Cummins in its complaint make clear that the diversification requirements referred to are those imposed by the tax code that no more than 55% of the assets in a VUL account be held in a single investment. But the complaint alleges only that 22% of Cummins' assets in the Tremont Fund were invested with Madoff and makes no other allegations about the diversification of the funds offered through New York Life.

New York Life made representations that it reserved the right to make certain changes to Cummins' investments. Cummins' complaint attempts to transform these reservations into a representation that New York Life would actively manage the accounts on its policyholders' behalf. But New York Life's actual statements do not remotely support this interpretation. New York Life's actual statement was that it reserved the right to make certain changes if conditions warranted, not that it would be under any obligation to do so. Similarly, Cummins alleges that New York Life did not notify it of the "changes" in its policies caused by Madoff's fraud. But any careful reading of the policy documents—or even just the passages quoted in the complaint—makes clear that this is not the sort of "change" New York Life represented it would give notice of.

16

New York Life also represented to Cummins that the funds would be invested in a managed portfolio.  But nowhere does Cummins allege anything to support the conclusion that Tremont itself did not invest his funds in a portfolio of some kind or that the Tremont Fund was not managed.

Finally, Cummins alleges that New York Life misrepresented that it would furnish to Cummins any supplements or amendments to offering memoranda of the VUL funds, such as Tremont.  New York Life's offering memorandum indeed states that New York Life would "[d]istribute the Fund's prospectus or confidential memorandum and any supplements thereto to policyowners."  But in context, it is clear that this is not a representation to policyholders that New York Life would provide the most up-to-date version of any fund's offering documents.  Rather, the statement is made in the course of New York Life's explanation of the administrative fee it would receive from any funds in which New York Life invested.  Thus, New York Life made no misrepresentation to Cummins based on failure to provide Tremont's amended offering memorandum.

Because Cummins has not sufficiently alleged any misrepresentations made by New York Life, Cummins' fraud-in-the-inducement and negligent-misrepresentation claims against New York Life are dismissed.  And because the claims against Tremont are dismissed, Cummins' related vicarious liability claim against New York Life for its "conspiracy" with Tremont is also dismissed.

17

<u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

Cummins alleges that New York Life breached the implied covenant of good faith and fair dealing by failing to reasonably exercise its sole discretion and exclusive rights to make changes to Cummins' investments in Madoff and avoid loss of the cash value of the VUL policies.

Under New York law, the elements of a claim for breach of the duty of good faith and fair dealing are: (1) defendant must owe plaintiff a duty to act in good faith and conduct fair dealing; (2) defendant must breach that duty by acting in bad faith or failing to conduct fair dealing; and (3) the breach of duty must proximately cause plaintiff's damages.  <u>Washington v. Kellwood Co.</u>, No. 05 Civ. 10034, 2009 WL 855652, at *6 (S.D.N.Y. Mar. 24, 2009).

Here, Cummins' claim fails because again Cummins attempts to transform New York Life's reservation of rights into a requirement that it actively manage the accounts on its policyholders' behalf.  Cummins' proposed monitoring and due diligence by New York Life is not the type of oversight contemplated by the agreement.

Moreover, Cummins fails to adequately allege that New York Life acted in bad faith.  The only factual support Cummins provides to show bad faith is another reference to the same alleged misrepresentations that the court rejected above.

Thus, Cummins claim for breach of the implied covenant of good faith and fair dealing is dismissed.

18

<u>Breach of Fiduciary Duty and Unjust Enrichment</u>

**The Tremont Defendants**

Tremont argues that Cummins' breach-of-fiduciary-duty and unjust-enrichment claims against it are derivative claims and that Cummins lacks standing to bring them.  If the claims are derivative claims, they may only be brought by Tremont Fund or by investors in the Tremont Fund, such as New York Life, in a derivative suit on behalf of the Tremont Fund.  Cummins, which is not an investor in the Tremont Fund, attempts to bring these claims on its own behalf.

Because the Tremont Fund is a limited partnership organized under the laws of Delaware, Delaware law governs whether Cummins' claims are derivative or direct.  <u>See</u> <u>Prickett</u>, 896 F. Supp. 2d at 248.  To determine whether a claim is derivative under Delaware law, courts consider: "Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy?"  <u>Tooley v. Donaldson, Lufkin & Jenrette, Inc.</u>, 845 A.2d 1031, 1035 (Del. 2004).  The fact that a shareholder may ultimately suffer some loss does not make the claim direct.  <u>Feldman v. Cutaia</u>, 951 A.2d 727, 733 (Del. 2008).  Rather, where "all of a corporation's stockholders are harmed and would recover pro rata in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature."

<u>Id</u>.  To state a direct claim, "the plaintiff must have suffered some individualized harm not suffered by all of the stockholders at large."  <u>Id</u>.

The unjust-enrichment claim, the claim is that Tremont received excessive revenues from the fees it collected based on the policies' cash values and that it would be inequitable for Tremont to retain the benefit.  But Tremont was paid fees by the Tremont Fund, under the limited partnership agreement governing the Tremont Fund and its partners.  Any harm was to the Tremont Fund from Tremont's mismanagement of the Tremont Fund or collection of excessive fees from the Tremont Fund.  Any valid claim would be a derivative claim on behalf of the Tremont Fund.  <u>See</u> <u>Prickett</u>, 896 F. Supp. 2d at 248.

