UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TREMONT SECURITIES LAW, STATE LAW and INSURANCE LITIGATION | Master File No.: 08 Civ. 11117 (TPG) |
| This Document Relates To:<br><br>State Law Actions, 08 Civ. 11183 (TPG)<br>Securities Actions, 08 Civ. 11212 (TPG)<br>Insurance Actions, 09 Civ. 557 (TPG) | ECF CASES<br>Electronically Filed |

**TREMONT'S MEMORANDUM OF LAW**
**ON REMAND FROM THE SECOND CIRCUIT**

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Defendants
Tremont Partners, Inc.,
Tremont Group Holdings, Inc.,
Tremont (Bermuda) Limited,
Tremont Capital Management, Inc.,
Rye Investment Management,
Robert I. Schulman, Rupert A. Allan,
Harry Hodges, James Mitchell,
Lynn O. Keeshan, Patrick Kelly,
Stephen Thomas Clayton, Stuart Pologe,
Cynthia J. Nicoll and Darren Johnston

# TABLE OF CONTENTS

BACKGROUND ..... 1

ARGUMENT ..... 3

I. THE RELEASE DOES NOT BAR THE $80,000 CLAIM ..... 3

A. The Release and Applicable Rules of Construction ..... 3

B. The Context of the Settlement Bears on the Scope of the Release ..... 5

C. The Text of the Investor Settlement, Read as a Whole, Bears on the Scope of the Release ..... 6

D. The Parties' Post-Settlement Conduct Further Demonstrates No Intent To Release the $80,000 Claim ..... 8

1. The Parties Stated Their Intent To Limit the Release at the Fairness Hearing ..... 8

2. Tremont's Post-Release Conduct Manifests Its Intention Regarding the Scope of the Release ..... 8

3. The Parties' Stipulation Confirms Their Intent ..... 9

CONCLUSION ..... 10

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Bowersox Truck Sales & Service, Inc. v. Harco National Insurance Co.,
209 F.3d 273 (3d Cir. 2000)....................6

Cahill v. Regan,
5 N.Y.2d 292 (1959)....................6

Compagnie Financière de CIC et de L'Union Européenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
232 F.3d 153 (2d Cir. 2000)....................4

Consolidated Edison, Inc. v. Northeast Utilities,
332 F. Supp. 2d 639 (S.D.N.Y. 2004)....................4, 5, 6, 7, 9

Hughes v. Long Island University,
762 N.Y.S.2d 401 (App. Div. 2d Dep't 2003)....................6

Lucent Technologies, Inc. v. Gateway, Inc.,
470 F. Supp. 2d 1195 (S.D. Cal. 2007)....................4, 5, 6

Peterson v. Regina,
935 F. Supp. 2d 628 (S.D.N.Y. 2013)....................9

Rotondi v. Drewes,
819 N.Y.S.2d 779 (App. Div. 2d Dep't 2006)....................8

In re Tremont Securities Law, State Law & Insurance Litigation,
08 Civ. 11117, 2013 U.S. Dist. LEXIS 30006 (S.D.N.Y. March 1, 2013)....................3

Pursuant to this Court's Order dated October 29, 2013 (Dkt. 875), the Tremont Defendants[1] hereby brief the following question on remand from the Second Circuit Court of Appeals: does the release (the "Release") contained in this Court's judgment approving the settlement of this action (the "Investor Settlement") bar certain objectors to the Investor Settlement (the "Objectors") from challenging aspects of a different settlement (the "Trustee Settlement") reached in a different, albeit related, action commenced in bankruptcy court?

As demonstrated below, the Release does not cover any claims pertaining to the Trustee Settlement, which was signed on July 25, 2011. As intended by the parties to the Investor Settlement, the Release bars only certain claims accruing on or before December 11, 2008, when Bernard Madoff first revealed his theft of customer assets. Consequently, claims arising out of subsequent transactions – such as the Trustee Settlement – fall outside and are not barred by the Release. Accordingly, Tremont respectfully requests that the Court enter the stipulation and proposed order submitted herewith confirming that the Release does not operate to bar any challenge to the Trustee Settlement.

