IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TREMONT SECURITIES LAW, STATE LAW AND INSURANCE LITIGATION<br><br>This Document Relates To:<br><br>All Actions | MASTER FILE NO.:<br>08 CIV. 11117 (TPG) |

**AFFIDAVIT OF STEPHANIE AMIN-GIWNER IN SUPPORT OF
MOTION FOR APPROVAL OF DISTRIBUTION OF THE NET SETTLEMENT FUND**

STATE OF NEW YORK  )
                                          )  ss.:
COUNTY OF NASSAU  )

STEPHANIE AMIN-GIWNER, being duly sworn, deposes and says:

1. I am an Assistant Director of Operations for Garden City Group, LLC ("GCG").[1] I submit this affidavit in support of the motion for distribution of the Net Settlement Fund ("NSF"), pursuant to the Plan of Allocation that was approved by Order dated December 22, 2014 (ECF Doc. 994). This affidavit supplements the previously filed Affidavit of Stephen J. Cirami in Support of Motion for Approval of the Net Settlement Fund Plan of Allocation and Scheduling of Motion for Distribution dated December 5, 2014 (the "Cirami Affidavit") (ECF Doc. 990). The following statements are based on my knowledge and information provided by other experienced GCG employees working under my supervision.

2. As of February 27, 2015, GCG has received 737 Proofs of Claim.[2] GCG has processed these Proofs of Claim in accordance with the terms of the Stipulation and the Court-

---

[1] Please note that The Garden City Group, Inc. is now Garden City Group, LLC.
[2] Although GCG reported receiving 734 Proofs of Claim in the Cirami Affidavit, three claims were withdrawn and omitted from the total claim count reported in that affidavit. In addition, in February,

approved Net Settlement Fund Plan of Allocation for the Net Settlement Fund (the "NSF POA").[3] Processing has been completed with respect to the majority of the Claims submitted. As discussed below, there are still some Claims for which the processing has not yet been completed and GCG continues to work on these claims. GCG and Lead Counsel believe that there is no reason to delay distribution of the Net Settlement Fund to those Claimants whose Claims have been fully processed and are approved for payment pending completion of the processing of the remaining Claims. GCG hereby submits its administrative determinations accepting and rejecting Proofs of Claim in preparation for a distribution of the Net Settlement Fund to Authorized Claimants. GCG hereby presents a distribution plan that provides for an immediate distribution to Claimants whose Claims have been fully processed and establishes a reserve that will, among other things, allow Claimants whose Claims have not yet been fully processed and may subsequently be approved for payment in parity with those Claimants who will receive payment in the initial distribution.

## PROCESSING PROOFS OF CLAIM

3.      As noted, GCG has received and processed 737 Proofs of Claim received through February 27, 2015. GCG has spent a significant amount of time analyzing and comparing the data provided by Claimants on their Proofs of Claim and the spreadsheets that GCG obtained from Tremont regarding investors' contributions and redemptions and their ending balance for each of the eight Rye Funds for each month through December 31, 2008 and investors' ending balance in each of the nine Tremont Funds as of December 1, 2008. *See* Cirami Aff. ¶¶ 20-25.

---

2015, GCG was notified that 146 additional parties that had previously requested exclusion from the Settlement had agreed in principle to seek to opt back into the Settlement Class and will be submitting Proofs of Claim. *See* ¶¶ 24-29, *infra*.

[3] All terms with initial capitalization not otherwise defined herein shall have the meanings ascribed to them in the Stipulation of Partial Settlement dated February 25, 2011 (the "Stipulation") and the Cirami Affidavit.

As instructed by Lead Counsel, GCG used the data in these spreadsheets to assist Settlement Class Members and complete as many claims as possible.

4. Through February 27, 2015, GCG has completed the processing of 692 Proofs of Claim that were received in connection with the Settlement and has determined that 536 are accepted in whole or in part, and that 156 should be wholly rejected because they are ineligible for recovery from the Net Settlement Fund.

