UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE TREMONT SECURITIES LAW,
STATE LAW AND INSURANCE
LITIGATION

08-cv-11117

**OPINION**

Before the court is a motion to approve distribution of a settlement fund in the cases against the Tremont funds and related entities. The distribution would compensate a large class of plaintiffs who lost money through investments in Bernard Madoff's Ponzi scheme.

Several parties have filed objections to the motion to distribute the fund. This opinion concerns those objections.

**Case Background**

The court assumes familiarity with the record in this case, but recapitulates briefly. Defendants are the Tremont funds, and related individuals and entities. Plaintiffs are investors who suffered because defendants invested their money with Bernard Madoff.

On March 26, 2009, the court entered a consolidation order creating three groups of consolidated actions against defendants: the Securities Actions, the State Law Actions, and the Insurance Actions.

On February 23, 2011, after mediation by retired District Judge Layn R. Phillips, plaintiffs from these groups signed, with defendants, a Stipulation of Partial Settlement. That stipulation called for the creation of a fund to pay certain class members' claims. The fund was to be comprised of $100 million, plus monies from a possible future recovery in a separate

action, the "Fidelity Bond Recovery." The amount in the fund was subject to reduction through various expenses and fee awards. After taking account of these reductions, and the amount added through the Fidelity Bond Recovery, the fund became known as the "Net Settlement Fund." In the time elapsed since the settlement, the amount available in the Net Settlement Fund has decreased to approximately $75 million.

To be distributed separately were certain residual monies in defendants' funds after the resolution of these proceedings (the "Fund Distribution Account").

On August 19, 2011, after two fairness hearings, the court signed an order of final judgment dismissing plaintiffs' claims pursuant to the settlement (the "Final Approval Order"). The Final Approval Order also certified a class (the "Settlement Class") comprised of subclasses corresponding to the plaintiffs in the State Law Actions, Securities Actions, and Insurance Action. Among the parties excluded from the Settlement Class were plaintiffs and groups of plaintiffs who requested exclusion (the "Opt-Out Plaintiffs").

Various appeals to the Final Approval Order were filed. The last was resolved on October 6, 2014, with the Supreme Court's denial of a petition for writ of *certiorari*.[1]

Since 2011, the Opt-Out Plaintiffs have pursued extensive separate litigation against defendants before this court. That litigation is ongoing.

During 2014, lead counsel for the Settlement Class ("lead counsel"), along with defendants and several interested parties, conducted further mediation with Judge Layn R. Philips concerning the distribution of funds to the Settlement Class.

---

[1] In re Tremont Sec. Law, State Law, & Ins. Litig., No. 11-4030 (2d Cir. Apr. 3, 2014), cert. denied, 135 S. Ct. 270 (2014).

On December 22, 2014, the court approved a plan of allocation for the Net Settlement Fund submitted by lead counsel.

In February, 2015, the Opt-Out Plaintiffs, with the help of lead counsel, reached a confidential settlement agreement with defendants. That agreement involved their readmission to the Settlement Class. The fairness of that readmission is the subject of several objections to the motion now before the court.

### The Motion to Distribute the Net Settlement Fund

On February 27, 2015, lead counsel moved to distribute the Net Settlement Fund. That motion announced that "in February 2015, pursuant to the ongoing mediation process, [several plaintiffs who] had opted out of the Settlement agreed in principle with Defendants and Lead Counsel to seek to opt back in to the Settlement." (Lead Counsel Mot., Dkt. 1003, at 3.)

Pursuant to the court's order of February 18, 2015, the deadline for submitting papers responding or objecting to lead counsel's motion passed on March 27, 2015. On April 17, 2015, the court announced that a hearing would be held on May 28, 2015, concerning lead counsel's motion and objections thereto. The court accepted late objections that were submitted prior to the hearing.

On May 28, 2015, the court held a hearing concerning the motion and the various objections. Lead counsel and objecting parties made their arguments before the court, and the court reserved decision. (May 28, 2015 Hearing Tr., Dkt. 1064.)

