UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| IN RE TREMONT SECURITIES LAW, STATE LAW AND INSURANCE LITIGATION | Master File No. 08 Civ. 11117 (TPG) ECF Case |

_____/

**MEMORANDUM OF LAW IN SUPPORT OF FUTURESELECT FUNDS' MOTION CONCERNING THE $1.5 BILLION FUND DISTRIBUTION ACCOUNT (FDA) TO [1] CERTIFY FDA SUBCLASSES AND [2] APPOINT SEPARATE FDA SUBCLASS COUNSEL**

FutureSelect Prime Advisor II LLC, The Merriwell Fund, L.P., and Telesis IIW, LLC (collectively, "FutureSelect") submit this Memorandum of Law in support of their Motion to [1] Certify Subclasses and [2] Appoint Separate Counsel for those Subclasses ("Motion").

## INTRODUCTION

This Motion seeks to avoid reversible error in the equitable allocation of the $1.5 billion Fund Distribution Account ("FDA").

This Court has not yet approved a plan of allocation for the FDA. When the Court approved the class action settlement ("Settlement") of $100 million (the Net Settlement Fund or "NSF") for those who opted *into* the Settlement, it also created the fifteen-times-larger FDA that applied to *all* Tremont victims, even those that opted *out*. FutureSelect are just that—opt-out victims denied standing until now to object to the Settlement or its related distributions.[1]

FutureSelect does object. Although every victim was a net loser victimized by

---

[1] *See* ECF. No. 127-2 (Notice Re: Settlement) at 20-21 (Item 15): "How Do I Exclude Myself From The Settlement? . . . If you ask to be excluded, . . . you cannot object to the settlement." *See also* Hr'g Tr. 48:1-3, June 1, 2011, ECF No. 552 ("MR. ENTWISTLE: . . . Each of those have all sought exclusion from the settlement and, as a result, have no standing to object to the settlement."); *id.* at 48:23-24 ("MR. ENTWISTLE: . . . [N]o excluded objector has standing to make an objection to the settlement."); *id.* at 71:13-14 ("MR. ENTWISTLE: . . . He has no standing to argue the adequacy or lack of adequacy of the settlement amount here.").

1

Tremont's malfeasance, Class Counsel's FDA Plan of Allocation ("FDA POA," ECF No. 1050-2) proposes to distinguish among those victims by distributing to some investors more than <u>ten times</u> the amount of others. The Settlement was secured by representations of fair treatment to *all* victims of Tremont, the principal defendant in this action, and with the proposed FDA POA, those representations have proved wrong.

More fundamentally, the FDA POA makes clear a violation of the Second Circuit decision announced days after the hearing on approval of the Settlement in this action. In *In re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242 (2d Cir. 2011), the Second Circuit articulated a principle long held in the class settlement context: that "adequacy of representation cannot be determined solely by finding that the settlement meets the <u>aggregate</u> interests of the class or 'fairly' compensates the different types of claims at issue." *Id.* at 254. Instead, in the Rule 23(a)(4) context and in evaluating the need for separately represented subclasses, the court "must ask independently whether the interests of <u>all</u> class members were adequately represented." *Id.*

In vacating a class certification and settlement, the Court acknowledged that named class plaintiffs—and their class counsel—inadequately represented <u>all</u> class members where the class members' interests fundamentally conflicted. When subclasses' interests diverge, a "district court abuse[s] its discretion in certifying the class and approving the Settlement, because the named plaintiffs fail[] to adequately represent the interests of <u>all</u> class members." *Id.* at 245.

That is precisely what has happened here. Every member of the Tremont "FDA class" is a net loser investor, and all were lied to by Tremont. Notwithstanding that every FDA-entitled investor lost money because of the *same* alleged misrepresentations, gross negligence and malfeasance <u>on the part of Tremont</u>, however, "FDA class" member interests have

fundamentally diverged because Class Counsel proposes a distribution plan in which particular Subclasses and Categories of Tremont investors stand to gain more than <u>10 times the recovery</u> of other investors like FutureSelect. Under the Plan, FutureSelect stands to recover approximately 4 cents on the dollar, while others recover more than 50 cents per dollar, and Madoff speculator investors recover undisclosed millions of dollars in *profits*.

