UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x

IN RE TREMONT SECURITIES LAW,          :
STATE LAW AND INSURANCE                :      Master File No.:
LITIGATION                             :      08 Civ. 11117 (TPG)
                                       :
------------------------------------------------------ x      **JURY TRIAL DEMANDED**

This Document Relates to:  All Actions  :
                                       :      "**ECF Case**"

------------------------------------------------------ x


**PLAINTIFFS' SETTLEMENT CLASS COUNSEL'S MEMORANDUM
OF LAW IN OPPOSITION TO FUTURESELECT'S MOTION FOR APPROVAL
OF FUND DISTRIBUTION ACCOUNT PLAN OF ALLOCATION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

RELEVANT FACTS .............................................................................................. 5

ARGUMENT ....................................................................................................... 8

I.    FUTURESELECT'S PROPOSAL DISREGARDS FUND STRUCTURE
AND WRONGFULLY REALLOCATES FUND ASSETS ................................. 8

    A.    FutureSelect's Proposal Wrongfully Reallocates the Assets
Contributed to the FDA by the Rye Onshore, Rye Offshore and
Rye Insurance Funds ................................................................. 8

    B.    FutureSelect Disregards the Varying Madoff Exposure of Each
Fund in Determining Fund Distribution Claimants' Net
Investments ........................................................................... 12

    C.    FutureSelect Wrongfully Limits the Definition of Fund
Distribution Claimant ............................................................. 13

II.    FUTURESELECT'S REMAINING ARGUMENTS IN SUPPORT OF
ITS PROPOSAL SHOULD BE REJECTED ....................................... 15

    A.    FutureSelect Fails to Recognize that the Consensus FDA POA
Allocates Substantial Assets to the XL and Prime Funds ..................... 15

    B.    FutureSelect Improperly Compares the NSF to the FDA ........................ 16

    C.    *In re Literary Works* Does Not Apply to the FDA POA .......................... 17

CONCLUSION ................................................................................................... 17

EC.58979.1

# TABLE OF AUTHORITIES

## Cases

*CFTC v. Walsh,*
    712 F.3d at 735 (2d Cir. 2013)........................................................................ 11

*FDIC v. Colonial Realty Co.,*
    966 F.2d 57 (2d Cir. 1992)............................................................................. 12

*In re Bernard L. Madoff Inv. Sec. LLC,*
    708 F.3d 422 (2d Cir. 2013)...................................................................... 9, 10

*In re Bernard L. Madoff Inv. Sec. LLC,*
    No. 11 CV 7330 (GBD), 2012 WL 2497270 (S.D.N.Y. June 27, 2012).......................... 6

*In re Bernard Madoff Investment Securities, LLC,*
    654 F.3d 229 (2d Cir. 2011)............................................................................ 10

*In re Bonham,*
    229 F.3d 750 (9th Cir. 2000) ........................................................................ 12

*In re Literary Works in Electronic Databases Copyright Litigation,*
    654 F.3d 242 (2d Cir. 2011)........................................................................... 17

*In re Owens Corning,*
    419 F.3d 195, 210 (3rd Cir. 2005) ................................................................... 12

*Picard v. Tremont Grp. Holdings, Inc.,*
    Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y. Sept. 22, 2011) ....................................... 2, 6, 9

*Sampsell v. Imperial Paper & Color Corp.,*
    313 U.S. 215 (1941)..................................................................................... 12

*SEC v. Byers,*
    637 F. Supp. 2d 166 (S.D.N.Y. 2009)............................................................... 10

*SEC v. Credit Bancorp, Ltd.,*
    290 F.3d 80 (2d Cir. 2002).............................................................................. 10

*SEC v. Huber,*
    702 F.3d 903 (7th Cir. 2012) .......................................................................... 11

*Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.),*
    860 F.2d 518 (2d Cir. 1988)........................................................................... 12

EC.58979.1

*United States v. Ovid*,
    No. 09-CR-216 (JG) (ALC), 2012 WL 2087084 (E.D.N.Y. June 8, 2012)................. 9, 11

**Statutes**

11 U.S.C. § 105................................................................................................................. 12

iv

## PRELIMINARY STATEMENT

Plaintiffs' Settlement Class Counsel ("Class Counsel") respectfully submit this memorandum in opposition to *FutureSelect Prime Advisor II LLC, the Merriwell Fund, L.P. and Telesis IIW, LLC's Motion for Approval of Investor Fund Distribution Account Plan of Allocation* (ECF No. 1082), filed on July 7, 2015 ("FutureSelect's FDA Allocation Motion" or the "Motion").

FutureSelect Portfolio Management, Inc. is the operations manager or general partner for three Madoff feeder funds that opted out of the class action Settlement in this case -- FutureSelect Prime Advisor II LLC, the Merriwell Fund, L.P. and Telesis IIW, LLC (collectively, "FutureSelect" or the "FutureSelect Funds").[1]  Ronald Ward, FutureSelect's President, manages the FutureSelect Funds.  Mr. Ward did not personally opt out of the class action Settlement and it was Mr. Ward that made the now-overruled objection to the Net Settlement Fund ("NSF") distribution that sought discovery of confidential mediation material. ECF No. 1069.

