UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x
                                                  :
IN RE TREMONT SECURITIES LAW, STATE   :   Master File No.
LAW AND INSURANCE LITIGATION              :   1:08-cv-11117 (TPG)
                                                  :
This Document Relates To                     :   ECF Case
All Actions                                         :
                                                  :   ORAL ARGUMENT
———————————————————————— x   REQUESTED


# INSURERS' MEMORANDUM OF LAW
# IN PARTIAL OBJECTION TO THE FDA ADMINISTRATORS' MOTION
# FOR ATTORNEY'S FEES AND REIMBURSEMENT OF EXPENSES


**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178
Tel: 212.309.6000

*Attorneys for Insurers*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii
PRELIMINARY STATEMENT ..............................................................................................1
STATEMENT OF FACTS .......................................................................................................4
      A.      The FDA and NSF ................................................................................................4
      B.      The FDA Administrators' Role ............................................................................5
      C.      The Requested FDA Percentage Fee ...................................................................6
ARGUMENT ............................................................................................................................7
CONCLUSION .......................................................................................................................12

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*,
   2002 WL 1315603 (S.D.N.Y. June 17, 2002) ................................................................8

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d. 47 (2d Cir. 2000) .................................................................................*passim*

*In re Bausch & Lomb, Inc. Sec. Litig.*,
   183 F.R.D. 78 (W.D.N.Y. 1998) ....................................................................................9

*In re Bristol-Myers Squibb Sec. Litig.*,
   361 F. Supp. 2d 229 (S.D.N.Y. 2005) ...........................................................................8

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
   2001 U.S. Dist. LEXIS 8418 (S.D.N.Y. June 22, 2003) ...............................................9

*In re Elan Sec. Litig.*,
   385 F. Supp. 2d 363 (S.D.N.Y. 2005) .........................................................................11

*In re Indep. Energy Holdings PLC*,
   2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) ............................................................8

*In re IndyMac Mortgage-Backed Sec. Litig.*,
   2015 WL 1315147 (S.D.N.Y. Mar. 24, 2015) .............................................................11

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) ..............................................................8-11

*In re Visa Check/Mastermoney Antitrust Litig.*,
   297 F. Supp. 2d 503 (E.D.N.Y. 2003) *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) .........................................................................8

*Karpus v. Borelli*,
   2004 U.S. Dist. LEXIS 21429 (S.D.N.Y. Oct. 26, 2004) .............................................8

*Rogers v. Sterling Foster & Co. (In Re Sterling Foster & Co.)*,
   238 F. Supp. 2d 480 (S.D.N.Y. 2002) ...........................................................................9

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ............................................................................................8

New York Life Insurance and Annuity Corporation, Metropolitan Life Insurance Company, New England Life Insurance Company, General American Life Insurance Company, John Hancock Life Insurance Company (U.S.A.), Pacific Life Insurance Company, Security Life of Denver, AIG Life Insurance Company, Delaware Life Insurance Company (f/k/a Sun Life (SLF) Assurance Company of Canada (U.S.)), Pruco Life Insurance Company, Nationwide Life Insurance Company (collectively, the "Insurers") respectfully submit this memorandum of law in partial objection to the attorneys' fees and reimbursement of expenses sought by Plaintiffs' Settlement Counsel Entwistle & Cappucci LLP, Hagens Berman Sobol Shapiro LLP, and Bernstein Liebhard LLP (collectively, "FDA Administrators") in their Motion for Approval of Fund Distribution Account Plan of Allocation, Distribution Procedures, Attorneys' Fees and Reimbursement of Expenses, dated July 10, 2015 ("Motion" or "Mot."). *See* No. 1:08-cv-11117, ECF Nos. 1088-89.

## PRELIMINARY STATEMENT

The Insurers oppose the request by the FDA Administrators that they be awarded a fee of three percent of the Fund Distribution Account (the "FDA"), which may exceed $40 million. The FDA Administrators are entitled to be compensated for their work in connection with the FDA Plan of Allocation ("POA"). However, the FDA Administrators can be fully and fairly compensated by awarding them their reasonable attorneys' fees for time spent on the FDA and the POA without awarding them a percentage of assets collected by others. To the extent that the FDA Administrators' requested compensation is reduced, the ultimate beneficiaries will not be the Insurers, but rather the Insurer's policyholders who have been the real victims of Madoff's fraud and to whom the Insurers will distribute the savings.

