UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

IN RE TREMONT SECURITIES LAW, STATE LAW AND INSURANCE LITIGATION : 08 Civ. 11117 (CM) (GWG)

: REPORT AND RECOMMENDATION
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

The United States Court of Appeals for the Second Circuit remanded this matter to the district court for revision of the lodestar multiplier that had been approved by the late Honorable Thomas P. Griesa in making an attorney's fee award to plaintiffs' "Lead Counsel," consisting of the law firms of Entwistle & Cappucci LLP, Hagens Berman Sobol Shaprio LLP, and Berstein Liebhard LLP. See In re Tremont Securities Law, State Law & Ins. Litig., 699 F. App'x 8 (2d Cir. 2017). In September 2015, Judge Griesa had awarded fees to Lead Counsel consisting of the lesser of 3% of a settlement fund or Lead Counsel's hourly lodestar multiplied by 2.5. In re Tremont Securities Law, State Law & Ins. Litig., 2015 WL 5333494, at *9-11 (S.D.N.Y. Sept. 14, 2015). At that time, 3% of the settlement fund would have yielded a fee that represented 1.09 times Lead Counsel's lodestar. Id. at *9. The fund has since grown in size thereby increasing the value of the 3% portion. However, the growth of Lead Counsel's lodestar has not kept pace, and accordingly 3% of the fund would result in a lodestar multiplier of 1.67, which is what Lead Counsel now propose as a new cap. Several investors, the "Tremont Fund Objectors"

("the TFO"), have objected.[1] For the following reasons, this Court is of the view that a multiplier of 1.0 is warranted — that is, no multiplier — and thus that Lead Counsel should be awarded $19,866,014.25 in attorney's fees, which is approximately 1.79% of the fund.

I. BACKGROUND

A. Case History

This case arose out of the collapse of Bernard L. Madoff Investment Securities ("BLMIS") in December 2008. Tremont Group Holdings and its affiliates managed two groups of hedge funds, the "Rye Funds"[2] and the "Tremont Funds." See Tremont, 699 F. App'x at 10-11. Some of the Rye Funds invested directly with BLMIS and "were 'net losers,' meaning they

[1] See Notice of Motion by Plaintiffs' Settlement Class Counsel for Approval of Revised Lodestar Multiplier Cap on Award of Attorneys' Fees, filed July 16, 2018 (Docket # 1258); Memorandum in Support of Motion for Revised Lodestar Multiplier Cap on Award of Attorneys' Fees, filed July 16, 2018 (Docket # 1259) ("Pl. Mem."); Joint Declaration of Andrew J. Entwistle, Reed R. Kathrein and Stephanie M. Beige in Support of Class Counsel's Motion for Revised Lodestar Multiplier Cap on Award of Attorneys' Fees, filed July 16, 2018 (Docket # 1260) ("Joint Decl."); The Tremont Fund Objectors' Objection to Lead Counsels' Petition for Attorneys' Fees and Opposition to Lead Counsels' Motion at ECF/1258, filed July 31, 2018 (Docket # 1262) ("TFO Opp. Mem."); Declaration of Vincent T. Gresham in Support of the Tremont Fund Objectors Objection to Lead Counsels' Petition for Attorneys' Fees and Response to Lead Counsels [sic] Motion at ECF/1258, filed July 31, 2018 (Docket # 1263); Reply Memorandum in Support of Motion for Revised Lodestar Multiplier Cap on Award of Attorneys' Fees, filed Aug. 6, 2018 (Docket # 1264) ("Pl. Reply Mem."); Letter from Andrew J. Entwistle, dated Dec. 12, 2018 (Docket # 1277) ("Pl. Supp. Submission"); The Tremont Fund Objectors' Supplemental Objection Based on Lead Counsels' Newly Created Time-Summaries Filed 12/12/2018, filed Dec. 28, 2018 (Docket # 1280) ("TFO Supp. Opp."); Declaration of Vincent T. Gresham in Support of TFO's Supplemental Objection to Lead Counsels' Motion for Attorneys' Fees, filed Dec. 28, 2018 (Docket # 1281); Reply Memorandum to "Supplemental Opposition by Tremont Fund Objectors" and in Support of Motion for Revised Lodestar Multiplier Cap on Award of Attorneys' Fees, filed Jan 9. 2019 (Docket # 1282) ("Pl. Supp. Reply).

[2] These consist of Rye Select Broad Market XL Fund, L.P. ("Rye XL"), Rye Select Broad Market Fund, L.P., Rye Select Broad Market Portfolio Limited, Rye Select Broad Market Insurance Fund, L.P., Rye Select Broad Market Prime Fund, L.P. See In re Tremont, 699 F. App'x at 10-11.

invested more money with BLMIS than they withdrew." Id. at 11. The Tremont Funds invested a portion of their assets with the Rye Funds, which invested those assets with BLMIS, while the rest of their investments were unrelated to BLMIS. Id.

When BLMIS collapsed in December 2008, investors in the Rye and Tremont funds filed numerous putative class actions and derivative actions against entities and individuals responsible for investing fund assets with BLMIS. Id. In 2009, these actions were consolidated and the Lead Counsel in this action were appointed as counsel to represent all settling investors. Id.

In February 2011, the parties to the consolidated cases settled. Id. The "Investor Settlement" that resulted created two separate funds. Id. The first was the "Net Settlement Fund ("NSF"), which contained $100 million paid by the defendants in exchange for a release of all claims against them. Id. The second fund was the "Fund Distribution Account" ("FDA"), which is a fund structured to receive, allocate, and distribute the assets that remained in the Rye Funds after any claims by and against the trustee of the BLMIS bankruptcy estate (the "Trustee") were resolved in a separate litigation (the "Trustee Litigation"). See id.; Joint Decl. ¶ 14. The Trustee Litigation was lead by separate counsel, not the Lead Counsel here. 699 F. App'x at 17.

"In the Trustee Litigation, the three net-loser Rye Funds filed approximately $2.2 billion in claims against the Trustee under the Securities Investment Protection Act ("SIPA")." Id. at 11. The Trustee then "sought to claw back approximately $2.1 billion in avoidable transfers made to the Rye and Tremont Funds." Id. In July 2011, a settlement was reached (the "Trustee Settlement"), which provided for the Rye and Tremont Funds to collectively pay the Trustee $1 billion in cash, in exchange for the Trustee's withdrawal of its avoidance claims against each fund, and its grant to the net-loser Rye Funds of roughly $2.2 billion in claims, as well as the

return of 80% of a $1 billion payment pursuant to section 502(h) of the Bankruptcy Code. Id. Accordingly, "after the funds paid the Trustee $1 billion to settle the clawback claims against them, the net-loser Rye Funds received claims totaling roughly $3 billion." Id.