The breach-of-fiduciary-duty claim is likewise derivative.  The alleged duty is the duty which Tremont owed to the Tremont Fund, and any breach of that duty would be a harm to that fund and all investors in that fund.  Thus, this claim is a derivative claim.

Accordingly, Cummins' claims for unjust enrichment and breach of fiduciary duty against Tremont are derivative, and Cummins lacks standing to pursue them.  The claims should therefore be dismissed.

Consequently, these claims should also be dismissed as against Oppenheimer, MassMutual Holding, Massachusetts Mutual, and the Rye defendants, whose liability all depended on Tremont's liability.

**New York Life**

Cummins also alleges that New York Life was unjustly enriched and breached its fiduciary duty.  These claims also fail, but for different reasons.

Cummins alleges that New York Life was unjustly enriched "by receiving excessive revenue derived from the fees they collected."  Under New York law, a claim for unjust enrichment is a quasi-contractual remedy and cannot be used to recover where a contract exists.  See Goldman v. Metro. Life Ins. Co., 841 N.E.2d 742, 746 (N.Y. 2005).

Here, Cummins relationship with New York Life—including the fees that New York Life would receive—was entirely governed by contract.  Accordingly, Cummins cannot state a claim for the quasi-contractual remedy of unjust enrichment based on conduct that, if proven, would amount to a breach of contract, so that claim is dismissed.

Cummins also alleges that New York Life breached its fiduciary duty because of the alleged misrepresentations.  To prevail on a claim for breach of fiduciary duty, a plaintiff must plead that defendants owed him a fiduciary duty and that they breached that duty.  Thermal Imaging, Inc. v. Sandgrain Sec., Inc., 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001).  But "[o]rdinarily, arms-length commercial transactions, including insurance transactions, do not give rise to fiduciary relationships."  Prickett, 896 F. Supp. 2d at 250.

Here, Cummins does not allege that its dealings were anything other than an arms-length commercial transaction between two sophisticated parties.

21

And Cummins allegations in the complaint underscore this conclusion.  For example, Cummins conducted its own due diligence into Tremont, submitting its request for proposal, meeting with Tremont representatives, and reviewing Tremont's SEC filings and Tremont's website.

Because Cummins has not alleged that New York Life owed it a fiduciary duty, the claim for breach of fiduciary duty is dismissed.

Aiding and Abetting Fraud and Breaches of Fiduciary Duty

Cummins alleges that Oppenheimer, MassMutual Holding, and Massachusetts Mutual Life Insurance Co. controlled the Tremont defendants and aided and abetted the alleged wrongdoing against Cummins.  Under New York law, aiding and abetting fraud and breaches of fiduciary duty require a primary violation—that is, an underlying fraud or breach of fiduciary duty. Prickett, 896 F. Supp. 2d at 250–51.

But here, Cummins failed to adequately allege that Tremont committed fraud or breached its fiduciary duty, so Cummins has necessarily failed to state a claim for adding and abetting that same wrongdoing.  Id.  Thus, those claims against Oppenheimer, MassMutual Holding, and Massachusetts Mutual Life Insurance Co. are dismissed.

Civil Conspiracy

Cummins attempts to state a claim for civil conspiracy against all defendants.  But under New York law, civil conspiracy is not an independent

cause of action.  Lewis v. Rosenfeld, 138 F. Supp. 2d 466, 479 (S.D.N.Y. 2001).
Rather, civil conspiracy requires the commission of an independent actionable
tort.  In re Parmalat Securities Litigation, 477 F. Supp. 2d 602, 613 (S.D.N.Y.
2007).

As discussed above, Cummins has failed to state a tort claim against any
defendant.  Without pleading an actionable tort, Cummins cannot plead a civil-
conspiracy claim.  Thus, the civil conspiracy count is dismissed.


New York General Business Law § 349

Cummins alleges that New York Life and Tremont violated New York
General Business Law § 349.  New York's General Business Law § 349
prohibits deceptive acts or practices in the conduct of any business, trade or
commerce or in the furnishing of any service.  A claim under § 349 requires a
showing of "consumer-oriented conduct that is materially deceptive and causes
injury to the plaintiff."  Shou Fong Tam v. Metro. Life Ins. Co., 913 N.Y.S.2d
183, 185 (N.Y. App. Div. 2010).  But securities transactions are not the type of
consumer transactions for which § 349 was intended to provide a remedy.  See
Prickett, 896 F. Supp. 2d at 252.

Here, as in Prickett, Cummins' claim arises out of its purchase of the New
York Life VUL policies and subsequent allocation of its cash value to the
Tremont Fund, causing New York Life to invest in the Tremont Fund through
the VUL (a purchase of securities by New York Life).  See id.  And the alleged
misrepresentations concern the diligence, monitoring, and investment

strategies defendants would undertake with respect to the Tremont Fund and its investments. Thus, the transactions on which Cummins bases its claims are securities transactions, so Cummins has failed to state a claim under New York General Business Law § 349.

## Conclusion

The motions to dismiss are granted, and the complaint is dismissed in its entirety.

This opinion resolves the motions listed as documents 837 and 840 in case number 08 Civ. 11117; document 220 in case number 09 Civ. 557; and documents 49, 55, 58, and 60 in case number 10 Civ. 9252.

So ordered.

Dated:  New York, New York
        September 26, 2013

_____
Thomas P. Griesa
United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/26/2013