## BACKGROUND

The Objectors invested in two hedge funds advised by Tremont (the "Market Neutral Funds").[2] At Tremont's direction, the Market Neutral Funds allocated their assets for investment among several different managers, one of whom was Bernard Madoff. Madoff stole Market Neutral Fund assets and the assets of a number of other Tremont-managed funds (the

---

1 The Tremont Defendants, also referred to herein as "Tremont," are: Tremont Partners, Inc., Tremont Group Holdings, Inc., Tremont (Bermuda) Limited, Tremont Capital Management, Inc., Rye Investment Management, Robert I. Schulman, Rupert A. Allan, Harry Hodges, James Mitchell, Lynn O. Keeshan, Patrick Kelly, Stephen Thomas Clayton, Stuart Pologe, Cynthia J. Nicoll and Darren Johnston.

2 The Market Neutral Funds are Tremont Market Neutral Fund, L.P. and Tremont Market Neutral Fund II, L.P.

"Funds"), resulting in the consolidated litigation pending before this Court under the caption In re Tremont Securities Law, State Law and Insurance Litigation, Master Docket No. 08 Civ. 11117 (S.D.N.Y.) (the "Investor Litigation").

On August 22, 2011, this Court entered final judgment (the "Judgment") approving the Investor Settlement. As contemplated by that settlement, the Judgment included a Release of all claims that had or could have been asserted in the extant consolidated amended complaints arising out of or relating to Tremont's oversight of Madoff before he confessed to his scheme on December 11, 2008. In entering the Judgment, this Court overruled numerous objections asserted by the Objectors, including an objection regarding the scope of the Release which, according to the Objectors, could be interpreted to bar them from challenging the Market Neutral Funds' participation in the Trustee Settlement. That particular objection made no sense given that the Trustee Settlement post-dated the Investor Settlement. The parties did not intend – and could not have intended – to release a non-existent claim challenging a non-existent Trustee Settlement when they entered into the Investor Settlement. But even if that had been possible, the parties expressly disavowed any such intent at the fairness hearing on the Investor Settlement held before this Court in August 2011 (the "Fairness Hearing"). At that hearing, the parties confirmed on the record their intention that the scope of the Release would be limited solely to claims based on the conduct, transactions and occurrences alleged in the consolidated amended complaints, all of which occurred on or before December 11, 2008.

Following entry of the Judgment, Objectors filed a notice of appeal with the Second Circuit. On May 8, 2012, after the notice of appeal had been filed, Tremont tendered $129,885 to the Objectors, an amount equal to the net losses Objectors incurred as a result of Madoff's misappropriation of Market Neutral Fund assets (the "Madoff Theft Losses"), plus

prejudgment interest. (See Schwartz May 8, 2012 Letter (Trans. Decl. Ex. A[3]).) Although the Objectors rejected Tremont's tender by letter dated May 18, 2012 (Trans. Decl. Ex. B), Tremont thereafter filed a motion asking the Second Circuit to dismiss Objectors' appeal on the ground that the tender provided full reimbursement for Objectors' Madoff Theft Losses, thereby mooting their objections to the fairness and adequacy of the Investor Settlement.

In an effort to avoid dismissal on mootness grounds, Objectors argued to the Second Circuit that Tremont's tender did not make them whole because it did not include alleged losses of $80,696 purportedly incurred as a result of the Market Neutral Funds' contribution to the Trustee Settlement (the "$80,000 Claim"). (See Haines Mot. for Leave To File Surreply (Trans. Decl. Ex. C).) Objectors also filed a motion in this Court, contending that those purported losses constituted "newly discovered evidence" warranting entry of an order vacating the Judgment pursuant to Rule 60 of the Federal Rules of Civil Procedure. See In re Tremont Secs. Law, State Law & Ins. Litig., 08 Civ. 11117, 2013 U.S. Dist. LEXIS 30006, at *11-12 (S.D.N.Y. March 1, 2013). This Court denied the Rule 60 motion, finding that Objectors had "presented essentially no evidence to support [it]." Id. at *15. As for the Second Circuit, on October 25, 2013, it remanded the Judgment to this Court for the limited purpose of determining whether the $80,000 Claim is barred by the Release. (See Summary Order (Trans. Decl. Ex. D).)