**Additional Complexities Encountered in Claims Processing**

5. During the processing of Proofs of Claim GCG encountered non-conforming Proofs of Claim, which, in general, require significantly more work than standard Proofs of Claim because of the information contained in or missing from the Proof of Claim, or because of the manner in which the Proof of Claim was completed. Non-conforming claims include, among other conditions, claims with missing pages, claims with no name or address, claims that are blank but are submitted with documentation for GCG to complete, and claims that are so materially deficient as to make what is being claimed unrecognizable. A significant amount of time and resources were required to manually review these Proofs of Claims. In addition, GCG encountered additional complexities due to the unique nature of this Settlement.

6. In reviewing and analyzing the Tremont Data Spreadsheets, GCG observed numerous transactions that were called "assign in" and "assign out" on the spreadsheets but which Claimants had identified as contributions and redemptions on their Proof of Claim. GCG reviewed all claims with such transactions and coded them accordingly in the Settlement Database. GCG alerted Lead Counsel to these transactions and after discussion, Lead Counsel instructed GCG to treat these transactions as contributions and redemptions in the amount indicated on the Tremont Data Spreadsheets.

**Claims Filed by Swap Counterparties**

7.      The NSF POA (ECF No. 988-1) defines a "Swap Counterparty" as "a party that entered into a swap transaction or similar arrangements with any of the Rye Funds or Tremont Funds in order to provide these Funds with a leveraged return." *Id.* ¶C(10). Pursuant to the NSF POA, the Recognized Claims for a Swap Counterparty, after they are calculated pursuant to the same methodologies as for other claims, are "subject to a discount factor of 99%."

8.      GCG worked with Lead Counsel to identify all claims that were filed by Swap Counterparties to ensure that the 99% discount factor was properly applied. To that end, Lead Counsel provided GCG with a list of Swap Counterparties. GCG compared that list to the Settlement Database and provided Lead Counsel with copies of the claims filed by any parties whose name matched the list of Swap Counterparties. After review by Lead Counsel and Counsel for Defendants, Lead Counsel provided GCG with a list of six Swap Counterparties Claimants whose Recognized Claims are subject to the 99% discount factor. GCG updated the Settlement Database to reflect which Claims would receive the discount.

9.      In addition, GCG sent letters to the six Swap Counterparties Claimants informing them that their claim was subject to the discount factor.[4] A copy of this letter is attached hereto as Exhibit A.

**Clawback Payments Treated as Contributions**

10.     The NSF POA also provides that "Direct payments, if any, by any Authorized Claimant to the SIPA Trustee to settle clawback claims will be treated as Contributions for purposes of calculating that Authorized Claimant's Recognized Claim." *Id.* ¶ D. GCG reviewed

---

[4] The six Swap Counterparties are: (1) ABN AMRO Custodial Services (Ireland) Limited; (2) HSBA Bank PLC; (3) HSBC Bank USA; (4) Scotiabank Caribbean Treasury Limited; (5) The Royal Bank of Scotland N.V. f/k/a ABN AMRO Bank NL (London Branch); and (6) Somers Dublin Ltd. A/C KOC A/C Pledger to Lehman Brothers Finance S.A.

claims to identify, which if any, included documented payments to the SIPA trustee that should be treated as contributions. GCG identified one such Claim and updated the Claim to reflect that amount as a contribution for purposes of calculating the Recognized Claim.

11. In addition, pursuant to Lead Counsel's direction, each of the eligible funds that contributed to the Settlement with the SIPA Trustee and do not have a bankruptcy claim are eligible for a "Step Up." For the Rye Prime Fund, which had 100% of its money invested in Madoff, GCG calculate the Step Up percentage by dividing the amount the Fund contributed to the SIPA Trustee settlement by the investors' total net equity as provided on the Tremont Data Spreadsheet for the Rye Funds. For those funds that had less than 100% of its money invested in Madoff -- the Tremont Market Neutral LP, Tremont Market Neutral II LP, Tremont Opportunity II LP, and Tremont Opportunity III LP -- GCG divided the amount the Fund contributed to the Trustee Settlement into the investors' total net equity (including the Madoff investment) as provided on the Tremont Data Spreadsheets for the Tremont Funds, multiplied by the fractional amount the investors had invested with Madoff, in order to get a percentage (the "Step Up Percentage"). The Recognized Claims for each of Eligible Funds is then increased by the Step Up Percentage for the applicable Authorized Claims.[5]