Lead counsel contends that the readmission of the Opt-Out Plaintiffs to the Settlement Class, pursuant to the motion to distribute the Net Settlement Fund, is in the best interests of the Settlement Class. Lead counsel argues that readmission of the Opt-Out Plaintiffs would (a) streamline the distribution of funds from the Net Settlement Fund, and (b) resolve or facilitate

3

the ongoing mediation of a plan of allocation for the Fund Distribution Account by securing a waiver of possible objections from the Opt-Out Plaintiffs. Furthermore, the readmission of the Opt-Out Plaintiffs would end the Opt-Out Plaintiffs' extensive separate litigation before this court and others.[2] Thus, monies that defendants save by avoiding further litigation with the Opt-Out Plaintiffs may later flow to Settlement Class members.

Accordingly, lead counsel proposes to set aside 20% of the Net Settlement Fund as a reserve (the "Net Settlement Fund reserve" or the "reserve") to accommodate, among other things, payments to the readmitted Opt-Out Plaintiffs. This reserve would hold approximately $15 million (20% of the Net Settlement Fund). Lead counsel has represented to the court that approximately $7.5 million of the reserve would be set aside for payments to readmitted Opt-Out Plaintiffs and approximately $7.5 million would be set aside for payment of unresolved claims by current members of the Settlement Class, as well as administrative contingencies. (Repl. Mem., Dkt. 1029, at 3-4). The claims administrator would process claims of the Opt-Out Plaintiffs, and unresolved claims by current class members, and determine whether they are entitled to recover from the reserve. If there is money left in the Net Settlement Fund reserve at the end of this process, it would be distributed amongst the whole Settlement Class.

Certain members of the Settlement Class have objected to lead counsel's motion to approve distribution of the Net Settlement Fund. The objections are summarized below.

---

[2] The Opt-Out Plaintiffs in the following actions before this court join the motion for distribution of lead counsel for the Settling Class: Anikstein v. Tremont Group Holdings, Inc., (12 Civ. 9058), Becker v. Tremont Group Holdings, Inc., (12 Civ. 9060), Bilgore v. Tremont Group Holdings, Inc., (12 Civ. 9061), Cocchi v. Tremont Group Holdings, Inc., (12 Civ. 9064), Karasel II, L.P. v. Tremont Group Holdings, Inc., (12 Civ. 9062), Spectrum Select L.P. v. Tremont Group Holdings, Inc., (12 Civ. 9057), and Spectrum Select II, L.P. v. Tremont Group Holdings, Inc., (12 Civ. 9063).

**Objections to the Motion to Approve Distribution of the Net Settlement Fund**

Six groups of investors filed objections to the readmission of the Opt-Out Plaintiffs into the Settlement Class, or, relatedly, to the confidentiality of the Opt-Out Plaintiffs' settlement. Three of the six groups have since withdrawn their objections. The objections relating to the readmission of the Opt-Out Plaintiffs are summarized in Section A, below.

One party, Lehman Brothers Finance, filed a narrower objection relating solely to its own classification by the claims administrator as a "Swap Counterparty." Lehman Brothers Finance's classification as a Swap Counterparty would result in a steep discount of its recovery under the plan of allocation for the Net Settlement Fund. This objection is summarized in Section B, below.

### A. Objections Relating to the Readmission of the Opt-Out Plaintiffs into the Settlement Class

The following six groups of investors filed objections relating to the readmission of the Opt-Out Plaintiffs, or seeking disclosure of the terms of the Opt-Out Plaintiffs' settlement:

(1) Austin Capital BMP Fund ("ACM")

(2) Calabrese Parties and Boston Class Members Group (the "Calabrese Boston Group")

(3) Collins Capital

(4) Meritage Capital

(5) The "Tremont Fund Objectors"

(6) The "Ward Objectors"

#### i. The Objections by ACM, Collins Capital, and Meritage Capital Have Been Withdrawn

Three of the above parties—ACM, Collins Capital, and Meritage Capital—withdrew their objections prior to the May 28, 2015 hearing on this motion.

5

### ii. The Calabrese Boston Group Objection

The Calabrese Boston Group opposes lead counsel's proposal to create a 20% Net Settlement Fund reserve from which payments would be made to the Opt-Out Plaintiffs now seeking readmission to the class.

The Calabrese Boston Group argues that readmitting the Opt-Out Plaintiffs to the Settlement Class would harm the members of the Settlement Class without any countervailing benefit, and that it would be fundamentally unfair to class members who did not opt out.