Worse still, this Court approved the Settlement in this action predicated on Class Counsel's repeated representations that *all* Tremont limited partners—who were *equally* impacted by Tremont's gross negligence and misrepresentations—would get "their share" of the FDA. *See, e.g.,* Hr'g Tr. 29:16-19, June 1, 2011, ECF No. 552 ("MR. ENTWISTLE: . . . [E]very limited partner in the Rye funds will receive their share of what's left after the Madoff trustee litigation is finished and the winding-up process is completed."). Class Counsel sought to represent *all* Class Members on the premise that *all* would get their fair share—a premise that has proved false.

That is exactly the sort of substantive and structural unfairness that *Literary Works* prohibits. The development of the Plan was structurally improper because the very same investors who are now losing out were **not** specifically represented by counsel for their subclass, who advanced their interests as a subclass, and who advocated not for the purpose of getting credit for $1.5 billion in the door, but on behalf of <u>the specific persons</u> that those funds were supposed to compensate. As the *Literary Works* court asked, "[H]ow can the value of any subgroup of claims be properly assessed without independent counsel pressing its most compelling case?" *Id.* at 253. The answer is that they cannot.

In short, the Settlement here is predicated on the misstatements of Class Counsel who, in an attempt to represent <u>all</u> class persons, massively misrepresented the elemental facts upon

3

which this Court and this "class" has proceeded. Because Class Counsel has not represented <u>all</u> "class" members as required by the Second Circuit, FutureSelect respectfully requests, in conformance with *Literary Works*, that this Court certify subclasses of investors now proposed to be treated differently under the FDA POA and to appoint counsel for those subclasses for purposes of determining an equitable distribution of the FDA.[2]

## ARGUMENT

### I.  *Literary Works* Requires Separate Counsel For Subclass Members With "Fundamentally Conflicting" Interests

In *In re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242 (2d Cir. 2011), the Second Circuit determined that in addition to being fair in the <u>aggregate</u>, a class settlement must be procedurally and substantively fair to <u>every</u> member of the class and <u>requires</u> the creation of <u>separately represented subclasses</u> to protect those class members whose interests "fundamentally conflict" with others.

Plaintiffs were authors who sold their writings to publishers for print publication. *Id.* at 245. When Defendants later republished those works in electronic databases and on the Internet, the plaintiff authors alleged in three independent class actions that these unauthorized electronic publications infringed their copyrights. *Id.*

After years of mediation, the parties reached a settlement, dividing the class members' works into three categories—Category A, B or C—based on whether and when the authors had registered for copyright protection. *Id.* at 246. The settlement agreement provided different compensation for Category A, B or C claims. *Id.* Category C claim holders—for works that had never been registered with the Copyright Office—were agreed to be compensated at a

---

[2] FutureSelect were investors in two Tremont funds ("XL" and "Prime") relevant here, and requests the separate, subclass representation for each as required by the Second Circuit.

4

fraction of Category A and B claims.

On motion from class counsel, the district court certified a single class as "All persons who, individually or jointly, own a copyright under the United States copyright laws . . . that has been reproduced, displayed, adapted, licensed, sold and/or distributed in any electronic or digital format," and approved the Settlement as fair, reasonable, and adequate. *Id.* at 247 n.3. The named class plaintiffs included persons that held *each* category of claim, but subclasses were not created—and separate counsel was not named—for Category A, B and C claim holders.

The Second Circuit reversed. Notwithstanding that the named plaintiffs included persons holding each category of claim, the proposed settlement made "essential allocation decisions among categories of claims." *Id.* at 251. Because "individual Category A and B claims are 'more valuable' than Category C claims," there were "disparate interests within the class" (*id.*), but no separate "subset of class members whose claims mirrored their own" interests. *Id.* at 252. Accordingly, "[o]nly the creation of subclasses, and the advocacy of an attorney representing each subclass, can ensure that the interests of that particular subgroup are in fact adequately represented." *Id.*

In decertifying the class and vacating the settlement agreement, the Second Circuit acknowledged that the settlement "was the product of an intense, protracted, adversarial mediation, involving multiple parties and complex issues. The mediators were highly respected and capable, and their participation provided some assurance that the proceedings were free of collusion and undue pressure." *Id.* at 252. The Second Circuit likewise acknowledged that there may be differences in the claims that warrant differential treatment. *Id.* at 253.