Mr. Ward and the FutureSelect Funds invested in two Rye Funds, Rye Select Broad Market XL Fund, L.P. (the "XL Fund") and Rye Select Broad Market Prime Fund, L.P. (the "Prime Fund").[2]  The XL Fund and the Prime Fund do not have recognized claims in the Madoff Bankruptcy.  Only Rye Onshore, Rye Select Broad Market Portfolio Limited ("Rye Offshore")

---

[1] The terms herein have all the same meanings and definitions as those in Class Counsel's memorandum in support of their motion for approval of the Fund Distribution Account Plan of Allocation and related distribution procedures ("Class Counsel's FDA Approval Memorandum") (ECF No. 1089), the Consensus FDA POA (ECF No. 1089-1) and the Stipulation of Partial Settlement ("Stipulation") (ECF 392-1).  The Court is respectfully referred to those documents, where appropriate.

[2] FutureSelect Prime Advisor II LLC also invested in Rye Select Broad Market Fund, L.P. ("Rye Onshore"), but was a net winner in that Fund, withdrawing $3,363,000 more than it contributed. Telesis IIW, LLC invested in Rye Onshore and had a net investment of $206,000.

and Rye Select Broad Market Insurance Fund, L.P. ("Rye Insurance") have recognized claims in the Madoff Bankruptcy -- the net proceeds of which those three Funds contributed to the Fund Distribution Account ("FDA") pursuant to the Settlement of the Actions and the settlement of the claims of the Madoff Bankruptcy Trustee ("Madoff Trustee" or "Trustee") (the "Trustee Settlement"). *See Picard v. Tremont Grp. Holdings, Inc.*, Adv. Pro. No. 10-05310, slip op. 2 (Bankr. S.D.N.Y. Sept. 22, 2011) (ECF No. 38-1). The Prime Fund did not contribute any assets to the FDA, though it did make a contribution to the Trustee Settlement, for which it received a release of the Trustee's claims against it. The XL Fund contributed approximately $32 million in cash to the FDA, which the proposed FDA Plan of Allocation ("FDA POA" or "Consensus FDA POA") returns to XL Fund investors on a priority basis. ECF No. 1089-1 at 6.

The FutureSelect proposal (ECF No. 1083-1) does not, as FutureSelect argues, treat all investors the same by allocating to Fund Distribution Claimants a *pro rata* share of the FDA derived from their net investment.[3] This is because in order to give all Fund Distribution Claimants a *pro rata* share of the FDA based on their net investment, as FutureSelect suggests, one must necessarily take a substantial portion of the assets contributed to the FDA by Rye Onshore, Rye Offshore and Rye Insurance (at the moment, about $620 million of the approximately $650 million in the FDA) and simply give it to Fund Distribution Claimants that invested in Rye and Tremont Funds which contributed little or nothing to the FDA, including the two Funds in which FutureSelect invested -- the Prime Fund, which made no contribution to the

---

[3] The FutureSelect Funds, as investors, are entitled to object to the Consensus FDA POA submitted by Class Counsel and even to make a counter proposal in that context (in fact, FutureSelect objected to the FDA portion of the Settlement here during the approval process (ECF No. 459)). However, FutureSelect's investor status does not imbue it with any authority to make a motion that seeks to cast its proposal as an "FDA POA." Regardless of what one calls it, the FutureSelect proposal is fatally flawed, inequitable, inconsistent with the FDA structure reflected in the approved Settlement and fundamentally self-serving.

EC.58979.1

FDA, and the XL Fund, which contributed only approximately $32 million to the FDA.  While this reallocation of wealth may be attractive to those who contributed nothing to the FDA, it is grossly unfair to the Fund Distribution Claimants who invested in the three Funds whose assets now make up the vast bulk of the FDA.  This inequitable taking of assets from the Funds that contributed them to the FDA in order to give to Funds that, absent the compromises reflected by the Consensus FDA POA, would have little or no legal claim to those assets, in and of itself requires that FutureSelect's FDA Allocation Motion be denied.

FutureSelect's proposal is also fatally flawed because it:  (i) ignores the distinct structure of each of the Funds; (ii) ignores the payments of the various Rye and Tremont Funds to the Madoff Trustee in connection with the Trustee Settlement, as well as the cash contributions of certain Funds to the FDA; (iii) ignores the provisions of the previously approved Settlement requiring the preservation of Cross Investments; (iv) attempts to distribute FDA assets to Tremont Fund investors beyond the amounts those Funds invested in the Madoff-exposed Rye Funds; and (v) improperly limits the definition of "Fund Distribution Claimant" to holders as of December 11, 2008, thus preventing assignees and successors-in-interest from recovering their legally transferred interests in the FDA.