The FDA is predominantly comprised of money collected by the Bernard L. Madoff Investment Securities LLC ("BLMIS") Trustee Irving Picard (the "Trustee") for the benefit of Madoff's victims.  The FDA Administrators played no role in the collection of the money by the Trustee.  Instead, the FDA Administrators' role principally has been to administer the distribution of those funds to the Tremont investors that were the victims of Madoff.  Awarding the FDA Administrators three percent of the money in the FDA would give them a windfall profit that is totally unconnected to their efforts to administer the FDA.

The FDA is separate from the Net Settlement Fund ("NSF"), which was the result of the class action litigation before this Court in which the FDA Administrators acted as class counsel. In the class action, class counsel filed a complaint on behalf of investors in various Madoff "feeder funds" established and run by Tremont Group Holdings, Inc. and Tremont Partners, Inc. (collectively, "Tremont").  Class counsel prosecuted that action for nearly two years and obtained a settlement for the benefit of class members, which included the Insurers.[1]  As is typically the case in class actions, class counsel sought, and were granted, an award of approximately $30 million, representing a percentage of the total settlement.  The Insurers did not oppose that fee request.

In contrast to the class action, the FDA Administrators did not engage in any litigation or class action representation with respect to the FDA.  Instead, the FDA Administrators worked with the various Tremont investors to develop the POA submitted to the Court and will hereafter assist in the allocation and distribution of the money recovered by the BLMIS Trustee.  Unlike in the class action, where class counsel faced a risk that it would not collect any money for its efforts if the case was dismissed, the FDA Administrators bore no such risk with respect to the

---

[1] All funds collected through the class action litigation and the FDA are not for the benefit of the Insurers themselves but instead will be distributed to their policyholders who invested in Tremont funds.

2

FDA.  The FDA is the result of the efforts of the BLMIS Trustee.  Indeed, even at the time the FDA Administrators first assumed their functions with respect to the FDA, it was clear there would be hundreds of millions of dollars in the FDA, so that the FDA Administrators have never been exposed to any risk of insufficient funds to provide them with appropriate compensation.

Despite the lack of risk, the FDA Administrators do not seek their reasonable fees (as determined by their hourly rates multiplied by time spent), but instead seek a percentage of the amount of the Trustee's recoveries flowing into the FDA, which continues to increase based solely on the Trustee's ongoing collection efforts.  Indeed, based on current estimates of the Trustee's ultimate collections and distributions, the three percent fee requested by the FDA Administrators would likely result in the FDA Administrators receiving more money for their limited role in connection with the FDA (perhaps more than $40 million) than they collected in their role as class counsel.  There is no justification for awarding the FDA Administrators such a windfall and thereby diverting money collected by the Trustee away from the real victims of Madoff's fraud, including the Insurers' policyholders.

Accordingly, this Court should reject the FDA Percentage Fee requested in the FDA Administrators' Motion.  Given the absence of risk or any uncertainty with respect to payout from the FDA, under *Goldberger v. Integrated Res., Inc.*, 209 F.3d. 47 (2d Cir. 2000) and its progeny, no justification exists for compensating the FDA Administrators above and beyond the reasonable legal fees they incurred with respect to the FDA, calculated by their hourly rate, which they have reported to be $15,988,621.75 (the "Hourly Legal Fees").  *See* ECF No. 1090 ¶¶ 36, 47.

**STATEMENT OF FACTS**

By their Motion, the FDA Administrators request a percentage of the FDA as fees in connection with their administration and distribution of the FDA. This application is different from the FDA Administrators' earlier application for legal fees in connection with their role as class counsel and legal work they performed in connection with the NSF, for which they have already been awarded approximately $30 million.

A.     The FDA and NSF

The FDA predominantly consists of payouts received from a settlement that Tremont, represented by Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), reached with the BLMIS Trustee (the "Trustee Settlement"), which permitted Tremont to submit a nearly $3 billion claim against the BLMIS estate in the bankruptcy action. *See* No. 10-05310-brl, ECF No. 37 (S.D.N.Y. Bnkr. Sep't 22, 2011), *see also id.* ECF No. 17, Exh A (Settlement Agreement, dated as of July 25, 2011) (the "Trustee Settlement Agreement").