The money to be received from the Trustee comprises almost the entirety of the FDA, which also includes $32.4 million in cash remaining in Rye XL, a Rye Fund that did not have to contribute towards the $1 billion Trustee Settlement. Id. In 2017, the Second Circuit noted that "[i]t is expected that a total of around $1.45 billion will eventually flow into the FDA from the Trustee." Id.

The 2011 Investor Settlement did not provide for how the FDA would be allocated among claimants. Id. However, in its 2011 final judgment approving the Investor Settlement, Judge Griesa gave Lead Counsel a number of tasks, including the responsibility for the defense of the Settlement, the ongoing prosecution of certain related actions, the defense of the related settlement of the Madoff Trustee litigation (which is the primary funding source for the FDA), the development of plans of allocation ("POAs") for the NSF and the FDA, and supervising and directing the administration, calculation and distribution of the FDA to the claimants. See Stipulation of Partial Settlement, filed Feb. 25, 2011 (Docket # 392-1), ¶¶ 1.45, 2.17, 5.7, 5.8; see also Final Judgment and Order of Dismissal with Prejudice Regarding Settlement and Rules 23 and 23.1, filed Aug. 19, 2011 (Docket # 604), ¶¶ 7, 29, 30; In re Tremont, 2015 WL 5333494, at *9.

With respect to the NSF, following a fairness hearing held on June 1, 2011, and on August 8, 2011, the district court on August 19, 2011, awarded attorneys' fees to Lead Counsel "in the amount of 30% of their portion of the Gross Settlement Fund" plus costs. See Order and Final Judgment Granting Plaintiff's State and Securities Law Settlement Class Counsels' Motion

for Award of Attorneys' Fees, Reimbursement of Expenses, and Awards to State Law and Securities Plaintiffs, filed Aug. 19, 2011 (Docket # 603) ("Aug. 19, 2011, Attorneys' Fee Award"), 2, ¶ 2. While Lead Counsel at that time also requested attorneys fees in relation to the FDA, the district court denied that request "as of now, subject to revisiting [it] at a later point," Transcript of Hearing Held on Aug. 8, 2011, filed Aug. 15, 2011 (Docket # 599) ("Tr."), 112, and held that "Class Counsel will make a further application for an award of attorneys' fees related to the Fund Distribution Account at the time of their motion for approval of the Fund Distribution Account Plan of Distribution." Aug. 19, 2011, Attorneys' Fee Award at 2, ¶ 3. Judge Griesa said the reason for this was that "[t]here just [wasn't] enough information about what will be derived or what is necessary in the way of legal service." (Tr. 112).

In April 2014, Lead Counsel solicited plans from interested parties regarding a proposed allocation of the FDA, and notified those parties of mediation proceedings. 699 F. App'x at 12. After more than a year of mediation, a "consensus plan of allocation" ("POA") was proposed to the district court to allocate the funds in the FDA. See id.[3]

---

[3] The POA distributed the FDA assets as follows.

> First, the $32.4 million that Rye XL contributed to the FDA is returned to Rye XL investors.
>
> Next, the funds are awarded equal priority to the balance of the FDA using a simple formula: (1) each net-loser Rye Fund has a claim (referred to as a "SIPC Claim") equal to its portion of the $3 billion Trustee Settlement; (2) each Tremont and net-winner Rye Fund that contributed cash to the Trustee Settlement has a "Virtual SIPC Claim" equal to eighty percent of its Trustee Settlement contribution.
>
> Finally, once the money is allocated to the appropriate funds using the formula described above, each fund's investors will receive a pro rata share of the fund's allocation according to the investor's

In September 2015, following a hearing regarding the POA, the district court rejected an alternative plan proposed by an objector, approved the POA, and awarded Lead Counsel attorneys' fees — the award that is now at issue in the instant motion. See id.; see also In re Tremont, 2015 WL 5333494, at *9-11. Lead Counsel sought, and the District Court granted, "a fee amounting to the lesser of three percent of the funds distributed through the FDA, or its hourly fees (lodestar) multiplied by 2.5." 2015 WL 5333494, at *9. The District Court noted that

> To date, Class Counsel has performed over 25,000 hours of work in connection with the FDA. . . . Class Counsel has overseen the creation of the FDA, defended it in connection with the Class Settlement, arrived at the Plan of Allocation through mediation and extensive communication with numerous parties, worked with defendants to maximize the FDA recovery, and, not least, defended the Plan of Allocation in the present proceeding.

Id.

The District Court explained its decision to grant the application for attorney's fees under the rule laid out in Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 47 (2d Cir. 2000). See 2015 WL 5333494, at *10-11. Goldberger held that in determining an appropriate common fund fee, a district court should be guided by the following factors: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the

---

> net equity (i.e., amount lost) in that fund. In other words, only investors who lost money in a given fund due to that fund's investment in BLMIS are entitled to recover anything from the fund. Thus, net-loser investors in any fund will recover a share of that fund's SIPC or Virtual SIPC Claim; and net-loser investors in any net-loser fund will recover a share of that fund's cross-investment in each Rye Fund in which it was invested.

In re Tremont, 699 F. App'x. at 12.

litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." Goldberger, 209 F.3d at 50 (internal quotation marks and citations omitted). The district court noted that "Class Counsel has unquestionably put forth great labor," and that "the litigation has been highly complex, involving a great deal of unsettled law, many parties, and a voluminous case history." In re Tremont, 2015 WL 5333494, at *10. The district court added that "Class Counsel has displayed great skill in managing these challenges" and noted that "the allocation and distribution of the FDA is a complex matter of great importance to many parties, and Class Counsel has performed admirably." Id. Accordingly, the district court reasoned that the first, second, and fourth Goldberger factors weighed in favor of a large fee. Id. Similarly, with respect to the sixth factor, "public policy considerations," Goldberger, 209 F.3d at 50, the district court reasoned that "it is clear that public policy is well served here by awarding a viable fee [because] . . . Class Counsel has done excellent work in a case with widespread consequences." In re Tremont, 2015 WL 5333494, at *10. While it noted that the fifth factor was "more difficult to evaluate, because the FDA is an unusual vehicle for the distribution of moneys recovered through bankruptcy and cannot be easily likened to a typical class action settlement recovery," id., the district court stated that the "requested three percent is much smaller than the percentage typically requested as a fee," which was "to be expected because a proportion larger than three percent of the total FDA would amount to an inappropriate windfall," id.