## ARGUMENT

## I. THE RELEASE DOES NOT BAR THE $80,000 CLAIM

### A. The Release and Applicable Rules of Construction

The Release releases the "Released Claims," which are:

> any and all direct, indirect and/or derivative claims, . . . including both known claims and Unknown Claims . . . that have been asserted in the [Investor Litigation], or, to the extent they related to direct or indirect

[3] "Trans. Decl." refers to the accompanying transmittal declaration of Jason C. Vigna.

> investments in or by the Settling Funds . . ., that could have been asserted in any forum by [the Class Members] against any of the Released Parties that arise out of, or are based upon, or related to, the allegations, transactions, facts, matters, or occurrences, representations or omissions involved, set forth, or referred to in the Complaints filed in the [Investor Litigation], or that relate to the purchase, retention, ownership or sale of limited partnership interests in or shares of the Settling Funds or the Settling Funds' investments in Madoff.

(Judgment (Dkt. 604) ¶ 15.)

As with any release, the Release at issue here is a "contract governed by principles of contract law." Consolidated Edison, Inc. v. Ne. Utilities, 332 F. Supp. 2d 639, 646 (S.D.N.Y. 2004).[4] Thus, like any other contract, the Release should be interpreted to give effect to the intent of the parties. See Compagnie Financiére de CIC et de L'Union Europèenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153, 157 (2d Cir. 2000) ("The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement."); see also Consolidated Edison, 332 F. Supp. 2d at 646 (same). To that end, "[t]he Court of Appeals of New York has cautioned that a release should not be read to cover claims which the parties clearly did not intend to waive." Lucent Techs., Inc. v. Gateway, Inc., 470 F. Supp. 2d 1195, 1199 (S.D. Cal. 2007) (collecting cases).

Here, there is no dispute among the parties who negotiated and signed the Investor Settlement regarding the intended scope of the Release: it bars only claims for Madoff Theft Losses that accrued on or before December 11, 2008. That intention is evident from the context in which the settlement was reached, the text of the Investor Settlement itself, and the parties' post-settlement conduct.

---

[4] Under paragraph 9.17 of the Investor Settlement, the settlement is governed by New York law. (See Investor Settlement (Dkt. 392-1) § 9.17.)

**B. The Context of the Settlement Bears on the Scope of the Release**

It is well settled "that the 'scope of a release turns on the controversy being settled and the purpose for which the release was actually given.'" Consolidated Edison, 332 F. Supp. 2d at 647 (citation omitted); accord Lucent, 470 F. Supp. 2d at 1200 ("New York law interprets a release considering the entirety and context of the agreement to determine the claims which the parties intended to waive."). Thus, construction of the Release in this action turns, at least in part, on whether the parties who negotiated the Investor Settlement had raised, and then sought to settle, any controversy related to the Trustee Settlement. The parties agree that no such issue was ever raised before signing the Investor Settlement and there is no evidence to the contrary.

Here, the Investor Settlement resolved only one controversy: the alleged liability of the settling defendants for Tremont's failure to detect Madoff's fraud and avoid the Madoff Theft Losses prior to December 11, 2008. In that connection, the gravamen of the consolidated amended complaints in the Investor Litigation is that Fund investors suffered Madoff Theft Losses as a result of: (a) Tremont's purported failure to adequately monitor Madoff's investment activities, and (b) alleged misrepresentations of Tremont's due diligence efforts. (See, e.g., Securities Action Compl. (Dkt. 66).) Those complaints contain no allegation relating to investments made by the Market Neutral Funds or any other Fund with managers other than Madoff. Moreover, the parties to the Investor Settlement submitted their settlement agreement (including the proposed releases to be included in the Judgment) to this Court for approval in February 2011, well before July 2011, when Tremont entered into the Trustee Settlement, and well in advance of February 2013, when the Market Neutral Funds made a settlement payment to the Trustee. Consequently, claims based on payments made by the Market Neutral Funds or any other Fund toward the Trustee Settlement were not – and could not have been – contemplated by the parties when they negotiated, drafted and signed the agreement containing the Release. See, e.g.,

Cahill v. Regan, 5 N.Y.2d 292, 299 (1959) (release did not cover possible future claims based on transactions that had not yet occurred when the release was executed). As a result, any such claims accruing after February 2011, when the parties entered into the Investor Settlement, are necessarily outside the scope of the Release. See Hughes v. Long Island University, 762 N.Y.S.2d 401, 401-02 (App. Div. 2d Dep't 2003); see also Bowersox Truck Sales & Serv., Inc. v. Harco Nat'l Ins. Co., 209 F.3d 273, 279 (3d Cir. 2000) ("'the general words of [a] release will not be construed so as to bar the enforcement of a claim which has not accrued at the date of the release'" (citation omitted)).