## THE DEFICIENCY PROCESS

12. Approximately 227 or 30% of the Proofs of Claim received through February 27, 2015, were partially or wholly rejected for one or more reason, and, therefore, were subjected to

---

[5] The following Funds are not eligible for any Step Up because they filed a bankruptcy claim and/or did not make any contribution to the Trustee settlement: Rye Select Broad Market Fund, L.P., Rye Select Broad Market XL Fund, L.P., Rye Select Broad Market Insurance Fund, L.P., Rye Select Broad Market Insurance Portfolio, LDC, Rye Select Broad Market Portfolio Limited, Rye Select Broad Market XL Portfolio Limited, Broad Market XL Holdings Limited, Tremont Market Neutral Fund Limited, Tremont Opportunity Fund Limited, Tremont Arbitrage Fund, L.P., Tremont Arbitrage Fund-Ireland, and Tremont Strategic Insurance Fund, L.P.

additional processing and correspondence.  Many of these Proofs of Claim submitted were incomplete, not signed, not properly documented, or were otherwise deficient.  Much of GCG's efforts in handling an administration involve Claimant communications so that all Claimants have sufficient opportunity to cure any deficiencies and file a complete Proof of Claim.  The "Deficiency Process," which involved letters and emails to Claimants was intended to assist Claimants in properly completing their otherwise deficient submissions so that they would be eligible to participate in the Settlement.

### Wholly Rejected Claims

13. As described in the Cirami Affidavit, GCG utilized internal Proof of Claim codes to identify and classify Proofs of Claim and conditions that existed within them.  These Proof of Claim conditions included, among other things, notations about which Proofs of Claim were partially deficient and which were wholly deficient.  If a Proof of Claim was determined to be wholly deficient GCG mailed a letter entitled "Notice of Rejection of Your Entire Claim."  Examples of such conditions include, but are not limited to: i) Proof of Claim missing documentation for entire Proof of Claim; ii) Claimant did not sign the Proof of Claim; iii) Claimant did not provide enough information to calculate the claim; or iv) the Proof of Claim was determined to have no Recognized Claim when calculated under the NSF POA.  The letter described to the Claimant the defect(s) with his, her or its Proof of Claim and what, if anything, was necessary to cure the Claim.  The letter also advised the Claimant that the submission of the appropriate information and/or documentary evidence to complete the Proof of Claim was required within 20 days from the date of the letter, or the Claim would be recommended for rejection in its entirety.  To date, GCG mailed (or e-mailed in the case of Electronic Claims) a "Notice of Rejection of Your Entire Claim" in connection with approximately 189 Proofs of Claim during the administration of the Settlement.

**Partially Rejected Claims**

14. If a Proof of Claim was determined to be partially deficient, GCG mailed a letter entitled "Notice of Rejection of Part of Your Claim." Examples of such conditions include, but not limited to: i) the Claimant was missing documentation for some but not all transactions; ii) the Claimant did not supply some transactional information causing the claim to not balance; or iii) the Claimant did not invest in one of the Eligible Funds. The letter described to the Claimant the defect(s) in his, her or its Proof of Claim and what was necessary to cure the defect(s) in the Claim. This letter also provided a 20-day period to cure the Claim. To date, GCG mailed (or e-mailed in the case of Electronic Claims) a "Notice of Rejection of Part of Your Claim" in connection with approximately 38 Proofs of Claim during the administration of the Settlement.

15. Attached hereto as Exhibit B are examples of the types of letters sent to notify Claimants of the deficiencies in, or the ineligibility of, their Proofs of Claim. Both letters explained that this deficiency process was the Claimant's only opportunity to cure the deficiencies in his, her or its Claim (to the extent that the deficiencies could be cured).