### a. Factual Background

On April 13, 2011, the claims administrator commenced mailing notices to potential members of the Settlement Class in this case. These notices advised investors in the relevant funds of the settlement pending approval. (Notice, Dkt 438-2, ¶ 3) The notices provided a means to request exclusion from the class. They stated that "[i]f you ask to be excluded, you will not get any payment from the Net Settlement Fund." (Id. at ¶ 15.) Such opt-outs would retain their right to sue defendants. (Id.)

Lead counsel estimated that opt-outs who pursued their claims independently would recover, on average, no more that 5.7% percent of their losses before fees—the same as the projected recovery for the settling class. (Id. at pp. 3-4.) Lead counsel also noted that those who chose to opt out would face challenging and unpredictable legal hurdles. (Id. at ¶¶ 65, 70.) The notice did not contemplate readmission to the class after May 11, 2011. (Id. at ¶ 15.) A supplemental notice to the class, mailed weeks later, announced that August 1, 2011 would constitute a firm deadline for requesting readmission to the class. (Supp. Notice, Dkt. 554, Ex. A, p. 2.)

6

On August 19, 2011, the court approved the settlement and certified the Settlement Class. In so doing, the court announced that those who excluded themselves from the Settlement Class "may not make any claim with respect to or receive any benefit from the Settlement [with the exception of a benefit from the Fund Distribution Account]." (Final Approval Order, Dkt. 604, ¶¶ 3, 20.)

According to lead counsel, the proposed readmission of the Opt-Out Plaintiffs and the creation of a reserve for payment of their valid claims would likely reduce the amount available to current Settlement Class plaintiffs in the Net Settlement Fund by about $7.5 million. (May 28, 2015 Hearing Tr., Dkt. 1064, at 7.) The Calabrese Boston Group counters that the amount could be reduced by the entire amount of the reserve, or $15 million. (See id. at 51.) However, even in the latter scenario, the class members' ultimate recovery would not necessarily be reduced by $15 million, because the amount that eventually flows to class members through the Fund Distribution Agreement could be increased by the readmission of the Opt-Out Plaintiffs. The Opt-Out Plaintiffs' readmission to the Settlement Class would result in an end to their separate litigation, which drains defendant funds that would ultimately flow to the class members through the Fund Distribution Agreement. (Opt-Out Joinder, Dkt. 1006, at 3.) And readmission would cause the Opt-Out Plaintiffs to support lead counsel's proposal for the plan of allocation of the Fund Distribution Agreement, to the benefit of the class. (Id.)

The terms of the Opt-Out Plaintiffs' settlements have been kept confidential. They have admitted that the terms include separate payments from defendants, in addition to the amount they may collect from the Net Settlement Fund reserve. (May 28, 2015 Tr., Dkt. 1064, at 46.) But the amount of those payments remains undisclosed.

7

### b. Discussion

The court, in approving or administering a class action settlement, has a "duty to protect the interests of absent class members." Plummer v. Chemical Bank, 668 F.2d 654, 659 n. 4 (2d Cir. 1982).

The Calabrese Boston Group argues that the Settlement Class members would be harmed by lead counsel's proposal to readmit the Opt-Out Plaintiffs and reserve 20% of the Net Settlement Fund, because the Settlement Class would lose the ability to recover all or part of that reserve.

The Calabrese Boston Group also argues that the terms of the Opt-Out Plaintiffs' settlement with defendants should be made public or at least subjected to discovery. The Calabrese Boston Group points out that the terms of that settlement may undercut lead counsel's arguments about the benefits that would inure to Settlement Class members by readmitting the Opt-Out Plaintiffs. For example, if defendants are making very large separate payments to the Opt-Out Plaintiffs as part of their settlement, thus depleting defendants' residual funds, it could weaken lead counsel's argument that Settlement Class members will ultimately benefit from an end to litigation between defendants and the Opt-Out Plaintiffs.

The Calabrese Boston Group makes a further argument to fundamental fairness. The Calabrese Boston Group avers that the Opt-Out Plaintiffs took a calculated risk by requesting exclusion from the class, and they should have to live with the consequences.