However, there is no basis for properly assessing those differences "in the absence of

5

independent representation. . . . The rationale is simple: how can the value of any subgroup of claims be properly assessed without independent counsel pressing its most compelling case? It is for this reason that the participation of impartial mediators and institutional plaintiffs does not compensate for the absence of independent representation." *Id.*

## II. Class Counsel's FDA Plan of Allocation Demonstrates "Fundamental Conflicts" Among Subclasses of Tremont Investors

On May 21, 2015, Class Counsel submitted the FDA POA (ECF No. 1050-2), which proposed an allocation of the FDA pursuant to the Settlement and on behalf of the "class" of persons injured by Tremont.

The Plan's claim, however, that it was the "product of countless hours of discussion, calls and meetings in a mediation context over almost two years" (*id.* at p. 1) neither avoids the fairness required by the Second Circuit (*see Literary Works*, 654 F.3d at 252 ("[T]hese features offered some structural assurance . . . [but] we cannot conclude that they did enough to satisfy Rule 23(a)(4)")), nor hides reality: Class Counsel now proposes **massively different distributions among investors that were treated equally tortiously by Tremont**.

Essentially, the Plan would divide Tremont investors—all class members—into 4 camps: (1) investors in the Rye Onshore, Rye Offshore and Rye Insurance funds whose claims have in large part been purchased by Madoff speculator Fortress Capital (the "Fortress Investors" or "Category A"); (2) investors in the Broad Market XL Fund ("XL Investors" or "Category B"), a leveraged fund mismanaged by Tremont; (3) investors in the Broad Market Prime Fund ("Prime Investors" or "Category C"), a fund with some "net winner" investors and some "net loser" investors; and (4) investors in a Tremont Fund of Funds ("Tremont Investors" or "Category D").

The Plan seeks to award the vast majority of the FDA to the Fortress Investors in

Category A. That is, under the Plan, **96.8%** of the $1.5 Billion FDA would go to Category A investors alone. All other investors—including Category B and C, to which FutureSelect belong—would divide the remaining **3.2%**. Based on the losses in each fund, this means that despite no difference in the allegations of <u>treatment by the Tremont Defendants</u> in this settlement of claims <u>against Tremont,</u> Category A investors stand to recover nearly $.50 on the dollar for their claims,[3] while investors in Categories B and C recover less than $.05 on the dollar.

This is exactly the fundamental conflict in interest that has (a) produced the "countless hours of discussion, calls and meetings in a mediation context over almost two years" (ECF No. 1050-2 at p. 1) and (b) required the designation of separately represented classes in *Literary Works*. "Essential allocation decisions designed to confine compensation and to limit defendants' liability" require designation of subclasses." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 627 (1997). *See also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999) (alleged differences in class claim values among class members requires "reclassification with separate counsel").

The lessons of *Literary Works*—decided days after the hearing on Settlement approval—are directly relevant here, and preclude any approval of a plan of distribution pursuant to the Settlement without certification of subclasses of investors in Prime and XL with separate counsel. "Only the creation of subclasses, and the advocacy of an attorney representing each subclass, can insure that the interests of that particular subgroup are in fact adequately represented. *In re Literary Works*, 654 F.3d at 252.

---

[3] In fact, the Fortress Investors are not evaluating what number of cents on the dollar they will recover. Because they purchased claims from Madoff victims after the fraud was exposed, they are awaiting distribution to determine how large a *profit* they will make at the expense of Category B and C. Category D investors are scheduled to return more than $.50 per dollar.

### III. Class Counsel's Misstatements Disguised These "Fundamental Conflicts"

In fact, the FDA POA is the culmination of a long-standing disregard for the interests of specific subclasses that began with a Settlement approved on false pretenses.

Knowingly or unknowingly, Class Counsel secured this Court's approval for the Settlement based on misrepresentations to the Court, misrepresentations which are now prejudicing some subclasses of FDA participants. For example, Class Counsel asserted that:

- ***The Rye Funds were all net losers.*** See Hr'g Tr. 27:16-18, June 1, 2011, ECF No. 552 ("MR. ENTWISTLE: In this context, your Honor, all of the Rye funds that were 100 percent invested in Madoff are all net losers."); *id.* at 24:24-25:10 ("MR. ENTWISTLE: I don't believe any of the Rye Funds are net winners, no, your Honor. The Rye Funds weren't net winners because the money that flowed into the Rye Funds would have then flowed right out to investors. So the funds themselves are not net winners . . . . [b]ut it's really a question of what happened with the limited partners in the Rye Funds."); *id.* at 26:21-24 ("THE COURT: . . . . Were any of the Rye funds net winners as funds? MR. ENTWISTLE: Not that we can tell, your Honor, at this point, no.").