In stark contrast, the Consensus FDA POA that Class Counsel submitted reflects a series of hard-fought compromises during the Mediation, designed to address the relevant equities while still respecting the requirements of the Settlement, the FDA and underlying Fund structure, and remaining consonant with the Trustee Settlement.  The Consensus FDA POA assures that: (i) all Funds contributing assets to the FDA receive a credit for those contributions; (ii) all Funds that contributed to the Trustee Settlement are treated on an equivalent basis (by giving each such Fund a Virtual SIPC Claim on the same basis as that awarded to recognized claimants in the

3

Madoff Bankruptcy); (iii) all Cross Investments by Rye and Tremont Funds in one another are preserved; and (iv) the XL Fund is given a priority for the approximately $32 million in cash it contributed to the FDA.[4]

FutureSelect also blithely ignores the fact that the compromise hammered out by Class Counsel and reflected in the Consensus FDA POA allocates to the Prime Fund a Virtual SIPC Claim of approximately $28 million, and preserves the net Cross Investments of the Prime Fund in Rye Onshore ($15 million) and in the XL Fund ($250 million) (where, in contrast, the Trustee rejected the Prime Fund's claim in the Madoff Bankruptcy because the Fund was a net winner, meaning that, as a Fund, it took substantially more money from Madoff than it actually invested). Compromises reached in the Mediation concerning the XL Fund -- which did not invest in Madoff/BLMIS and, thus, had no Madoff Bankruptcy claim -- include giving the XL Fund a priority claim for the return of the $32 million in cash it contributed to the FDA, together with the preservation of its Cross Investment of $184.5 million in Rye Onshore.[5]

Lastly, we note the authority cited by FutureSelect is either inapt or actually supports the rejection of its application and approval of the Consensus FDA POA.

---

[4] In its memorandum, FutureSelect inaccurately refers to the "Fortress POA" and the "Investor POA" as purportedly arising out of the Mediation of the FDA plan of allocation. ECF No. 1083. There is only one FDA POA "arising" out of the Mediation here -- the Consensus FDA POA submitted by Class Counsel which is supported by investors from all Funds. There is no such thing as an "Investor POA" or a "Fortress POA." To be sure, within the confidentiality of the Mediation proceedings, Mediation participants made and/or joined in various Mediation-related proposals and/or in subsequent submissions that attempted to respond to equitable concerns raised by Class Counsel, and that reflected efforts to achieve a mediated compromise. The FDA POA submitted by Class Counsel to the Court reflects that process. It is wholly improper and transparently self-serving for FutureSelect to mischaracterize the Consensus FDA POA as belonging to any one of the myriad investors that support it. FutureSelect is equally wrong to suggest that any "investor," other that itself, supports FutureSelect's proposal.

[5] The beneficial ownership of this preserved $184 million Cross Investment by the XL Fund in Rye Onshore has been disputed by HSBC Bank plc ("HSBC"). HSBC contends that, since the shares corresponding to this Cross Investment were collateral under a swap agreement with the XL Fund, it has a right to a disbursement from the FDA corresponding to this Cross Investment.

EC.58979.1

## RELEVANT FACTS[6]

Five of the Funds, Rye Onshore, Rye Offshore, Rye Insurance, Rye Select Broad Market Insurance Portfolio, LDC ("Insurance Portfolio LDC") and the Prime Fund filed customer claims with the Trustee (the "Customer Claims" or "SIPC Claims") in the Madoff Bankruptcy.  The Trustee denied only the Prime Fund's Customer Claim because the Fund's withdrawals exceeded its investments in Madoff, making it a net winner.  Trustee Settlement Agreement, *Picard v. Tremont Grp. Holdings, Inc.*, Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y. July 28, 2011) (ECF No. 17-1 at 10).  The Prime Fund did not file an objection to that determination.  *Id.*

On December 7, 2010, the Trustee filed an adversary proceeding against Tremont Group Holdings, Inc. and related entities seeking to recover more than $2.1 billion in direct transfers made from BLMIS to the Funds.  *Id.* at 8.  The Trustee's claims against the Tremont-related defendants were ultimately settled through the collaborative efforts of Class Counsel and Defendants on July 28, 2011.  Pursuant to the Trustee Settlement (approved by each of the settling Rye and Tremont Funds which were represented by their own counsel independently of the Fund manager):  (1) the named defendants in that proceeding were required to pay to the Trustee $1 billion in cash; (2) the Trustee approved the Customer Claims of Rye Onshore, Rye Offshore and Rye Insurance in the aggregate amount of $2,186,177,715.88;[7] and (3) the Trustee allowed additional claims for Rye Onshore and Rye Offshore under Section 502(h) of the Bankruptcy Code in the aggregate amount of $800,000,000 (80% of the $1 billion in cash paid to

---

[6] For a complete discussion of the relevant history of the Actions, we respectfully refer the Court to Class Counsel's FDA Approval Memorandum (ECF No. 1089).

[7] Comprised of (a) $1,647,687,625.00 for Rye Onshore, (b) $498,490,000.88 for Rye Offshore and (c) $40,000,000.00 for Rye Insurance.