According to the FDA Administrators, "[t]he FDA consists of all assets remaining in the Rye Funds after settlement of the claims of the Madoff Trustee, approved by the Bankruptcy Court in 2011 and subsequently affirmed by the District Court." The FDA is "a 'pour over' account effecting a quasi-liquidation of the Rye Funds" that contains "all assets remaining in any of the Funds – including the claims in the Madoff bankruptcy preserved by the Trustee Settlement…" Mot. at 3. The FDA Administrators further recount the history of the underlying bankruptcy proceedings that led to the Trustee Settlement, and explain that it "was the culmination of proceedings that began on December 11, 2008, when the Securities and Exchange Commission filed a complaint in this District against Madoff and related defendants[ . . . ] alleg[ing] that Madoff *et al.* engaged in fraud through the investment advisor activities of BLMIS." Mot. at 10-11.

4

By contrast, the NSF arose out of the settlement of the class action brought by class counsel on behalf of investors in BLMIS feeder funds established and run by Tremont against Tremont (the "Class Action Settlement").  *See* No. 1:08-cv-11117, ECF Nos. 419 and 604.  The Insurers, who were members of the class, did not oppose legal fees sought by the FDA Administrators for their representation undertaken as class counsel to achieve the Class Action Settlement.

While the Class Action Settlement led to the money in the NSF, the money in the FDA resulted almost entirely from negotiations between the BLMIS Trustee and Tremont's counsel, Skadden, and the BLMIS Trustee's efforts to collect money for the BLMIS estate. The money recovered by the BLMIS Trustee that flows into the FDA is a recovery for claims of Madoff's victims, which resulted (and will continue to result) from work undertaken by the BLMIS Trustee, not the FDA Administrators.

### B. The FDA Administrators' Role

The Trustee Settlement entered between Tremont and the BLMIS Trustee sought to ensure the maximum recovery for Madoff's victims invested in Tremont.  Accordingly, paragraph 7 of the Trustee Settlement Agreement governing the FDA states that Tremont "shall not be entitled to any fees, profits, or expenses for their management or administration of any funds received, either directly or indirectly, or on behalf of Broad Market, Portfolio Limited, Rye Insurance or Insurance Portfolio LDC from the BLMIS estate." *See* No. 10-05310-brl, ECF No. 17, Exh A (emphasis added).

As part of the Class Action Settlement with Tremont, the FDA Administrators agreed to assume Tremont's responsibilities in managing, administering, and distributing FDA funds received from the BLMIS Trustee to members of the class who were entitled to them as investors

in Tremont, *see* ECF No. 392-1, and presented a proposed FDA POA accordingly, *see* ECF No. 1088.

The FDA Administrators' role with respect to the FDA was totally separate and independent from their role as class counsel in the class action litigation, and involved administrative functions and related legal work, separate from the Trustee's efforts to collect money for Madoff's victims.  Moreover, when the FDA Administrators assumed Tremont's responsibility of administering the FDA, there already was a certainty that the FDA would receive hundreds of millions of dollars of payment from the BLMIS estate.  At that juncture, unlike in a class action lawsuit, an enormous recovery from the BLMIS Trustee was already assured; only the ultimate amount of recovery remained an open question.

C.  **The Requested FDA Percentage Fee**

The FDA Administrators now seek to collect attorneys fees equal to "3% of the FDA" (the "FDA Percentage Fee") plus reimbursement of $975,322.56 in total "out-of-pocket charges, costs and expenses that were reasonably and necessarily paid and incurred in respect of the post-May 6, 2011 litigation and related activities." *See* Joint Declaration, ECF Doc. No. 1090, dated July 10, 2015 ("July Decl.") ¶ 32.

The reasonable legal fees that the FDA Administrators actually incurred for administering and distributing the FDA are represented to be "a lodestar of $15,988,621.75 for their post-May 6, 2011 work in connection with these and related proceedings," representing approximately "23,871.75 hours of work over the past four years."  *Id.* ¶ 33.

Based upon the "$623 million current FDA Net Recovery," the FDA Administrators claim this FDA Percentage Fee "would constitute a multiplier of only approximately 1.17" because it would seem to amount to approximately $18,690,000 (3% of "$623 million current FDA Net Recovery").  *Id.*

6

However, the BLMIS Trustee is ultimately expected to distribute additional funds (approaching 80 cents per dollar of claims), which will raise the "FDA Net Recovery" to more than twice $623 million and concomitantly increase the FDA Administrators' FDA Percentage Fee from $18,690,000 to more than $40,000,000. This would award the FDA Administrators a multiplier of more than 2.0.