With respect to the third Goldberger factor, "the risk of the litigation," Goldberger, 209 F.3d at 50, the district court stated that "[i]n short, this litigation involved unique practical and legal challenges. The outcome of Class Counsel's labor was never certain." In re Tremont, 2015 WL 53333494, at *10. Weighing these factors, the District Court concluded that

"substantial compensation is warranted, and the fee Class Counsel seeks is justified," id., at *11, even as it noted that "a lodestar of 2.5 is at the high end of what courts in this Circuit are willing to award," id. at *10 (citations omitted).

B. The Appeal to the Second Circuit

Certain investors appealed. On June 26, 2017, in a summary order, the Second Circuit affirmed the district court's approval of the POA, but vacated the court's fee award, holding that the lodestar cap multiplier of 2.5 was "excessive," and remanded the case to the district court to "revise the cap to reflect counsel's limited risk." In re Tremont, 699 F. App'x at 18. The Second Circuit did not question the District Court's assessment of the other Goldberger factors.

In a footnote ("Footnote 13") discussing the lodestar cap, the Second Circuit stated that "the sparse summaries provided by Lead Counsel are of doubtful adequacy," id. at 18 n.13, and ordered that on remand, "the district court should require the submission of more detailed summaries that, at the very least, break down the hours worked by year and task," id.[4] The

---

[4] The full text of Footnote 13 is as follows:

> Appellants George Turner, Bindler Living Trust, Madelyn Haines, John Johnson, William J. Millard Trust, Stella Ruggiano Trust, West Trust, and Paul Zamrowski challenge the lodestar multiplier cap on the additional grounds that the district court relied on time summaries (rather than contemporaneous time records) and Lead Counsel's hourly rates. With respect to time records, although they are ordinarily required, see Scott v. City of New York, 626 F.3d 130, 133-34 (2d Cir. 2010) (per curiam), the district court may rely on summaries that are based on voluminous contemporaneous records. See Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1160 (2d Cir. 1994) ("A review of the submissions made by [counsel] shows that they made contemporaneous entries as the work was completed, and that their billing [summary] was based on these contemporaneous records. We believe this falls sufficiently within the meaning of 'contemporaneous'. . . ."). However, the sparse summaries provided by Lead Counsel are of doubtful adequacy. Therefore, on remand, the district court should require the submission of more detailed summaries that, at the very least, break down the hours worked by year and task.

Second Circuit also explicitly upheld the district court's award of counsel's hourly rates. Id.

In remanding the case for a recalculation of the multiplier, the Second Circuit reasoned that the district court "gave insufficient consideration to the lack of contingency risk" which is "generally the most important [factor] in determining whether to award a lodestar multiplier." Id. at 17 (citing Goldberger, 209 F.3d at 54). The Second Circuit noted that the district court identified two principle risks: 1) the risk involved "'in bringing the derivative claims that gave rise to the inclusion of the FDA as part of the [Investor] Settlement,'" id. (citing 2015 WL 5333494, at *9) (alteration in original), and 2) the "risk[] in defending the Plan of Allocation against objectors," id. (citing 2015 WL 5333494, at *9) (alteration in original).

With respect to the risk "in bringing the derivative claims that gave rise to the inclusion of the FDA as part of the [Investor] Settlement," the Second Circuit held that this was "not a proper consideration in relation to this particular fee award." Id. This was because "Lead Counsel was already compensated for the risk of bringing the derivative (i.e., state law) claims in the fee award for the August 2011 Investor Settlement." Id. Further, the Second Circuit explained that because Lead Counsel was seeking fees for work completed only after the district court's approval of the Investor Settlement, it did not make sense to multiply the fee award on this basis because the risk "dissipated when the court approved that settlement." Id. Lastly, the Second Circuit noted that the money flowing into the FDA was "essentially guaranteed by the July 2011 settlement in the Trustee Litigation, a separate case led by separate counsel (who already took their cut) involving money obtained by the Trustee (who is also being

---

Id. at *18 n.13.

compensated)." Id. Accordingly, the Second Circuit found "no reason to award Lead Counsel a lodestar multiple based on the size of a recovery they did not secure." Id. Further, the Second Circuit noted that there was never "a real possibility that the FDA would be so insignificant that Lead Counsel might be deprived of rich compensation for their work relating to it." Id.

With respect to the "risk[] in defending the Plan of Allocation against objectors," the Second Circuit noted that "Lead Counsel's fee award is not tied to any particular plan of allocation" but rather is "dependent on the size of the FDA (which is a product of the Trustee's efforts) and the lodestar — which only increased as the number of objections to the POA (and thus Lead Counsel's hours spent defending it) grew." Id. at 17-18. The Second Circuit accordingly concluded that there was "little (if any) risk in defending the POA against objectors, except for the remote possibility that the district court would refuse to approve any plan of allocation submitted by Lead Counsel." Id. at 18.

C. Proceedings Since Remand

After the case was remanded, Lead Counsel provided new time summaries as required by Footnote 13 as part of its briefing to have the Court fix the new multiplier. See Class Counsel Lodestar Summary - May 6, 2011 - February 28, 2018 (annexed as Ex. A to Joint Decl.) ("First Time Summary"); Declaration of Andrew J. Entwistle in Support of Motion for Revised Lodestar Multiplier Cap on Award of Attorneys' Fees (annexed as Ex. B to Joint Decl.) ("Entwistle Decl."); Declaration of Reed R. Kathrein in Support of Motion for Revised Lodestar Multiplier Cap on Award of Attorneys' Fees (annexed as Ex. C to Joint Decl.) ("Kathrein Decl."); Declaration of Stephanie M. Beige in Support of Motion for Revised Lodestar Multiplier Cap on Award of Attorneys' Fees (annexed as Ex. D to Joint Decl.) ("Beige Decl."); Declaration of Paul Schroer (annexed as Ex. E to Joint Decl.). Following referral of the pending

motion for fees to the undersigned, this Court held a telephone conference and ordered Lead Counsel to provide more detailed time summaries. See Memo Endorsed Letter, filed Nov. 8, 2018 (Docket # 1270); see also Order, filed Oct. 24, 2018 (Docket # 1267); Transcript of Proceedings Held on November 1, 2018, filed Nov. 13, 2018 (Docket # 1271). Lead Counsel provided the new summaries. See Pl. Supp. Submission. The Tremont Fund Objectors ("TFO") filed supplemental objections, see TFO Supp. Opp., and Lead Counsel filed a reply brief, see Pl. Supp. Reply.