To be sure, as the Second Circuit observes in the Summary Order remanding the Judgment to this Court, at least one portion of the Release appears to be "capacious," namely, the last clause of the definition of "Released Claims." (Summary Order (Trans. Decl. Ex. D) at 8.) Nevertheless, as a matter of law, the scope of the Release must be construed in light of the context in which the parties negotiated and entered into the Investor Settlement – *i.e.*, they agreed to resolve the Investor Litigation before they knew there would be a Trustee Settlement, let alone the terms of any compromise. To "champion the general language [of the Release] over the context of the [settlement] agreement" would "ignore[] the importance New York law places on the context of a release." Lucent, 470 F. Supp. 2d at 1200. The context in this case compels the conclusion that the Release covers only claims for recovery of Madoff Theft Losses accruing prior to December 11, 2008.

### C. The Text of the Investor Settlement, Read as a Whole, Bears on the Scope of the Release

As a general rule of contract interpretation, a "Settlement Agreement must be read 'as a whole, and every part will be interpreted in reference to the whole.'" Consolidated Edison,

332 F. Supp. 2d at 647 (citation omitted). Application of this rule here further supports the parties' interpretation of the Release.

In construing the definition of "Released Claims," for example, it is appropriate to interpret that defined term in light of the definition of the "Settlement Class" set forth in the Investor Settlement. The Settlement Class includes "all Persons . . . who were holders of limited partnership interests in or shares of the [Funds] as of December 11, 2008, and who sustained net losses thereby." (Investor Settlement (Dkt. 392-1) § 1.53.) In contrast, the Settlement Class does *not* include limited partners of the Funds as of September 30, 2011 who sustained losses thereby when the Funds recognized an obligation to contribute to the Trustee Settlement. This confirms that the Release is intended to cover only those claims "related to injuries that could be suffered . . . and . . . asserted" by the Settlement Class, *i.e.*, claims arising out of Madoff Theft Losses suffered on or before December 11, 2008. Consolidated Edison, 332 F. Supp. 2d at 649.

In the same vein, the provisions relating to the settlement of the derivative (non-class) claims in the Investor Litigation compel the same conclusion. For instance, with respect to amounts to be paid to Fund investors from the Fund Distribution Account to settle the derivative claims, the proposed Plan of Allocation originally submitted to the Court in connection with the Investor Settlement contemplated distributions to investors pro rata to their "Recognized Claims," *i.e.*, the amount of each investor's ending balance in its capital account with the Fund as of December 2008. (See Proposed Fund Distribution Account Plan of Allocation (Dkt. 392-3, Ex. 2).) The Plan of Allocation did not contemplate any adjustment to the capital account based on events after December 11, 2008, such as a reduction of the capital balance resulting from contributions made by a Fund to the Trustee Settlement. Thus, the definition of Recognized Claims in the proposed Plan of Allocation further evidences the parties' intention that claims based

on a Fund's agreement to make contributions to the Trustee Settlement after December 11, 2008 are outside the scope of the Investor Settlement and are not barred by the Release.

**D. The Parties' Post-Settlement Conduct Further Demonstrates No Intent To Release the $80,000 Claim**

In addition to the provisions of the Investor Settlement itself, other evidence illustrates that the parties never intended to release claims, if any, arising out of the Trustee Settlement.