16. In addition, as a result of GCG's review and analysis of the Tremont Data Spreadsheets, GCG identified approximately 31 Claims for which the Tremont Data Spreadsheets included contributions and redemptions that were not provided on the Proof of Claim. Pursuant to direction from Lead Counsel, GCG added these transactions from the Tremont Data Spreadsheets to the Claim. GCG sent a letter advising these Claimants that additional transactions were identified and added to their claim. GCG also identified approximately 30 Claims in which the information the Ending Dollar Balance at the close of business on December 11, 2008 provided on the Proof of Claim was higher than Ending Dollar Balance in the Tremont Data Spreadsheet. Pursuant to the direction of Lead Counsel, GCG updated the Claim to reflect the Ending Dollar Balance provided by Tremont. Letters were sent

7

to these Claimants notifying them that their Claims had been updated. Copies of these letters are attached hereto as Exhibit C.

17. Claimants' responses to these complete or partial rejection letters were scanned into GCG's database and associated with the related Proofs of Claim. Those responses were then carefully reviewed and evaluated by GCG's team of processors. If a Claimant's response corrected the defect(s), GCG updated the database manually to reflect the change in status of the Claim.

**QUALITY ASSURANCE, FRAUD PREVENTION AND REGULATORY COMPLIANCE**

18. An integral part of all of GCG's settlement administration projects is its Quality Assurance review. GCG's Quality Assurance personnel worked throughout the entire administration process to ensure that Proofs of Claim were processed properly; that deficiency and ineligibility message codes were properly applied to Proofs of Claim; that deficiency letters were mailed to the appropriate Claimants; and that GCG's computer programs were operating properly.

19. GCG's Quality Assurance team performed a final project wrap-up on all of the Claims that have been reviewed as described in this affidavit. For example, the Quality Assurance team conducted a review of the deficiency letters mailed along with the resulting deficiency responses to ensure proper processing. The team also reviewed the claims filed to ensure the correctness and completeness of all of the Proofs of Claim before GCG prepared its final reports to Lead Counsel. Here, in connection with this Quality Assurance wrap-up, GCG (i) confirmed that valid Proofs of Claim have no messages denoting ineligibility; (ii) confirmed that Proofs of Claim that are ineligible have messages denoting ineligibility; (iii) confirmed that Proofs of Claim that contained purchases that occurred before or after the Class Period contain appropriate ineligibility messages; (iv) confirmed that Proof of Claim detail (transaction)

messages appear only on Proof of Claim detail records; (v) confirmed that all Proofs of Claim requiring "deficiency" letters were sent such letters; (vi) performed a sample review of deficient Proofs of Claim; (vii) reviewed Proofs of Claim with large dollar losses; (viii) sampled Proofs of Claim that had been determined to be ineligible, including those with no calculated Recognized Claim under the NSF POA, in order to verify that all transactions had been captured correctly; (ix) tested the accuracy of the calculation program, which included ensuring that the Funds' Madoff Exposure was properly taken into account and that the Step Up Percentage was calculated and applied properly; and (x) confirmed the 99% discount factor was accurately applied to claims filed by Swap Counterparties.

20. In support of the work described above, GCG's computer staff designed and implemented and the Quality Assurance team tested the following programs for this administration: (i) data entry screens that store Proof of Claim information (including all transactional data included on each Proof of Claim) and attach message codes and, where necessary, text to denote conditions existing within the Proof of Claim; (ii) programs to load and analyze transactional data submitted electronically for all Electronic Claims (the load program converts the data submitted into the format required by the calculation program, and the analysis program determines if the data is consistent and complete and triggers a response to the electronic filer where appropriate); (iii) a calculation program to analyze the holding and transactional data for all Proofs of Claim, and calculate each Recognized Claim based on the NSF POA; (v) programs to generate various reports throughout and at the conclusion of the administration, including lists of all eligible and ineligible Proofs of Claim; and (vi) programs that calculate each Authorized Claimant's Distribution Amount by determining the pro ration factor for the Settlement, and applying it to the Recognized Claim.