Lead counsel counters that the court should overrule this objection, because readmission of the Opt-Out Plaintiffs "does not prejudice or materially impact the members of the [Net Settlement Fund] Settlement Class, will further the fundamental goals of efficient and speedy distribution of the [Net Settlement Fund], preserve value for all recovering [Net Settlement

8

Fund] Settlement Class members (*e.g.*, any amounts remaining in Tremont after completion of the wind down of operations), avoid the substantial delay and expense associated with further proceedings involving the Opt-Out Plaintiffs and remove possible objections to the [plan of allocation for the Fund Distribution Account] currently the subject of mediation proceedings." (Repl. Mem, Dkt. 1029, at 4.)

Lead counsel observes that members of the Settlement Class never detrimentally relied on the decision of the Opt-Out Plaintiffs to opt out. Numerous courts have permitted opt-outs to rejoin a class under similar circumstances. See, e.g., Electric Weld, 1982 WL 1873, *2-3 (E.D. Pa. June 30, 1982) (opt-out rejoining class caused class members no prejudice where "the remaining class members will receive no less than what they would have received had [the opt-out plaintiff] never opted out"); see also In re Elec. Carbon Prods Antitrust Litig., 447 F. Supp. 2d 389, 397 (D.N.J. 2006) (readmission of opt-out plaintiffs deemed "in the best interests of the Settlement Class" where "it cannot be said that any class member relied, to its detriment, on the [opt-out plaintiffs'] original decision to opt out, since that development was contemporaneous with all other decisions").

Lead counsel adds that, even after the Opt-Out Plaintiffs' readmission to the class, all class members would receive more than the projected recovery which was communicated to class members when they decided not to opt out. The class notice projected *pro rata* recovery of 4% on class members' investments. After the Opt-Out Plaintiffs' readmission, the Settlement Class members would receive *pro rata* recoveries of 4.59% (versus 5.18% percent if the Opt-Out Plaintiffs are not readmitted).

Additionally, lead counsel emphasizes that readmission of the Opt-Out Plaintiffs will facilitate distribution of the Fund Distribution Account. The Fund Distribution Account is a

9

separate pool of residual funds to be distributed to, among others, members of the Settlement Class. Its plan of allocation is the subject of ongoing mediation, and the Opt-Out Plaintiffs have attested that if they are readmitted to the class, they will support lead counsel's proposed plan of allocation in that mediation. (Opt-Out Joinder, Dkt. 1006, at 3.) Thus, readmission would facilitate finalization of the plan of allocation of the Fund Distribution Account and the distribution of those monies to Settlement Class members.

Finally, lead counsel argues that the court should not disturb the confidentiality of the Opt-Out Plaintiffs' settlement. Lead counsel observes that settlement confidentiality is not to be disturbed absent compelling circumstances. See In re Teligent, Inc., 640 F.3d 53, 57-60 (2d Cir. 2011). Lead counsel furthermore states that it has already disclosed all the information about the settlement that is material to the Settlement Class, and that allowing discovery or compelling disclosure would further delay the distribution of funds to class members.

The court agrees with lead counsel's determination that the instant motion is in the best interests of the Settlement Class. In representing the interests of the Settlement Class, lead counsel must navigate tradeoffs. Here, lead counsel seeks to allow a relatively small part of the Net Settlement Fund to flow to the Opt-Out Plaintiffs, in exchange for a range of benefits to the Settlement Class, including Opt-Out Plaintiffs' support for lead counsel's favored plan of allocation of the Fund Distribution Account, and a cessation of separate litigation which may further deplete defendants' resources. The amount that Settlement Class members will receive, after readmission, is greater than the class notice projected they might receive. Under these circumstances, lead counsel is acting prudently and consistently with its duties to the Settlement Class in seeking the readmission of the Opt-Out Plaintiffs.

Furthermore, compelling the disclosure of the Opt-Out Plaintiffs' settlement agreement with defendants is not warranted. The Calabrese Boston Group has asserted that payments made from defendants to the Opt-Out Plaintiffs would harm the Settlement Class, presumably because they could deplete defendant funds available for later distribution. But such funds could just as easily be depleted if the Opt-Out Plaintiffs continued to litigate separately. And compelling disclosure of the settlement terms would almost certainly harm the Settlement Class by occasioning further delay in the distribution of both the Net Settlement Fund and the Fund Distribution Account.

The objection of the Calabrese Boston Group is overruled.

### iii. The Tremont Fund Objectors Lack Standing

The Tremont Fund Objectors, a group six individual members of the Settlement Class, submitted an objection to the readmission of the Opt-Out Plaintiffs and to the secrecy of the mediation and settlement arrived at between defendants and the Opt-Out Plaintiffs.