- ***Investors that are net losers will get "their share" of the FDA.*** *Id.* at 29:22-25 ("MR. ENTWISTLE: . . . [I]f you are a net loser and you were an investor or a limited partner in the funds, you will get your share of settlement money, which will flow to you as long as you're a net loser."); *id.* at 30:6-7 ("MR. ENTWISTLE: . . . So the direct limited partners in the settling funds, the Rye funds, will receive their share from both accounts . . . ."); *id.* at 29:16-19 ("MR. ENTWISTLE: . . . [E]very limited partner in the Rye funds will receive their

share of what's left after the Madoff trustee litigation is finished and the winding-up process is completed."); *id.* at 25:23-25 ("THE COURT: . . . In other words, the members of the class are people who were losers?  MR. ENTWISTLE: Losers, that's correct, your Honor.").

- ***Named plaintiffs had the right to assign away XL investors' derivative claims with no benefit to XL investors.*** *See id.* at 63:7-16 ("MR. ENTWISTLE: . . . The XL fund has a representative in the settlement, the Lange plaintiffs, which purchased the XL Fund -- . . . THE COURT:  Did they bring derivative action? MR. ROZWOOD: No.  MR. ENTWISTLE: They were part of the state law action that was brought here, which included the derivative claims, included the Langes as plaintiffs."); *id.* at 65:16-23 ("THE COURT: . . . You are telling me and representing that each of the plaintiffs in the derivative action involving XL has consented to the settlement.  Is that right?  MR. ENTWISTLE: That's correct, your Honor.  THE COURT: OK.  Then it seems to me, Mr. Rozwood, that settles it.  MR. ROZWOOD: If that were true, your Honor, I agree with you, it would.").

None of these statements proved true, and each has become essential not only to the approval of the Settlement in this action, but to the Plan of Allocation that Class Counsel now advances.

Contrary to what Class Counsel represented, some of the Rye Funds like Prime and XL are now asserted to be net winner funds, and Class Counsel seeks to use that fact to deny their investors—***who are by hundreds of millions of dollars "net losers"***—a meaningful participation in the FDA. "Net losers" in Tremont—who Class Counsel purports to represent—

are now *not* going to receive "their share" of the FDA, as represented to this Court in securing Settlement. Instead, they are slated to receive less than they contributed to that fund, effectively subsidizing the recovery of Category A Investors, and the profits of Category A speculators.

There is "no authority that permits a court to approve a settlement . . . on the basis of consents by members of a unitary class, some of whom happen to be members of . . . distinct subgroups." *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 743 (2d Cir. 1993). Thus, even if the Court could conclude that a settlement *did* fairly compensate all claimants based on the differences in their claims, it "cannot rely on that fact to affirm class certification, because doing so would conflate Rule 23(a)(4)'s adequacy of representation analysis with Rule 23(e)(2)'s fairness, adequacy and reasonableness analysis." *Literary Works*, 654 F.3d at 254. The Court "must ask independently whether the interests of all class members were adequately represented." *Id.*

Here, they were not. Separate counsel for the XL and Prime subclasses—Category B and C Investors—are required to advocate for those investors' interests, and no Settlement or distribution of the FDA is proper in the Second Circuit without such designation.

## CONCLUSION

For each of the foregoing reasons, FutureSelect respectfully requests that the Motion be granted and that the Court designate subclasses in conformance it.

Dated:  June 25, 2015

                Respectfully Submitted,

                THOMAS, ALEXANDER & FORRESTER LLP


                */s/ Mark Forrester*
                Mark Forrester, Esq. (admitted *pro hac vice*)
                14 27th Avenue
                Venice, California 90291
                Tel:  (310) 961-2536
                Fax:  (310) 526-6852
                Email:  markforrester@tafattorneys.com

                Attorneys for FutureSelect Prime Advisor II LLC, The Merriwell Fund, L.P. and Telesis IIW, LLC