EC.58979.1

fund the Trustee Settlement).[8]  Each of the Funds that contributed money to the Trustee

Settlement received full releases in exchange for those payments, regardless of whether they had

a recognized claim in the Madoff Bankruptcy.

In response to the Trustee's motion seeking approval of the Bankruptcy settlement, a

group of investors in the XL Fund and the Prime Fund filed an objection arguing, among other

things, that the Trustee Settlement's proposed allocation of the $800 million credit to Rye

Onshore and Rye Offshore was inequitable.  Objections of Limited Partners of Rye Funds to the

Trustee's Motion, *Picard v. Tremont Grp. Holdings., Inc.*, Adv. Pro. No. 10-05310 (Bankr.

S.D.N.Y. Sept.6 & 22, 2011) (ECF No. 24 at 18-20; ECF No. 36 at 9-13).  The Bankruptcy

Court overruled those objections, finding that the objectors did not have standing to contest the

Trustee Settlement because they *were not customers of BLMIS*, and concluding that the

allocation of the $800 million to Rye Onshore and Rye Offshore was appropriate.  *See Picard*

slip op. 2, 3-4 (ECF No. 38-1).  Moreover, the Bankruptcy Court confirmed that the Prime

Fund's Customer Claim was properly rejected because that Fund was a net winner.  *Id.* at 5.

The objectors appealed the Bankruptcy Court's decision to the District Court, which

confirmed that the appellants lacked standing to challenge the settlement and dismissed the

appeal on that basis.  *In re Bernard L. Madoff Inv. Sec. LLC* ("*Madoff I*"), No. 11 CV 7330

(GBD), 2012 WL 2497270, at *1 (S.D.N.Y. June 27, 2012).

---

[8] To fund the required payment under the Trustee Settlement, Fortress Group LLC and related
entities loaned Rye Onshore and Rye Offshore approximately $650 million.  The remainder of
the payment consisted of $8 million paid by Rye Onshore, $200 million paid by Rye Offshore,
$35 million paid by the Prime Fund and approximately $94 million contributed collectively by
various Tremont Funds ($12 million of which was paid by two Tremont Funds that were net
winners and, thus, by definition under the Settlement, are not eligible to participate in the FDA).
In addition, the XL Fund contributed $32,409,239 directly to the FDA.

6

Following approval of the Settlement of the Actions, Class Counsel worked with prior objectors and various parties ("Interested Parties") who invested in one or more of the Rye and Tremont Funds, and expressed a desire to participate post-Fairness Hearing to develop plans of allocation for both the NSF and FDA, consistent with the Settlement and the decisions in the bankruptcy proceeding.  At all times during this process, Class Counsel and Fund Distribution Claimants were required to abide by the determinations of the Bankruptcy Court and the District Court, as well as the structure of the Trustee Settlement and the Settlement of the Actions.

Without commenting in any way on the content of any submissions or negotiations during the Mediation, Class Counsel simply notes that procedurally, the Interested Parties were provided with extensive materials relating to allocation and given an opportunity to submit proposed plans (or related commentary) in advance of the two-day Mediation in late July 2014. ECF No. 989 at ¶11.  Following all of the Mediation sessions and related discussions, Class Counsel drafted the proposed FDA POA which, we submit, fairly and reasonably allocates the FDA among all Fund Distribution Claimants.  Indeed, Class Counsel ultimately obtained broad-based support for the proposed FDA POA of the Rye and Tremont Fund investors representing the vast majority of the aggregate net ownership interests in those Funds.  ECF No. 1090 at ¶9. Accordingly, on July 10, 2015, Class Counsel filed their motion for approval of the proposed FDA POA and related distribution procedures.[9]  ECF No. 1088.

The Court's order approving the Settlement, dated August 19, 2011 (ECF No. 604), directed "Class Counsel" to move for approval of the plans of allocation in connection with the

---

[9] We respectfully refer the Court to our memorandum in support of Class Counsel's FDA Approval Memorandum (ECF No. 1089) for a full discussion of our proposed FDA POA.

7

NSF and FDA.[10]  While not specifically prohibiting FutureSelect's current application, there is

certainly nothing in the Court's Order approving the Settlement authorizing an application of this

kind.

## ARGUMENT

I.   **FUTURESELECT'S PROPOSAL DISREGARDS FUND STRUCTURE AND WRONGFULLY REALLOCATES FUND ASSETS**

### A.   FutureSelect's Proposal Wrongfully Reallocates the Assets Contributed to the FDA by the Rye Onshore, Rye Offshore and Rye Insurance Funds

FutureSelect claims its proposal treats all investors the same when, in fact, it does no

such thing.  Under the guise of "fairness," FutureSelect simply takes the assets contributed by

Rye Onshore, Rye Offshore and Rye Insurance and gives them to investors who contributed little

or nothing to the FDA.  "Robbing from Peter to pay Paul" must seem attractive to "Paul" (the

role FutureSelect plays here), but it substantially harms "Peter" (Rye Onshore, Rye Offshore and

Rye Insurance investors).