## ARGUMENT

The FDA Administrators' requested FDA Percentage Fee is improper because the FDA Administrators faced no risk in administering the FDA, nor did they act as class action counsel with respect to the FDA, so as to entitle them to recover a multiplier of their reasonable Hourly Legal Fees incurred. This Court should not award the FDA Percentage Fee requested by the FDA Administrators because they faced no risk or uncertainty of recovery in distributing the FDA and the Trustee Settlement Agreement prohibited "profits" from administering the FDA. To do so would improperly penalize victims of the Madoff fraud by charging them a premium on the recovery collected on their behalf by the Trustee for the windfall benefit of FDA Administrators.

As the FDA Administrators acknowledge, "the '*Goldberger* factors' ultimately determine the reasonableness of" an attorney fee consisting of a fund percentage, including:

>   (1) the time and labor expended by counsel;
>   (2) the magnitude and complexities of the litigation;
>   (3) the risk of the litigation ...;
>   (4) the quality of representation;
>   (5) the requested fee in relation to the settlement; and
>   (6) public policy considerations.

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121-22 (2d Cir. 2005) (citing *Goldberger,* 209 F.3d at 50 (citation omitted); *Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*,

7

2002 WL 1315603, at *1 (S.D.N.Y. June 17, 2002) ("[D]istrict courts should continue to be guided by the [*Goldberger* factors].")). "Recognizing that economies of scale could cause windfalls in common fund cases, courts have traditionally awarded fees for common fund cases in the lower range of what is reasonable." *Id.* (citing *Goldberger,* 209 F.3d at 52; *In re Indep. Energy Holdings PLC,* 2003 WL 22244676, at *6 (S.D.N.Y. Sept. 29, 2003) ("[T]he percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement. Otherwise, those law firms who obtain huge settlements, whether by happenstance or skill, will be over-compensated to the detriment of the class members they represent.")).

"Courts of this Circuit have recognized the risk of litigation to be 'perhaps the foremost factor to be considered in determining' the award of appropriate attorneys' fees." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 2007 WL 313474, at *16 (S.D.N.Y. Feb. 1, 2007) (citations omitted). Moreover, "[c]ourts of this Circuit recognize that, where 'claims were precipitated by public events,' the risk undertaken by Counsel is especially slight." *Id.* (citing *In re Bristol-Myers Squibb Sec. Litig.,* 361 F. Supp. 2d 229, 234 (S.D.N.Y. 2005); *Goldberger,* 209 F.3d at 54 (finding contingency risk to be low where case arose from notorious fraud prosecution); *Karpus v. Borelli,* 2004 U.S. Dist. LEXIS 21429, at *35 (S.D.N.Y. Oct. 26, 2004) ("This was not a case in which there was a government investigation that had resulted in disclosure of misconduct and was also driving a settlement."); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 523 (E.D.N.Y. 2003) *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) (determining litigation to be risky where "Lead Counsel did not benefit from any previous or simultaneous government litigation"); *Rogers v. Sterling Foster & Co. (in Re Sterling Foster & Co.),* 238 F. Supp. 2d 480, 488 (S.D.N.Y. 2002)

(finding contingency risk to be low in light of previous government investigations of defendants); *In re Dreyfus Aggressive Growth Mut. Fund Litig.,* 2001 U.S. Dist. LEXIS 8418, at *20-*21 (S.D.N.Y. June 22, 2001) (finding low risk "where there was substantial overlap between the government's investigations and the plaintiffs' claims"); *In re Bausch & Lomb, Inc. Sec. Litig.,* 183 F.R.D. 78, 87 (W.D.N.Y. 1998) (SEC investigation begun after commencement of securities action "clearly overlapped" and "put additional pressure on [defendant] to settle the case, and would also have given plaintiffs' counsel greater reason to believe that they could prevail")).

Here, the FDA Administrators fail to reference any meaningful risk they faced in administering the FDA, but instead cite the contingent nature of their prosecution of state law and securities claims that led to the Class Action Settlement from which they have already recovered $30 million in fees – contingencies not relevant to their compensation as FDA Administrators.  *See* Mot. at 27-29; *see also* ECF Doc. No. 453 at 13-19.

By contrast, the FDA was not the result of a typical class action where the risk of non-recovery and lack of compensation often places a plaintiff's counsel in a precarious high risk position so as to justify ultimately awarding class counsel a multiplier of their actual legal fees.  In actuality, the FDA was almost exclusively funded by monies recovered by the BLMIS Trustee, established by the BLMIS Trustee Settlement, which was brokered by negotiations between Skadden and the BLMIS Trustee.