In their supplemental briefing, Lead Counsel state that they request 3% of the settlement fund as it stands now and that they will make no further requests for fees even if the settlement fund grows bigger. Pl. Supp. Reply at 1. The total amount of the fund is $1,107,987,128.76. Pl. Supp. Submission at 9. Three per cent of the fund is thus $33,239,610.00. Id. Because Lead Counsel assert their lodestar is $19,886,014.25, id., the requested award would result in a multiplier of approximately 1.67, id. at 10.

## II. DISCUSSION

In light of the Second Circuit's decision, we view our task on remand as (1) reassessing the multiplier based on the Second Circuit's admonitions as to the level of risk; and (2) ensuring that the Second Circuit's directive in Footnote 13 has been complied with.

We first make a determination of the current lodestar, referencing the new time summaries as necessary. We then make our determination of the proper multiplier.

### A. Determination of the Lodestar

#### 1. Whether Lead Counsel May Seek Hours Involving Non-FDA Matters

To determine the lodestar, we must first address the TFO's contention that Lead Counsel's lodestar hours may properly include only time spent on tasks related to the

administration of the FDA itself, rather than the NSF. See TFO Opp. Mem. at 14-12; TFO Supp. Opp. at 2-4, 10-17. This contention represents the vast bulk of the TFO's objections to the proposed lodestar.

Lead Counsel seek compensation for hours billed between May 6, 2011, and February 28, 2018, Pl. Mem. at 11; Pl. Supp. Submission at 1; Pl. Supp. Reply at 2, and seek to include in the lodestar all hours related to the litigation post-May 6, 2011 (other than hours relating to their efforts to seek attorney fees). That is, they seek fees for work beyond their administration of the FDA. Pl. Reply Mem. at 3; Pl. Supp. Submission; Pl. Supp. Reply at 1-5. The TFO argue that "[Lead Counsel] are entitled to attorneys' fees for only that fraction of their 30,000 hour Lodestar that [Lead Counsel] prove is 'related to' the FDA." TFO Opp. at 3; see TFO Supp. Opp. at 1-5. The TFO argue that when Judge Griesa initially approved Lead Counsels' fee in 2015, he mistakenly believed that Lead Counsel's lodestar consisted of only FDA hours. TFO Opp. Mem. at 15-16. The TFO argue that allowing the inclusion of hours spent on the NSF in the lodestar allows double recovery, as "all NSF activities were baked into the $30+ million, 30% NSF fee award cake," TFO Supp. Opp. at 10; see TFO Opp. Mem. at 16, 18 — referring to the 30% attorney award Lead Counsel received for the NSF settlement in June 2011.

"Under the law-of-the-case doctrine, where a case has been decided by an appellate court and remanded, the court to which it is remanded must proceed in accordance with the mandate and such law of the case as was established by the appellate court." Kerman v. City of New York, 374 F.3d 93, 109 (2d Cir. 2004) (internal quotation marks, citations, and brackets omitted). The "mandate rule prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate." Brown v. City of Syracuse, 673 F.3d 141, 147 (2d

Cir. 2012) (internal quotation marks and citation omitted). "[W]here an issue was ripe for review at the time of an initial appeal but was nonetheless foregone, the mandate rule generally prohibits the district court from reopening the issue on remand unless the mandate can reasonably be understood as permitting it to do so." United States v. Ben Zvi, 242 F.3d 89, 95 (2d Cir. 2001); accord United States v. Stanley, 54 F.3d 103, 107 (2d Cir. 1995). "Furthermore, where the mandate limits the issues open for consideration on remand, the district court ordinarily may not deviate from the specific dictates or spirit of the mandate by considering additional issues on remand." Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 762 F.3d 165, 175 (2d Cir. 2014) (citation omitted).

In its 2015 application for fees, Lead Counsel informed Judge Griesa that its lodestar included post-May 6, 2011, work in connection with the Settlement and Trustee Settlement as well as work performed in connection with "related proceedings." See Joint Declaration of Andrew J. Entwistle, Reed R. Kathrein and Jeffrey M. Haber in Support of Plaintiffs' Settlement Class Counsel's Motion for Approval of Fund Distribution Account Plan of Allocation, Distribution Procedures, Attorneys' Fees and Reimbursement of Expenses, filed July 10, 2015 (Docket # 1090), 13-14 . Similarly Lead Counsel noted that the "more than 23,871.75 hours" it was seeking was for the prosecution not only of the FDA POA, but also for "related proceedings" following the May 6, 2011, initial fee application. Id. at 15 (emphasis added). Lead Counsel referred specifically to its work on the NSF when it noted that the court had deferred the fee application to be paid from the FDA in anticipation of "significant legal work" to be performed "in defending the Settlement and Trustee Settlement, prosecuting related actions contemplated under the Settlement" and in "bringing the NSF . . . allocation issues to conclusion." Memorandum in Support of Motion for Approval of Fund Distribution Account

Plan of Allocation, Distribution Procedures, Attorneys' Fees and Reimbursement of Expenses, filed July 10, 2015 (Docket # 1089), 27. Thus, at the time Judge Griesa made his ruling, he had been made aware that Lead Counsel's lodestar involved time spent on matters other than the FDA, including time spent on the NSF for which he had already made a 30% award of fees.

More importantly, the question of whether non-FDA hours should be included in the lodestar awarded by Judge Griesa in 2015 was briefed by both the TFO and Lead Counsel before the Second Circuit. The TFO argued to the Second Circuit that Judge Griesa improperly included all post-May 6, 2011, time in Lead Counsel's lodestar, even though the time was not spent exclusively on FDA work. See Brief of Objector-Appellants George Turner, Bindler Living Trust, Madelyn Haines, John Johnson, William J. Millard Trust, Stella Ruggiano Trust, West Trust and Paul Zamrowski, In re Tremont, 699 F. App'x 8, (No. 15-3011) (2d Cir. Jan 25, 2016), (Docket # 164) ("TFO 2d Cir. Mem."), 61-63; Reply Brief of Objector-Appellants George Turner, Bindler Living Trust, Madelyn Haines, John Johnson, William J. Millard Trust, Stella Ruggianao Trust, West Trust and Paul Zamrowski, 699 F. App'x 8, (No. 15-3011) (2d Cir. May 23, 2016), (Docket # 288) ("TFO 2d Cir. Reply Mem."), 72-75. Thus, the TFO noted that:

> Most post-5/6/2011 time was not spent on allocations [under the FDA]. For example, time was spent obtaining NSF recoveries for which LC have already been paid such as "a $225,000 recovery from the BONY settlement . . . and the net Fidelity Bond recoveries of $13,167,573.56. . . ." (A834-835-n.15.) Because these amounts were included in LCs' 30% NSF fee, the court double-paid LC for post-5/6/2011 time spent on these successful NSF claims.