1. The Parties Stated Their Intent To Limit the Release at the Fairness Hearing

During the Fairness Hearing before this Court in August 2011, the Objectors argued that the language of the Release is ambiguous because it might "arguably release the Tremont defendants from any problems in connection with the negotiation of the [Trustee Settlement]." (Aug. 8, 2011 Hr'g Tr. (Dkt. 605) at 91-92.) Even if any such ambiguity existed, it was dispelled during the Fairness Hearing, when lead class counsel unequivocally stated on the record the parties' intention that the release cover only "claims related to . . . matters in these complaints" and not claims related to negotiation of the Trustee Settlement or any other post-December 11, 2008 conduct. (Id. at 92.) That statement – which was not contested by any other party – is further evidence of the intended scope of the Release. See, e.g., Rotondi v. Drewes, 819 N.Y.S.2d 779, 781 (App. Div. 2d Dep't 2006).

2. Tremont's Post-Release Conduct Manifests Its Intention Regarding the Scope of the Release

Tremont's understanding of the scope of the Release also is evident from its communications with Objectors after this Court approved the Investor Settlement. For example, on May 8, 2012, Tremont tendered to the Objectors their Madoff Theft Losses plus interest with the objective of mooting their appeal from the Judgment. (See Schwartz May 8, 2012 Letter

(Trans. Decl. Ex. A).) Given this objective, if Tremont believed that the Investor Settlement operated to extinguish claims challenging the Trustee Settlement, its tender could and would have included an amount sufficient to moot the Objectors' $80,000 Claim. Tellingly, when Objectors purported to reject Tremont's tender on May 18, 2012, their letter of rejection made no reference to the $80,000 Claim, much less asserted that the tender was inadequate in light of the Release and the absence of compensation for the $80,000 Claim. (See Gresham May 18, 2012 Letter (Trans. Decl. Ex. B).) In any event, Tremont's tender reflected Tremont's understanding of the claims that had been resolved and released by the Investor Settlement – namely, the claims to recoup Madoff Theft Losses incurred on or before December 11, 2008. Thus, the tender provides further evidence of the scope of the Release. See, e.g., Peterson v. Regina, 935 F. Supp. 2d 628, 641 (S.D.N.Y. 2013) (relying on party's conduct "after the release was signed" as evidence of party's intent as to scope of release); Consolidated Edison, 332 F. Supp. 2d at 650-51 (finding party's failure to raise defense of release until nine months after settlement became final was "persuasive evidence" that settlement was not intended to preclude subsequent lawsuit).

3. The Parties' Stipulation Confirms Their Intent

The Objectors were not parties to the Investor Settlement and did not participate in the negotiation of the Release. Thus, to the extent there is any ambiguity in the language of the Release, Objectors have no evidence to proffer regarding the parties' intent. Undaunted, they insist that the Release bars the $80,000 Claim, a contention that makes no economic sense. If Objectors sincerely believed they had legitimate claims arising out of the Trustee Settlement, they would be supporting Tremont's interpretation of the Release because it preserves the $80,000 Claim. Instead, Objectors have adopted an illogical interpretation to serve their agenda of blowing up the Investor Settlement at all costs, even at the risk of extinguishing a claim that the parties to

the settlement agree has not been released, and even though Objectors were offered one hundred cents on the dollar of their Madoff Theft Losses.

In all events, in the accompanying stipulation and proposed order, the parties have again confirmed their intention as to the scope of the Release. The parties always contemplated that it would cover only claims arising out of Madoff Theft Losses accruing prior to December 11, 2008. Tremont respectfully requests that the Court enforce the Judgment in accordance with the intent of the parties.

**CONCLUSION**

For the reasons stated, Tremont respectfully requests that the Court enter the accompanying stipulation and proposed order confirming the intent of the parties that the Release does not bar the $80,000 Claim.

Dated: New York, New York
November 12, 2013

Respectfully submitted,

/s/ Seth M. Schwartz

Seth M. Schwartz (Seth.Schwartz@Skadden.com)
Jason C. Vigna (Jason.Vigna@Skadden.com)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Defendants
Tremont Partners, Inc.,
Tremont Group Holdings, Inc.,
Tremont (Bermuda) Limited,
Tremont Capital Management, Inc.,
Rye Investment Management,
Robert I. Schulman, Rupert A. Allan,
Harry Hodges, James Mitchell,
Lynn O. Keeshan, Patrick Kelly,
Stephen Thomas Clayton, Stuart Pologe,
Cynthia J. Nicoll and Darren Johnston