21.     GCG also used a variety of fraud protection controls throughout the administration process to identify potential fraudulent Proofs of Claim.  Duplicate Claim searches (by beneficial owner name, tax identification number, account number and Recognized Claim amounts), duplicate transaction searches (which compared duplicate transactions within the same Proof of Claim and other Proofs of Claim), high value reviews, spot reviews and other standard audit reports that examined the information in a variety of ways, were used during the Proof of Claim review.

22.     GCG reviewed and compared the entire database for the Settlement against the "watch list" of known potential fraudulent filers that GCG developed throughout its over thirty years of experience as a claims administrator.  GCG works closely with the FBI to update that watch list with the latest information available.

23.     In accordance with the regulations of the Office of Foreign Asset Control regulations and guidelines, known as OFAC, GCG will perform searches on certain payments that it will issue to identify potential payees whose names appear on the federal government's restricted persons list or who reside in countries to which payments are prohibited.  GCG regularly monitors changes to OFAC regulations and guidelines.

## CLAIMS-IN-PROCESS

24.     In February 2015, Lead Counsel notified GCG that 146 parties that had previously requested exclusion from the Settlement agreed in principle with Defendants and Lead Counsel to seek to opt back into the Settlement.  Since these parties have not yet submitted formal Proofs of Claim the processing for those Claims, which are referred to herein as the "Claims-in-Process," has not yet been completed.  However, GCG did a preliminary review of Settling Plaintiffs' claims information that was shared with counsel for the Settling Plaintiffs.  I am also informed by Lead Counsel that Counsel for the Settling Plaintiffs' agreed in principal to

the NSF Reserve.  Because those Claims-in-Process will take additional time to complete, Plaintiffs have proposed, and GCG agrees, that, rather than delay distribution to the 536 Claimants whose Claims have been completely processed and are recommended for approval until the Claims-in-Process are fully processed, any distribution to the Claims-in-Process, to the extent they ultimately are determined to be eligible to participate in the Settlements, should await what is defined below under "Distribution Plan for the Net Settlement Fund" as the "Claims-in-Process Distribution."  (*See id.*, ¶ 29).

25. GCG has completed the review and processing of the majority of claims, however, GCG is working with Claimants to cure their deficiencies and perfect their claims but has not yet been able to complete these Claims.  To the extent these approximately 45 claims are perfected and determined by GCG to be acceptable, GCG recommends that these claims be included in the Claims-In-Process Distribution described below.

## DISPOSITION OF PROOFS OF CLAIM

26. Through February 27, 2015, GCG has completed the processing of 692 Proofs of Claim that have been received in connection with the Settlement, and has determined that 536 are acceptable in whole or in part and 156 should be rejected.  The 156 wholly rejected Proofs of Claim are ineligible for the following reasons:

| Summary of Rejected Proofs of Claim | |
|---|---|
| **Reason for Ineligibility** | **Number of Proofs of Claim** |
| Claim Did Not Fit Definition of Class | 34 |
| Duplicate Proof of Claim | 36 |
| Deficient Proof of Claim Never Cured | 43 |
| Claim Did Not Result in a Recognized Claim | 43 |
| **TOTAL** | **156** |

27. A list of the Claims submitted and their ultimate disposition is contained in the

11

Administrator's Report (the "Report") attached hereto as Exhibit D. Exhibit D-1, entitled "Eligible Claims," lists all provisionally accepted Claims and states their Recognized Claim. Exhibit D-2, entitled "Ineligible Claims," lists all wholly rejected Claims and states the reason for their ineligibility. For privacy reasons, Exhibit D provides only the Claimant's Claim number, and Recognized Claim or Reason for Ineligibility (no names, addresses, or social security or other taxpayer identification numbers are disclosed).

28.  The provisionally accepted Claims represent a total of $1,342,929,318.99 in Recognized Claims calculated in accordance with the NSF POA. This includes 536 Eligible Claims. According to the NSF POA, each Authorized Claimant with a Recognized Claim shall receive a *pro rata* share of the Net Settlement Fund, which shall be the Authorized Claimant's Recognized Claim divided by the sum total of the Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.

## DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

29.  Should the Court concur with GCG's determinations concerning the provisionally accepted and rejected Claims, GCG recommends the following distribution plan (the "Distribution Plan"):

(a)  Rather than delay distribution to Authorized Claimants until Claims-in-Process are fully resolved, any distribution to Claims-in-Process, to the extent they ultimately are determined to be eligible to participate in the Settlements, shall await what is defined in (c) below as the "Claims-in-Process Distribution."

(b)  GCG will conduct an initial distribution (the "Initial Distribution") of the available balance of the Net Settlement Fund, after deducting the payments previously allowed and requested herein, and after the payment of any estimated taxes and the costs of preparing appropriate tax returns and any escrow fees, as follows:

(1) GCG will calculate award amounts for all Authorized Claimants as if the entire Net Settlement Fund was to be distributed by calculating their *pro rata* shares of the funds. More specifically, pursuant to the NSF POA, GCG will calculate each Authorized Claimant's *pro rata* share of the Settlement Fund by comparing the Claimant's Recognized Claim to the total Recognized Claims of all Authorized Claimants. The Authorized Claimant's calculated *pro rata* share of the Net Settlement Fund will be the Claimant's "Distribution Amount."

(2) Authorized Claimants whose Distribution Amount calculates to less than $100 pursuant to subparagraph (b)(1) above will be paid their full Distribution Amount ("Claims Paid in Full"), and such Claimants will get no additional payment in subsequent distributions of the Net Settlement Fund.

(3) Authorized Claimants whose Distribution Amount calculates to $100 or more pursuant to subparagraph (b)(1) above will be paid 80% of their Distribution Amount. The remaining 20% of their payments will be held in reserve (the "NSF Reserve") to address any Claims-in-Process that ultimately are determined to be eligible to participate in the Settlement, and for any other contingencies that may arise. To the extent the NSF Reserve is not depleted, the remainder will be distributed in the "Second Distribution" of the Net Settlement Fund described in subparagraph (d) below.

(4) In order to encourage Authorized Claimants to cash their checks promptly, and to avoid or reduce future expenses relating to unpaid checks, all Initial Distribution checks (and Claims-in-Process Distribution checks issued pursuant to subparagraph (c) below) will bear the notation: "CASH PROMPTLY,

VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT CASHED BY [DATE [120] DAYS AFTER ISSUE DATE]."

(5) Authorized Claimants who do not cash their Initial Distribution checks (or, as applicable, Claims-in-Process Distribution checks) within the time allotted will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be available to be redistributed to other Authorized Claimants in the Second Distribution described below. Similarly, Authorized Claimants who do not cash their Second Distribution checks or any subsequent distributions within the time allotted will irrevocably forfeit any further recovery from the applicable Net Settlement Fund.

(c) When GCG has completed the processing of the Claims-in-Process, GCG will provide to Lead Counsel a report of additional Authorized Claimants with their Distributable Amounts, calculated as set forth in paragraph (b) above. Lead Counsel, will approve these payments, without further order of the Court, and make a distribution to those Claimants that will bring them into parity with the Claimants approved for payment pursuant to Lead Plaintiffs' instant motion (the "Claims-in-Process Distribution"). GCG will also notify all claims that are recommended for rejection. Specifically, GCG will:

(1) Determine which of these Authorized Claimants' Distribution Amount is less than $100, and these Claimants will be sent their full Distribution Amount and become "Claims Paid in Full" and get no additional payment in subsequent distributions of the Settlement Fund.

(2) With respect to Authorized Claimants whose Distribution Amount calculates to $100 or more pursuant to subparagraph (b)(3) above, GCG will distribute to such Claimants 80% of their Distribution Amount.