However, the Tremont Fund Objectors' objection is moot because defendants have now tendered payments to these parties covering the entirety of their interests in this litigation.

Two of the six Tremont Fund Objectors received tenders of payment from defendants during earlier phases of litigation. The Second Circuit consequently found that those two members of the Tremont Fund Objectors lacked standing to appeal. In re Tremont Sec. Law, State Law & Ins. Litig., 561 F. App'x 61, 63 (2d Cir. 2014); In re Tremont Sec. Law, State Law & Ins. Litig., 542 F. App'x 43, 47 (2d Cir. 2013).

The further four Tremont Fund Objectors received similar tenders from defendants on May 26, 2015. The amounts of those offers matched or exceeded the Tremont Fund Objectors' possible recoveries if their objection were sustained. Thus, the tenders rendered the Tremont

11

Fund Objectors without a "personal stake in the outcome of the lawsuit." United States v. Wiltshire, 772 F.3d 976, 978 (2d Cir. 2014) (per curiam) (quoting Lewis v. Cont'l Bank Corp., 494 U.S. 472, 478 (1990)).

The Tremont Fund Objectors claim that the Second Circuit's recent decision in Tanasi v. New Alliance Bank, 2015 U.S. App. LEXIS 7932 (2d Cir. N.Y. May 14, 2015), changed the law of mootness in the Second Circuit, such that the tender offers to the Tremont Fund Objectors do not moot their objection. Specifically, they claim that after Tanasi, their objections cannot be moot unless the court has entered judgment in their favor.

Tanasi has no application here. That case concerned whether a plaintiff's putative class claim was mooted by an unaccepted offer under of judgment under Fed. R. Civ. P. 68. Here, judgment has already been entered in the Final Approval Order, which dismissed class plaintiffs' claims pursuant to the settlement and certified the Settlement Class. (Final Judgment and Order of Dismissal with Prejudice Regarding Settlement and Rules 23 and 23.1 ("Final Approval Order"), Dkt. 604, Aug. 19, 2011). The Tremont Fund Objectors have not received offers of judgment under Fed. R. Civ. P. 68, but rather checks constituting the full amounts to which they could possibly be entitled in connection with this litigation. The cases are thus in vastly different procedural postures, and Tanasi cannot be read to require the entry of judgment that the Tremont Fund Objectors seek.

The objections of the Tremont Fund Objectors are moot.

### iv. The Ward Objectors

The Ward Objectors, a group consisting of Dianne Ward, Ronald Ward, and RCW Group, submitted an objection on June 4, 2015. They seek to compel the production of all the

12

Opt-Out Plaintiffs' settlement agreements, and delay the distribution of the Net Settlement Fund pending an examination of the terms of those agreements.

This objection came more than two months after the March 27, 2015 deadline for opposing lead counsel's motion to distribute the Net Settlement Fund. It also came after the conclusion of the May 28, 2015 hearing on the motion and various objections. The Ward Objectors state that their objection was prompted by the disclosure, at the May 28, 2015 hearing, that the Opt-Out Plaintiffs were receiving unspecified settlement consideration from defendants in addition to their readmission to the class. However, this does not excuse the lateness of the request. Other objectors, including as the Calabrese Boston Group, raised similar concerns about extra consideration flowing to the Opt-Out Plaintiffs in their timely objections.

The court strikes the Ward Objectors' submission at docket number 1067 as untimely. Furthermore, were it not untimely, it would have been overruled for the same reasons that the court denied the Calabrese Boston Group's request to disturb the confidentiality of the Opt-Out Plaintiffs' settlement.

### B. The Objection of Lehman Brothers Finance Concerning its Classification as a "Swap Counterparty"

#### i. Background and Facts

Lehman Brothers Finance ("LBF"), a member of the Settlement Class, has raised a separate objection, unrelated to the settlement of the Opt-Out Plaintiffs. LBF objects to the decision of lead counsel and the claims administrator to classify certain shares that LBF owns in one of defendant's funds as shares acquired by a "Swap Counterparty." Under the terms of the

13

court-approved plan of allocation, such shares are subject to a 99% discount in their recovery from the Net Settlement Fund.