Moreover, robbing Peter to pay Paul also requires one to completely disregard Fund

structure and ignore the Funds' varying Madoff exposures.  There is simply nothing in the

language of the Settlement or the Trustee Settlement that supports FutureSelect's redirection of

assets or disregard of Fund structure.  To the contrary, the Stipulation governing the Settlement

of the Actions implicitly recognizes the Funds' separate structures, specifically requiring the

preservation of Cross Investments and stating the FDA will distribute "all amounts in the Rye

---

[10] At the hearing on August 8, 2011, Class Counsel agreed with the Court to postpone until a later date consideration and resolution of all issues regarding the plans of allocation, and to work to create as broad a consensus as possible with respect to the NSF and FDA plans of allocation. Hr'g Tr. 66-67, Aug. 8, 2011, ECF No. 599.  Shortly thereafter, the Court entered its order approving the Settlement, which specifically directed Class Counsel to move for approval of the operative plans of allocation at the appropriate time.  ECF No. 604 at ¶29 ("A separate order shall be entered to approve *the application by Plaintiffs' State and Securities Law Settlement Class Counsel . . .* for approval of the Plans of Allocation") (emphasis added).

8

Funds" and "all amounts the Tremont Funds would otherwise be entitled to from the [FDA] as a result of the Tremont Funds' investments in the Rye Funds."  Stipulation at ¶¶ 1.19, 1.50.

Pursuant to the terms of the Trustee Settlement, Rye Onshore, Rye Offshore and Rye Insurance were allowed Customer Claims amounting to $2,986,177,715.88.  According to the Bankruptcy Court, this amount was "to be fairly and equitably allocated among [those Funds] and their respective partners and/or investors."  Trustee Settlement Agreement, *Picard v. Tremont Grp. Holdings, Inc.*, Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y. July 28, 2011) (ECF No. 17-1, at 14, 16).  This provision was based upon the fact that the three Rye Funds were direct customers of BLMIS (unlike the Tremont Funds or the XL Fund) and because they were net losers (unlike the Prime Fund).  *Picard*, slip op. at 3, 5 (ECF No. 38-1).  *See also In re Bernard L. Madoff Inv. Sec. LLC* ("*Madoff II*"), 708 F.3d 422, 426-27 (2d Cir. 2013) (holding that investors in customers of BLMIS, such as the Rye and Tremont Funds, are not customers of BLMIS, and as such, do not have SIPC Claims).

"Fairness" does not, as FutureSelect argues, require that the Court ignore the structure of the FDA, Fund structure or the Trustee Settlement and prior rulings in the Second Circuit.  In fact, it would be grossly unfair to disregard the terms of the Settlement and Trustee Settlement by taking the assets contributed to the FDA by the three Rye Funds, and dividing them equally among investors in all of the Funds, as opposed to crediting them to the investors in the Funds that contributed them to the FDA.  *See United States v. Ovid*, No. 09-CR-216 (JG) (ALC), 2012 WL 2087084, at *8 (E.D.N.Y. June 8, 2012) (reasoning that different levels of recovery between funds is not inequitable because "however fair it may seem to attempt to equalize the victims' losses, it is 'inconsistent with fundamental rules of property' for a court to impose 'a liability for

9

contribution between victims of a common fraud . . . so that victims who by good fortune have not lost their assets are compelled . . . to make up the losses of those who have.'").

Moreover, the decision in the Madoff Bankruptcy proceeding cited by FutureSelect does not support its proposal. Specifically, the Second Circuit's decision in *In re Bernard Madoff Investment Securities, LLC* ("*Madoff III*"), 654 F.3d 229 (2d Cir. 2011), mainly addresses why the "net investment" method (which Class Counsel's Consensus FDA POA applies) for determining customer claims is appropriate instead of the "last statement" method. This decision actually supports the rejection of FutureSelect's proposal because it addresses how to calculate the losses of *customers* of BLMIS. Here, only Rye Offshore, Rye Onshore, Rye Insurance and the Prime Fund were *customers* of BLMIS. Under this rationale, the XL Fund and Tremont Funds would have no claim to the assets in the FDA from the Trustee because they are not customers of BLMIS, while the Prime Fund, a *net winner*, would also have no claim. *See also Madoff II,* 708 F.3d at 426-27.[11]

The Rye and Tremont Funds consisted of a number of legally separate investment entities with differing investment strategies, some related to Madoff and others wholly independent of Madoff. In general terms, the Tremont Funds were funds-of-funds invested to various degrees in the several Rye Funds, which, in turn, were either invested in Madoff or synthetic investments,