Unlike in a typical class action, the work the FDA Administrators performed here was primarily administrative.  With respect to the FDA (unlike the NSF), the FDA Administrators did not focus on maximizing recovery as class counsel would typically seek, but instead focused on allocating, administering, and distributing whatever recovery that the BLMIS Trustee collected.

9

While they might have faced risk in litigating the class action, the FDA Administrators did not face the same risk, or any risks typically attendant upon class actions, in administering the FDA. There was no possibility of loss for the FDA Administrators, just varying degrees of gain over the level of recovery the Trustee would achieve to fund the FDA. The FDA Administrators thereby faced no appreciable risk of non-recovery, minimal recovery, or inadequate compensation with respect to the FDA.

This lack of risk militates against the FDA Administrators' recovery of a percentage of the FDA in substantial excess of the work that the FDA Administrators actually performed. Given the administrative nature of their role and the certainty of enormous recovery from the BLMIS Trustee, the FDA Administrators should not be compensated in the same manner as a plaintiff's counsel might be compensated in a typical class action lawsuit. Instead, they should be awarded reasonable legal fees, as attorneys are typically compensated outside of the class action context.

Other courts have held that, where "the risk of non-recovery . . . was low[, it] [] does not militate in favor of an award of attorneys' fees substantially in excess of the work counsel actually performed," particularly where, as here, "the prospect of recovery was promising from the outset." *See In re Merrill Lynch & Co.,* 2007 WL 313474 at *16-*19 (observing that "the prospect of recovery was promising from the outset" because "[t]hese Actions stemmed from the highly publicized NYAG's investigation into the alleged undisclosed conflict of interest between Merrill Lynch's underwriting and brokerage arms."); *see also In re IndyMac Mortgage-Backed Sec. Litig.,* 2015 WL 1315147, at *4 (S.D.N.Y. Mar. 24, 2015) (finding that the percentage sought of a settlement fund of a securities class action was unreasonably high and in analyzing the risk prong of the *Goldberger* factors, noting that "securities cases like this practically always

settle, meaning that the risk of total non-recovery was almost nonexistent" and "this case had the benefit of pre-existing investigations by government authorities, a fact that rendered the case less risky than it otherwise might have been"); *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 375 (S.D.N.Y. 2005) (reducing the amount of fees sought and reasoning that "counsel faced only a modest risk of dismissal at the outset of the case because, among other things, the SEC commenced a parallel proceeding…" that "certainly have put additional pressure on [Elan] to settle the case, and would also have given plaintiffs' counsel greater reason to believe that they could prevail").

Overall, the requested FDA Percentage Fee is excessive. The FDA Administrators should not be allowed, in effect, to charge Madoff's victims a premium for distributing money flowing from the Trustee or piggyback on the Trustee Settlement and the BLMIS Trustee's successful efforts in collecting funds on behalf of victims of Madoff's fraud. The FDA Administrators are not entitled to a windfall profit for either of those efforts. When awarding fees to the FDA Administrators, the Court should separate out the benefits attributable to the FDA Administrators' own efforts and not credit them for others' work. The FDA Administrators should therefore be awarded their Hourly Legal Fees, which will sufficiently and fairly compensate them for the work they undertook and performed in connection with the FDA based upon their hourly rates, as well as reimbursement for their incurred expenses.[2]

---

[2] Determination of the fee issue need not, and should not, delay approval of the FDA POA and subsequent distribution of the FDA to investors. The Court may order the FDA Administrators' Hourly Legal Fees and expenses be paid from the FDA, and place any additional amounts (up to 3% of the FDA) into escrow pending final resolution of the fee issue.

## **CONCLUSION**

For the foregoing reasons, the Insurers respectfully request that the Court deny the FDA Percentage Fee requested by the FDA Administrators in their Motion, and instead award them their reasonable Hourly Legal Fees and expenses with respect to the FDA.

Dated: New York, New York
August 10, 2015

        MORGAN, LEWIS & BOCKIUS LLP

        _/s/ John M. Vassos_____
        John M. Vassos
        jvassos@morganlewis.com
        Mary C. Pennisi
        mpennisi@morganlewis.com
        101 Park Avenue
        New York, New York 10178-0060
        (212) 309-6000

        *Attorneys for Insurers*