TFO 2d. Cir. Mem. at 63. Lead Counsel opposed the TFO's assertion that the purported "double-pa[yment]" was improper, responding that the TFO "ignore[] the fact that the current award reflects that portion of Class Counsel's global fee request that was previously deferred by agreement until after the FDA POA was submitted." Plaintiffs-Appellees' Consolidated Brief in

Response to Briefs of Appellants, 699 F. App'x 8, (No. 15-3011) (2d Cir. Apr. 26, 2016), (Docket # 254) ("Pl. 2d Cir. Opp. Mem."), 70.

The Second Circuit's decision does not instruct this Court to determine whether the hours included in Lead Counsel's lodestar related only to the FDA or give any other suggestion that it accepted the TFO's argument on this point. Rather, it affirmed the fee award in all respects with the sole exception that it mandated a reconsideration of the multiplier amount and included a directive to require "more detailed [time] summaries." 699 F. App'x at 18 n.13.

The TFO do not point to anything in the Second Circuit's decision that explicitly or implicitly upheld their objection. Instead they argue that the sentence in Footnote 13 that noted the lack of contemporaneous billing records and that ordered the provision of more detailed "time summaries" was in fact an invitation to address the very fundamental question of whether Judge Griesa erred in 2015 by approving 25,000 lodestar hours that indisputably did not all relate to the FDA. See TFO Opp. Mem. at 3. It is certainly true, as the TFO argue, that with the "better Time Summaries, ordered by the Second Circuit, this Court can now do a better job of determining" how many hours are related to exclusively FDA work. Id. at 16. But the fact that the non-FDA hours were included was never in dispute and the Second Circuit's ruling did not explicitly or implicitly invite the Court to address the issue of whether such hours should have been included in the lodestar.

Given that the Second Circuit's decision does not advert in any way to the question of whether the 3% fee could be justified based on hours spent on non-FDA work, and given the fact that the issue was presented during the appellate briefing, we cannot conclude that in a single sentence in a footnote requiring "more detailed" time summaries, the Second Circuit sub silentio was directing the district court to rule on the issue presented to the Second Circuit on appeal of

whether to exclude from the lodestar those fees not directly related to the FDA. To the contrary, the Second Circuit's decision is exceedingly narrow. Thus, "look[ing] to both the specific dictates of the remand order as well as the broader 'spirit of the mandate,'" Ben Zvi, 242 F.3d at 95 (internal citations omitted), we conclude that excluding hours that were not dedicated solely to the administration of the FDA is not within the Second Circuit's mandate. In other words, whatever may be the merits of the TFO's argument on excluding the non-FDA hours from the lodestar, that is not an issue that this Court may permissibly revisit.

2. Adequacy of Time Summaries

We turn next to the time summaries supplied by Lead Counsel. On appeal, the TFO argued that the district court "never obtained LCs' contemporaneous time records" and that the fees petition was instead supported "only by conclusory name, hours, rate, and lodestar amount representations." TFO 2d Cir. Mem. at 61. They gave as an example the following entry:

| Name | Hours | Claimed Rate | Lodestar |
|---|---|---|---|
| Andrew Entwistle | 3,616.10 | $900 | $3,254,490.00 |

Id. The TFO argued that "[t]his conclusory information prevented the court from being able to determine if LCs' time was reasonable and necessary." Id. They argued that there was "insufficient information for the court to determine how much of LCs' huge lodestar resulted from duplication or waste, or failure to delegate to lower priced associates." Id. at 62.

In response to this argument, one sentence in Footnote 13 of the Second Circuit's opinion addressing the TFO's arguments on the "lodestar multiplier cap" directed this Court on remand to "require the submission of more detailed [time] summaries that, at the very least, break down the hours worked by year and task." 699 F. App'x, at 18 n.13. This was the entirety of the Second Circuit's directive as to the time summaries. On remand, Lead Counsel offered time

summaries that provided breakdowns by year and task in approximately a dozen pages per firm. See First Time Summary; Entwistle & Cappucci LLP Fee Summary (annexed as Ex. 1 to Entwistle Decl.) ("Entwistle & Cappucci Fee Summary"); Hagens Berman Sobol Shapiro LLP Fee Summary (annexed as Ex. 1 to Kathrein Decl.) ("Hagens Berman Sobol Shapiro Fee Summary"); Bernstein Liebhard LLP Fee Summary (annexed as Ex. 1 to Beige Decl.) ("Bernstein Liebhard Fee Summary"). This Court found these to be insufficient and required more detailed breakdowns, which resulted in a submission of 197 pages of summaries. See Pl. Supp. Submission.

The Second Circuit did not state the specific purpose of requiring the more detailed time summaries. One possible purpose is that the Second Circuit wanted the district court to have the time summaries available as an aid to conducting the re-consideration of the lodestar multiplier. If that is the purpose, we fulfill it by considering the hours and nature of the work reflected in these summaries in arriving at the multiplier as discussed in section II.B below.

The other possible purpose is that it wanted this Court to determine whether Judge Griesa could properly have compensated Lead Counsel for the "approximately 25,000" hours that were sought and approved in 2015. We address this question next.

Where fees are awarded based on a lodestar, only "reasonable" hours expended by an attorney are to be included. See Luciano v. Olsten Corp., 109 F.3d 111, 115 (2d Cir. 1997); Lunday v. City of Albany, 42 F.3d 131, 133-34 (2d Cir. 1994). "To determine whether the number of hours spent by counsel was reasonable, the Court must use [its] experience with the case, as well as [its] experience with the practice of law, to assess the reasonableness of the hours spent . . . in a given case." Div. 1181 Amalgamated Transit Union-New York Employees Pension Fund v. D & A Bus Co., Inc., 270 F. Supp. 3d 593, 619 (E.D.N.Y. 2017) (internal

citations and quotations omitted) (alteration in original); accord Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir. 1992).

However, where a lodestar is acting as a "cross-check" to determine the appropriateness of a percentage fee award, which is essentially what is occurring here, Goldberger makes clear that "the hours documented by counsel need not be exhaustively scrutinized by the district court." 209 F.3d at 50; accord id. at 49-50 (there is "no need [for] district courts to undertake the cumbersome, enervating, and often surrealistic process of lodestar computation") (citation and quotation marks omitted). Thus, we will not undertake an exhaustive scrutiny of counsel's hours here.