(d) After GCG has made reasonable and diligent efforts to have Authorized Claimants cash their Initial Distribution checks and Claims-in-Process Distribution checks, GCG will conduct a second distribution (the "Second Distribution") of the Net Settlement Fund. Any amount remaining in the Net Settlement Fund one (1) year after the Claims-in-Process Distribution (including the NSF Reserve and the funds for all void stale-dated checks), after deducting GCG's unpaid costs and expenses incurred in connection with administering the Settlement for which it has not yet been paid (including the costs of the Claims-in-Process Distribution and the estimated costs of such Second Distribution), and after the payment of any estimated taxes and the costs of preparing appropriate tax returns, will be distributed to all Authorized Claimants from the Initial Distribution or Claims-in-Process Distribution who (1) were not Claims Paid in Full and (2) cashed their Initial Distribution check or Claims-in-Process Distribution check.

(e) In order to allow a final distribution of any funds remaining in the Net Settlement Fund after completion of the Second Distribution, whether by reason of uncashed checks, returned funds, tax refunds, or otherwise:

(1) If cost effective, not less than six (6) months after the Second Distribution is conducted, a further redistribution of the relevant Net Settlement Fund, pursuant to which the funds remaining in such Net Settlement Fund, after deducting GCG's unpaid costs and expenses incurred in connection with administering the applicable Settlement for which it has not yet been paid

(including the estimated costs of such distribution), and after the payment of any estimated taxes and the costs of preparing appropriate tax returns, will be distributed to Authorized Claimants who cashed their Second Distribution checks and who would receive at least $10 from such redistribution of the Net Settlement Fund, with additional redistributions thereafter in six-month intervals, subject to the conditions previously noted, until GCG and Lead Counsel determine that further redistribution of the Net Settlement Fund is not cost-effective.

(2) At such time as GCG and Lead Counsel determine that the redistribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance of such Net Settlement Fund, after payment of any unpaid costs or fees and taxes, shall be contributed to non-sectarian, not-for-profit 501(c)(3) organizations recommended by Lead Counsel, after consultation with Settling Class Plaintiffs, and approved by the Court.

**FEES AND DISBURSEMENTS**

30. GCG agreed to be the Claims Administrator in exchange for payment of its fees and expenses. Lead Counsel have been billed on a regular basis and received regular reports of all of the work GCG performed with respect to the administration of the Settlement, and authorized all of the claims administration work performed herein. Attached hereto as Exhibit E are copies of GCG's invoices, totaling $555,461.23, covering all fees and expenses incurred for its work performed through February 15, 2015, as well as GCG's estimate of fees and expenses to conduct the initial distribution of the Net Settlement Fund. GCG's invoices are separated into two sections: a "fee" section, and an "expense" section, which lists those items for which GCG is only asking to recoup its costs. GCG respectfully requests that the Court approve payment of all of GCG's fees and expenses set forth on Exhibit E hereto.

its work performed through February 15, 2015, as well as GCG's estimate of fees and expenses to conduct the initial distribution of the Net Settlement Fund. GCG's invoices are separated into two sections: a "fee" section, and an "expense" section, which lists those items for which GCG is only asking to recoup its costs. GCG respectfully requests that the Court approve payment of all of GCG's fees and expenses set forth on Exhibit E hereto.

## RECORDS RETENTION AND DESTRUCTION

31. Unless otherwise ordered by the Court, one year after the final distribution of the Settlement Fund, GCG will destroy the paper copies of the Proofs of Claim and all supporting documentation, and three years after the final distribution of the Settlement Fund it will destroy electronic copies of the same.

## CONCLUSION

32. GCG respectfully requests that the Court enter an Order approving its administrative determinations accepting and rejecting Proofs of Claim and calculating Recognized Claims and disbursements and approving the proposed Distribution Plan. GCG further respectfully submits that its fees and expenses, as reflected on the invoices attached hereto as Exhibit E should be approved for payment from the Net Settlement Fund.

*Stephanie Amin-Giwner*
Stephanie Amin-Giwner

Sworn to before me this
27th day of February, 2015

*Vanessa M Vigilante*
Notary Public

VANESSA M VIGILANTE
Notary Public, State of New York
No. 01VI6143817
Qualified in Nassau County
Commission Expires April 17, 2018

17