LBF contends it is not a Swap Counterparty, and that these shares were not shares acquired by a Swap Counterparty. Specifically, it contends that it never entered into any swap transaction with the funds at issue, and that lead counsel and the claims administrator are erroneously conflating LBF with Lehman Brothers Special Financing ("LBSF"), a separate entity which did enter into a swap transaction with the Tremont funds.

LBF is a Swiss entity in bankruptcy, which is controlled by PwC AG Zurich. LBSF is a U.S. entity controlled by Lehman Brothers Holdings.

LBF is the beneficial owner of certain shares that were subscribed by LBSF, and LBF does not object to the classification of its LBSF-subscribed shares as Swap Counterparty shares. It admits that these were acquired as part of a swap transaction, and that LBSF was a Swap Counterparty. But LBF contends that the remainder of its shares, which were not subscribed by LBSF, are not shares acquired by a Swap Counterparty.

The court-approved plan of allocation for the Net Settlement Fund defines a swap counterparty as follows: "a party that has entered into a swap transaction or similar arrangement with any of the Rye Funds or Tremont Funds in order to provide said Funds with a leveraged return." LBF emphasizes that a "swap" is a "contract to exchange cash at specified intervals calculated to an index." In re Thrifty Oil Co., 249 B.R. 537, 539-40 (S.D. Cal. 2000). LBF itself did not enter into an agreement meeting that definition.

Lead counsel responds that at all relevant times prior to the Madoff bankruptcy, LBF and LBSF were operating as a single entity—Lehman Brothers. Therefore, it is not relevant that LBF and LBSF are no longer affiliated. Lehman Brothers used multiple entities to structure

14

single transactions for tax and regulatory reasons. Lead counsel argues that, even though LBF never actually signed a swap agreement with the relevant Tremont funds, its investments were made as part of a swap agreement entered into by LBSF. In other words, LBF's transactions were made pursuant to a swap agreement entered into by LBSF which was, at relevant times, essentially the same entity as LBF.

Finally, lead counsel points out that the LBF's relevant shares are Class D shares in the Broad Market Portfolio Fund. Lead counsel observes, and LBF does not dispute, that Class D shares were made available by defendants only as part of swap transactions.

### ii. Discussion

The question raised by the objection is whether LBF is, per the terms of the plan of allocation, "a party that has entered into a swap transaction or similar arrangement with any of the Rye Funds or Tremont Funds in order to provide said Funds with a leveraged return."

At the time of the transactions, LBF and LBSF were both part of a larger entity, known as Lehman Brothers. Lehman Brothers, through LBSF, undisputedly entered into a swap transaction with the Rye Funds in order to provide them with a leveraged return. Specifically, LBSF signed a swap agreement obligating it to periodically pay to the Rye Select XL Portfolio Fund (a leveraged return fund) an amount equal to three times the return on $27.5 million were it invested in the Rye Select Broad Market Portfolio Fund. Precisely as a hedge against that obligation, LBF and LBSF together purchased a total of $83 million in Class D shares of the Rye Select Broad Market Portfolio Fund. The swap agreement signed by LBSF did not require that the obligation be hedged. But LBF does not dispute that its shares were hedges against LBSF's obligation and that, were they owned by LBSF instead of LBF, they would be subject to a 99% discount under the plan of allocation.

The court concludes that although LBF did not technically enter into a swap transaction with the Rye funds, lead counsel and the claims administrator were correct in applying the Swap Counterparty discount to LBF's recovery on the shares in question. That is because the plan of allocation defines a swap party, with emphasis added, as "a party that has entered into a swap transaction *or similar arrangement* with any of the Rye Funds or Tremont Funds in order to provide said Funds with a leveraged return." In purchasing Class D shares (i.e., shares meant to be held by swap counterparties) as part of a hedge against its sister entity's swap obligation, LBF entered into an arrangement reasonably similar to a swap transaction. And it did so in order to facilitate the provision of a leveraged return to the Rye Select XL Portfolio Fund.

The court overrules LBF's objection.

## Conclusion

The court finds the motion to distribute the Net Settlement Fund to be fair and reasonable. The objections to the motion are overruled. This resolves the motions at numbers 1056 and 1069 on the docket.

SO ORDERED.

Dated:   New York, New York
         June 5, 2015

_____
Thomas P. Griesa
United States District Judge