---

[11] Equally unavailing are the other cases relied upon by FutureSelect in this regard. ECF No. 1083 at 7. In *SEC v. Byers*, 637 F. Supp. 2d 166 (S.D.N.Y. 2009), the defendants operated a Ponzi scheme through several entities offering investments comprised of real estate funds, commodity funds and other securities. *Byers*, 637 F. Supp. 2d at 169-71. The court appointed a receiver to wind down the entities and distribute the funds that remained to investors, and the receiver proposed a distribution plan that paid investors a *pro rata* share of their net investments. *Id.* at 168. Judge Chin approved the distribution, relying on *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80 (2d Cir. 2002). However, the court stated that two factors must be satisfied for this type of *pro rata* distribution to be approved: (1) "investors' funds must have been commingled;" and (2) "the victims must be similarly situated with respect to their relationship to the defrauders." *Byers*, 637 F. Supp. 2d at 177 (citations omitted). Neither factor is satisfied here.

including swap transactions designed to mimic investments made by certain Rye Funds directly invested in Madoff.  All contributions and withdrawals in the Rye and Tremont Funds were separately tracked and reported by Tremont.  There is no evidence that Defendants ever comingled investors' assets in one Fund with the investor assets of another Fund.  Since there was no commingling of assets and, for the purposes of approving a plan of allocation, the Funds are not similarly situated, FutureSelect's proposal should be rejected.  *See Ovid*, 2012 WL 2087084, at *8 ("The defendants established two separate hedge funds.  They marketed them separately to different groups of investors at different times.  The two hedge funds were legally separate entities and there was no commingling of their assets.  Their respective assets were invested differently and suffered different losses at different times.  Because of these and other distinctions, QBE and the other victims are not similarly situated and should not share in a *pro rata* distribution of the combined assets of the Logos and Donum Funds."); *see also SEC v. Huber*, 702 F.3d 903, 904 (7th Cir. 2012) (rejecting *pro rata* distribution in a Ponzi scheme and permitting some investors to recover less than others).[12]

It is also important to keep in mind that the FDA structure approved here is a "pour over" account in which the assets of the Rye Funds are poured into the FDA for distribution.  The FDA effects the liquidation of the Rye Fund assets.  The FDA does not substantively consolidate the assets contributed to the FDA into one homogeneous pool that one may simply redistribute without regard to who contributed the assets, as FutureSelect's proposal seeks to do here.  That

---

[12] The facts in *CFTC v. Walsh*, 712 F.3d at 735 (2d Cir. 2013) are similar to those in *Byers* in that the court approved a distribution plan that paid investors a *pro rata* share of their net investments because the defendants operated a Ponzi scheme through two investment entities which (i) unbeknownst to investors "operated as a single entity," (ii) could not have survived without the other, (iii) commingled funds as if the two entities were interchangeable and "were similarly situated with respect to their relationship with [the fraudsters]." *Walsh*, 712 F.3d at 741, 744, 745.

type of substantive consolidation of assets is a rarely invoked equitable remedy exclusive to

bankruptcy cases arising out of the bankruptcy courts' general powers of equity and common

law.  *See* 11 U.S.C. § 105; *see, e.g., Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215,

219 (1941); *FDIC v. Colonial Realty Co.,* 966 F.2d 57, 59 (2d Cir. 1992).

     While the FDA structure certainly contemplates allocation on an equitable basis (for

which the Consensus FDA POA provides), it does not and could not provide for the type of

substantive consolidation that FutureSelect proposes, where all assets are combined and

redistributed without regard to which Fund contributed the assets.  Such an extreme and rarely

invoked remedy requires a detailed factual showing not present here.  This remedy generally

exists only in bankruptcy, is not contemplated by the FDA structure and would, as a result, be

exceed the general equitable powers of the Court in the present circumstances.  *See, e.g., Union*

*Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 518

(2d Cir. 1988) (indicating care should be taken in applying substantive consolidation); *In re*

*Owens Corning*, 419 F.3d 195, 210-211 (3rd Cir. 2005) ("because substantive consolidation is

extreme . . . and imprecise, this 'rough justice' remedy should be rare and, in any event, one of

last resort"); *In re Bonham*, 229 F.3d 750, 767 (9th Cir. 2000) (consolidation should be used

"sparingly").

### B.  FutureSelect Disregards the Varying Madoff Exposure of Each Fund in Determining Fund Distribution Claimants' Net Investments

     FutureSelect's proposal also disregards the fact that the Rye and Tremont Funds had

different exposures to Madoff.  For example, the exposure of the various Tremont Funds to

Madoff-related investments ranged from as much as 28 percent to as little as 0 percent,

depending on their level of Cross Investments in the Rye Funds.  At the same time, some of the

Rye Funds were 100% invested in Madoff, while others, like the XL Fund, had no direct

12

investment in Madoff.  Nevertheless, FutureSelect disregards the obvious differences created by Fund structure and FDA contributions in arguing that one should look solely to each Fund Distribution Claimant's net investment in determining its allocable share of the FDA.