In his September 14, 2015, opinion, Judge Griesa reviewed and approved the "over 25,000 hours of claimed legal work" — hours incurred prior to August 13, 2015. 2015 WL 5333494, at *4. In preparing their most recent current submission, Lead Counsel have eliminated some hours, and provide the detailed records for 24,810.15 hours incurred as of August 14, 2015. See Supplement 2011 Monthly Time Summaries of Class Counsel (annexed as Ex. 1 to Pl. Supp. Submission) ("2011 Supp. Summary"); Supplement 2012 Monthly Time Summaries of Class Counsel (annexed as Ex. 2 to Pl. Supp. Submission) ("2012 Supp. Summary"); Supplement 2013 Monthly Time Summaries of Class Counsel (annexed as Ex. 3 to Pl. Supp. Submission) ("2013 Supp. Summary"); Supplement 2014 Monthly Time Summaries of Class Counsel (annexed as Ex. 4 to Pl. Supp. Submission) ("2014 Supp. Summary"); Supplement 2015 (Part 1) Monthly Time Summaries of Class Counsel (annexed as Ex. 5 to Pl. Supp. Submission) ("2015 Part 1 Supp. Summary"). While, due to Lead Counsel's subtraction of hours since preparing the new time summaries, the two sets of numbers do not match precisely, we are satisfied from the time summaries that the presentation to Judge Griesa was

substantially accurate.

In its briefing, the TFO raise numerous concerns about the reasonableness of the hours Lead Counsel included in their lodestar prior to August 2015. See TFO Opp. Mem. at 14-24. Most of the TFO's arguments are premised upon the notion that Lead Counsel are not permitted to include hours unrelated to the administration of the FDA in their lodestar, see id. at 14-20; TFO Supp. Opp. at 3-5, 10-17 — an argument we have found dehors the Second Circuit's mandate insofar as it raised to challenge the lodestar calculation, see Section II.A.1 above.

The TFO also argue that "there was significant overstaffing of this case," and that "[l]ack of billing discipline resulted in numerous high-priced partners from all three [Lead Counsel] firms billing time to the same task." TFO Supp. Opp. at 18. The TFO argue that "[w]ith respect to most of [Lead Counsel's] work, the [supplemental] monthly Time Summaries include too many items to detect even material waste or duplication." Id. at 20. As to the latter point, we disagree. The time summaries ordered by this Court are in fact quite detailed: they identify the tasks included, the specific attorneys working on the tasks, and the number of hours each attorney spent on those tasks for each month.

The TFO raise objections to only two specific matters before August 2015. TFO notes that in June 2012, Lead Counsel billed $203,857 in the category of "Objectors' Appeals," and argue that this amount was excessive given that Lead Counsel's only filing during that month consisted of a "one page joinder to another appellee's motion to dismiss." TFO Supp. Opp. at 20 (citing Plaintiffs-Appellees' Memorandum in Support of Motion to Dismiss Appeal No. 11-4030, No. 11-3899-cv (L), 11-4030-cv (CON), (2d Cir. June 4, 2012) (Docket # 335-2)) ("Pl. June 2012 Joinder"). But the TFO's argument ignores the fact that in order to join in another party's brief and to "adopt and incorporate the legal arguments and authorities set forth in" that

brief, Pl. June 2012 Joinder at 1, Lead Counsel would have to undertake a review of the submission they were joining, which included hundreds of pages of documents, see "Tremont Defendants/Appellees' Motion to Dismiss Appeal No. 11-4030 and Memorandum of Law," No. 11-3899-cv (L), 11-4030-cv (CON), (2d Cir. June 1, 2012) (Docket # 323). Work related to "Objectors' Appeals" from June 2012 also included reviewing opposition briefs. See 2012 Supp. Summary, at *11. During June 2012, subsequent to the filing of Lead Counsel's joinder, there were numerous additional filings, including a motion to strike the brief Lead Counsel joined, filed by some of the TFO represented by TFO counsel Gresham, see Emergency Motion with Decision Requested by June 6, 2012 by the Haines Appellants' [sic] to Strike Defendants' Latest Motion to Dismiss, 11-3899(L), 11-4030 (CON), (2d Cir. June 4, 2012) (Docket # 326), which counsel had an obligation to review.

The TFO also object to time billed in September 2011 to category 13(a), "[r]eviewing notices of appeal." TFO Supp. Opp. at 20 (referring to 2011 Supp. Summary). In particular, the time summaries Lead Counsel provided indicate that during September 2011, work in that category consisted of reading docket entries 613-15 and 617 in the instant case. These docket entries are each notices of appeal, consisting of 1-2 pages, with the exception of Docket # 615, which annexes Judge Griesa's Final Judgment dated August 11, 2011, as an exhibit. A total of 59.05 hours was billed to these tasks, with Entwistle & Cappucci partner Andrew J. Entwistle billing 32.60 hours to this task. While this amount of time indeed seems excessive, it represents only a tiny fraction of Lead Counsel's lodestar, and we do not believe it merits revisiting Judge Griesa's approval of the lodestar hours before him. As noted by Goldberger, where a court is using a lodestar as a cross-check against a percentage award, it need not parse time records at this level of detail. Goldberger, 209 F.3d at 50.

Nonetheless, having reviewed the records ourselves, we take into account what we view as the rich staffing of this matter in the context of our consideration of the multiplier. See section II.B below.

3. The New Application for Hours Expended After August 14, 2015

Lead Counsel's application to this Court seeks fees for time spent after August 14, 2015. This is the first time the post-August 14, 2015, hours have been assessed by any court for inclusion in the lodestar. These hours are described in many dozens of pages in the supplemental monthly time charts. See Supplement 2015 (Part 2) Monthly Time Summaries of Class Counsel (annexed as Ex. 6 to Pl. Supp. Submission) ("2015 Part 2 Supp. Summary"); Supplement 2016 Monthly Time Summaries of Class Counsel (annexed as Ex. 7 to Pl. Supp. Submission) ("2016 Supp. Summary"); Supplement 2017 Monthly Time Summaries of Class Counsel (annexed as Ex. 8 to Pl. Supp. Submission) ("2017 Supp. Summary"); Supplement 2018 Monthly Time Summaries of Class Counsel (annexed as Ex. 9 to Pl. Supp. Submission) ("2018 Supp. Summary"). Lead Counsel seeks compensation for 5903.4 hours for the post-August 14, 2015 period, which totals $3,127.011.25 in lodestar fees. Pl. Supp. Reply at 2. Counsel states that this is their "final application" for fees and that they "will continue to administer the FDA without any additional compensation." See id. at 1.