For Rye Fund Claimants, FutureSelect's disregard for Fund structure and FDA asset contribution results, as noted above, in "robbing Peter to pay Paul" by taking money contributed to the FDA by Rye Onshore, Rye Offshore and Rye Insurance, and giving it to investors in other Rye Funds with no asset contributions to the FDA.  For Tremont Fund Claimants, FutureSelect's proposal provides a credit for 100% of their net total net investment, regardless of whether the Tremont Fund they invested in had 1% of its assets invested in a Rye Fund or whether it had 28% of its assets invested in a Rye Fund -- a spectacular windfall for Tremont Fund investors, at the expense of the Rye Fund investors that contributed the bulk of the assets to the FDA.[13]  This result, alone, requires that the FutureSelect proposal be rejected.

### C.  FutureSelect Wrongfully Limits the Definition of Fund Distribution Claimant

FutureSelect also seeks to prevent a large group of investors who would otherwise be entitled to share in the FDA from receiving any distribution.  FutureSelect does so through its

---

[13] Indeed, one of the Tremont Funds has a total Madoff exposure of approximately $200,000, while its investors have net investments ranging between approximately $1 million to over $80 million.  Under the FutureSelect proposal, the disbursements for these investors would vastly exceed their Madoff-related losses -- the only compensable losses under the Settlement.  The Consensus FDA POA avoids this inequity by relying on the Tremont Funds' Cross Investments to calculate their recovery under the FDA.

13

proposed definition of "Fund Distribution Claimant." ECF No. 1083-1 at 3.[14] FutureSelect limits the definition of Fund Distribution Claimants to: (i) those "entitled under this FDA POA to share in the disbursement of the FDA" (ECF No. 1083-1 at 3), instead of those who are "*entitled under the Stipulation and* this FDA POA to share in the disbursement of the Fund Distribution Account" (ECF No. 1089-1 at 4 (emphasis added)); and (ii) only those "who were limited partners or shareholders as of December 11, 2008," thereby excluding assignees and successors-in-interest of such investors' claims. Comparing the FutureSelect proposal's definition of Fund Distribution Claimant to the definition in the Consensus FDA POA[15] (ECF No. 1089-1 at 4), it is clear the FutureSelect proposal was designed to exclude all investors who acquired interests in the Funds after December 11, 2008 for the purpose of increasing FutureSelect's own recovery under the FDA.

---

[14] The FutureSelect proposal defines "Fund Distribution Claimant" as "any limited partner or shareholder invested in Eligible Securities of any Eligible Hedge Fund as of December 11, 2008 who is entitled under this FDA POA to share in the disbursement of the FDA. Only those Fund Distribution Claimants who suffered a net loss on their investments in Eligible Securities are entitled to a payment from the Fund Distribution Account. Only those Fund Distribution Claimants who were limited partners or shareholders as of December 11, 2008 may be entitled to a Disbursement from the Fund Distribution Account." ECF No. 1083-1 at 3.

[15] "Fund Distribution Claimant" in the Consensus FDA POA is defined as "any limited partner or shareholder invested in Eligible Securities of any Eligible Hedge Fund as of December 11, 2008 *or its successors pursuant to any merger or other business combination or by valid assignment (including secondary market purchasers of such claims), who is entitled under the Stipulation and this FDA POA* to share in the disbursement of the Fund Distribution Account. Only those Fund Distribution Claimants who suffered a net loss on their investments in Eligible Securities (determined separately for each Eligible Hedge Fund in which the Fund Distribution Claimant invested), are entitled to a payment from the Fund Distribution Account. Only those Fund Distribution Claimants who were limited partners or shareholders as of December 11, 2008, *or their successors pursuant to any merger or other business combination or by valid assignment (including secondary market purchasers of such claims)*, may be entitled to a Disbursement from the Fund Distribution Account. For the avoidance of doubt, any person who purchased an interest in an Eligible Hedge Fund after December 11, 2008, shall receive distributions on account of such interest based on the net equity investment of the person who held such interest as of December 11, 2008. Nothing herein is intended to affect the Loan Agreements or the Claim Participation Agreement." ECF No. 1089-1 at 4 (emphasis added).

14

Moreover, FutureSelect's definition of Fund Distribution Claimant has other inequitable consequences.  By not incorporating the definition of Fund Distribution Claimant in the Stipulation, FutureSelect would permit investors in the Liquidating Funds (Insurance Portfolio LDC, Rye Select Broad Market XL Portfolio Limited and Broad Market XL Holdings) to recover from the FDA.  *See* Stipulation at ¶¶1.18, 1.29.  The Liquidating Funds are expressly excluded from the definition of Fund Distribution Claimant in the Stipulation because their investors already received, or will receive, a recovery from the liquidation of those Funds in the Cayman Islands.