The TFO argue that Lead Counsel's lodestar "must be reduced to make true the claim that their 'hourly rates were upheld by the Second Circuit'" on the ground that hourly rates have risen since the original approval. TFO Opp. Mem. at 23 (quoting Pl. Mem. at 11). Although some individual hourly rates have risen since 2015, we view them as essentially consistent with the rates previously approved by Judge Griesa given that attorney rates will rise as an attorney gains experience and due to the effects of inflation. In light of the Second Circuit's

determination that Lead Counsel's rates were reasonable "[g]iven the skill and experience required in this complex securities litigation," In re Tremont, 699 F. App'x at 18 n.13, this Court accepts counsel's higher rates during the later time period. Nonetheless, as described below, we consider these rates for purposes of our assessment of the lodestar multiplier cap.

As to the number of hours expended, the TFO point to several instances of what they consider "examples of overstaffing resulting in excessive fees" that occurred during the post-August 2015 period. See TFO Supp. Opp. at 20-21. Upon reviewing Lead Counsels' time summaries, we accept that the staffing of many matters was extremely generous, and may be charitably described as overly rich. There are examples of multiple lawyers billing for time and hearings at which only one lawyer actually spoke or participated and large numbers of hours spent on litigation tasks. As already noted, however, in the context of this "cross-check" to determine if the 3% award is appropriate, the court need not do an "exhaustive[]" review of hours to determine a lodestar computation. Goldberger, 209 F.3d at 50. We will thus not describe our examination of the dozens of pages of time summaries other than to say that for purposes of the cross-check, we find the hours claimed for the time period after August 14, 2015, to be accurate but also reflective of rich staffing. We will discuss this further in our discussion of the multiplier.

B. The Lodestar Multiplier

We now turn to the main purpose of the Second Circuit's remand: to determine a new lodestar multiplier for purposes of checking whether the 3% award from the FDA was appropriate. The Second Circuit remanded because the 2.5 multiplier cap failed "to reflect counsel's limited risk." 699 F. App'x at 18. We recognize that the Second Circuit noted that "[a]lthough a cap of 2.5 times the lodestar is excessive, one equal to the lodestar is not

necessarily required." Id.

In their supplemental briefing, Lead Counsel request a lodestar multiplier of 1.67, which is the number needed to justify an award of 3% of the FDA, or $33,239,610.00, based on the funding of the FDA to date. Pl. Supp. Reply at 1. As noted, Lead Counsel have agreed that this will be their "final application" for fees," they "will request no fees on any future FDA distributions, and [they] will continue to administer the FDA without any additional compensation." Id.

The factors articulated in Goldberger govern the determination of the lodestar multiplier cap. These are "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . .; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." Goldberger, 209 F.3d at 50. The "risk of success" is generally the foremost factor to be considered in determining whether to award a multiplier. See id. at 54. While we revisit the question of risk we accept Judge Griesa's determination that the other factors largely favor Lead Counsel. 699 F. App'x at 17; 2015 WL 43333494 at *10.

As to risk, courts in this Circuit have recognized that "[t]here is generally only a very small risk of non-recovery in securities class litigation." In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 2007 WL 313474, at *16 (S.D.N.Y. Feb. 1, 2007); accord In re Dreyfus Aggressive Growth Mutual Fund Litig., 2001 WL 709262, at *4 (S.D.N.Y. June 22, 2001). Further, "[c]ourts of this Circuit recognize that, where claims were precipitated by public events, the risk undertaken by class counsel is especially slight." Merrill Lynch, 2007 WL 313474, at *16. This assessment of minimal risk is magnified in this case because the corpus of money in the fund from which the 3% fee was awarded — the FDA— was generated without

any risk by Lead Counsel. As the Second Circuit noted, the money flowing into the FDA was "essentially guaranteed by the July 2011 settlement in the Trustee Litigation, a separate case led by separate counsel (who already took their cut) involving money obtained by the Trustee (who is also being compensated)." In re Tremont, 699 F. App'x at 17.

Lead Counsel argue that "this Court should consider not just the risks attendant merely in structuring the FDA, but all of the risks that the Actions presented from the outset in 2008." Pl. Mem. at 13. Lead Counsel note that "[t]he contingency risk related to the derivative claims was incurred at the outset of the litigation and did not end in August 2011 upon District Court approval of the Settlement." Id. In addition, Lead Counsel point to the risk associated with continuing appeals of the Settlement, id. at 14-15, and the inherent risk associated with contingency cases, id. at 13-14.

While hours unrelated to the FDA have been included in the lodestar calculation, we disagree with the proposition that the 3% award from the FDA is intended to compensate counsel for all risks they have taken including those related to the NSF. The only identifiable risk is embodied in the derivative claims Class Counsel originally brought. The Second Circuit's decision, however, makes clear that "bringing the derivative claims that gave rise to the inclusion of the FDA as part of the [Investor] Settlement" were "not a proper consideration in relation to this particular fee award," 699 F. App'x at 17 (emphasis added); that the risk associated with defending the Settlement "dissipated when the court approved that settlement," id.; and that there "appears to have been little (if any) risk in defending the POA against objectors, except for the remote possibility that the district court would refuse to approve any plan of allocation submitted by Lead Counsel," id. at 18 (emphasis in original).

In the end, Lead Counsel's brief points to no real risks that the FDA would at some point

lessen, let alone vanish, as a fund from which to pay their attorney's fees and expenses. Certainly, as they point out, much work needed to be accomplished to defend the POA both at the district court level and on appeal. But the realistic worst-case scenario was that the POA would be rejected and they would have had to come up with a new manner to allocate the FDA among the claimants.

Certainly, as Lead Counsel point out, case law repeatedly notes that a lawyer working on a contingency basis incurs more risk than a lawyer paid on an hourly basis. See, e.g., Sakiko Fujiwara v. Sushi Yasuda Ltd., 58 F. Supp. 3d 424, 438-39 (S.D.N.Y. 2014); Shapiro v. JPMorgan Chase & Co., 2014 WL 1224666, at *21 (S.D.N.Y. Mar. 24, 2014). However, accepting a case on a contingency basis does not necessarily reflect a risk of non-payment. See, e.g., Goldberger, 209 F.3d at 52 ("the principal analytical flaw in counsel's argument lies in their assumption that there is a substantial contingency risk in every common fund case. . . . At least one empirical study has concluded that there appears to be no appreciable risk of non-recovery in securities class actions, because virtually all cases are settled.") (internal punctuation and citations omitted). In the cases cited by Lead Counsel for the proposition that contingency cases are inherently risky and deserving of a multiplier, additional risk factors increased the riskiness of litigation. See Sakiko Fujiwara, 58 F. Supp. 3d at 433 ("Plaintiffs faced risks in establishing their damages"); Shapiro, 2014 WL 1224666, at *21-22 (risk related to establishing defendants' liability, risk of proving that damages were attributable to defendant's conduct, and risks to counsel related to representation on a wholly-contingent fee basis).