## II.   FUTURESELECT'S REMAINING ARGUMENTS IN SUPPORT OF ITS PROPOSAL SHOULD BE REJECTED

### A.   FutureSelect Fails to Recognize that the Consensus FDA POA Allocates Substantial Assets to the XL and Prime Funds

FutureSelect fails to recognize that the Consensus FDA POA allocates substantial assets to the XL and Prime Funds, neither of which would otherwise be entitled to recovery under the terms of the Trustee Settlement.  The Consensus FDA POA clearly states that both the XL and Prime Fund investors receive disbursements from the FDA.  The Consensus FDA POA allocates assets to investors in the Prime Fund through the Fund's Virtual SIPC Claim, which equals 80% of the Prime Fund's approximately $35 million contribution to the Trustee Settlement, and the Prime Fund's Cross Investments in other Rye Funds.  Investors in the XL Fund also receive assets from the FDA though the XL Funds' Cross Investments and from the XL Priority Allocation, which is the priority distribution to XL Fund Distribution Claimants of the first $32,409,239 from the FDA.

FutureSelect argues that its proposed plan of allocation is consistent with the Settlement because, under its proposal, none of the Funds is excluded from recovery under the FDA.  ECF No. 1083 at 5.  However, the same is true for the Consensus FDA POA.  The Consensus FDA

POA does not limit recovery to "net loser funds only" as FutureSelect suggests, because all Eligible Funds recover to the extent they have Cross Investments (*e.g.*, the Prime Fund), recognized SIPC Claims, Virtual SIPC Claims (*e.g.*, the Prime Fund) or more than *de minimis* direct contributions to the FDA (the XL Fund).

FutureSelect also argues that its proposal is consistent with the "statements Class Counsel made in seeking approval of the Settlement" (ECF No. 1083 at 6) such as "every limited partner . . . will receive their share" of the FDA if the investor is a "net loser." These statements made by Class Counsel were true then and now. Nothing in the Consensus FDA POA contradicts these statements. Indeed, FutureSelect does not explain how the phrase "their share" could mean anything but "a portion" of the FDA or that somehow that "portion" would not reflect the contributions, if any, made by the Fund in which they invested to the FDA.

### B.  FutureSelect Improperly Compares the NSF to the FDA

FutureSelect also erroneously argues that the Court's approval of the NSF POA (ECF No. 994) requires the Court to approve a similar plan of allocation (*i.e.*, FutureSelect's proposal) for the FDA. ECF No. 1083 at 8. This argument is invalid and should be rejected. The NSF was a class action settlement fund containing money that Defendants provided to the Class to compensate for alleged wrongdoings. The FDA is a pour over account designed to return to Fund Distribution Claimants the assets remaining in each of the respective Funds. Thus, the analogy between the NSF and the FDA simply does not work.

In any event, FutureSelect mischaracterizes the NSF POA by suggesting that the NSF POA "did not distinguish among [C]lass members based on the [F]und in which they invested." *Id.* at 8-9. In fact, the NSF POA *did* distinguish among investors based upon the Fund in which they invested, such that, investors in the Tremont Funds received a payment from the NSF on the

portion of their net investment corresponding to the Madoff-exposure of the Tremont Fund(s) in which they invested.  ECF 1005 at 9.

Moreover, the Funds' contributions to the Trustee Settlement also affected Class Members' recovery from the NSF.  Class Members who invested in the Rye and Tremont Funds that contributed to the Trustee Settlement, but did not receive a bankruptcy claim, were entitled under the NSF to a "Step Up" in their payment from the NSF.  *Id.* at 5.  Thus, the NSF did, in fact, distinguish among Funds when apportioning payments to Class Members.

### C.  *In re Literary Works* Does Not Apply to the FDA POA

Finally, as discussed further in Class Counsel's memorandum in opposition to FutureSelect's motion for FDA subclasses (ECF No. 1097), *In re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242 (2d Cir. 2011), has no application to this case.  *In re Literary Works* says *nothing* about whether a Court should approve a *particular* plan of allocation.  Rather, it addresses the adequacy of representation under Federal Rule of Civil Procedure 23 within the context of a class action settlement, a context distinct from the situation here.  *Literary Works*, 654 F.3d at 254.  To claim that *Literary Works* "flatly prohibit[s]" the Consensus FDA POA is disingenuous and is an inappropriate reading of that case.  ECF No. 1083 at 10.

### CONCLUSION

For the foregoing reasons, the Court should reject FutureSelect's proposal and deny its Motion in its entirety.

17

Dated: July 23, 2015
        New York, New York

**ENTWISTLE & CAPPUCCI LLP**

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle
Arthur V. Nealon
Robert N. Cappucci
280 Park Avenue, 26th Floor West
New York, NY  10017
(212) 894-7200
(212) 894-7272 (fax)
aentwistle@entwistle-law.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Reed R. Kathrein*
Reed R. Kathrein
Lee Gordon
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
(510) 725-3000
(510) 725-3001 (fax)
reed@hbsslaw.com

*Co-Lead Counsel for the State Law Actions*

**BERNSTEIN LIEBHARD LLP**

*/s/ Jeffrey M. Haber*
Jeffrey M. Haber
Stephanie M. Beige
10 East 40th Street
New York, NY  10016
(212) 779-1414
(212) 779-3218 (fax)
haber@bernlieb.com

*Lead Counsel for the Securities Actions*

18