Similarly, Lead Counsel cites numerous cases in support of its contention that its requested lodestar multiplier cap "is well within the range that courts in this Circuit and elsewhere have found reasonable for crosscheck purposes in other securities class actions." Pl.

Mem. at 19 & n.12. However, the cases cited are distinguishable because in those cases the courts held that there was some real and significant risk associated with the litigation. See Fleisher v. Phoenix Life Ins. Co., 2015 WL 10847814, at *1, *21 (S.D.N.Y. Sep. 9, 2015) (settlement was reached "on the eve of trial, after class certification and decertification briefing and rulings, voluminous cross-motions for summary judgment and rulings"); In re Hi-Crush Partners L.P. Sec. Litig., 2014 WL 7323417, at *16 (S.D.N.Y. Dec. 19, 2014) (plaintiffs "faced considerable risk that available evidence would not withstand a summary judgment motion, or that they would not be able to convince a jury to accept Lead Plaintiffs' theory over Defendants' competing narrative" and where "Defendants[']s . . . arguments in opposition to Lead Plaintiffs' loss causation and damages theories . . . created additional risk that in the absence of a settlement, the Class's recovery would have been commensurately smaller, or nonexistent"); In re Citigroup Inc. Secs. Litig., 965 F. Supp. 2d 369, 399 (S.D.N.Y. 2013) ("the factors that traditionally render securities cases most likely to survive a motion to dismiss and, in turn, to settle—such as prior government investigations—are absent here. . . . Thus, notwithstanding the likelihood of settlement, the risks involved in undertaking this litigation were real."). None of these risks were present with respect to Lead Counsel's litigation regarding the FDA. As the Second Circuit put it, "the hundreds of millions of dollars that have been flowing into the FDA were essentially guaranteed by the July 2011 settlement in the Trustee Litigation, a separate case led by separate counsel." See 599 F. App'x at 17. Thus, arguably more apt are those cases that have awarded a 1.0 multiplier (that is, no multiplier) where the risk is low. See, e.g., Goldberger, 209 F.3d at 54 (no multiplier); In re Zyprexa Products Liab. Litig., 2008 WL 1844000, at *5 (E.D.N.Y. Apr. 22, 2008) (no multiplier); In re Painewebber P'ship Litig., 2003 WL 21787410, at *2 (S.D.N.Y. Aug. 4, 2003) (no multiplier for work relating to settlement

allocation phase of class action); see also Bowling v. Pfizer, 132 F.3d 1147, 1151 (6th Cir. 1998) ("this case has settled so there is no risk. . . counsel do not merit the benefit of a multiplier.").

We have considered the risk factor along with all the other Goldberger factors. We recognize that many of these other factors favor Lead Counsel, as was explained in Judge Griesa's and the Second Circuit's opinions. 699 F. App'x at 16-17; 2015 WL 5333494, at *10. Additionally, we have considered the fact that counsel state that this will be their last application and that they undertake any remaining tasks in administering the FDA without compensation. We have also considered the fact that this award compensates for work on the NSF fund for which significant compensation had already been paid.

Nonetheless, the risk factor is, as the Second Circuit noted, "generally the most important [factor] in determining whether to award a lodestar multiplier." 699 F. App'x at 17 (citation omitted). The lack of risk here strongly weighs in favor of an extremely low or no multiplier. As the Second Circuit noted, "[t]here is no reason to award Lead Counsel a lodestar multiple based on the size of a recovery they did not secure." Id. Additionally, we have also considered, in the context of the first factor, that the newly-produced time sheets show extremely rich staffing of the case, combined with generous hourly rates.[5] See, e.g., Goldberger, 209 F.3d at 56 (concluding that it "was a permissible exercise of discretion" for the district court to decline "to award formal multipliers for risk and quality of representation" when the district court "did consider those factors by allowing counsel to recover generous hourly fees"); In re

[5] See 2011 Supp. Summary (hourly rates ranging from $750- $1000/hour for partners); 2012 Supp. Summary (same); 2013 Supp. Summary (same); 2014 Supp. Summary (same); 2015 Part 1 Supp. Summary (same); 2015 Part 2 Supp. Summary (hourly rates ranging from $750- $950/hour for partners); 2016 Supp. Summary (hourly rates ranging from $750-$1150/hour for partners); 2017 Supp. Summary (same); 2018 Supp. Summary (same).

KeySpan Corp. Sec. Litig., 2005 WL 3093399, at *16 (E.D.N.Y. Sept. 30, 2005) ("the use of rates which are higher than reasonable . . . . may be considered in this lodestar cross-check"); In re Indep. Energy Holdings PLC, 2003 WL 22244676, at *9 (S.D.N.Y. Sept. 29, 2003) (accounting for high hourly rates and that "the partner/associate rate at [plaintiffs' firm] (29.75%) is somewhat high" in determining lodestar multiplier); In re Arakis Energy Corp. Securities Litig., 2001 WL 1590512, at *16 (E.D.N.Y. Oct. 31, 2001) (considering high hourly rates in setting multiplier).[6]

After weighing all of these factors, we find that multiplier cap of 1.0 (that is, no multiplier) to be appropriate. With a lodestar of $19,866,014.25, this amounts to approximately 1.79% of the FDA fund.

CONCLUSION

For the foregoing reasons, Lead Counsel's motion for attorneys' fees (Docket # 1258) should be granted in the amount of $19,866,014.25

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court, with copies sent to the Hon. Colleen

[6] Following the lead of Judge Kaplan faced with a case with a similar large number of hours, our discussion regarding staffing "imputes no wrongdoing to any of the lawyers engaged in this case," who "have done a professional job." In re Weatherford Intern. Securities Litig., 2015 WL 127847, at *2 (S.D.N.Y. Jan. 5, 2015).

McMahon at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections or responses must be directed to Judge McMahon. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a), 6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: February 11, 2019

New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge